## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUSAN DUBE, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SIGNET JEWELERS LIMITED, MARK LIGHT, and MICHELE SANTANA,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Susan Dube ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Signet Jewelers Limited ("Signet" or the "Company"), with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Signet; and (c) review of other publicly available information concerning Signet.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a class action on behalf of persons or entities that acquired Signet securities between January 7, 2016, and June 3, 2016, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Signet is purportedly the world's largest retailer of diamond jewelry.   The Company claims to operate thousands of stores in North America, and some in the United Kingdom, through well-known brand names such as "Kay," "Jared," "Zales," and "Peoples Jewellers."

3.     On May 25, 2016, *BuzzFeed News* reported on the seemingly wide-spread occurrences of diamond swapping in connection with the Company's Kay stores.   The news report recounted the stories of multiple Kay customers whose diamonds were swapped out for much less expensive stones while the customers' jewelry was in the custody of Kay, typically for repair.

4.     Then, on May 26, 2016, the Company issued a press release announcing its first quarter fiscal year 2017 financial results.   Therein, the Company disclosed that its same store

sales for the period increased by only 2.4%, falling below the Company's previously issued first quarter 2017 guidance of 3% to 4%.  The Company also disclosed that it was lowering its fiscal year 2017 same store sales growth guidance from 3.0% – 4.5% down to 2.0% – 3.5%.

5.      On this news, Signet's stock price fell $11.37 per share, or 10.5%, to close at $97.00 per share on May 26, 2016, on unusually heavy trading volume.

6.      On June 3, 2016, the Company issued a press release entitled "Signet Jewelers Issues Statement Regarding Its Longstanding Commitment to Superior Customer Service and Rigorous Product Quality Procedures."  Therein, the Company appeared to confirm the existence of instances of "diamond swapping" at the Company's stores, though it denied that it was "systematic," stating:

> [W]e strongly object to recent allegations on social media, republished and grossly amplified, that our team members systematically mishandle customers' jewelry repairs or engage in 'diamond swapping.'  Incidents of misconduct, which are exceedingly rare, are dealt with swiftly and appropriately.

7.      On this news, Signet's stock price fell $4.04 per share, or 4.3%, to close at $88.19 per share on June 3, 2016.

8.      Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that the Company was experiencing difficulty ensuring the safety of customer's jewelry while in the custody of Signet's brands; (2) that employees at stores under at least one of Signet's brands (Kay) were swapping customers' stones for less valuable stones; (3) that the Company was experiencing a drop-off in customer confidence; (4) that the Company was facing increasing competitive pressures; (5) that, as result of the foregoing, the Company's financial performance was being negatively impacted; and (6) that, as a result of the foregoing,

Defendants' positive statements about Signet's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

12.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, the Company's shares are actively traded within this Judicial District.

13.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

14.     Plaintiff Susan Dube, as set forth in the accompanying certification, incorporated

by reference herein, purchased Signet securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

15.     Defendant Signet Jewelers Limited is a Bermuda corporation with its principal executive offices located in Bermuda.

16.     Defendant Mark Light ("Light") was, at all relevant times, the Chief Executive Officer ("CEO") of Signet.

17.     Defendant Michele Santana ("Santana") was, at all relevant times, the Chief Financial Officer ("CFO") of Signet.

18.     Defendants Light and Santana are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Signet's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

19.     Signet is purportedly the world's largest retailer of diamond jewelry.   The Company claims to operate thousands of stores in North America, and some in the United Kingdom, through well-known brand names such as "Kay," "Jared," "Zales," and "Peoples Jewellers."

### Materially False and Misleading
### Statements Issued During the Class Period

20.     The Class Period begins on January 7, 2016.  On that day, Signet issued a press release entitled, "Signet Jewelers Reports Holiday Season Same Store Sales up 4.9%."  Therein, the Company, in relevant part, stated:

> HAMILTON, Bermuda--(BUSINESS WIRE)--January 7, 2016--Signet Jewelers Limited ("Signet") (NYSE and LSE: SIG), the world's largest retailer of diamond jewelry, today announced its sales for the eight weeks ended December 26, 2015 ("Holiday Season") and guidance for the 13 weeks ("Fourth Quarter") ending January 30, 2016.
>
> **Holiday Season Sales Highlights:**
>
> - Total sales of $1,947.8 million, up 5.0% over the prior year.
>
> - Same store sales increased 4.9% compared to an increase of 3.6% in the prior year.
>
> - Financial guidance narrowed to top end of previously provided guidance.
>
> Mark Light, Chief Executive Officer, said, "Signet delivered excellent holiday sales as a result of the successful execution of our product, marketing, and omni-channel selling strategies, as well as our superior customer experience. These results were driven by broad-based success across strategic store brands, merchandise categories and selling channels. The implementation of store operations initiatives in the third quarter combined with investment in our recently launched innovative merchandising and marketing programs positioned Signet well for a strong fourth quarter and beyond.

"The continuation of strong sales and profitability combined with operating expenses that were in-line with expectations, including as-anticipated credit-related expense trends, enabled us to narrow our fourth quarter earnings guidance as well as our same store sales guidance to the top end of the previously provided guidance.

"I would like to thank all Signet team members very much for their dedication, hard work, and solid execution of our strategies during the holiday selling period."

**Fourth Quarter Financial Guidance:**

|  | **Currently** | Formerly |
|---|---|---|
| Same Store Sales | **4.6% to 5.0%** | 3.5% to 5.0% |
| Earnings per Share | **$3.44 to $3.50** | $3.30 to $3.50 |
| Adjusted Earnings per Share | **$3.54 to $3.60** | $3.40 to $3.60 |

**Holiday Season Fiscal 2016 Sales Highlights:**

Total sales were $1,947.8 million, up $93.4 million or 5.0%, compared to $1,854.4 million in the eight weeks ended December 27, 2014 ("prior year"). Total sales at constant exchange rate increased 6.3% compared to prior year. Same store sales increased 4.9% compared to an increase of 3.6% in the prior year driven primarily by mall-based and outlet concepts in the U.S. as well as Ernest Jones stores in the U.K. Signet's e-commerce sales in the Holiday Season were $139.7 million, up $13.7 million or 10.9% compared to $126.0 million in the prior year.

- Sterling Jewelers division results were driven primarily by higher sales at Kay Jewelers and the success of key collections and categories such as recently introduced Ever Us two-stone rings as well as diamond earrings and bracelets. Jared delivered higher sales year-over-year driven by the combined impact of new consumer-research-driven initiatives around store operations, marketing, and merchandising.

- Zale division sales were driven by material increases at the flagship Zales stores as well as Piercing Pagoda kiosks. Ever Us and select other fashion and bridal brands were important drivers at Zales; as well as gold jewelry sales in the kiosk channel.

- UK Jewelry division total sales were driven by higher same store sales largely offset by unfavorable foreign currency exchange rates. Same store sales increases were driven primarily by branded bridal, diamond fashion jewelry, and beads – most notably at Ernest Jones.

21.     On March 24, 2016, Signet issued a press release entitled, "Signet Jewelers Reports Excellent Fourth Quarter and Fiscal 2016 Financial Results."  Therein, the Company, in relevant part, stated:

> HAMILTON, Bermuda--(BUSINESS WIRE)--March 24, 2016--Signet Jewelers Limited ("Signet") (NYSE:SIG), the world's largest retailer of diamond jewelry, today announced its results for the 13 weeks ("fourth quarter Fiscal 2016") and 52 weeks ("Fiscal 2016") ended January 30, 2016.

> **Highlights:**

> - Annual total sales of $6.55 billion increased 14.2%.
>
> - Fiscal 2016 same store sales increased 4.1%; diluted earnings per share ("EPS") grew nearly 24%; adjusted EPS grew nearly 22%.
>
> - Fourth quarter same store sales increased 4.9%; EPS grew over 20%; adjusted EPS grew over 18%.
>
> - Increased three-year net synergy target due to strong integration progress to a range of $225 million - $250 million, nearly a 50% increase (February 1, 2015 through January 31, 2018), with the majority of the remaining synergies to be realized in the 52 weeks ending January 28, 2017 ("Fiscal 2017").

> Mark Light, Chief Executive Officer of Signet Jewelers, said, "Signet had an excellent finish to another strong year with annual sales of $6.55 billion and comp sales growth of 4.1%. Once again, we delivered strong top and bottom line growth with results driven by product innovation; targeted marketing; and supported by delivering superior customer service by the best store teams in retail. These and many other competitive strengths such as a diversified real estate portfolio, customer finance programs, and custom jewelry and repair continue to position Signet long term as a profitable growth company in the specialty retail sector.

> "The integration of Zale continues to go well, and we remain confident in our recently raised synergies. We see an expanded and accelerated level of financial contribution from the deep pipeline of initiatives our teams are working on to unleash the long term potential of a fully integrated Signet. We remain committed to maintaining profitable growth while balancing investment back into the business with shareholder return.

As we start our new fiscal year, we are pleased with our progress quarter to date as indicated by the financial guidance we have provided. In Fiscal 2017, we will continue our disciplined execution of our focused strategies that include our omni-channel approach to customer service; product innovation and fresh line extensions; and maximizing the effectiveness of marketing through the use of customer segmentation research. All of these efforts combined with an accelerated pace of store openings give us confidence in achieving another year of significant EPS growth, as evidenced by our newly-initiated annual guidance.

"I want to thank all Signet team members for their contributions to our results and for all their hard work in delivering the fourth quarter and Fiscal 2016."

*    *    *

**Financial Guidance:**

Signet is initiating annual earnings guidance along with its customary quarterly guidance. The establishment of annual guidance is to more effectively communicate the impact and timing that the upwardly revised synergies are expected to have. In addition, to foster a more long-term view of its model, Signet intends to continue with annual earnings guidance *in lieu of quarterly* earnings guidance after Fiscal 2017.

***[The Remainder of This Page Is Intentionally Left Blank]***

*13 Weeks Ended April 30, 2016 ("First Quarter Fiscal 2017")*

| | |
|---|---|
| Same store sales | 3% to 4% |
| EPS | $1.80 to $1.87 |
| Adjustments (purchase accounting and transaction/integration costs) | ($0.10) to ($0.08) |
| Adjusted EPS | $1.90 to $1.95 |

First quarter Fiscal 2017 weighted average shares outstanding are anticipated to be 78.8 million based upon approximately $125 million of share repurchases.

*Fiscal 2017*

| | |
|---|---|
| Same store sales | 3.0% to 4.5% |
| EPS | $7.88 to $8.23 |
| Adjustments (purchase accounting and transaction/integration costs) | ($0.37) to ($0.32) |
| Adjusted EPS | $8.25 to $8.55 |
| | |
| Effective tax rate | Approximately 28% |
| Capital expenditures | $315 million to $365 million |
| Net selling square footage growth | 3.0% to 3.5% |
| Net synergies | $158 million to $175 million |

Capital expenditures will be driven primarily by new Kay and Jared stores, store remodels, and I/T to support global implementations. The higher level of capital expenditures over Fiscal 2016 is in part due to an increase in forecasted new store growth. Our current estimated net selling square footage growth of 3.0% to 3.5% (4.0% to 4.5% when excluding regional closures) is greater than previous guidance of 2.0% to 3.0%. Most of Signet's new square footage growth is slated for real estate venues other than enclosed malls.

* * *

**Fourth Quarter Fiscal 2016 Sales Highlights:**

Signet's total sales were $2,392.6 million, up $116.2 million or 5.1%, compared to $2,276.4 million in the 13 weeks ended January 31, 2015 ("fourth quarter Fiscal 2015"). Same store sales increased 4.9% compared to an increase of 4.2% in the fourth quarter Fiscal 2015 driven primarily by diamond fashion jewelry. E-commerce sales in the fourth quarter were $166.3 million, up $16.7 million or 11.2% compared to $149.6 million in the fourth quarter Fiscal 2015. By operating segment:

- Sterling Jewelers' same store sales increased 5.0%. Average transaction value increased 6.0% and the number of transactions decreased 2.3%. This was driven principally by strong sales of diamond fashion jewelry.

- Zale Jewelry's same store sales increased 4.4%. Average transaction value increased 6.2%, while the number of transactions decreased 2.1%. This was driven principally by strong sales of diamond fashion jewelry and

bridal.

- Piercing Pagoda's same store sales increased 6.4%. Average transaction value increased 10.0%, while the number of transactions decreased 2.7%. This was driven principally by strong sales of 14 kt. gold and diamond jewelry.

- UK Jewelry's same store sales increased 4.7%. Average transaction value increased 3.7% and the number of transactions increased 1.1%. This was driven principally by strong sales of diamond jewelry and prestige watches.

22.     On the same day, Signet filed its Annual Report with the SEC on Form 10-K for the fiscal year ended January 30, 2015.  The Company's Form 10-K was signed by Defendant Santana, and reaffirmed the Company's financial results announced in the press release issued the same day.

23.     The above statements contained in ¶¶20-22 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, these statements were false and/or misleading statements and/or failed to disclose: (1) that the Company was experiencing difficulty ensuring the safety of customer's jewelry while in the custody of Signet's brands; (2) that employees at stores under at least one of Signet's brands (Kay) were swapping customers' stones for less valuable stones; (3) that the Company was experiencing a drop-off in customer confidence; (4) that the Company was facing increasing competitive pressures; (5) that, as result of the foregoing, the Company's financial performance was being negatively impacted; and (6) that, as a result of the foregoing, Defendants' positive statements about Signet's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

24.     On May 25, 2016, *BuzzFeed News* reported on the seemingly wide-spread occurrences of diamond swapping in connection with the Company's Kay stores.  The news

report recounted the stories of multiple Kay customers whose diamonds were swapped out for much less expensive stones while the customers' jewelry was in the custody of Kay, typically for repair.

25.     Then, on May 26, 2016, the Company issued a press release announcing its first quarter fiscal year 2017 financial results.  Therein, the Company, in relevant part, stated:

> HAMILTON, Bermuda--(BUSINESS WIRE)--May 26, 2016--Signet Jewelers Limited ("Signet") (NYSE: SIG), the world's largest retailer of diamond jewelry, today announced its results for the 13 weeks ended April 30, 2016 ("first quarter Fiscal 2017").

> **Highlights:**

> - Diluted earnings per share ("EPS") grew 26.4%. Adjusted EPS grew 20.4%.

> - Same store sales up 2.4%. Total sales $1.6 billion up 3.2%. Total sales at constant exchange rate up 3.9%.

> - Annual earnings guidance reaffirmed.

> - Zale acquisition integration progressing well; synergies remain on-target.

> - Repurchased over 1.1 million shares in first quarter for $125.0 million.

> - Conducting strategic evaluation of credit portfolio; first quarter credit metrics improved sequentially and in-line with expectations.

> Mark Light, Chief Executive Officer of Signet Jewelers said, "Signet delivered another period of solid performance resulting in record first quarter EPS and strong operating margin expansion. We gained profitable market share despite a challenging retail environment through strong sales of Ever Us and other fashion jewelry collections as well as select branded bridal. Our 26% EPS growth was driven by higher same store sales and total sales along with solid expense management and synergies, leading to 190 basis points of operating margin expansion. In addition to delivering earnings results at the top end of our guided range, we achieved sales growth across real estate formats and in each of our divisions and our credit metrics showed strong sequential improvement.

> Mr. Light added, "This Sunday marks the two-year anniversary of the close of our acquisition of Zale. The integration continues to go extremely well across all aspects of our business. The synergies we expect to deliver this year will be

mostly driven by operating expense savings as a result of the sound investments and strategic management of the integration over the past couple of years. Learnings from our customer segmentation study and business results since the acquisition have validated our growth assumptions, and we have an enviable position with the three leading U.S. brands in a heavily fragmented and growing middle market jewelry industry. We are pursuing the opportunity to grow square footage both near-term, driven principally by Kay, and medium-term driven more by Zales.

"I want to thank all Signet team members for their contributions to our results. Their superior experience and dedication is the key to our ability to deliver consistently solid performance in an ever-changing environment."

*       *       *

**Financial Guidance:**

*13 weeks ended July 30, 2016 (2nd Quarter)*

| | |
|---|---|
| Same store sales | 1.0% to 2.0% |
| EPS | $1.39 to $1.46 |
| Adjustments (purchase accounting and integration costs) | ($0.10) to ($0.08) |
| Adjusted EPS | $1.49 to $1.54 |

*Fiscal 2017 (Annual)*

| | |
|---|---|
| Same store sales | 2.0% to 3.5% |
| EPS | $7.88 to $8.23 |
| Adjustments (purchase accounting and integration costs) | ($0.37) to ($0.32) |
| Adjusted EPS | $8.25 to $8.55 |
| Effective tax rate | 27% to 28% |
| Capital expenditures | $315 million to $365 million |
| Net selling square footage growth | 3.0% to 3.5% |

Capital expenditures will be driven primarily by new Kay and Jared stores, store remodels, and I/T to support global implementations. Most of Signet's new square footage growth is slated for real estate channels other than enclosed malls.

26.    On this news, Signet's stock price fell $11.37 per share, or 10.5%, to close at $97.00 per share on May 26, 2016, on unusually heavy trading volume.

27.    The above statements contained in ¶25 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, these statements were false and/or misleading statements and/or failed to

disclose: (1) that the Company was experiencing difficulty ensuring the safety of customer's

jewelry while in the custody of Signet's brands; (2) that employees at stores under at least one of

Signet's brands (Kay) were swapping customers' stones for less valuable stones; (3) that the

Company was experiencing a drop-off in customer confidence; (4) that the Company was facing

increasing competitive pressures; (5) that, as result of the foregoing, the Company's financial

performance was being negatively impacted; and (6) that, as a result of the foregoing,

Defendants' positive statements about Signet's business, operations, and prospects, were false

and misleading and/or lacked a reasonable basis.

### Disclosures at the End of the Class Period

28.    On June 3, 2016, the Company issued a press release entitled "Signet Jewelers

Issues Statement Regarding Its Longstanding Commitment to Superior Customer Service and

Rigorous Product Quality Procedures."  Therein, the Company appeared to confirm the existence

of instances of "diamond swapping" at the Company's stores, though it denied that it was

"systematic," stating:

 **HAMILTON, Bermuda, June 3, 2016 –** Signet Jewelers Limited ("Signet")
(NYSE:SIG), the world's largest retailer of diamond jewelry, today issued the
following statement responding to misleading allegations about its business
practices and reaffirming its rigorous product quality practices:

"Signet Jewelers' entire team culture is directed toward ensuring that we
earn and maintain customer trust.  Signet Jewelers has a 100-year history
of providing products of impeccable quality and delivering superior
customer service.  This commitment to customer care has allowed Signet
to satisfy many millions of customers, year after year.  We understand that
every piece of jewelry is much more than an accessory - that it is often a
reflection of a deeply personal and meaningful moment.  Signet has in
place vigorous product quality procedures that are consistently
monitored.  Our teams review the characteristics of the item with the
customer both when they drop their jewelry off and when they pick it up
following service or repair to ensure their confidence in the safe return of
their original piece.  Although our customer service team has not received
an unusual number of complaints related to these procedures, we take

every customer concern seriously and make every effort to understand, resolve and learn from each one – and when issues arise, we do everything we can to make things right. In our design and service centers, we manage more than 4,000,000 service and repair transactions each year, and over 99% are completed without negative customer feedback.  Of those generating negative customer feedback, many are related to either repairs taking longer than expected due to our high standards, or shipping delays, which we work diligently to address in cooperation with our shipping partners.  Signet is an industry leader and is an accredited member of the Better Business Bureau with an A+ rating.

In addition, we strongly object to recent allegations on social media, republished and grossly amplified, that our team members systematically mishandle customers' jewelry repairs or engage in "diamond swapping."  Incidents of misconduct, which are exceedingly rare, are dealt with swiftly and appropriately.

Signet Jewelers remains firmly committed to responding to all customer concerns, upholding the highest standards of quality and service and continuing to maintain our customers' trust."

Mark Light, Chief Executive Officer of Signet Jewelers, said "The trust of our customers is not something we take lightly. It has been an honor to help our customers celebrate life and express love through our high quality jewelry for almost 100 years, and dedication to superior customer service and quality control is integral to who we are and how we conduct business. Our guests are our most precious commodity, and we are committed to maintaining their trust."

29.     On this news, Signet's stock price fell $4.04 per share, or 4.3%, to close at $88.19 per share on June 3, 2016.

## CLASS ACTION ALLEGATIONS

30.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons or entities that acquired Signet securities between January 7, 2016, and June 3, 2016, inclusive (the "Class Period") and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

31.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Signet's securities were actively traded on the New York Stock Exchange (the "NYSE").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Millions of Signet shares were traded publicly during the Class Period on the NYSE.  As of March 18, 2016, Signet had 78,384,481 common shares outstanding.  Record owners and other members of the Class may be identified from records maintained by Signet or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

32.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

33.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

34.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Signet; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

35.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

36.     The market for Signet's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Signet's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Signet's securities relying upon the integrity of the market price of the Company's securities and market information relating to Signet, and have been damaged thereby.

37.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Signet's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Signet's business, operations, and prospects as alleged herein.

38.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the

damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Signet's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

39.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

40.     During the Class Period, Plaintiff and the Class purchased Signet's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

41.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the

federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Signet, his/her control over, and/or receipt and/or modification of Signet's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Signet, participated in the fraudulent scheme alleged herein.

### APPLICABILITY OF PRESUMPTION OF RELIANCE
### (FRAUD-ON-THE-MARKET DOCTRINE)

42.     The market for Signet's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Signet's securities traded at artificially inflated prices during the Class Period.  On January 7, 2016, the Company's stock closed at a Class Period high of $133.28 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Signet's securities and market information relating to Signet, and have been damaged thereby.

43.     During the Class Period, the artificial inflation of Signet's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Signet's business, prospects, and operations.   These material misstatements and/or omissions created an unrealistically positive assessment of Signet and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities

at such artificially inflated prices, and each of them has been damaged as a result.

44.     At all relevant times, the market for Signet's securities was an efficient market for the following reasons, among others:

(a)     Signet stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Signet filed periodic public reports with the SEC and/or the NYSE;

(c)     Signet regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Signet was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

45.     As a result of the foregoing, the market for Signet's securities promptly digested current information regarding Signet from all publicly available sources and reflected such information in Signet's stock price. Under these circumstances, all purchasers of Signet's securities during the Class Period suffered similar injury through their purchase of Signet's securities at artificially inflated prices and a presumption of reliance applies.

46.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128

(1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

47.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Signet who knew that the statement was false when made.

**FIRST CLAIM**
**Violation of Section 10(b) of The Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

48.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

49.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Signet's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

50.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Signet's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

51.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Signet's financial well-being and prospects, as specified herein.

52.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a

course of conduct as alleged herein in an effort to assure investors of Signet's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Signet and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

53.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

54.     The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such

defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Signet's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

55.      As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Signet's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Signet's securities during the Class Period at artificially high prices and were damaged thereby.

56.      At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Signet was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Signet securities, or,

if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

57.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

58.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

59.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

60.     The Individual Defendants acted as controlling persons of Signet within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

61.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

62.     As set forth above, Signet and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  August 25, 2016                    **GLANCY PRONGAY & MURRAY LLP**


                                           By: *s/ Lesley F. Portnoy*
                                           Lesley F. Portnoy (LP-1941)
                                           122 East 42nd Street, Suite 2920
                                           New York, NY 10168
                                           Telephone: (212) 682-5340
                                           Facsimile: (212) 884-0988
                                           lportnoy@glancylaw.com

                                                   -and-

                                           **GLANCY PRONGAY & MURRAY LLP**
                                           Lionel Z. Glancy
                                           Robert V. Prongay
                                           Charles H. Linehan
                                           1925 Century Park East, Suite 2100
                                           Los Angeles, CA 90067
                                           Telephone:  (310) 201-9150
                                           Facsimile:   (310) 201-9160

                                           **LAW OFFICES OF HOWARD G. SMITH**
                                           Howard G. Smith
                                           3070 Bristol Pike, Suite 112
                                           Bensalem, PA 19020
                                           Telephone: (215) 638-4847
                                           Facsimile: (215) 638-4867

                                           *Attorneys for Plaintiff*

**SWORN CERTIFICATION OF PLAINTIFF**

Signet Jewelers Limited, SECURITIES LITIGATION

I, Susan Dube, certify:

1.  I have reviewed the complaint and authorized its filing.

2.  I did not purchase Signet Jewelers Limited, the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.  My transactions in Signet Jewelers Limited, during the class period set forth in the Complaint are as follows:

    See Attached Transactions

5.  I have not served as a representative party on behalf of a class under this title during the last three years except as stated:

6.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

    ____ Check here if you are a current employee or former employee of the defendant Company.

    I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: 8/5/2016                    _Susan Dube_____
                                           (Please Sign Your Name Above)

**Susan Dube's Transactions in**
**Signet Jewelers Limited (SIG)**

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|----------|------------|
| 02/04/2016 | Bought | 45 | $110.2970 |