UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUSAN DUBE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SIGNET JEWELERS LIMITED, MICHAEL BARNES, MARK LIGHT, RONALD RISTAU and MICHELE SANTANA,<br><br>Defendants. | Case No. 1-16-CV-06728-JMF<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 1

II.    JURISDICTION AND VENUE ........................................................................... 7

III.   PARTIES ............................................................................................................. 8

IV.    SUBSTANTIVE ALLEGATIONS:  SIGNET MISLED INVESTORS ABOUT
       MATERIAL RISKS TO ITS REPUTATION ................................................... 10

       A.     Signet Misled Investors About Risks to Its Reputation from Pervasive Sexual
              Harassment in Its Corporate Culture................................................... 10

              1.     The *Jock* Lawsuit and Arbitration........................................... 10

              2.     Sexual Harassment Was Pervasive at Signet ............................ 11

              3.     Signet Knew About the Rampant Sexual Harassment at the Company
                     and the Explosive Allegations of Sexual Harassment in the *Jock*
                     Arbitration................................................................................ 16

              4.     Signet Made Many Different Misleading Statements About the
                     Existence and Risks of Pervasive Sexual Harassment at the Company ... 18

       B.     Signet Misled Investors About Risks to Its Reputation from Occurrences of
              Fraudulent Diamond Swapping ........................................................... 19

              1.     The Importance of Customer Trust to Signet's Business ......................... 19

              2.     Fraudulent "Diamond Swapping" Occurred at Signet Retail
                     Locations During the Class Period .......................................... 20

              3.     Signet Management Was Aware of Occurrences of Fraudulent
                     Diamond Swapping................................................................... 24

V.     SUBSTANTIVE ALLEGATIONS:  SIGNET MISLED INVESTORS ABOUT ITS
       CREDIT PORTFOLIO....................................................................................... 25

       A.     Signet Is a Consumer Creditor............................................................ 25

       B.     Signet's Lending Standards Were Shoddy During the Class Period ................... 26

       C.     Signet Historically Hid Details About the Quality of Its Credit Portfolio
              and Its Calculation of Delinquencies .................................................. 28

       D.     The Amount of Money Owed to Signet Increased Significantly as a Result
              of Its Lax Lending Standards............................................................... 31

       E.     The Quality of Signet's Credit Portfolio Declined During the Class Period........ 32

       F.     Signet Management Knew About the Very Low Quality of Signet's Credit
              Portfolio and the Sharp Increase in Signet's High-Risk Borrowers .................... 35

VI.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................................... 37

       A.     Defendants' False and Misleading Statements in 2013 ......................... 37

       B.     Defendants' False and Misleading Statements in 2014 ......................... 41

i

C.      Defendants' False and Misleading Statements in 2015 ........................................ 49

D.      Defendants' False and Misleading Statements in 2016 ........................................ 60

VII.    LOSS CAUSATION ................................................................................................. 74

A.      May 25, 2016 ........................................................................................................ 74

B.      May 26, 2016 ........................................................................................................ 75

C.      June 2, 2016 .......................................................................................................... 77

D.      June 3, 2016 .......................................................................................................... 80

E.      August 25, 2016 ................................................................................................... 81

F.      February 27, 2017 ................................................................................................ 83

VIII.   ADDITIONAL SCIENTER ALLEGATIONS ....................................................... 84

A.      Defendants Each Knew About Pervasive Sexual Harassment at the Company
        and Related Allegations in the *Jock* Arbitration ................................................ 84

B.      Defendants Signet, Light and Santana Each Knew About the Poor Quality of
        Signet's Credit Portfolio and the Sharp Increase in Its High-Risk Borrowers ..... 86

C.      Defendants Signet, Light and Santana Each Knew About Occurrences of
        Fraud at Signet's Retail Locations ...................................................................... 89

IX.     CLASS ACTION ALLEGATIONS ......................................................................... 91

X.      PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ........... 92

XI.     NO SAFE HARBOR ............................................................................................... 94

XII.    FIRST CLAIM ........................................................................................................ 95

        Violation of Section 10(b) of The Exchange Act and  Rule 10b-5 Promulgated
        Thereunder Against All Defendants ...................................................................... 95

XIII.   SECOND CLAIM ................................................................................................... 96

        Violation of Section 20(a) of The Exchange Act Against the Individual Defendants ...... 96

XIV.    PRAYER FOR RELIEF .......................................................................................... 97

XV.     JURY TRIAL DEMANDED .................................................................................. 98

Lead Plaintiffs Susan Dube and Lyubomir Spasov (collectively, "Plaintiffs" or "Lead Plaintiffs"), allege the following by and through their attorneys and on behalf of all other persons and entities similarly situated.  All of the following allegations are made upon information and belief, except those allegations concerning Plaintiffs, which are alleged upon personal knowledge.  Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation:  (a) review and analysis of regulatory filings made by Signet Jewelers Limited ("Signet" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Signet; (c) review of other publicly available information concerning Signet; and (d) interviews with former employees of Signet.

## I.    INTRODUCTION

1.     This is a class action (the "Action") on behalf of persons or entities that acquired Signet securities between August 29, 2013 and February 27, 2017, inclusive (the "Class Period").  The Action seeks to recover damages and to obtain other remedies for Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Signet is the world's largest retailer of diamond jewelry.  The Company operates thousands of jewelry stores in North America and the United Kingdom under well-known trademarks including "Kay," "Jared," "Zales," "J.B. Robinson" and "Peoples Jewellers."

3.     Signet's business, like that of all diamond jewelers, is unusually dependent on the reputation of its brands.  Most of Signet's target customers purchase diamonds in connection with the most treasured moments in their lives—as engagement rings for their wedding or as a gift to commemorate a special anniversary—and most recipients of diamond jewelry are women.  These target customers are highly unlikely to purchase diamonds to commemorate cherished life moments from a store that has a nausea-inducing reputation for systematically abusing its female

1

employees by treating them as sexual objects.  In the same vein, Signet's business is highly dependent on customer trust—customers are unlikely to buy diamonds from a jeweler if they lack confidence that the diamonds they are buying are authentic.  As Defendant Mark Light, Chief Executive Officer of Signet, has stated, "I've been selling jewelry my whole life, over 30 years, and the most important part of selling jewelry is trust."[1]  Signet recognizes that establishing and maintaining customer trust is critical to its business; Signet stated in its July 3, 2016 Form 8-K SEC filing that "Signet Jewelers' entire team culture is directed toward ensuring that we earn and maintain customer trust."[2]

4.      Signet is more than just a diamond-jewelry retailer—it is also a lender.  In order to facilitate its sales of jewelry, Signet extends customers loans on all or a portion of the cost of the jewelry through its in-house finance program.  This in-house finance program is a significant part of Signet's business:  approximately one fifth of Signet's operating profit comes from its in-house customer finance program.[3]  More than sixty percent of Signet's sales during Signet's 2016 fiscal year[4] were made in whole or in part using credit from Signet.[5]

5.      Plaintiffs bring this Action because during the Class Period Signet knowingly misled the investing public about two important aspects of its business:  (1) Signet failed to disclose that that its brand reputation hung by a thread, both because (a) blatant sexual harassment of female employees was a pervasive feature of its corporate culture, such that even Signet CEO Defendant Mark Light himself conditioned women's success at the Company on

---

[1] Signet Jewelers Ltd., Fiscal 2017 Second Quarter Earnings Conference Call, at 10 (Aug. 25, 2016).

[2] Signet Jewelers Ltd., Current Report (Form 8-K), at Ex. 99-1 (July 3, 2016).

[3] Signet Jewelers Ltd., Annual Report (Form 10-K), at 20-40 (Mar. 24, 2016).

[4] Signet's fiscal year ends on or about January 30 and runs eleven months ahead of the calendar year.  For example, Signet's fiscal year 2016 began on January 31, 2015 and ended on January 30, 2016.

[5] Signet Jewelers Ltd., Annual Report (Form 10-K), at 20 (Mar. 24, 2016).

their having sex with him, and (b) fraudulent activity at its retail locations was destroying, and would continue to destroy, customers' trust in its brand; and (2) Signet omitted material facts about the quality of its credit portfolio, namely, that the quality of the portfolio was declining sharply during the Class Period.

6.    *First*, Signet failed to disclose that its brand reputation, which was and is critical to its performance, was at risk of devastating injury.  Signet was at constant risk of losing its reputation during the Class Period because sexual harassment at Signet was rampant, and proof of this rampant sexual harassment was at risk of being disclosed to the public, and because Signet retail stores were fraudulently swapping false stones for precious stones, and evidence of this fraudulent activity was likely to be publicized.

7.    Sexual harassment was rampant at Signet before and during the Class Period. Signet was aware that clear evidence of this sexual harassment—a slew of declarations attesting to disgusting abuses at Signet—existed during the Class Period and could be released to the public in the course of an ongoing legal proceeding, as it ultimately was, causing immense harm to Signet's reputation and value.  In 2008, a group of female employees filed a class action lawsuit against Signet's wholly-owned subsidiary, Sterling Jewelers Inc. ("Sterling"), alleging that Signet discriminated in employment decisions on the basis of gender and that such discrimination was "exacerbated" by rampant sexual harassment at Signet.  That same year the case was referred to arbitration.  In 2013, Plaintiffs submitted a class certification motion under seal to which they attached over 250 declarations from former female and male employees attesting to rampant, nauseating sexual harassment at Sterling, including a declaration that CEO Mark Light conditioned women's success at the Company on their having sex with him.  Even though Signet bore an obvious and material risk that damning evidence of rampant sexual

harassment at Sterling could be made public, including through the dissemination of these declarations, Signet consciously chose for years not to warn the investing public about this risk.

8.       That Signet knew about the rampant sexual harassment at the Company and the declarations submitted in the arbitration cannot be disputed seriously.  Signet CEO and Board member Mark Light himself sexually harassed women.  Moreover, the Chairman of the Board of Signet recently admitted flat out that the Board was aware of the allegations of sexual harassment in the arbitration since 2008, including the allegations against Mark Light.

9.       Information about the rampant sexual harassment at Signet, including the damning information in the declarations produced in the arbitration, was highly material to reasonable investors.  Because Signet's success was and is so highly dependent on its reputation, investors were keenly interested in information that obliterated Signet's positive public image— information that tied customer's wedding rings and anniversary gifts to nauseating sexual misconduct.  Revelation of this information caused substantial losses to Signet's investors. When the declarations were made public, *The Washington Post* summarized their contents in an article, and upon publication of that article, Signet's share price fell $9.29 per share, or approximately 13%, to close at $63.59 per share on February 28, 2017, on unusually heavy trading volume.  Investors recognized the extensive damage the sexual harassment allegations would do to Signet's business.

10.      Signet also failed to disclose fraudulent activity at its retail locations that was likely to destroy its brand reputation:  Signet failed to disclose that on multiple occasions during the Class Period, when customers left their diamond jewelry at a Kay store to be cleaned or repaired, the authentic diamonds in the jewelry were replaced with false diamonds.

11.     Signet's management knew about these occurrences of fraud at its retail locations. The customers affected by the fraud complained about the fraud to the Company.  According to a confidential witness, Signet CEO Mark Light received daily reports from all divisions of the Company, including reports regarding customer complaints.  On information and belief, such daily reports likely would have included any complaints alleging criminal fraud.  Moreover, given that, "[p]rimary factors in determining customer buying decisions in the jewelry sector include customer confidence in the retailer," as Signet stated in in its fiscal year 2016 Form 10-K SEC filing, Signet management, including Defendants Mark Light and Michele Santana, would have been informed about occurrences of criminal fraud that threatened consumer confidence in Signet.[6]  Likewise, given the importance of occurrences of fraud to the business of a diamond jeweler, Signet was under a duty to disclose fraud at its retail locations to its investors, and this information was material to reasonable investors.[7]

12.     Signet's failure to disclose the fraudulent activity at its retail locations artificially inflated the value of Signet's shares, and the revelation of this information resulted in substantial losses to Class members.  On May 25, 2016 at 3:04 PM EDT, BuzzFeed News reported on occurrences of diamond swapping at Kay stores.[8]  The news report recounted the stories of multiple Kay customers whose diamonds were swapped out for considerably less expensive stones while the customers' jewelry was in the custody of Kay.[9]  This fraud occurred at multiple retail locations owned and operated by Signet, including Kay and Zales.  The next day, after the

---

[6] Signet Jewelers Ltd., Annual Report (Form 10-K), at 29 (Mar. 24, 2016).

[7] *Id.*

[8] Stephanie McNeal, *Women Say Kay Swapped Their Diamond for a Stone of Worse Quality After a Repair*, BuzzFeed News (May 25, 2016), *available at* https://www.buzzfeed.com/stephaniemcneal/women-say-kay-0020swapped-their-diamonds?utm_term=.ot9MEl0wB#.ll1z5a9vb.

[9] *See id.*

market absorbed the revelation of this fraud, Signet's share price fell $11.37 per share, or 10.5%, to close at $97.00 per share, on unusually heavy trading volume.

13.     On June 3, 2016, the Company issued a press release entitled "Signet Jewelers Issues Statement Regarding Its Longstanding Commitment to Superior Customer Service and Rigorous Product Quality Procedures" in which the Company confirmed the occurrence of "diamond swapping" misconduct at the Company's stores.[10]   On this news, Signet's share price fell $4.04 per share, or 4.3%, to close at $88.19 per share on June 3, 2016.

14.     *Second,* Signet failed to disclose that the quality of the credit portfolio it held as part of its in-store financing program was declining sharply by important measures during the Class Period.   Importantly, Signet failed to disclose that the number of personal bankruptcy submissions filed in the fourth quarter of calendar year 2015 that named Signet as a creditor increased approximately forty percent above the number of such filings in the first quarter of that year, and the number of such filings in the first quarter of 2016 skyrocketed seventy-two percent over the number of such filings for the first quarter of calendar year 2015.   Signet clearly had this information within its possession—the clerk of the U.S. Bankruptcy Court notifies all creditors named in a bankruptcy filing as a matter of course.   And Signet's management clearly was aware of this information—Individual Defendants Mark Light and Michele Santana both signed filings expressly stating that management routinely reviewed calculations that included the number of bankruptcy filings naming Signet as a creditor.[11]

15.     This information about the sharp decline in the quality of Signet's credit portfolio was material to a reasonable investor in Signet, and Signet had a duty to disclose it.   When

---

[10] Signet Jewelers Ltd., Press Release, *Signet Jewelers Issues Statement Regarding Its Longstanding Commitment to Superior Customer Service and Rigorous Product Quality Procedures* (June 3, 2016).

[11] Signet Jewelers Ltd., Annual Report (Form 10-K), at 19 (Mar. 24, 2016).

Signet first hinted that the quality of its credit portfolio had become problematic by announcing on May 26, 2016 that it had hired a firm to review its credit portfolio, Signet's share price fell $11.37 per share, or 10.5%, to close at $97.00 per share, on unusually heavy trading volume.[12]

16.    A week later, on June 2, 2016, an article in *Grant's Interest Rate Observer* first revealed that bankruptcy filings naming Signet as creditor had increased seventy-two percent year-over-year.[13]  Within hours of the publication of this article, Signet shares dropped 14%, prompting multiple news articles about how revelation of the information in the *Grant's* article had caused the shares to plummet.[14]

17.    Signet's failure to disclose key information about the declining quality of its credit portfolio, including information about bankruptcy filings naming Signet as creditor, while making statements suggesting the quality of its credit portfolio remained stable, with no significant changes, artificially inflated the value of Signet's shares, and the revelation of this information resulted in substantial losses to Class members.

18.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

19.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

---

[12] Signet Jewelers Ltd., Current Report (Form 8-K), at 18 (May 26, 2016).

[13] James Grant, *Lending Clubbed*, Grant's Interest Rate Observer, 10 (June 2, 2016).

[14] *See, e.g.*, Bloomberg News, *Signet Drops after Grant's Investment Newsletter Sparks Concerns* (June 2, 2016), *available     at*     https://www.bloomberg.com/news/articles/2016-06-02/signet-drops-after-grant-s-investment-newsletter-sparks-concerns.

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

21.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).   Substantial acts in furtherance of the alleged fraud, as well as transactions constituting the fraud, including the dissemination of materially false and/or misleading information in connection with the sale and purchase of Signet securities, occurred in this Judicial District.   In addition, the Company's shares are traded actively on the New York Stock Exchange, located within this Judicial District, and the Company otherwise transacts business in this District, including through its retail locations located in this District.

22.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### III.     PARTIES

23.     Plaintiff Susan Dube, as set forth in the previously filed certification, incorporated by reference herein, purchased Signet securities during the Class Period and suffered damages as a result of the federal securities law violations alleged herein.

24.     Plaintiff Lyubomir Spasov, as set forth in the previously filed certification, incorporated by reference herein, purchased Signet securities during the Class Period and suffered damages as a result of the federal securities law violations alleged herein.

25.     Defendant Signet Jewelers Limited is a Bermuda corporation with its principal executive offices located in Bermuda.   Signet is purportedly the world's largest retailer of diamond jewelry.   The Company wholly owns Sterling Jewelers, Inc., through which it operates

retail stores under the brand names Kay Jewelers ("Kay") and Jared The Galleria of Jewelry ("Jared"), among others.  The Company also wholly owns Zale Corporation, through which it operates retail stores under the brand names "Zales The Diamond Store" ("Zales") and "Piercing Pagoda," among others.  The Company has multiple additional subsidiaries, including subsidiaries in Canada, England, Bermuda, Malta and Luxembourg.

26.     Defendant Michael Barnes ("Barnes") served as Chief Executive Officer ("CEO") and as a Director of Signet from January 2011 to October 31, 2014.

27.     Defendant Mark Light ("Light") was a CEO and a Director of Signet during the Class Period.  Light became CEO of Sterling Jewelers Inc. on October 31, 2014, CEO of Signet Jewelers Limited on November 1, 2014, and Director of Signet Jewelers Limited and Sterling Jewelers Inc. on November 1, 2014.  Light continues to hold these positions.  Light has held senior leadership positions with Signet and its Sterling Jewelers division for over 25 years, and prior to becoming CEO of Signet, Light served as President and Chief Operating Officer of Signet and CEO of the Sterling Jewelers division.  According to the Company's website, Light "has broad and deep knowledge of Signet's business and the jewelry industry" and "has extensive knowledge of Signet's operations."

28.     Defendant Ronald Ristau ("Ristau") served as Chief Financial Officer ("CFO") of Signet from April 2010 to July 31, 2014.

29.     Defendant Michele Santana ("Santana") was a CFO of Signet during the Class Period.  Michele Santana became CFO of Signet on August 1, 2014, and continues to hold that position.  Ms. Santana is a certified public accountant.  Prior to joining Signet, Ms. Santana held key leadership positions at KPMG LLP where she had nearly 14 years of experience working with Signet and its divisions.

9

30.     Defendants Barnes, Light, Ristau and Santana are collectively referred to hereinafter as the "Individual Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS:  SIGNET MISLED INVESTORS ABOUT MATERIAL RISKS TO ITS REPUTATION

### A.     Signet Misled Investors About Risks to Its Reputation from Pervasive Sexual Harassment in Its Corporate Culture

31.     Over at least the past two decades, sexual harassment has been a fixture of the Signet workplace.  The nature and extent of this culture of sexual harassment at Signet was revealed when certain declarations and other documents from a class action lawsuit and arbitration against Signet were made public.  That lawsuit and arbitration, and the content of the documents made public revealing rampant sexual harassment at Signet, are described in turn below.

### 1.     The *Jock* Lawsuit and Arbitration

32.     On March 18, 2008, a group of fifteen current and former employees of Signet filed a class action lawsuit against Sterling in the Southern District of New York.  That case is Jock v. Sterling Jewelers, Inc., 10:08-cv-02875-JSR (S.D.N.Y. Mar. 18, 2008) (the "*Jock* Lawsuit").  The *Jock* Lawsuit complaint alleged that Sterling had discriminated against women in determining pay and promotions for Sterling employees by "deny[ing] promotional opportunities for which they were qualified, and pa[ying women] less than men performing the same work."  The complaint further alleged:

> Sterling has permitted or encouraged other workplace conduct that may exacerbate the discrimination in promotions and compensation alleged above.  (a) Sterling managers have subjected female employees to sexual harassment and other discriminatory comments based upon their sex.  (b) Sterling has failed to take prompt and effective remedial action in response to complaints of discrimination and to comments demeaning to women made in the workplace.

33.     On these allegations, the class brought claims against Sterling for violations of Title VII of the Civil Rights Act for disparate impact and disparate treatment, for violations of the Equal Pay Act, and, on behalf of two named plaintiffs, for violations of the Age Discrimination in Employment Act.

34.     Sterling employment agreements require employees to agree that disputes arising out of that employment be resolved through private arbitration.  On June 18, 2008, the District Court referred the *Jock* Lawsuit to private arbitration, which was conducted by the American Arbitration Association Employment and Class Action Tribunal under case number 11-160-00655-08 (the "*Jock* Arbitration").  Retired Judge Kathleen Roberts served as the arbitrator.

35.     After five years of extensive discovery, on June 21, 2013, the plaintiffs in the *Jock* Arbitration filed a motion for class certification.  As part of that motion, the plaintiffs submitted a "Memorandum in Support of Motion for Class Certification" (the "Class Certification Memo").  The plaintiffs attached to the Class Certification Memo sworn declarations from approximately 250 women and men in support of its claims (the "*Jock* Declarations"), which amounted to more than 1,300 pages of testimonial evidence.[15]

### 2.     Sexual Harassment Was Pervasive at Signet

36.     In addition to providing clear evidence of pay and promotion discrimination at Signet, the *Jock* Declarations provided overwhelming evidence of rampant sexual harassment at the Company.  Over 100 of the *Jock* Declarations contained detailed allegations relating to sexual harassment in the Signet workplace.  Those allegations, as well as statements in the Class

---

[15] Mem. in Supp. of Mot. for Class Cert., Ex., *Jock v. Sterling Jewelers, Inc*., Am. Arbitration Ass'n, No. 11-160-00655-08 (June 21, 2013), *available at* http://www.cohenmilstein.com/ sites/default/files/Sterling%20Sworn%20Statements_reduced.pdf.  Defendants incorporate the *Jock* Declarations and the Class Certification Memo into this Complaint by reference.

Certification Memo, that were highlighted in a February 27, 2017 article in *The Wall Street Journal* are restated and/or summarized below.

37.     The *Jock* Declarations made clear that female employees at the Company throughout the late 1990s and the 2000s, across numerous states and Signet divisions and retail brands, were routinely groped, demeaned and made to provide sexual favors to their bosses in order to remain employed or to gain promotions.

38.     Female Signet employees were routinely required to provide sexual favors in order to retain their jobs, or to receive opportunities for promotions or protection from punishment.  Sanya Douglas, a Kay sales associate and manager in New York in the 2000s, said her manager had a saying for male leaders' coaxing women into sexual favors to advance their careers:  "going to the big stage."

39.     This profoundly saddening feature of work life for women at Signet—the requirement that female employees provide sex in exchange for advancement—existed at all levels of the organization, beginning with the very top leadership.  The CEO of the Company, Defendant Light, personally required women to have sex with him in order for them to succeed at Signet.  Other senior male executives at Signet imposed this same base expectation on female employees.  As the Class Certification Memo, citing to the sworn *Jock* Declarations, states:

> Light, Mooney and Liebler, the latter two of whom are currently VPROs, have had sex with women employees and conditioned women's success at Sterling upon acceding to such demands, an expectation attributed to other male executives as well.

40.     Heather Ballou offered her experience of quid pro quo sexual harassment in the *Jock* Declarations.  She stated that as she worked her way up to store manager, she became increasingly disturbed by the frequency of sexual harassment from what she described as a "boy's club."  Then at a managers meeting in 2005, a district manager promised to help transfer

her to a better store if she had sex with him.  That night, she acceded to his demand because she was "backed into a corner" and had no other way to advance.

41.    In general, Signet's corporate culture was one in which female employees were treated as sexual objects by male executives, including Defendant Light, and other male employees.  Top male managers, including top managers at Signet's headquarters in Akron, Ohio, would send "scouting parties" to Signet retail locations to locate attractive female employees for them to sleep with.  They would laugh about women's bodies in the workplace. Dean Huffman, a male employee at Signet who offered his knowledge of Signet's culture of fostering sexual harassment in the *Jock* Declarations, stated:

> Defendant Light was "entertained rather than offended when a manager at a company meeting described a good female store manager as one who 'walked like a sailor' because of the amount of sex in which she had engaged and had swollen lips because of her frequency of having oral sex."

42.    Another male employee, Richard Sumen, stated in the *Jock* Declarations that he recalled one Ohio-based executive saying, "Why pay women more when they just get pregnant and have families?"  Sumen also recounted an incident at Ohio corporate headquarters in which an executive pointed to a female secretary and asked a district manager, "Are you doing her?" Sumen stated that the secretary looked visibly uncomfortable, but that the executive said again, and louder, "I want to f[---]ing know if you are f[---]ing doing her."  Sumen added in his declaration, "This culture of sexism and womanizing was so prevalent that female management employees were pressured to acquiesce and participate."

43.    Allegations in the *Jock* Declarations relating to the Company's events, including its annual managers meetings, at which attendance was effectively mandatory for many female employees, were particularly revolting.  Female declarants described these meetings as boozy "sex fest[s]," to which spouses were not invited, and at which women were aggressively pursued,

grabbed and harassed.  At these events, a common practice was for executives and high-level

managers to ply female subordinates with alcohol and sexually harass them.

44.     Melissa Corey, a manager of Sterling stores in Massachusetts and Florida between

2002 and 2008 stated that sexual "preying" at company events was routine and "was done out in

the open and appeared to be encouraged, or at least condoned, by the company."

45.     Top executives at Signet, including Defendant Mark Light, attended and

participated in these "sex fest[s]."  As stated in the Class Certification Memo, multiple witnesses

stated in the sworn *Jock* Declarations that they saw Defendant Light "being entertained" as he

watched and joined nude and undressed female employees in a swimming pool at such a

company event:

> Mr. Light was [. . .] observed by multiple witnesses at Company meetings being
> entertained by female managers, in various states of undress, in a swimming pool
> and joining them in the pool himself.

46.     Ellen Contaldi, a Sterling manager in Massachusetts between 1994 and 2008,

likewise stated in her declaration that male Sterling executives "prowled around the [resort

hosting the event] like dogs that were let out of their cage and there was no one to protect the

female managers from them."

47.     Though women made up a large part of Sterling's sales force, many female

employees stated in the *Jock* Declarations that they felt they had little recourse against sexual

harassment with the Company's primarily male management.  Attempts by female employees to

get the Company's human resources department to intervene to address instances of sexual

harassment were routinely ignored, or else led to retribution against the employee.

48.     Julia Highfill, a nine-year Sterling manager in Florida, Louisiana and Mississippi,

said in her sworn declaration that the company "did not have an effective or serious mechanism

by which female employees could complain about their mistreatment."   After calling the

14

company to report that a district manager had arrived to work late and reeking of alcohol, she alleged that he called soon after to warn her against calling again.

49.     Kristin Henry, a five-year Sterling employee, was only 22 when an older male Sterling employee, who was "married and old enough to be [her] father" took her to his room at a manager's meeting and tried to kiss and touch her sexually.  Henry later contacted the Company's human resources department and reported the incident.  Within a week of reporting the incident, an executive at Signet arrived at her store and stayed for two days.  The individual interviewed all of the individuals who worked under Henry and reviewed store documents and videos.  When the executive interviewed Henry, he accused her of stealing a gold chain and $100.00 in cash, based on the lack of a bank deposit on a certain day.  Henry produced a bank receipt for that day proving the deposit and her innocence and showed it to the executive.  The executive fired Henry the next day, only days before Henry was due to receive her annual commission payment based on performance, which amounted to approximately $30,000.

50.     As explained above, the *Jock* Declarations contained numerous additional damning allegations similar to, and expanding on, those detailed above, in more than 1,300 pages of testimonial evidence.  The *Jock* Declarations also provided ample, convincing evidence of company-wide gender discrimination in hiring and promotion practices.  This evidence of systemic job discrimination went well beyond that described in any of Signet's public statements concerning the content of the *Jock* Arbitration.  Accordingly, Signet also misled the public about the compelling nature of the allegations in the *Jock* Arbitration relating to job discrimination.

3.      **Signet Knew About the Rampant Sexual Harassment at the Company and the Explosive Allegations of Sexual Harassment in the *Jock* Arbitration**

51.     Signet, through its executives and Board of directors, were fully aware of the pervasive sexual harassment that occurred at the Company, and of the explosive and damning allegations of sexual harassment contained in the *Jock* Declarations.

52.     Defendant Light personally participated in the sexual harassment of women, as described above.  Other senior executives of Signet likewise sexually harassed women, and attended company events, including the annual managers meetings, at which sexual harassment of women was manifestly rampant.  These executives of Signet, including Defendant Light, were directly aware of the rampant sexual harassment at Signet, through participating in it or through witnessing it firsthand.

53.     All members of the Board of Directors of Signet since 2008, including Barnes and Light, were briefed on the allegations in the *Jock* Arbitration, and therefore were fully aware of the explosive and damning content of these allegations throughout the Class Period.  On Signet's March 9, 2017 earnings call, the current Chairman of Signet Todd Stitzer stated:

> As a board, we have been briefed on this litigation since 2008.  As noted earlier, many of the allegations publicized in connection with the case go back decades.  When evaluating whether to make Mark Chief Operating Officer in 2014, we obviously reviewed his business performance and evaluated with advice from counsel the allegations that were described in connection with the case, reviewed the available information, the timeframes involved, and the context in which it was offered. Based on our review and evaluation, we appointed Mark as COO.

54.     In the *Jock* Arbitration, Signet tacitly recognized that the allegations in the *Jock* Declarations were wholly true.  As Arbitrator Kathleen Roberts stated in her 2015 decision to certify the class in the *Jock* Arbitration:

> [The testimony includes allegations of] soliciting sexual relations with women (sometimes as a quid pro quo for employment benefits), and creating an

16

environment at often-mandatory Company events in which women are expected to undress publicly, accede to sexual overtures and refrain from complaining about the treatment to which they have been subjected. [. . .] **For the most part Sterling has not sought to refute this evidence.** [. . .] Sterling argues that it is inadmissible, irrelevant and insufficient to establish a corporate culture that demeans women.

55.    A confidential witness ("CW1") has confirmed that sexual harassment occurred at Signet before and during the Class Period, and that high-level executives were aware of the sexual harassment.  CW1's titles, in chronological order, were Employment and Management Development Specialist (1998-2000), Employee Relations Specialist (2000-2002), Regional Human Resources Specialist (2002-2005), Manager, Field Human Resources (2005-March 2011), Director, Field Human Resources (March 2011-April 2015); and Director, Diversity & Inclusion (April 2015-May 7, 2016).  CW1 was based at the company's Akron, OH headquarters.  As Director of Field Human Resources, CW1's job was to manage a team of Human Resources specialists who investigated employee complaints, including sexual harassment and sexual misconduct complaints.  CW1 recalled numerous complaints regarding sexual harassment during the 2000s and through at least 2014.

56.    CW1 participated in a "complaint update" meeting with top leaders of the company to discuss employee complaints and the results of the investigations done by Human Resources.  CW1 said the meetings were attended by Sterling CFO Bob Trabucco, SVP of Human Resources Steve Becker, VP of Employee Relations Mike Lynch, Lynn Dennison (head of the company's legal department), and another VP from legal, among others.  According to CW1, all complaints against higher-level employees and the status of the investigations were reviewed during these meetings.  CW1 believed that the direct reports to CEO Mark Light (Becker, Dennison, Trabucco), were reporting to Light about the results of the quarterly

complaint update meetings, particularly information about the investigations of high-level employees.

### 4.   Signet Made Many Different Misleading Statements About the Existence and Risks of Pervasive Sexual Harassment at the Company

57.   As detailed in Part IV below, Signet made numerous false and/or misleading statements and omissions concerning the existence and risks of pervasive sexual harassment at the Company.

58.   In disclosing pending lawsuits against the Company that could materially impact its finances (as required under SEC disclosure regulations), Signet stated that the *Jock* Lawsuit and Arbitration concerned allegations of job discrimination on the basis of gender, and that Signet bore a risk of money damages that it could not estimate.   These disclosures were misleading because Signet failed to tell the whole truth—the *Jock* Lawsuit and Arbitration did not concern only allegations of job discrimination, but also allegations of sexual harassment. When the *Jock* Declarations were made available to Signet, Signet was made aware of explosive and damning evidence of rampant sexual harassment that would seriously damage Signet's reputation if and when made public.   Signet misled the investing public by suggesting that the only risk it bore from the *Jock* Arbitration and Lawsuit was a risk of money damages—Signet also knowingly bore a significant risk that the evidence of which it had been made aware, in particular the *Jock* Declarations, could be made public, causing substantial damage to its brand reputation.   Signet further misled the public by suggesting that it could not estimate the potential damages from the *Jock* Arbitration.   The *Jock* Declarations made clear that the *Jock* plaintiffs' claims for job discrimination were very strong.   Once Signet learned of the damning evidence against it, including explosive evidence of sexual harassment in the *Jock* Declarations, Signet

knew that it was certain, or at least highly likely, to have to pay a significant amount of money to settle the Arbitration.

59.     For the same reasons, Signet's financial statements throughout the Class Period were misleading.   Signet statements of its net worth, profitability, and potential losses were misleading because they failed to account for the massive liability that Signet in effect had already accrued in the *Jock* Lawsuit and Arbitration.

60.     Signet also misled the public by stating in its SEC filings that it denied the allegations in the *Jock* Lawsuit and Arbitration.   In making this statement without qualification in its SEC filings, Signet clearly suggested that it believed that the allegations in the *Jock* Lawsuit and Arbitration, including allegations of sexual harassment, were false.   Yet Signet knew these allegations to be true—Defendant Light himself sexually harassed women at Signet, and yet certified in SEC filings that allegations of sexual harassment at Signet were false.

61.     Signet's statements regarding risks it bore relating to reputation and consumer confidence were also misleading because they failed to tell the whole truth about Signet's situation.   Signet was aware that it bore a massive risk that explosive, damning allegations of sexual harassment would be made public, yet failed to warn the investing public about this risk when discussing the risk of harm to reputation it faced.

**B.     Signet Misled Investors About Risks to Its Reputation from Occurrences of Fraudulent Diamond Swapping**

**1.     The Importance of Customer Trust to Signet's Business**

62.     Signet's business, like that of all diamond jewelers, is unusually dependent on customer trust—customers are unlikely to buy diamonds from a jeweler if they lack confidence that the diamonds they are buying are authentic.

63.     Defendant Mark Light, Chief Executive Officer of Signet during the Class Period, has stated, "I've been selling jewelry my whole life, over 30 years, and the most important part of selling jewelry is trust."[16]

64.     Signet recognizes that establishing and maintaining customer trust is critical to its business.  Signet stated in its July 3, 2016 Form 8-K SEC filing that "Signet Jewelers' entire team culture is directed toward ensuring that we earn and maintain customer trust."[17]  Signet likewise stated in in its fiscal year 2016 Form 10-K SEC filing:  "Primary factors in determining customer buying decisions in the jewelry sector include customer confidence in the retailer."[18]

### 2.     Fraudulent "Diamond Swapping" Occurred at Signet Retail Locations During the Class Period

65.     On multiple occasions during the Class Period, when customers left their diamond jewelry at Signet retail locations to be cleaned or repaired, the authentic diamonds in the jewelry were replaced with false diamonds.  This fraudulent activity occurred at multiple Signet retail locations in widely different geographic areas.

66.     Jim Clarius purchased an engagement ring, a one-carat diamond set in white gold, for his current wife, Chrissy Clarius, at Kay Jewelers in Maryland in 2010 for approximately $4,300, according to a BuzzFeed News report.[19]  The stone came with a certificate of authenticity from Gemological Science International ("GSI"), and was inscribed with a certification number, which Mr. Clarius observed when he purchased the ring.

---

[16] *Id*. at 10.

[17] Signet Jewelers Ltd., Current Report (Form 8-K), at Ex. 99-1 (July 3, 2016).

[18] Signet Jewelers Ltd., Annual Report (Form 10-K), at 29 (Mar. 24, 2015).

[19] Stephanie McNeal, *Women Say Kay Swapped Their Diamond for a Stone of Worse Quality After a Repair*, BuzzFeed News (May 25, 2016), *available at* https://www.buzzfeed.com/stephaniemcneal/women-say-kay-0020swapped-their-diamonds?utm_term=.ot9MEl0wB#.ll1z5a9vb.

67.     Kay insured the stone against loss and damage under the store's guarantee, which was conditioned on the Clarius's submitting the diamond and its setting for inspection at regular intervals.  In February 2016, pursuant to this condition, Ms. Clarius brought her diamond ring to a Kay Jewelers at the Westminster Mall in Maryland for inspection.  Following the inspection, Clarius sent the ring out for a repair of the setting because the prongs on it were loose.

68.     In March 2016, Ms. Clarius retrieved her ring from the Kay store, but the ring she received did not have an identifying GSI certification number.  Nevertheless, the Kay store manager assured Ms. Clarius that the diamond was authentic.  Ms. Clarius took the stone to two other jewelers, Littman Jewelers and Smyth, which are unaffiliated with Signet, to have the diamond tested.  Both third-party jewelers determined that the stone was, in fact, a moissanite, not a diamond.  Moissanite is a stone that resembles diamond but is far less valuable.  Also, the stone was set in platinum, rather than white gold.

69.     Ms. Clarius took the stone back to the Westminster Mall Kay store and informed the manager that the stone was tested as moissanite, but that store's test incorrectly showed that the stone was a diamond.  A similar test at another retail location, Zales (also a Signet brand), likewise incorrectly showed the stone to be a diamond, rather than moissanite.

70.     Kay has informed Clarius that the Kay "loss protection team" is "looking into the issue."  Kay spokeswoman Kim Kanary stated to BuzzFeed News that the Company was "continuing to work with Ms. Clarius toward resolution" of the complaint.[20]

71.     Fraudulent diamond swapping through Signet retail locations was widespread during the Class Period.  Ms. Clarius stated that she has knowledge of "hundreds" of people with

_____

[20] *Id.*

21

experiences at Kay similar to hers.[21]   Indeed, numerous individuals who have had their precious

stones fraudulently swapped while the stones were in the custody of Signet retail stores have

posted their experiences on social media.

72.    For example, on April 27, 2016, Heidi-Stier Rivera posted the following message

on Kay Jewelers' Facebook page:

> Kays switched my diamond from its engagement setting; essentially stealing my
> SI1 diamond and replacing it with an "Imperfect" diamond; I never received any
> help resolving the issue from Store Managers. I deeply regret not calling the
> police from the store, but I truly trusted Kay's integrity, especially since a good
> friend worked there and I trusted her. Kay jewelers switched my diamond when it
> was sent in for re-mounting/sizing, and refused to take responsibility, even though
> it's clear it's a completely different diamond; the new one full of inclusions. They
> kept insisting my prongs had hidden the inclusions before, but I had other
> jewelers authenticate that it is not the same diamond my husband purchased. Even
> a Kays jewelry themselves admitted my new diamond was not an SI- either I had
> been fraudulently sold an imperfect diamond and given the wrong certificate and
> valuation, or the diamond was indeed switched when it was sent in for re-
> mounting.[22]

73.    Likewise, on May 31, 2016, Kay customer Jennifer Wohletz posted the following

message on Facebook, which suggests that fraudulent diamond swapping was occurring at Kay

stores at least as far back as 2006:

> I suspect I was also a victim of a diamond switch. Ten years ago I bought 1/4 c.
> diamond solitaire earrings at Kay's, I dropped them off for a checkup/cleaning at
> 6 months, six months later I took those earrings and some other jewelry to a local
> shop to have them all cleaned, and the manager asked me if I was aware that the
> stones in the earrings were not diamonds. I was not. He told me they were cubic
> zirconia. I took them back to Kay's, and the associate told me they were
> diamonds, and the other guy was trying to scam me. I doubt that, because the
> local guy wasn't trying to sell me anything or asking to replace the stones.
> I eventually gave the earrings away because I gauged my ears, so there isn't much
> I can do now, but wanted to post out of solidarity, because no one deserves to get
> ripped off.[23]

---

[21] Id.

[22] Heidi-Stier Rivera, Facebook (Apr. 27, 2016), https://www.facebook.com/KayJewelers/posts/994189927283933.

[23] Jennifer Wohletz, Facebook (May 31, 2016), https://www.facebook.com/boycottkayjewelers.

74.     Additional examples include the following:

- On May 31, 2016, Kay customer Robert Brand posted the following message on Facebook:

> My wife and I were scammed on our wedding ring. Our ring returned after being "serviced" which by the way took them a month to do, with the middle diamond having a huge black speck in it and the side stones being uneven afterwards. They say it was that way but my wife my family and my friends all know that it wasn't the same stones. The ring was returned to them cause after a year of arguing and complaining to them cause we were not paying it off because of this. They gladly took the ring back, offered no money for the bull[], and said see that wasn't hard was it. Are you kidding me ???? Our ring from our wedding!!! Our hearts broke because of this.[24]

- On May 31, 2016, Kay customer Tracy B. Smith posted the following message on Facebook:

> Same experience [as others posted on Facebook] in November at Arbor Place Mall in Douglasville, Georgia in which Neil Lane wedding ring and wrap band needed repairs. The wrap came back with smaller and poor quality diamonds with a very noticeable poor resetting job. After the second inspection on yesterday not only was I was told that all of the diamonds on the wrap are loose and need the prongs tightened and had to show the representative where the missing diamond slot was in the band portion. Totally inexperienced personnel. As a result of all of these factors, I requested a complete replacement of the band and was told to call the corporate office.[25]

- On May 31, 2016, Kay customer Melanie Borden posted the following message on Facebook:

> I purchased a ring with citrine birthstone. Took it for cleaning and they said a prong was loose. I left it. When I went back it was a much darker stone. I actually cried about this. I've not bought anymore jewelry at Kay's, Florence Alabama store. CROOKED bunch of people and they won't listen to me about it. They do not act like they care.[26]

---

[24] Robert Brand, Facebook (May 31, 2016), https://www.facebook.com/boycottkayjewelers.

[25] Tracy B. Smith, Facebook (May 31, 2016), https://www.facebook.com/boycottkayjewelers.

[26] Melanie Borden, Facebook (May 31, 2016), https://www.facebook.com/boycottkayjewelers.

- On May 31, 2016, J.B. Robinson customer Jeff Novak posted the following message on Facebook:

  > I bought my wife a genuine opal ring from their sister store JB Robinson. We took it back in the warranty period when the stone fell out and went missing. The stone that came back looks like a manufactured opal, though they swear that it is not.[27]

- On June 8, 2016, Kay customer Daisy Thomas posted the following message on Facebook:

  > I have felt time after time, that the stones in my rings are not the same stones my husband bought, but I never though[t] for a minute Kay jewelry would do something like this so I just let it go, I'm so heart broken now, I really believe now that I was scammed.[28]

- On November 17, 2016, Kay customer Stephanie S. posted the following message on Facebook:

  > I swear Kays exchanged my diamond out for a chipped one. We got it dipped before our third child was born and then I went back one month after my 6 mo[nth] check up was due to find out my diamond is chipped and I was out of warranty. I was a stay a home mom, who did nothing but laundry and dishes . . . . what would I have chipped a diamond on?![29]

### 3. Signet Management Was Aware of Occurrences of Fraudulent Diamond Swapping

75.   Signet's management knew about these occurrences of fraud at its retail locations. The customers affected by the fraud complained about the fraud to the Company—through direct complaints to retail management, through calls to customer service, through postings to Kay's Facebook page, and/or through other means.

76.   A second confidential witness ("CW2") worked at Signet's Special Orders and Customer Care division from June 2004 to July 2016 and reported to Vice President Paul Karonik, who headed that division.  According to CW2, CEO Mark Light received daily reports

---

[27] Jeff Novak, Facebook (May 31, 2016), https://www.facebook.com/boycottkayjewelers.

[28] Daisy Thomas, Facebook (June 8, 2016), https://www.facebook.com/boycottkayjewelers.

[29] Stephanie S., Facebook (Nov. 17, 2016), https://www.facebook.com/boycottkayjewelers.

from all divisions of the Company, including reports containing data on customer complaints. On information and belief, such daily reports likely would have included any complaints against the Company alleging criminal fraud.

77.     Moreover, given that "[p]rimary factors in determining customer buying decisions in the jewelry sector include customer confidence in the retailer," as Signet stated in in its fiscal year 2016 Form 10-K SEC filing, occurrences of fraud that jeopardize this customer confidence affect the core of Signet's business.[30]   Accordingly, management, including Defendants Mark Light and Michele Santana, knew or should have known about such occurrences.

78.     For the same reason, Signet was under a duty to disclose occurrences of fraud at its retail locations to its investors, and this information was material to reasonable investors.

## V.     SUBSTANTIVE ALLEGATIONS:  SIGNET MISLED INVESTORS ABOUT ITS CREDIT PORTFOLIO

### A.     Signet Is a Consumer Creditor

79.     In addition to selling jewelry, Signet is a consumer creditor.  When qualifying customers make purchases of jewelry, they are offered the option of purchasing the jewelry on Signet credit.  This in-house consumer financing business has been centralized at Signet since 1990.[31]  The business is not a separate operating division within Signet, and it does not report separate operating results.[32]

80.     This in-house finance program is a significant part of Signet's business:  more than one-third of Signet's operating income comes from its in-house customer finance programs.[33]   More than sixty percent of Signet's in-store sales in the first quarter of Signet's

---

[30] Signet Jewelers Ltd., Annual Report (Form 10-K), at 29 (Mar. 24, 2016).

[31] *Id*. at 18.

[32] *Id*.

[33] *Id*. at 40, 103.

2017 fiscal year were made in whole or in part using credit from Signet.[34]  Approximately 75% of Sterling division bridal sales—sales in the most significant market for Signet's diamond jewelry—utilize Signet credit.[35]

**B.    Signet's Lending Standards Were Shoddy During the Class Period**

81.    According to confidential witnesses, Signet had very lax lending standards during the Class Period, lending standards that led Signet to extend credit even to individuals who posed a significant risk of filing for bankruptcy.  One confidential witness ("CW3") worked at a retail location operated by Signet from 2006 to August 2016, first as a retail salesperson and then as the store manager.  According to CW3, Signet executives "pushed credit very, very hard," and mandated that each retail-chain employee take and submit at least one credit application from customers per day.  Failure to do so was cause for termination.

82.    According to CW3, Signet approved the credit applications of multiple customers who had filed for bankruptcy within the previous 12 months.  CW3 recalled at least two customers who told CW3 that they doubted they could be approved for credit, yet were nevertheless approved by Signet.  CW3 stated:

> I really can't tell you how a lot of these applications were approved, because when you hear customers telling us how bad their credit is before applying, there is just no way they should be approved.  And you should have seen how shocked they were after.  That's when they'd start telling us the truth about bankruptcies, not paying for jewelry they had bought at Kay or Jared's.  After they were approved is when we started hearing the truth.

83.    Another confidential witness ("CW4") worked as a Customer Care Credit Specialist at Signet's main office between September 2015 and July 2016, where CW4's responsibilities included addressing complaints involving credit and collection issues.  CW4

---

[34] *Id*. at 20.

[35] Signet Jewelers Ltd., Fourth Quarter and Fiscal 2016 Year End Earnings Call, at 6 (Mar. 24, 2016).

likewise noted that Signet's lending standards were very low during the Class Period.  CW4 stated that Signet's in-house credit department often approved credit applications of people who had bankruptcies and histories of missed payments on their records.  Signet relied heavily on first time borrowers with little or no credit or work history.  CW4 stated, "I do know for a fact that we dealt with a lot of young people, 18-year old kids, sometimes still in high school or just graduating.  One thing that Jared and Kay were known for is that they were easy to get credit."

84.    According to CW4, management encouraged soliciting credit applications from those with poor credit history:  "The company also let us know to tell people, if they called in with questions, that we would consider people with bankruptcies, or even if they had defaulted on merchandise they bought from us."

85.    A further confidential witness ("CW5") worked as a Senior Business Analyst at Signet between January 2015 and July 2016, where CW5 was in charge of collections and asset recovery for CW5's division.  CW5 confirmed that Signet's lending standards during the Class Period were low and designed to maximize additional purchases, even by consumers with poor credit.  According to CW5, the Company routinely extended credit offers or credit limit increases to consumers who had repeatedly made late payments to Signet or who had defaulted on prior loans.  Some customers had been in default with the company as little as one month prior to receiving new credit offers from Signet.  According to CW5, the company's credit practices were "far below anything you would see at a regular credit card company," and could not be defended, based on CW5's experience in consumer credit.  "Based on my personal experience, the way Signet does credit approval is not the right way.  The practice is way too lenient.  They have their own standards that are completely different than you would see from a regular credit company."

27

86.     CW5 also stated that Signet would change its credit standards during different seasons and promotions:  "I know that marketing would change the credit scores needed for each promotion."

### C.     Signet Historically Hid Details About the Quality of Its Credit Portfolio and Its Calculation of Delinquencies

87.     In spite of the fact that its credit portfolio constitutes a significant part of its business, Signet historically has provided very little information about the quality of its credit portfolio, its underwriting practices and the accounting methodology it uses in calculating the aging of accounts in its portfolio.

88.     For example, in its fiscal year 2015 Form 10-K SEC filing, Signet stated merely that "[e]ach individual application for credit is evaluated centrally against set lending criteria," and "[a]ll applications are evaluated by proprietary credit scoring models."[36]

89.     Only in its fiscal year 2016 Form 10-K SEC filing did Signet first provide limited details about the credit quality of the customers to whom it was extending credit.[37]  Many lenders use scores calculated with algorithms from Fair Isaac Corporation (FICO) to estimate the creditworthiness of applicants; the scores are based on factors such as delinquencies, age of credit information, and available credit.  In its 2016 Form 10-K SEC filing, Signet disclosed that the balanced weighted FICO scores of its credit portfolio for fiscal years 2014, 2015 and 2016 were 665, 663 and 662 respectively.[38]  Many financial analysts consider a loan to an individual with a FICO score of 640 to be a subprime loan.[39]

---

[36] Signet Jewelers Ltd., Annual Report (Form 10-K), at 18-19 (Mar. 24, 2016).

[37] Signet Jewelers Ltd., Current Report (Form 8-K), at 18 (Mar. 24, 2016) ("The company expanded its disclosures in its SEC Form 10-K related to underwriting, credit monitoring, collections and portfolio aging.").

[38] Signet Jewelers Ltd., Annual Report (Form 10-K), at 18-19 (Mar. 24, 2016).

[39] See, e.g., James Grant, Lending Clubbed, Grant's Interest Rate Observer, 10 (June 2, 2016).

90.     Signet also disclosed for the first time in its 2016 Form 10-K SEC filing limited details about the obscure accounting methodology it uses in calculating the aging of accounts in its portfolio.  As Signet stated, it uses a "form of the recency method":

> This form of the recency method relies upon qualifying payments determined by management to measure delinquency.  In general, an account will not remain current unless a qualifying payment is received.  A customer is aged to the next delinquency level if they fail to make a qualifying payment by their monthly aging.  A customer's account ages each month five days after their due date listed on their statement, allowing for a grace period before collection efforts begin. A qualifying payment can be no less than 75% of the scheduled payment, increasing with the delinquency level.  If an account holder is two payments behind, then they must make a full minimum payment to return to current status.  If an account holder is three payments behind, then they must make three full payments before returning to a current status.  If an account holder is more than three payments behind, then the entire past due amount is required to return to a current status.[40]

91.     This method of aging the delinquency of accounts is not standard.  The most common method of aging the delinquency of accounts is the "contractual" method, whereby an account is current only if the account holder is paid in full.  In contrast, Signet's accounting methodology counts an account as "current" even when a customer has missed payments, so long as the customer has made one minimum "qualifying payment" recently.  For example, if a customer has failed completely to make any payment for 90 days, the account will nevertheless "reset" and be considered current if the customer simply makes one minimum monthly payment—the customer need not make any payment of any of the past due amount to be considered current by Signet under its account aging methodology.  If the customer then fails again to make any payment for another 90 days, yet then makes one additional minimum monthly payment, the account again will be considered current, even though the customer at this point would have a past due amount equal to 120 days of scheduled payments.

---

[40] *Id*. at 19.

92.     Signet's aging methodology allows Signet to avoid disclosing to the market the amount of money owed to Signet that is actually past due.  Instead, Signet calculates its "non-performing receivables" using its recency aging methodology, a calculation that can grossly understate the amount past due on an account.

93.     In addition, Signet discloses very little information about the methodology it uses to calculate its allowance for uncollectible accounts.  Signet has stated the following:

> Allowances for uncollectible amounts [are] calculated using a model that analyzes factors such as delinquency rates and recovery rates. An allowance for amounts 90 days aged under on a recency basis is established based on historical loss experience and payment performance information.  A 100% allowance is made for any amount aged more than 90 days on a recency basis and any amount associated with an account the owner of which has filed for bankruptcy.  [. . .] The allowance calculation is reviewed by management to assess whether, based on economic events, additional analysis is required to appropriately estimate losses inherent in the portfolio.[41]

94.     Signet's account aging methodology is so obscure and potentially misleading that the SEC recently started to look into it.  In a letter sent to Defendant Michele Santana at Signet on October 4, 2016, the SEC asked Signet why it did not disclose to the market the amount of money owed to Signet that is past due ("contractually delinquent"):

> We note your use of a form of recency-aging of accounts receivable for measuring delinquency and establishing loss allowances for your in-house credit receivable portfolio.  Please tell us your consideration of discussing the impact on bad debt expense and the allowance for uncollectible accounts of basing your allowance on the age of accounts receivable on a recency as opposed to a contractual basis.  For example, tell us your consideration of disclosing the aging of accounts receivable based on your recency-aging methodology as of each balance sheet; i.e., the dollar amount of accounts that is contractually delinquent but still considered current or performing, based on your recency-aging methodology.[42]

---

[41] Signet Jewelers Ltd., Annual Report (Form 10-K), at 19 (Mar. 24, 2016).

[42] Letter from William H. Thompson, Branch Chief, S.E.C., to Michele Santana, C.F.O., Signet Jewelers Ltd., at 2 (Oct. 4, 2016).

95.     Signet replied in effect that disclosing to the market the amount of money owed to Signet that is actually past due would be "misleading," or as Signet stated, "Disclosure of incremental information in isolation that does not inform our reserve methodology was concluded to be potentially misleading."[43]

### D.     The Amount of Money Owed to Signet Increased Significantly as a Result of Its Lax Lending Standards

96.     Throughout the Class Period, Signet was significantly expanding its lending. Signet's accounts receivables swelled from $1,280,600,000 at the start of Signet fiscal year 2014 to $1,855,900,000 at the end of fiscal year 2016.[44]  While sales in the first quarter of Signet's fiscal year 2017 (the quarter ending April 30, 2016) grew by 3.2% year-over-year, Signet's net accounts receivable increased much faster, at 12.6% year-over-year.[45]

97.     Signet's lax lending standards promoted this growth in sales and account receivables.  As Signet extended credit to more and more individuals, even to those with bad credit, those individuals made more purchases at Signet retail locations, raising Signet's sales and accounts receivables on the backs of high-risk borrowers.

98.     Signet's recency aging methodology likewise facilitated this expansion of lending to high-risk borrowers.  Signet's recency aging methodology allowed the company to lend to borrowers with poor credit, who were likely to be delinquent in repaying their loans, while counting these resulting delinquencies as "current" under its recency aging methodology for the purposes of its public disclosures.  According to CW5, Signet's "recency" portfolio aging methodology was designed to allow Signet to offer credit to customers that under a contractual

---

[43] Letter from Michele Santana, C.F.O., Signet Jewelers Ltd. to William H. Thompson, Branch Chief, S.E.C., at 8 (Oct. 18, 2016).

[44] Signet Jewelers Ltd., Annual Report (Form 10-K), at 20 (Mar. 24, 2015).

[45] James Grant, *Lending Clubbed*, Grant's Interest Rate Observer, 10 (June 2, 2016).

aging methodology would be considered delinquent.  "[T]hey let us know they needed customers to be okay with 'recency' so we could loan to them again."

###    E.    The Quality of Signet's Credit Portfolio Declined During the Class Period

99.    By October 2014, the quality of Signet's credit portfolio was decreasing sharply due to its poor lending practices, and decreasing to an extent not adequately captured by Signet's financial disclosures.

100.    In its December 4, 2015 Form 10-Q SEC filing, Signet stated that its third quarter fiscal year 2016 charge-offs, which should include amounts associated with an account the owner of which has filed for bankruptcy, increased year-over-year to $121.5 million from $101.0 million, an increase of 20.2%.[46]

101.    In its March 24, 2016 Form 10-K SEC filing, Signet stated that its "non-performing" loans, those past due and aged more than 90 days, increased year-over-year in the fourth quarters of fiscal years 2014, 2015 and 2016 from $53.5 million to $62.7 million to $74.1 million, respectively.[47]   Signet stated further that as a percentage of the ending receivable balance for each of these periods, non-performing loans increased from 3.7% to 3.8% to 4.0% respectively.[48]   Charge-offs increased in fiscal years 2014, 2015 and 2016 from $128.2 million to $144.7 million to $173.6 million.[49]   That is, according to Signet, by January 30, 2016, the value of Signet's non-performing loans increased year-over-year by 18.1%; the value of its non-performing loans as a percentage of ending receivable balance increased 5.2%; and during Signet fiscal year 2016, its charge-offs increased 19.9%.

---

[46] Signet Jewelers Ltd., Quarterly Report (Form 10-Q), at 16 (Dec. 4, 2015).

[47] Signet Jewelers Ltd., Annual Report (Form 10-K), at 104 (Mar. 24, 2016).

[48] *Id.*

[49] *Id.*

102.    Likewise, in its June 3, 2016 10-Q, Signet stated that its net charge-offs increased year-over-year in the first quarter of Signet fiscal year 2017 (the period January 31, 2016 to April 30, 2016) from $37.9 million to $46.8 million, an increase of 23.4% year-over-year.

103.    However, the number of bankruptcies naming Signet as a creditor increased significantly more during the Class Period.  In the first quarter of calendar year 2015, 1,903 bankruptcy filers named Signet as a creditor.  In the months following the end of that quarter, that number jumped:  2,663 bankruptcy filers named Signet as a creditor in the fourth quarter of calendar year 2015, an increase of 39.9% over the first quarter, and 3,274 filers in the first quarter of calendar year 2016 named Signet as a creditor, an increase of 72.0% year-over-year.[50] Yet Signet never disclosed to the public this sharp increase in the number of bankruptcy filers naming Signet as creditor.

104.    This sharp increase in the number of bankruptcy filers naming Signet as creditor runs directly contrary to trends in the total number of bankruptcy filers in the United States, which has been decreasing steadily for years.[51]  The total number of non-business bankruptcy filers nationwide for the 12-month period ending March 31, 2016 was 833,515, compared to 911,086 filers for the 12-month period ending March 31, 2015.

105.    Some analysts expressed concerns over the poor quality of Signet's credit portfolio during the Class Period.  On February 11, 2016, Greg Farrell of Bloomberg wrote that "behind its sparkly empire lie consumer loans that bankers might consider subprime debt."[52] Farrell quoted Ufuk Boydak, managing director of German investment fund Loys AG, who

---

[50] James Grant, *Lending Clubbed*, Grant's Interest Rate Observer, 10 (June 2, 2016).

[51] Administrative Office of the U.S. Courts, *March 2016 Bankruptcy Filings Down 8.5 Percent* (Apr. 28, 2016), *available at* http://www.uscourts.gov/news/2016/04/28/march-2016-bankruptcy-filings-down-85-percent.

[52] Greg Farrell, Bloomberg, *Is Signet a Sparkly Empire or a Finance Company?* (Feb. 11, 2016), *available at* https://www.bloomberg.com/news/articles/2016-02-12/a-money-store-of-diamonds-grows-and-so-do-the-questions.

stated:  "There is a risk here.  [. . .]  The credit business can get complicated.  If things were to turn negatively, you have the recipe for a potential disaster."[53]  As David Ritter, an analyst at Bloomberg Intelligence stated in the article, "[loans from retail stores] tend to be the first bill that doesn't get paid when you have problems."[54]  Farrell noted analysts' particular concern over "Signet's reliance on an unusual accounting method to determine which customer accounts are past due and could go bad—an approach they fear could underestimate future losses in light of Signet's expanded credit business."[55]  However, these analysts lacked sufficient information from Signet to confirm their concerns.  As Farrell stated, "[j]ust how Signet sizes up its customers and accounts for its loans has some investment analysts pressing for more information."[56]

106.    On March 29, 2016, Ben Strubel wrote an article that suggested that the quality of Signet's credit portfolio was likely low, and that this was likely to cause problems for Signet.[57]  Strubel noted that credit sales were increasing faster than sales.[58]  He also noted with respect to customer FICO scores that, "the credit scores of new customers have been steadily trending down as has composite credit score for the entire loan portfolio."[59]  As Strubel concluded:

> Turning to loaning your customers money to drive sales is never a good strategy. As loan growth begins to accelerate faster than sales growth, you need to generate ever greater credit sales in order to keep total sales growing. This inevitably leads to a decline in underwriting standards. Eventually the entire scheme collapses either when credit growth slows or when serious problems begin to develop with the loan portfolio. We don't know when that will be, but Signet's strategy will

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] Ben Strubel, Gurufocus, *Signet Jewelers Headed for Trouble*, (Mar. 29, 2016), *available at* http://www.gurufocus.com/news/403387/signet-jewelers-headed-for-trouble.

[58] *Id.*

[59] *Id.*

surely fail eventually. Indeed, we can already see the cracks beginning to form as the loan portfolio deteriorates in quality.[60]

107.    By mid-2016, near the end of the Class Period, Signet's increasingly risky and increasingly broad lending practices had become too great for management to ignore.   On May 26, 2016, Signet announced that the Board of Directors "authorized management to conduct a strategic evaluation of the Company's credit portfolio" and that Goldman Sachs had been engaged as the Company's financial advisor in the process.[61]   While Signet CEO Mark Light downplayed the significance of the credit review by stating that Signet "[is] always looking for the best way to optimize [its] operating model," investors recognized the announcement to be "concerning news."[62]

108.    According to CW5, Goldman's Sachs' investigation is extensive and company-wide.  It targets Signet's credit and collection departments, including a focus on the company's senior management.

### F.      Signet Management Knew About the Very Low Quality of Signet's Credit Portfolio and the Sharp Increase in Signet's High-Risk Borrowers

109.    Given that Signet's in-house consumer finance program fueled its sales of jewelry, this program was part of Signet's core business.   Accordingly, Signet management, including Defendants Mark Light and Michele Santana, would have had robust knowledge of Signet's in-house consumer finance program, including knowledge of the poor and declining quality of Signet's credit portfolio.

110.    Moreover, Signet management knew about the sharp increase in bankruptcy filings naming Signet as creditor during the Class Period.   Signet had information regarding the

---

[60] *Id*.

[61] Signet Jewelers Ltd., Current Report (Form 8-K), at 18 (May 26, 2016).

[62] James Grant, *Lending Clubbed*, Grant's Interest Rate Observer, 11 (June 2, 2016).

number of personal bankruptcy filings naming Signet as a creditor within its possession throughout the Class Period.  U.S. Bankruptcy Courts notify all creditors named in a bankruptcy filing as a matter of course.[63]

111.    Signet has made clear that management routinely reviews aggregate numbers of personal bankruptcy filings naming Signet as creditor.  As Signet stated in its fiscal year 2016 Form 10-K SEC filing, "*A 100% allowance* [for uncollectible amounts] *is made for* any amount aged more than 90 days on a recency basis and *any amount associated with an account the owner of which has filed for bankruptcy.*  [. . .]  *The allowance calculation is reviewed by management* to assess whether, based on economic events, additional analysis is required to appropriately estimate losses inherent in the portfolio."[64] (Emphasis added.)  "*On an ongoing basis, management monitors the credit exposure* based on past due status and collection experience, as it has found a meaningful correlation between the past due status of customers and the risk of loss."[65] (Emphasis added.)

112.    On the Company's March 24, 2016 conference call with investors, Michele Santana stated:  "[O]ur year end valuation allowance and non-performing metrics improved as Management had expected compared to the third quarter.  [. . .]  *The visibility that we [Management] have into our credit portfolio performance* which *includes* daily collections, weekly roll rates to 30, 60, and 90 days and *other meaningful indicators* leads us to remain highly confident in the strength of our credit portfolio performance." (Emphasis added.)

---

[63] *See, e.g.*, Fed. R. Bankr. P. 2002.

[64] Signet Jewelers Ltd., Annual Report (Form 10-K), at 19 (Mar. 24, 2015).

[65] *Id*. at 103.

## VI.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### A.   Defendants' False and Misleading Statements in 2013

113.   In its August 29 and November 26, 2013 Form 10-Q SEC filings, Signet stated that the relevant risk disclosures referenced below in its March 28, 2013 Form 10-K had not changed.

114.   In its March 28, 2013 Form 10-K, Signet stated in relevant part:

*Loss of confidence by consumers in Signet's brand names, poor execution of marketing programs and reduced marketing expenditure could have a detrimental impact on sales.*

Primary factors in determining customer buying decisions in the jewelry sector include customer confidence in the retailer and in the brands it sells, together with the level and quality of customer service. The ability to differentiate Signet's stores and merchandise from competitors by its branding, marketing and advertising programs is an important factor in attracting consumers. If these programs are poorly executed, the level of support for them is reduced, or the customer loses confidence in any of Signet's brands for whatever reason, it could unfavorably impact sales and earnings.[66]

115.   The statements referenced in ¶¶ 113-14 above were materially false and/or misleading because they failed to disclose that:  (i) some of Signets' customers' precious stones were being swapped fraudulently for less valuable stones while in the custody of Signet; therefore (ii) a decline in customer confidence already had begun; (iii) the risk of further decline in customer confidence upon broader revelation of the fraudulent swapping was nearly certain; (iv) sexual harassment of female employees was pervasive at Signet and its subsidiaries, and was perpetrated by senior executives such as Defendant Light; and (v) Signet bore a material risk that information about the pervasive sexual harassment of women at Signet would become public, leading to loss of confidence in Signet's brands.

---

[66] Signet Jewelers Ltd., Annual Report (Form 10-K), at 30 (Mar. 28, 2013).

116.    Also in its March 28, 2013 Form 10-K, Signet stated in relevant part:

*Signet's success is dependent on the strength and effectiveness of its relationships with its various stakeholders whose behavior may be affected by its management of social, ethical and environmental risks.*

Social, ethical and environmental matters influence Signet's reputation, demand for merchandise by consumers, the ability to recruit staff, relations with suppliers and standing in the financial markets. Signet's success is dependent on the strength and effectiveness of its relationships with its various stakeholders: customers, shareholders, employees and suppliers. In recent years, stakeholder expectations have increased and Signet's success and reputation will depend on its ability to meet these higher expectations.

117.    The statements referenced in ¶ 113 and ¶ 116 above were materially false and/or misleading because they failed to disclose that:  (i) some of Signets' customers' precious stones were being swapped fraudulently for less valuable stones while in the custody of Signet; (ii) a change in customer behavior as a result of this unethical conduct already had begun; (iii) the risk of further change in customer behavior upon broader revelation of the fraudulent swapping was nearly certain; (iv) sexual harassment of female employees was pervasive at Signet and its subsidiaries, and was perpetrated by senior executives such as Defendant Light; (v) Signet bore a material risk that information about the pervasive sexual harassment of women at Signet would become public, leading to loss of demand by consumer's for Signet's merchandise.

118.    In its March 28, 2013 Form 10-K, Signet stated in relevant part:

*An adverse decision in legal proceedings and/or tax matters could reduce earnings.*

In March 2008, private plaintiffs filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ("Sterling"), a subsidiary of Signet, in US District Court for the Southern District of New York, which has been referred to private arbitration. In September 2008, the US Equal Employment Opportunities Commission filed a lawsuit against Sterling in US District Court for the Western District of New York. **Sterling denies the allegations from both parties** and has been defending these cases vigorously. If, however, it is unsuccessful in either defense, **Sterling could be required to pay substantial damages**. At this point, no outcome or amount of loss is able to be estimated. See Note 24 in Item 8.

[. . .]

*Legal proceedings*

In March 2008, a group of private plaintiffs filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ("Sterling"), a subsidiary of Signet, in the U.S. District Court for the Southern District of New York **alleging that US store-level employment practices are discriminatory as to compensation and promotional activities**. In June 2008, the District Court referred the matter to private arbitration where the plaintiffs sought to proceed on a class-wide basis. In June 2009, the arbitrator ruled that the arbitration agreements allowed the plaintiffs to proceed on a class-wide basis and attempt to seek class certification.

[. . .]

Sterling denies the allegations of both parties and has been defending these cases vigorously. At this point, no outcome or amount of loss is able to be estimated.

119.    The statements referenced in ¶ 113 and ¶ 118 above were materially false and/or misleading because they failed to disclose that:  (i) the allegations at issue in the *Jock* Lawsuit and Arbitration included explosive allegations of sexual harassment, and so were not limited to allegations of job discrimination in compensation and promotion, as the Company represented; (ii) the allegations of sexual harassment against Signet and its senior executives, including Defendant Light, were true; (iii) in the course of discovery in the 2008 private class action and arbitration, hundreds of former and then-current Signet employees submitted explosive and damning declarations that they and others at Signet were sexually harassed; and (iv) an additional risk of the *Jock* Lawsuit and Arbitration—a risk as great or greater than payment of damages—was the risk that these explosive and damning allegations of sexual harassment could be made public and cause damage to the reputation of Signet's brands.

120.    On August 29, 2013, Signet issued a press release entitled, "Signet Reports Second Quarter Financial Results," in which Signet stated:

We delivered solid second quarter results as expected, driven by same store sales increases of 3.6% overall and 4.9% in the US led by Kay up 5.8% and Jared up

5.5%. Our earnings per share of $0.84 were at the high-end of our guidance; excluding Ultra our earnings per share were $0.90. All results were, as previously explained, impacted by the Mother's Day calendar shift.[67]

121.   Signet made the same or substantially similar statements to those in ¶ 120 in its August 29, 2013 Form 10-Q SEC filing.

122.   The statements referenced in ¶¶ 120-21 above were materially false and/or misleading because they failed to disclose that:  (i) the *Jock* Arbitration concerned explosive allegations regarding sexual harassment and job discrimination that put Signet at great risk of substantial damages and loss of reputation, and (ii) indicators of the Company's positive financial performance as stated were artificially inflated, and indicators of the Company's potential losses were understated.

123.   On November 26, 2013, Signet issued a press release entitled, "Signet Reports Third Quarter Financial Results," in which Signet stated:

We are pleased with our third quarter results, led by a Kay same store sales increase of 5.8%.

[. . .]

Total sales were $771.4 million, up $55.2 million or 7.7% compared to $716.2 million in the 13 weeks ended October 27, 2012.[68]

124.   Signet made the same or substantially similar statements to those in ¶ 123 in its November 26, 2013 Form 10-Q SEC filing.

125.   The statements referenced in ¶¶ 123-24 above were materially false and/or misleading because they failed to disclose that:  (i) the *Jock* Arbitration concerned explosive allegations regarding sexual harassment and job discrimination that put Signet at great risk of substantial damages and loss of reputation, and (ii) indicators of the Company's positive

---

[67] Signet Jewelers Ltd., Press Release, *Signet Reports Second Quarter Financial Results*, at 1 (Aug. 29, 2013).

[68] Signet Jewelers Ltd., Press Release, *Signet Reports Third Quarter Financial Results*, at 1 (Nov. 29, 2013).

financial performance as stated were artificially inflated, and indicators of the Company's potential losses were understated.

### B.     Defendants' False and Misleading Statements in 2014

126.    On February 27, 2014, Signet made publicly available its Code of Conduct, which it maintained on its website until the end of the Class Period.  The Code of Conduct states the following:

Maintaining a Safe, Healthy and Affirmative Workplace

**The Company is an equal opportunity employer and bases our recruitment, employment, development and promotion decisions solely on a person's ability and potential** in relation to the needs of the job, and complies with local, state and federal employment laws.

[. . .]

**Those who violate the standards in this Code will be subject to disciplinary action.**

[. . .]

**The Company is committed to a workplace that is free from sexual, racial, or other unlawful harassment**, and from threats or acts of violence or physical intimidation. Abusive, harassing or other offensive conduct is unacceptable, whether verbal, physical or visual. Any person who believes that they have been harassed or threatened with or subjected to physical violence in or related to the workplace should report the incident to an appropriate supervisor or Human Resources, who will arrange for it to be investigated. All efforts will be made to handle the investigation confidentially.

127.    The statements referenced in ¶ 126 above were materially false and/or misleading because they failed to disclose that:  (i) sexual harassment of female employees was pervasive at Signet and its subsidiaries, and was perpetrated by senior executives such as Defendant Light, so the Company was not meaningfully committed to a workplace free from sexual harassment; (ii) usually employees who violated the Code of Conduct by committing acts of sexual harassment were subject to no disciplinary action at all; and (iii) the Company did not "base[ its]

41

recruitment, employment, development and promotion decisions solely on a person's ability and potential" and did not comply with local, state and federal employment laws, because Signet routinely discriminated against women in its employment and promotion practices and often conditioned employment and promotion decisions on sexual favors.

128.     On March 27, 2014, Signet issued a press release entitled, "Signet Reports Fourth Quarter and Fiscal 2014 Results," in which Signet stated:

> Signet performed well during the year delivering a 4.4% increase in same store sales and a 4.8% increase in EPS.
>
> [. . .]
>
> Total sales were $1,564.0 million, up $50.7 million or 3.4%, compared to $1,513.3 million in the 14 weeks ended February 2, 2013.[69]

129.     Signet made the same or substantially similar statements to those in ¶ 128 in its March 27, 2014 Form 10-K SEC filing.

130.     The statements referenced in ¶¶ 128-29 above were materially false and/or misleading because they failed to disclose that:  (i) the *Jock* Arbitration concerned explosive allegations regarding sexual harassment and job discrimination that put Signet at great risk of substantial damages and loss of reputation, and (ii) indicators of the Company's positive financial performance as stated were artificially inflated, and indicators of the Company's potential losses were understated.

131.     In its March 27, 2014 Form 10-K, Signet stated in relevant part:

> *Loss of confidence by consumers in Signet's brand names, poor execution of marketing programs and reduced marketing expenditure could have a detrimental impact on sales.*
>
> Primary factors in determining customer buying decisions in the jewelry sector include customer confidence in the retailer and in the brands it sells, together with

---

[69] Signet Jewelers Ltd., Press Release, *Signet Reports Record Fourth Quarter and Fiscal 2013 Results*, at 1 (Mar. 28, 2013).

the level and quality of customer service. The ability to differentiate Signet's stores and merchandise from competitors by its branding, marketing and advertising programs is an important factor in attracting consumers. If these programs are poorly executed, the level of support for them is reduced, or the customer loses confidence in any of Signet's brands for whatever reason, it could unfavorably impact sales and earnings.[70]

132.    In its June 3, September 10 and December 8, 2014 Form 10-Q SEC filings, Signet stated that the relevant risk disclosures referenced herein in its March 27, 2014 Form 10-K had not changed.

133.    The statements referenced in ¶¶ 131-32 above were materially false and/or misleading because they failed to disclose that:  (i) some of Signets' customers' precious stones were being swapped fraudulently for less valuable stones while in the custody of Signet; therefore (ii) a decline in customer confidence already had begun; (iii) the risk of further decline in customer confidence upon broader revelation of the fraudulent swapping was nearly certain; (iv) sexual harassment of female employees was pervasive at Signet and its subsidiaries, and was perpetrated by senior executives such as Defendant Light; and (v) Signet bore a material risk that information about the pervasive sexual harassment of women at Signet would become public, leading to loss of confidence in Signet's brands.

134.    Also in its March 27, 2014 Form 10-K, Signet stated in relevant part:

*Signet's success is dependent on the strength and effectiveness of its relationships with its various stakeholders whose behavior may be affected by its management of social, ethical and environmental risks.*

Social, ethical and environmental matters influence Signet's reputation, demand for merchandise by consumers, the ability to recruit staff, relations with suppliers and standing in the financial markets. Signet's success is dependent on the strength and effectiveness of its relationships with its various stakeholders: customers, shareholders, employees and suppliers. In recent years, stakeholder expectations have increased and Signet's success and reputation will depend on its ability to meet these higher expectations.

---

[70] Signet Jewelers Ltd., Annual Report (Form 10-K), at 30 (Mar. 28, 2013).

135.    The statements referenced in ¶ 132 and ¶ 134 above were materially false and/or misleading because they failed to disclose that:  (i) some of Signets' customers' precious stones were being swapped fraudulently for less valuable stones while in the custody of Signet; (ii) a change in customer behavior as a result of this unethical conduct already had begun; (iii) the risk of further change in customer behavior upon broader revelation of the fraudulent swapping was nearly certain; (iv) sexual harassment of female employees was pervasive at Signet and its subsidiaries, and was perpetrated by senior executives such as Defendant Light; (v) Signet bore a material risk that information about the pervasive sexual harassment of women at Signet would become public, leading to loss of demand by consumer's for Signet's merchandise.

136.    In its March 27, 2014 Form 10-K, Signet stated in relevant part:

*An adverse decision in legal proceedings and/or tax matters could reduce earnings.*

In March 2008, private plaintiffs filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ("Sterling"), a subsidiary of Signet, in US District Court for the Southern District of New York, which has been referred to private arbitration. In September 2008, the US Equal Employment Opportunities Commission filed a lawsuit against Sterling in US District Court for the Western District of New York. **Sterling denies the allegations from both parties** and has been defending these cases vigorously. If, however, it is unsuccessful in either defense, **Sterling could be required to pay substantial damages**. At this point, no outcome or amount of loss is able to be estimated. See Note 24 in Item 8.

[. . .]

*Legal proceedings*

As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ("Sterling"), a subsidiary of Signet, in the U.S. District Court for the Southern District of New York **alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender.** In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis.  Discovery has been completed. The Claimants filed a motion for class certification and Sterling opposed the motion.

[. . .]

Sterling denies the allegations of both parties and has been defending these cases vigorously. At this point, no outcome or amount of loss is able to be estimated.

(Emphasis added.)

137.    The statements referenced in ¶ 132 and ¶ 136 above were materially false and/or misleading because they failed to disclose that:  (i) the allegations at issue in the *Jock* Lawsuit and Arbitration included explosive allegations of sexual harassment, and so were not limited to allegations of job discrimination in compensation and promotion, as the Company represented; (ii) the allegations of sexual harassment against Signet and its senior executives, including Defendant Light, were true; (iii) in the course of discovery in the 2008 private class action and arbitration, hundreds of former and then-current Signet employees submitted explosive and damning declarations that they and others at Signet were sexually harassed; and (iv) an additional risk of the *Jock* Lawsuit and Arbitration—a risk as great or greater than payment of damages—was the risk that these explosive and damning allegations of sexual harassment could be made public and cause damage to the reputation of Signet's brands.

138.    On May 22, 2014, Signet issued a press release entitled, "Signet Reports First Quarter Financial Results," in which Signet stated:

> We delivered a very strong first quarter with increases of 6.3% in total sales, 3.3% in same store sales and 14.2% in adjusted EPS. Positive momentum at our UK division continued with same store sales of 4.1% and a significant improvement in profitability. US division same store sales increased 3.2%, with a solid performance by both Kay and Jared.[71]

139.    Signet made the same or substantially similar statements to those in ¶ 138 in its June 3, 2014 Form 10-Q SEC filing.

---

[71] Signet Jewelers Ltd., Press Release, *Signet Reports First Quarter Financial Results*, at 1 (May 22, 2014).

140.    The statements referenced in ¶¶ 138-39 above were materially false and/or misleading because they failed to disclose that: (i) the *Jock* Arbitration concerned explosive allegations regarding sexual harassment and job discrimination that put Signet at great risk of substantial damages and loss of reputation, and (ii) indicators of the Company's positive financial performance as stated were artificially inflated, and indicators of the Company's potential losses were understated.

141.    On August 28, 2014, Signet issued a press release entitled, "Signet Jewelers Reports Second Quarter Financial Results," in which Signet stated:

> We delivered a very strong second quarter with increases of 6.3% in organic same store sales and 19.0% in organic EPS. Positive momentum at our UK division continued with our best quarterly same store sales increase in seven years, at 4.4%, and our best operating margin in five years.[72]

142.    Signet made the same or substantially similar statements to those in ¶ 141 in its September 10, 2014 Form 10-Q SEC filing.

143.    The statements referenced in ¶¶ 141-42 above were materially false and/or misleading because they failed to disclose that: (i) the *Jock* Arbitration concerned explosive allegations regarding sexual harassment and job discrimination that put Signet at great risk of substantial damages and loss of reputation, and (ii) indicators of the Company's positive financial performance as stated were artificially inflated, and indicators of the Company's potential losses were understated.

144.    On November 25, 2014, Signet issued a press release entitled, "Signet Jewelers Reports Third Quarter Fiscal 2015 Financial Results," in which the Company stated, in relevant part:

---

[72] Signet Jewelers Ltd., Press Release, *Signet Jewelers Reports Second Quarter Financial Results*, at 1 (Aug. 28, 2014).

**Third Quarter Fiscal 2015 Sales Highlights:**

Total sales were $1,177.9 million, up $406.5 million or 52.7%, compared to $771.4 million in the third quarter Fiscal 2014. [. . .] Same store sales increased 4.2% compared to an increase of 3.2% in the third quarter Fiscal 2014.[73]

145.   Signet made the same or substantially similar statements to those in ¶ 144 in its

December 8, 2014 Form 10-Q SEC filing, as well as the following statements, in relevant part:

Allowance for credit losses on Sterling Jewelers' customer in-house finance receivables:[74]

| (in millions) | 39 weeks ended November 1, 2014 | 52 weeks ended February 1, 2014 |
|---|---|---|
| Charge-offs | 101.0 | 128.2 |
| Provision Expense | (127.9) | (164.3) |

[. . .]

Credit quality indicator and age analysis of past due Sterling Jewelers' customer in-house finance receivables:

| (in millions) | Nov. 1, 2014 | Feb. 1, 2014 | Nov. 2, 2013 |
|---|---|---|---|
| Performing | | | |
| Current, aged 0-30 days | 1,087.9 | 1,170.4 | 946.9 |
| Past due, aged 31-90 days | 233.8 | 229.9 | 201.1 |
| Non Performing | | | |
| Past-due, aged more than 90 days | 61.2 | 53.5 | 53.4 |

146.   The statements referenced in ¶¶ 144-45 above were materially false and/or

misleading because they failed to disclose that:  (i) Signet had very low lending standards that

were materially below the standards of other consumer creditors and that were not adequately

---

[73] Signet Jewelers Ltd., Press Release, *Signet Jewelers Reports Third Quarter Fiscal 2015 Financial Results* (Nov. 24, 2014).

[74] Signet Jewelers Ltd., Quarterly Report (Form 10-Q), at 13 (Dec. 8, 2014).

captured in Signet's credit quality indicators; (ii) the amount of money owed to Signet that was actually past due was significantly greater than Signet's delinquency figures suggested; (iii) Signet's low lending standards were fueling Signet's sales growth; (iv) the *Jock* Arbitration concerned explosive allegations regarding sexual harassment and job discrimination that put Signet at great risk of substantial damages and loss of reputation, and (v) indicators of the Company's positive financial performance as stated were artificially inflated, and indicators of the Company's potential losses were understated.

147.    In addition, Signet made the following statements in its December 8, 2014 Form 10-Q SEC filing:

> There have been no material changes in our risk factors from those disclosed in Part I, Item 1A, of Signet's Fiscal 2014 Annual Report on Form 10-K, filed with the SEC on March 27, 2014, except that the risk factors set forth below include any material changes to, and supersede, to the extent included below, the description of, the risk factors disclosed in Part I, Item 1A of Signet's Fiscal 2014 Annual Report on Form 10-K.[75]

148.    Signet made no changes to the section of Part I, Item 1A, of Signet's Fiscal 2014 Annual Report on Form 10-K entitled, "Loss of confidence by consumers in Signet's brand names, poor execution of marketing programs and reduced marketing expenditure could have a detrimental impact on sales."  That section stated:

> *Loss of confidence by consumers in Signet's brand names, poor execution of marketing programs and reduced marketing expenditure could have a detrimental impact on sales.*
>
> Primary factors in determining customer buying decisions in the jewelry sector include customer confidence in the retailer and in the brands it sells, together with the level and quality of customer service. The ability to differentiate Signet's stores and merchandise from competitors by its branding, marketing and advertising programs is an important factor in attracting consumers. If these programs are poorly executed or the level of support for them is reduced, or the

---

[75] Signet Jewelers Ltd., Quarterly Report (Form 10-Q), at 61 (Dec. 8, 2014).

customer loses confidence in any of Signet's brands for whatever reason, it could unfavorably impact sales and earnings.

149.    In its November 24, 2014 and January 8, 2015 press releases, and in the presentations accompanying its November 24, 2014 and January 8, 2015 conference calls with investors, Signet incorporated the section of Part I, Item 1A, of Signet's Fiscal 2014 Annual Report on Form 10-K entitled, "Loss of confidence by consumers in Signet's brand names, poor execution of marketing programs and reduced marketing expenditure could have a detrimental impact on sales" by reference.

150.    The statements referenced in ¶¶ 147-49 above were materially false and/or misleading because they failed to disclose that:  (i) some of Signets' customers' precious stones were being swapped fraudulently for less valuable stones while in the custody of Signet; therefore (ii) a decline in customer confidence already had begun; (iii) the risk of further decline in customer confidence upon broader revelation of the fraudulent swapping was nearly certain; (iv) sexual harassment of female employees was pervasive at Signet and its subsidiaries, and was perpetrated by senior executives such as Defendant Light; and (v) Signet bore a material risk that information about the pervasive sexual harassment of women at Signet would become public, leading to loss of confidence in Signet's brands.

C.    Defendants' False and Misleading Statements in 2015

151.    On January 8, 2015, Signet issued a press release entitled, "Signet Holiday Season Same Store Sales Increase 3.6%," in which the Company stated, in relevant part, that its same-store sales for the Signet fiscal year 2015 holiday season were "up 3.6%."[76]

152.    The statements referenced in ¶ 151 above were materially false and/or misleading because they failed to disclose that:  (i) Signet had very low lending standards, standards

---

[76] Signet Jewelers Ltd., Press Release, *Signet Holiday Season Same Store Sales Increase 3.6%* (Jan. 8, 2015).

materially below the standards of other consumer creditors; (ii) these low lending standards were fueling Signet's sales growth; (iii) the *Jock* Arbitration concerned explosive allegations regarding sexual harassment and job discrimination that put Signet at great risk of substantial damages and loss of reputation, and (iv) as a result, indicators of the Company's positive financial performance as stated were artificially inflated, and indicators of the Company's potential losses were understated.

153.   On March 26, 2015, Signet issued a press release entitled, "Signet Jewelers Reports Excellent Fourth Quarter and Strong Fiscal 2015 Financial Results," in which Defendant Mark Light stated, in relevant part:

> We had an outstanding finish to another strong year of growth for Signet. The disciplined execution of our focused strategies drove broad-based success across all of our divisions and store brands. For the quarter, we delivered a 4.2% increase in same store sales, EPS of $2.84, and adjusted EPS of $3.06—an increase of 40.4%. For the year, we generated a 4.1% same store sales increase which led to EPS of $4.75 and adjusted EPS of $5.63 -- an increase of 23.5%.[77]

154.   Signet made the same or substantially similar statements to those in ¶ 153 in its March 26, 2015 Form 10-K SEC filing, as well as the following statements, in relevant part:

*Customer Finance*

Each individual application for credit is evaluated centrally against set lending criteria. In Fiscal 2015 the Sterling Jewelers division invested in a new decision engine, which preserves requirements while allowing more refined scoring of applicants, allowing for optimum credit extensions. The risks associated with the granting of credit to particular groups of guests with similar characteristics are balanced against the gross merchandise margin earned by the proposed sales to those guests. Management believes that the primary drivers of the net bad debt to total Sterling Jewelers sales ratio are the effectiveness of the proprietary customer credit models used when granting customer credit, the procedures used to collect the outstanding balances, credit sales as a percentage to total Sterling Jewelers sales and the overall macro-economic environment. Cash flows associated with

---

[77] Signet Jewelers Ltd., Press Release, *Signet Jewelers Reports Excellent Fourth Quarter and Strong Fiscal 2015 Financial Results* (Mar. 26, 2015).

the granting of credit to guests of the individual store are included in the projections used when considering store investment proposals.[78]

*Customer Financing Statistics*

| (in millions) | Fiscal 2015 | Fiscal 2014 |
| --- | --- | --- |
| Net bad debt expense | 160.0 | 138.3 |

[. . .]

| (in millions) | Fiscal 2015 | Fiscal 2014 |
| --- | --- | --- |
| Charge-offs | 144.7 | 128.2 |
| Provision Expense | (187.5) | (164.3) |

[. . .]

Credit quality indicator and age analysis of past due Sterling Jewelers' customer in-house finance receivables:

| (in millions) | Jan. 31, 2015 | Feb. 1, 2014 | Feb. 2, 2013 |
| --- | --- | --- | --- |
| Performing | | | |
| Current, aged 0-30 days | 1,332.2 | 1,170.4 | 1,030.3 |
| Past due, aged 31-90 days | 271.1 | 229.9 | 203.9 |
| Non Performing | | | |
| Past-due, aged more than 90 days | 62.7 | 53.5 | 46.4 |

155.   The statements referenced in ¶¶ 153-54 above were materially false and/or misleading because they failed to disclose that:  (i) Signet had very low lending standards that were materially below the standards of other consumer creditors and that were not adequately captured in Signet's credit quality indicators; (ii) the amount of money owed to Signet that was

---

[78] Signet Jewelers Ltd., Annual Report (Form 10-K), at 19, 98 (Mar. 26, 2015).

actually past due was significantly greater than Signet's delinquency figures suggested; (iii) Signet's low lending standards were fueling Signet's sales growth; (iv) the *Jock* Arbitration concerned explosive allegations regarding sexual harassment and job discrimination that put Signet at great risk of substantial damages and loss of reputation, and (v) as a result, indicators of the Company's positive financial performance as stated were artificially inflated, and indicators of the Company's potential losses were understated.

156.   In its March 26, 2015 Form 10-K SEC filing, Signet further stated in relevant part:

> *Loss of confidence by consumers in Signet's brand names, poor execution of marketing programs and reduced marketing expenditure could have a detrimental impact on sales.*
>
> Primary factors in determining customer buying decisions in the jewelry sector include customer confidence in the retailer and in the brands it sells, together with the level and quality of customer service. The ability to differentiate Signet's stores and merchandise from competitors by its branding, marketing and advertising programs is an important factor in attracting consumers. If these programs are poorly executed, the level of support for them is reduced, or the customer loses confidence in any of Signet's brands for whatever reason, it could unfavorably impact sales and earnings.[79]

157.   In its June 3, September 3, and December 4, 2015 Form 10-Q filings, Signet stated that the relevant risk disclosures referenced herein in its March 26, 2015 Form 10-K SEC filing had not changed.[80]

158.   Likewise in its March 26, May 28, August 27, November 24, 2015 and January 8, 2016 press releases, and in the presentations accompanying its March 26, May 28, August 27, November 24, 2015 and January 8, 2016 conference calls with investors, Signet incorporated by reference the relevant risk disclosures referenced herein.

---

[79] Signet Jewelers Ltd., Annual Report (Form 10-K), at 28 (Mar. 26, 2015).

[80] Signet Jewelers Ltd., Quarterly Report (Form 10-Q), at 49 (June 3, 2015); Signet Jewelers Ltd., Quarterly Report (Form 10-Q), at 63 (Sept. 3, 2015); Signet Jewelers Ltd., Quarterly Report (Form 10-Q), at 62 (Dec. 4, 2015).

159.    The statements referenced in ¶¶ 156-58 above were materially false and/or misleading because they failed to disclose that:  (i) some of Signets' customers' precious stones were being swapped fraudulently for less valuable stones while in the custody of Signet; therefore (ii) a decline in customer confidence already had begun; and (iii) the risk of further decline in customer confidence upon broader revelation of the fraudulent swapping was nearly certain; (iv) sexual harassment of female employees was pervasive at Signet and its subsidiaries, and was perpetrated by senior executives such as Defendant Light; and (v) Signet bore a material risk that information about the pervasive sexual harassment of women at Signet would become public, leading to loss of confidence in Signet's brands.

160.    Also in its March 26, 2015 Form 10-K, Signet stated in relevant part:

*Signet's success is dependent on the strength and effectiveness of its relationships with its various stakeholders whose behavior may be affected by its management of social, ethical and environmental risks.*

Social, ethical and environmental matters influence Signet's reputation, demand for merchandise by consumers, the ability to recruit staff, relations with suppliers and standing in the financial markets. Signet's success is dependent on the strength and effectiveness of its relationships with its various stakeholders: customers, shareholders, employees and suppliers. In recent years, stakeholder expectations have increased and Signet's success and reputation will depend on its ability to meet these higher expectations.

161.    The statements referenced in ¶¶ 157-58 and ¶ 160 above were materially false and/or misleading because they failed to disclose that:  (i) some of Signets' customers' precious stones were being swapped fraudulently for less valuable stones while in the custody of Signet; (ii) a change in customer behavior as a result of this unethical conduct already had begun; (iii) the risk of further change in customer behavior upon broader revelation of the fraudulent swapping was nearly certain; (iv) sexual harassment of female employees was pervasive at Signet and its subsidiaries, and was perpetrated by senior executives such as Defendant Light; and (v) Signet bore a material risk that information about the pervasive sexual harassment of

women at Signet would become public, leading to loss of demand by consumer's for Signet's

merchandise.

162.    In its March 26, 2015 Form 10-K, Signet stated in relevant part:

*An adverse decision in legal proceedings and/or tax matters could reduce earnings.*

In March 2008, private plaintiffs filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ("Sterling"), a subsidiary of Signet, in US District Court for the Southern District of New York, which has been referred to private arbitration. In September 2008, the US Equal Employment Opportunities Commission filed a lawsuit against Sterling in US District Court for the Western District of New York. **Sterling denies the allegations from both parties** and has been defending these cases vigorously. If, however, it is unsuccessful in either defense, **Sterling could be required to pay substantial damages**. At this point, no outcome or amount of loss is able to be estimated. See Note 24 in Item 8.

[. . .]

*Legal proceedings*

As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ("Sterling"), a subsidiary of Signet, in the U.S. District Court for the Southern District of New York **alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender**. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis.  Discovery has been completed. The Claimants filed a motion for class certification and Sterling opposed the motion.

[. . .]

Sterling denies the allegations of both parties and has been defending these cases vigorously. At this point, no outcome or amount of loss is able to be estimated.

(Emphasis added.)

163.    The statements referenced in ¶¶ 157-58 and ¶ 162 above were materially false

and/or misleading because they failed to disclose that:  (i) the allegations at issue in the *Jock*

*Lawsuit and Arbitration* included explosive allegations of sexual harassment, and so were not

limited to allegations of job discrimination in compensation and promotion, as the Company

represented; (ii) the allegations of sexual harassment against Signet and its senior executives, including Defendant Light, were true; (iii) in the course of discovery in the 2008 private class action and arbitration, hundreds of former and then-current Signet employees submitted explosive and damning declarations that they and others at Signet were sexually harassed; and (iv) an additional risk of the *Jock* Lawsuit and Arbitration—a risk as great or greater than payment of damages—was the risk that these explosive and damning allegations of sexual harassment could be made public and cause damage to the reputation of Signet's brands.

164.    On May 28, 2015, Signet issued a press release entitled, "Signet Jewelers Reports Strong First Quarter Financial Results," in which Defendant Mark Light stated, in relevant part:

> We delivered a very strong first quarter of 3.6% same store sales and a 25.6% increase in adjusted EPS. Each of our divisions had impressive same store sales increases, led by our UK division with an increase of 6.2%, while our newest division, Zale, had a 5.6% increase. The Sterling division had a 2.3% same store increase—its 22nd consecutive quarterly comp increase.[81]

165.    Signet made the same or substantially similar statements to those in ¶ 164 in its June 3, 2015 Form 10-Q SEC filing, as well as the following statements, in relevant part:

> The allowance for credit losses on Sterling Jewelers' customer in-house finance receivables is shown below:[82]

| (in millions) | 13 weeks ended May 2, 2015 | 13 weeks ended May 3, 2014 |
|---|---|---|
| Charge-offs | 37.9 | 32.3 |
| Provision Expense | (38.5) | (30.8) |

[. . .]

The following tables summarize the credit quality indicator and age analysis of past due Sterling Jewelers' customer in-house finance receivables:

---

[81] Signet Jewelers Ltd., Press Release, *Signet Jewelers Reports Strong First Quarter Financial* Results (May 28, 2015).

[82] Signet Jewelers Ltd., Quarterly Report (Form 10-Q), at 14 (June 3, 2015).

| (in millions) | May 2, 2015 | Jan. 31, 2015 | May 3, 2014 |
|---|---|---|---|
| Performing | | | |
| Current, aged 0-30 days | 1,290.9 | 1,332.2 | 1,130.8 |
| Past due, aged 31-90 days | 246.4 | 271.1 | 205.6 |
| Non Performing | | | |
| Past-due, aged more than 90 days | 55.4 | 62.7 | 46.2 |

166.    The statements referenced in ¶¶ 164-65 above were materially false and/or misleading because they failed to disclose that:  (i) Signet had very low lending standards that were materially below the standards of other consumer creditors and that were not adequately captured in Signet's credit quality indicators; (ii) the amount of money owed to Signet that was actually past due was significantly greater than Signet's delinquency figures suggested; (iii) the number of personal bankruptcy filings naming Signet as a creditor was sharply increasing; (iv) Signet's low lending standards were fueling Signet's sales growth; (v) the *Jock* Arbitration concerned explosive allegations regarding sexual harassment and job discrimination that put Signet at great risk of substantial damages and loss of reputation, and (vi) as a result, indicators of the Company's positive financial performance as stated were artificially inflated, and indicators of the Company's potential losses were understated.

167.    On August 27, 2015, Signet issued a press release entitled, "Signet Jewelers Reports Second Quarter Financial Results," in which Defendant Mark Light stated, in relevant part:

> "Signet delivered a second quarter increase in same store sales of 4.2%, earnings per share of $0.78, and adjusted earnings per share of $1.28, a 19.6% increase. These results exceeded our same store sales and adjusted EPS guidance for the quarter. Results were driven by strong and consistent sales growth across all of

our selling channels, as well as solid profitability and disciplined cost management across our organization.[83]

168.    Signet made the same or substantially similar statements to those in ¶ 167 in its

September 3, 2015 Form 10-Q SEC filing, as well as the following statements, in relevant part:

The allowance for credit losses on Sterling Jewelers' customer in-house finance receivables is shown below:

| (in millions) | 26 weeks ended August 1, 2015 | 26 weeks ended August 2, 2014 |
|---|---|---|
| Charge-offs | 74.6 | 63 |
| Provision Expense | (95.9) | (79.1) |

[. . .]

The following tables summarize the credit quality indicator and age analysis of past due Sterling Jewelers' customer in-house finance receivables:[84]

| (in millions) | Aug. 1, 2015 | Jan. 31, 2015 | Aug. 2, 2014 |
|---|---|---|---|
| Performing | | | |
| Current, aged 0-30 days | 1,252.4 | 1,332.2 | 1,110.6 |
| Past due, aged 31-90 days | 278.4 | 271.1 | 236.8 |
| Non Performing | | | |
| Past-due, aged more than 90 days | 68.3 | 62.7 | 56.6 |

169.    The statements referenced in ¶¶ 167-68 above were materially false and/or

misleading because they failed to disclose that:  (i) Signet had very low lending standards that

were materially below the standards of other consumer creditors and that were not adequately

captured in Signet's credit quality indicators; (ii) the amount of money owed to Signet that was

---

[83] Signet Jewelers Ltd., Press Release, *Signet Jewelers Reports Third Quarter Financial Results* (Aug. 27, 2015).

[84] Signet Jewelers Ltd., Quarterly Report (Form 10-Q), at 16 (Sept. 3, 2015).

actually past due was significantly greater than Signet's delinquency figures suggested; (iii) the number of personal bankruptcy filings naming Signet as a creditor was sharply increasing; (iv) Signet's low lending standards were fueling Signet's sales growth; (v) the *Jock* Arbitration concerned explosive allegations regarding sexual harassment and job discrimination that put Signet at great risk of substantial damages and loss of reputation, and (vi) as a result, indicators of the Company's positive financial performance as stated were artificially inflated, and indicators of the Company's potential losses were understated.

170.    On November 24, 2015, Signet issued a press release entitled, "Signet Jewelers Reports Third Quarter Financial Results," in which Defendant Mark Light stated, in relevant part:

> Signet delivered another quarter of continued growth, highlighted by a same store sales increase of 3.3% and adjusted earnings per share growth of 57.1%," commented Mark Light, Chief Executive Officer of Signet Jewelers. "We are pleased to report strong sales growth in line with our third quarter guidance. We also delivered excellent earnings growth, although earnings were affected by a modest margin impact due to a sales mix shift from Jared to Kay.
>
> We are currently experiencing an encouraging start to November particularly at Jared and Zales. The implementation of store operations initiatives in the third quarter combined with significant investment in our recently launched innovative merchandising and marketing programs have positioned Signet for a strong fourth quarter."[85]

171.    Signet made the same or substantially similar statements to those in ¶ 170 in its December 4, 2015 Form 10-Q SEC filing, as well as the following statements, in relevant part:

> The allowance for credit losses on Sterling Jewelers' customer in-house finance receivables is shown below:[86]

---

[85] Signet Jewelers Ltd., Press Release, *Signet Jewelers Reports Third Quarter Financial Results*, at 6 (Nov. 24, 2015).

[86] Signet Jewelers Ltd., Quarterly Report (Form 10-Q), at 16 (Dec. 4, 2015).

| (in millions) | October 31, 2015 | November 1, 2014 |
|---|---|---|
| Charge-offs | 121.5 | 101.0 |
| Provision | (157.6) | (127.9) |

The following tables summarize the credit quality indicator and age analysis of past due Sterling Jewelers' customer in-house finance receivables:

| (in millions) | Oct. 31, 2015 | Jan. 31, 2015 | Nov. 1, 2014 |
|---|---|---|---|
| Performing | | | |
|   Current, aged 0-30 days | 1,212.2 | 1,332.2 | 1,087.9 |
|   Past due, aged 31-90 days | 271.2 | 271.1 | 233.8 |
| Non Performing | | | |
|   Past-due, aged more than 90 days | 76 | 62.7 | 61.2 |

172.    On Signet's November 24, 2015 conference call with investors, Defendant Michele Santana stated:

> Signet has not changed its credit standards and our credit portfolio continues to perform well and profitably.  [. . .]  No changes have been made in our credit standards and the bottom line is that small changes have a more pronounced impact in the third quarter as the third quarter is our smallest quarter but our credit earnings are earned more evenly throughout the year.[87]

173.    The statements referenced in ¶¶ 170-72 above were materially false and/or misleading because they failed to disclose that:  (i) the quality of Signet's credit portfolio had dropped materially more than these figures suggest; (ii) the amount of money owed to Signet that was actually past due was significantly greater than Signet's delinquency figures suggested; (iii) the number of bankruptcy filers naming Signet as a creditor had significantly increased; (iv) Signet had very low lending standards that were materially below the standards of other

---

[87] Signet Jewelers Ltd., Fiscal 2016 Third Quarter Financial Results Call and Webcast (Nov. 24, 2015).

consumer creditors and that were not adequately captured in Signet's credit quality indicators; (v) Signet's low lending standards were fueling Signet's sales growth; (vi) the *Jock* Arbitration concerned explosive allegations regarding sexual harassment and job discrimination that put Signet at great risk of substantial damages and loss of reputation, and (vii) as a result, indicators of the Company's positive financial performance as stated were artificially inflated, and indicators of the Company's potential losses were understated.

### D.    Defendants' False and Misleading Statements in 2016

174.    On January 7, 2016, Signet issued a press release entitled, "Signet Jewelers Reports Holiday Season Same Store Sales up 4.9%," in which the Company stated, in relevant part:

**<u>Holiday Season Sales Highlights:</u>**

- Total sales of $1,947.8 million, up 5.0% over the prior year.

- Same store sales increased 4.9% compared to an increase of 3.6% in the prior year.

- Financial guidance narrowed to top end of previously provided guidance.[88]

175.    The statements referenced in ¶ 174 above were materially false and/or misleading because they failed to disclose that:   (i) Signet had very low lending standards that were materially below the standards of other consumer creditors and that were not adequately captured in Signet's credit quality indicators; (ii) the number of personal bankruptcy filings naming Signet as a creditor had increased significantly; (iii) these low lending standards were fueling Signet's sales growth; (iv) the *Jock* Arbitration concerned explosive allegations regarding sexual harassment and job discrimination that put Signet at great risk of substantial damages and loss of reputation, and (v) as a result, indicators of the Company's positive financial performance as

---

[88] Signet Jewelers Ltd., Press Release, *Signet Jewelers Reports Holiday Season Same Store Sales up 4.9%* (Jan. 7, 2016).

stated were artificially inflated, and indicators of the Company's potential losses were understated.

176.    In its March 24, 2016 Form 10-K, Signet stated in relevant part:

*Loss of confidence by consumers in Signet's brand names, poor execution of marketing programs and reduced marketing expenditure could have a detrimental impact on sales.*

Primary factors in determining customer buying decisions in the jewelry sector include customer confidence in the retailer and in the brands it sells, together with the level and quality of customer service. The ability to differentiate Signet's stores and merchandise from competitors by its branding, marketing and advertising programs is an important factor in attracting consumers. If these programs are poorly executed, the level of support for them is reduced, or the customer loses confidence in any of Signet's brands for whatever reason, it could unfavorably impact sales and earnings.[89]

177.    In its June 3, 2016 Form 10-Q SEC filing, Signet stated that the relevant risk disclosure in its March 24, 2016 Form 10-K referenced herein had not changed.

178.    Likewise in its March 24, May 26 and June 3, 2016 press releases, and in the presentations accompanying its March 24 and May 26, 2016 conference calls with investors, Signet incorporated by reference the relevant risk disclosures referenced herein.

179.    The statements referenced in ¶¶ 176-78 above were materially false and/or misleading because they failed to disclose that:  (i) some of Signets' customers' precious stones were being swapped fraudulently for less valuable stones while in the custody of Signet; therefore (ii) a decline in customer confidence already had begun; (iii) the risk of further decline in customer confidence upon broader revelation of the fraudulent swapping was nearly certain; (iv) sexual harassment of female employees was pervasive at Signet and its subsidiaries, and was perpetrated by senior executives such as Defendant Light; (v) Signet bore a material risk that

---

[89] Signet Jewelers Ltd., Annual Report (Form 10-K), at 29 (Mar. 24, 2016).

information about the pervasive sexual harassment of women at Signet would become public, leading to loss of confidence in Signet's brands.

180.    Also in its March 24, 2016 Form 10-K, Signet stated in relevant part:

*Signet's success is dependent on the strength and effectiveness of its relationships with its various stakeholders whose behavior may be affected by its management of social, ethical and environmental risks.*

Social, ethical and environmental matters influence Signet's reputation, demand for merchandise by consumers, the ability to recruit staff, relations with suppliers and standing in the financial markets. Signet's success is dependent on the strength and effectiveness of its relationships with its various stakeholders: customers, shareholders, employees and suppliers. In recent years, stakeholder expectations have increased and Signet's success and reputation will depend on its ability to meet these higher expectations. Signet's success also depends upon its reputation for integrity in sourcing its merchandise, which, if adversely affected could impact consumer sentiment and willingness to purchase Signet's merchandise

181.    The statements referenced in ¶¶ 177-78 and ¶ 180 above were materially false and/or misleading because they failed to disclose that:  (i) some of Signets' customers' precious stones were being swapped fraudulently for less valuable stones while in the custody of Signet; (ii) a change in customer behavior as a result of this unethical conduct already had begun; (iii) the risk of further change in customer behavior upon broader revelation of the fraudulent swapping was nearly certain; (iv) sexual harassment of female employees was pervasive at Signet and its subsidiaries, and was perpetrated by senior executives such as Defendant Light; (v) Signet bore a material risk that information about the pervasive sexual harassment of women at Signet would become public, leading to loss of demand by consumer's for Signet's merchandise.

182.    In its March 24, 2016 Form 10-K, Signet stated in relevant part:

*An adverse decision in legal proceedings and/or tax matters could reduce earnings.*

Signet is involved in legal proceedings incidental to its business. Litigation is inherently unpredictable. Any claims against us, whether meritorious or not, could be time consuming, result in costly litigation, require significant amounts of management time and result in the diversion of significant operational resources. In March 2008, private plaintiffs filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ("Sterling"), a subsidiary of Signet, in US District Court for the Southern District of New York, which has been referred to private arbitration. In September 2008, the US Equal Employment Opportunities Commission filed a lawsuit against Sterling in US District Court for the Western District of New York. **Sterling denies the allegations from both parties** and has been defending these cases vigorously. If, however, it is unsuccessful in either defense, **Sterling could be required to pay substantial damages**. At this point, no outcome or amount of loss is able to be estimated.

[. . .]

*Legal proceedings*

As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against SJI, a subsidiary of Signet, in the US District Court for the Southern District of New York **alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender.** In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis.

[. . .]

Sterling denies the allegations of both parties and has been defending these cases vigorously. At this point, no outcome or amount of loss is able to be estimated.

(Emphasis added.)

183.    The statements referenced in ¶¶ 177-78 and ¶ 182 above were materially false and/or misleading because they failed to disclose that:  (i) the allegations at issue in the *Jock* Lawsuit and Arbitration included explosive allegations of sexual harassment, and so were not limited to allegations of job discrimination in compensation and promotion, as the Company represented; (ii) the allegations of sexual harassment against Signet and its senior executives, including Defendant Light, were true; (iii) in the course of discovery in the 2008 private class action and arbitration, hundreds of former and then-current Signet employees submitted

explosive and damning declarations that they and others at Signet were sexually harassed; and (iv) an additional risk of the *Jock* Lawsuit and Arbitration—a risk as great or greater than payment of damages—was the risk that these explosive and damning allegations of sexual harassment could be made public and cause damage to the reputation of Signet's brands.

184.   On March 24, 2016, Signet issued a press release entitled, "Signet Jewelers Reports Excellent Fourth Quarter and Fiscal 2016 Financial Results," in which the Company stated, in relevant part:

> **Highlights:**
>
> •       Annual total sales of $6.55 billion increased 14.2%.
>
> •       Fiscal 2016 same store sales increased 4.1%; diluted earnings per share ("EPS") grew nearly 24%; adjusted EPS grew nearly 22%.
>
> •       Fourth quarter same store sales increased 4.9%; EPS grew over 20%; adjusted EPS grew over 18%.
>
> [. . .]
>
> Mark Light, Chief Executive Officer of Signet Jewelers, said, "Signet had an excellent finish to another strong year with annual sales of $6.55 billion and comp sales growth of 4.1%. Once again, we delivered strong top and bottom line growth with results driven by product innovation; targeted marketing; and supported by delivering superior customer service by the best store teams in retail. ***These and many other competitive strengths such as*** a diversified real estate portfolio, ***customer finance programs***, and custom jewelry and repair continue to position Signet long term as a profitable growth company in the specialty retail sector."[90]
>
> (Emphasis added.)

185.   Signet made the same or substantially similar statements to those in ¶ 184 in its March 24, 2016 Form 10-K SEC filing, as well as the following statements, in relevant part:[91]

---

[90] Signet Jewelers Ltd., Press Release, *Signet Jewelers Reports Excellent Fourth Quarter and Fiscal 2016 Financial Results* (Mar. 24, 2016).

[91] Signet Jewelers Ltd., Annual Report (Form 10-K) (Mar. 24, 2016).

*Customer Financing Statistics*

| (in millions) | Fiscal 2016 | Fiscal 2015 |
|---|---|---|
| Net bad debt expense | 190.5 | 160.0 |

[. . .]

| (in millions) | Fiscal 2016 | Fiscal 2015 |
|---|---|---|
| Charge-offs | 173.6 | 144.7 |
| Provision Expense | (225.8) | (187.5) |

[. . .]

Credit quality indicator and age analysis of past due Sterling Jewelers' customer in-house finance receivables:

| (in millions) | Jan. 30, 2016 | Jan. 31, 2015 | Feb. 1, 2014 |
|---|---|---|---|
| Performing | | | |
| Current, aged 0-30 days | 1,473.0 | 1,332.2 | 1,170.4 |
| Past due, aged 31-90 days | 259.6 | 230.2 | 195.7 |
| Non Performing | | | |
| Past-due, aged more than 90 days | 74.1 | 62.7 | 53.5 |

186. The statements referenced in ¶¶ 184-85 above were materially false and/or misleading because they failed to disclose that: (i) Signet had very low lending standards that were materially below the standards of other consumer creditors and that were not adequately captured in Signet's credit quality indicators; (ii) the amount of money owed to Signet that was actually past due was significantly greater than Signet's delinquency figures suggested; (iii) the number of personal bankruptcy filings naming Signet as a creditor had increased significantly; (iv) these low lending standards were fueling Signet's sales growth; (v) the *Jock* Arbitration

concerned explosive allegations regarding sexual harassment and job discrimination that put Signet at great risk of substantial damages and loss of reputation, and (vi) as a result, indicators of the Company's positive financial performance as stated were artificially inflated, and indicators of the Company's potential losses were understated.

187.  Also in its March 24, 2016 Form 10-K SEC filing, Signet gave the following overview of its consumer finance program:

*Consumer finance*

*General*

**Our in-house consumer financing program provides Signet with a competitive advantage** through the enabling of incremental profitable sales that would not occur without a consumer financing program. Several factors inherent in the US jewelry business support the circumstances through which Signet is uniquely positioned to generate profitable incremental business through its consumer financing program. These factors include a high average transaction value; a significant population of customers seeking to finance merchandise primarily in the bridal category; and the minimum scale necessary to administer credit programs efficiently.

[. . .]

*Underwriting*

The majority of credit applications originate in one of our retail locations and are approved or denied automatically based on proprietary origination models. Origination and purchase authorization strategies are designed by a dedicated Risk Management team, which is separate and distinct from our retail sales organization ensuring that financing decisions are not influenced by sales driven objectives. Our underwriting process considers one or more of the following elements: credit bureau information; income and address verification; current income and debt levels. We have developed and refined proprietary statistical models that provide standardized credit decisions, and drive the optimization of credit limit assignment, down payment requirements and more significant debt service requirements as compared to general consumer lending standards. **For certain credit applicants that may have past credit problems or lack credit history, we use stricter underwriting criteria.** These additional requirements may include items such as verification of employment and minimum down payment levels. Part of our ability to control delinquency and net charge-offs is based on the level of required down payments, tailored credit limits and more significant

66

debt service requirements as mentioned above. ***Underwriting risk tolerance has not been altered in the past 10 years.*** [. . .]

***The following aggregate FICO metrics for the portfolio demonstrate the overall consistency of our financing strategy approach:***

[***The Balance weighted FICO score - New Additions for Fiscal 2016, Fiscal 2015 and Fiscal 2014 were 684, 685 and 690, respectively, and the Balance weighted FICO score - Portfolio for Fiscal 2016, Fiscal 2015 and Fiscal 2014 were 662, 663 and 665 respectively.***]

*Credit monitoring and collections*

***Our objective is*** to facilitate the sale of jewelry and to collect the outstanding credit balance as quickly as possible, ***minimizing risk*** and enabling the customer to make additional jewelry purchases using their credit facility. [. . .] The quality of our credit loan portfolio at any time reflects, among other factors: 1) the creditworthiness of our customers, 2) general economic conditions, 3) the success of our account management and collection activities, and 4) a variety of variables that change over time such as the proportion of new versus seasoned accounts or changes in the relative growth rate in sales between our various retail brands or formats. Cash flows associated with the granting of credit to guests of the individual store are included in the projections used when considering store investment proposals.[92]

*Portfolio aging*

Since inception of its in-house financing, Signet measures delinquency and establishes loss allowances using a form of the recency method. This form of the recency method relies upon qualifying payments determined by management to measure delinquency.

[. . .]

Allowances for uncollectible amounts are recorded as a charge to cost of goods sold in the income statement. The allowance is calculated using a model that analyzes factors such as delinquency rates and recovery rates. [. . .] The allowance calculation is reviewed by management to assess whether, based on economic events, additional analysis is required to appropriately estimate losses inherent in the portfolio.[93]

[. . .]

---

[92] *Id.* at 18-19.

[93] *Id.* at 19.

*(k) Accounts receivable*

Accounts receivable under the customer finance programs are presented net of an allowance for uncollectible amounts. This allowance represents management's estimate of the expected losses in the accounts receivable portfolio as of the balance sheet date, and is calculated using a model that analyzes factors such as delinquency rates and recovery rates. An allowance for amounts 90 days aged and under on a recency basis is established based on historical loss experience and payment performance information. A 100% allowance is made for any amount aged more than 90 days on a recency basis and any amount associated with an account the owner of which has filed for bankruptcy. [. . .][94]

(Emphasis added.)

188.    The statements referenced in ¶ 187 above were materially false and/or misleading because they misrepresented or failed to disclose the following:  (i) as run, Signet's in-house customer finance program put Signet at a potential competitive disadvantage vis-à-vis competitors; because the quality of Signet's credit portfolio had dropped precipitously, Signet was at a greater risk than its competitors of financial turmoil or collapse; (ii) based on reports of confidential witnesses, Signet did not "use stricter underwriting criteria" for "certain credit applicants that may have past credit problems or lack credit history;" Signet's lending standards were unusually lax; (iii) Signet's statement that its "Underwriting risk tolerance has not been altered in the past 10 years" was false or misleading given that the number of bankruptcy filers naming Signet as a creditor had jumped significantly; (iv) likewise, Signet's statement that there was "consistency" in its "financing strategy" lending was false or misleading given that the number of bankruptcy filers naming Signet as a creditor had jumped significantly; and (v) Signet's disclosure of the weighted average FICO scores of its credit portfolio, which decreased between fiscal years 2015 and 2016, is misleading in omitting to disclose as well that the number of bankruptcy filers naming Signet as a creditor had increased significantly.

---

[94] *Id*. at 90.

189.   In its March 24, 2016 Form 8-K SEC filing, Signet and Defendant Michele Santana made the following statements:

*Credit*

Net accounts receivable were $1,756.4 million, up 12.0% compared to $1,567.6 million as of January 31, 2015 driven primarily by higher credit penetration rate combined with higher average purchase.

Regarding in-house credit, Michele Santana, Signet Chief Financial Officer, said, "***Our consistency in underwriting*** is informed by our deep history of borrower behavior data which provides insights into payment patterns where customers have an emotional connection with their jewelry purchases. This provides us with a unique ability to underwrite effectively, capture incremental profitable sales, and develop lifetime customer relationships."

[. . .]

Michele Santana continued, "***We see stable trends in our lending and credit metrics*** for which our average FICO portfolio score has been in a consistent range for numerous years. Our in-house credit finance is designed for rapid repayment and turns over on average in nine months. ***We continue to be confident in our credit portfolio performance*** and the competitive advantages associated with our in-house program."[95]

190.   The statements referenced in ¶ 189 above were materially false and/or misleading because they failed to disclose that:  (i) the quality of Signet's credit portfolio had dropped precipitously, indicating Signet's underwriting was not "consistent"; (ii) the number of bankruptcy filers naming Signet as a creditor had jumped significantly, and therefore "trends" in relevant "lending and credit metrics" reviewed by Signet were not "stable"; (iii) Signet's expression of "confiden[ce] in [its] credit portfolio performance" was misleading given that the quality of Signet's credit portfolio had declined significantly; and (iv) Signet's lending standards were very low, and materially below the standards of other consumer creditors.

191.   On its March 24, 2016 Fourth Quarter and Fiscal 2016 Year End Earnings Call, Defendant Michele Santana stated, in relevant part:

---

[95] Signet Jewelers Ltd., Current Report (Form 8-K), at 5 (Mar. 24, 2016).

Before we discuss our in-house credit metrics, I wanted to spend a few minutes to speak more holistically on our in-house credit operations. We have provided and operated in-house credit for 30 years and it gives us a number of competitive advantages.

[. . .]

Third, our underwriting standards are proven and have been consistent over a long period of time. This **consistency in our underwriting** also is demonstrated in our weighted average FICO score for the portfolio. For FY16, **our weighted average FICO was 662 and has been in the mid-660s for numerous years**.

[. . .]

In addition, as we have disclosed in our February 29th pre-release, **our year-end valuation allowance and non-performing metrics improved** as Management had expected compared to the third quarter. This improvement was driven not only by the normal seasonality we customarily see but also due to excellent credit execution and credit marketing initiatives designed to favorably influence credit receivable mix. The visibility that we have into our credit portfolio performance which includes daily collections, weekly roll rates to 30, 60 and 90 days and other meaningful indicators leads us to remain **highly confident in the strength of our credit portfolio performance**. All of these considerations are factored into our Q1 and annual guidance.[96]

192.    The statements referenced in ¶ 191 above were materially false and/or misleading because they misrepresented or failed to disclose that:  (i) the quality of Signet's credit portfolio had dropped precipitously, indicating Signet's underwriting was not "consistent"; (ii) while the weighted average FICO scores of its credit portfolio decreased between fiscal years 2015 and 2016, the number of bankruptcy filers naming Signet as a creditor had increased significantly; (iii) Signet's non-performing metrics had not improved, and the number of bankruptcy filers naming Signet as a creditor had jumped significantly; (iv) Signet's expression of "confiden[ce] in [its] credit portfolio performance" was misleading given that the quality of Signet's credit portfolio had declined significantly; and (v) Signet's lending standards were very low, and materially below the standards of other consumer creditors.

---

[96] Signet Jewelers Ltd., Fourth Quarter and Fiscal 2016 Year End Earnings Call, at 6-7 (Mar. 24, 2016).

193.    On May 26, 2016, the Company issued a press release titled "Signet Jewelers Reports Record First Quarter Earnings," announcing its first quarter fiscal year 2017 financial results.  Therein, the Company stated, in relevant part:

**Highlights:**

- Diluted earnings per share ("EPS") grew 26.4%. Adjusted EPS grew 20.4%.

- Same store sales up 2.4%. Total sales $1.6 billion up 3.2%. Total sales at constant exchange rate up 3.9%.

- Annual earnings guidance reaffirmed.

[. . .]

- Conducting strategic evaluation of credit portfolio; first quarter credit metrics improved sequentially and in-line with expectations.

Mark Light, Chief Executive Officer of Signet Jewelers said, "Signet delivered another period of solid performance resulting in record first quarter EPS and strong operating margin expansion. [. . .] In addition to delivering earnings results at the top end of our guided range, we achieved sales growth across real estate formats and in each of our divisions and our credit metrics showed strong sequential improvement."[97]

[. . .]

[For the 13 weeks ended July 30, 2016 (2nd Quarter):  Same store sales, 1% to 2%; EPS $1.39 to $1.46.  For Fiscal 2017 (Annual):  Same store sales, 2.0% to 3.5%; EPS $7.88 to $8.23.]

194.    The statements referenced in ¶ 193 above were materially false and/or misleading because they failed to disclose that:  (i) Signet had very low lending standards that were materially below the standards of other consumer creditors; (ii) these low lending standards were fueling Signet's sales growth; (iii) the *Jock* Arbitration concerned explosive allegations regarding sexual harassment and job discrimination that put Signet at great risk of substantial

---

[97] Signet Jewelers Ltd., Press Release, *Signet Jewelers Reports Record First Quarter Earnings* (May 26, 2016).

damages and loss of reputation, and (iv) as a result, indicators of the Company's positive financial performance as stated were artificially inflated.

195.    On its May 26, 2016 First Quarter Earnings Conference Call, Defendant Mark Light stated in relevant part:

> I want to start off with stating, and I just need to start off because we said in our announcement, that *our credit metrics and our credit portfolio are strong*.  As we said, *our credit metrics are improving sequentially* and within our expectations and all we've fought for and involved in our earnings guidance both on a quarterly basis and an annual basis, so our credit metrics are strong.[98]

196.    On Signet's May 26, 2016 First Quarter Earnings Conference Call, financial analyst Oliver Chen asked CFO Michele Santana about the FICO scores of the individuals to whom it extended credit in the first quarter of fiscal year 2016, and noted concerns by investors about its accounts receivable and recency accounting methodology:  "Some investors are asking a lot about accounts receivable, aging and the FICO score distribution and the reality of using the recency accounting methodology."   Santana replied to Chen's question, in relevant part, "[i]n terms of FICO scores, that will be an annual disclosure for us but what I can tell you is the FICO scores are broadly in the same range as what we saw in Q4 which everybody would expect you're not going to have major shifts quarter to quarter on that."[99]

197.    In its June 3, 2016 Form 10-Q SEC filing, Signet made the following statements, in relevant part:

> The allowance for credit losses on Sterling Jewelers' customer in-house finance receivables is shown below:

---

[98] Signet Jewelers Ltd., Fiscal 2017 First Quarter Earnings Conference Call, at 11 (May 26, 2016).

[99] *Id*. at 11-12.

| (in millions) | 13 weeks ended April 30, 2016 | 13 weeks ended May 2, 2015 |
|---|---|---|
| Charge-offs | 46.8 | 37.9 |
| Provision | (43.7) | (38.5) |

The credit quality indicator and age analysis of Sterling Jewelers' customer in-house finance receivables are shown below:[100]

| (in millions) | Apr. 30, 2016 | Jan. 30, 2016 | May 2, 2015 |
|---|---|---|---|
| Performing | | | |
|   Current, aged 0-30 days | 1,427.5 | 1,473.0 | 1,290.9 |
|   Past due, aged 31 – 60 days | 240.9 | 259.6 | 211.6 |
|   Past due, aged 31-90 days | 39.2 | 49.2 | 34.8 |
| Non Performing | | | |
|   Past-due, aged more than 90 days | 63.5 | 74.1 | 55.4 |

198.    The statements referenced in ¶¶ 195-97 above were materially false and/or misleading because they failed to disclose that:  (i) Signet had very low lending standards that were materially below the standards of other consumer creditors and that were not adequately captured in Signet's credit quality indicators; (ii) the amount of money owed to Signet that was actually past due was significantly greater than Signet's delinquency figures suggested; (iii) the number of personal bankruptcy filings naming Signet as a creditor had increased significantly; (iv) Signet's low lending standards were fueling Signet's sales growth; (v) the *Jock* Arbitration concerned explosive allegations regarding sexual harassment and job discrimination that put Signet at great risk of substantial damages and loss of reputation, and (vi) as a result, indicators

---

[100] Signet Jewelers Ltd., Quarterly Report (Form 10-Q), at 14 (June 3, 2016).

of the Company's positive financial performance as stated were artificially inflated, and indicators of the Company's potential losses were understated.

## VII.    LOSS CAUSATION

199.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

200.    Throughout the Class Period, the price of the Company's securities was artificially inflated as a result of Defendants' materially false and misleading statements and omissions identified herein.

201.    The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

### A.    May 25, 2016

202.    On May 25, 2016 at 3:04 PM EDT, BuzzFeed News reported on occurrences of diamond swapping at Kay stores.[101]   The news report recounted the stories of multiple Kay customers whose diamonds were swapped out for considerably less expensive stones while the customers' jewelry was in the custody of Kay, as described above.[102]   The revelation on May 25, 2016 of occurrences of diamond swapping led to a deluge of customer complaints and concerns about the authenticity of their jewelry.   CW4, who worked as Customer Care Credit Specialist and fielded complaints as part of that job, stated:   "Customers were panicky, demanding their money back or proof that their diamonds were real.   They were very angry and very scared."

---

[101] Stephanie McNeal, *Women Say Kay Swapped Their Diamond for a Stone of Worse Quality After a Repair*, BuzzFeed News (May 25, 2016), *available at* https://www.buzzfeed.com/stephaniemcneal/women-say-kay-0020swapped-their-diamonds?utm_term=.ot9MEl0wB#.ll1z5a9vb.

[102] *See id.*

203.   On May 26, 2016, after the market absorbed the revelation of these occurrences of fraud, Signet's share price fell $11.37 per share, or 10.5%, to close at $97.00 per share, on unusually heavy trading volume.

204.   The BuzzFeed News story partially revealed to the market, and/or the concealed risk materialized: (i) that numerous instances of fraudulent swapping of customers' precious stones were occurring while the stones were in the custody of Signet; and (ii) that customer confidence in Signet had declined and would decline further.

**B.    May 26, 2016**

205.   In a May 26, 2016 press release titled, "Signet Jewelers Reports Record First Quarter Earnings," Signet announced that a review by Goldman Sachs of its credit portfolio was underway:

> Signet also announced that its Board of Directors has authorized management to conduct a strategic evaluation of the Company's credit portfolio. Goldman Sachs has been engaged as the Company's financial advisor in this process. Signet will consider a full range of options with respect to its credit operations and update investors as appropriate.

> Mr. Light said, "We are always looking for the best ways to optimize our operating model, and to that end, *the Board has determined to undertake a formal and comprehensive strategic evaluation of the Company's credit portfolio*. This is a top priority and as we move through this review, we will remain focused on executing our operational plans and driving profitable growth in our business. The primary objective of this process will be to ensure Signet has an optimized business structure that enhances our ability to execute against our strategic objectives which in turn delivers value for shareholders."[103]

> (Emphasis added.)

206.   Signet made the same or substantially similar statements to those in ¶ 206 in its May 26, 2016 Form 8-K SEC filing.[104]

---

[103] Signet Jewelers Ltd., Press Release, *Signet Jewelers Reports Record First Quarter Earnings* (May 26, 2016).

[104] Signet Jewelers Ltd., Current Report (Form 8-K) (May 26, 2016).

207.    This announcement increased investors' concerns about the sustainability of Signet's credit portfolio.  Financial analyst James Gentile published an article the same day, May 26, 2016, titled "Has Signet Been Giving Too Much Credit," in which he stated that "what jumped out to me was the announcement that Signet hired Goldman Sachs (GS) to securitize portions of its credit portfolio."[105]  Gentile then questioned:

> Has Signet been lending to its customer base at terms and volumes that may prove to be unsustainable?  Are the cracks starting to form in the borrowing base?  Can you repossess a ring?  [. . .]  We will see how the strategic evaluation of the company's credit portfolio with Goldman pans out.  If the volume of sales that Signet has been enjoying in the last three years is driven by loose lending, then look out below.

208.    Signet's announcements on May 26, 2016 partially revealed to the market, and/or the concealed risk materialized:   (i) that Signet had very low lending standards that were materially below the standards of other consumer creditors and that were not adequately captured in Signet's credit quality indicators; (ii) that these low lending standards were fueling Signet's sales growth; and  (iii) that as a result, indicators of the Company's positive financial performance as stated were artificially inflated, and indicators of the Company's potential losses were understated.

209.    On its May 26, 2016 conference call with investors, Signet reported same-store sales growth year-over-year of only 2.4%, below the Company's prior trend.[106]  Signet also lowered its fiscal year 2017 same-store sales growth guidance from 3-4% to 2-3.5%.[107]  On information and belief, Signet had begun to tighten its lending practices in the first quarter of Signet fiscal year 2017.  That quarter represented an inflection point in Signet's sales growth,

---

[105]  James Gentile, *Has Signet Been Giving Too Much Credit?*, The Street (May 26, 2016), *available at* http://realmoney.thestreet.com/articles/05/26/2016/has-signet-been-giving-too-much-credit.

[106] Signet Jewelers Ltd., Fiscal 2017 First Quarter Earnings Conference Call, at 3 (May 26, 2016).

[107] *Id.* at 8.

and Signet began a review of its credit portfolio around that time.  Signet's misrepresentations and omissions about the quality of its credit portfolio during the Class Period led to artificially inflated sales.  When Signet was forced to tighten its credit lending standards, and sales decreased, this decrease in sales led to a partial market correction on May 26, 2016.

210.    On Signet's announcement, Signet's share price fell 10.4% to close at $97.00 per share on May 26, 2016, even though the same announcement reported "record first quarter earnings."[108]

**C.    June 2, 2016**

211.    On June 2, 2016, *Grant's Interest Rate Observer* published an article titled "Lending Clubbed" that suggested that Signet was overvalued because its business was in large part a consumer credit company, and its consumer credit portfolio was in poor condition.[109]

212.    The *Grant's* article explained that Signet was not merely a large retailer, but also a significant consumer credit lender, and that this aspect of Signet's business was increasing:

> More than a retailer, Signet is a finance company, too.  In-store credit facilitated no fewer than 61.7% of sales in the quarter ended April 30.  Furthermore, that percentage has been steadily on the rise: from 52.6% in fiscal 2008 to 61.5% in fiscal 2016.  So it is that growth in accounts receivable outpaces growth of cash-register receipts; in the quarter ended April 30, sales rose by 3.2%, to $1,579 million, and net accounts receivable by 12.6%, to $1,689 million (both measured year over year).[110]

---

[108] *Id.*

[109] The date that appears on the Grant's article is June 3, 2016, but the article was released to the public no later than June 2, 2016, as shown by public articles published on June 2, 2016 addressing the publication of the Grant's article. *See, e.g*., Bloomberg News, *Signet Drops after Grant's Investment Newsletter Sparks Concerns* (June 2, 2016), *available at* https://www.bloomberg.com/news/articles/2016-06-02/signet-drops-after-grant-s-investment-newsletter-sparks-concerns.

[110] James Grant, *Lending Clubbed*, Grant's Interest Rate Observer, 10 (June 2, 2016).

213.    The *Grant's* article highlighted as well that Signet's credit portfolio was near

subprime:  "In fiscal 2016, the average FICO score of Signet's portfolio was 662, only

marginally higher than the 640 threshold of subprime."[111]

214.    The article then explained that while Signet's disclosures regarding its non-

performing loans were ostensibly positive, Signet's "recency" method of calculating how aged

an account is, and thus whether it is "non-performing," obscures its disclosures:

> At first glance, the Signet credit portfolio would seem to be shipshape.  Non-
> performing loans amounted to 3.6% of gross receivables on April 30, only 10
> basis points higher than a year earlier.  Second glance tells a different story.
> "Recency" is the name of the method that Signet elects to employ in accounting
> for credit delinquency.  A layman might call it forgiving.
>
> An example will underscore just how forgiving Signet is of its customers and of
> itself.  Say that you owe $1,000 on June 30, but you pay $500 instead, and that
> you pay it on time.  Because you have made a "qualifying payment" by the due
> date, your account is considered current.  (Under the "contractual" method of
> accounting, a customer is counted current only if he or she has paid in full. You
> can see the lack of appeal of the contractual approach.)[112]

215.    Importantly, the article then suggested that a better way to understand the quality

of Signet's credit portfolio is to count bankruptcy filings naming Signet as a creditor.[113]   The

article revealed that the number of personal bankruptcy submissions filed in the first quarter of

calendar year 2016 that named Signet as a creditor jumped more than seventy percent above the

number of such filings in the same quarter of calendar year 2015:

> Thanks to Marc Cohodes, former portfolio manager of Copper River Partners and
> a current short-seller of Signet, for identifying an alternative path to the true
> condition of Signet's credit portfolio. Just count bankruptcy filings, Cohodes
> suggests. Thus, in the months of January through March, 3,274 American
> personal bankruptcy submissions named Signet or one of its brands as a creditor.

---

[111] *Id.*

[112] *Id.*

[113] *See id.* at 10-11.

Compare the 2,663 such listings in the fourth quarter 2015 and the 1,903 in the first quarter 2015.[114]

216.     The article described Signet's announcement that it was engaging Goldman Sachs

to review its credit portfolio as "concerning":

> For whatever reason, or set of reasons, Signet has just engaged Goldman Sachs to conduct a strategic review of its credit portfolio. It is concerning news, inasmuch as the finance division not only facilitates sales but also is a key contributor to company-wide operating margins. Thus, in the April 30 quarter, the credit unit generated $39.2 million in operating profit, or 18% of the grand total.[115]

217.     The article also noted the revelation that some of Signet's customers' diamonds

were swapped for false diamonds while in the custody of Kay stores:

> Trawl through Facebook looking for "Zales" or "Kay," and you'll find allegations that Signet employees have taken the opportunity of these inspections to replace bona fide diamonds with lesser-quality stones. Some complain that Signet stores have switched diamonds with Moissanite, a man-made diamond substitute. BuzzFeed reporter Stephanie McNeal has corroborated some of these stories in April 22 and May 25 exposés.  Did Signet have a comment?  Not for Grant's; our pings went unanswered.[116]

218.     On June 2, 2016 at 10:26AM, very shortly after the publication of the *Grant's*

article, financial analyst Paul Quintaro wrote a summary of a key revelation in the article.  The

summary read in full:   "Grant's Interest Rate Observer On Signet: Says 3,274 American

Bankruptcy Submissions For Jan-Mar Mentioned Signet As Brand Creditor, Q4 2015 Had 2,663

Such Listings And Q1 2015 Had 1,903 Such Listings."[117]

219.     Signet's announcements on May 26, 2016 partially revealed to the market, and/or

the concealed risk materialized, that:  (i) the number of bankruptcy filers naming Signet as a

---

[114] *Id*. at 10-11.

[115] *Id*. at 11.

[116] *Id*.

[117] Paul Quintaro, Benzinga.com, *Grant's Interest Rate Observer On Signet: Says 3,274 American Bankruptcy Submissions For Jan-Mar Mentioned Signet As Brand Creditor, Q4 2015 Had 2,663 Such Listings And Q1 2015 Had 1,903 Such Listings* (June 2, 2016), *available at* "http://www.benzinga.com/analyst-ratings/analyst-color/16/06/8061792/grants-interest-rate-observer-on-signet-says-3-274-ameri.

creditor had jumped significantly; (ii) Signet had very low lending standards that were materially

below the standards of other consumer creditors and that were not adequately captured in

Signet's credit quality indicators; (iii) these low lending standards were fueling Signet's sales

growth; and (iv) as a result, indicators of the Company's positive financial performance as stated

were artificially inflated, and indicators of the Company's potential losses were understated.

220.    On this news, Signet's share price fell $6.50 per share, or 6.6%, to close at $92.23

per share on June 2, 2016, on unusually heavy trading volume.  Signet's share price continued to

fall as the market absorbed the new information, falling another $4.04, or 4.3%, to close at

$88.19 per share on June 3, 2016, on unusually heavy trading volume.

**D.    June 3, 2016**

221.    On June 3, 2016, the Company issued a press release entitled "Signet Jewelers

Issues Statement Regarding Its Longstanding Commitment to Superior Customer Service and

Rigorous Product Quality Procedures," in which the Company confirmed the occurrence of

"diamond swapping" misconduct at the Company's stores.  The press release stated, in relevant

part:

> *[W]e strongly object to recent allegations on social media, republished and grossly amplified, that our team members systematically mishandle customers' jewelry repairs or engage in "diamond swapping." **Incidents of misconduct, which are exceedingly rare, are dealt with swiftly and appropriately**.*
>
> Signet Jewelers remains firmly committed to responding to all customer concerns, upholding the highest standards of quality and service and continuing to maintain our customers' trust."[118]

(Emphasis added.)

222.    Mark Light, Chief Executive Officer of Signet Jewelers, said:  "The trust of our

customers is not something we take lightly.  It has been an honor to help our customers celebrate

---

[118] Signet Jewelers Ltd., Press Release, *Signet Jewelers Issues Statement Regarding Its Longstanding Commitment to Superior Customer Service and Rigorous Product Quality Procedures* (June 3, 2016).

life and express love through our high quality jewelry for almost 100 years, and dedication to superior customer service and quality control is integral to who we are and how we conduct business.  Our guests are our most precious commodity, and we are committed to maintaining their trust."[119]

223.    Signet's June 3, 2016 announcement partially revealed to the market, and/or the concealed risk materialized:  (i) that numerous instances of fraudulent swapping of customers' precious stones were occurring while the stones were in the custody of Signet; and (ii) that customer confidence in Signet had declined and would decline further.

224.    This news, along with the residual impact of the *Grant's* article, caused Signet's share price to fall $4.04 per share, or 4.3%, to close at $88.19 per share on June 3, 2016, on unusually heavy trading volume.

### E.    August 25, 2016

225.    In its August 25, 2016 Form 8-K SEC filing, Signet announced a decrease of 2.3% year-over-year in its same-store sales growth.[120]  Signet also lowered its fiscal year 2017 same-store sales growth guidance from 2-3.5% to negative 2.5-1.0%.[121]  On information and belief, Signet had begun to tighten its lending practices in the first quarter of Signet fiscal year 2017.  That quarter represented an inflection point in Signet's sales growth, and Signet began a review of its credit portfolio around that time.  Signet's misrepresentations and omissions about the quality of its credit portfolio during the Class Period led to artificially inflated sales.  When Signet was forced to tighten its credit lending standards, and sales decreased, this decrease in sales led to a partial market correction on August 25, 2016.

---

[119] *Id.*

[120] Signet Jewelers Ltd., Fiscal 2017 Second Quarter Earnings Conference Call, at 6 (Aug. 25, 2016).

[121] *Id.* at 9.

226.    On its August 25, 2016 Fiscal 2017 Second Quarter Earnings Conference Call, Signet, through Defendant Michele Santana, admitted that it had suffered some economic loss in the form of additional SG&A expenses as a result of the revelation of occurrences of fraud at its retail locations:   "We also incurred unplanned costs of $5 million on consulting and related expenses due to the unsubstantiated claims against Signet's business integrity."[122]

227.    Defendant Mark Light further admitted that Signet could not assess the broader impact of the fraudulent occurrences on Signet's sales and earnings:

> As far as the reputational issues that arose in late May, there were some negative media, social media perceptions of Kay in May and into June, but this completely normalizes—and we track this weekly—that the social media perceptions have completed normalized in July and into August. We measure—on a regular basis we look at our customer complaints, we look at social media and we had some lifts in the end of May and into June, but like I said, in July and into August it's all been normalized.
>
> We've done several different surveys to make sure that we understand what the bad news and how the perceptions of our Kay brand were, and our Jared brand for that matter, and it's impossible to really know for sure if it's affected our sales or not but what we do know is that the surveys that we have taken, and there were some independent surveys done by some sell side analysts, all confirm that the Kay brand is still very well perceived by consumers, as is the Zales and Jared brand. Overall, the Kay brand is still in very good—the Kay brand equity is very strong as it ever has been.
>
> We have—one thing you can look at, by the way, is our Kay brand actually did better compared to most of our banners. So we don't believe the publicity overhang is really affecting our business but it's hard to understand specifically if it is or is not. The surveys are a key indicator for us, and obviously sales are a key indicator for us.[123]

228.    Defendant Light also noted that the Company would be investing in additional equipment to prevent fraud at its retail locations:

> [W]e're taking the opportunity to test in the fourth quarter some new technology that relates to specific gem scopes that we're putting in place in some of our Kay

---

[122] Signet Jewelers Ltd., Fiscal 2017 Second Quarter Earnings Conference Call, at 7 (Aug. 25, 2016).

[123] *Id*. at 13.

stores that will not only have a view of the product under magnification, but it will also have a digital screen on top of the gem scope that will highlight the unique marks of everybody's diamond. Every customer's diamond is like a thumbprint; they have all unique marks to it and we will mark those on a digital screen and then we'll have the ability to digitally send over that picture to our customers via email and keep it in our own files. So, we believe that by putting this type of new technology in place in our stores that we are enhancing and creating even more transparency for our customers and that it will be a huge competitive advantage for us into the future.[124]

229.    On this news, Signet's share price fell 12.6% to close at $83.44 per share on August 25, 2016, on unusually heavy trading volume.  The stock price continued to decline on August 26, 2016, falling another 3.3%, to close at $80.65 per share, on unusually heavy trading volume.

**F.     February 27, 2017**

230.    On February 27, 2017, *The Washington Post* published an article entitled, "Hundreds Allege Sex Harassment, Discrimination at Kay and Jared Jewelry Company."[125]  The article summarized the content of the 250 *Jock* Declarations and other documents made public on or around that day from the *Jock* Arbitration, which made clear for the first time that the *Jock* Arbitration concerned numerous explosive allegations of sexual harassment, and not just allegations relating to unequal pay and promotions.  The article stated that the declarations included numerous claims that sexual harassment against women was a pervasive part of Signet's culture.  It also stated that the released documents implicated Mark Light personally in the conduct:

"[A] memorandum by the employees' attorneys supporting their motion for class certification, filed in 2013, revealed that top executives including Mark Light, now chief executive of Sterling's parent company, Signet Jewelers, were among

---

[124] *Id.* at 10.

[125] Drew Harwell, *Hundreds Allege Sex Harassment, Discrimination at Kay and Jared Jewelry Company*, The Washington Post (Feb. 27, 2017).

those accused of having sex with female employees and promoting women based upon how they responded to sexual demands."

231.    The market recognized the potential impact of these revelations on Signet's financial valuation, both because the revealed information made clear that Signet risked substantial financial losses through a costly settlement and/or fines, and because the information caused immediate damage to Signet's reputation and so suggested that future sales would decline.

232.    On this news, Signet's share price fell $9.29 per share, or approximately 13%, to close at $63.59 per share on February 28, 2017, on unusually heavy trading volume.

## VIII.    ADDITIONAL SCIENTER ALLEGATIONS

### A.    Defendants Each Knew About Pervasive Sexual Harassment at the Company and Related Allegations in the *Jock* Arbitration

233.    Signet, Barnes, Light, Ristau and Santana each knew about the pervasive sexual harassment that occurred at Signet during and prior to the Class Period and was fully aware of the allegations raised in the *Jock* Arbitration relating to this pervasive sexual harassment, as well as the false and misleading nature of the statements discussed above, or at a minimum was reckless for not knowing these matters.

234.    Defendants Barnes and Light served successively as CEO, and were each a Director, of Signet during the Class Period.  As CEO, Barnes and Light were each the head of Signet's management team.  Defendants Ristau and Santana served successively as CFO of Signet during the Class Period.  Barnes and Light, by virtue of their responsibilities and activities as CEO and Director of the Company, were each privy to all material information concerning the core of Signet's business, which was the selling of diamond and other precious stone jewelry to mid-market customers.  Signet's workforce, including its female employees, participated in, and were essential to, Signet's core business.  Barnes and Light had knowledge of the rampant sexual

84

harassment that directly impacted Signet's workforce, and therewith, its core business. Likewise, Ristau and Santana, as CFO, were each privy to, and participated in, all matters directly impacting the financial aspects of Signet's core business, including the recruitment, retention and promotion of its workforce. Ristau and Santana knew about the rampant sexual harassment that directly impacted Signet's workforce, and therewith, its core business.

235.    Defendant Light personally participated in the pervasive sexual harassment at the Company and was therefore directly aware of such harassment. As described in the Class Certification Memo based upon sworn declarations of Signet employees:

- "Light, Mooney and Liebler, the latter two of whom are currently VPROs, have had sex with women employees and conditioned women's success at Sterling upon acceding to such demands, an expectation attributed to other male executives as well."

- "Mr. Light was also observed by multiple witnesses at Company meetings being entertained by female managers, in various states of undress, in a swimming pool and joining them in the pool himself."

- Defendant Light was "entertained rather than offended when a manager at a company meeting described a good female store manager as one who 'walked like a sailor' because of the amount of sex in which she had engaged and had swollen lips because of her frequency of having oral sex."

236.    All members of the Board of Directors of Signet since 2008, including Barnes and Light, were briefed on the allegations in the *Jock* Arbitration, and therefore were fully aware of the explosive and damning content of these allegations throughout the Class Period. On Signet's March 9, 2017 earnings call, the current Chairman of Signet Todd Stitzer stated:

As a board, we have been briefed on this litigation since 2008. As noted earlier, many of the allegations publicized in connection with the case go back decades. When evaluating whether to make Mark Chief Operating Officer in 2014, we obviously reviewed his business performance and evaluated with advice from counsel the allegations that were described in connection with the case, reviewed the available information, the timeframes involved, and the context in which it was offered. Based on our review and evaluation, we appointed Mark as COO.

237.    Defendants Barnes, Light, Ristau and Santana each signed certifications pursuant to contained signed a certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") for each SEC filing referenced in Part VI above during his or her tenure as CEO or CFO.  In these certifications, each of the Individual Defendants certified that he or she had reviewed the SEC filings and determined that they contained no contained no false or misleading statements or omissions.

**B.    Defendants Signet, Light and Santana Each Knew About the Poor Quality of Signet's Credit Portfolio and the Sharp Increase in Its High-Risk Borrowers**

238.    Signet, Light and Santana each knew about the poor quality of Signet's credit portfolio and the sharp increase in its high-risk borrowers, and the false and misleading nature of the statements discussed above, or at a minimum were reckless for not knowing these matters.

239.    Defendant Mark Light was a CEO and a Director of Signet during the Class Period and the head of Signet's management team.  Defendant Michele Santana was a CFO of Signet during the Class Period.  Light, by virtue of his responsibilities and activities as CEO and director of the Company, was privy to, and participated in, the development and execution of the Company's sales strategy, including its strategy to increase sales by making credit available to borrowers with very poor credit.  Santana, as CFO, was privy to and participated in the gathering, calculating and dissemination of financial data, including data indicating the quality of Signet's credit portfolio, such as numbers of personal bankruptcy filings naming Signet as creditor, allowances for uncollectible accounts, and account delinquency status, and other data regarding Signet's accounts receivables.

240.    As Signet's in-house consumer finance program fueled its sales of jewelry, this program was part of Signet's core business.  Credit sales constituted a majority of the Company's total sales throughout the Class Period.  Credit sales were 57.7% of total sales in

fiscal year 2014, 60.5% of total sales in fiscal year 2015, and 61.5% of total sales in fiscal year 2016.[126]  Credit sales were also 61.7% of total first quarter 2017 sales.[127]

241.    Santana repeatedly emphasized the importance of Signet's in-house consumer finance program to investors from the beginning of the Class Period.  For example, Santana stated on Signet's November 25, 2014 conference call with investors, "In-house credit remains an important component of our Sterling division's business and a competitive advantage." [128]

242.    Santana also demonstrated her thorough knowledge of Signet's consumer finance program when, on numerous conference calls, she personally relayed information about Signet's increasing accounts receivables and credit participation rate, as well as its net bad debt expense, among other figures relating to its credit portfolio.  For example, on Signet's August 27, 2015 conference call with investors, Santana stated, "Net bad debt expense for the quarter was $49.5 million and that compares to $41.8 million last year, an increase of $7.7 million and that's driven primarily by the growth in receivables balances from the increased credit penetration and the change in the credit program mix."[129]

243.    Given that Signet's in-house consumer finance program was part of its core business, Light and Santana would have had robust knowledge of this program, including the poor and declining quality of Signet's credit portfolio, or they were at least reckless in not knowing about these matters.

---

[126] Signet Jewelers Ltd., Annual Report (Form 10-K), at 20 (Mar. 24, 2016).

[127] Signet Jewelers Ltd., Quarterly Report (Form 10-Q), at 44 (June 3, 2016).

[128] Signet Jewelers Ltd., Q3 Fiscal 2015 Results Conference Call, at 7 (Nov. 25, 2014).  Santana made the same or substantially similar comments to on Signet's March 26, May 28, 2015 and November 24, 2015 conference calls, all of which Light also attended.

[129] Signet Jewelers Ltd., Fiscal 2016 Second Quarter Financial Results Call and Webcast, at 6 (Aug. 27, 2015). Santana made the same or substantially similar comments to on Signet's November 25, 2014, March 26, May 28, 2015 and November 24, 2015 conference calls, all of which Light also attended.

244.    Light and Santana both monitored Signet's credit exposure and the quality of Signet's credit portfolio.  As Signet stated, "*On an ongoing basis, management monitors the credit exposure* based on past due status and collection experience, as it has found a meaningful correlation between the past due status of customers and the risk of loss."[130] (Emphasis added.) Santana has stated that management's decisions that affect Signet's credit portfolio are highly deliberative:  "every credit decision we made is done on a very thorough analysis using both predictive and statistical analysis to drive those decisions."[131]

245.    Likewise, on the Company's March 24, 2016 conference call with investors, Michele Santana stated:  "[O]ur year end valuation allowance and non-performing metrics improved as Management had expected compared to the third quarter.  [. . .]  *The visibility that we [Management] have into our credit portfolio performance* which *includes* daily collections, weekly roll rates to 30, 60, and 90 days *and other meaningful indicators* leads us to remain highly confident in the strength of our credit portfolio performance." (Emphasis added.)

246.    Light and Santana were both aware of the increasing number of bankruptcy filings naming Signet as a creditor during the Class Period.  Signet had information regarding the number of personal bankruptcy filings naming Signet as a creditor within its possession throughout the Class Period.  U.S. Bankruptcy Court notifies all creditors named in a bankruptcy filing as a matter of course.[132]  Signet has made clear that management routinely reviews aggregate numbers of personal bankruptcy filings naming Signet as creditor.  As Signet stated in its fiscal year 2016 Form 10-K SEC filing, "*A 100% allowance* [for uncollectible amounts] *is made for* any amount aged more than 90 days on a recency basis and *any amount associated with*

---

[130] *Id*. at 103.

[131] Signet Jewelers Ltd., *Fiscal 2016 Third Quarter Financial Results Call and Webcast*, at 7 (Nov. 24, 2015).

[132] *See, e.g.*, Fed. R. Bankr. P. 2002.

*an account the owner of which has filed for bankruptcy.* [. . .]  *The allowance calculation is reviewed by management* to assess whether, based on economic events, additional analysis is required to appropriately estimate losses inherent in the portfolio."[133] (Emphasis added.)

247.    In virtue of Light's position as head of management, and Santana's position as head of financial management, Light and Santana both would have been part of the management team that reviewed this allowance calculation, and necessarily as a part of that review, aggregate bankruptcy filing data.

248.    In virtue of their high-level positions, Light's and Santana's knowledge may be imputed to Signet.

### C.    Defendants Signet, Light and Santana Each Knew About Occurrences of Fraud at Signet's Retail Locations

249.    Signet, Mark Light and Michele Santana also each knew about occurrences of fraudulent diamond swapping at its retail locations, and the false and misleading nature of the statements discussed above regarding such occurrences, or at a minimum were reckless for not knowing these matters.

250.    Defendant Mark Light was the CEO and a Director of Signet during the Class Period and the head of Signet's management team.  Defendant Michele Santana was CFO of Signet during the Class Period.  Light, by virtue of his responsibilities and activities as a CEO and Director of the Company, was privy to all material information concerning the core of Signet's business, which was the selling of diamond and other precious stone jewelry to mid-market customers.  Santana, as CFO, was privy to, and participated in, all matters directly impacting the financial health of the Company.

---

[133] Signet Jewelers Ltd., Annual Report (Form 10-K), at 19 (Mar. 24, 2015).

251.    Signet was informed about the occurrences of fraudulent diamond swapping.  The customers affected by the occurrences of fraudulent diamond swapping complained about the fraud to the Company—through direct complaints to retail management, through calls to customer service, through postings to Kay's Facebook page, and/or through other means.

252.    As Signet stated in in its fiscal year 2016 Form 10-K SEC filing, "[p]rimary factors in determining customer buying decisions in the jewelry sector include customer confidence in the retailer." [134]   Occurrences of fraud that jeopardize this customer confidence affect the core of Signet's business, which is the selling of diamond and other precious stone jewelry to mid-market customers.   Accordingly, management, including Light and Santana, knew or should have known about such occurrences of fraud.

253.    Light, by virtue of his responsibilities and activities as a CEO and director of the Company, was privy to all material information concerning the core of Signet's business. Indeed, confidential witness CW2 worked at Signet's Special Orders and Customer Care division from June 2004 to July 2016 and reported to Vice President Paul Karonik, who headed that division.  According to CW2, CEO Mark Light received daily reports from all divisions of the Company, including reports containing data on customer complaints.  On information and belief, such daily reports likely would have included any complaints alleging criminal fraud against the Company.

254.    Santana, as CFO, was privy to and participated in all matters directly impacting the financial health of the Company; accordingly, Santana would have been informed about a potential drop in customer confidence that could have had a direct impact on sales and other financial data.

---

[134] Signet Jewelers Ltd., Annual Report (Form 10-K), at 29 (Mar. 24, 2016).

## IX.    CLASS ACTION ALLEGATIONS

255.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons or entities that acquired Signet securities during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

256.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Signet's securities were actively traded on the New York Stock Exchange (the "NYSE").  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Millions of Signet shares were traded publicly during the Class Period on the NYSE.  As of February 24, 2017, Signet had 68.3 million common shares outstanding.  Record owners and other members of the Class may be identified from records maintained by Signet or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

257.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

258.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

259.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Signet;

(c)     whether the Individual Defendants caused Signet to issue false and misleading statements during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

(e)     whether the members of the Class have sustained damages and, if so, what the proper measure of damages is.

260.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class individually to redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

## X.    PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

261.    The market for Signet's securities was open, well-developed and efficient at all relevant times.   As a result of the materially false and/or misleading statements and/or failures to disclose, Signet's securities traded at artificially inflated prices during the Class Period.   On

October 30, 2015, the Company's shares closed at a Class Period high of $150.94 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Signet's securities and market information relating to Signet and have been damaged thereby.

262.    During the Class Period, the artificial inflation of Signet's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Signet's business, prospects, and operations.   These material misstatements and/or omissions created an unrealistically positive assessment of Signet and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs' and other members' of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

263.    At all relevant times, the market for Signet's securities was an efficient market for the following reasons, among others:

        (a)    Signet shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

        (b)    As a regulated issuer, Signet filed periodic public reports with the SEC and/or the NYSE;

        (c)    Signet regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases

on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Signet was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

264.    As a result of the foregoing, the market for Signet's securities promptly digested current information regarding Signet from all publicly available sources and reflected such information in Signet's share price.   Under these circumstances, all purchasers of Signet's securities during the Class Period suffered similar injury through their purchase of Signet's securities at artificially inflated prices, and a presumption of reliance applies.

265.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.   Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.

## XI.   NO SAFE HARBOR

266.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be

characterized as forward looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Signet who knew that the statement was false when made.

## XII.    FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against All Defendants

267.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

268.    During the Class Period, Defendants made, disseminated or approved the false and misleading statements specified above.  Defendants knew that such statements, when made, were false and misleading, or were reckless in their disregard as to the truth of such statements, which contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

269.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

     (b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

     (c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs in connection with its purchases of Signet securities during the Class Period.

270.    Plaintiffs have suffered damages in that, in reliance on Defendants' statements and the integrity of the market, they paid artificially inflated prices for Signet's securities. Plaintiffs would not have purchased such securities at the prices they paid, or at all, if they had been aware that the market prices of such securities had been artificially and falsely inflated by Defendants' misleading statements.

271.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Signet's securities during the Class Period.

## XIII.    SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act Against the Individual Defendants

272.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

273.    The Individual Defendants acted as controlling persons of Signet within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the

decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

274. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

275. As set forth above, Signet and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in

this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## XV.    JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury in this Action.

Dated:  April 3, 2017                              Respectfully submitted,

                                                   POMERANTZ LLP

                                                   */s/ Jeremy A. Lieberman*
                                                   Jeremy A. Lieberman
                                                   Austin P. Van
                                                   600 Third Avenue, 20th Floor
                                                   New York, New York 10016
                                                   Telephone:  (212) 661-1100
                                                   Facsimile:  (212) 661-8665
                                                   Email:  jalieberman@pomlaw.com
                                                   avan@pomlaw.com
                                                   ahood@pomlaw.com

                                                   POMERANTZ LLP
                                                   Patrick V. Dahlstrom
                                                   10 South La Salle Street, Suite 3505
                                                   Chicago, Illinois 60603
                                                   Telephone:  (312) 377-1181
                                                   Facsimile:  (312) 377-1184
                                                   Email:  pdahlstrom@pomlaw.com

                                                   Lesley F. Portnoy
                                                   GLANCY PRONGAY & MURRAY LLP
                                                   122 East 42nd Street, Suite 2920
                                                   New York, New York 10168
                                                   Telephone:  (212) 682-5340
                                                   lportnoy@pomlaw.com

GLANCY PRONGAY & MURRAY LLP
Lionel Z. Glancy
Robert V. Prongay
Casey E. Sadler
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150

*Attorneys for Lead Plaintiffs Susan Dube and
Lyubomir Spasov*