## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re Signet Jewelers Limited Securities Litigation* | Case No.1:16-CV-06728-JMF<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................... 2

II.     JURISDICTION AND VENUE ............................................................................... 8

III.    THE PARTIES......................................................................................................... 9

        1.      Lead Plaintiff ............................................................................................. 9

        2.      Defendants ................................................................................................. 9

IV.     SUMMARY OF THE FRAUD ............................................................................. 11

        A.      Signet Misrepresented the Credit Quality Of Its In-House Loan Portfolio, its
                Underwriting Process, and Its Loan Loss Reserves.............................................. 11

                1.      Signet's Consumer Lending Portfolio Was Critical To The Company's
                        Value, and Was a Key Focus of the Market and Defendants .................. 11

                2.      As the Credit Portfolio Increases in Size to Drive Sales, Defendants
                        Repeatedly Assure Investors that Their Underwriting Is Conservative
                        and Credit Quality is Strong ................................................................... 13

                3.      Contrary to Defendants' Statements, Signet Had Engaged In High-
                        Risk Lending Practices To Drive Loan Volume, Thus Filling Its Credit
                        Portfolio With Huge Amounts of Toxic Loans........................................ 20

                4.      As Signet's Hidden Credit Problems Begin to Emerge, Defendants
                        Issue False Assurances to Quell Market Concern.................................... 28

                5.      The Truth Emerges ................................................................................. 36

                        a.      Contradicting Their Prior Representations about the Strength of
                                the Credit Portfolio, Defendants Announce That Signet Has
                                Retained a Third Party to Review the Portfolio, and Is
                                Considering Selling It ................................................................. 36

                        b.      As Signet Is Forced To Tighten Its Underwriting Practices, Its
                                Sales Rapidly Decrease............................................................... 40

                        c.      As Market Concern Intensifies Over Defendants' Use of
                                Recency Accounting, the SEC Questions the Company, and
                                Signet Stonewalls........................................................................ 44

                        d.      Defendants Reveal that the Portfolio Contains $700 to $800
                                Million in Subprime Loans, Which Are So Toxic that Signet
                                Has Not Been Able to Find a Buyer for Them ............................ 47

B.      Signet Misled Investors about a Culture of Sexual Harassment at the Company .................................................................................................. 49

      1.      Signet Repeatedly Mischaracterized the *Jock* Actions and Made Misleading Statements Concerning the Conduct of Its Business ............ 50

      2.      In Reality, and Contrary to Signet's Representations, Signet Had a Culture of Rampant Sexual Harassment Reaching up to the Highest Levels of the Company .......................................................................... 57

            a.      Sterling Management—Including Executives at the Highest Levels of the Company—Were Known Throughout the Company for Harassing Female Subordinates............................ 58

            b.      Sterling Executives Routinely Sexually Harassed Subordinates at Sterling's Annual Managers' Meetings and Other Special Events........................................................................................... 61

            c.      Sterling Executives Regularly Harassed Female Subordinates in the Ordinary Course of Business ............................................. 65

            d.      Sterling Executives Regularly Conditioned Employment Decisions Concerning Female Employees on Whether or Not Those Employees Acceded to Sexual Demands.......................... 67

            e.      Sterling Repeatedly Failed to Respond to Sexual Harassment Allegations and to Protect Female Employees who Complained of Sexual Harassment from Retaliation ....................... 71

            f.      Sterling Repeatedly Attempted to Intimidate Employees into Silence in the Context of the Actions ........................................... 77

      3.      The Truth Emerges ................................................................... 79

V.      POST-CLASS PERIOD EVENTS ................................................................ 84

VI.      ADDITIONAL SCIENTER ALLEGATIONS................................................ 87

      A.      Additional Scienter Allegations Related to the Statements Concerning the Credit Operation.................................................................................... 87

      B.      Additional Scienter Allegations Related to the Statements Concerning the Arbitration and the Conduct of Signet's Business ................................ 91

VII.      SIGNET MATERIALLY UNDERSTATED THE RESERVES FOR ITS LOAN PORTFOLIO, THEREBY MATERIALLY OVERSTATING ITS INCOME ................ 92

VIII.      MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS .... 99

A.     Materially False And Misleading Statements And Omissions Concerning The Second Quarter Fiscal 2014 ................................................................................. 100

B.     Materially False And Misleading Statements And Omissions Concerning The Third Quarter Fiscal 2014 ..................................................................................... 107

C.     Materially False And Misleading Statements And Omissions Concerning The Fourth Quarter And Full Fiscal Year 2014 ........................................................ 111

D.     Materially False And Misleading Statements And Omissions Concerning The First Quarter Fiscal 2015 ..................................................................................... 117

E.     Materially False And Misleading Statements And Omissions Concerning The Second Quarter Fiscal 2015 ................................................................................. 121

F.     Materially False And Misleading Statements And Omissions Concerning The Third Quarter Fiscal 2015 ..................................................................................... 124

G.     Materially False And Misleading Statements And Omissions Concerning The Fourth Quarter And Full Fiscal Year 2015 ........................................................ 129

H.     Materially False And Misleading Statements And Omissions Concerning The First Quarter Fiscal 2016 ..................................................................................... 133

I.      Materially False And Misleading Statements And Omissions Concerning The Second Quarter Fiscal 2016 ................................................................................. 136

J.      Materially False And Misleading Statements And Omissions Concerning The Third Quarter Fiscal 2016 ..................................................................................... 138

K.     Materially False And Misleading Statements And Omissions Concerning The Fourth Quarter And Full Fiscal Year 2016 ........................................................ 142

L.     Materially False And Misleading Statements And Omissions Concerning The First Quarter Fiscal 2017 ..................................................................................... 149

M.    Materially False And Misleading Statements And Omissions Concerning The Second Quarter Fiscal 2017 ................................................................................. 153

N.     Materially False And Misleading Statements And Omissions Concerning The Third Quarter Fiscal 2017 ..................................................................................... 156

O.     Materially False And Misleading Statements And Omissions Concerning The Fourth Quarter and Full Fiscal Year 2017 ........................................................ 159

IX.    LOSS CAUSATION .............................................................................................. 160

A.     The Credit Portfolio ............................................................................................ 160

B.      Sexual Harassment .................................................................................................. 166

X.     THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ......................... 167

XI.    THE PRESUMPTION OF RELIANCE ................................................................ 168

XII.   CLASS ACTION ALLEGATIONS .................................................................... 169

XIII.  CAUSES OF ACTION ...................................................................................... 170

XIV.  PRAYER FOR RELIEF .................................................................................... 175

XV.   JURY DEMAND .............................................................................................. 175

Lead Plaintiff the Public Employees' Retirement System of Mississippi ("MissPERS"), individually and on behalf of a class of similarly situated persons and entities, by its undersigned attorneys, alleges the following against Signet Jewelers Limited ("Signet" or the "Company") and the Executive Defendants (defined below), upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters.

Lead Plaintiff's information and belief as to allegations concerning matters other than itself and its own acts is based upon the investigation conducted by and through counsel, which included, among other things, the review and analysis of: (i) transcripts, press releases, news articles, and other public statements issued by or concerning Signet and the Executive Defendants; (ii) research reports issued by financial analysts concerning the Company; (iii) reports and other documents filed publicly by Signet with the U.S. Securities and Exchange Commission ("SEC"); (iv) Signet's corporate website; (v) interviews with former Signet employees; and (vi) other publicly available information. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

Lead Plaintiff brings this federal securities class action on behalf of itself and a class consisting of all persons and entities who purchased, or otherwise acquired, the common stock of the Company from August 29, 2013 to May 24, 2017, inclusive (the "Class Period"), subject to certain exclusions addressed in paragraph 531 below (the "Class"). The Defendants in this action are: Signet; Michael Barnes, Signet's former Chief Executive Officer ("CEO"); Ronald Ristau, Signet's former Chief Financial Officer ("CFO"); Mark Light, Signet's former CEO; and Michele Santana, Signet's CFO. Lead Plaintiff's and the Class's claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.

## I.    <u>INTRODUCTION</u>

1.      This case concerns a series of misstatements and omissions about Signet, a jewelry retailer that owns well-known brands such as Jared, Kay Jewelers and Zales. Through an in-house lending program, Signet extended credit to its customers for their jewelry purchases. As detailed herein, Defendants held Signet out to the investing public as a "prudent" lender that made high-quality loans according to "stringent" credit criteria. Unbeknownst to investors, Signet was actually a reckless subprime lender that had systematically built a massive portfolio of high-risk consumer loans. When these facts were revealed to the market, the price of Signet's stock collapsed.

2.      Signet's lending operation was of vital importance to the Company and its investors. During the Class Period, the loan portfolio grew to approximately $1.7 billion—the second largest asset on the Company's balance sheet. Defendants stated that the loan portfolio was critical to Signet's business because it increased sales, built customer loyalty, and incentivized repeat purchases. On dozens of occasions during the Class Period, Defendants emphasized that Signet's lending operation was a "competitive advantage" that boosted Signet's financial performance and distinguished the Company from its peers.

3.      Given the significance of Signet's lending operation, Defendants repeatedly assured investors that they paid close attention to the Company's underwriting and the credit quality of the portfolio. For instance, Defendant Michael Barnes, Signet's former CEO, stated that the credit portfolio was "a big important part of our business and one that we don't take lightly. We watch it very closely and we use it to really help drive the core of our business." Defendant Ronald Ristau, Signet's former CFO, further stated that "we . . . fully understand the credit risk and profitability of our decisions."

4.      Prior to and during the Class Period, Defendants significantly expanded the loan portfolio, thereby fueling substantial sales growth for Signet. Defendants repeatedly assured investors that this sales growth was being undertaken in a safe and responsible way. Based on their close familiarity with the lending operation, Defendants represented that the Company's underwriting was strict, and the credit quality of its loan portfolio was very strong. For example, on numerous occasions, Defendants stated that Signet's underwriting was "very stringent[]," "very conservative[]," and that the Company was a "best in class operator" of its "private label credit operation." The credit quality of the portfolio, according to Defendants, was "very, very strong" and "excellent."

5.      Bolstering these representations, in Signet's financial statements, Defendants consistently reported small loan loss reserves for the portfolio, which signaled to investors that the portfolio was, in fact, healthy and stable. As alleged herein, these low reserve levels were enabled by Defendants' use of "recency" accounting—a controversial and disfavored form of counting delinquent loans, under which a loan may be considered current even if the borrow does not make the contractually required payments. Signet used the recency methodology to obscure the quality of, and mask the true losses embedded in, its credit portfolio.

6.      Due to Defendants' expansion of the credit portfolio and Signet's resulting sales growth, Defendants consistently reported favorable financial results. Indeed, Signet met or exceeded analysts' earnings estimates—often by just a hair—for much of the Class Period. Defendants lauded the Company as "a prudent, measured and profitable growth story."

7.      Based on Defendants' statements and the Company's ostensibly stellar financial results, analysts repeatedly issued buy recommendations for Signet stock, reporting that "credit [is] a competitive advantage for Signet," and that the portfolio was "stable and healthy" and "high-

quality." As a result, Signet's stock price more than doubled during the Class Period, rising from $69.83 at the start of the Class Period to a Class Period high of $150.94 on October 30, 2015.

8.     However, during the fall of 2015, after Signet surprisingly reported disappointing financial results, certain analysts and investors began questioning whether Signet had been generating significant amounts of risky loans in an effort to drive its sales to an unsustainable degree. They also criticized Signet's use of the recency method, and questioned whether it was obscuring the true credit quality of the loan book.

9.     In response to these concerns, Defendants "doubled down" on their prior assurances. Defendants vehemently denied that the concerns were legitimate, with the Company's Vice President of Investor Relations dismissing them as "bullying" from a few investors and assuring the market that Signet was "one of the great retail businesses of our time." Likewise, the Company's then-CEO, Defendant Mark Light, and current CFO, Defendant Michele Santana, mounted a staunch public defense of Signet's lending operation. They repeatedly assured investors that the Company's credit quality remained strong, that its underwriting remained conservative, and that the "extremely profitable" loan book remained a "competitive advantage." In a nutshell, Defendant Light stated that the "concerns about our credit portfolio" were "unwarranted, quite frankly."

10.    Nothing could have been further from the truth. Contrary to Defendants' statements, Signet's loan portfolio was rife with toxic credits that posed a material risk to the Company. Unbeknownst to investors, approximately 45% of Signet's loan portfolio consisted of subprime loans.

11.    Soon after Defendants' dismissal of investor concern as "bullying" and "unwarranted," the truth about Signet's troubled loan operation began to slowly emerge. On May

26, 2016, Defendants announced that the Board had authorized "a strategic evaluation of the Company's credit portfolio," and had hired a third party, Goldman Sachs, to run the review. Defendants acknowledged that they were considering a sale of the portfolio and a complete outsourcing of the credit operation—a revelation that was at odds with their statements, made just weeks prior, that the high-quality portfolio was a key competitive advantage for Signet. Surprised analysts noted the discrepancy, reporting, "From listening to management's script . . . , you would never have imagined that the company would need to commission a 'strategic evaluation' of the segment." On May 26, 2016, Signet's stock price swiftly declined, falling more than 10% in a single day on very high trading volume.

12.     With its credit problems surfacing, Signet was forced to tighten its aggressive lending standards, causing its sales to slow and its stock price to decline over the coming fiscal quarters. Throughout this time period, investor concern intensified—and the SEC publicly questioned the Company's use of the recency method in its financial statements. Defendants, however, continued their spirited defense of the credit quality of Signet's loan portfolio.

13.     It was not until May 25, 2017 that investors learned just how poor the credit quality of the loan book truly was. That day, Signet was forced to reveal that its sales had again dramatically declined, and that—even though it had been shopping its portfolio for one year—it had been able to sell only the "prime" portion of its credit portfolio. This portion of the portfolio totaled $1 billion, or approximately 55% of the total book. The remaining 45% of the loan book—totaling between $700 million to $800 million—consisted of subprime loans. The Company revealed that it had been unable to find a buyer for these toxic credits, and that no buyer was in sight. Signet's stock price swiftly collapsed again, immediately declining by nearly 8% on extremely heavy volume.

14.     Unfortunately for investors, Defendants were concealing yet another ugly truth during the Class Period. In 2008, Signet was sued by a class of female employees alleging gender discrimination in pay and promotion decisions. Pursuant to arbitration agreements Signet required its employees to sign, the matter was referred to arbitration and kept confidential. Signet repeatedly minimized the matter in its disclosures, assuring investors that the matter concerned Signet's "store-level" practices at a "few" stores, asserting that these limited practices were allegedly "discriminatory as to compensation and promotional activities," and stating that the Company had investigated the allegations and found them to be unsubstantiated. At the same time, Signet further assured investors that it adhered to the highest level of ethics in conducting its business. Signet repeatedly stated that it made employment decisions "solely" on merit, and was "committed to a workplace that is free from sexual . . . or other unlawful harassment . . . . Abusive, harassing or other offensive conduct is unacceptable . . . ."

15.     Prior to the beginning of the Class Period, however, Signet had been provided approximately 250 sworn declarations from nearly 200 employees detailing myriad horrific instances of sexual harassment by senior Signet executives over the course of several years. Contrary to Defendants' statements that the arbitration concerned only limited, unsubstantiated "store-level practices . . . as to compensation and promotional activities," this raft of evidence demonstrated that a pervasive culture of severe sexual harassment existed at Signet—and that this harassment was also conducted by the Company's senior executives, including Defendant Light. Scores of declarations detailed, among other things, routine instances of sexual harassment of female subordinates by male superiors—including high-level executives—at Signet's annual Managers' Meetings, as well as regular instances of female employees being pressured into sexual activity with their male superiors in order to obtain promotions and other economic advances, or

even simply to keep their jobs. As one former Signet employee stated in her declaration, "[s]exual harassment regularly occurred in Sterling. The Company's top level executives fostered this behavior and this culture of sexual discrimination at the Company because they actively participated in it."

16.     As Defendants knew, the existence of this culture of sexual harassment posed a severe risk to Signet's business and reputation. This was because Signet's key product—diamond bridal jewelry—was meant for women. Moreover, as Defendants repeatedly told investors, "trust" was essential to its sales model, because its product was an "emotional" one that was sold in face-to-face settings. According to Signet, trust was the single most important factor impacting a consumer's decision to buy jewelry at Signet's stores. If the facts demonstrating the existence of pervasive sexual harassment at Signet became public, it would alienate the recipients of Signet's flagship products, seriously compromise the trust on which its sales model depended, and significantly damage the Company's business, reputation, and stock price.

17.     Thus, while publicly minimizing the allegations and facts in the arbitration, and touting its own ethical business conduct, Defendants strove to keep this explosive evidence hidden from public view. Since at least 2015, the media had sought to access the declarations, which were kept confidential under arbitration rules. Defendants resisted disclosure for years—successfully.

18.     It was not until February 27, 2017, when the declarations were finally made public—albeit still with "company-approved" redactions—that investors learned the truth about sexual harassment at Signet. That evening, after the close of market, The Washington Post published a blockbuster article entitled "Hundreds allege sex harassment, discrimination at Kay and Jared jewelry company." The article detailed Signet's pervasive culture of sexual harassment,

reaching all the way up to the highest levels of the Company, and quoted and summarized many of the declarations evidencing that fact.

19.     Investors were shocked, and they fled the Company in droves. On February 28, 2017, Signet's stock priced opened sharply down, and by midday had declined 8%. Desperate to arrest this nosedive, Signet took the extraordinary action of halting trading so that it could prepare a public statement. In this statement, Signet reiterated its prior mischaracterization of the arbitration as involving "a very small number of individuals," whose assertions had been "thoroughly investigated" and were "not substantiated."

20.     The market disagreed. When trading resumed, Signet's stock price continued its collapse. By the close of market on February 28, 2017, Signet's stock price had lost 13% of its value on extraordinary trading volume of more than 11 million shares.

21.     On July 17, 2017, Defendant Light unexpectedly stepped down after more than 30 years with Signet. Signet and Light offered scant explanation for his departure, with Light citing a "need to address some health issues" and stating that "the Board and I agreed that it is a good time for a transition." The media noted that, given the Company's troubles, Light's departure was "also an opportunity to bring fresh eyes to a business that clearly needs new direction."

22.     Signet's stock price is currently approximately $67.00 per share, far less than half of its Class Period high.

## II.     JURISDICTION AND VENUE

23.     This Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

24.     This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1337.

25.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c), and (d). Many of the acts and omissions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material facts, occurred in this District.

26.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of national securities exchanges.

## III.    THE PARTIES

### 1.    Lead Plaintiff

27.     MissPERS is a pension fund established for the benefit of the current and retired public employees of the State of Mississippi. MissPERS is responsible for the retirement income of employees of the State, including current and retired employees of the State's public school districts, municipalities, counties, community colleges, state universities, libraries and water districts. MissPERS provides benefits to over 75,000 retirees, manages over $25 billion in assets for its beneficiaries, and is responsible for providing retirement benefits to more than 250,000 current public employees. MissPERS purchased Signet securities during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

### 2.    Defendants

28.      Defendant Signet Jewelers Limited ("Signet" or "the Company") is a Bermuda corporation with its headquarters located in Akron, Ohio. Signet is purportedly the world's largest retailer of diamond jewelry. The Company wholly owns Sterling Jewelers, Inc. ("Sterling"), through which it operates retail stores under the brand names Kay Jewelers ("Kay") and Jared The Galleria of Jewelry ("Jared"), among others, as well as its in-house credit operation. The Company

also wholly owns Zale Corporation, through which it operates retail stores under brand names including "Zales The Diamond Store" ("Zales") and "Piercing Pagoda."

29.      Defendant Michael Barnes ("Barnes") served as Chief Executive Officer and as a Director of Signet from January 2011 until October 31, 2014.

30.      Defendant Mark Light ("Light") was the Chief Executive Officer ("CEO") and a Director of Signet during the Class Period. Light became CEO and a Director of Signet on November 1, 2014. Prior to becoming CEO of Signet, Light served as President and Chief Operating Officer of Signet and CEO of its Sterling Jewelers division, and held senior leadership positions with Signet and the Sterling division for over 25 years. According to the Company's website, Light "has broad and deep knowledge of Signet's business and the jewelry industry" and "has extensive knowledge of Signet's operations." Light resigned on July 31, 2017.

31.      Defendant Ronald Ristau ("Ristau") served as Chief Financial Officer ("CFO") of Signet from April 2010 until July 31, 2014.

32.      Defendant Michele Santana ("Santana") became CFO of Signet on August 1, 2014, and continues to hold that position.

33.      Barnes, Light, Ristau, and Santana are collectively referred to herein as the "Executive Defendants." The Executive Defendants, because of their high-ranking positions and direct involvement in the everyday business of Signet and its subsidiaries, directly participated in the management of Signet's operations, including its public reporting functions, had the ability to, and did control, Signet's conduct, and were privy to confidential information concerning Signet and its business, operations and financial statements, as alleged herein.

34.      Signet and the Executive Defendants together are sometimes collectively referred to herein as the "Defendants."

**IV.    SUMMARY OF THE FRAUD**

    **A.    Signet Misrepresented the Credit Quality Of Its In-House Loan Portfolio, its Underwriting Process, and Its Loan Loss Reserves**

        **1.    Signet's Consumer Lending Portfolio Was Critical To The Company's Value, and Was a Key Focus of the Market and Defendants**

35.     Prior to and during the Class Period, a key part of Signet's business was its consumer lending operation. While Signet's competitors generally offered credit-financed sales through third party underwriters, Signet operated an in-house credit business run through its Sterling division. By 2015, Signet's total credit-financed sales (that is, sales financed through the use of this credit facility) had grown to 61.5% of total sales, or $2.45 billion. The Company's outstanding receivables balance had risen to $1.85 billion, or more than double its 2008 levels and triple its 2004 levels. The lending portfolio's receivables grew to be Signet's second-largest asset by 2015. More than one-third of Signet's operating income came from its in-house consumer finance program.

36.     In numerous investor conference calls and investor presentations before and throughout the Class Period, Defendants repeatedly stressed that the lending operation and loan portfolio were extremely important to the Company's business and financial performance, in major part because the lending operation increased sales and thus was a key driver of revenue for the company. For example, during an October 8, 2013 New York Analyst Day, then-CEO Barnes touted Signet's in-house customer finance operation, emphasizing "how valuable that is to our Company because it's powerful and it really drives our business and we have a very large percentage of sales that use our in-house customer financing. So that's a huge competitive advantage for us." Similarly, during a September 4, 2014 Goldman Sachs Global Retailing Conference, Defendant Santana described the Company's credit operation as "a key enabler of our

sales," and "as one of the competitive advantages we have." Indeed, Defendants opened their discussion of the Company's credit portfolio on nearly every earnings call during the Class Period with a statement that the lending operation was a "competitive advantage." In total, Defendants described Signet's in-house credit operation as a "competitive advantage" no fewer than 20 times over the course of the Class Period.

37.    The lending operation was especially important to driving sales in the bridal category, which comprised 60% of the Sterling division's credit sales and was its most important segment. According to the Company, credit penetration in the bridal category could reach 70%.

38.    Based on Defendants' statements, analysts repeatedly issued reports stating that the lending operating was a key differentiating feature that boosted the value of Signet's shares. For instance, on January 29, 2014, Miller Tabak & Co., LLC reported regarding Signet's credit portfolio:

> A competitive advantage, it's proven, self-funding and integral to the primary business goal, i.e., the sale of fashion and diamond jewelry[.] The high-quality credit portfolio is specifically designed to help customers make jewelry purchases (primarily bridal) and keep them coming back for add-on purchases.

The same report likewise concluded that it was unlikely that Signet would ever consider a sale of its credit operation considering the edge it gave the Company over its competitors. Buckingham Research Group similarly reported on December 19, 2014 that Signet's "proprietary credit card is probably one of its most important competitive strengths as it helps drive sales."

39.    Given the importance of the lending operation to Signet's financial performance and value, along with its sheer size, it was a significant focus of the market's attention during the Class Period—as evidenced by numerous investor questions during earnings calls relating to the Company's credit business. Signet was well aware of this fact. As Ristau stated during Signet's New York Analyst Day on October 8, 2013, "Well, I couldn't do a presentation without talking

about credit." As explained further below, Defendants addressed this subject in detail in dozens of investor calls and presentations during the Class Period, and analysts issued hundreds of reports concerning Signet's lending operation.

40.     In light of the market's focus on the credit operation, Defendants repeatedly stated that they paid close attention to the lending operation and the health of the portfolio, and had personal knowledge of these subjects. For example, during the September 10, 2013 Goldman Sachs Global Retailing Conference, Defendant Barnes stated that the credit portfolio was "a big important part of our business and one that we don't take lightly. We watch it very closely and we use it to really help drive the core of our business." During the October 8, 2013 New York Analyst Day, Defendant Ristau further stated that the Company "welcome[s] the increasing use of our credit programs, as we have very definitive approval criteria and fully understand the credit risk and profitability of our decisions. We take great care in our decisions[.]"

41.     Defendants bolstered these representations in their SEC filings. Defendants stated in Signet's Form 10-Ks that "on an ongoing basis, management monitors the credit exposure based on past due status and collection experience." Signet's Form 10-K filed in February 2014 provided that subsequent to a customer's initial finance purchase, "Signet monitors the credit quality of its customer finance receivable portfolio based on payment activity that drives the aging of receivables. This credit quality indicator is assessed on a real-time basis by Signet." Likewise, in its Form 10-K for fiscal 2016, Signet stated that, "We closely monitor the credit portfolio to identify delinquent accounts early[.]"

> **2.     As the Credit Portfolio Increases in Size to Drive Sales, Defendants Repeatedly Assure Investors that Their Underwriting Is Conservative and Credit Quality is Strong**

42.     Prior to and during the Class Period, Defendants expanded Signet's in-house credit program to drive sales. The Company's credit penetration rate and the size of the loan portfolio

grew to record heights during the Class Period. For example, from the beginning of the Class Period to the end of 2016, the credit penetration rate rose from 60.4% to a high of 66.8%. Similarly, the Company's accounts receivable grew from $1.15 billion in the beginning of the Class Period to $1.86 billion by the first quarter of fiscal 2018.

43.     Defendants' expansion of the Company's credit portfolio in turn caused the Company to experience enormous sales growth. For example, at the very beginning of the Class Period, Signet reported second quarter fiscal 2014 total sales of $880.2 million. By the second quarter fiscal 2015, the Company reported total sales of $1.2 billion, followed by total sales of $1.4 billion in the second quarter fiscal 2016.

44.     As the Company's sales grew, Defendants repeatedly told investors that their underwriting remained conservative and that the credit quality of the portfolio remained healthy and strong. For example, during an August 29, 2013 earnings call, Defendant Light stated that Signet's

> overall credit portfolio statistics continue to remain very strong and I want to make sure that you understand that point. [] Consumers are behaving strongly. They are making more than the minimum down payments very strongly. They are using credit appropriately. Our credit approval rates remain relatively consistent to prior year, so there is no big change in anything that we are doing there.

45.     Similarly, on September 10, 2013 during the Goldman Sachs Global Retailing Conference, Defendant Ristau stated that there had been no "change in the quality of the portfolio or consumer behavioral changes. That has all been very, very strong and the portfolio continues to be very healthy." Ristau further stated that Defendants "don't push the credit, we don't change the way that we measure in terms of 'do you get credit, do you not get credit.' We will never cross that line. But because of the fact that it is so well-managed we're still gaining a lot of traction, bringing in a lot of new customers."

46.     During the same conference, Defendant Ristau assured investors that Defendants were intimately familiar with the credit operation, and the Company's underwriting was "stringent" and "conservative," stating:

> Okay, well, the credit business, as I am sure you are all aware, we believe is a competitive advantage of our business. We do run our own credit operation. We are very, very strong operators of that particular segment of our business, we have been at it for 40 or 50 years, we are best in class operators of running a private label credit operation.
>
> So it is very stringently controlled, it is a very important part of our business particularly as it helps to facilitate the sale of the bridal product. . . . So it is a very important part of our business, it is very well managed, it is very conservatively managed. From a credit granting perspective about 50% of the people who apply for credit are granted credit. So it is very stringently managed from a credit criteria perspective.

47.     Whenever the Company's provision for bad debt ticked upwards, Defendants assured investors that the increase was not due to credit deterioration. Specifically, Defendants stated that the increasing bad debt provision was driven by the fact that the portfolio was increasing in size, thus requiring an increasing provision automatically. Defendants further stated that this provision was "more than offset" by the increased levels of interest income generated by the larger portfolio—resulting in a net benefit to Signet—and that credit continued to be "profitable" and "integral to enabling sales in the business[.]"

48.     For example, on October 8, 2013, Defendant Ristau noted that the "net impact" of these items—*i.e.*, bad debt expense and interest income—"was an increase of $19.3 million in operating income. . . . So our message here is credit is profitable . . . ." Defendants made substantially similar disclosures throughout the Class Period.

49.     Analysts issued reports adopting this understanding and continued to report that they had no concerns regarding Signet's credit portfolio. For instance, following Signet's August 29 earnings call, Deutsche Bank reported that "although bad debt as a percentage of sales rose

YoY, management said they have seen no deterioration in customers' ability to re-pay, and indeed profits from credit rose YoY." On August 30, 2013, Stephens reported that it viewed Signet's "credit portfolio as healthy despite an uptick in bad debt expense," which was "attributed to higher receivables and is being offset by higher interest income on those receivables." In September 2013, Stephens reported that Signet's bad debt increase was "due to a higher credit penetration as more consumers are buying on credit. This was mostly offset by higher interest income earned on a higher receivables balance. Its underwriting terms have not changed."

50.     In April 2014, the Company made certain unspecified changes to its credit decision engine. These changes further increased the Company's credit penetration rates; that is, they resulted in Signet granting more credit.

51.     Soon thereafter, on July 1, 2014, Signet issued a press release notifying the public that Defendant Ristau would resign from his position as CFO effective July 31, 2014, and that Defendant Santana would replace him following his departure. During an August 28, 2014 earnings call, Defendant Santana assured investors that the changes to the Company's credit decision engine would not adversely the credit quality of the portfolio. Defendant Santana stated that these changes "preserve[] credit requirements, but more accurately score applicants, which yields more qualified customers." According to Santana, the changes were meant to "increase credit penetration without adversely affecting the net impact of bad debt." In November 2014, Defendant Light replaced Defendant Barnes as CEO.

52.     At the same time Defendants were making these statements, they also reported in their SEC filings that the credit portfolio did not pose a material concentration of credit risk. For example, each of Signet's Form 10-Qs stated that "[m]anagement does not believe Signet is

- 16 -

exposed to any significant concentrations of credit risk that arise from cash and cash equivalent investments, derivatives or accounts receivable."

53.     Meanwhile, Defendants kept the Company's publicly reported loss reserves at very low levels. This communicated to the market that only a very small percentage of the debt was likely to default, and therefore that the portfolio was strong. Further, because bad debt was charged against income dollar for dollar, keeping reserves low allowed Signet to report higher income. The Company's reserves, *i.e.*, its "allowance for credit losses as a percentage of accounts receivable," ranged from 6.5% to 7.9% throughout the Class Period.

54.     Notably, Signet used a rare and disfavored form of accounting—"recency accounting—that effectively suppressed the number of accounts considered delinquent. This method of "aging," or determining the delinquency of accounts receivable, is not standard. The most common method of aging the delinquency of accounts receivable is the "contractual" method, whereby an account is current only if the account holder is paid in full under the contractual terms of the loan. In contrast, Signet's accounting methodology counted an account as "current" even when a customer had missed a payment—or several of them—so long as the customer recently had made a single "qualifying payment" of a minimum amount which could be less than the amout due.

55.     Specifically, Signet permitted customers to make partial payments—as little as 75% of the monthly contractual agreed upon amount—for the account to be considered current under Signet's recency method, even though such account would not be current under the contractual method. Thus, for example, if a customer had failed to make any payment for 90 days, the account would nevertheless "reset" and be considered current if the customer subsequently made one minimum partial monthly payment: the customer did not need to pay the past due amount

to be considered current under Signet's accounting methodology. This aging methodology enabled Defendants to avoid disclosing to the market the amount of money owed to Signet that was actually past due because it deferred the identification of accounts as delinquent.

56.    During the Class Period, Defendants also used the Company's reserve levels as a signal to investors that the credit portfolio was healthy. For example, Santana stated during a March 26, 2015 earnings call that "the portfolio continues to perform very strongly for us and that's evidenced by the allowance as a percentage of our ending accounts receivable finishing nearly flat to last year." Similarly, during a May 28, 2015 first quarter earnings call, Defendant Santana stated that, "Our portfolio continues to perform well as evidenced by the [positive] net impact of bad debt and other operating income as well as the allowance as a percentage of accounts receivable being fairly consistent."

57.    Significantly, by keeping the allowance low, the Company was also able to consistently meet earnings estimates (by avoiding charges against its income that would have been required if the reserves were raised). From the beginning of the Class Period until the fiscal third quarter of 2016 (when the hidden truth about the credit portfolio began to leak out), Signet consistently met earnings expectations, often by just a penny or two:[1]

---

[1] In the Second Quarter of Fiscal 2015, the Company reported organic EPS of $1.00 excluding "transaction, severance, and capital structure and financing items incurred as well as the results of Zale operations and related purchase accounting adjustments." The corresponding chart reflects the Company's organic EPS reported for that quarter.



58.     Analysts consistently lauded the Company's performance and issued "buy" recommendations for its stock. For example, on August 27, 2015, Buckingham Research Group issued a BUY rating for the Company, noting that its recent earnings beat consensus estimates "on a better than expected same store sales increase[.]" Similarly, on September 1, 2015, UBS issued a report stating that Signet is "still shining bright," and highlighting that the Company's EPS "was well ahead of management guidance." On October 21, 2015, Wells Fargo named Signet its "top pick in our universe" and placed it on the Priority Stock List.

59.     As a result of Defendants' statements, Signet's stock price rose sharply upward. Signet's stock price rose from $69.83 at the start of the Class Period to a Class Period high of $150.94 on October 30, 2015, an increase of more than 100%.

### 3.    Contrary to Defendants' Statements, Signet Had Engaged In High-Risk Lending Practices To Drive Loan Volume, Thus Filling Its Credit Portfolio With Huge Amounts of Toxic Loans

60.    Unbeknownst to investors, in order to expand the Company's lending operation, Signet had engaged in reckless underwriting through which it routinely extended credit to high-risk borrowers—the precise opposite of the "conservative" practices Defendants touted. As a result of its reckless underwriting, the Company's loan portfolio contained a material amount of high-risk loans that were likely to default in significant numbers, contrary to Defendants' statements that the credit quality of the portfolio was "strong." Numerous former Signet employees confirmed that Signet engaged in high-risk lending practices to increase sales.

61.    Former Employee 1 worked at Signet from January 1999 until February 2014. Former Employee 1 began in the collections department and rose through the Company. Former Employee 1 began working in the credit risk department in 2009 as a Project Manager/Business Analyst before becoming the Director of the Credit Information Technology and Strategy Department in 2011. Former Employee 1 was involved with designing the Company's credit scoring system called "score card" in approximately 2005 or 2006. Later, as the Director of the Credit Information Technology and Strategy Department, Former Employee 1 was responsible for all technological aspects of the Company's credit business, including system management, infrastructure, and data analytics. Former Employee 1 reported to Mario Weiss, who was Signet's Senior Vice President of Credit Operations from 1990 to 2016.

62.    Former Employee 1 reported that the Company's credit portfolio did not collapse suddenly. Rather, according to Former Employee 1, the high levels of bad debt in the portfolio and resulting problems were well known within the Company dating back to at least 2008: "There were signals going all the way back to 2008 that the credit department had some major issues with the bad debt process, with how it used recency methods and causing major cash flow issues." Former

Employee 1 reported that the biggest issue with the portfolio was the growing gap between total sales and real cash flow.

63.     Former Employee 1's responsibilities included conducting daily or weekly gap analyses of the differences between sales numbers and real cash flow within the Company. As Former Employee 1 explained, this "gap" arose from granting credit to borrowers with low or no credit history, who could afford only very low monthly minimum payments. For example, Former Employee 1 explained, by taking someone fresh out of college with no credit, giving him a $2,000 limit, and making the monthly payment only $25 per month, the Company would be able to show a great number from a sales perspective. However, from a true cash flow perspective, this was problematic. The money that the Company reported as revenue wasn't really there. Former Employee 1 explained that this question of sales numbers versus real cash flow was always a question from outsiders, including investors. Internally, the credit department was performing constant analyses, and this gap between sales totals and real cash was the number one analysis they did.

64.     Former Employee 1 also stated that Signet's recency method of accounting allowed the gap between outstanding account balances and real cash flow to grow. The Company had many customers who were between thirty and ninety days delinquent. They would make smaller monthly payments, and the Company would charge them interest. From a recency perspective, and the Company's perspective, the customers were still current even though they were paying only $25 per month. However, these small monthly payments were eaten up by interest, so the customers' actual account balance kept increasing. Further, because customers were current, they were able to purchase more merchandise on their credit line. Thus, even if the customer is still paying $25

or $30 per month, the gap between the account balance and the amount actually being collected continues to grow.

65.     Former Employee 1 strongly disagreed with the notion that the bad debt increase Signet experienced was an "all of a sudden thing." Former Employee 1 reported that employees in the credit risk department began issuing internal warnings as far back as 2007 or 2008 that the bad debt issue was a problem and the portfolio was in trouble, but nothing was really done.

66.     Former Employee 1 reported that this issue and other negative trends in the credit portfolio were communicated to senior Signet executives, including Defendant Light. Former Employee 1's department would identify negative and positive trends in the credit data. In addition to the cash flow problem, one of the key negative trends was the rate of customer contacts for collection compared with the number of attempts to contact them. The lower that rate became, the greater the cash flow decrease associated with collections. These types of reports would then be written up and sent to Former Employee 1's peers and other executives in the credit department, and ultimately shared with Defendant Light and Bob Trabucco, the chief financial officer of Sterling Jewelers. Former Employee 1 reported that there would be regular bad debt meetings with the executives, including Light and Trabucco, to discuss strategies to overcome expanding bad debt, low contact rates, and similar issues.

67.     Former Employee 1 said that the question in meetings was always, "Do we change our lending practices and alienate a large portion of customers that would not qualify for more stringent credit terms?" The overarching opinion was that, if the Company tightened its underwriting, Sterling would lose a significant number of customers from a buying power perspective.

68.     Former Employee 1 reported that it was an internal joke that the Company was going to have a discussion about changing the lending program every October, which was the month prior to the high increase in sales during the holiday season. Former Employee 1 reported that, "It was like we thought about changing the lending program but here comes the holidays so those high sales numbers will cover the smell of the bad debt." According to Former Employee 1, everyone at the Company knew that eventually the Company was going to have to change their lending practices because it was going to fall apart, which indeed eventually happened to Sterling. Former Employee 1 reported, "There was always that piano hanging above everyone's heads, but the performance of the sales during the holidays hid the smell for the most part. That's why you'd see that sales versus cash flow gap continuing to grow. Maybe from the outside it looked like all of a sudden, but if you look at the internal trends you could see the issue going back as far as 2007 or 2008."

69.     Former Employee 1 would also listen in to investor calls. As Former Employee 1 recalled, the number one topic that always came up was the bad debt. Defendant Light, or whoever was speaking for the Company, would typically represent that "the bad debt was manageable, the credit portfolio was okay, and there were no plans on changing Signet's recency method because that's what gave the Company its competitive advantage." But Former Employee 1 knew from the trend analyses that the recency method had to be modified, or at least scaled down so the cash flow was more equitable to the sales numbers. Yet that reconciliation never happened and only got worse.

70.     Former Employee 1 characterized Light's remarks on the calls as "spin." For instance, as Former Employee 1 described, Light would represent that the credit portfolio is doing fine, and would explain to investors all these indicators the Company looks at showing the trends

were moving in a positive direction. But Light was not mentioning all of the negative trends that Former Employee 1 and his team were looking at. Former Employee 1 said that internally, discussions about bad debt were very different than they were on the investor calls. That was one of the reasons Former Employee 1 finally decided to leave the Company. Former Employee 1 held significant positions at Signet for thirteen years and saw the direction the Company was going in, especially at the executive level.

71.     Numerous former employees reported that the Company forced its sales representatives to aggressively push credit on customers, even those who did not want it, by requiring them to meet minimum daily quotas for credit applications, and disciplining employees or firing them when they did not meet these quotas. Former employees also reported that the Company was extremely lax in granting credit to customers, even those who appeared to be high-risk, such as those with bankruptcy or late fee histories.

72.     Former Employee 2 worked for the Company as a sales associate at Kay and Belden stores from approximately 2012 to 2014 in Massena, New York. Former Employee 2 reported that the Company was extremely strict about its quota for getting credit applications. Former Employee 2 was required to obtain one credit application for every day Former Employee 2 worked. If you worked five days in a week, you had to get five credit applications. This was a very harsh requirement, especially in the mall Former Employee 2 worked at, which was small. Former Employee 2 reported that the Company would make staff stand out in the mall hallway and essentially beg people for credit applications "or else we'd get fired." The Company was "very, very, very dominant about getting credit applications," Former Employee 2 reported. "We needed credit, credit, credit, and that was our downfall in our [Belden] store, anyway," said Former Employee 2. Former Employee 2 reported that sales staff were judged by six standards, including

the quota of one credit application per day, sales goals, upselling on warranties and service plans, among others. If a sales associate failed to meet their credit application quota for a month, they would get fired.

73.     Former Employee 3 worked for the Company as a sale associate at the Jared store in Fort Lauderdale from January 2014 to April 2017. Former Employee 3 reported that Former Employee 3 was required to procure one half of a credit application per day. Because a lot of potential customers already have credit, "you were really going out of your way to get [new credit applications]." Former Employee 3 stated that getting credit applications was very important for promotions. "You heard 'credit is king' every day; that's what was written on the daily goals sheet. They pushed credit more than they pushed sales," said Former Employee 3. Former Employee 3 further stated that Jared's "credit was pretty easy to get. They gave credit to people I wouldn't have let take my car around the block. They gave credit to just about everybody." According to Former Employee 3, the only time the Company would not give credit was if the applicant had not paid the Company in the past. Former Employee 3 said, "It's the culture of getting credit, and as long as it's extended, you have to sell. You've got to do it."

74.     Former Employee 4 was a district training captain at Ultra Diamonds, and moved over to Sterling when Ultra was acquired in 2012. Former Employee 4 was a District Manager in Training at Sterling until leaving the Company in March 2015. Former Employee 4 reported that every employee was held to standards of production, and one of them was the number of credit applications they generated. Based on whether an employee was full time or part time, a determination was made on what that requirement was. This was factored into promotions, demotions, and terminations. The training pieces for this standard focused on going out and getting applications rather than looking for applicants with a true need for credit or who were attractive

and safe borrowers. Some store managers would have their employees walk around the mall and ask other mall employees to fill out applications just to meet their standard. The standard was either one or two credit applications per day. Sometimes it would be one or two credit applications per four or six hour block. Part time employees had to get half of whatever the full time production standard was. Managers were considered selling managers, so they were held to these standards as well. Former Employee 4 echoed that "there were a lot of people that would say they had bad credit, and we'd still get them a $300 starter line. There was a big increase in the amount of those which are obviously riskier and more likely to default."

75.     Former Employee 5 worked for the Company from June 2008 until May 2017. At the end of Former Employee 5's tenure, Former Employee 5 was an assistant store manager in Fort Lauderdale Florida. When asked about Signet's credit program, Former Employee 5 explained that "basically anybody gets approved" and you had to have "the worst credit score in history" to be denied. Former Employee 5 said that it was "very, very easy" to get credit and that the application process took five minutes, with a decision being made within five minutes of the submission unless the individual had a security block. Former Employee 5 provided her mother as an example of the ease with which someone with poor credit would be approved through Signet's system. Former Employee 5's mother applied for credit from Signet to help Former Employee 5 meet her credit application quota. "She was doing it to help me for a quota I needed to meet," Former Employee 5 said. At the time, Former Employee 5's mother had filed for bankruptcy, was losing her home, had "tons of medical bills and a car she couldn't pay for," and as a result Former Employee 5 assumed she had an extremely poor credit score. To Former Employee 5's surprise, Signet approved Former Employee 5's mother for approximately $8,000 in credit.

76.     Former Employee 5 explained that Signet had a quota on the number of credit applications each sales associate was required to process. In the Jared division this was one half of a credit application per day, but in the Kay division it was one credit application per day. If you were unable to convince a customer to apply for credit, Signet would want you to bring in a fellow employee to try to convince the customer. The objective was to convince customers to open credit. This quota structure remained the same throughout Former Employee 5's tenure at the Company. Former Employee 5 stated that these quotas were set by corporate, and there were six standards, referred to internally as the "6 for 6 standard": sales goals, selling additional pieces during a single transaction, selling lifetime warranties on the purchased jewelry, revenue generated by the in-store repair department, credit applications, and selling credit insurance.

77.     Former Employee 6 worked as a collector in the level 3 collections department, which collected on accounts that were 90 days past due, from 2011 until September 2014. Former Employee 6 would start the collections process by looking at the original credit applications. Former Employee 6 reported that a lot of the applications were "garbage." Former Employee 6 noted, "A lot of the times the original credit application was incomplete, either not filled out or missing the applicant's signature. I remember looking at one and in source of income it said 'stealing watches.' It was just ridiculous. I'd look at these applications and just shake my head." Former Employee 6 said that Former Employee 6's department would always laugh at the credit authorizers because it was "ridiculous how some of the people they were collecting on got approved for loans in the first place."

78.     The above statements by former employees are corroborated by the fact that the Company's borrowers did, in fact, increasingly consist of bankruptcy filers during the Class Period. As stated in ¶113, below, in the first quarter of calendar year 2015, 1,903 bankruptcy filers

named Signet as a creditor. In the months following the end of that quarter, that number jumped: 2,663 bankruptcy filers named Signet as a creditor in the fourth quarter of calendar year 2015, an increase of 29.9% over the first quarter, and 3,274 filers in the first quarter of calendar year 2016 named Signet as a creditor, an increase of 72% year-over-year.

79.     Defendants had knowledge of these facts. Bankruptcy courts notify all creditors named in a bankruptcy filing. Further, the Company stated in its SEC filings that it tracked bankruptcy petitions throughout the Class Period. For example, in Signet's fiscal 2016 Form 10-K, the Company's underwriting disclosures provided that:

> [A] 100% allowance [for uncollectible amounts] is made for any amount aged more than 90 days on a recency basis and any amount associated with an account the owner of which has filed for bankruptcy . . . . The allowance calculation is reviewed by management to assess whether, based on economic events, additional analysis is required to appropriately estimate losses inherent in the portfolio.

### 4.     As Signet's Hidden Credit Problems Begin to Emerge, Defendants Issue False Assurances to Quell Market Concern

80.     As explained below, the severe credit risk created by Signet's reckless lending practices began to emerge in late 2015, causing investors to question the credit quality of the Company's loan portfolio and the conservativism of its underwriting. Defendants promptly assured investors that any concerns were unfounded and that the credit portfolio remained stable and healthy.

81.     On November 24, 2015, Signet issued disappointing earnings for the third quarter of 2015, which were below consensus expectations. Specifically, earnings per share were $0.33, $0.05 below the street's $0.38 estimate. Defendants revealed that higher net bad debt expense, which rose to $53 million compared to $41.7 million the year prior, had led to contracting margins and therefore to the earnings miss. These results caused investors to question the credit quality of Signet's loan portfolio and, in turn, caused Signet stock to immediately fall 4%, dropping from

$140.65 per share on November 23, 2015 to a closing price of $134.89 per share on November 24, 2015, on elevated trading volume of more than 4.6 million shares traded.

82.     To mitigate the impact of investor concern on Signet's stock price, Defendants made a number of false reassuring statements in response to analysts' questions on the conference call to discuss these results. For example, Defendant Santana explained that the increased net bad debt expense was not caused by deterioration, but rather by a shift in "credit mix," namely, an increase in credit being granted to Kay customers (who had a lower credit profile) relative to Jared customers. Further, Defendants claimed that because the third quarter was historically a very small one for the Company's earnings, the effect of this shift in credit mix was magnified more than it would normally have been. Ultimately, Defendants assured investors, the Company's underwriting remained disciplined and credit quality was strong. As Santana stated:

> The credit mix shift had a notable and partially offsetting impact on operating income because our operating earnings in Q3 are less than 5% of our overall annual operating earnings, so a small shift in credit has a more noticeable impact. Our credit approval standards remain disciplined and unchanged. [] The higher participation rate was primarily driven by a greater increase of Kay customers compared to our Jared customers. [] Signet has not changed its credit standards and our credit portfolio continues to perform well and profitably.

83.     Analysts issued reports in which they credited Defendants' reassurances. Barclays reported that the higher bad debt expense "was due to mix shift to Kay vs. Jared, which has different credit metrics, but the overall state of the credit business remains in good shape." Cowen & Company likewise reported that Signet "remains highly disciplined in its approval process and its credit portfolio continues to be profitable and stable."

84.     For some analysts, however, skepticism lingered. On December 23, 2015, Pacific Square Research reported its belief that "SIG is covering up fundamental weaknesses," and questioned whether the Company was in fact experiencing meaningful credit deterioration. As the report noted, "Credit quality clearly appears to be under pressure and, in our view, is at a critical

juncture to go even lower." The analysts further noted that investors did not have a clear view of delinquencies at the Company, stating, "Trouble is, because SIG uses the recency method of accounting, the aging of AR [accounts receivable] understates the true level [of] past due accounts."

85.     Between the end of November 2015 and May 2016, investors continued to raise questions about Signet's credit operation, and Defendants continued to issue a series of false reassurances in which they stated that the Company's underwriting remained conservative and its credit quality was strong. As Pacific Square Research stated in a January 4, 2016 report, "the first hurdle for the stock will be [the] holiday sales report by the company. We expect SIG to put up a big defense of its credit operation. Based on recent comments, analysts appear to have already been primed to believe the impact will be minimal."

86.     Indeed, on the January 7, 2016 holiday sales call, Defendants dismissed market concern as unwarranted and reassured investors that all was well with the credit operation. For example, Defendant Light stated that

> [I]t's very important that everybody understands this. We have been running a credit portfolio for well over 30 years – well over 30 years. And we've been through good times and bad times with the recessions, and we've been able to manage our accounts receivable appropriately and arguably better than most during all times over the last 30-plus years. So – this credit, as Michele said, there's modest shifts going on, but there's nothing that's unprecedented for us. So we have every confidence in the way we manage our credit portfolio and the profitability of our credit portfolio. I just want to reinforce that because there seems to be some concerns about our credit portfolio, and – we just think it's unwarranted, quite frankly.

87.     Similarly, Santana added, "Again, just to go back, our credit portfolio remains extremely profitable. . . . So I really hope with the comments that we mentioned today, that it does help to put this credit discussion – to minimize it to where it should be." Santana added that, "In-

house credit has long been an important element of Signet's success," and emphasized again that, "Our credit program offers a competitive advantage for the Company."

88.     Analysts reacted positively to Defendants' assurances. For example, Telsey Advisory Group reported on February 1, 2016, for example, that "for all the concern over bad debt expense and the credit business reflected in the stock performance, we are not seeing the impact to current earnings."

89.     However, other analysts remained concerned and continued to question Defendants' assurances. Pacific Coast Research reported on January 8, 2016 that, "In our view, regardless of whether it was coached or decided on its own, SIG appears to be tackling credit concerns by trying to create the impression that everything is fine. []But based on the extremely defensive game of dodge ball played by management on the holiday sales call, it appears to us that SIG is counting on its credit issues to just go away."  A February 12, 2016 report by Bloomberg questioned whether Signet's enormous credit portfolio made it more a finance company than a jewelry retailer, noting that "behind [Signet's] sparkly empire lie consumer loans that bankers might consider subprime debt," and that "[o]f most concern to skeptical analysts is Signet's reliance on an unusual accounting method . . . an approach they fear could underestimate future losses."

90.     A January 21, 2016 report by The Capital Forum also questioned the Company's use of recency accounting, and noted that the Company had refused to answer the analyst's questions on this subject. Specifically, the report noted that recency accounting has been criticized by academics, who wrote that, "in contrast to the proper contractual reckoning[, recency accounting] is illegal in some jurisdictions, frowned upon in many more, and [is] universally misleading." The report further noted that "recency accounting is currently rarely used for external

disclosures or reporting purposes," and that "rating agencies frown on servicers' use of recency to track delinquent payments from borrowers."

91.     The report further noted that the Company had recently sought to assure analysts that Signet's use of recency accounting did not understate delinquencies because the Company "requires a 'substantial majority' of [the] minimum payment for an account to be treated as performing." However, when The Capital Forum asked several follow up questions to gain clarity on this issue, it "did not receive a response to these questions."

92.     To counter these lingering questions, in addition to making repeated assurances that the Company's credit portfolio was healthy and profitable, Defendants undertook initiatives to comfort the market with promises of an immediately improving credit mix. Specifically, the Company targeted its top credit quality customers with mailings to encourage them to reactivate their credit cards. It also offered a discount for new customers opening credit cards to produce a "more favorable" credit mix shift—in other words, an attempt to increase the number of higher quality borrowers in its portfolio. Most importantly and in response to growing investor pressure for transparency into credit metrics, Defendants promised investors that there would be new disclosures regarding the Company's credit decision-making protocol, accounting method, and credit metrics in its forthcoming March 2016 SEC filing.

93.     In addition, on February 29, 2016, Signet made a number of announcements designed to discredit its critics and boost its stock price. First, Signet took the extremely unusual step of pre-announcing its earnings for the fiscal fourth quarter 2016, which exceeded its guidance. Notably, Signet's Vice President of Investor Relations James Grant sent this preannouncement to several investors along with a note dismissing the market's concerns as "bullying" from a few investors, and lauding Signet as "one of the great retail businesses of the present time:"

> Normally [we] would not pre-announce our earnings-beat unless it materially deviated from our guidance. But this is a very unique time for all of us. Please, do not consider this a new precedent or read into this in any way except for what it is: A news release to publicly show our great results which creates an open period to repurchase our stock; and to counter the bullying we've endured over the last three months regarding our business – one of the great retail businesses of the present time.

94.     Second, the Company announced that its Board had authorized a share repurchase of $750 million. Third, the Company announced an 18% increase in its dividend.

95.     On March 1, 2016, Pacific Square Research reported on these machinations, stating that, "in an apparent effort to spark renewed interest by investors, SIG pulled not just one lever (a buyback announcement) or two levers (adding in a dividend increase) but three levers – the third being the granddaddy of all: The implication that short sellers have been 'bullying' its stock." Regarding the buyback, Pacific Square reported that Signet

> said the buybacks can be made in the 'open market and through privately negotiated transactions.' We realize that can be viewed as a boilerplate statement. But with Corvex Management holding a stake of slightly more than 7% of SIG's shares, we believe investors should not blindly dismiss the possibility that SIG buys back shares from big investors just as ADT bought Corvex's stake in late 2013.

96.     Other analysts similarly raised questions. A report by Dichotomy Capital questioned whether "management buying back stock" was part of a façade. The report noted that—consistent with Former Employee 1's report—Signet generated very little "free cash flow" despite the size of its lending operations. Noting that "Signet keeps their credit portfolio a closely guarded secret," the analyst speculated that "I believe Signet has simply extended credit to individuals who should not be given credit." The report further noted the analyst's "discussions with several store employees and managers indicates that A. Signet approved credit via a soft pull, B. for many people, this is their first and/or only credit card, C. management compensation is based on credit applications, and D. there is no need to verify income or employment." The analyst questioned whether Signet was, at bottom, "a subprime finance company."

97.     In March of 2016, Defendants made a number of additional disclosures designed to reassure the market that the credit portfolio was strong and the Company's reserves were accurately stated. For instance, during a March 24, 2016 conference call to discuss fourth quarter 2015 earnings, Defendant Santana emphasized again that "We have provided and operated in-house credit for 30 years, and it gives us a number of competitive advantages," that the "credit program is designed for rapid repayment that minimizes risk," and that the Company's "underwriting standards are proven and have been consistent." Santana further stated that "the visibility that we have into our credit portfolio performance which includes daily collections, weekly roll rates to 30, 60 and 90 days and other meaningful indicators leads us to remain highly confident in the strength of our credit portfolio performance." The Company discussed its improved credit metrics that had been pre-released, with Santana stating that the Company's "year-end valuation allowance and nonperforming metrics improved as management had expected, compared to the third quarter. This improvement was driven not only by the normal seasonality we customarily see, but also due to excellent credit execution and credit marketing initiatives designed to favorably influence credit receivable mix."

98.     In defending the Company's use of recency accounting, Santana stated that this approach accurately reflected the Company's true financial condition, and that switching to contractual accounting would make no difference: "In other words, the net charge-off to the balance sheet, and the net bad debt expense in the P&L would be the same under both recency and contractual aging. There is no difference between the two when it come to our financial statements." The Company also pointed to additional disclosures in its Form 10-K, including disclosures expanding on the manner in which Signet used the recency method, and a disclosure

showing that the weighted average FICO score of the credit portfolio was 662, higher than the 640 score that is generally considered to be subprime.

99.     The market, by and large, reacted favorably to these disclosures. Cowen & Company reported that "management commented that excellent credit team execution & credit marketing initiatives designed to favorably influence credit receivable mix helped to drive the improvement [in the Sterling in-house credit portfolio]," and J.P. Morgan reported that improved fourth quarter credit metrics should "assuage[e] concerns that had been weighing on the stock following a 3Q increase in mix driven bad debt expense. [] Importantly, this update should put the bear thesis to rest for now regarding concerns for worsening credit metrics given a moderating credit environment." On March 28, an analyst from Buckingham Research Group stated that, "we are more confident that there is no 'smoking gun' to come from SIG's credit operations," while issuing a "BUY" rating for the Company's stock.

100.     Still, other analysts continued to raise questions. On March 30, 2016, Pacific Square Research reported that the "additional disclosure does little to quell concerns," and that Signet's "claim of increased transparency falls short of what investors really need to know." On April 15, 2016, The Capitol Forum reported on its continuing "suspicions that the use of recency accounting and Signet's pushing of credit accounts allowed the company to obfuscate some of the risk in the credit portfolio." During store visits, the analyst learned that the Kay division of the Company extends credit to borrowers with no credit or poor credit through "starter accounts." According to the analyst, extending starter accounts is an "indicia of a company that more closely resembles a subprime retailer or installment lender than a jewelry company."

### 5.   **The Truth Emerges**

101.    The full truth about Signet's toxic loan portfolio was not revealed until the end of the Class Period on May 25, 2017, and was disclosed to investors on a piecemeal basis through a series of partial corrective disclosures, as explained below.

> a.    **Contradicting Their Prior Representations about the Strength of the Credit Portfolio, Defendants Announce That Signet Has Retained a Third Party to Review the Portfolio, and Is Considering Selling It**

102.    On May 26, 2016, Signet reported earnings for the first quarter of fiscal year 2017. While the Company's press release touted its "record first quarter earnings," the results were mixed. Signet fell short of consensus estimates for revenue but exceeded consensus estimates for its earnings per share by 1 cent. Continuing its efforts to boost its stock price, Signet announced that it had repurchased 1.1 million shares in the first quarter for $125 million.

103.    Significantly, contradicting Defendants' repeated and very recent statements emphasizing the strength and value of the credit portfolio, Signet's press release stated that its management was "conducting a strategic evaluation of the Company's credit portfolio," which Light described in the press release as a "top priority." Signet further announced that it had hired a third-party, Goldman Sachs, to conduct this evaluation, and that it would "consider a full range of options with respect to its credit operations"—including a sale or outsourcing of what Defendants had told investors for years was a critical source of strength and a key competitive advantage for Signet. Notwithstanding the importance of this development, the Company's press release gave no specifics on why this review was necessary or what the goal of it was. The press release vaguely stated that the "primary objective of this process will be to ensure Signet has an optimized business structure that enhances our ability to execute against our strategic objectives."

104.    The news that the Company was considering offloading its credit portfolio—and that the situation was serious enough that it had to hire a third party to analyze the book—was perplexing because it followed years of Defendants' repeated assurances that the portfolio's credit quality was strong and low-risk, that the portfolio was a critical "competitive advantage" for the Company, and that Defendants were completely familiar with the portfolio based on their 30 years of managing it. Even more surprising, Defendants had spent the past several months vociferously repelling any suggestion that the credit portfolio was risky or problematic.

105.    On the conference call held on May 26, 2016 to discuss the Company's results, after Defendant Light reiterated generally that the Company was "considering a full range of options" as to its credit portfolio, analysts pressed Defendant Light for more detail on what the Company's actual "priorities" were for the review. Just as Signet did in its press release, Defendant Light obfuscated, stating that the Company was "going to look at it holistically," was "looking to see what opportunity is out there," was "talking to different type of constituents," and "we'll keep you up to speed."

106.    Multiple analysts reacted with surprise and concern. For instance, Deutsche Bank issued a report on May 26, 2016 stating that the news of the credit review was "a surprise to us, given the confidence in the importance of the credit book as the competitive advantage to engage with customers and maximize the sale opportunity." Pacific Square Research noted that "the most compelling question" about Signet was, "If the credit operation is performing well, why did the company commission a strategic evaluation?" Pacific Square Research further noted that the announcement seriously called into question Defendants' prior statements on the recent holiday sales call:

> Earlier this year – during the company's holiday sales call – management touted the importance and performance of its credit operation in response to concerns

expressed by investors about the apparent deterioration in credit metrics. From listening to management's script at the time, you would never have imagined that the company would need to commission a "strategic evaluation" of the segment.

107.    Pacific Square Research also noted that, "Despite analyst attempts [on the May 26 earnings call] to narrow down the range of possible actions, management refused to provide any clarity."

108.    Following Signet's earnings release, The Street analyst James Gentile similarly reported on the Company's "underwhelming" earnings, highlighting its announcements that Signet hired Goldman Sachs to securitize portions of its credit portfolio:

> We have been asking ourselves over the last few years how the company, whose main mall-based brands are Zale and Kay Jewelers, has been able to make so much dough. Earnings have skyrocketed to around $8.40 per share, up 50% from fiscal 2014 (when the company acquired Zale) on an 18% increase in sales. [] Signet has been materially outperforming. Has it been using jewelry as collateral to drive consumers to borrow? If so, like any other situation of this kind, it can end badly.

Gentile went on to question whether Signet has "been lending to its customer base at terms and volumes that may prove to be unsustainable? Are the cracks starting to form in the borrower base? Can you repossess a ring? I have no answers at the moment. Just questions." He closed with a warning to the market that "[i]f the volume of sales that Signet has been enjoying in the last three years is driven by loose lending, then look out below."

109.    In response to the Company's disclosures, on May 26, 2016, Signet's stock price swiftly declined, falling more than 10% in a single day on very high trading volume. Specifically, Signet's stock price fell from a closing price of $108.37 per share on May 25, to a closing price of $97 per share on May 26, a decline of more than $11 per share, on trading volume of more than 9.3 million shares.

110.    At the same time that the Company announced the strategic review, Defendants also continued to defend the credit quality and performance of the credit portfolio, making a

number of statements designed to assuage any investor concern created by the announcement. On the May 26 earnings call, Defendant Light stated that "our credit metrics in our credit portfolio are strong" and "are improving sequentially. . . . So, our credit metrics are strong." He added that, a "point I want you to take away is that we remain a growth story; a prudent, measured and profitable growth story."

111.    Similarly, Defendant Santana explained that the higher net bad debt provision "was driven by our higher receivables balance," and thus, was a function of increased sales, not credit deterioration. When asked again about "the reality of using the recency accounting methodology," she again represented that it accurately stated the Company's reserves, stating, "at the end of the day, regardless of recency or contractual, whatever method you are on, the financial results are going to yield the same answer. The provision will be the same, our bad debt expense will be the same."

112.    Then, on the morning of June 2, 2016, Grant's Interest Rate Observer published an article titled "Lending Clubbed" that suggested that Signet was overvalued because its business was in large part a consumer credit company, and its consumer credit portfolio was in poor condition. The article (which appeared in the June 3 print edition of Grant's Interest Rate Observer) reported:

> At first glance, the Signet credit portfolio would seem to be shipshape. Non-performing loans amounted to 3.6% of gross receivables on April 30, only 10 basis points higher than a year earlier. Second glance tells a different story. "Recency" is the name of the method that Signet elects to employ in accounting for credit delinquency. A layman might call it forgiving.

113.    The report suggested that Signet could be masking the true condition of its portfolio through its use of the recency method, and further noted that the "true condition" of the portfolio was evidenced by the fact that the number of American personal bankruptcy filings naming Signet as a creditor was skyrocketing, increasing by 19% in just 3 months:

Thanks to Marc Cohodes, former portfolio manager of Copper River Partners and a current short seller of Signet, for identifying an alternative path to the true condition of Signet's credit portfolio. Just count bankruptcy filings, Cohodes suggests. Thus, in the three months of January through March, 3,274 American personal bankruptcy submissions named Signet or one of its brands as a creditor. Compare the 2,663 such listings in the fourth quarter 2015 and the 1,903 in the first quarter 2015.

* * *

For whatever reason, or set of reasons, Signet has just engaged Goldman Sachs to conduct a strategic review of its credit portfolio. It is concerning news, inasmuch as the finance division not only facilitates sales but is also a key contributor to company-wide operating margins.

114.    In response to the Grant's Interest Rate Observer article, on June 2, 2016, Signet's stock price quickly fell another 6.5%. That day, the stock price declined from a closing price of $98.73 on June 1, to a closing price of $92.23 on June 2, on trading volume of more than 11.5 million shares.

### b.    As Signet Is Forced To Tighten Its Underwriting Practices, Its Sales Rapidly Decrease

115.    In approximately mid-2016—around the same time that Goldman Sachs was brought in to conduct a "strategic review" of the credit operation, and unbeknownst to investors—Signet was forced to tighten its reckless underwriting practices. Former Employee 7 described the Company's efforts to tighten its credit portfolio. From August 2011 until February 2017, Former Employee 7 was a Credit Authorizer based out of Signet headquarters in Akron, Ohio. Former Employee 7 processed credit applications. Former Employee 7 stated that in approximately mid-2016, credit guidelines became stricter and the Company made changes to the way it scored customer accounts. Thereafter, if a customer had a score at or below a certain level, it was "pretty much a definite termination of their account even if on the credit bureau [the customer] had only one bad marking on their last credit review." At one point, Former Employee 7 was closing at least five accounts a day based on the new changes the Company implemented.

116.     As a result of its tightened underwriting, Signet's sales growth, which to that point

had been fueled by its high-risk lending, began to contract. In need of cash, Signet nearly doubled

its credit facility. On July 18, 2016, Signet announced that it amended its credit agreement to

increase its credit facility from $400 million to $700 million, while extending maturity dates as

well. The Company again offered a vague and dubious explanation for the unexpected maneuver.

As reported by Pacific Square Research:

> The company's explanation in an email to investors was that it needed the bigger
> line to reflect that it is now 'a bigger company' since acquiring Zale. That's true,
> but Zale was acquired more than two years ago. So our question: Why now? We
> don't know, of course, but we will say this: If the company is about to generate a
> ton more cash by selling its credit book, as has been speculated, why would it
> expand its credit line?

117.     On August 25, 2016, Signet announced extremely disappointing results for the

second fiscal quarter 2017, as its sales growth had cratered due to the need to reign in its reckless

underwriting. Specifically, Signet announced that its same store sales had decreased 2.3%, and its

total sales had declined 2.6%. Its reported adjusted earnings of $1.14 per share were far below

consensus estimates. Signet also lowered its fiscal 2017 same-store growth guidance from 2-3.5%

growth to a 2.5-1.0% contraction, and revised the upper bound of its projected yearly earnings per

share downwards from $8.23 to just $7.22.

118.     Simultaneously, the Company announced deteriorating credit metrics. Specifically,

Signet reported that net bad debt expense rose 12% from the prior year, driven by higher receivable

balances and an increase in non-performing loans. Total allowance for doubtful accounts also

increased 12% from the prior quarter, while non-performing loans as a percentage of gross

receivables increased more than 22%.

119.     On a conference call to discuss these results, Defendants offered a raft of excuses

for Signet's poor performance. For instance, Defendant Light stated that the sales slow-down was

- 41 -

due to the declining energy industry, which impacted sales in places such as Texas and "Louisiana, Oklahoma, and Alberta, Canada"—locations that have a small minority of the Company's stores. He also cited macro trends impacting the industry, and when asked to expand on that subject, he cited "Brexit [which] we believe affected the mindset of people in middle America and across the country," and the "presidential election which is unique this year and I think has some very unique characteristics that can be affecting the mindset of middle America consumers." Light also noted, for the first time, that "We believe Jared has a number of fundamental issues that have not been quick and easy fixes."

120.    In tandem with announcing these poor results, Defendants made a pair of additional announcements designed to blunt investors' reaction to the news and mitigate the negative impact on the Company's stock price. First, Defendants announced that private equity investor Leonard Green & Partners ("LGP") had committed to a $625 million purchase of convertible preferred stock in the Company, the value of which was pegged to the Company's stock price, but which also paid a 5% dividend. On the August 25 call, Defendant Light positioned this investment as a reason for the "public markets" not to punish Signet's stock price for the Company's performance, stating that "[t]he transaction is a significant vote of confidence in the Signet operating model and our long-term prospects for growth," that supposedly "should serve as a validating signal to the public markets." Light assured investors that the Company had "opened our books and shared significant amounts of information as a part of the process" (but did not specify what information was provided, or what it showed).

121.    Second, consistent with Defendants' focus on managing Signet's stock price, they again emphasized their continuing buyback tactic. On the call, Defendant Light stated that the Company had bought back 4% of its shares. Notably, Defendant Santana stated that the Company

financed this repurchasing by using $200 million of its recently-enlarged credit facility—a statement which contradicted the Company's prior statement that it needed the larger facility simply because it was a "bigger company" following the Zales acquisition. Defendant Light added that the Company would also use all the money from the LGP investment to purchase its own shares.

122.   The questions swirling around the Company's credit portfolio and management credibility intensified. On August 26, 2016, Pacific Square Research reported that Defendants' comments on the earnings calls amounted to "excuses filled with contradictions." The report noted that:

> Sales did not just fall, they careened off a cliff at a disturbingly high speed. . . . The implication, based on management's comments, was that everything fell apart in the last two months of the quarter. We find that hard to believe. The excuses ranged from the Brexit vote's impact on "the mindset of people in middle America, across America and across the country" to oil being responsible[.]

123.   The report added that Defendants' attempt to "blame it on oil" was belied by the fact that Texas, Oklahoma, Louisiana and Alberta accounted for just 9% of the Company's stores. Similarly, management's attempt to "blame it on Jared" was belied by the fact that, as recently as May, Defendant Light had stated that "Jared is growing in a healthy, profitable way." As for Defendant Light's attempt to blame the performance on Brexit and the presidential election, the report stated, sardonically, "No comment."

124.   Finally, the report noted Defendants' focus on managing Signet's stock price: "As we have said previously, especially with so much talk of buybacks, management appears fixated, if not panicked, on managing its stock." The report further noted that it suspected that "management wanted to announce the Leonard Green deal in conjunction with earnings to soften the blow of otherwise horrible results. Smart move, because without the tie to Green, we suspect the stock – already clobbered – would have been pummeled." In an August 25, 2016 report titled

"Disappointing Q2 Miss & Big Guidance Revision," RBC Capital Markets analysts noted that the LPG investment "came out of the blue." Similarly, in a later report dated November 18, 2016, Compass Point Research & Trading LLC stated that, "We also do not see an economic reason for the transaction other than Signet trying to obtain an expensive 'stamp of approval' at a time where controversy is surrounding the company."

125.    In response to the Company's August 25 announcements, Signet's stock price plummeted again on heavy volume. On August 25, 2016, the Company's stock price fell from the prior day's close of $95.50, to a closing price of $83.44—a decline of nearly 13%—on volume of nearly 11 million shares.

**c.    As Market Concern Intensifies Over Defendants' Use of Recency Accounting, the SEC Questions the Company, and Signet Stonewalls**

126.    In the coming months, investor concern about Signet continued to build. For instance, on November 18, 2016, Compass Point Research & Trading reported that the value of Signet's portfolio could be $130 million lower than Defendants were reporting because Signet had failed to write-off a massive amount of severely risky loans that were likely to default:

> We are increasingly under the belief that there is a large segment of the portfolio that should have been written off, but has not. We refer to this segment as a "zombie" portfolio. . . . A more conservative measure of a 15% zombie portfolio would imply that about $260 million of the portfolio may be represented by customers that should be charged off, but have not. Yet Signet only had $129.4M of reserves at the end of FQ2'17 suggested a charge [of $130.6 million] could be necessary as a clean-up provision (not to mention that the company would still need reserves for the remaining portfolio). If there is ultimately any clean-up charge, it would basically reflect profits that were recognized in prior periods that should not have been.

127.    The report also noted its belief that Signet's credit standards "need to be tightened" and "such credit tightening will result in lower credit sales, profits, and/or margins."

128.   At the same time that investors were expressing their concern, the SEC was questioning the Company's disclosures concerning its use of recency accounting. On October 4, 2016, the SEC sent Signet a letter asking for detail on the Company's accounting practices. The SEC asked the Company why it did not disclose the dollar amount of accounts that were contractually delinquent, but which Signet nevertheless categorized as performing under its recency method:

> [T]ell us your consideration of disclosing the aging of accounts receivable on a contractual basis as compared to the aging of accounts receivable based on your recency-aging methodology as of each balance sheet date; i.e., the dollar amount of accounts that is contractually delinquent but still considered current or performing, based on your recency-aging methodology.

129.   In response to the SEC's questions, the Company stonewalled. In an October 18, 2016 letter to the SEC, Signet again offered a spate of generalities, asserting that the recency method allowed it "to provide outstanding customer service and build long-term relationships with its guests, while maximizing the use of our working capital." Signet also asserted that the recency method "provides a more accurate reflection of its customers' performance relative to the ultimate collectability of the customer account," and that providing information about what the Company's delinquencies would look like under the contractual method "is not relevant or meaningful from a disclosure perspective."

130.   On November 21, 2016, Compass Point Research & Trading published a report stating it was "skeptical" of Signet's responses to the SEC:

> We believe more information is necessary for investors to assess the adequacy of the loan loss allowance. [] [W]e believe showing the impact on bad debt expense under a contractual aging methodology combined with amounts that have been re-aged, are in forbearance, or modified would be extremely useful for investors in making better informed investment decisions. Regardless of minimum payment differences between Signet and other lenders, this information should be disclosed.
>
> Signet's management has previously indicated they would provide incremental disclosures regarding its consumer financing operations in the future. However, we

are skeptical that any meaningful incremental disclosures will be made after reviewing the response letter to the SEC comment letter.

131.     The financial press voiced very similar concerns over the Company. On March 3, 2017, the New York Times published an article titled, "Signet Jewelers' Balance Sheet Gets Extra Sparkle." The article reported that Signet's "shareholders may not be fully aware of the risks in its in-house credit portfolio. That's because it uses an unusual – and lenient – accounting method . . . [that] minimizes delinquencies and makes a loan portfolio appear to be performing better than it would under a stricter approach." The article further stated "that recency accounting tends to understate delinquencies by approximately 50%, analysts say." After noting the Company's stonewalling in response to the SEC comment letter, the article stated, "you'd think the company would be interested in giving [shareholders] more information, not less."

132.     On March 9, 2017, the Company reported results for the fourth quarter of 2016. On the same day, the Company held a conference call to discuss these results. In a remarkable change, and unlike previous analyst calls, this call was moderated by Signet's head of investor relations, James Grant, and its non-executive Chairman of the Board of Directors, Todd Stizer.

133.     Stizer continued the defense of the Company's use of recency accounting—this time offering the excuse that Signet employed the method in order to enable its customers to maintain higher credit scores. Notably, in another about-face for the Company, Stizer also stated that Signet would switch to the contractual method if the Company kept the credit business. Stizer said specifically:

> [I]n regard to our credit business, we absolutely reject any notion that Signet manipulates either its numbers or its customers. The great American retail business was built on consumer credit provided by retailers. While we respect that this system is in transition, we are providing a valuable service for our customers, enabling them to celebrate life and express love. [] It is regrettable that the use of the recency aging method, a credit business management tool which we've applied in our credit business consistently and successfully for over 30 years, has been distorted by certain members of the financial community to advance their own

narrative about our business. In reality, the recency method actually enables customers to better maintain their credit rating. And we are, after all, interested in serving our customers. That being said, should we decide to retain and optimize the in-house credit business, we will change to contractual aging.

134.     Analysts remained troubled by Defendants' continued obfuscation. For instance, on March 10, 2017, Compass Point Research & Trading reported that:

> The board member also suggested that Signet's use of recency account aging has been "distorted by certain members of the financial community to advance their own narrative about our business." While still allowed under Generally Accepted Accounting Principles," recency accounting is an archaic methodology which has been phased-out by virtually all financial institutions. The only financial companies that still use the recency methodology cater to low-end subprime borrowers, and we believe recency accounting distorts true underlying credit trends. If the company were true to its word, they would have released contractual statistics to the investment community yesterday as they have continually promised.

### d.     Defendants Reveal that the Portfolio Contains $700 to $800 Million in Subprime Loans, Which Are So Toxic that Signet Has Not Been Able to Find a Buyer for Them

135.     On May 25, 2017, investors learned just how poor the quality of Signet's lending portfolio actually was. On that date, the Company announced unexpectedly bad financial results as well as the sale of a portion of the portfolio, which gave investors new insight into the lending operation. Signet reported EPS of $1.03, far below analysts' expectations of approximately $1.65. The Company also announced plummeting sales—a 10% decline in net sales, an 11.5% decline in same store sales, and a 12.6% decline in credit sales in the Sterling division.

136.     Significantly, the Company revealed that—even though it had been considering selling its portfolio for one year—it had been able to sell only the "prime" portion of its credit portfolio to Alliance Data Services. This portion of the portfolio totaled $1 billion or approximately 55% of the total book. The remaining 45% of the loan book consisted of $700 million to $800 million in subprime loans. The Company had been unable to find a buyer for these toxic credits.

137.    The Company further announced that it was outsourcing the servicing of the subprime portfolio to two different credit servicers, Genesis and Progressive Leasing. Progressive would service the most risky portion of the subprime customers by offering them a so-called "lease to own" option. In other words, these customers were of such poor credit quality that they were only qualified to lease their jewelry rather than buy it on credit. During a conference call, Defendant Santana acknowledged that these customers comprised approximately 7% of the company's sales for the past several years, which amounted to about $125 million of the credit portfolio.

138.    On that conference call, analysts asked when the Company would be able to find a buyer for the $700 to $800 million worth of subprime loans in the portfolio. Defendants Light and Santana were unable to give any timeline, other than to concede that it would not be in 2017. In other words, there was no buyer in sight.

139.    Contrary to Defendants' numerous prior public statements asserting that the credit book was strong and did not pose a material risk, on the conference call and in accompanying materials, they stated that the purpose of the transaction was to "substantially derisk[] our balance sheet" and "eliminate material credit risk from the balance sheet." Signet also confirmed that— after more than a year of defending its recency method as appropriate and transparent—it would finally switch to the contractual method for its subprime loans in October 2017.

140.    Analysts reacted with disappointment, and reported that the Company's inability to sell a massive portion of the credit portfolio indicated that the portfolio was rife with toxic loans. For instance, on May 25, 2017, Buckingham Research Group reported that Signet "was only able to sell 55% of its receivables" and that the Company will thus "retain the remaining on its balance

sheet and continue to act as a sub-prime lender." Compass Point Research & Trading issued a

report noting that Signet was touting "All the Good But Delaying the Bad":

> The company also said it will essentially begin the phase II process to sell/outsource the subprime credit function to a third-party. What was disappointing about this was the belief by the investment community that the process was already well underway as it has been over a year since the company began evaluating strategic alternatives for the credit function. It is also the segment of the portfolio that will likely face credit charges to facilitate a sale. We would also add that SIG will only be transferring the servicing function on this portfolio segment to Genesis Financial Services, but not the sale of the portfolio to them. Since Genesis is a provider of credit under "second-look" programs, the <u>lack of a sale to them suggests the economics are so bad that Signet is still trying to find a better deal elsewhere</u>.
>
> * * *
>
> <u>Clearly, management front-loaded to good, but delayed recognizing the "bad" from the transition to an outsourced credit function</u>. It has been over a year since the process began, and the <u>lack of sale of the lower credit tier spectrum is concerning. It suggests that Signet is having a difficult time finding a third-party at acceptable economic terms that will not cause a disruption in sales</u>. The outsourcing of credit was also supposed to be to two different parties. Now it is three, <u>suggesting the company was underwriting credits much deeper down the credit spectrum than investors believed</u>. Finally, we remain skeptical that the transition to contractual aging will not result in any material hit to earnings.

141.    In response to this news, Signet's stock price immediately declined. On May 25,

Signet's stock price declined by nearly 8%, falling from the prior day's closing price of $54.53 per

share, to a closing price of $50.30 per share, on extremely heavy volume of more than 9.3 million

shares traded.

### B.    Signet Misled Investors about a Culture of Sexual Harassment at the Company

142.    As set forth below, at the same time that Signet misrepresented and concealed

critical information concerning its credit operation, the Company also misled investors about a

culture of rampant sexual harassment at Signet, which was at issue in a lawsuit filed against the

Company. While the existence of such a culture would be of obvious importance to any investor,

it was especially important to investors in Signet stock. This is because the Company's principal

product, bridal and other jewelry, was primarily purchased for women. Further, as the Company repeatedly told investors, Signet's business was built on a foundation of trust, and that trust was cultivated by its employees.For precisely this reason, the Company stated that its June 24, 2015 investor presentation that its employees were "our most important competitive strength." The existence of pervasive sexual harassment at Signet therefore seriously threatened to alienate the recipients of its products, and severely harm the trust that its business was built upon. It also threatened to severely harm the the Company's relationship with the employees who were charged with creating that trust and building Signet's reputation.

### 1.   Signet Repeatedly Mischaracterized the *Jock* Actions and Made Misleading Statements Concerning the Conduct of Its Business

143.   On March 18, 2008, a class action lawsuit, captioned *Jock et al v. Sterling Jewelers, Inc.*, Case No. 1:08-cv-02875-(JSR), was filed in the United States District Court for the Southern District of New York (the "*Jock* Litigation").

144.   The *Jock* Litigation was filed on behalf of a class of current and former female employees of Sterling. It alleged that female Sterling employees were subjected to age and gender discrimination, as well as sexually harassing comments and communications, while working there. On the basis of these allegations, the class brought claims against Sterling for violations of (i) Title VII of the Civil Rights Act, (ii) the Equal Pay Act, and (iii), on behalf of two of the named plaintiffs, for violations of the Age Discrimination in Employment Act.

145.   Sterling's employment agreements required that employees agree to arbitrate disputes arising out of their employment. On June 18, 2008, Judge Jed Rakoff referred the *Jock* Litigation to private arbitration, which was conducted by the American Arbitration Association Employment and Class Action Tribunal under case number 11-160-00655-08 (the "*Jock* Arbitration," and, collectively with the *Jock* Litigation, the "*Jock* Actions"), and stayed the *Jock*

Litigation. Retired Judge Kathleen Roberts served as the arbitrator in the *Jock* Arbitration (the "Arbitrator"). The *Jock* Arbitration was initially kept confidential.

146.    On September 23, 2008, the United States Equal Employment Opportunities Commission also filed a lawsuit against Sterling, bringing claims under Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991 (the "EEOC Litigation," and, collectively with the *Jock* Actions, the "Actions").

147.    On June 21, 2013, claimants in the *Jock* Arbitration filed a memorandum in support of their motion for class certification (the "Class Certification Brief"). The Class Certification Brief attached declarations (the "Declarations") from hundreds of Sterling employees (the "Declarants") concerning their experiences at Sterling.

148.    Neither the Class Certification Brief nor the attached Declarations were initially made public. Although claimants in the *Jock* Arbitration sought to make the materials public, Signet resisted. Finally, in late 2013, counsel for plaintiffs in the *Jock* Actions, Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein"), posted a version of the Class Certification Brief with Company-approved redactions (the "Redacted Class Certification Brief") on its website. The Declarations were not posted publicly at that time.

149.    The Redacted Class Certification Brief contained only limited information from the Declarations that was immediately relevant to class certification issues. While the brief asserted that Defendant Light had engaged in certain instances of sexual harassment, the evidence for those assertions was largely obscured. The Company-approved redactions in the Redacted Class Certification Brief obscured, among other things, the names of many individuals and the nearly eight pages of the Class Certification Brief's Statement of Facts that specifically discussed the

roles and activities of Sterling executives in Sterling's alleged discriminatory activity and provided "evidence of abusive treatment and sexualization of women employees."

150.    On February 2, 2015, the Arbitrator issued a ruling permitting the *Jock* Arbitration claimants to proceed with disparate impact claims on a class-wise basis (the "Class Award"). As with the Redacted Class Certification Brief, the Class Award contained only limited information concerning the underlying merits of the litigation, focusing instead on issues pertinent to its class certification determination. The Arbitrator permitted Cohen Milstein to post the Class Award on its website, which it did in 2015. Like the Redacted Class Certification Brief, the Class Award contained only limited information relevant to class certification issues.

151.    For its part, Signet repeatedly mischaracterized the Actions when it made (required) disclosures to investors in its filings with the SEC. Signet first disclosed the *Jock* Litigation in a Form 6-K it filed with the SEC on March 20, 2008. In its disclosure, Signet stated that the *Jock* Litigation (i) was based on allegations of discrimination in "store-level" employment practices concerning "compensation and promotional opportunities" made by a limited number of employees at a "few" stores, and (ii) that the Company had investigated the allegations and found them to be unsubstantiated:

> The lawsuit alleges Sterling Jewelers' US store-level employment practices are discriminatory as to compensation and promotional opportunities.
>
> The lawsuit is based on the allegations of 15 former and current employees working in a few stores. They allege that the subsidiary paid women less than men who performed similar work, and with favoring men over women for promotions. When these allegations first surfaced, they were investigated. That investigation failed to substantiate the allegations.

152.    In subsequent disclosures throughout 2008 and into 2009, Signet repeated its characterization of the *Jock* Litigation as alleging only that store-level employment activities were discriminatory with respect to pay and promotion.

153.    On March 25, 2009, Signet filed a Form 6-K with the SEC in which it revised its disclosure concerning the *Jock* Litigation to include language disclosing the EEOC Action. Signet added no substantive facts concerning the allegations underlying the lawsuits, stating only that:

> A class lawsuit for an unspecified amount has been filed against Sterling Jewelers Inc., a subsidiary of Signet Jewelers Limited, in the New York federal court by private plaintiffs. The US Equal Opportunities [sic] Commission has filed a separate lawsuit <u>alleging that US store-level employment practices are discriminatory as to compensation and promotional activities.</u>

154.    Signet substantially repeated this disclosure in its various SEC filings throughout 2009.

155.    By letter dated December 23, 2009, the SEC raised questions about the adequacy of Signet's disclosures. Among other things, the SEC asked Signet to supplement its disclosures concerning the Actions by "disclos[ing] the date the proceedings commenced, and briefly describ[ing] the factual basis alleged to underlie the class action proceeding."

156.    In a letter filed with the SEC on January 22, 2010 (the "January 2010 Letter"), Signet proposed including the following language in future filings, which did not substantially expand on its prior disclosures:

> In March 2008, a class action lawsuit for an unspecified amount was filed against Sterling Jewelers Inc, a subsidiary of Signet, in the U.S. District Court for the Southern District of New York federal court by private plaintiffs <u>alleging that US store-level employment practices are discriminatory as to compensation and promotional activities.</u> On September 23, 2008, the US Equal Employment Opportunities [sic] Commission ("EEOC") filed a lawsuit against Sterling in the U.S. District Court for the Western District of New York. The EEOC's lawsuit alleges that Sterling engaged in a pattern or practice of gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present. The EEOC asserts claims for unspecified monetary relief and non-monetary relief against the Company on behalf of a class of female employees subjected to these alleged practices. <u>The Group denies the allegations from both parties and intends to defend them vigorously.</u>

157.    Signet adopted the substantive characterization of the allegations in the Actions that it proposed in the January 2010 letter in the litigation disclosure and litigation-related "Risk Factors" sections of its SEC filings from 2010 through the end of the Class Period.

158.    In its Form 10-Q filed with the SEC on August 29, 2013, Signet first disclosed that, in the *Jock* Arbitration, "[o]n June 21, 2013, pursuant to the briefing schedule ordered by the Arbitrator, the Claimants filed their motion for class certification, disclosed their experts, and produced their expert reports." Sterling did not disclose the existence or contents of the Declarations at this time

159.    Sterling first acknowledged the existence of the Declarations in its Form 10-Q filed with the SEC on November 26, 2013, when it disclosed that "[i]n mid-October 2013, Sterling filed its opposition to Claimants' class certification motion, its disclosure of its experts and their reports, as well as three motions to exclude the reports of Claimants' experts and a motion to strike Claimants' declarations and attorney summaries." Sterling said nothing further about the Declarations in that filing, and made no further statements concerning the Declarations until after February 28, 2017.

160.    Signet's attempts to minimize the Actions were largely successful: analysts paid little attention to the Actions. Only two pre-class period analyst reports discussed the Actions at all, with virtually no substantive commentary. News coverage of the Actions was similarly limited. Only a handful of articles discussed the Actions in the period prior to February 26, 2017, and unsurprisingly none of those addressed the extensive facts asserted in the Declarations.

161.    At the same time that Signet minimized the Actions in its public disclosures, it also assured the market that it adhered to rigorous standards of ethics. Prior to and throughout the Class Period, Signet repeatedly made available to investors its "Code of Conduct" and "Code of Ethics."

In its Form 20-F, filed with the SEC on April 1, 2009, Signet explained that the Codes applied to senior officers, and adherence to them was of "vital importance":

> In adopting both the Code of Ethics and the Code of Conduct, the Company has recognized the vital importance to the Company of conducting its business subject to high ethical standards and in full compliance with all applicable laws and, even where not required by law, with integrity and honesty.

162.    The Code of Conduct explained that (i) Signet was committed to a workplace free from sexual harassment, (ii) the Company based its employment and promotion decisions, among other things, "solely" on ability and potential in relation to job needs, (iii) the Company would protect persons who reported ethical concerns and had confidential and anonymous processes for reporting concerns, and (iv) sexual harassers would be disciplined. As the Code of Conduct explained (italics in original):

> *Maintaining a Safe, Healthy and Affirmative Workplace*
>
> The Company is an equal opportunity employer and <u>bases our recruitment, employment, development and promotion decisions solely on a person's ability and potential in relation to the needs of the job, and complies with local, state and federal employment laws.</u>
>
> <u>The Company is committed to a workplace that is free from sexual, racial, or other unlawful harassment, and from threats or acts of violence or physical intimidation.</u> Abusive, harassing or other offensive conduct is unacceptable, whether verbal, physical or visual.

163.    The Code of Conduct further explained:

> Those who violate the standards in this Code will be subject to disciplinary action.
>
> * * *
>
> It is the Company's policy to encourage the communication of bona fide concerns relating to the lawful and ethical conduct of business, and audit and accounting procedures or related matters. It is also the policy of the Company to protect those who communicate bona fide concerns from any retaliation for such reporting. Confidential and anonymous mechanisms for reporting concerns are available and are described in this Code.

164.    The Code of Ethics provided for additional duties for Signet's CEO, CFO, and other senior officers of Signet and its subsidiaries (collectively, the "Covered Officers"). As the Code of Ethics explained:

> In all of their dealings on behalf of, or with, the Company, each Covered Officer must:
>
> a.    <u>Engage in and promote honest and ethical conduct</u> . . . ;
>
> b.    Act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts . . . .

165.    The statements above from the Codes were substantially re-adopted each year by the Board and published on Signet's website throughout the Class Period. Signet also incorporated these documents by reference into several SEC filings throughout the Class Period, including its Form 10-Ks filed March 27, 2014 and March 26, 2015.

166.    Signet also repeatedly emphasized to the market that, given the nature of its business—selling jewelry, often engagement rings, in face-to-face settings—its business was built on a foundation of reputation and customer trust. Signet further stated that this reputation and trust were cultivated by its employees, who interacted directly with Signet's customers. Given the critical function of its employees, Signet specifically stated in its SEC filings that the Company had an "excellent" relationship with them.

167.    For example, at the Signet Jewelers Ltd. Institutional Investor Conference on June 24, 2015, then-CEO Defendant Light emphasized the centrality of trust and reputation to Signet's business:

> [T]rust is the most important factor why people buy jewelry where they do . . . .
>
>                        * * *
>
> [T]he beauty of our category . . . quite frankly is that because our product is about emotion and it's about trust at every age group they want to have someone to interact with and treat with them and work with them on understanding diamonds

and understanding if it's the right thing to make and they want to make the right move.

\* \* \*

That's the big point. Because we have the benefit of having this emotional product.

At the Goldman Sachs Global Retailing Conference, on September 10, 2015, Defendant Light likewise stated, "it goes back to over the 30 odd some years that I've been in this business, every year we continue to measure what consumers' most important characteristic when they buy jewelry. It continues to be year after year after year is the trust factor." Similarly, on Signet's August 25, 2016 earnings call, Defendant Light stated, "I've been selling jewelry my whole life, for 30 years. And the most important part of selling jewelry is trust."

168.    In Signet's Form 10-K filed with the SEC on March 24, 2016, Signet stated:

As trust is the most important factor in why people buy jewelry where they do, customers overwhelmingly complete their purchases in our stores with our trusted knowledgeable sales associates. . . . In order to truly accomplish our core mission of helping our guests "Celebrate Life and Express Love," we must have people with high capability and passion. We will continue our efforts to attract, develop and retain the best and the brightest individuals in the jewelry and watch industry.

\* \* \*

Signet considers its relationship with its employees to be excellent.

**2.      In Reality, and Contrary to Signet's Representations, Signet Had a Culture of Rampant Sexual Harassment Reaching up to the Highest Levels of the Company**

169.    Signet's disclosures and omissions successfully concealed an ugly truth: that Signet's culture was rife with sexual harassment of female employees, all the way up to the highest levels of the Company—including Signet's CEO, Mark Light.

170.    As set forth more fully below, the truth would not be revealed until February 2017, when versions of the Declarations, albeit still bearing Company-approved redactions obscuring

the names of executives and managers who committed sexual harassment (the "Redacted Declarations"), were made public.

171.    The Redacted Declarations provided copious facts demonstrating that, unbeknownst to investors, (i) sexual harassment was indeed rampant at Signet, (ii) it pervaded several aspects of female employees' work lives, and (iii) executives at the highest levels of the Company committed acts of sexual harassment against their subordinates. Signet by and large did not contest the veracity of the horrific facts contained in the Declarations during Class Certification in the *Jock* Arbitration. As the Arbitrator explained in the Class Award:

> The conduct described in the declarations . . . includes references to women in sexual and vulgar ways, groping and grabbing women, soliciting sexual relations with women (sometimes as a quid pro quo for employment benefits), and creating an environment at often-mandatory Company events in which women are expected to undress publicly, accede to sexual overtures and refrain from complaining about the treatment to which they have been subjected. . . . For the most part Sterling has not sought to refute this evidence; rather Sterling argues that it is inadmissible, irrelevant and insufficient to establish a corporate culture that demeans women.

### a.    Sterling Management—Including Executives at the Highest Levels of the Company—Were Known Throughout the Company for Harassing Female Subordinates

172.    Several Declarants explained that Sterling had a pervasive—and well-known—culture of sexual harassment, flowing from the very top levels of the Company. For example, Anthony Christy, who worked at Sterling for several years during the period from 1997 through 2008, explained about the Company's leadership:

> In general, I would describe the top executives of the Company as being a "'boys' club.'" There was basically a clique at the top of the Company that consisted of the primary male executives. . . . These executives had a reputation at the Company for engaging in intimate sexual relations with subordinate female managers at Sterling.

173.    Sherri Chegini, who worked for Sterling in the early 1990s, and then again from approximately 2000 until 2006, had a similar characterization. She recalled that Sterling managers, including District Managers and higher-level executives, were part of what they called "the 'boy's

club,'" which consisted of "male managers who played golf together, went to strip clubs, and made sexual conquests of female associates."

174. Sadie Cisneros-McMillian, who worked for Sterling from 2003 until 2006, stated that "it was widely known and accepted as part of the Company culture that male management and upper management engaged in sexual harassment of and sleeping around with female employees under them."

175. Several high-level executives were notorious throughout the Company for being "womanizers" and for routinely sleeping with and sexually harassing female subordinates. As Heather Henry, who worked for Sterling from 1998 until 2005, explained:

> Sexual harassment regularly occurred in Sterling. The Company's top level executives fostered this behavior and this culture of sexual discrimination at the Company because they actively participated in it. For instance, [a certain top-level executive] had a well-known reputation at the Company for being a womanizer who took sexual advantage of lower level-female managers or employees at the Company.

176. Donna Orosz, who worked at Sterling from 1984 until at least 2009, recalled, of a senior Sterling executive, that "[i]t was known among the managerial ranks that [he] was a womanizer, who used the power and prestige of his high-ranking executive position at Sterling to get subordinate female managers to have sexual affairs with him."

177. Katherine Christy, who worked for the Company from 1993 until 2006, likewise said, of a "very high ranking executive of the Company," that he "had a reputation at the Company for pursuing and engaging in romantic affairs with subordinate female managers at Sterling. . . . Other Sterling managers told me that [he] had a "list of pretty girls" that he was especially interested in at the Company. . . ." Christy further explained that "It was also common knowledge at the Company that there were other high-ranking male executives who . . . were also engaged in sexual affairs with female subordinates in the Company . . . ."

178.    Melissa Corey, who worked for Sterling for approximately seven years starting in 2002, mentioned two specific executives who had reputations for being "womanizers." At least one of them was "a high level executive" who had a reputation for "sleeping with female employees."

179.    Mandy Lee Alva, who worked at Sterling in 1996 and then from 1999 until 2007, recalled never wanting to meet a certain "top executive" because he had a reputation "for being a womanizer who slept with subordinate female managers at the Company." She also stated that she was told by one or more of her Store Managers that the executive "would 'do' anything that walked and that female managers needed to be careful about what clothes they wore when they were around him, so as not to provide him with any provocation" to approach them sexually.

180.    Tina Waring, who worked for Sterling from approximately 1999 or 2000 until 2005, stated that she knew that a certain executive "was a high level executive at Sterling." A store manager told her that that high level executive was a "playboy" who "slept around with female Sterling employees."

181.    Julia Highfill, who worked for Sterling from 2002 until 2011, stated:

During my employment at Sterling, I was aware that sexual harassment of female employees by superior male managers and executives was widespread and prevalent. I was exposed to many examples of this during the nearly nine years I worked for Sterling. The sexual harassment I was aware of occurred throughout the various supervisory ranks of the Company and included some of the Company's highest ranking male executives.

182.    Joseph Kabbas, who worked at Sterling, likewise stated:

I knew [a certain executive] during my employment at Sterling. He was a high-ranking executive who became Sterling's [Redacted] in approximately 2003. I met [him] many times including at Sterling's Headquarters in [Redacted] Ohio . . . . [He] was an attractive man with a charismatic personality. He also had a very well-known reputation at Sterling for being a womanizer with subordinate female employees at Sterling. This reputation came to me from other Store Managers and

supervisors above the Store Manager level who would regularly discuss [his] womanizing activity.

> **b.    Sterling Executives Routinely Sexually Harassed Subordinates at Sterling's Annual Managers' Meetings and Other Special Events**

183.    The Declarants also identified scores of instances where Sterling executives—including high-level executives—sexually harassed female subordinates at Sterling's annual Mangers' Meetings and at other special events.

184.    Anthony Christy attended several Managers' Meetings, and explained:

These meetings provided much opportunity for Sterling's male executives and managers to have sexual encounters with subordinate female managers in attendance. Male executives used the power and prestige of being Sterling executives to find and coerce lower-level female employees at Sterling to have sexual relations with them. Based on my personal observations of executive behaviors and from discussions with other Sterling Managers, it was apparent that this inappropriate and warped activity was well- known throughout the Company, and it encouraged lower-level male managers to engage in similar behavior.

185.    Timeen Adair, another former Sterling employee who attended several Managers' Meetings, also observed male executives and District Managers hitting on female subordinates at the events. She explained that "[i]t seemed . . . that at these meetings the men were on the prowl sexually, and the younger the better when it came to the females they pursued."

186.    Chris Jones, who worked at Sterling from 2001 to 2008, explained that:

It was common knowledge at the Company that the Annual Managers' Meeting . . . was a "Sexcapade." That is the term I recall hearing to describe it. There were wide-spread rumors at the Company about all the illicit sexual activity at the [events], which is why they were referred to as "Sexcapades."

187.    Melissa Corey attended several Managers' Meetings. She stated that the Managers' Meetings "had a reputation within the company for being a wild event in which male managers, supervisors, and executives could seek out sexual encounters with subordinate female Store Managers." She further explained that, at Managers' Meetings, she

> Regularly observed [male executives and District Managers] hitting on female Store Managers, buying them drinks, dancing with them in a sexually suggestive manner, and otherwise sexually preying on them. This was done out in the open, and appeared to be encouraged, or at least condoned by the company.

She also called the Managers' Meetings "a sex-fest," explaining that she was warned to stay away from a hot tub at the resort at which a Managers' Meeting was being held because "male executives and supervisors had sex with female Store Managers in the hot tub after hours." She further recalled seeing a high-level Sterling executive regularly staying late at the bars with a group of attractive female Store Managers and buying alcoholic drinks and shots for the group, and that she had heard stories about that executive, who had a reputation as a "womanizer," being naked in the hot tub with female Store Managers.

188.    Alain Dawn Gough, who worked at Sterling from 1998 until 2005, also described the Managers' Meetings as a "sex-fest." She recalled witnessing members of upper management getting drunk with employees, and noted that an executive, "who was at the top of upper management, had a reputation of being a womanizer of Sterlings' [sic] female employees and was regularly drunk with a woman by his side." She also recalled hearing "that members of upper management would invite some of the female Store Managers to join them in their pool area where they would watch the female Store Managers get even more drunk."

189.    More "colorful" terms were commonly used for the Managers' Meetings as well. Marsha Davis, who worked for Sterling from 1994 to 2002, stated that at least one Store Manager who had attended a Managers' Meetings referred to it as a "f*ck fest." She also stated that she learned about the reputation of Managers' Meetings from Store Managers who had attended them, explaining that "[t]he reputation of the [Managers'] Meeting was one of sexual permissiveness between the male and female managers and executives who attended it."

190.    Stacey Goldberg, who worked at Sterling from 1997 until 2007, also used the same term: she stated that the Managers' Meetings "had a well-deserved reputation of being 'F*ck Fests,' which was a common term at Sterling used to describe them. . . . Sexually promiscuous activity between male executives and managers and subordinate female managers was commonplace."

191.    Diane Acampora, who worked for Sterling from 2002 through 2009, attended several Managers' Meetings. Among other things, Ms. Acampora explained in the Declarations that "[i]t was common knowledge at the Company that these meetings provided abundant opportunity for heavy drinking and extramarital sexual activity between male managers, supervisors, and executives and subordinate female managers." She further explained that she saw a Sterling executive at the Managers' Meetings who "had a well-known reputation at Sterling for being a womanizer including his having sexual relations with subordinate female managers." She also explained that, while attending one of the Managers' Meetings, she was groped and fondled by a Sterling Manager, and that a District Manager attempted to kiss her. She further explained that it was common knowledge that sexual activity between male Sterling managers and their female subordinates occurred during cruises that Sterling held to recognize high-performing employees.

192.    Heather Ballou, who worked for Sterling from 2000 through 2009, also attended several Managers' Meetings. At one, she was propositioned by a Sterling District Manager. She also recounted observing a Sterling executive watching a group of 10 female managers "frolicking" in a pool in various stages of undress at one of the meetings, and, at another, the same executive flirted with her and touched her on the lower back in a way that made her feel uncomfortable and that he was "putting the moves" on her and another Store Manager.

193.    On information and belief, the Sterling executive whom Ballou described and whose name was redacted in Ballou's Declaration was Mark Light, who would later become Signet's CEO. The Redacted Class Certification Brief alleged that "Mr. Light was also observed by multiple witnesses at Company meetings being entertained by female managers, in various states of undress, in a swimming pool and joining them in the pool himself."

194.    Jeanene Glaude worked for Sterling from 1996 until 2002. She recalled seeing a "very high-ranking executive at the company" at the Managers' Meetings, and stated:

> [At the Managers' Meetings] I regularly observed him being very touchy-feely with subordinate females, and flirting with them. For example, he us usually had a crowd of attractive female managers around him, and it was not unusual for him to have his arm around one of them. . . . [He] had a reputation within the company as being a womanizer.

195.    Brad Bartl, who worked for Sterling from 1989 until 2006 and attended Managers' Meetings from 1991 to 2005, explained that "[i]t was . . . common knowledge that many of the male managers and executives in attendance [at the Managers' Meetings] were engaged in extramarital sexual activities with their subordinate female managers."

196.    Donna Bartl, who worked for Sterling from 1999 through 2003, attended the 2002 Mangers' Meeting and observed that "[t]here was a lot of drinking . . . and inappropriate fraternizing between male managers and their female subordinates." She gave the example of observing a Sterling executive inappropriately touching a female subordinate on the buttocks while waiting for dinner with a group of Sterling employees.

197.    Cathy Mantia, who worked for Sterling from 2003 until 2006, attended the 2005 Managers' Meeting. She recalled seeing a District Manager and other executives "dancing with female Managers in a close, sexual manner with their bodies touching those female Managers." She also explained that she "she could not walk around [the event] without a male Manager propositioning [her] for sex." She recounted an episode where an executive had tried to force her

- 64 -

to dance with him, and held her with both arms around her when she refused to do so; when several women intervened and managed to pry the executive's arms from around her so she could escape, he became angry.

198.    Katherine Christy, who worked at Sterling from 1991 until 2006, shared her harrowing experience at the 2003 Managers' Meeting: she was dancing with a male District Manager at a party there when:

> [He] said, "I need some air." He put his hand on my elbow and led me off the dance floor and outside. After we got outside, he suddenly grabbed my arm and dragged me off to the bushes nearby. I was stunned. He reached through the front of my dress and fondled my breasts and kissed me on the mouth. I pushed him off with both hands, and kneed him on his inner thigh. I ran away very upset and crying.

Christy returned to the party, where she learned that the same District Manager had previously been "arrested at the Florida meeting for raping [a female Sterling employee]."

199.    Several other Declarations give similar accounts of Sterling's Managers' Meetings. In total, more than 90 of the Declarations discuss the Managers' Meetings, and the vast majority of those describe a similar atmosphere of sexual predation by Sterling managers and executives on female subordinates.

### c.    Sterling Executives Regularly Harassed Female Subordinates in the Ordinary Course of Business

200.    The Declarations further make clear that sexual harassment of female employees by Sterling executives was not limited to the Managers' Meetings—it was a pervasive feature of the Sterling workplace.

201.    Timeen Adair explained that, on the occasions a certain Sterling executive visited the store where she worked, he "requested attractive female employees go out for drinks and dancing with him the night before he visited the store." She further explained that the District Manager would call in advance of these visits with a list of women for the executive to party with.

She stated, "It was apparent to me that [the executive] was arranging these evenings to find someone to hook up with sexually," and explained that, although the female employees did not want to go, they felt obligated to do so. She also recounted hearing stories of women going up to the executive's room at the hotel and hearing about a time when a colleague had to get a female employee out of the executive's bathroom after the female employee locked herself in there when she became scared by the executive's behavior.

202.    Heather Ballou also experienced sexual harassment while working at Sterling. She explained that a District Manager "would come up and wrap his arms around me, and I would have to pull away. [The District Manager] told me not to tell his fiancée, who also worked for Sterling in the district." On another occasion, Ballou said, the same District Manager "grabbed my butt in a sexual way." Ballou also described a situation where a District Manager sexually assaulted Ballou's coworker: although the District Manager apologized the next day," he "also said he could get away with just about anything, like it was a joke." Ballou and her coworker did not report the assault because they were afraid of retaliation. Ballou also stated that it was "common knowledge in the store that [the District Manager] had several sexual harassment complaints from female employees against him [but] he was not fired for sexual harassment until years later."

203.    Anna Battaglia-Laglante worked at Sterling from 2005 until 2006. While there, she observed and experienced "inappropriate behavior and sexual harassment by male upper management"; she stated, for example, that a District Manager would "look me and the other female Sales Associates with whom I worked up and down, stare at our breasts and rear ends, get very close in our personal space, and even reach into our shirts to stick tags back in." She never complained about his behavior because she and her coworkers "were . . . afraid of him. He was our District Manager, and we felt our jobs were in his hands."

204.    Sherri Chegini recalled that two different Store Managers she worked for were both having affairs with their District Managers.

205.    Anthony Christy likewise stated, "I was told by a young female front office employee at [a] Kay store that [the District Manager] had made sexual advances toward her. She was approximately 19 or 20 years old at the time . . . . [The District Manager] was viewed by his employees as a sexual predator."

206.    Katherine Christy also experienced sexual harassment from her District Manager. She explained that her District Manager "often made inappropriate sexual comments to me that made me uncomfortable. He made comments about my breasts and legs." She recalled one incident in which they were sitting on a couch and he said to her, "'Oh my god. Looking at your legs makes me hard. We have to get up and walk around.'"

> **d.    Sterling Executives Regularly Conditioned Employment Decisions Concerning Female Employees on Whether or Not Those Employees Acceded to Sexual Demands**

207.    The Declarations demonstrate that female employees at Sterling were routinely pressured into sexual activity with their superiors in exchange for better economic opportunities at the Company, including preferred store assignments and promotions, as well as to protect themselves from adverse employment decisions.

208.    Amanda Barger, who worked for Sterling on and off from 2005 until 2010, explained that, when she expressed interest in a promotion to a District Manager, he invited her to a management meeting in Georgia. While at the meeting, he sent her a sexually explicit text. When she reported the sexual harassment, Human Resources employees accused her of having a relationship with the District Manager but told her that "she would not have to be worried about [her] job" if she "cooperated."

209.    Mary Casillo, who worked at Sterling from 2003 until 2010, explained that "Sexual harassment is prevalent at Sterling." She recalled a situation where a female Assistant General Store Manager was passed over for promotion to General Manager in favor of a female sales person "who was rumored to have been performing sexual favors for the District Manager." After that sales person was promoted to Store Manager, another employee walked in on her and the District Manager "engaged in sexual behavior in the stockroom."

210.    Ellen Contaldi worked for Sterling from 1994 until 2008. As she explained in her Declaration:

> Employees typically found out about promotion opportunities at Sterling through word-of-mouth. Advancement at Sterling was very dependent on who you were connected to at the Company. If you were connected to, meaning you had a relationship with, someone in upper management you were more likely to advance into management and receive perks. At Sterling it was common for female employees to exchange sexual favors for non-sexual favors with their male superiors, and when a female employee was promoted employees typically speculated "I wonder who she knew and who she blew," meaning that if a female employee obtained a promotion it was highly probable that she had an intimate relationship with a male superior.

Contaldi further explained:

> I knew from speaking with other female Store Managers that a way to ensure advancement at Sterling was to establish a sexual relationship with a male Executive. In approximately 2000, I began a sexual relationship with [an executive]. . . . When my relationship with [the executive] turned sexual, he transferred me almost immediately to a more desirable, high-volume store and I received a pay increase. Before my relationship with [him] I was placed in less desirable, low-volume Stores. He also started to groom me for advancement into management.

211.    Other employees' Declarations confirm that female employees were vulnerable to predation by male executives in exchange for career advancement and job security. Alaine Dawn Gough explained that a certain District Manager "had many affairs with Store Managers. It was well known among the Store Managers that if [he] slept with a Store Manager, he looked out for her better interest." Gough recounted a situation where a certain Sales Manager was caught

"performing oral sex on" a District Manager, who later "turned a blind eye" to the Store Manager's declining sales; she was not written up or demoted, and nothing was entered into her file. In fact, she was promoted.

212.   Jeanene Glaude likewise explained:

[A very high-ranking executive] had a reputation within the company as being a womanizer. I heard this from other Store Managers and District Managers. It was believed within the company that sleeping with [Redacted] was a way for women to advance within the company. For example, [Redacted] was a young, attractive female employee who came to Sterling from Starbucks. She moved up in the company very quickly, and was promoted to Store Manager at the Kay store in California, at the [Redacted]. Sterling managers talked about how she gained quick advancement by being one of [the executive's] favorites, and by sleeping with him.

213.   Heather Ballou told of two situations where District Managers suggested that she could advance her career by acceding to sexual demands. When she expressed interest in being promoted to the same District Manager who hugged and grabbed her as described above, he "tried to get me to go out and discuss it with him over dinner and drinks, in a manner that appeared inappropriate to me." At the 2005 Managers' Meeting, Ballou, then a Store Manager in Florida, was propositioned by a District Manager. She stated in her Declaration that the District Manager "told me that if I had sex with him, then he would make sure that I would be transferred back to the [redacted], Florida area whenever I wanted to make that move. From conversation with me, he knew that was something I was going to be interested in doing in the future." Ballou acceded to the District Manager's demand, and, when she sought to transfer a few years later, the District Manager made the transfer happen.

214.   Cathy Mantia was also propositioned by a superior in connection with a potential promotion. Mantia explained that, when she was interested in being promoted to Store Manager, a District Manager asked her "'what incentives' I was prepared to do for him in exchange for a promotion to Store Manager." Mantia further explained, "I felt cornered, afraid, and angry that

[the District Manager] was propositioning me for sex in exchange for a promotion to Store Manager." She further stated that the District Manager propositioned her on at least four other occasions, and that she was initially afraid to report him. Also, as discussed above, Mantia was subjected to sexual harassment at a Managers' Meeting, when a District Manager tried to force her to dance with him and became angry when she escaped with the help of friends. She was fired soon after. A few weeks later, she called the District Manager to discuss her termination and the sexual harassment incident. The District Manager "confirmed that he was the person who dealt with termination issues," and became "hostile" and stonewalled Mantia when he learned about her reason for calling, saying that she "'[would] not win a sexual harassment or wrongful termination case against Sterling.'"

215.    Female employees who refused to accede to their superiors' sexual demands risked being frozen out of opportunities for advancement at Sterling. For example, Jessica Delorey repeatedly refused the advances of the District Manager for whom she worked. As she explained in her Declaration:

> At the time, I was a single mom and could not afford to lose my job. [The District Manager] knew this and preyed upon my vulnerability. However, I refused to succumb to his advances and requests for sexual favors and as a result, [he] refused to aid in my obtaining a raise or promotion to assistant management. I am not aware of females being promoted on merit by [the District Manager]. Based on my experience, the only way to be promoted as a female at Sterling under [him] was to perform sexual favors.

Delorey further noted that female employees who had affairs with this particular District Manager received promotions shortly thereafter.

216.    Alain Dawn Gough recounted a similar example in which a female employee was pressured into sexual acts with a Sterling executive in order to keep her job:

> [M]ale District Managers were often predatory and sought out subordinate female employees to prey on. For example, in 1999, [a female store manager] told me that she contacted [a District Manager] because her store had an inventory problem and

she was worried she would be fired. She told me that she agreed to have sexual relations with [the District Manager] in exchange for keeping her job. This Store Manager also described to me in detail their sexual encounter . . . . This Store Manager was not fired.

217.    Stacey Goldberg had a similar experience. She explained that a Sterling executive who would periodically visit her store "began to sexually proposition me" once they had become acquainted. She explained that the executive "was very persistent in his pursuit of me," and that, after he continued to persist even though she rebuffed his advances, "I began to think my job security might be in jeopardy if I did not succumb to his pressure. I eventually felt I had no other option." This also happened to Goldberg with her District Manager: although she felt it was inappropriate and against Sterling's official policies, "due to my concern about my job security and [the District Manager's] pressure, as my direct and immediate supervisor, I felt I had no option but to succumb to his demands."

218.    Heather Henry also experienced the pressure to engage in sexual acts to advance her career. She explained that, when she sought a Store Manager position, a District Manager told her he could get her a job, and, "[b]ased on his reactions and what he said on the phone about helping me get [the job], it was clear to me that he would expect me to succumb to him sexually if I decided to accept this offer." Henry decided not to accept the job, and was terminated shortly thereafter.

                    **e.    Sterling  Repeatedly  Failed  to  Respond  to  Sexual
                            Harassment Allegations and to Protect Female Employees
                            who Complained of Sexual Harassment from Retaliation**

219.    The Declarations also make clear that Sterling's responses to allegations of sexual harassment at the company were grossly inadequate, and that they failed to protect employees who reported harassment from retaliation by their harassers or the Company.

220.    Sterling utilized a hotline, called "TIPS," for employees to report matters including sexual harassment. As many employees discovered, complaints raised via the TIPS hotline were routinely ignored or swept under the rug by the Company. Even worse, although the TIPS system was held out to employees as being anonymous, it was not, as many employees discovered: employees who reported sexual harassment were routinely outed to their harassers and subjected to retaliation for making complaints.

221.    For example, Jasmina Hadzialic explained in her Declaration that a male superior sent her "numerous text messages with pictures of his penis" and propositioned her with extremely crude language, saying "'I want to bend you over the case and f*ck the sh*t out of you.'" Although she reported this to her District Manager, nothing was done for three months, during which time the harassment continued. When Sterling did finally act, it transferred Hadzialic. She explained that she was not aware of her harasser being reprimanded; in fact, Sterling subsequently promoted him twice.

222.    As Julia Highfill explained in her Declaration:

Sterling did not have an effective or serious mechanism by which female employees could complain about their mistreatment. Many employees were afraid to call the supposed anonymous complaint TIPS line because it was not confidential or anonymous. In approximately 2003, I called the TIPS line to put in a complaint regarding [a District Manager]. [He] was scheduled to visit my store but he didn't show up until 30 minutes before closing. When [he] did show up it was clear that he was drunk; he was giddy and reeked of alcohol. After I called the TIPS line to complain about this incident, [the District Manager] called me back soon after I called and told me that I shouldn't have made a complaint against him. He confirmed that the TIPS office had notified him of my "confidential" complaint. He warned me if I called again, he would immediately find out about it. I was hesitant to call the TIPS line after that because I was afraid of retaliation. This was true throughout my employment with Sterling . . . .

223.    Many employees who knew about the lack of anonymity of the TIPS hotline were scared out of using it at all. After Jessica Delorey was sexually harassed by a District Manager, a colleague told the District Manager that Delorey was going to call the TIPS hotline.

[The District Manager] then called the store and asked for me and demanded that I step outside and call him back on my cell phone and not on the store's phone. When I called him back, he was furious and threatened to fire me if I called TIPS. He stated, "If you complain, I will take you out." He also made clear to me that he would be informed if I called TIPS . . . . There was no one I could complain to at Sterling who had the power to stop the sexual harassment I was facing. I knew the TIPS tine would not be confidential because [the District Manager] clearly stated it was not and I learned through personal experience that it was not. I believe the fact that Sterling has no policy or procedure in place to allow employees to confidentially report sexual harassment without the fear of losing their jobs only allows for more sexual harassment to take place.

224.    Amy Anderson, who worked for Sterling from 1984 until 1991 and again from 1998 until at least 2009, shared a story and explained that she did not believe that the TIPS hotline was truly anonymous:

Employees at Sterling are encouraged to use an anonymous "TIPS" system to report instances of sexual harassment. This system utilizes a toll-free number that supposedly reaches someone in the H.R. department, who is then supposed to conduct an investigation. Although it is widely advertised that calls to the "TIPS" line are anonymous, this is not actually the case.

I am aware of a part-time Sales Associate who called in a complaint to the TIPS line about a Store Manager, in 1999 or 2000. Shortly after the complaint was lodged, my Store Assistant Manager . . . told me that she and the District Manager were aware of the name of the person who made the complaint . . . . I no longer have faith that if I need to make a complaint in the future, that it will be anonymous, as advertised. I probably would not be comfortable making a complaint, if the need ever arose, knowing that the subject of the complaint may discover my identity and be free to confront me or retaliate against me.

225.    Wendy Avila, who worked for Sterling from 2002 until 2008, shared a similar story:

During my employment, I observed that calls to Sterling's supposedly confidential complaint hotline, TIPS, were not in fact confidential. It was well known in the district that [the District Manager] found out the identity of those employees who utilized the TIPS line to make complaints. In 2005 or 2006, I learned from [a female employee] that [the District Manager] had told her that [the District Manager] had listened to the recording of an employee's call to the TIPS line. [The District Manager] said she was able to identify the employee's identify from her voice and accent.

Because [the District Manager] was able to learn the identity of employees who utilized the TIPS line, it impacted whether employees would use it to bring complaints to the company's attention. For example, in 2007 or 2008, [a female

employee] came to me about an offensive remark that [the District Manager] had made comparing gas prices to rape. I counseled [the female employee] not to call the TIPS line because [the District Manager] would find out that she had made the complaint and possibly retaliate against her for that.

226.    Christine Ferreri, who worked for Sterling from 2002 until 2009, explained that, when she reported harassment by a male coworker, Sterling asked her District Manager "if I was a 'troublemaker. . . . Retaliation was widely feared at Sterling, and this comment confirmed those fears for me."

227.    Teri Flippin, who worked for Sterling from 2003 until at least 2013, likewise stated that she had been dissuaded from reporting inappropriate sexual activity between a Store Manager and an employee "because I have heard other Sales Associates say that complaints to TIPS are not confidential and are usually not addressed or resolved by Sterling."

228.    Lisa Jackson, who worked at Sterling from 2001 to 2003 and then from 2006 until at least 2012, shared her story of intimidation in her Declaration: in the fall of 2010, she was interviewed by Human Resources regarding a complaint that had been made about a male superior who had previously warned her that, if she "complained about him to HR, he would find out about it and that it would not be good for" her. As she explained:

> Sure enough, within a few minutes after I hung up the phone with [Human Resources], [the male superior] called me and in a threatening manner asked me how my call with [Human Resources] had gone. He told me that I should have called him to report the details of the call.

229.    Joy Lamb, who worked for Sterling from 2004 until 2011, shared her story of Signet's failure to take seriously complaints of sexual harassment:

> Sterling's attitude about female employees is also evident in the way that it handles complaints of sexual harassment. Inappropriate behavior by Store Manager [Redacted] was a frequent topic of conversation in the [Redacted] Jared. Stories about him getting too close in the supply room, making inappropriate comments or having lunches with young female subordinates were constantly heard in the store. I regularly saw young female employees actually crying about his inappropriate behavior. I know some people reported this behavior on the TIPS line, but am not

aware of any action or investigation taking place as a result of that. In fact, after complaints were made about his sexual harassment, [the Store Manager] was actually promoted to a position in another state.

230.    Cathy Mantia also suffered indifference regarding her sexual harassment complaints. As discussed above, Mantia explained that she was initially afraid to report her District Manager who offered her a promotion in exchange for sexual activity, but once she transferred to a different district she attempted to file a harassment complaint on at least two occasions. As Mantia stated:

> Each time I asked Human Resources if I could speak with someone regarding sexual harassment that I had experienced, Human Resources refused to listen to me. I was told by Human Resources that my sexual harassment issue could not be addressed at that time but someone would contact me at a later date. No one from Human Resources ever followed up with me to discuss filing a sexual harassment complaint.

231.    Adawie Mais Tarrab explained that, in her experience, "Sterling would transfer females who complained of sexual harassment rather than discipline or demote the harasser."

232.    Vanessa White, who worked at Sterling from 1999 until 2010, shared her experience with a Store Manager who routinely touched without permission and made inappropriate, sexual comments to female employees. White explained that when complaints were launched via the TIPS hotline, Signet "would investigate by calling complainants in the store where they worked – often alongside the accused party." This allowed the Store Manager to identify the women who made complaints, thus deterring others from doing so in the future. And, in any event, White was unaware of any action take against the Store Manager despite numerous complaints; in fact, he was subsequently transferred to a higher-volume, more lucrative store.

233.    Joretta Whyde, who worked for the Company from 2003 until 2005 and again in 2007, also experienced Sterling's indifference to sexual harassment complaints. Whyde's Store Manager repeatedly touched her without permission and made inappropriate comments. As Whyde

explained, when she complained about the sexual harassment to her District Manager, "he shrugged off my complaint by saying 'That's just [Store Manager].'" Whyde noted that the Store Manager <u>had been previously fired by Sterling for sexual harassment</u>, and stated, "[t]he fact that the company had rehired a sexual harasser, and then a District Manager shrugged off complaints about his behavior, made me realize that it was futile to complain about sexual harassment to this company." Later, when Whyde was working at a different store and was harassed by a Sterling Sales Associate, she complained to her Store Manager; her complaint was again brushed off, and shortly thereafter her hours started being reduced.

234.    Lindsay Zalanka, who worked for Sterling during the time period from 2003 through 2005, was also the victim of sexual harassment and retaliation for reporting it. Zalanka was groped against her will by a coworker, and then pressured not to bring a complaint with the Company because her Store Manager "felt this would attract negative attention to our store." Zalanka explained:

> There was a lot of pressure on me not to say anything. . . . I also got the sense that Sterling management had encouraged [the Store Manager] to dissuade women from reporting incidents of sexual harassment. This gave me the sense that this kind of incident had been ignored by Sterling in the past.

Zalanka further explained that, when she eventually did complain, she was retaliated against: she worked temporarily on a sporadic, part-time basis during 2005, and when she sought full-time employment again she was told that "Sterling's corporate officers refused" to give her her old position back: "When I asked why, [the Store Manager] refused to give me an answer. I had consistently high standards and a high sales record, so I believe that Sterling was only refusing to reinstate me in retaliation for having filed a complaint of sexual harassment."

**f.      Sterling Repeatedly Attempted to Intimidate Employees into Silence in the Context of the Actions**

235.      Several Declarants testified that they were intimidated into signing declarations for Sterling in the *Jock* Actions that were materially inaccurate. For example, Christine Ferreri, who worked for Sterling from 2002 until 2009, explained that, on April 5, 2006, she was interviewed by an attorney for Sterling in a vacant store front at the mall at which she worked. Ferreri further explained:

> I was very concerned about my job security when answering questions from Sterling's attorney and felt compelled to participate in the interview. . . . At the end of the interview, Sterling's attorney handed me a statement to sign. I did not feel like I had a choice other than to sign the statement because I was concerned about losing my job if I did not.

236.      Susan Crump, who worked for Sterling from 2005 until at least 2009 and who was a claimant in the *Jock* Arbitration from 2008 onwards, recounted her experience being interviewed in connection with the *Jock* Actions. Crump explained that, on October 10, 2005, Sterling's HR Manager, Mary Ellen Mennett, and Sterling's outside counsel, Jacqueline Kalk, arrived at the store at which Crump worked, unannounced, to conduct interviews. Crump was interviewed last, at approximately 8:30 p.m., after a full day of work. One of Crump's co-workers was fired during his interview. Mennett told Crump at the start of her interview that she would be terminated if she did not cooperate. Crump explained:

> It was very intimidating and scary to have my job threatened like this. It was my only means of income – my livelihood, and I also had aspirations to be promoted to Assistant Manager and then Store Manager. I was not offered to have a lawyer of my own present, nor was I told that I did not have to speak with Sterling's HR manager or its outside attorney. I felt very scared, intimidated, and threatened.
>
> * * *
>
> [A]bsent from the declaration Mennett and Kalk gave me to sign was information I had provided them regarding sexual harassment and inappropriate behavior by male Sterling employees against female Sterling employees that I had witnessed on the job. . . . In addition, during the interview, I was asked if I agreed with the women

who were bringing the case against Sterling that Sterling was discriminating against its female employees in pay and promotions based on their gender, and I said, "yes." However, Kalk and Mennett did not include this statement, or any of the information I provided regarding sexual harassment and inappropriate behavior, in the declaration they gave me to sign at the conclusion of my interview.

* * *

Because of what Mennen told me, I understood that if I did not cooperate in the interview and sign the declaration at the end of the "interview," that I would be terminated.

I signed the statement and was not given a copy. I felt so pressured to keep my job that I did not even feel comfortable asking for a copy. This was one of the most emotionally and psychologically grueling hours of my life.

237. Anna Melton, who worked for Sterling from 2002 until 2006, was also interviewed by an attorney for Sterling in connection with the *Jock* Actions, though Melton was misled into thinking that the interview was in connection with a proactive investigation into timekeeping practices conducted by Sterling after Zales had been sued for issues related to overtime compensation. Melton's interview was conducted in March 2006. She stated, "I was very intimidated by having to speak with an attorney for Sterling and was fearful that I would lose my job if I did not cooperate with the attorney." Melton explained that the attorney did not ask questions about gender discrimination issues. Melton signed the declaration the attorney drafted without reading it. Years later, she was dismayed to find that it contained assertions concerning fairness in pay and promotion, including "I believe my pay rates have been set fairly and without regard to gender," and "[g]ender is not a factor in making promotion decisions, instead, all promotions are awarded to the most qualified applicant," which Melton did not believe at the time the interview was conducted.

238. Adawie Mais Tarrab was also intimidated into signing a declaration containing untrue statements. Tarrab explained that she "did not voluntarily provide [her initial statement]. I was told by [a Store Manager] that I was required to participate in the interview." Tarrab explained

that the way in which Sterling conducted the interviews made her believe that she had no choice

by to agree to whatever Sterling's attorneys prepared for her to sign:

> I was intimidated, afraid to refuse to participate in the interview and feared
> retaliation if I refused to sign the statement or disagreed with its contents. I felt that
> I had been summoned to the interview specifically "to agree" and that the process
> was being conducted for the benefit of Sterling, to protect it from some legal
> trouble.

* * *

> Because I am no longer employed by Sterling or dependent upon Sterling for my
> livelihood, I no longer feel afraid to acknowledge experiences I had during my
> employment, which demonstrated to me that Sterling did in fact make promotion
> decisions in favor of males based upon gender and that Sterling would transfer
> females who complained of sexual harassment rather than discipline or demote the
> harasser.

### 3.   The Truth Emerges

239.   On August 31, 2016, Signet disclosed in a Form 10-Q that it had filed a motion for

a protective order in the *Jock* Arbitration, that the matter was fully briefed and argued, and that the

parties awaited the Arbitrator's decision.

240.   One analyst, Capitol Forum, picked up on this news, and speculated in a September

1, 2016 report that Signet filed the motion to prevent "potentially damaging documents and

evidence submitted by the claimants" in the class certification phase of the *Jock* Arbitration from

coming to light. Capitol Forum explained that any release of the documents and evidence would

be significant:

> Although stakeholders are able to gather basic information about the contents of
> the documents and evidence by reading the Class Award and the [Redacted Class
> Certification Brief], the release of the underlying documentary evidence would
> likely provide more insight into the culture in the Sterling Jewelers Division and
> the specific alleged conduct that created an unequal or unfair working environment
> for women. The release of the evidence would also provide information about
> whether the practices alleged in the [Redacted Class Certification Brief] were
> limited in nature or pervasive.

241.    On the evening of Sunday, February 26, 2017, Cohen Milstein posted redacted versions of the Declarations (the "Redacted Declarations") on its website. The Redacted Declarations contained over 1,300 pages of material, and included approximately 250 declarations from nearly 200 employees.

242.    The very next night, after market close on Monday, February 27, 2017, *The Washington Post* published a blockbuster article entitled "Hundreds allege sex harassment, discrimination at Kay and Jared jewelry company" (the "Washington Post Article"). The Washington Post Article quoted several of the 250 Redacted Declarations, and summarized others. It also included interviews with several of the Declarants. The Washington Post Article focused directly on Signet's pervasive culture of sexual harassment, reaching all the way up to the highest levels of the Company:

> Hundreds of former employees of Sterling Jewelers, the multibillion-dollar conglomerate behind Jared the Galleria of Jewelry and Kay Jewelers, claim that its chief executive and other company leaders presided over a corporate culture that fostered rampant sexual harassment and discrimination, according to arbitration documents obtained by The Washington Post.

> Declarations from roughly 250 women and men who worked at Sterling, filed as part of a private class-action arbitration case, allege that female employees at the company throughout the late 1990s and 2000s were routinely groped, demeaned and urged to sexually cater to their bosses to stay employed. Sterling disputes the allegations.

243.    The article also explained that journalists and Cohen Milstein had sought to make the Declarations public over a year earlier, but that Signet had resisted, and had only recently agreed to the publication of the materials—and only after approving redactions that obscured harassers' identities:

> Most of the sworn statements were written years ago, but the employees' attorneys were only granted permission to release them publicly Sunday evening. One of the original women who brought the case, those lawyers said, died in 2014 as proceedings crawled on without resolution.

\* \* \*

Since 2015, The Post has requested to review the employee statements submitted as part of arbitration, all of which were designated as confidential. Employees' attorneys have also sought to make them publicly available. Attorneys for the employees and the company recently reached an agreement that the documents could be made public on the condition that they not identify any of the individuals to whom conduct was attributed.

More than 1,300 pages of sworn statements were released Sunday and feature company-approved redactions that obscure the names of managers and executives accused of harassment or abuse.

244.    The interviews in the Washington Post Article were particularly saddening. Heather Ballou explained in her interview that, when her District Manager promised to help her get a store transfer she wanted if she had sex with him, she did so because she believed she was "'backed into a corner' and had no other way to advance." The Washington Post Article further quoted Ballou: "'Looking back, I can't believe some of the things I had to do,' Ballou told The Post, adding that in the moment she thought: 'You suck it up and do what you have to do for your family. You need this job.'"

245.    The Washington Post Article also pulled together facts from the Redacted Class Certification Brief, the newly-released Redacted Declarations, and from interviews, which provided the market with a new and more complete picture of sexual harassment at Sterling. For example, the Washington Post Article highlighted new facts substantiating earlier allegations against Defendant Light:

One night, Ballou told The Post, she saw a top executive watching as female managers in varying stages of undress splashed in a hotel pool. "He had a drink in one hand and a cigar in the other, just taking it all in, like, 'I am the king and this is my harem,'" she told The Post. She was prevented by her attorneys from naming which executive was involved, because of the condition of the arbitration documents' release. The 2013 class-action motion states Light took part in a pool-related incident similar to the one Ballou described.

246.    The revelations in the Redacted Declarations and the Washington Post Article stunned the market, and its reaction the following day was severe. Signet stock closed at $72.88 per share on February 27, 2017. It opened on February 28 at $68.90, and, by 11:22 a.m. that day, it was down to $66.89, 8.3% off the previous day's close.

247.    At 11:22 a.m. on February 28, the Company halted trading pending a release of news. Half an hour later, at 11:52 a.m., Signet issued a press release denying the allegations in the Washington Post Article, which it characterized as "misleading" and "distorted and inaccurate." Signet further argued, among other things, that the *Jock* Actions had never included sexual harassment claims, that the claims "involve a very small number of individuals," that Signet "takes any concerns seriously and had – and continues to have – multiple processes in place to receive and investigate allegations of misconduct," and that the Company had "thoroughly investigated the allegations and [] concluded they [were] not substantiated by the facts and certainly [did] not reflect [Signet's] culture."

248.    The market—newly educated by the Redacted Declarations and the Washington Post Article—was not reassured: when trading resumed, losses continued to mount. By day's end, Signet was trading at $63.59, down from the previous day's close of $72.88 by $9.29 per share, or 13%, on extraordinary volume of 11,317,100 shares.

249.    The revelations in the Redacted Declarations and the Washington Post Article swept through the media. Signet's hometown newspaper, the *Akron Beacon Journal*, published an article on March 1, 2017, detailing the allegations in the Redacted Declarations and the Washington Post Article and linking readers to both sets of documents.

250.    Several other articles, also published on March 1, reported on the revelations. For example, an article entitled "5 Things We Learned About Sexual Harassment Discrimination

Claims Against Kay Jewelers, Jared," published by *Consumerist*, recounted details of several revelations contained in the Redacted Declarations and the Washington Post Article, including (i) events occurring at the Managers' Meetings, (ii) the conditioning of employment decisions on female employees' acquiescing to sexual demands of superiors, and (iii) retaliation against employees who reported harassment to the TIPS hotline. Similarly, a March 1 article published in the *Detroit Free Press* explained that "[d]eclarations by nearly 250 women and men describe [Sterling] as a hotbed of sexual harassment where senior men groped, demeaned and demanded sex of young saleswomen in return for better jobs and job security . . . ." A *New York Times* article published the same day explained that one of the Declarants "did not know much about the experiences of other women at [Signet]. As it turns out, [she] was one of hundreds of former Sterling employees who described a corporate culture polluted by sexual aggression, gender discrimination and abuses of power, according to newly released documents . . . ." And a March 1, 2017 article in *USA Today* explained that "[t]he declarations, obtained by the Washington Post, depict Sterling Jewelers as fostering a workplace where senior men treated young saleswomen as their private harems, including groping, demeaning and demanding sex in return for better jobs and job security, the Post reported."

251.    S&P Capital IQ issued a report on March 2, 2017, in which it lowered its opinion on Signet from "Buy" to "Hold" and lowered its 12-month target for Signet shares by $20, from $105 to $85, citing the recent revelations:

> We think a Washington Post report bringing public a 2008 class action arbitration allegation of gender discrimination and harassment at SIG's Sterling Jewelers operations will weigh on the shares. SIG disputes the reports as portrayed in the media, but we think the exposure will hurt sales regardless.

## V.   POST-CLASS PERIOD EVENTS

252.   Signet scrambled to deal with the repercussions of the release of the Redacted Declarations and the Washington Post Article in late February 2017, and soon proposed dramatic reforms. On March 9, 2017, Signet hosted its fourth-quarter 2017 earnings call. Todd Stitzer, the Chairman of the Board, started the call by speaking at length concerning the recent revelations. After rehashing several of Signet's previous denials of the validity of the *Jock* Actions, Stitzer announced that Signet was undertaking three new initiatives "to assure ourselves, our shareholders, and our team members that our policies and practices are functioning as intended, and to identify areas where we can further improve." First, the Board would form a new committee, comprised of all of the Company's female directors, and focused on "respect in the workplace," and specifically on "programs and policies to support the advancement and development of [Signet's] female team members." Second, the new committee would appoint an independent consultant to conduct a "thorough review" covering the Company's current and future policies and practices regarding, among other things, training, reporting, investigation, and non-retaliation in the context of sexual harassment. Stitzer explained the purpose of the independent consultant: "[W]e want to be sure that the framework we have in place for reporting and responding to [discrimination and harassment] is robust and effective." Finally, the new committee would establish an ombudsperson office to provide confidential advice to employees, address their concerns regarding issues in the workplace, and to provide them with strategies and options to help resolve workplace concerns.

253.   Stitzer also explained that the Board had been briefed on the litigation for years and, when considering Defendant Light for promotions during the Class Period, had reviewed available information concerning the harassment:

> As a Board, we have been briefed on this litigation since 2008. As noted earlier, many of the allegations publicized in connection with the case go back decades. When evaluating whether to make Mark Chief Operating Officer in 2014, we

obviously reviewed his business performance and evaluated, with advice from counsel, the allegations that were described in connection with the case, reviewed the available information, the timeframes involved, and the context in which it was offered. Based on our review and evaluation, we appointed Mark as COO. When the previous CEO departed the Company, we conducted a further confirmatory review, and Mark was appointed CEO.

254.    Approximately one month later, Signet issued a completely revamped Code of Conduct, the first such overhaul of the document since it was issued in 2009. For the first time, the Code of Conduct began with a letter from Defendant Light. In that letter, Light explicitly connected compliance with ethical principles to earning and keeping customer trust and to the success of the business more generally (bold and all caps in original):

> Our Core Values require not only compliance with law but also ethical conduct. We have refreshed our existing codes across all locations and brands to reflect an enhanced One Signet Code of Conduct ("Code").
>
> Through ethical behavior and commitment to a high standard of integrity, we earn and keep the trust of our Customers who turn to us to help them **CELEBRATE LIFE AND EXPRESS LOVE**. Without the trust of our Customers, our Company will not achieve its mission. You have the power not to allow anything to compromise your commitment to Signet Jewelers' Core Values as well as your own values.

The Code of Conduct also included multiple reassurances to employees that any complaints would be handled anonymously, and specifically included a direction to Sterling managers to "[n]ever retaliate against a[n employee] who raises an issue or concern."

255.    Regarding Signet's loan portfolio, on May 25, 2017, the Probes Reporter SEC Investigation Update issued a report indicating that Signet may be the subject of ongoing SEC enforcement proceedings. In the report, Probes stated that it filed its first FOIA request with the SEC related to Signet in July 2012, and filed one per year thereafter to confirm whether or not the Company was the subject of any SEC action. On March 14, 2016, the SEC responded to the FOIA request with: "No SEC investigative records found." The following year, on April 4, 2017, the

SEC responded to the FOIA request with: "SEC denies access to records over concern their release 'could reasonably be expected to interfere with enforcement activities.'" On May 4, 2017 in response to an appeal of the denial of the FOIA request, the SEC responded: "Existence of on-going SEC enforcement proceedings confirmed on appeal; Access to records remains blocked."

256.    On June 2, 2017, Bryan Morgan, Signet's COO, resigned due to "violations of company policy unrelated to financial matters."

257.    On July 17, 2017, Signet issued a press release announcing that Defendant Light was unexpectedly retiring. The press release came as a surprise to investors who noted Light's three-plus decades with the Company, and provided very little explanation of the organizational change, with Light stating only that "[g]iven the Company's positive direction and my need to address some health issues, the Board and I agreed that it is a good time for a transition."

258.    On July 17, 2017, the Wall Street Journal reported that Light "decided to retire for health reasons," but that Signet "[o]fficials declined to disclose the condition prompting Mr. Light to leave the company he has been a part of for 35 years." Several news sources connected his departure to the sexual harassment allegations revealed in the Redacted Declarations and the Washington Post Article. For example, in an article published on July 17, 2017 entitled "Signet Jewelers CEO Hit By Sexual Harassment Controversy Leaving Company," Fortune.com reported:

> The Signet Jewelers CEO who faced allegations of misconduct during the retailer's ongoing sexual harassment controversy is leaving the company, citing health reasons.
>
> Mark Light, who became chief executive of the largest U.S. jewelry retailer in late 2014, will be replaced by a longtime Procter & Gamble executive and current Signet director Virginia Drosos on August 1, the company said on Monday. She'll face the daunting task of getting the company, which operates the Kay, Jared, and Zales stores in the United States, along with British chains, back on track saleswise and past a series of damaging hits to its reputation in the last year.
>
> Those have included allegations of gem swapping at its Kay Jewelers stores and a devastating Washington Post story earlier this year alleging years of systemic, mass

sexual harassment, charges Signet has repeatedly and adamantly denied. The Post story said among other things that Light was alleged to have been seen in a pool with "nude and partially undressed female employees."

Similarly, in another article published on the same day entitled "Signet Jewelers' New CEO Has Her Work Cut Out for Her," the *Bloomberg Gadfly* explained:

> Signet Jewelers Ltd., the corporate parent of Kay Jewelers and Zales, has lost much of its sparkle in the past couple of years.

> The company on Monday took an important step toward reclaiming it: naming a new CEO, Virginia C. Drosos. She will replace Mark Light, who had held the top job since 2014, but whose career at Signet spanned more than 35 years. The company said Light is retiring "due to health reasons."

> The change is a potentially pivotal shake-up for a company that badly needs one.

* * *

> [S]worn statements in an arbitration case released earlier this year show Light has been accused of inappropriate sexual behavior toward female employees. This claim was unearthed in a class-action case in which hundreds of former workers said there was a pattern of sexual misconduct at the company. (Signet has denied wrongdoing.)

> Replacing Light is an effective way for Signet to show employees and investors it wants to move forward and is serious about fixing a troubling workplace culture.

> It's also an opportunity to bring fresh eyes to a business that clearly needs new direction.

## VI.  ADDITIONAL SCIENTER ALLEGATIONS

259.    As set forth above and further below, numerous facts demonstrate that Defendants knew or, at minimum, recklessly disregarded that their statements were materially false and misleading.

### A.    Additional Scienter Allegations Related to the Statements Concerning the Credit Operation

260.    As noted above, Defendants repeatedly stated that they were intimately familiar with the Company's underwriting and the credit quality of its loan portfolio. For instance, Defendant Barnes stated that the loan portfolio was "a big important part of our business and one

that we don't take lightly. We watch it very closely and we use it to really help drive the core of our business." Defendant Ristau stated that we "welcome the increasing use of our credit programs, as we have very definitive approval criteria and fully understand the credit risk and profitability of our decisions. We take great care in our decisions[.]" Defendant Light stated that he and other senior executives were personally familiar with the portfolio because "we've been running a credit portfolio for well over 30 years." In its SEC filings, Signet repeatedly assured investors that "on an ongoing basis, management monitors the credit exposure," "[w]e closely monitor the credit portfolio," and Signet assessed the portfolio's quality "on a real-time basis." Given their detailed knowledge of Signet's credit operation, Defendants knew that Signet was engaged in reckless underwriting and had generated several hundred million dollars' worth of high-risk subprime loans.

261.   Moreover, Former Employee 1 reported that Signet's senior management, including Defendant Light, were made aware of problems with the credit portfolio as far back as 2007 or 2008. As set forth above, Former Employee 1 reported that the credit risk department began issuing internal warnings as far back as 2007 or 2008 that the bad debt issue was a problem and the portfolio was in trouble, but nothing was really done. As Former Employee 1 stated, "the credit department had some major issues with the bad debt process, with how it used recency methods," particularly because the Company was booking sales that weren't actually generating real cash due to the borrower's inability to pay a meaningful portion of their loan. The problems with the loan portfolio were documented in regular internal reports that were ultimately shared with Defendant Light and Bob Trabucco. Further, there were regular bad debt meetings with executives, including Light and Trabucco, to discuss strategies to overcome expanding bad debt, low contact rates, and similar issues. As former Employee 1 reported, at these meetings, the

executives considered changing the Company's lending practices and adopting more stringent credit terms, but decided against it because it would harm sales.

262.    In addition, as detailed above, beginning in approximately November 2015, concerned investors repeatedly questioned Signet's underwriting and the credit quality of its loan portfolio, and criticized its recency methodology as opaque. In response, Defendants staunchly denied that there was a basis for any concern or criticism. Defendants called investor criticism of the Company's disclosures and business practices "bullying," and stated that any concern was "unwarranted, quite frankly." They further reassured investors that the Company's underwriting remained stringent, the credit quality of the portfolio remained strong, and the Company's use of the recency method accurately reflected the health of the portfolio. At the same time, they undertook a series of machinations designed to prop up the Company's flagging stock price, including substantial buybacks, a dividend raise, and the announcement of a private equity investment. Just weeks after issuing these denials, Signet disclosed that its Board was considering selling the loan portfolio. Ultimately—contrary to Defendants' strident assurances of stringent underwriting and high credit quality—it was revealed that nearly half of the Company's loan portfolio consisted of risky subprime loans. The fact that Defendants issued repeated false denials when investors questioned their statements, while pulling "levers" to prop up the stock price, is powerful evidence of scienter.

263.    The significance of the loan portfolio to Signet further supports an inference of scienter. As set forth above, Defendants routinely stated that the portfolio was a key enabler of sales, especially in the critical bridal segment, and was therefore an essential aspect of Signet's business model. Defendants constantly emphasized that the portfolio was "competitive advantage" for Signet that set it apart from its peers. During the Class Period, the loan portfolio grew to be

approximately $1.8 billion in size, and was Signet's second largest asset, accounting for approximately 30% of its total assets. Given that the loan portfolio was critical to Signet's business model and an extremely important driver of the Company's operations and financial performance, Defendants' misstatements on this subject were at least reckless.

264.    The market's intense focus on the Company's credit operation also supports an inference of scienter. As set forth herein, given the importance of the credit operation to Signet's business, the market focused closely on the purported credit quality of the portfolio and the conservatism of Signet's underwriting. Because these issues were so important to the valuation of Signet's stock, Defendants made myriad public statements assuring investors that Signet's underwriting was, in fact, stringent and the credit quality of the portfolio was strong. As Defendant Ristau stated during the beginning of the Class Period, "Well, I couldn't do a presentation without talking about credit." In turn, analysts issued dozens, if not hundreds of reports addressing this subject. In light of the attention that the market paid to this subject—and the fact that Defendants spoke reassuringly on this subject dozens of times—any failure by Defendants to ensure the accuracy of their repeated statements was severely reckless at minimum.

265.    Finally, Defendants' use of the recency aging methodology supports an inference of scienter under the circumstances of this case. As set forth above, recency is a disfavored method because it can be used to obscure the credit risk in a portfolio—and that is precisely how Defendants used it here. Despite repeated calls from the market and an inquiry from the SEC to provide delinquency numbers based on the contractual method, Defendants refused. It was not until the end of the Class Period that the reason became clear: because, contrary to Defendants' statements, nearly half of Signet's loan portfolio consisted of toxic subprime loans that posed a

material concentration of risk to Signet. Signet employed the recency method for the very reason that investors questioned it—because the Company had something to hide.

**B.** **Additional Scienter Allegations Related to the Statements Concerning the Arbitration and the Conduct of Signet's Business**

266. There can be no serious dispute that Defendants were aware of the facts detailed in the Declarations. Defendants had received the Declarations by the start of the Class Period. Thus, contrary to their public statements, they knew that the *Jock* Actions did not merely concern "store-level" practices related only to pay and promotion activities, but rather detailed a pervasive culture of sexual harassment that reached the Company's highest levels.

267. Further, the harassment was open, notorious, and widespread. Among other things, the harassment regularly occurred at the Company's gathering of executives known as the Manager's Meetings. And, according to the Declarants, it involved Defendant Light. Given Defendants' knowledge of this widespread conduct, they knew that their statements mischaracterizing the nature and scope of the arbitration, as well as their statements touting Signet's supposed ethical business conduct, were materially misleading at best.

268. In addition, the information contained in the Declarations—and specifically the facts asserted as to Defendant Light—was repeatedly discussed at the highest levels of Signet. As noted above, the Signet Board had been repeatedly briefed on the litigation since 2008 and, when considering Defendant Light for promotions during the Class Period, had again reviewed this information. According to Signet's Chairman:

> As a Board, we have been briefed on this litigation since 2008. . . . When evaluating whether to make Mark Chief Operating Officer in 2014, we obviously reviewed his business performance and evaluated, with advice from counsel, the allegations that were described in connection with the case, reviewed the available information, the timeframes involved, and the context in which it was offered. . . . When the previous CEO departed the Company, we conducted a further confirmatory review, and Mark was appointed CEO.

In short, Defendants were well aware of the facts set forth in the Declarations.

## VII.   SIGNET MATERIALLY UNDERSTATED THE RESERVES FOR ITS LOAN PORTFOLIO, THEREBY MATERIALLY OVERSTATING ITS INCOME

269.   At each quarter, Signet was required to record in its publicly filed financial statements an "allowance for doubtful accounts," or "allowance for credit losses," also known as a reserve. The reserve represented the dollar amount of accounts receivable that, based on current evidence, were likely uncollectible. This was a key metric for investors because it reflected the health of the loan portfolio, which, as noted above, was fundamental to Signet's business. Further, reserve increases were charged dollar-for-dollar against Signet's pre-tax income, and directly impacted the Company's financial performance.

270.   Generally Accepted Accounting Principles ("GAAP") required that Signet recognize and disclose probable losses inherent in its loan portfolio prior to charging off accounts receivable when the loss is ultimately confirmed (*i.e.*, the "loss confirming event"). Specifically, ASC 450, in conjunction with ASC 310, Receivables, required that the Company record allowances for uncollectible accounts receivable and related credit loss provisions when the following conditions existed:

> a.   Information available before Signet's financial statements were issued or were available to be issued indicated that it was probable that a loan or group of loans had been impaired or a liability had been incurred at the date of the financial statements; and
>
> b.   The amount of the loss was reasonably estimable (ASC 450-20 -25-2).

271.   Under GAAP, those conditions may be considered in relation to individual receivables or in relation to groups of similar types of receivables. If the conditions are met, allowances for losses shall be made even though the particular receivables that are uncollectible may not be identifiable. (ASC 310-10-35-9).

272.     Signet's use of the recency aging method and its related charge-off policy obscured and extended the time between when a loan was made and when the related receivable was ultimately charged off—a period of time known as the "loss discovery period." Signet required its credit customers to sign an agreement specifying minimum payment terms. Typically, a failure to comply with the minimum payment terms is an adverse fact that indicates that the prospect for an uncollectible account is greater. However, under the recency method, Signet permitted customers to make partial payments (as little as 75% of the agreed upon amounts) for the account to be considered as current.

273.     Therefore, a customer could be dropping further and further from its agreed upon payment schedule, but with these partial payments the account would be considered to be current under Signet's recency method. Late in the Class Period (in October 2016) the SEC questioned Signet on its use of the recency method, indicating that it is not comparable to other market participants. Indeed, one impact of Signet's atypical recency method is to understate and/or mask true delinquency trends, as accounts may be shown as recency current but may actually be several payments contractually past due. Thus, while Signet reported figures for delinquent and non-performing loans in its SEC filings during the Class Period, these figures understated the true number of delinquencies and non-performing loans the Company was experiencing, and obscured the true credit quality of the loan portfolio.

274.     Since the uncollectibility of an account receivable—and hence, the adequacy of a reserve—is confirmed when the account is charged off, a company's policy of writing off its accounts is significant. Signet's policy of writing off accounts receivable is to wait until the accounts become (a) more than 120 days aged on the recency method, and (b) more than 240 days aged on the contractual method.

275.    Thus, Signet's use of the recency method for aging accounts receivables defers the identification of an account as past due. Further, Signet's policy of not charging the loan off until it is both 120 days past due on a recency basis and 240 days past due on a contractual basis, significantly defers when the Company recognizes the "loss confirming event" (*i.e.*, the charge-off of the uncollectible account receivable). To illustrate, if a customer failed to make any payments on an account, it would take 30 days for that account to become one day past due, and then another 240 days for it to become 240 days past due—meaning that even in the case of a customer who made no payments it would take Signet nine months (270 days) before it wrote off the account.

276.    Notably, this 270-day minimum period could be extended if the customer made any partial payments under the recency method. Therefore, in all reality, Signet's accounting policy likely extended the loss-confirming period to at least one year.

277.    Notwithstanding the fact that Signet had extremely lenient delinquency and charge off policies (which delayed the charge off of losses), Signet's reserves were still consistently less than the confirmed losses it recognized during the preceding twelve months. In other words, Signet's reserves for losses were consistently less than the actual charge-offs it had recorded on a smaller receivable portfolio during the preceding loss discovery period (*i.e.*, assumed twelve month period).

278.    For example, at the end of the class period (i.e., Signet's Third quarter of its Fiscal 2017 year), Signet had a recorded reserve of $133 million for its accounts receivable of $1.7 billion. Yet—even under its very lenient recency method and its policy of not charging off accounts until they become 240 days past due on the contractual basis—Signet wrote off $195 million for the preceding one year period loan portfolio which was slightly smaller at $1.6 billion. This is

strong evidence that Signet's reserves were understated by at least $62 million at the end of the Class Period. This is especially so given Signet's assertions that its underwriting and the performance of the portfolio did not change for many years—assertions which further demonstrate that the probable uncollectible receivables (the reserve) and related loss experience should be the same as those which very recently occurred (the charge offs).

279.   Based on an estimated loss discovery period of one year, Signet failed to increase its reserves and related bad debt expense as of the end of each quarter in the Class Period in violation of GAAP. Consequently, Signet's reserves and bad debt expense were understated, and its pre-tax income was overstated, by material amounts throughout the Class Period.

280.   The following table sets forth the understatements of Signet's reserves for each reporting period in the Class Period based on an estimated loss discovery period of one year. The cumulative amount by which Signet's reserve was understated ranged from $30 to $66 million.

| Fiscal Period: | Reserve reported by Signet (in millions): | Charge-offs reported by Signet for the preceding year (in millions): | Understatement of reserve and related bad debt expense (in millions) if cumulative understatement was recognized: |
|---|---|---|---|
| FY 2017 | $139 | $203 | $64 |
| Q4 2017 | $139 | $203 | $64 |
| Q3 2017 | $133 | $195 | $62 |
| Q2 2017 | $129 | $189 | $59 |
| Q1 2017 | $117 | $183 | $66 |
| FY 2016 | $130 | $174 | $44 |
| Q4 2016 | $130 | $174 | $44 |
| Q3 2016 | $122 | $165 | $43 |

| Fiscal Period: | Reserve reported by Signet (in millions): | Charge-offs reported by Signet for the preceding year (in millions): | Understatement of reserve and related bad debt expense (in millions) if cumulative understatement was recognized: |
|---|---|---|---|
| Q2 2016 | $116 | $156 | $40 |
| Q1 2016 | $103 | $150 | $47 |
| FY 2015 | $113 | $145 | $32 |
| Q4 2015 | $113 | $145 | $32 |
| Q3 2015 | $103 | $138 | $36 |
| Q2 2015 | $99 | $135 | $36 |
| Q1 2015 | $88 | $131 | $43 |
| FY 2014 | $98 | $128 | $30 |
| Q4 2014 | $98 | $128 | $30 |
| Q3 2014 | $90 | $125 | $35 |
| Q2 2014 | $89 | $120 | $31 |

281. Likewise, the following chart reflects the percentage amounts by which Signet's quarterly income and earnings would have decreased at each reporting period in the Class Period if Signet had corrected its cumulative understatements of reserves and bad debt expenses.

| Fiscal Period: | Percentage decrease of reported quarterly operating income if cumulative understatement was recognized: | Percentage decrease of reported quarterly pre-tax income if cumulative understatement was recognized: | Percentage decrease of reported net income if cumulative understatement was recognized: | Percentage decrease of reported diluted earnings per share if cumulative understatement was recognized: |
|---|---|---|---|---|
| FY 2017 | 8% | 9% | 8% | 10% |
| Q4 2017 | 16% | 17% | 14% | 17% |
| Q3 2017 | 194% | 321% | 238% | 274% |
| Q2 2017 | 49% | 55% | 47% | 47% |
| Q1 2017 | 31% | 33% | 29% | 29% |
| FY 2016 | 6% | 7% | 6% | 6% |
| Q4 2016 | 11% | 11% | 10% | 10% |
| Q3 2016 | 128% | 196% | 186% | 186% |
| Q2 2016 | 40% | 45% | 42% | 42% |
| Q1 2016 | 27% | 28% | 26% | 26% |
| FY 2015 | 5% | 6% | 5% | 5% |
| Q4 2015 | 10% | 10% | 9% | 9% |

| Fiscal Period: | Percentage decrease of reported quarterly operating income if cumulative understatement was recognized: | Percentage decrease of reported quarterly pre-tax income if cumulative understatement was recognized: | Percentage decrease of reported net income if cumulative understatement was recognized: | Percentage decrease of reported diluted earnings per share if cumulative understatement was recognized: |
|---|---|---|---|---|
| Q3 2015 | 333% | 1874% | 1780% | 1429% |
| Q2 2015 | 43% | 51% | 40% | 41% |
| Q1 2015 | 29% | 29% | 29% | 29% |
| FY 2014 | 5% | 5% | 5% | 5% |
| Q4 2014 | 11% | 11% | 11% | 11% |
| Q3 2014 | 68% | 69% | 69% | 67% |
| Q2 2014 | 29% | 29% | 30% | 30% |

282.    Notably, an analysis of charge-offs subsequent to each reporting period confirms the understatement of Signet's reserves. The following table compares each respective reserve to the confirmed losses realized over the relevant, average discovery period (*i.e.*, the subsequent twelve month period):

| Fiscal Period: | Reserve reported by Signet (in millions): | Charge-offs reported by Signet for the subsequent year (in millions): | Understatement of reserve if cumulative understatement was recognized (in millions): |
|---|---|---|---|
| Q2 2017 | $129 | $218 | $88 |
| Q1 2017 | $117 | $211 | $94 |
| FY 2016 | $130 | $203 | $73 |
| Q4 2016 | $130 | $203 | $73 |
| Q3 2016 | $122 | $195 | $73 |
| Q2 2016 | $116 | $189 | $73 |
| Q1 2016 | $103 | $183 | $79 |
| FY 2015 | $113 | $174 | $61 |
| Q4 2015 | $113 | $174 | $61 |
| Q3 2015 | $103 | $165 | $63 |
| Q2 2015 | $99 | $156 | $57 |
| Q1 2015 | $88 | $150 | $63 |
| FY 2014 | $98 | $145 | $47 |
| Q4 2014 | $98 | $145 | $47 |
| Q3 2014 | $90 | $138 | $49 |
| Q2 2014 | $89 | $135 | $46 |

## VIII.  MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

283.    Throughout the Class Period, Defendants made numerous materially false and misleading statements and omissions including those concerning: (1) the quality and risks of Signet's in-house credit portfolio and underwriting; (2) the Company's financial performance and

accounting, including its reserves and earnings; (3) the culture of sexual harassment at Signet, including the nature and risks of the lawsuits it was facing; and (4) the conduct of its business, particularly as it related to ethical standards and sexual harassment.

### A.     Materially False And Misleading Statements And Omissions Concerning The Second Quarter Fiscal 2014

284.    On August 29, 2013, Signet issued a press release entitled "Signet Reports Second Quarter Financial Results" (the "Second Quarter 2014 Press Release"). That same day, the Company filed with the SEC a Form 8-K (the "Second Quarter 2014 Form 8-K"), which Defendant Ristau signed, that included the press release as an exhibit. The Second Quarter 2014 Press Release and the Second Quarter 2014 Form 8-K reported net income of $67.4 million, operating income of $105.5 million, income before taxes of $104.5 million, and diluted EPS of $0.84.

285.    The financial results set forth above were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 30%, its operating income was overstated by 29%, its income before taxes was overstated by 29% and its diluted EPS was overstated by 30%, as set forth above at Section VII.

286.    Later on August 29, 2013, Signet filed with the SEC its Form 10-Q for the quarter ended August 2, 2013 (the "Second Quarter 2014 Form 10-Q"), which was signed by Defendant Ristau and Defendant Barnes. The Second Quarter 2014 Form 10-Q reported the same financials set forth in the Second Quarter 2014 Press Release and the Second Quarter 2014 Form 8-K, and additionally reported allowance for credit losses of $89.1 million, a 7.2% valuation allowance as a percentage of gross receivables, and year-to-date net bad debt expense of $57.8 million.[2]

---

[2] In its SEC filings, Signet did not provide specific figures for net bad debt expense. The Company provided figures for "Provision" and "Recoveries," and stated that "net bad debt expense is equal to provision expense less recoveries." The net bad debt expense numbers provided throughout were calculated using the formula provided by the Company in its SEC filings.

287.    These metrics were materially understated by the amounts and for the reasons set forth above in Section VII.

288.    Also on August 29, 2013, Defendants held a conference call with investors to discuss Second Quarter fiscal 2014 results (the "Second Quarter 2014 Conference Call"). During the Second Quarter 2014 Conference Call, Defendants made additional misleading statements regarding the health of Signet's loan portfolio. Specifically, Defendant Ristau responded to an analyst's question regarding the increasing bad debt and whether there were "any issues with [the] customer mix and maybe the ability to pay[.]" Ristau stated that he

> wouldn't say there is any issue with our consumers' ability to pay. <u>Our overall credit portfolio statistics continue to remain very strong and I want to make sure that you understand that point.</u> When we look at the bad debt issue again, about 75% of it, so, in the quarter, we had a $5 million increase in our bad debt, about $3.5 million, $3.6 million of it is directly traceable to increases in the volume, with the residual being comprised of several things. . . . But I don't think there is anything wrong with our consumers' ability to pay. <u>Consumers are behaving strongly. They are making more than the minimum down payments very strongly. They are using the credit appropriately. Our credit approval rates remain relatively consistent to prior year, so there is no big change in anything that we are doing there.</u> So I don't want to cause any alarm, but I do want to properly describe the situation. It is mostly volume with some tweaks, if you will, in the collection profile primarily caused by the change in these programs.

289.    These statements were materially misleading. Contrary to the statement that "overall credit portfolio statistics continue to remain very strong," the portfolio contained several hundred million dollars' worth of high-risk subprime loans. Further, it was misleading to state that there were no issues with consumers' ability to pay, because the Company had granted several hundred million dollars' worth of subprime loans to consumers who posed a significant risk of default. It was also misleading to cite bade debt expense as an indication of strong credit quality because that figure was materially understated.

290.    At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the Second Quarter 2014 Form 10-Q, Signet made the following statement concerning the Actions in its "Commitments and contingencies" disclosure concerning legal proceedings:

> In March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ("Sterling"), a subsidiary of Signet, in the U.S. District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. . . . On June 21, 2013, pursuant to the briefing schedule ordered by the Arbitrator, the Claimants filed their motion for class certification, disclosed their experts, and produced their expert reports. Sterling's response to Claimants' class certification motion, Sterling's disclosure of its experts and their reports, as well as any motions relating thereto are due on October 3, 2013. The Claimants' reply brief, any expert rebuttal submissions, as well as any motions relating thereto are due on December 20, 2013. Expert discovery is ongoing, and all expert depositions must be completed by January 10, 2014. The parties have proposed that a hearing on Claimants' motion for class certification be held during the week of January 20, 2014, or as soon thereafter as the Arbitrator's schedule permits.
>
> * * *
>
> On September 23, 2008, the U.S. Equal Employment Opportunity Commission ("EEOC") filed a lawsuit against Sterling in the U.S. District Court for the Western District of New York. The EEOC's lawsuit alleges that Sterling engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present.
>
> * * *
>
> Sterling denies the allegations of both parties and has been defending these cases vigorously. At this point, no outcome or amount of loss is able to be estimated.

291.    This statement was materially false and misleading. It was materially false and misleading to represent that the Actions concerned merely "store-level employment practices" that were alleged to be "discriminatory as to compensation and promotional activities with respect to gender," when in fact the Actions had uncovered extensive evidence showing a pervasive culture

- 102 -

of sexual harassment reaching up to the highest levels of the Company. It was also materially misleading because it failed to disclose the true degree of reputational and business risk that the Company was now facing as a result of the facts set forth in the Declarations. It was further materially false and misleading to omit disclosure of the facts asserted in the Declarations when Signet made disclosures concerning class certification briefing in discussing the *Jock* Arbitration.

292.   Also in the Second Quarter 2014 Form 10-Q , Signet stated that "There have been no material changes in our risk factors from those disclosed in Part I, Item 1A, of Signet's Fiscal 2013 Annual Report on Form 10-K, filed with the SEC on March 28, 2013." Signet's Form 10-K, filed with the SEC on March 28, 2013 (the "Fiscal Year 2013 Form 10-K"), provided in relevant part that Signet was exposed to the following risk factor (bold and italics in original):

> ***Loss of confidence by consumers in Signet's brand names, poor execution of marketing programs and reduced marketing expenditure could have a detrimental impact on sales.***
>
> Primary factors in determining customer buying decisions in the jewelry sector include customer confidence in the retailer and in the brands it sells, together with the level and quality of customer service. The ability to differentiate Signet's stores and merchandise from competitors by its branding, marketing and advertising programs is an important factor in attracting consumers. If these programs are poorly executed or the level of support for them is reduced, or the customer loses confidence in any of Signet's brands for whatever reason, it could unfavorably impact sales and earnings.

293.   This statement was materially false and misleading. It was materially false and misleading for Signet to represent that the risk of customers losing confidence in the Company's brands was merely hypothetical when Signet knew that it was, in fact, already facing a highly material risk that customers would lose confidence in its brands. Indeed, as set forth above, Signet knew that there was a pervasive culture of sexual harassment at the Company, and that this information was highly likely to become public.

294.   The Fiscal Year 2013 Form 10-K further provided that Signet was exposed to the following risk factor (bold and italics in original):

> ***Signet's success is dependent on the strength and effectiveness of its relationships with its various stakeholders <u>whose behavior may be affected by its management of social, ethical and environmental risks.</u>***
>
> <u>Social, ethical and environmental matters influence Signet's reputation, demand for merchandise by consumers, the ability to recruit staff</u>, relations with suppliers and standing in the financial markets. Signet's success is dependent on the strength and effectiveness of its relationships with its various stakeholders: customers, shareholders, employees and suppliers. In recent years, stakeholder expectations have increased and Signet's success and reputation will depend on its ability to meet these higher expectations.

295.   This statement was materially false and misleading. It was false and misleading for Signet to represent that that the behavior of stakeholders, including "employees," "may be affected by its management of social, ethical, and environmental risks," when this risk had already materialized, and Signet's "employees" already <u>had</u> been affected by the Company's pervasive culture of sexual harassment.

296.   By the beginning of the Class Period, Signet had also published its Codes to investors. The version of the Code of Conduct that was published at the start of the Class Period was adopted on February 28, 2013. The Code of Conduct stated (italics in original):

> *Maintaining a Safe, Healthy and Affirmative Workplace*
>
> <u>The Company is an equal opportunity employer and bases our recruitment, employment, development and promotion decisions solely on a person's ability and potential in relation to the needs of the job, and complies with local, state and federal employment laws.</u>

297.   These statements were materially false and misleading. Contrary to the statement that Signet "bases our recruitment, employment, development and promotion decisions solely on a person's ability and potential in relation to the needs of the job, and complies with local, state and federal employment laws," the Company was pervaded with a culture of sexual harassment,

in which women employees were frequently granted or denied promotions or employment opportunities based on whether they acquiesced to such harassment.

298.    The Code of Conduct further stated:

The Company is committed to a workplace that is free from sexual, racial, or other unlawful harassment, and from threats or acts of violence or physical intimidation. Abusive, harassing or other offensive conduct is unacceptable, whether verbal, physical or visual. Any person who believes that they have been harassed or threatened with or subjected to physical violence in or related to the workplace should report the incident to an appropriate supervisor or Human Resources, who will arrange for it to be investigated. All efforts will be made to handle the investigation confidentially.

299.    These statements were materially false and misleading. Contrary to the statement that "[t]he Company is committed to a workplace that is free from sexual . . . harassment," and "harassing or other offensive conduct is unacceptable" to Signet, the Company was pervaded with a culture of sexual harassment. Also, contrary to the statement that "[a]ll efforts will be made to handle the investigation confidentially," the Company's reporting mechanism was not kept confidential.

300.    The Code of Conduct further stated:

Those who violate the standards in this Code will be subject to disciplinary action.

* * *

It is the Company's policy to encourage the communication of bona fide concerns relating to the lawful and ethical conduct of business . . . . It is also the policy of the Company to protect those who communicate bona fide concerns from any retaliation for such reporting. Confidential and anonymous mechanisms for reporting concerns are available and are described in this Code.

301.    These statements were materially false and misleading. Contrary to the statement that it was Signet's "policy to encourage the communication of bona fide concerns relating to the lawful and ethical conduct of business," and "to protect those who communicate bona fide concerns from any retaliation," the Company was pervaded with a culture of sexual harassment. Further, the Company neither encouraged the reporting of this harassment nor protected those who

did. Likewise, it was materially false to represent that "[t]hose who violate the standards of this Code will be subject to disciplinary action," because the Company's male executives engaged in sexual harassment regularly and with impunity. Finally, contrary to the statement that "[c]onfidential and anonymous mechanisms for reporting concerns are available," the Company's reporting mechanism was not kept confidential.

302.    The Code of Ethics Stated:

> The Company has also adopted a Code of Conduct (the "Code of Conduct") that applied to directors, officers and employees of the Company. The Chairman, IDs, CEO, CFO and other senior officers of the Company that are subject to this Code of Ethics are also subject to the Code of Conduct. In adopting both this Code of Ethics and the Code of Conduct, the Company has recognized the vital importance to the Company of conducting its business subject to high ethical standards and in full compliance with all applicable laws and, even where not required by law, with integrity and honesty.

> * * *

> In all of their dealings on behalf of, or with, the Company, each Covered Officer must:

> a.    Engage in and promote honest and ethical conduct . . . ; [and]
> b.    Act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts . . . .

303.    These statements were materially false and misleading. Contrary to the statement that the Company's senior officers "must . . . [e]ngage in and promote honest and ethical conduct," the Company was pervaded with a culture of sexual harassment that reached to its highest levels.

304.    The Company included statements identical to those in above in subsequent Codes that it adopted on February 27, 2014, February 26, 2015, and March 3, 2016, and throughout the Class Period it published those statements on Signet's website and incorporated them into its SEC filings. The statements remained materially false and misleading for the reasons stated above.

**B.** **Materially False And Misleading Statements And Omissions Concerning The Third Quarter Fiscal 2014**

305.    On September 10, 2013, Defendants participated in a New York Investor Day (the "2013 Investor Conference"). During the 2013 Investor Conference, Defendants made false and misleading statements regarding Signet's credit portfolio. In response to an analyst question regarding factors pressuring Signet's margins, Defendant Ristau stated that

> [w]e have had some margin pressure as a result of our credit operation percentage of bad debt percentage, not because of any change in the quality of the portfolio or consumer behavioral changes. That has all been very, very strong and the portfolio continues to be very healthy. But just the simple size of the receivable growing. Due to the penetration growing our receivable grew last quarter by about 11.9%, which is higher than the growth rate of sales. So we did experience the bad debt percentage increasing as a percentage of sales slightly. But again, that is mostly driven by volume and growth in the receivable balance. So we think that all of the indicators are under good control and we look forward to get to the second half of the year having a good result.

306.    This statement was false and misleading. Contrary to the statement that the "quality of the portfolio" was "very, very strong and the portfolio continues to be very healthy," the portfolio contained several hundred million dollars' worth of high-risk subprime loans.

307.    Also during the 2013 Investor Conference, Defendant Ristau responded to an analyst question whether Defendants view Signet's credit portfolio as a "competitive advantage". In response, Defendant Ristau stated that

> We believe [the credit business] is a very competitive advantage of our business. We do run our own credit operation. We are very, very strong operators of that particular segment of our business, we have been at it for 40 or 50 years, we are best-in-class operators of running a private label credit operation. [The private label credit operation] is <u>very stringently controlled</u>, it is a very important part of our business particularly as it helps to facilitate the sale of bridal product.

Ristau further emphasized that the portfolio was "<u>very stringently managed</u>," stating that it "is a very important part of our business, <u>it is very well managed, it is very conservatively managed</u>.

- 107 -

From a credit granting perspective about 50% of the people who apply for credit are granted credit. So it is very stringently managed from a credit criteria perspective."

308.    These statements were false and misleading. Contrary to the statements that Signet was a "best-in-class operator[] of running a private label credit operation," and that the Company's credit program "is very stringently controlled," "very conservatively managed," and "very stringently managed," the Company engaged in extremely risky lending practices that generated several hundred million dollars' worth of high-risk subprime loans.

309.    Also during the 2013 Investor Conference, Defendant Barnes stated, regarding the credit business, that:

> we manage it so well. And we manage it for that consumer especially and we manage it to drive our sales. And the problem with outsourced credit is that the objectives don't necessarily line up with our objectives. [] [I]t really is a sales driving technique that we have and we have run it very well and we've proven ourselves through good times and bad on how we operate the credit facility that we do run. But we feel like it is a huge competitive strength for us and something that will continue to help drive our business going forward.

310.    Similarly, later on the conference call, Barnes stated that

> [w]e don't go out there, we don't push the credit, we don't change the way that we measure in terms of do you get credit, do you not get credit. We will never cross that line. But because of the fact that it is so well-managed we're still gaining a lot of traction, bringing in a lot of new customers."

311.    These statements were materially misleading. Contrary to the statements that Signet's credit operation was "so well managed," and that the Company did not "push credit," the Company engaged in extremely risky lending practices, including aggressively pushing credit on its customers, which generated several hundred million dollars' worth of high-risk subprime loans.

312.    On November 26, 2013, Signet issued a press release entitled "Signet Reports Third Quarter Financial Results" (the "Third Quarter 2014 Press Release"). That same day, the Company filed with the SEC a Form 8-K (the "Third Quarter 2014 Form 8-K"), which Defendant Ristau

signed, that included the press release as an exhibit. The Third Quarter 2014 Press Release and the Third Quarter 2014 Form 8-K reported net income of $33.6 million, operating income of $51.6 million, income before taxes of $50.7 million and diluted EPS of $0.42.

313.    The financial results set forth above were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 68%, its operating income was overstated by 68%, its income before taxes was overstated by 69% and its diluted EPS was overstated by 68%, as set forth above in Section VII.

314.    On November 26, 2013, Signet also filed with the SEC its Form 10-Q for the quarter ended November 2, 2013 (the "Third Quarter 2014 Form 10-Q"), which was signed by Defendant Ristau and Defendant Barnes. The Third Quarter 2014 Form 10-Q set forth the same financials stated in ¶312, above. The Third Quarter 2014 Form 10-Q also reported allowance for credit losses of $89.6 million, a 7.5% valuation allowance as a percentage of gross receivables, and $92.9 million of year-to-date net bad debt expense.

315.    These metrics were materially understated by the amounts and for the reasons set forth above in Section VII.

316.    At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the Third Quarter 2014 Form 10-Q, Signet made the following statement concerning the Actions in its "Commitments and contingencies" disclosure concerning legal proceedings:

> In March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ("Sterling"), a subsidiary of Signet, in the U.S. District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. . . . In June 2013, the Claimants filed their motion for class certification, disclosed their experts, and produced their expert reports. In

mid-October 2013, <u>Sterling filed its opposition to Claimants' class certification motion, its disclosure of its experts and their reports, as well as three motions to exclude the reports of Claimants' experts and a motion to strike Claimants' declarations and attorney summaries.</u> The Claimants' reply brief, any expert rebuttal submissions, as well as any motions relating thereto are due in mid-January 2014. Also due at that time are Claimants' responses to Sterling's motions to exclude and strike, and Sterling's replies thereto are due in early February 2014. . . . <u>Sterling has filed a motion requesting hearings (i.e., separate arguments) on its motions to exclude and strike.</u> Claimants filed their opposition to Sterling's motion on November 4, 2013 and Sterling's reply thereto was filed with the Arbitrator on November 11, 2013.

On September 23, 2008, the U.S. Equal Employment Opportunity Commission ("EEOC") filed a lawsuit against Sterling in the U.S. District Court for the Western District of New York. <u>The EEOC's lawsuit alleges that Sterling engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present.</u>

* * *

Sterling denies the allegations of both parties and has been defending these cases vigorously. At this point, no outcome or amount of loss is able to be estimated.

317.    This statement was materially false and misleading. It was materially false and misleading to represent that the Actions concerned merely "store-level employment practices" that were alleged to be "discriminatory as to compensation and promotional activities with respect to gender," when in fact the Actions had uncovered extensive evidence showing a pervasive culture of sexual harassment reaching up to the highest levels of the Company. It was also materially misleading because it failed to disclose the true degree of reputational and business risk that the Company was now facing as a result of the facts set forth in the Declarations. It was further materially false and misleading to omit disclosure of the facts asserted in the Declarations when Signet made disclosures concerning class certification briefing in discussing the *Jock* Arbitration.

318.    Also in the Third Quarter 2014 Form 10-Q , Signet stated that "There have been no material changes in our risk factors from those disclosed in Part I, Item 1A, of Signet's Fiscal 2013 Annual Report on Form 10-K, filed with the SEC on March 28, 2013."

319.    This statement incorporates by reference the statements discussed in ¶292 and ¶294. Those statements remained false and misleading for the reasons identified in ¶293 and ¶295.

### C.    Materially False And Misleading Statements And Omissions Concerning The Fourth Quarter And Full Fiscal Year 2014

320.    On January 9, 2014, Signet held a conference call with investors to discuss holiday sales results. In response to analyst questions regarding the credit penetration rate and credit approval rates for the holiday season, Defendant Ristau stated: "Penetration rates were good. They were up slightly. Our approval rate was consistent. So the credit program continues to function very well. [] We'll update you on that when we have the fourth quarter, but it was up slightly."

321.    This statement was materially false and misleading. Contrary to the statement that the "credit program continues to function very well," the Company's extremely risky lending to large numbers of subprime borrowers created a material risk to the Company.

322.    On March 27, 2014, Signet issued a press release entitled "Signet Reports Fourth Quarter and Fiscal 2014 Results" (the "Fourth Quarter 2014 Press Release"). On that same day, Signet filed with the SEC a Form 8-K (the "Fourth Quarter 2014 Form 8-K"), which Defendant Ristau signed, that attached the press release as an exhibit. In the Fourth Quarter 2014 Press Release and the Fourth Quarter 2014 Form 8-K, Signet reported fourth quarter diluted EPS of $2.18, net income of $175.2 million, operating income of $270.6 million, and income before taxes of $269.4 million.

323.    The financial results set forth above were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its fourth quarter net income was overstated by 11%, its operating income was overstated by 11%, its income before taxes was overstated by 11% and its diluted EPS was overstated by 11%, as set forth above in Section VII.

324.    For the full fiscal 2014 year, the Company reported diluted EPS of $4.56, net income of $368 million, operating income of $570.5 million, and income before taxes of $566.5 million.

325.    The financial results set forth above were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 5%, its operating income was overstated by 5%, its income before taxes was overstated by 5% and its diluted EPS was overstated by 5%, as set forth above in Section VII.

326.    The same day, Signet filed with the SEC its Form 10-K for the fiscal year ended February 1, 2014 (the "Fiscal 2014 Form 10-K"), which was signed by Defendant Barnes and Defendant Ristau. The Fiscal 2014 Form 10-K repeated many of the same financials stated in ¶322 and ¶324, above. The Fiscal 2014 Form 10-K also reported allowance for credit losses of $97.8 million, a 6.7% valuation allowance as a percentage of gross receivables, and year-to-date net bad debt expense of $138.3 million for the full fiscal year.

327.    These metrics were materially understated by the amounts and for the reasons set forth above in Section VII.

328.    The Fiscal 2014 Form 10-K—as well as Form 10-Ks filed through Fiscal Year 2016—provided that

The U.S. division:

- establishes credit policies that take into account the overall impact on the business. In particular, the U.S. division's objective is to facilitate the sale of jewelry and to collect the outstanding credit balance as quickly as possible, minimizing risk and enabling the customer to make additional jewelry purchases using the credit facility. In contrast, management believes that many financial institutions focus on earning interest by maximizing the outstanding credit balance[.]

329.    This statement was materially false and misleading. Contrary to the statement that the Company sought to "minimize risk" through its lending operation, in reality, Signet sought to

drive loan volume through the use of reckless underwriting practices, through which the Company generated several hundred million dollars' worth of high-risk subprime loans, thereby creating a material concentration of credit risk.

330.    The Fiscal 2014 Form 10-K—as well as all subsequent Form 10-Ks filed throughout the Class Period—further provided that

> Signet does not require collateral or other security to support cash investments or financial instruments with credit risk; however it is Signet's policy to only hold cash and cash equivalent investments and to transact financial instruments with financial institutions with a certain minimum credit rating. Management does not believe Signet is exposed to any significant concentrations of credit risk that arise from cash and cash equivalent investments, derivatives or accounts receivable.

331.    This statement was materially false and misleading. Contrary to the statement that "[m]anagement does not believe Signet is exposed to any significant concentrations of credit risk that arise from cash and cash equivalent investments, derivatives or accounts receivable," Signet's management knew or, at the very least recklessly disregarded, that the Company's accounts receivable had a "significant concentration of credit risk" in the form of several hundred million dollars' worth of high-risk subprime loans. Indeed, at the end of the Class Period, Signet stated that it was selling its loan portfolio precisely in order to "eliminate material credit risk from the balance sheet."

332.    Later on March 27, 2014, Signet held a conference call with investors to discuss fourth quarter 2014 and full year fiscal 2014 earnings (the "Fourth Quarter 2014 Conference Call"). During the call, Defendant Barnes repeated the financials stated in ¶322 and ¶324, above.

333.    During the Fourth Quarter 2014 Conference Call, Defendants also made additional false and misleading statements meant to persuade investors that Signer's credit portfolio was strong and profitable. Specifically, regarding Signet's credit portfolio, Defendant Ristau further stated that the portfolio "continued its strong performance."

334.   This statement was false and misleading. Contrary to Defendants' statements that the credit portfolio "continued its strong performance," the portfolio was rife with several hundred million dollars' worth of high-risk subprime loans.

335.   During the call, Defendants also responded to analyst questions about Signet's credit portfolio. Specifically, a Sterne Agee analyst asked Defendants how investors "should we be thinking about credit participation in 2014" and "receivable book growth as we model out 2014[.]" Defendant Ristau responded that

> the credit portfolio, as I indicated, continues to perform very strongly. We are very pleased with the overall performance of the portfolio. We have experienced last year some creeping increase in the participation and penetration rates because people just seem to like the program and the certainty of payments and they like to pay off their jewelry purchases quickly, which is what we always say is the benefit of our program. So I would expect that this year when you think about it that we will probably see some slow further increase in the penetration rate, nothing dramatic, but slow increase driven by our focus on bridal. Again, as you know, credit supports the bridal program very, very strongly and as high as 70% and maybe even a little higher as it keeps getting up there. So it is a very important part of supporting our bridal program, so that will drive it forward.
>
> And I think that the overall performance of the portfolio will remain stable, which I would describe as good to excellent. I mean it might get some creeping increase in the bad debt as a percentage of sales again due to growth in the overall portfolio. Last year on an annual basis the growth in the portfolio should be I would guess somewhat similar, maybe a touch lower, but similar is the way to model it is what I would choose to do. And if the business gets stronger, it might go up a little bit, which would be a good thing. If the business is relatively consistent with last year, it would be about the same growth rate. I think that is how you should think about it. But the performance of that portfolio is very, very strong.

336.   These statements were false and misleading. Contrary to the statement that the "performance of that portfolio is very, very strong" and "good to excellent," the portfolio contained several hundred million dollars' worth of high-risk subprime loans.

337.   At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the Fiscal 2014

Form 10-K, Signet made the following statement concerning the Actions in its "Commitments and contingencies" disclosure concerning legal proceedings:

> As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ("Sterling"), a subsidiary of Signet, in the U.S. District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. Discovery has been completed. The Claimants filed a motion for class certification and Sterling opposed the motion. A hearing on the class certification motion was held in late February 2014. The motion is now pending before the Arbitrator.
>
> Also as previously reported, on September 23, 2008, the U.S. Equal Employment Opportunity Commission ("EEOC") filed a lawsuit against Sterling in the U.S. District Court for the Western District of New York. The EEOC's lawsuit alleges that Sterling engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present.
>
> * * *
>
> Sterling denies the allegations of both parties and has been defending these cases vigorously. At this point, no outcome or amount of loss is able to be estimated.

338.   This statement was materially false and misleading. It was materially false and misleading to represent that the Actions concerned merely "store-level employment practices" that were alleged to be "discriminatory as to compensation and promotional activities with respect to gender," when in fact the Actions had uncovered extensive evidence showing a pervasive culture of sexual harassment reaching up to the highest levels of the Company. It was also materially misleading because it failed to disclose the true degree of reputational and business risk that the Company was now facing as a result of the facts set forth in the Declarations. It was further materially false and misleading to omit disclosure of the facts asserted in the Declarations when Signet made disclosures concerning class certification briefing in discussing the *Jock* Arbitration.

339.    Also in the Fiscal 2014 Form 10-K, Signet provided that it was exposed to the following risk factor (bold and italics in original):

> ***Loss of confidence by consumers in Signet's brand names, poor execution of marketing programs and reduced marketing expenditure could have a detrimental impact on sales.***
>
> Primary factors in determining customer buying decisions in the jewelry sector include customer confidence in the retailer and in the brands it sells, together with the level and quality of customer service. The ability to differentiate Signet's stores and merchandise from competitors by its branding, marketing and advertising programs is an important factor in attracting consumers. If these programs are poorly executed or the level of support for them is reduced, or the customer loses confidence in any of Signet's brands for whatever reason, it could unfavorably impact sales and earnings.

340.    This statement was materially false and misleading. It was materially false and misleading for Signet to represent that the risk of customers losing confidence in the Company's brands was merely hypothetical when Signet knew that it was, in fact, already facing a highly material risk that customers would lose confidence in its brands. Indeed, as set forth above, Signet knew that there was a pervasive culture of sexual harassment at the Company, and that this information was highly likely to become public.

341.    The Fiscal 2014 Form 10-K further provided that Signet was exposed to the following additional risk factor (bold and italics in original):

> ***Signet's success is dependent on the strength and effectiveness of its relationships with its various stakeholders whose behavior may be affected by its management of social, ethical and environmental risks.***
>
> Social, ethical and environmental matters influence Signet's reputation, demand for merchandise by consumers, the ability to recruit staff, relations with suppliers and standing in the financial markets. Signet's success is dependent on the strength and effectiveness of its relationships with its various stakeholders: customers, shareholders, employees and suppliers. In recent years, stakeholder expectations have increased and Signet's success and reputation will depend on its ability to meet these higher expectations.

342.     This statement was materially false and misleading. It was false and misleading for Signet to represent that that the behavior of stakeholders, including "employees," "may be affected by its management of social, ethical, and environmental risks," when this risk had already materialized, and Signet's "employees" already <u>had</u> been affected by the Company's pervasive culture of sexual harassment.

343.     In the Fiscal Year 2014 10-K, Signet also stated: "<u>Signet considers its relationship with its employees to be excellent.</u>"

344.     This statement was materially false and misleading. It was false and misleading to represent that Signet had an "excellent" relationship with its employees when in fact the Company had a pervasive culture of sexual harassment to which its female employees were subject.

### D.     <u>Materially False And Misleading Statements And Omissions Concerning The First Quarter Fiscal 2015</u>

345.     On May 22, 2014, Signet issued a press release entitled, "Signet Reports First Quarter Financial Results" (the "First Quarter 2015 Press Release"). On that same day, Signet filed with the SEC a Form 8-K (the "First Quarter 2015 Form 8-K"), which Defendant Ristau signed, that attached the press release as an exhibit. The First Quarter 2015 Press Release and the First Quarter 2015 Form 8-K reported diluted EPS of $1.20, as well as net income of $96.6 million, operating income of $150.7 million, and income before taxes of $148.9 million.

346.     The financial results set forth above were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 29%, its operating income was overstated by 29%, its income before taxes was overstated by 29% and its diluted EPS was overstated by 29%, as set forth above in Section VII.

347.     On June 3, 2014, Signet filed with the SEC its Form 10-Q for the quarter ended May 3, 2014 (the "First Quarter 2015 Form 10-Q"). The First Quarter 2015 Form 10-Q reported

the same financial results set forth above. The First Quarter 2015 Form 10-Q also reported allowance for credit losses of $87.8 million, a 6.4% valuation allowance of gross receivables, and year-to-date net bad debt expense of $22.3 million.

348.    These metrics were materially understated by the amounts and for the reasons set forth above in Section VII.

349.    Regarding the health of the Company's credit portfolio, the First Quarter 2015 Form 10-Q, and all subsequent Form 10-Qs filed throughout the Class Period, provided that "[m]anagement does not believe Signet is exposed to any significant concentrations of credit risk that arise from cash and cash equivalent investments, derivatives or accounts receivable."

350.    This statement was materially false and misleading. Contrary to the statements that "[m]anagement does not believe Signet is exposed to any significant concentrations of credit risk that arise from …. . accounts receivable," Signet's management knew or, at the very least recklessly disregarded, that the Company's accounts receivable had a "significant concentration of credit risk" in the form of several hundred million dollars' worth of high-risk subprime loans, as evidenced by Defendants' comments. Indeed, at the end of the Class Period, Signet stated that it was selling its loan portfolio precisely in order to "eliminate material credit risk" from the balance sheet.

351.    On May 22, 2014, Defendants held a conference call with investors to discuss first quarter fiscal 2015 results (the "First Quarter 2015 Conference Call"). During the First Quarter 2015 Conference Call, Defendant Ristau stated that that the "US net bad debt expense to US sales ratio was consistent with the prior first quarter at 2.5% with the <u>credit portfolio continuing to perform strongly.</u> 96.7% of the portfolio is classified as performing versus 96.3% as of last year's fiscal 2014 year-end."

352. This statement was materially misleading because the net bad debt expense cited by Ristau was materially understated, as set forth in Section VII. Further, contrary to the statement that the "credit portfolio continu[ed] to perform strongly," the portfolio contained several hundred million dollars' worth of high-risk subprime loans.

353. At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the First Quarter 2015 Form 10-Q, Signet made the following statement concerning the Actions in its "Commitments and contingencies" disclosure concerning legal proceedings:

> As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ("Sterling"), a subsidiary of Signet, in the U.S. District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. Discovery has been completed. The Claimants filed a motion for class certification and Sterling opposed the motion. A hearing on the class certification motion was held in late February 2014. The motion is now pending before the Arbitrator.
>
> Also as previously reported, on September 23, 2008, the U.S. Equal Employment Opportunity Commission ("EEOC") filed a lawsuit against Sterling in the U.S. District Court for the Western District of New York. The EEOC's lawsuit alleges that Sterling engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present.
>
> * * *
>
> Sterling denies the allegations of both parties and has been defending these cases vigorously. At this point, no outcome or amount of loss is able to be estimated.

354. This statement was materially false and misleading. It was materially false and misleading to represent that the Actions concerned merely "store-level employment practices" that were alleged to be "discriminatory as to compensation and promotional activities with respect to gender," when in fact the Actions had uncovered extensive evidence showing a pervasive culture

of sexual harassment reaching up to the highest levels of the Company. It was also materially misleading because it failed to disclose the true degree of reputational and business risk that the Company was now facing as a result of the facts set forth in the Declarations. It was further materially false and misleading to omit disclosure of the facts asserted in the Declarations when Signet made disclosures concerning class certification briefing in discussing the *Jock* Arbitration.

355.    The First Quarter 2015 Form 10-Q also provided, with respect to the relevant risk factors, that "[t]here have been no material changes in our risk factors from those disclosed in Part I, Item 1A, of Signet's Fiscal 2014 Annual Report on Form 10-K, filed with the SEC on March 27, 2014."

356.    This statement incorporates by reference the statements discussed in ¶339 and ¶341. Those statements remained false and misleading for the reasons identified in ¶340 and ¶342.

357.    On March 28, 2014, *The New York Times* published an article entitled "Women Charge Bias and Harassment in Suit Against Sterling Jewelers," in which it discussed, among other things, the *Jock* Arbitration and in the Redacted Class Certification Brief. The article quoted a Sterling spokesman as saying the following:

> As for the allegations of sexual harassment, Mr. Bouffard said that Sterling investigated and took action when employees raised concerns. He added that Sterling had disciplined employees who violated discrimination and harassment policies.
>
> * * *
>
> Without referring to any specific employee, David Bouffard, a spokesman for Sterling, said that some of the allegations "relate to personal, consensual relationships with individuals who have never raised a concern with the company, or involve situations that already have been thoroughly investigated and addressed."
>
> * * *
>
> "Fairness, equal opportunity and respect for our female employees — and all employees," [Bouffard] said, "is central to who we are."

358.    These statements were materially false and misleading. It was materially false and misleading to represent that Sterling "investigated and took action when employees raised concerns" and "had disciplined employees who violated discrimination and harassment policies," when in fact Sterling routinely failed to take action when female subordinates raised concerns about sexual harassment by male superiors. It was misleading to represent that the allegations "relate to personal, consensual relationships with individuals who have never raised a concern with the company, or involve situations that already have been thoroughly investigated and addressed," when in fact the overwhelming majority of allegations of sexual harassment in the Declarations concern open, nonconsensual harassment that was not adequately or meaningfully investigated or addressed by the Company. It was also false and misleading to represent that "Fairness, equal opportunity and respect for our female employees . . . is central to who we are," when in fact Signet was pervaded by a rampant culture of sexual harassment that disrespected and demeaned female employees.

### E.    Materially False And Misleading Statements And Omissions Concerning The Second Quarter Fiscal 2015

359.    On August 28, 2014, Signet issued a press release entitled, "Signet Jewelers Reports Second Quarter Financial Results" (the "Second Quarter 2015 Press Release"). On that same day, the Company filed with the SEC a Form 8-K (the "Second Quarter 2015 Form 8-K"), which Defendant Santana signed, that attached the press release as an exhibit. The Second Quarter 2015 Press Release and the Second Quarter 2015 Form 8-K reported diluted EPS of $0.72, down 14.3% due to one-time expenses from the Zale acquisition, and organic EPS of $1.00. The Company also reported net income of $58.0 million, operating income of $83.5 million, and income before taxes of $69.8 million.

360.    The financial results set forth above were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 40%, its operating income was overstated by 43%, its income before taxes was overstated by 51% and its diluted EPS was overstated by 40%, as set forth above Section VII.

361.    Thereafter, on September 10, 2014, Signet filed with the SEC its Form 10-Q for the quarter ended August 2, 2014 (the "Second Quarter 2015 Form 10-Q"), which was signed by Defendant Barnes and Defendant Santana. The Second Quarter 2015 Form 10-Q reported the same financials set forth in ¶359, above. The Second Quarter 2015 Form 10-Q also reported allowance for credit losses of $98.9 million, a 7% valuation allowance of gross receivables, and year-to-date net bad debt expense of $64.1 million.

362.    These metrics were materially understated by the amounts and for the reasons set forth above in Section VII.

363.    In the Second Quarter 2015 Press Release Defendants made additional misleading statements concerning Signet's credit portfolio. For instance, the press release provided that

> The net bad debt as a percentage of the division's total sales increased to 3.7% in year to date Fiscal 2015 compared to 3.6% in year to date Fiscal 2014, driven primarily by growth in the outstanding receivable balance from increased credit penetration. The portfolio continues to perform strongly as evidenced by the allowance for doubtful accounts as a percentage of ending accounts receivable decreasing 20 basis points from 7.2% as of August 3, 2013 to 7.0% as of August 2, 2014.

364.    These statements were materially misleading. It was materially misleading to state that the "portfolio continues to perform strongly," and to point to the purportedly low allowance figures as "evidence," when that allowance figure was materially understated, and the portfolio contained hundreds of millions of dollars' worth of high-risk subprime loans.

365.    On August 28, 2014, Defendants held a conference call with investors to discuss second quarter fiscal 2015 results (the "Second Quarter 2015 Conference Call"). During the

conference call Defendants made additional misleading statements regarding Signet's credit portfolio. Specifically, Defendant Santana noted the year-over-year increase in the credit penetration rate from 57.1% to 60%, and attributed this increase

> primarily to the credit decision engine improvements, higher outlet participation and strong guest acceptance of our credit offerings. We have recently invested in a new decision engine, which preserves credit requirements, but more accurately scores applications, which yields more qualified customers. . . . Operating improvements made to the decision engine have helped increase credit penetration without adversely affecting the net impact of bad debt.

366.    This statement was materially false and misleading. It was materially misleading to tout the new decision engine as yielding "more qualified customers" and increasing "credit penetration without adversely affecting the net impact of bad debt," when the Company's net bad debt figures were materially understated, and the Company was continuing to generate massive amounts of high-risk subprime loans.

367.    At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the Second Quarter 2015 Form 10-Q, Signet also made the following statement concerning the Actions in its "Commitments and contingencies" disclosure concerning legal proceedings:

> As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ("Sterling"), a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. Discovery has been completed. The Claimants filed a motion for class certification and Sterling opposed the motion. A hearing on the class certification motion was held in late February 2014. The motion is now pending before the Arbitrator.
>
> Also, as previously reported, on September 23, 2008, the US Equal Employment Opportunity Commission ("EEOC") filed a lawsuit against Sterling in the US District Court for the Western District of New York. The EEOC's lawsuit alleges that Sterling engaged in intentional and disparate impact gender discrimination with

respect to pay and promotions of female retail store employees from January 1, 2003 to the present.

* * *

Sterling denies the allegations of both parties and has been defending these cases vigorously. At this point, no outcome or amount of loss is able to be estimated.

368.    This statement was materially false and misleading. It was materially false and misleading to represent that the Actions concerned merely "store-level employment practices" that were alleged to be "discriminatory as to compensation and promotional activities with respect to gender," when in fact the Actions had uncovered extensive evidence showing a pervasive culture of sexual harassment reaching up to the highest levels of the Company. It was also materially misleading because it failed to disclose the true degree of reputational and business risk that the Company was now facing as a result of the facts set forth in the Declarations. It was further materially false and misleading to omit disclosure of the facts asserted in the Declarations when Signet made disclosures concerning class certification briefing in discussing the *Jock* Arbitration.

369.    Also in the Second Quarter 2015 Form 10-Q, Signet stated, with respect to the relevant risk factors, that "[t]here have been no material changes in our risk factors from those disclosed in Part I, Item 1A, of Signet's Fiscal 2014 Annual Report on Form 10-K, filed with the SEC on March 27, 2014."

370.    This statement incorporates by reference the statements discussed in ¶339 and ¶341. Those statements remained false and misleading for the reasons identified in ¶340 and ¶342.

### F.    Materially False And Misleading Statements And Omissions Concerning The Third Quarter Fiscal 2015

371.    On September 4, 2014, Signet participated in a Goldman Sachs Global Retailing Conference (the "Fiscal 2015 Retailing Conference"), during which analysts asked about the performance of the Company's credit book. Defendant Santana stated that

our credit portfolio continues to perform very strong. Our credit is a key enabler of our sales, and we really do view it as one of the competitive advantages we have. And the value that a credit customer brings to our Sterling Jewelers division is about 3.5 times that of a noncredit customer.

372.    This statement was materially misleading. Contrary to the statement that the "credit portfolio continues to perform very strong," the portfolio contained several hundred million dollars' worth of high-risk subprime loans.

373.    Also during the Fiscal 2015 Retailing Conference, Defendant Santana made misleading statements concerning operating changes the Company made to its credit decision mechanism, meant to assure investors that despite the increase in the credit penetration rate, the quality of Signet's borrowers remained strong. Santana specifically stated:

One of the investments we recently had made was in our decision engine, and we've really been seeing the return on that investment. And in our last call, we talked about our credit penetration rate had increased up to 62%, and that really is driven by the investments we've made on the front end. And our investment there maintains that credit quality that we absolutely have to be robust about. But, what it does is it's a little bit more in terms of how it scores the accuracy of scoring an applicant. So, we're pulling in more of these quality customers into our portfolio.

374.    This statement was materially misleading. Contrary to Defendants' statement that the investment made in the credit decision engine "maintains that credit quality that we absolutely have to be robust about," Signet sought to drive loan volume through the use of reckless underwriting practices, and issued huge amounts of loans to high-risk subprime borrowers. Contrary to Defendants' statement that the Company was "pulling in more of these quality customers into our portfolio," the number of high-risk subprime loans in Signet's portfolio remained enormous throughout the Class Period.

375.    During the Fiscal 2015 Retailing Conference, Santana also relied on the Company's misstated allowance for doubtful accounts to convince investors that Signet's credit portfolio was healthy, stating that

when we think about the performance of our credit portfolio, <u>if you actually look at our allowance as a percentage of our accounts receivable, we actually had an improvement there of about 20 basis points over last year. So, it continues to perform strong</u>, and I think there's great things to come from our credit portfolio.

376.    These statements were materially misleading. It was materially misleading to state that the "portfolio continues to perform strong," and to point to the purportedly low allowance figures as a credit quality indicator, when that allowance figure was materially understated and the portfolio contained hundreds of millions of dollars' worth of high-risk subprime loans.

377.    On November 25, 2014, Signet issued a press release entitled "Signet Jewelers Reports Third Quarter Fiscal 2015 Financial Results" (the "Third Quarter 2015 Press Release"). On that same day, the Company filed with the SEC a Form 8-K (the "Third Quarter 2015 Form 8-K"), signed by Defendant Santana, that attached the press release as an exhibit. The Third Quarter 2015 Press Release and the Third Quarter 2015 Form 8-K reported adjusted EPS of $0.21 and pre-adjusted loss per share of $0.02 due to transaction costs in relation to the Zale acquisition. The Company also reported a net loss of $1.3 million, operating income of $10.7 million, and a loss before taxes of $1.9 million.

378.    The results set forth above were materially misstated. Specifically, as a result of Signet's cumulative understatements of its reserve, its net loss was understated by 1780%, its operating income was overstated by 333%, its loss before taxes was understated by 1874% and its loss per share was understated by 1429%, as set forth above in Section VII.

379.    The Third Quarter 2015 Form 8-K also reported an allowance for credit losses as a percentage of ending accounts receivable as 7.4% for year-to-date fiscal 2015. This metric was materially understated for the reasons set forth above in Section VII.

380.    On December 8, 2014, the Company filed with the SEC its Form 10-Q for the period ending November 1, 2014 (the "Third Quarter 2015 Form 10-Q"), which was signed by

Defendant Santana. The Third Quarter 2015 Form 10-Q reported the same financial results set forth in ¶377, above. The Third Quarter 2015 Form 10-Q also reported an allowance for credit losses of $102.6 million, a 7.4% valuation allowance as a percentage of gross receivables for the quarter, and year-to-date net bad debt expense of $105.8 million.

381.     These metrics were materially understated by the amounts and for the reasons set forth above in Section VII.

382.     The Third Quarter 2015 Press Release and the Third Quarter 2015 Form 8-K contained additional misleading statements concerning the health of Signet's credit portfolio as related to its bad debt valuation allowance. For instance, in the Third Quarter 2015 Press Release, Defendants stated that the "portfolio performed strongly as evidenced by the allowance for doubtful accounts as a percentage of ending accounts receivable decreasing 10 basis points to 7.4% as of November 1, 2014 from 7.5% as of November 2, 2013."

383.     These statements were materially misleading. Like the statements Defendant Santana made earlier in the year at the Fiscal 2015 Retailing Conference, it was materially misleading to state that the "portfolio performed strongly," and to point to the purportedly low allowance figures as "evidence," when that allowance figure was materially understated, and the portfolio contained hundreds of millions of dollars' worth of high-risk subprime loans.

384.     At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the Third Quarter 2015 Form 10-Q, Signet also made the following statement concerning the Actions in its "Commitments and contingencies" disclosure concerning legal proceedings:

> As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ("SJI"), a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that <u>US store-level employment practices</u>

<u>are discriminatory as to compensation and promotional activities with respect to gender.</u> In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. Discovery has been completed. <u>The Claimants filed a motion for class certification and SJI opposed the motion.</u> A hearing on the class certification motion was held in late February 2014. The motion is now pending before the Arbitrator.

Also, as previously reported, on September 23, 2008, the US Equal Employment Opportunity Commission ("EEOC") filed a lawsuit against SJI in the US District Court for the Western District of New York. <u>The EEOC's lawsuit alleges that SJI engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present.</u>

* * *

SJI denies the allegations of both parties and has been defending these cases vigorously. At this point, no outcome or possible loss or range of losses, if any, arising from the litigation is able to be estimated.

385.    This statement was materially false and misleading. It was materially false and misleading to represent that the Actions concerned merely "store-level employment practices" that were alleged to be "discriminatory as to compensation and promotional activities with respect to gender," when in fact the Actions had uncovered extensive evidence showing a pervasive culture of sexual harassment reaching up to the highest levels of the Company. It was also materially misleading because it failed to disclose the true degree of reputational and business risk that the Company was now facing as a result of the facts set forth in the Declarations. It was further materially false and misleading to omit disclosure of the facts asserted in the Declarations when Signet made disclosures concerning class certification briefing in discussing the *Jock* Arbitration.

386.    Also in the Third Quarter 2015 Form 10-Q, Signet stated, with respect to the relevant risk factors, that "[t]here have been no material changes in our risk factors from those disclosed in Part I, Item 1A, of Signet's Fiscal 2014 Annual Report on Form 10-K, filed with the SEC on March 27, 2014."

387.    This statement incorporates by reference the statements discussed in ¶339 and ¶341. Those statements remained false and misleading for the reasons identified in ¶340 and ¶342.

### G.    Materially False And Misleading Statements And Omissions Concerning The Fourth Quarter And Full Fiscal Year 2015

388.    On March 26, 2015, Signet issued a press release entitled "Signet Jewelers Reports Excellent Fourth Quarter And Strong Fiscal 2015 Financial Results" (the "Fourth Quarter 2015 Press Release"). On that same day, Signet filed with the SEC a Form 8-K (the "Fourth Quarter 2015 Form 8-K"), which Defendant Santana signed, that attached the press release as an exhibit. In the Fourth Quarter 2015 Press Release and Fourth Quarter 2015 Form 8-K, the Company reported diluted EPS of $2.84, net income of $228.0 million, operating income of $331.7 million, and income before taxes of $323.8 million for the fourth quarter.

389.    The results set forth above were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its fourth quarter 2015 net income was overstated by 9%, its operating income was overstated by 11%, its income before taxes was overstated by 10% and its diluted EPS was overstated by 9%.

390.    For the full fiscal year, the Company reported diluted EPS of $4.75, net income of $381.3 million, operating income of $576.6 million, and income before taxes of $540.6 million.

391.    The results set forth above were materially misstated. Its full year net income was overstated by 5%, its operating income was overstated by 5%, its income before taxes was overstated by 6%, and its diluted EPS was overstated by 5%, as set forth above in Section VII.

392.    Also on March 26, 2015, Signet filed with the SEC its Form 10-K for the year ended January 31, 2015 (the "Fiscal 2015 Form 10-K"), which was signed by Defendant Light and Defendant Santana. The Fiscal 2015 Form 10-K reported allowance for credit losses of $113.1

million, a 6.8% valuation allowance as a percentage of receivables, and year-to-date net bad debt expense of $160.0 million.

393.     These metrics were materially understated by the amounts and for the reasons set forth above in Section VII.

394.     The same day, Defendants held a conference call with investors to discuss fourth quarter and full-year fiscal 2015 financials (the "Fourth Quarter 2015 Conference Call"). During the conference call, Defendants made additional misleading statements concerning Signet's credit portfolio. Specifically, Defendant Santana stated that

> Operating improvements made to our decision engine have helped increase credit penetration and profit without adversely affecting the net impact of our bad debt for the full year. Now on a quarterly basis the net impact of bad debt and interest income was about flat and that's due primarily to the timing of recoveries which have been realized in the first quarter of fiscal 2016. The portfolio continues to perform very strongly for us and that's evidenced by the allowance as a percentage of our ending accounts receivable finishing nearly flat to last year.

395.     These statements were materially misleading. It was materially misleading to state that the improvements made to the decision engine "helped increase credit penetration and profit without adversely affecting the net impact of our bad debt," when the Company's net bad debt figures were materially understated, and the Company was continuing to generate massive amounts of high-risk subprime loans.

396.     At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the Fiscal 2015 Form 10-K, Signet made the following statement concerning the Actions in its "Commitments and contingencies" disclosure concerning legal proceedings:

> As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ("SJI"), a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to

gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. The Claimants filed a motion for class certification and SJI opposed the motion.

* * *

Also, as previously reported, on September 23, 2008, the US Equal Employment Opportunity Commission ("EEOC") filed a lawsuit against SJI in the US District Court for the Western District of New York. The EEOC's lawsuit alleges that SJI engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present.

* * *

SJI denies the allegations of both parties and has been defending these cases vigorously. At this point, no outcome or possible loss or range of losses, if any, arising from the litigation is able to be estimated.

397.    This statement was materially false and misleading. It was materially false and misleading to represent that the Actions concerned merely "store-level employment practices" that were alleged to be "discriminatory as to compensation and promotional activities with respect to gender," when in fact the Actions had uncovered extensive evidence showing a pervasive culture of sexual harassment reaching up to the highest levels of the Company. It was also materially misleading because it failed to disclose the true degree of reputational and business risk that the Company was now facing as a result of the facts set forth in the Declarations. It was further materially false and misleading to omit disclosure of the facts asserted in the Declarations when Signet made disclosures concerning class certification briefing in discussing the *Jock* Arbitration.

398.    Also in the Fiscal 2015 Form 10-K, Signet provided that it was exposed to the following risk factor (bold and italics in original):

> ***Loss of confidence by consumers in Signet's brand names, poor execution of marketing programs and reduced marketing expenditure could have a detrimental impact on sales.***
>
> Primary factors in determining customer buying decisions in the jewelry sector include customer confidence in the retailer and in the brands it sells, together with

the level and quality of customer service. The ability to differentiate Signet's stores and merchandise from competitors by its branding, marketing and advertising programs is an important factor in attracting consumers. <u>If these programs are poorly executed or the level of support for them is reduced, or the customer loses confidence in any of Signet's brands for whatever reason, it could unfavorably impact sales and earnings.</u>

399.    This statement was materially false and misleading. It was materially false and misleading for Signet to represent that the risk of customers losing confidence in the Company's brands was merely hypothetical when Signet knew that it was, in fact, already facing a highly material risk that customers would lose confidence in its brands. Indeed, as set forth above, Signet knew that there was a pervasive culture of sexual harassment at the Company, and that this information was highly likely to become public.

400.    The Fiscal 2015 Form 10-K further provided that Signet was exposed to the following additional risk factor (bold and italics in original):

> ***Signet's success is dependent on the strength and effectiveness of its relationships with its various stakeholders whose behavior <u>may be affected by its management of social, ethical and environmental risks.</u>***
>
> <u>Social, ethical and environmental matters influence Signet's reputation, demand for merchandise by consumers, the ability to recruit staff,</u> relations with suppliers and standing in the financial markets. Signet's success is dependent on the strength and effectiveness of its relationships with its various stakeholders: customers, shareholders, employees and suppliers. In recent years, stakeholder expectations have increased and Signet's success and reputation will depend on its ability to meet these higher expectations.

401.    This statement was materially false and misleading. It was false and misleading for Signet to represent that that the behavior of stakeholders, including "employees," "may be affected by its management of social, ethical, and environmental risks," when this risk had already materialized, and Signet's "employees" already <u>had</u> been affected by the Company's pervasive culture of sexual harassment.

402.    In the Fiscal Year 2015 10-K, Signet also stated: "<u>Signet considers its relationship with its employees to be excellent.</u>"

403.    This statement was materially false and misleading. It was false and misleading to represent that Signet had an "excellent" relationship with its employees when in fact the Company had a pervasive culture of sexual harassment to which its female employees were subject.

**H.    Materially False And Misleading Statements And Omissions Concerning The First Quarter Fiscal 2016**

404.    On May 28, 2015, Signet issued a press release entitled "Signet Jewelers Reports Strong First Quarter Financial Results" (the "First Quarter 2016 Press Release"). On the same day the Company filed with the SEC a Form 8-K (the "First Quarter 2016 Form 8-K"), which Defendant Santana signed, that attached the press release as an exhibit. The First Quarter 2016 Press Release and the First Quarter 2016 Form 8-K reported diluted EPS of $1.48, net income of $118.8 million, operating income of $176.2 million, and income before taxes of $165.2 million.

405.    The results set forth above were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 26%, its operating income was overstated by 27%, it income before taxes was overstated by 28% and its diluted EPS was overstated by 26%, as set forth above in Section VII.

406.    On June 3, 2015, Signet filed with the SEC its Form 10-Q for the quarter ended May 2, 2015 (the "First Quarter 2016 Form 10-Q"), which was signed by Defendant Light and Defendant Santana. The First Quarter 2016 Form 10-Q reported the same misstated financial results set forth in ¶404, above. The First Quarter 2016 Form 10-Q also reported allowance for credit losses of $103.3 million, a 6.5% valuation allowance as a percentage of gross receivables, and year-to-date net bad debt expense of $28.1 million.

407.    These metrics were materially understated by the amounts and for the reasons set forth above in Section VII.

408.    Later on May 28, 2015, Defendants held a conference call with investors to discuss first quarter fiscal 2016 financials (the "First Quarter 2016 Conference Call"). During the call, Defendants repeated the financials set forth in the First Quarter 2016 Press Release, and made additional misleading statements concerning Signet's credit portfolio.

409.    Specifically, Defendant Santana again relied on the Company's valuation allowance to represent to investors that the Company's credit portfolio was performing well:

> Net bad debt expense for the quarter was $28.1 Million compared to $22.3, last year, an increase in $5.8 Million. And that was driven primarily by the growth in receivables balance from increased penetration and change in the credit program mix. Other operating income was $63.5 Million compared to $54m last year. This was an increase of $9.5 Million and is due primarily to more interest income on the higher outstanding receivables as well as the shift away from interest-free programs. So the net impact of these two items was income of $35.4 Million compared to $31.7 Million in the prior year or an increase of $3.7 Million. <u>Our portfolio continues to perform well as evidenced by the net impact of bad debt and other operating income as well as the allowance as a percentage of accounts receivable being fairly consistent.</u>

410.    This statement was materially false and misleading. It was materially misleading to state that the "portfolio continues to perform well," and to point to the purportedly low net bad debt and allowance figures as "evidence," when those figures were materially understated, and the Company's extremely risky lending to subprime borrowers had created a material risk to the Company.

411.    At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the First Quarter 2016 Form 10-Q, Signet also made the following statement concerning the Actions in its "Commitments and contingencies" disclosure concerning legal proceedings:

As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against SJI, a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that <u>US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender.</u> In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. <u>The Claimants filed a motion for class certification and SJI opposed the motion.</u>

\* \* \*

Also, as previously reported, on September 23, 2008, the US Equal Employment Opportunity Commission ("EEOC") filed a lawsuit against SJI in the US District Court for the Western District of New York. <u>The EEOC's lawsuit alleges that SJI engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present.</u>

\* \* \*

SJI denies the allegations of the Claimants and EEOC and has been defending these cases vigorously. At this point, no outcome or possible loss or range of losses, if any, arising from the litigation is able to be estimated.

412.    This statement was materially false and misleading. It was materially false and misleading to represent that the Actions concerned merely "store-level employment practices" that were alleged to be "discriminatory as to compensation and promotional activities with respect to gender," when in fact the Actions had uncovered extensive evidence showing a pervasive culture of sexual harassment reaching up to the highest levels of the Company. It was also materially misleading because it failed to disclose the true degree of reputational and business risk that the Company was now facing as a result of the facts set forth in the Declarations. It was further materially false and misleading to omit disclosure of the facts asserted in the Declarations when Signet made disclosures concerning class certification briefing in discussing the *Jock* Arbitration.

413.    Also in the same filing, Signet stated that "[t]here have been no material changes in our risk factors from those disclosed in Part I, Item 1A, of Signet's Fiscal 2015 Annual Report on Form 10-K, filed with the SEC on March 26, 2015."

414.    This statement incorporates by reference the statements discussed in ¶398 and ¶400. Those statements remained false and misleading for the reasons identified in ¶399 and ¶401.

**I.    Materially False And Misleading Statements And Omissions Concerning The Second Quarter Fiscal 2016**

415.    On August 27, 2015, Signet issued a press release entitled "Signet Jewelers Reports Second Quarter Financial Results" (the "Second Quarter 2016 Press Release"). That same day, Signet filed with the SEC a Form 8-K (the "Second Quarter 2016 Form 8-K"), signed by Defendant Santana, that included the press release as an exhibit. The Second Quarter 2016 Press Release and Second Quarter 2016 Form 8-K reported diluted EPS of $0.78, exceeding guidance for the quarter. The Company also reported pre-tax income of $89.7 million, net income of $62.2 million, and operating income of $100.8 million.

416.    The results set forth above were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 42%, its operating income was overstated by 40%, its income before taxes was overstated by 45% and its diluted EPS was overstated by 42%, as set forth above in Section VII.

417.    On September 3, 2015, the Company filed with the SEC its Form 10-Q for the quarter ended August 1, 2015 ("Second Quarter 2016 Form 10-Q"), which was signed by Defendant Light and Defendant Santana. The Second Quarter 2016 Form 10-Q reported the same financial results set forth in ¶415, above. The Second Quarter 2016 Form 10-Q also contained reported allowance for credit losses of $116.0 million, a 7.3% valuation allowance as a percentage of gross receivables, and year-to-date net bad debt expense of $77.5 million.

418.    These metrics were materially understated by the amounts and for the reasons set forth above in Section VII.

419.    On August 27, 2015, the Company held a conference call with investors to discuss its fiscal 2016 second quarter results (the "Second Quarter 2016 Conference Call"). On that call, Defendant Santana made misleading statements designed to ensure investors that the credit quality of the Company's consumer loan portfolio was strong and healthy.

420.    For instance, Defendant Santana made false and misleading statements regarding the Company's allowance for doubtful accounts as a percentage of accounts receivable:

> The allowance as a percentage of AR of 7.3% increased over last year due to timing. That is, in Q2 last year accounts receivable grew due to the credit decision engine introduction; but the bad debt that would come with any AR growth lagged. So this created an unusually low percentage last year, which we are now lapping.

421.    This statement was false and misleading. It was false to state that the Company's prior allowance was "unusually low" when it was, in fact, materially understated.

422.    At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the Second Quarter 2016 Form 10-Q, Signet also made the following statement concerning the Actions in its "Commitments and contingencies" disclosure concerning legal proceedings:

> As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against SJI, a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. The Claimants filed a motion for class certification and SJI opposed the motion.
>
> * * *
>
> Also, as previously reported, on September 23, 2008, the US Equal Employment Opportunity Commission ("EEOC") filed a lawsuit against SJI in the US District Court for the Western District of New York. The EEOC's lawsuit alleges that SJI engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present.

* * *

SJI denies the allegations of the Claimants and EEOC and has been defending these cases vigorously. At this point, no outcome or possible loss or range of losses, if any, arising from the litigation is able to be estimated.

423.    This statement was materially false and misleading. It was materially false and misleading to represent that the Actions concerned merely "store-level employment practices" that were alleged to be "discriminatory as to compensation and promotional activities with respect to gender," when in fact the Actions had uncovered extensive evidence showing a pervasive culture of sexual harassment reaching up to the highest levels of the Company. It was also materially misleading because it failed to disclose the true degree of reputational and business risk that the Company was now facing as a result of the facts set forth in the Declarations. It was further materially false and misleading to omit disclosure of the facts asserted in the Declarations when Signet made disclosures concerning class certification briefing in discussing the *Jock* Arbitration.

424.    Also in the Second Quarter 2016 Form 10-Q, Signet stated that "[t]here have been no material changes in our risk factors from those disclosed in Part I, Item 1A, of Signet's Fiscal 2015 Annual Report on Form 10-K, filed with the SEC on March 26, 2015."

425.    This statement incorporates by reference the statements discussed in ¶398 and ¶400. Those statements remained false and misleading for the reasons identified in ¶399 and ¶401.

**J.    Materially False And Misleading Statements And Omissions Concerning The Third Quarter Fiscal 2016**

426.    On November 24, 2015, Signet issued a press release entitled "Signet Jewelers Reports Third Quarter Financial Results" ("Third Quarter 2016 Press Release"). That same day, Signet filed with the SEC a Form 8-K ("Third Quarter 2016 Form 8-K"), which Defendant Santana signed, that included the press release as an exhibit. The Third Quarter 2015 Press Release and the Third Quarter 2015 Form 8-K reported diluted EPS of $0.19. The Company also reported net

income of $15 million, operating income of $33.6 million, and income before taxes of $21.9 million.

427.   The financial results set forth above were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 186%, its operating income was overstated by 128%, its income before taxes was overstated by 196% and its diluted EPS was overstated by 186%, as set forth above in Section VII.

428.   Thereafter, on December 4, 2015, Signet filed with the SEC its Form 10-Q for the quarter ending October 31, 2015 ("Third Quarter 2016 Form 10-Q"), which was signed by Defendant Light and Defendant Santana. The Third Quarter 2016 Form 10-Q reported the same financial results set forth in ¶426, above. The Third Quarter 2016 Form 10-Q also reported allowance for credit losses of $122.2 million, a 7.8% valuation allowance as a percentage of gross receivables, and year-to-date net bad debt expense of $130.6 million.

429.   These metrics were materially understated by the amounts and for the reasons set forth above in Section VII.

430.   On November 24, 2015, Defendants held a conference call with investors to discuss third quarter fiscal 2016 results ("Third Quarter 2016 Conference Call"). Defendants repeated the results in the Third Quarter 2015 Press Release and the Third Quarter 2015 Form 8-K. On the call, Defendant Santana addressed Signet's credit portfolio and made misleading statements meant to quell market concern:

> Our credit approval standards remain disciplined and unchanged. The higher participation rate was primarily driven by a greater increase of Kay customers compared to our Jared customers. The average monthly collection rate was 11.7% compared to 12.1% due to two main reasons. First, as our mix or bridal increases due to our best in bridal strategy this creates a higher average receivable. By design the repayment rate is lower as the price point of the merchandise increases. Bridal has a higher average credit sale and therefore the repayment is longer, so this leaves a higher outstanding receivable to be collected. And second, like other consumer

loans more principle is paid off later in the life of the loan. So as our credit portfolio has grown more in the last year proportionally more of it will be paid later. [] <u>Importantly Signet has not changed its credit standards and our credit portfolio continues to perform well and profitably.</u>

Santana again stated later during the call that

[n]o changes have been made in our credit standards and the bottom line is that small changes had a more pronounced impact in the third quarter as the third quarter is our smallest quarter but our credit earnings are earned more evenly throughout the year. [] <u>We remain highly disciplined in our approval process and as a result our credit portfolio continues to be profitable and stable.</u>

431.    These statements were materially false and misleading. Contrary to Defendants' statements that the Company's "credit approval standards remain disciplined and unchanged" and that Defendants "remain highly disciplined in our approval process," the Company sought to drive loan volume through the use of reckless underwriting practices. Further, contrary to Defendants' statements that the credit portfolio "continues to perform well and profitably," and "continues to be profitable and stable," the Company's reckless lending generated several hundred million dollars' worth of high-risk subprime loans that posed a material risk to Signet.

432.    At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the Third Quarter 2016 Form 10-Q, Signet also made the following statement concerning the Actions in its "Commitments and contingencies" disclosure concerning legal proceedings:

As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against SJI, a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that <u>US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender.</u> In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. <u>The Claimants filed a motion for class certification and SJI opposed the motion.</u>

* * *

Also, as previously reported, on September 23, 2008, the US Equal Employment Opportunity Commission ("EEOC") filed a lawsuit against SJI in the US District Court for the Western District of New York. The EEOC's lawsuit alleges that SJI engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present.

\* \* \*

SJI denies the allegations of the Claimants and EEOC and has been defending these cases vigorously. At this point, no outcome or possible loss or range of losses, if any, arising from the litigation is able to be estimated.

433.   This statement was materially false and misleading. It was materially false and misleading to represent that the Actions concerned merely "store-level employment practices" that were alleged to be "discriminatory as to compensation and promotional activities with respect to gender," when in fact the Actions had uncovered extensive evidence showing a pervasive culture of sexual harassment reaching up to the highest levels of the Company. It was also materially misleading because it failed to disclose the true degree of reputational and business risk that the Company was now facing as a result of the facts set forth in the Declarations. It was further materially false and misleading to omit disclosure of the facts asserted in the Declarations when Signet made disclosures concerning class certification briefing in discussing the *Jock* Arbitration.

434.   Also in the Third Quarter 2016 Form 10-Q, Signet stated that "[t]here have been no material changes in our risk factors from those disclosed in Part I, Item 1A, of Signet's Fiscal 2015 Annual Report on Form 10-K, filed with the SEC on March 26, 2015."

435.   This statement incorporates by reference the statements discussed in ¶398 and ¶400. Those statements remained false and misleading for the reasons identified in ¶399 and ¶401.

**K.**    **Materially False And Misleading Statements And Omissions Concerning The Fourth Quarter And Full Fiscal Year 2016**

436.    On January 7, 2016, Defendants held a conference call with investors to discuss holiday results (the "Fiscal 2016 Holiday Conference Call"). Early in the call, Defendant Santana addressed Signet's credit operation, stating that

> [i]n-house credit has long been an important element of Signet's success and we are very proud of the significant sales and earnings the program has delivered in its 30-plus year history. Our credit program offers a competitive advantage for the company."

She then again stated that the Company's credit portfolio is "profitable and the performance in Q4 is very much in line with our expectations."

437.    These statements were materially false and misleading. It was materially false and misleading to state that the portfolio was "profitable" when the portfolio contained hundreds of millions of dollars' worth of high-risk subprime loans with substantial unrecognized losses.

438.    Also during the Fiscal 2016 Holiday Conference Call, Defendant Santana made misleading statements meant to address market skepticism surrounding the Company's credit metrics for the third quarter of fiscal 2016. In response to an analyst question about the possibility of outsourcing the credit business Santana stated that the "modest mix shift that we saw in Q3" that this

> was really magnified . . . given the small size of the quarter in Q3 which was only about 5% of our annual operating income. And that we had mentioned in Q4 the effect of that would be immaterial all of which was factored into our guidance at that point and continues to be factored into our guidance. The credit portfolio as I mentioned is performing exactly very much so in line with our expectations. We're very pleased with the performance. Early on the initiatives that we put forth to favorably influence that mix seem to be working in the right direction and again I just go back to our credit portfolio remains extremely profitable.

439.    These statements were materially misleading. Contrary to statements that the credit portfolio "is performing exactly very much so in line with our expectations," and that the "portfolio

remains extremely profitable," the portfolio contained several hundred million dollars' worth of high-risk subprime loans with significant undisclosed losses.

440.    In addition to Defendant Santana's misleading statements regarding the health of Signet's credit portfolio, Defendant Light made statements meant to quell investor concern. Specifically, Defendant Light stated that

> I just wanted to reinforce something that Michele said and I think it's very important that everybody understands this. We've been running a credit portfolio for well over 30 years, well over 30 years and we've been through good times and bad times with the recession and we've been able to manage our accounts receivable appropriately and arguably better than most during all times within the last 30-plus years.
>
> So this credit as Michele said there's modest shifts going on but there's nothing that's unprecedented for us. So we have every confidence in the way we manage our credit portfolio. I just want to reinforce that because there seems to be some concerns about our credit portfolio, and the profitability of our credit portfolio. I just want to reinforce that because there seems to be some concerns about our credit portfolio and we just think it's unwarranted quite frankly[.]"

441.    These statements were materially misleading. Contrary to the assurance that any "concerns about our credit portfolio" were "unwarranted," Signet had generated huge amounts of subprime loans that posed a material risk to the Company.

442.    Similarly, Santana added that, "so, I really hope with the comments that we mentioned today that it does help to put this credit discussion to minimize it where it should be." It was materially false and misleading for Santana to "minimize" concern over the credit portfolio because Signet had generated huge amounts of subprime loans that posed a material risk to the Company.

443.    On February 29, 2016, Signet issued a press release entitled "Signet Jewelers Announces Strong Fourth Quarter Preliminary Results" ("Preliminary Fourth Quarter 2016 Press Release"). On the same day, Signet filed with the SEC a Form 8-K ("Preliminary Fourth Quarter

2016 Form 8-K"), which was signed by Defendant Santana and attached the Preliminary Fourth Quarter 2016 Press Release as an exhibit. The Preliminary Fourth Quarter 2016 Press Release and Preliminary Fourth Quarter 2016 Form 8-K reported EPS of $3.42. The Preliminary Fourth Quarter 2016 Press Release and Preliminary Fourth Quarter 2016 Form 8-K also reported allowance for credit losses as 7.0% of gross receivables and a fourth quarter bad debt expense of $60 million.

444.    Signet's fourth quarter EPS was materially misleading because it was overstated by 10% as a result of Signet's understatements of its reserves. Further, Signet's allowance for credit losses and bad debt expense were materially understated for the reasons set forth above in Section VII.

445.    Thereafter, on March 24, 2016, Signet issued a press release entitled "Signet Jewelers Reports Excellent Fourth Quarter and Fiscal 2016 Financial Results" ("Fourth Quarter 2016 Press Release"). On the same day, Signet filed with the SEC a Form 8-K ("Fourth Quarter 2016 Form 8-K"), which was signed by Defendant Santana and attached the press release as an exhibit. The Fourth Quarter 2016 Press Release and the Fourth Quarter 2016 Form 8-K reported diluted EPS of $3.42, net income of $271.9 million, operating income of $393.1 million, and income before taxes of $381.0 million for the fourth quarter. The Company also reported allowance for credit losses of $130 million, a 7% valuation allowance as a percentage of gross receivables, and year-to-date net bad debt expense of $190.5 million.

446.    These results were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 10%, its operating incoming was overstated by 11%, its income before taxes was overstated by 11% and its diluted EPS was overstated by 10%, as set forth above at ¶444. Further, as set forth above in Section VII, the Company's allowance for credit losses and bad debt expense were materially understated.

447.   For the full fiscal 2016 year, the Fourth Quarter 2016 Press Release and the Fourth Quarter 2016 Form 8-K also reported net income of $467.9 million, operating income of $703.7 million, income before taxes of $657.8 million, and diluted EPS of $5.87. For the full fiscal year, the Company reported net bad debt expense of $190.5 million.

448.   These results were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 6%, its operating incoming was overstated by 6%, its income before taxes was overstated by 7% and its diluted EPS was overstated by 6%, as set forth above in Section VII. Further, as set forth above in Section VII, the Company's net bad debt expense was materially understated.

449.   Also on March 24, 2016, Signet filed with the SEC its Form 10-K for the fiscal year ended January 30, 2016 ("Fiscal 2016 Form 10-K"), which was signed by Defendant Light and Defendant Santana. The Fiscal 2016 Form 10-K repeated many of the same financial results stated above in ¶445 and ¶447.

450.   The Fourth Quarter 2016 Press Release contained additional false and misleading statements regarding the Company's credit portfolio. Specifically, Defendant Santana is quoted as saying:

> Our consistency in underwriting is informed by our deep history of borrower behavior data which provides insights into payment patterns where customers have an emotional connection with their jewelry purchases. This provides us with a unique ability to underwrite effectively, capture incremental profitable sales, and develop lifetime customer relationships. [] We continue to be confident in our credit portfolio performance and the competitive advantages associated with our in-house program.

451.   It was materially misleading to tout the Company's "unique ability to underwrite effectively" when, in truth, Signet had engaged in reckless underwriting, thus generated hundreds of millions of dollars' worth of high-risk subprime loans.

452.    The Fourth Quarter 2016 Press Release further quotes Santana as defending the

Company's use of the recency aging method, specifically that its

> use of the recency aging method optimizes collections and is aligned with our
> lending terms which require a qualifying payment defined as at least 75% of the
> scheduled monthly minimum payment and increases with delinquency level. It is
> important to understand that regardless of aging method, the balance sheet and
> income statement will yield the same result under US GAAP, as receivables must
> be stated at the net realizable value.

453.    These statements are materially false and misleading. It was false and misleading

to represent that Signet's financial performance would not be affected by the proper application of

GAAP, because Signet's financial statements were materially misstated in violation of GAAP.

454.    On March 24, 2016, Defendants held a conference call with investors to discuss

these results (the "Fourth Quarter 2016 Conference Call"). Santana stated that the Company's

"underwriting standards are proven and have been consistent over a long period of time. This

consistency in our underwriting also is demonstrated in our weighed average FICO score for the

portfolio. For FY16, our weighted average FICO was 662 and has been in the mid-660s for

numerous years. The FICO scores of the new customers in our portfolio in FY 16 at 684 was higher

than the average for the total portfolio."

455.    These statements were materially misleading. It was materially misleading to tout

the supposed proven and consistent nature of Signet's underwriting and the prime FICO scores of

its customers, when the Company's underwriting was reckless, and the portfolio contained

hundreds of millions of dollars' worth of high-risk subprime loans.

456.    Defendant Santana stated that

> regardless of aging method used over one's portfolio, the balance sheet and income
> statement will yield the same result, as under US GAAP receivables must be stated
> at the net realizable value. The net charge-off to the balance sheet and the net bad
> debt expense in the P&L would be the same under both recency and contractual
> aging. There is no difference between the two when it comes to our financial
> statements.

457.    These statements were materially misleading. It was false and misleading to represent that Signet's financial performance would not be affected by the proper application of GAAP, because Signet's financial statements were materially misstated in violation of GAAP

458.    At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In Fiscal 2016 Form 10-K, Signet also made the following statement concerning the Actions in its "Commitments and contingencies" disclosure concerning legal proceedings:

> As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against SJI, a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. The Claimants filed a motion for class certification and SJI opposed the motion.
>
> * * *
>
> Also, as previously reported, on September 23, 2008, the US Equal Employment Opportunity Commission ("EEOC") filed a lawsuit against SJI in the US District Court for the Western District of New York. The EEOC's lawsuit alleges that SJI engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present.
>
> * * *
>
> SJI denies the allegations of the Claimants and EEOC and has been defending these cases vigorously. At this point, no outcome or possible loss or range of losses, if any, arising from the litigation is able to be estimated.

459.    This statement was materially false and misleading. It was materially false and misleading to represent that the Actions concerned merely "store-level employment practices" that were alleged to be "discriminatory as to compensation and promotional activities with respect to gender," when in fact the Actions had uncovered extensive evidence showing a pervasive culture

of sexual harassment reaching up to the highest levels of the Company. It was also materially misleading because it failed to disclose the true degree of reputational and business risk that the Company was now facing as a result of the facts set forth in the Declarations. It was further materially false and misleading to omit disclosure of the facts asserted in the Declarations when Signet made disclosures concerning class certification briefing in discussing the *Jock* Arbitration.

460.    Also in the Fiscal 2016 Form 10-K, Signet provided that it was exposed to the following risk factor (bold and italics in original):

> ***Loss of confidence by consumers in Signet's brand names, poor execution of marketing programs and reduced marketing expenditure could have a detrimental impact on sales.***
>
> Primary factors in determining customer buying decisions in the jewelry sector include customer confidence in the retailer and in the brands it sells, together with the level and quality of customer service. The ability to differentiate Signet's stores and merchandise from competitors by its branding, marketing and advertising programs is an important factor in attracting consumers. If these programs are poorly executed, the level of support for them is reduced, or the customer loses confidence in any of Signet's brands for whatever reason, it could unfavorably impact sales and earnings.

461.    This statement was materially false and misleading. It was materially false and misleading for Signet to represent that the risk of customers losing confidence in the Company's brands was merely hypothetical when Signet knew that it was, in fact, already facing a highly material risk that customers would lose confidence in its brands. Indeed, as set forth above, Signet knew that there was a pervasive culture of sexual harassment at the Company, and that this information was highly likely to become public.

462.    The Fiscal 2016 Form 10-K further provided that Signet was exposed to the following additional risk factor (bold and italics in original):

> ***Signet's success is dependent on the strength and effectiveness of its relationships with its various stakeholders whose behavior may be affected by its management of social, ethical and environmental risks.***

<u>Social, ethical and environmental matters influence Signet's reputation, demand for merchandise by consumers, the ability to recruit staff,</u> relations with suppliers and standing in the financial markets. Signet's success is dependent on the strength and effectiveness of its relationships with its various stakeholders: customers, shareholders, employees and suppliers. In recent years, stakeholder expectations have increased and Signet's success and reputation will depend on its ability to meet these higher expectations. Signet's success also depends upon its reputation for integrity in sourcing its merchandise, which, if adversely affected could impact consumer sentiment and willingness to purchase Signet's merchandise.

463.     This statement was materially false and misleading. It was false and misleading for Signet to represent that that the behavior of stakeholders, including "employees," "may be affected by its management of social, ethical, and environmental risks," when this risk had already materialized, and Signet's "employees" already <u>had</u> been affected by the Company's pervasive culture of sexual harassment**.**

464.     In the Fiscal Year 2016 10-K, Signet also stated: "<u>Signet considers its relationship with its employees to be excellent.</u>"

465.     This statement was materially false and misleading. It was false and misleading to represent that Signet had an "excellent" relationship with its employees when in fact the Company had a pervasive culture of sexual harassment to which its female employees were subject.

L.     **<u>Materially False And Misleading Statements And Omissions Concerning The First Quarter Fiscal 2017</u>**

466.     On May 26, 2016, Signet issued a press release titled, "Signet Jewelers Reports Record First Quarter Earnings" ("First Quarter 2017 Press Release"). On the same day, Signet filed with the SEC a Form 8-K ("First Quarter 2017 Form 8-K"), signed by Defendant Santana, which attached the press release as an exhibit. The First Quarter 2017 Press Release and the First Quarter 2017 Form 8-K reported net income of $146.8 million, operating income of $212 million, income before taxes of $200.2 million, and diluted EPS of $1.87.

467.     These financial metrics were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 29%, its operating income was overstated by 31%, its income before taxes was overstated by 33% and its diluted EPS was overstated by 29%, as set forth above in Section VII.

468.     On June 3, 2016, Signet filed with the SEC its Form 10-Q for the quarter ended April 30, 2016 ("First Quarter 2017 Form 10-Q"), which was signed by Defendant Light and Defendant Santana. The First Quarter 2017 Form 10-Q repeated the financials stated in ¶466, above. The First Quarter 2017 Form 10-Q also reported allowance for credit losses of $116.8 million, a 6.6% valuation allowance as a percentage of gross receivables, and year-to-date net bad debt expense of $33.6 million.

469.     These metrics were materially understated by the amounts and for the reasons set forth above in Section VII.

470.     On May 26, 2016, Defendants held a conference call with investors to discuss first quarter fiscal 2017 earnings (the "First Quarter 2017 Conference Call"). During the First Quarter 2017 Conference Call, Defendants responded to analyst questions about outsourcing their credit portfolio. Defendant Light stated

> Our credit metrics in our credit portfolio are strong. As we said our credit metrics are improving sequentially and within our expectations and all we fought for and involved in our earnings guidance both on a quarterly basis and on an annual basis. So our credit metrics are strong. [] [T]he reason why we're doing this credit project, your point is, yes, we have had some good experience with ADS. We've had a full quarter now under our belt where ADS has been managing our entire credit portfolio for Zales from January through now, we're having some good experiences and we're learning more. [] [W]e're an evolving company. We're always looking for ways to better improve our business part of our business. That being said, we always feel there's ways of us getting smarter and understanding more about our business and we've also seen other major retailers out there, and I'm sure a lot of you know of them, that have carried internal receivables and have sold their receivables and have done work with receivables of recent and we've just understand [sic] there's an evolution going on and we want to make sure that we're

on top of it. [] Credit is no different. We've done major credit analysis in the past. So as we mentioned, as I mentioned in our remarks, possible outcomes could be outsourcing of all of our credit functions, possible outcomes could be some in-housing of our credit functions, some would be outsourced.

471.   These statements were materially misleading. Contrary to the statements that the "credit metrics in our credit portfolio are strong," as a result of Defendants' reckless lending practices the portfolio contained several hundred million dollars' worth of high-risk subprime loans that posed a material risk to Signet.

472.   During the First Quarter 2017 Conference Call, another analyst asked about accounts receivable aging and the "reality of using the recency accounting methodology" in terms of what Defendants are "seeing in your portfolio." Defendant Santana responded, stating:

> <u>Regardless of recency or contractual, whatever method you are on, the financial results are going to yield the same answer. The provision will be the same, our bad debt expense will be the same.</u> [] The reason why we use our recency is one, we have done it since the beginning of time. And it really has worked well for us over the years with the type of lending that we do, jewelry lending that emotional connection and it does optimize our collections for us. So with the use of recency it does help us to engage with the borrower, start collecting quicker. [] Now we will continue and when you see the 10-Q that we plan to file within the next week or so in the footnote you'll see the same type of a breakdown of our aging. So we've continued to provide the 30 day, 60, 90, etc.

473.   This statement was materially misleading. It was false and misleading to represent that Signet's financial performance would not be affected by the proper application of GAAP, because Signet's financial statements were materially misstated in violation of GAAP.

474.   At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the First Quarter 2017 Form 10-Q, Signet made the following statement concerning the Actions in its "Commitments and contingencies" disclosure concerning legal proceedings:

> As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against SJI, a subsidiary of Signet, in the US District Court for the Southern District of New York

alleging that <u>US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender.</u> In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. <u>The Claimants filed a motion for class certification and SJI opposed the motion.</u>

\* \* \*

Also, as previously reported, on September 23, 2008, the US Equal Employment Opportunity Commission ("EEOC") filed a lawsuit against SJI in the US District Court for the Western District of New York. <u>The EEOC's lawsuit alleges that SJI engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present.</u>

\* \* \*

SJI denies the allegations of the Claimants and EEOC and has been defending these cases vigorously. At this point, no outcome or possible loss or range of losses, if any, arising from the litigation is able to be estimated.

475.   This statement was materially false and misleading. It was materially false and misleading to represent that the Actions concerned merely "store-level employment practices" that were alleged to be "discriminatory as to compensation and promotional activities with respect to gender," when in fact the Actions had uncovered extensive evidence showing a pervasive culture of sexual harassment reaching up to the highest levels of the Company. It was also materially misleading because it failed to disclose the true degree of reputational and business risk that the Company was now facing as a result of the facts set forth in the Declarations. It was further materially false and misleading to omit disclosure of the facts asserted in the Declarations when Signet made disclosures concerning class certification briefing in discussing the *Jock* Arbitration.

476.   Also in the same filing, Signet stated that "[t]here have been no material changes in our risk factors from those disclosed in Part I, Item 1A, of Signet's Fiscal 2016 Annual Report on Form 10-K, filed with the SEC on March 24, 2016."

477.    This statement incorporates by reference the statements discussed in ¶460 and ¶462. Those statements remained false and misleading for the reasons identified in ¶461 and ¶463.

**M.    Materially False And Misleading Statements And Omissions Concerning The Second Quarter Fiscal 2017**

478.    On August 25, 2016, Signet issued a press release titled, "Signet Jewelers Reports Second Quarter Financial Results" ("Second Quarter 2017 Press Release"). On the same day, Signet filed with the SEC a Form 8-K ("Second Quarter 2017 Form 8-K"), which was signed by Defendant Santana and attached the press release as an exhibit. The Second Quarter 2017 Press Release and Second Quarter 2017 Form 8-K reported adjusted diluted EPS of $1.06, net income of $81.9 million, operating income of $119.9 million, and income before taxes of $108.0 million.

479.    These results were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 47%, its operating income was overstated by 49%, its income before taxes was overstated by 55% and its diluted EPS was overstated by 47%, as set forth above in Section VII.

480.    On August 31, Signet filed with the SEC its Form 10-Q for the period ended July 30, 2016 ("Second Quarter 2017 Form 10-Q"), which was signed by Defendant Light and Defendant Santana. The Second Quarter 2017 Form 10-Q repeated the financials stated in ¶478, above. The Second Quarter 2017 Form 10-Q also reported $129.4 million of allowance for credit losses, a 7.4% valuation allowance as a percentage of gross receivables, and year-to-date net bad debt expense of $88.9 million.

481.    These metrics were materially understated by the amounts and for the reasons set forth above in Section VII.

482.    Thereafter, Defendants held a conference call with investors to discuss second quarter fiscal 2017 earnings (the "Second Quarter 207 Conference Call"), during which

Defendants made additional misleading statements. Regarding non-performing loans, Defendant Santana stated:

> Our total valuation allowance as a percent of gross receivables was 7.4% in the second quarter. This slight increase of 10 basis points from prior year was driven by an IT glitch relating to customer reminders during the second quarter which resulted in slightly higher roll rates in the over 90 day aging category combined with overall receivable growth. On a sequential basis the ratio was up 80 basis points, the same as prior year, reflecting our seasonality changes. The same trend was true for the non-performing portion of our receivables as a percent of gross receivables. At 4.4% this was also up 10 basis points from prior year and up 80 basis points quarter over quarter for the same reasons that I just discussed. Again the sequential trend of non-performing loans was the same versus the prior-year period. In summary, we remain absolutely confident in our ongoing credit portfolio performance based on the visibility that we have into our daily collections, our weekly roll rates and other key performing metrics. Our portfolio continues to enable responsible and profitable growth of our merchandise sales and earnings.

483.    These statements were materially false and misleading. First, the cited 7.4% valuation allowance was materially understated, as set forth in Section VII. Second, contrary to the statement that the "portfolio continues to enable responsible and profitable growth of our merchandise sales and earnings," Signet drove sales through the use of reckless underwriting practices, through which the Company generated several hundred million dollars' worth of high-risk subprime loans that posed a material risk to Signet

484.    At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the Second Quarter 2017 Form 10-Q, Signet made the following statement concerning the Actions in its "Commitments and contingencies" disclosure concerning legal proceedings:

> As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against SJI, a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. The Claimants filed a motion for class certification and SJI opposed the motion.

* * *

Also, as previously reported, on September 23, 2008, the US Equal Employment Opportunity Commission ("EEOC") filed a lawsuit against SJI in the US District Court for the Western District of New York. <u>The EEOC's lawsuit alleges that SJI engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present.</u>

* * *

SJI denies the allegations of the Claimants and EEOC and has been defending these cases vigorously. At this point, no outcome or possible loss or range of losses, if any, arising from the litigation is able to be estimated.

485.    This statement was materially false and misleading. It was materially false and misleading to represent that the Actions concerned merely "store-level employment practices" that were alleged to be "discriminatory as to compensation and promotional activities with respect to gender," when in fact the Actions had uncovered extensive evidence showing a pervasive culture of sexual harassment reaching up to the highest levels of the Company. It was also materially misleading because it failed to disclose the true degree of reputational and business risk that the Company was now facing as a result of the facts set forth in the Declarations. It was further materially false and misleading to omit disclosure of the facts asserted in the Declarations when Signet made disclosures concerning class certification briefing in discussing the *Jock* Arbitration.

486.    Also in the same filing, Signet stated, with respect to the relevant risk factors, that "[t]here have been no material changes in our risk factors from those disclosed in Part I, Item 1A, of Signet's Fiscal 2016 Annual Report on Form 10-K, filed with the SEC on March 24, 2016."

487.    This statement incorporates by reference the statements discussed in ¶460 and ¶462. Those statements remained false and misleading for the reasons identified in ¶461 and ¶463.

### N.  Materially False And Misleading Statements And Omissions Concerning The Third Quarter Fiscal 2017

488.   On November 22, 2016, Signet issued a press release titled, "Signet Jewelers Reports Third Quarter Financial Results" ("Third Quarter 2017 Press Release"). On the same day Signet filed with the SEC a Form 8-K ("Third Quarter 2017 Form 8-K"), which was signed by Defendant Santana and which attached the press release as an exhibit. The Third Quarter 2017 Press Release and Third Quarter 2017 Form 8-K reported diluted EPS of $0.20, net income of $17 million, operating income of $32.1 million, and income before taxes of $19.4 million. The Company also reported a valuation allowance as a percentage of gross receivables at 7.9%.

489.   These results were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 238%, its operating income was overstated by 194%, its income before taxes was overstated by 321% and its diluted EPS was overstated by 274%, as set forth above in Section VII.

490.   On November 29, 2016, Signet reported additional financial metrics. Specifically, Signet filed with the SEC its Form 10-Q for the quarter ended October 29, 2016 ("Third Quarter 2017 Form 10-Q"), which was signed by Defendant Light and Defendant Santana. The Third Quarter 2017 Form 10-Q repeated the financials stated in ¶488, above. It also reported an allowance for credit losses of $133 million, a 7.9% valuation allowance for credit losses as a percentage of gross receivables, and year-to-date net bad debt expense of $146.1 million.

491.   These metrics were materially understated by the amounts and for the reasons set forth above in Section VII.

492.   On November 22, 2016 Defendants held a conference call with investors to discuss third quarter fiscal 2017 earnings (the "Third Quarter 2017 Conference Call"). During the Third Quarter 2017 Conference Call, Defendants made additional misleading statements regarding

Signet's credit portfolio. For instance, Defendant Santana made the following statements concerning the Company's valuation allowance for non-performing outstanding accounts receivable:

> Our total valuation allowance as a percent of gross receivables was 7.9% in the third quarter. The slight increase of 10 basis points for the prior year was driven by a variety of nearly offsetting factors. The impact of lower sales leading to lower receivables growth as well as a lingering effect from the Q2IT glitch slightly offset the impact of higher quality new borrowers. On a sequential basis the ratio was up 50 points, the same as prior year reflecting seasonality changes. For the non-performing portion of our receivables as a percent of the gross AR Q3 was 4.9%. This was flat to last year and better by 10 basis points on a sequential basis. In summary, we remain confident in our ongoing credit portfolio performance based on the visibility that we have into our daily collections, weekly roll rate and other key performing metrics. Our portfolio continues to enable responsible and profitable growth of our merchandise sales and earnings.

493.    These statements were materially misleading. First, the cited 7.9% valuation allowance was materially understated, as set forth in Section VII. Second, contrary to the statement that the "portfolio continues to enable responsible and profitable growth of our merchandise sales and earnings," Signet drove sales through reckless underwriting practices, thereby generating several hundred million dollars' worth of high-risk subprime loans that posed a material risk to Signet.

494.    In response to an analyst question about the balance sheet implications of a switch from recency to contractual method of aging accounts receivable, Defendant Santana stated that "the financial statement impact really would be immaterial moving to contractual. Your net realizable value is the same under recency or contractual basis."

495.    This statement was materially misleading. It was false and misleading to represent that Signet's financial performance would not be affected by the proper application of GAAP, because Signet's financial statements were materially misstated in violation of GAAP.

496.    At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the Third Quarter 2017 Form 10-Q, Signet made the following statement concerning the Actions in its "Commitments and contingencies" disclosure concerning legal proceedings:

> As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against SJI, a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that <u>US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender.</u> In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. <u>The Claimants filed a motion for class certification and SJI opposed the motion.</u>

> * * *

> Also, as previously reported, on September 23, 2008, the US Equal Employment Opportunity Commission ("EEOC") filed a lawsuit against SJI in the US District Court for the Western District of New York. <u>The EEOC's lawsuit alleges that SJI engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present.</u>

> * * *

> SJI denies the allegations of the Claimants and EEOC and has been defending these cases vigorously. At this point, no outcome or possible loss or range of losses, if any, arising from the litigation is able to be estimated.

497.    This statement was materially false and misleading. It was materially false and misleading to represent that the Actions concerned merely "store-level employment practices" that were alleged to be "discriminatory as to compensation and promotional activities with respect to gender," when in fact the Actions had uncovered extensive evidence showing a pervasive culture of sexual harassment reaching up to the highest levels of the Company. It was also materially misleading because it failed to disclose the true degree of reputational and business risk that the Company was now facing as a result of the facts set forth in the Declarations. It was further

materially false and misleading to omit disclosure of the facts asserted in the Declarations when Signet made disclosures concerning class certification briefing in discussing the *Jock* Arbitration.

498.    Also in the same filing, Signet stated, with respect to the relevant risk factors, that "[t]here have been no material changes in our risk factors from those disclosed in Part I, Item 1A, of Signet's Fiscal 2016 Annual Report on Form 10-K, filed with the SEC on March 24, 2016."

499.    This statement incorporates by reference the statements discussed in ¶460 and ¶462. Those statements remained false and misleading for the reasons identified in ¶461 and ¶463.

**O.    Materially False And Misleading Statements And Omissions Concerning The Fourth Quarter and Full Fiscal Year 2017**

500.    On March 9, 2017, Signet issued a press release entitled "Signet Jewelers Reports Fourth Quarter and Fiscal 2017 Financial Results" ("Fourth Quarter 2017 Press Release"). That same day, Signet filed with the SEC a Form 8-K ("Fourth Quarter 2017 Form 8-K"), which Defendant Santana signed, that included the press release as an exhibit. The Fourth Quarter 2017 Press Release and the Fourth Quarter 2017 Form 8-K reported net income of $297.5 million, operating income of $399.2 million, income before taxes of $386.2 million, and diluted EPS of $3.92 for the quarter.

501.    The financial results set forth above were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its fourth quarter net income was overstated by 14%, its fourth quarter operating income was overstated by 16%, its fourth quarter income before taxes was overstated by 17% and its fourth quarter diluted EPS was overstated by 17%, as set forth above in Section VII.

502.    For the full fiscal 2017 year, the Fourth Quarter 2017 Press Release and the Fourth Quarter 2017 Form 8-K reported net income of $543.2 million, operating income of $763.2 million, income before taxes of $713.8 million, and diluted EPS of $7.08.

503.    The financial results set forth above were materially misstated. Specifically, as a result of Signet's understatements of its reserve, its net income was overstated by 8%, its operating income was overstated by 8%, its income before taxes was overstated by 9% and its diluted EPS was overstated by 10%, as set forth above Section VII.

504.    On March 16, 2017, Signet filed with the SEC its Form 10-K for the year ended January 28, 2017 ("Fiscal 2017 Form 10-K"), which was signed by Defendant Light and Defendant Santana. The Fiscal 2017 Form 10-K reported many of the same financial results set forth in ¶500 and ¶502, above. The Company also reported allowance for credit losses of $139 million, a 7.1% valuation allowance as a percentage of gross receivables, and year-to-date bad debt expense of $212.1 million for the full fiscal year.

505.    These metrics were materially understated by the amounts and for the reasons set forth above in Section VII.

## IX.    LOSS CAUSATION

506.    The market price of Signet's publicly traded common stock was artificially inflated by the material misstatements and omissions complained of herein.

### A.    The Credit Portfolio

507.    Defendants' misstatements and omissions concerning the Company's credit operation artificially inflated the price of Signet's stock. The artificial inflation in Signet's stock price was removed when the conditions and risks misstated and omitted by Defendants were revealed to the market. The information was disseminated through partial disclosures on November 24, 2015, May 26, 2016, June 2, 2016, August 25, 2016, May 24, 2017 and May 25, 2017, which slowly revealed the nature and extent of the subprime quality of Signet's loan portfolio and its inadequate reserves. These disclosures, more particularly described below,

reduced the amount of inflation in the price of Signet's publicly traded stock, causing economic injury to Lead Plaintiff and other members of the Class.

508.    On November 24, 2015, Signet reported an earnings "miss." Defendants stated that higher net bad debt expense, which rose to $53 million compared to $41.7 million the year prior, had led to contracting margins. The increase in bad debt expense was a result of Defendants' reckless lending practices and the resulting increase in non-performing loans. These results caused investors to question the credit quality of Signet's loan portfolio and caused Signet stock to immediately fall 4%, dropping from $140.65 per share on November 23, 2015 to a closing price of $134.89 per share on November 24, 2015, on elevated trading volume of more than 4.6 million shares traded.

509.    Signet's November 24, 2015 disclosure partially corrected Defendants' prior materially misleading statements and omissions concerning the health of Signet's loan portfolio. This disclosure partially revealed the risk associated with the loan portfolio and called into question Defendants' representations about the profitability of the portfolio. Notwithstanding that partially corrective information, Defendants' false statements and omissions continued to operate as a fraud on the market because the November 24, 2015 disclosure failed to disclose that: (a) Signet had engaged in reckless underwriting and had been systematically issuing loans to subprime borrowers to drive loan volume; and (b) Signet overstated its financial results by failing to properly reserve for delinquent loans in violation of GAAP.

510.    On May 26, 2016, Signet released first quarter fiscal 2017 earnings. At the same time, the Company also stated that it had hired Goldman Sachs to conduct a "strategic review" of Signet's loan portfolio. Defendants provided no significant detail concerning this review, only sharing with investors that they were considering all options, including a sale of the portfolio. In

response to this news, Signet's stock price fell from a closing price of $108.37 per share on May 25, to a closing price of $97 per share on May 26, a decline of more than $11 per share, on trading volume of more than 9.3 million shares.

511.   Signet's May 26, 2016 disclosure partially corrected Defendants' prior materially misleading statements and omissions concerning the health and profitability of Signet's loan portfolio. These disclosures partially revealed the risk associated with the loan portfolio and called into question both Defendants' representations about the quality of the portfolio, and Defendants' representations that the portfolio was underwritten conservatively. Notwithstanding that partially corrective information, Defendants' prior false statements and omissions continued to operate as a fraud on the market because the May 26, 2016 disclosure failed to disclose that: (a) Signet had engaged in reckless underwriting and had been systematically issuing loans to subprime borrowers to drive loan volume; and (b) Signet overstated its financial results by failing to properly reserve for delinquent loans in violation of GAAP.

512.   On June 2, 2016, Grant's Interest Rate Observer published an article titled "Lending Clubbed" that suggested Signet was an overvalued consumer credit company and that its consumer credit portfolio may contain significant amounts of risky loans. The Grant's report also speculated that the Company was using the recency-aging method of accounting to disguise the risk associated with the portfolio. In response to the Grant's Interest Rate Observer article, on June 2, 2016, Signet's stock price quickly fell another 6.5%. That day, the stock price declined from a closing price of $98.73 on June 1, to a closing price of $92.23 on June 2, on trading volume of more than 11.5 million shares. The Company's share price continued to fall on June 3, 2016, declining further to close at $88.19, again on elevated trading value.

513.    The June 2, 2016 disclosure partially corrected Defendants' prior materially misleading statements and omissions concerning the stability of Signet's loan portfolio and the consistency of Defendants' underwriting standards. Notwithstanding that partially corrective information, Defendants' prior false statements and omissions continued to operate as a fraud on the market because the June 2, 2016 disclosure failed to disclose that: (a) Signet had engaged in reckless underwriting and had been systematically issuing loans to subprime borrowers to drive loan volume; and (b) Signet overstated its financial results by failing to properly reserve for delinquent loans in violation of GAAP.

514.    On August 25, 2016, Signet announced disappointing results for the second fiscal quarter 2017. Specifically, Signet announced that its same store sales had decreased 2.3%, and its total sales had declined 2.6%. It also reported adjusted earnings of $1.14 per share, far below consensus estimates. Signet also lowered its fiscal 2017 same-store growth guidance from 2-3.5% growth, to negative 2.5-1.0%. The Company also announced worsening credit metrics. It reported that net bad debt expense rose 12% from the prior year, total loan loss reserves increased 12% from the prior quarter, and non-performing loans as a percentage of gross receivables increased more than 22%. In response to the Company's August 25 announcements, Signet's stock price plummeted again on heavy volume. On August 25, 2016, the Company's stock price fell from the prior day's close of $95.50, to a closing price of $83.44—a decline of nearly 13%—on volume of nearly 11 million shares.

515.    Signet's August 25, 2016 disclosure partially corrected Defendants' prior materially misleading statements and omissions concerning the credit quality of Signet's loan portfolio the conservative nature of its underwriting, and the profitability of its credit business. Notwithstanding that partially corrective information, Defendants' prior false statements and

omissions continued to operate as a fraud on the market because the August 25, 2016 disclosures failed to disclose that: (a) Signet had engaged in reckless underwriting and had been systematically issuing loans to subprime borrowers to drive loan volume; and (b) Signet overstated its financial results by failing to properly reserve for delinquent loans in violation of GAAP.

516. On May 24, 2017, Buckingham Research Group issued a report titled, "Moving to Sidelines on Soft Sales Trends and Limited Visibility to Inflection." In the report, Buckingham lowered its rating of Signet to Neutral, and cut its price target on Signet's stock from $86 per share to $65 per share, in advance of Signet reporting its results for the first quarter of fiscal 2018, which were due out the next day. Buckingham attributed its downgrade in substantial part to concern over potentially aggressive underwriting and its inflationary impact on Signet's financial performance, stating that, "we think this quarter's results will likely reinforce the bear thesis that [] sales have been potentially inflated by aggressive credit standards[.]" On May 24, 2017, Signet's stock price fell on high trading volume, declining from a prior closing price of $58.38 to a new closing price of $54.53.

517. Finally, on May 25, 2017, Signet reported extremely poor financial results, and simultaneously announced the sale of the prime portion of its credit portfolio to Alliance Data Services. This portion of the portfolio totaled $1 billion, approximately 55% of the credit book. The remaining 45% of the credit book consisted of $700 - $800 million of subprime loans, which the Company was unable to locate a buyer for. Analysts reported that the Company's inability to sell a massive portion of the credit portfolio indicated that it was far riskier than Defendants had represented. In response to this news, Signet's stock price immediately declined. On May 25, Signet's stock price declined by nearly 8%, falling from the prior day's closing price of $54.53 per

share, to a closing price of $50.30 per share, on extremely heavy volume of more than 9.3 million shares traded.

518.   Signet's May 25, 2017 disclosure corrected Defendants' prior misleading statements and omissions concerning the strength and profitability of Signet's credit book, the credit quality of Signet's borrower base, and the Company's underwriting.

519.   None of these disclosures was sufficient on its own to fully remove the inflation from Signet's stock price, because each only partially revealed the risks and conditions that had been concealed from investors. Moreover, as explained above, the corrective impact of the disclosures alleged herein was tempered by Defendants' continued misstatements and omissions about Signet's expertise in managing its credit portfolio, the conservative nature of its underwriting, and the health of its credit portfolio. These continuing misrepresentations and omissions continued to maintain the prices of Signet's publicly traded stock at levels that were artificially inflated, inducing members of the Class to continue purchasing Signet's stock even after the truth began to partially enter the market. The disclosures that corrected the market prices to reduce the artificial inflation caused by Defendants' material misstatements and omissions are detailed above.

520.   The decline in Signet's stock price was a direct and proximate result of Defendants' scheme being revealed to investors and to the market. The timing and magnitude of Signet's stock price decline negates any inference that the economic losses and damages suffered by Lead Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic factors, or even Signet-specific facts unrelated to the Signet Defendants' fraudulent conduct.

B.    **Sexual Harassment**

521.    The market price of Signet's publicly traded common stock was artificially inflated by the material misstatements and omissions regarding the Actions and the culture of rampant sexual harassment pervading the Company.

522.    The artificial inflation in Signet's stock price was removed when the conditions and risks misstated and omitted by Defendants were revealed to the market. The information was disseminated via a corrective disclosure on the evening of February 27, 2017.

523.    On February 27, 2017, after market close, the Washington Post published an article describing the contents of hundreds of sworn Declarations, submitted as part of class certification briefing in the Jock Arbitration and made public for the first time—after years of wrangling with Signet—the night before. The Declarations and the Washington Post Article described a culture of pervasive sexual harassment and gender discrimination at Sterling, and for the first time, provided the market with a comprehensive understanding of that culture of sexual harassment at the Company, including the fact that there was significant evidence demonstrating that it reached to Signet's highest levels.

524.    These revelations shocked the market, and the market reacted immediately. Signet stock closed at $72.88 per share on February 27, 2017, just hours before the Washington Post Article was published. It opened on the morning of February 28 at $68.90, and, by 11:22 a.m. that day, it was down 8.3% from the previous day's close, to $66.89. At that time, the Company halted trading pending a press release. Thirty minutes later, Signet issued a press release stating that the allegations in the article were "misleading" and "inaccurate." Given all they had learned from the Washington Post Article and the Declarations, investors were not reassured: Signet stock continued to plummet and, by day's end on February 28, Signet was trading at $63.59, down from

the previous day's close of $72.88 by $9.29 per share, or 13%, on extraordinary volume of 11,317,100 shares.

525.    The decline in Signet's stock price was a direct and proximate result of Defendants' scheme being revealed to investors and to the market. The timing and magnitude of Signet's stock price decline negates any inference that the economic losses and damages suffered by Lead Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic factors, or even Signet-specific facts unrelated to the Signet Defendants' fraudulent conduct.

## X.      THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

526.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

527.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Signet who knew that the statement was materially false or misleading when made.

## XI.   **THE PRESUMPTION OF RELIANCE**

528.   Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omission of material fact that there was a duty to disclose.

529.   Lead Plaintiff is also entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, during the Class Period:

(a)   Signet's common stock was actively traded in an efficient market on the New York Stock Exchange;

(b)   Signet's common stock traded at high weekly volumes;

(c)   As a regulated issuer, Signet filed periodic public reports with the SEC;

(d)   Signet was eligible to file registration statements with the SEC on Form S-3;

(e)   Signet regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(f)   The market reacted promptly to public information disseminated by Signet;

(g)   Signet securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace;

(h)   The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Signet securities; and

(i)   Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased or acquired Signet common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

530.    Accordingly, Lead Plaintiff and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for Signet's common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## XII.    CLASS ACTION ALLEGATIONS

531.    Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired securities issued by Signet during the period from August 29, 2013 through May 24, 2017, inclusive, and who were damaged thereby. Excluded from the Class are Defendants; Signet's affiliates and subsidiaries; the officers and directors of Signet and its subsidiaries and affiliates at all relevant times; members of the immediate family of any excluded person; heirs, successors, and assigns of any excluded person or entity; and any entity in which any excluded person has or had a controlling interest.

532.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Signet common shares were actively traded on the New York Stock Exchange. As of January 28, 2017, Signet had approximately 68.3 million shares of common stock issued and outstanding. Although the exact number of Class members is unknown to Lead Plaintiff at this time, Lead Plaintiff believes that there are at least thousands of members of the proposed Class. Members of the Class can be identified from records maintained by Signet or its transfer agent(s), and may be notified of the pendency of this action by publication using a form of notice similar to that customarily used in securities class actions.

533.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' conduct as complained of herein.

534.     Common questions of law and fact exist to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of fact and law common to the Class are:

> (a)     whether Defendants' misrepresentations and omissions as alleged herein violated the federal securities laws;

> (b)     whether the Executive Defendants are personally liable for the alleged misrepresentations and omissions described herein;

> (c)     whether Defendants' misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss; and

> (d)     whether the members of the Class have sustained damages, and the proper measure of damages.

535.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation. Lead Plaintiff has no interest that conflicts with the interests of the Class.

536.     A class action is superior to all other available methods for the fair and efficient adjudication of this action. Joinder of all Class members is impracticable. Additionally, the damages suffered by some individual Class members may be small relative to the burden and expense of individual litigation, making it practically impossible for such members to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII.   <u>CAUSES OF ACTION</u>

<u>COUNT I</u>
**VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5
PROMULGATED THEREUNDER
(Against All Defendants)**

537.     Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

538.    During the Class Period, Defendants Barnes, Light, Ristau, and Santana carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (i) deceive the investing public regarding Signet's business, operations, management and the intrinsic value of Signet securities; (ii) enabled Defendants to artificially inflate the price of Signet securities; and (iii) caused Lead Plaintiff and other members of the Class to purchase Signet securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants jointly and individually took the actions set forth herein.

539.    The Defendants named in this count: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of the Company's securities during the Class Period in an effort to maintain artificially high market prices for Signet securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. The Defendants named in this count are sued as primary participants in the wrongful and illegal conduct charged herein. The Executive Defendants are also sued as controlling persons as alleged below.

540.    These Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal and misrepresent adverse material information about the business, operations and financial results of Signet as specified herein.

541.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Signet's value and performance and

continued substantial growth, which included the making of, and the participation in the making

of, untrue statements of material facts and omitting to state material facts necessary in order to

make the statements made, not misleading, as set forth more particularly herein, and engaged in

transactions, practices and a course of business which operated as a fraud and deceit upon the

purchasers of Signet securities during the Class Period.

542.    These Defendants are liable for the following materially false and misleading

statements and omissions made during the Class Period as alleged above in Section VIII:

(a)    Defendant Signet: Defendant Signet is liable for the false and misleading
statements and omissions made by any Defendant, which are set forth above
in Sections VII and VIII.

(b)    Defendant Barnes: Defendant Barnes is liable for all the false and
misleading statements in any SEC filing he signed, and that he made in any
press releases, conference calls, or investor presentations, as set forth above
in Sections VII and VIII;

(c)    Defendant Light: Defendant Light is liable for all the false and misleading
statements in any SEC filing he signed, and that he made in any press
releases, conference calls, or investor presentations, as set forth above in
Sections VII and VIII;

(d)    Defendant Ristau: Defendant Ristau is liable for all the false and misleading
statements in any SEC filing he signed, and that he made in any press
releases, conference calls, or investor presentations, as set forth above in
Sections VII and VIII;

(e)    Defendant Santana: Defendant Santana is liable for all the false and
misleading statements in any SEC filing she signed, and that she made in
any press releases, conference calls, or investor presentations, as set forth
above in Sections VII and VIII;

543.    Defendants Barnes, Light, Ristau, and Santana, as the most senior officers of the

Company, are liable as direct participants in the wrongs complained of herein. Through their high-

ranking positions of control and authority as the most senior executive officers of the Company,

each of these Defendants was able to control, and did directly control, the content of the public

statements disseminated by Signet. Defendants Barnes, Light, Ristau, and Santana had direct

involvement in the daily business of the Company and participated in the preparation and dissemination of Signet's materially false and misleading statements set forth above.

544.   The allegations in this Complaint establish a strong inference that Defendants Signet, Barnes, Light, Ristau, and Santana acted with scienter throughout the Class Period in that they had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts. As demonstrated by Defendants' material misstatements and omissions throughout the Class Period, if Defendants did not have actual knowledge of the misrepresentations and omissions alleged herein, they were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether their statements were false or misleading, even though such facts were available to them.

545.   Lead Plaintiff and the other members of the Class have suffered damages in that, in direct reliance on the integrity of the market in which the securities trade and/or the material false and misleading statements and omissions made by Defendants, they paid artificially inflated prices for Signet common stock, which inflation was removed from the stock when the true facts became known. Lead Plaintiff and the other members of the Class would not have purchased Signet common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

546.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

547.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of Signet securities during the Class Period.

## COUNT II
## VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
### (Against the Executive Defendants)

548.    Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

549.    Defendants Barnes, Light, Ristau, and Santana acted as controlling persons of Signet within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

550.    By reason of their high-level positions of control and authority as the Company's most senior officers and, in the cases of Defendants Barnes and Light, as its Directors, the Executive Defendants had the power and authority to influence and control, and did influence and control, the decision-making and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. The Executive Defendants were able to and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Signet during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein. The Executive Defendants were provided with or had unlimited access to copies of the Company's press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

551.    In their capacities as Signet's most senior corporate officers, and as more fully described above, the Executive Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities law violations as alleged herein. Defendants Light, Barnes, Ristau and Santana signed Signet's SEC filings and Sarbanes-Oxley

- 174 -

certifications, and were directly involved in providing false information and certifying and/or approving the false statements disseminated by Signet during the Class Period.

552. Each of the Executive Defendants culpably participated in some meaningful sense in the fraud alleged herein. Defendants Barnes, Light, Ristau, and Santana each acted with scienter, as set forth more fully in Section VI.

553. By virtue of their positions as controlling persons of Signet and as a result of their own aforementioned conduct, Defendants Barnes, Light, Ristau, and Santana, together and individually, are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## XIV.   **PRAYER FOR RELIEF**

**WHEREFORE,** Lead Plaintiff demands judgment against Defendants as follows:

(a) Declaring that this action is a proper class action and certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d) Awarding such other and further relief as the Court may deem just and proper.

## XV.   **JURY DEMAND**

Lead Plaintiff hereby demands a trial by jury.

Dated: September 29, 2017

/s/ John Rizio-Hamilton

John Rizio-Hamilton
**BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1448
johnr@blbglaw.com

*Lead Counsel for Lead Plaintiff
and the Class*
