**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re Signet Jewelers Limited Securities Litigation* | Case No. 1:16-CV-06728-JMF |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE FIFTH AMENDED CLASS ACTION COMPLAINT**

WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8000
Fax: (212) 310-8007

*Attorneys for Defendants Signet Jewelers Limited,*
*Michael Barnes, Virginia Drosos, Mark Light,*
*Ronald Ristau, and Michele Santana*

March 30, 2018

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS .........................................................................................................3

      A.    Parties.........................................................................................................3

      B.    Signet's Credit Portfolio: Key Metrics and Disclosures...........................4

      C.    Additional Credit Related Disclosures....................................................10

      D.    Jock Arbitration ......................................................................................11

ARGUMENT................................................................................................................................13

    I.     LEGAL STANDARD...............................................................................13

    II.    PLAINTIFF FAILS TO STATE A SECTION 10(b) CLAIM ..............14

      A.    Plaintiff Fails to State a Claim Relating to Signet's Credit Program ........14

         1.    No Actionable Misstatements .......................................14

         2.    No Scienter.....................................................................28

         3.    No Loss Causation .........................................................32

      B.    Plaintiff Fails to State a Claim Relating to the *Jock* Arbitration ...............34

         1.    No Actionable Misstatements .......................................34

         2.    No Scienter.....................................................................39

         3.    No Loss Causation .........................................................40

    III.   PLAINTIFF FAILS TO STATE A SECTION 20(a) CLAIM.............40

CONCLUSION............................................................................................................................40

## **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Alaska Laborers Empl'rs Ret. Fund v. Scholastic Corp.*,
  2011 WL 3427208 (S.D.N.Y. Aug. 3, 2011) .........................................................33

*Avon Pension Fund v. GlaxoSmithKline PLC*,
  343 F. App'x 671 (2d Cir. 2009) .........................................................................28

*Barrett v. PJT Partners Inc.*,
  2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017) ........................................................39

*In re Bos. Sci. Corp. Sec. Litig.*,
  490 F. Supp. 2d 142 (D. Mass. 2007) ..................................................................35

*In re Braskem S.A. Sec. Litig.*,
  246 F. Supp. 3d.731 (S.D.N.Y. 2017).................................................................39

*Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*,
  543 F. App'x 72 (2d Cir. 2013) .....................................................................18, 34

*Ciresi v. Citicorp*,
  782 F. Supp. 819 (S.D.N.Y. 1991) .......................................................................28

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014)...........................................................................37, 39

*Cortina v. Anavex Life Scis. Corp.*,
  2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016) ......................................................28

*ECA & Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)...........................................................................22, 30

*Fait v. Regions Fin. Corp.*,
  655 F.3d 105 (2d Cir. 2011)......................................................................17, 20, 21

*Fait v. Regions Fin. Corp.*,
  712 F. Supp. 2d 117 (S.D.N.Y. 2010)..................................................................21

*In re Fannie Mae 2008 Sec. Litig.*,
  742 F. Supp. 2d 382 (S.D.N.Y. 2010)..................................................................21

*Friedman v. Endo Int'l PLC*,
  2018 WL 446189 (S.D.N.Y Jan. 16, 2018) .....................................................27, 28

*Fries v. N. Oil and Gas Inc.*,
    2018 WL 388915 (S.D.N.Y. Jan. 11, 2018) .........................................................39

*Harrison v. Rubenstein*,
    2007 WL 582955 (S.D.N.Y. Feb. 26, 2007).......................................................37

*Hensley v. IEC Elecs. Corp.*,
    2014 WL 4473373 (S.D.N.Y. Sept. 11, 2014)...........................................3, 28, 29

*In re Herbalife, Ltd. Sec. Litig.*,
    2015 WL 1245191 (C.D. Cal. Mar. 16, 2015) ...................................................26

*Janbay v. Canadian Solar, Inc.*,
    2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ....................................................33

*Jock v. Sterling Jewelers Inc.*,
    646 F.3d 113 (2d Cir. 2011)...............................................................................12

*Jock v. Sterling Jewelers, Inc.*,
    143 F. Supp. 3d 127 (S.D.N.Y. 2015)..........................................................12, 36

*Jock v. Sterling Jewelers, Inc.*,
    Case No. 08-cv-2875 (JSR) (S.D.N.Y. Nov. 16, 2015) .......................................2

*Jock v. Sterling Jewelers Inc.*,
    188 F. Supp. 3d 320 (S.D.N.Y. 2016)................................................................12

*Jock v. Sterling Jewelers Inc.*,
    Case No. 08-cv-2875 (JSR) (S.D.N.Y. Jan. 16, 2018) .......................................12

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)........................................................................32, 33

*In re Lions Gate Entm't Corp. Sec. Litig.*,
    165 F. Supp. 3d 1 (S.D.N.Y. 2016) .............................................................37, 39

*Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*,
    724 F. Supp. 2d 447 (S.D.N.Y. 2010).................................................23, 25, 31

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) ............................................................................33

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014)..................................................................19

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011).............................................................................................13

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) ....................................................................17, 33

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan &*
   *Plymouth Cty. Ret. Ass'n v. MDC Partners, Inc.*,
   2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) ...............................................19

*NECA-IBEW Pension Tr. Fund v. Bank of Am.*,
   2012 WL 3191860 (S.D.N.Y. Feb. 9, 2012) ...................................................16

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) .....................................................................23, 29

*Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*,
   951 F. Supp. 2d 479 (S.D.N.Y. 2013) .......................................................16, 17

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015) .................................................................................22

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010) .......................................................18, 32, 33, 34

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*,
   153 F. Supp. 3d 628 (S.D.N.Y. 2015) ..........................................................19

*Pirnik v. Fiat Chrysler Autos., N.V. (Fiat I)*,
   2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) ...........................................14, 20, 29

*Pirnik v. Fiat Chrysler Autos., N.V. (Fiat II)*,
   2017 WL 3278928 (S.D.N.Y. Aug. 1, 2017) ...............................................31, 32

*Pirnik v. Fiat Chrysler Autos. N.V. (Fiat III)*,
   2017 WL 5312182 (S.D.N.Y. Nov. 13, 2017) ...............................................31

*Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*,
   548 F. App'x 16 (2d Cir. 2013) ...................................................................33

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) .......................................................................28

*In re Sanofi Sec. Litig.*,
   155 F. Supp. 3d 386 (S.D.N.Y. 2016) ..........................................................29

*Santa Fe Indus., Inc. v. Green*,
   430 U.S. 462 (1977) ...................................................................................27

*Sapssov v. Health Mgmt. Assocs., Inc.*,
   608 F. App'x. 855 (11th Cir. 2015) ..............................................................26

*Schaffer v. Horizon Pharma PLC.*,
  2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) .................................................................. *passim*

*In re SeaChange International, Inc. Securities Litigation*,
  2004 WL 240317 (D. Mass. Feb. 6, 2004) ...........................................................35, 37, 38

*SEC v. First Jersey Sec., Inc.*,
  101 F.3d 1450 (2d Cir. 1996)................................................................................................40

*Shields v. Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994)................................................................................................20

*Silsby v. Icahn*,
  17 F. Supp. 3d 348 (S.D.N.Y. 2014)....................................................................................37

*Stevelman v. Alias Research Inc.*,
  174 F.3d 79 (2d Cir. 1999)............................................................................................30, 31

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008)..........................................................................................29, 32

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)................................................................................................................14

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016)..................................................................................................22

*Turner v. MagicJack VocalTec, Ltd.*,
  2014 WL 406917 (S.D.N.Y. Feb. 3, 2014).........................................................................28

*In re Wachovia Equity Sec. Litig.*,
  753 F. Supp. 2d 326 (S.D.N.Y. 2011)...........................................................................20, 21

*In re The Warnaco Grp., Inc. Sec. Litig. (II)*,
  388 F. Supp. 2d 307 (S.D.N.Y. 2005)..................................................................................40

*Wielgos v. Commonwealth Edison Co.*,
  892 F.2d 509 (7th Cir. 1989) ...............................................................................................35

*Woodward v. Raymond James Fin., Inc.*,
  732 F. Supp. 2d 425 (S.D.N.Y. 2010)..................................................................................29

**Statutes & Rules**

15 U.S.C. § 78u-4(b)..............................................................................................................14

15 U.S.C. § 78u-5(c)................................................................................................................1

17 C.F.R. § 229.103)..............................................................................................................35

Fed. R. Civ. P. 9(b) ............................................................................................................1, 14

Fed. R. Civ. P. 12(b)(6)......................................................................................................1, 13

Defendants Signet Jewelers Limited ("Signet"), Michael Barnes, Virginia Drosos, Mark Light, Ronald Ristau, and Michele Santana (collectively, the "Individual Defendants") respectfully submit this memorandum of law in support of their Motion to Dismiss the Fifth Amended Class Action Complaint ("Complaint" or "FAC") pursuant to the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-5(c) ("PSLRA"), and Federal Rules of Civil Procedure 9(b) and 12(b)(6).

## PRELIMINARY STATEMENT

This motion addresses the fifth version of a complaint alleging securities fraud against Signet and each of its last three chief executive officers and two chief financial officers. The long Complaint (192 pages) marches through a nearly five-year class period (2013–2018), but, like its predecessors, never delivers a punch line: no corrective disclosures, no restatement of reported financials, no admission of wrongdoing, and no securities fraud.

Plaintiff advances two principal claims pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). First, Plaintiff says that Signet, the world's largest jewelry retailer with 3,600 stores and well-known brands including Kay Jewelers, Jared, and Zales, misled investors for years with respect to its in-house credit program. Plaintiff contends that Signet consistently understated reserves for bad debt in the program, thus inflating earnings, while at the same time falsely touting the "quality" of the credit program. But unlike a typical "loan loss reserve" case, Signet has never been forced to restate or dramatically increase reserves. And there is not a single purported confidential witness in the financial reporting chain who claims that Signet misstated the loan loss reserves or any credit metrics.

In fact, throughout the nearly five-year class period, in each and every quarterly and annual report and investor call, Signet made detailed disclosures about its credit portfolio, including the size of the portfolio, loan loss reserves, and the amount of "charge offs" for bad

debt. Signet also explained in detail how each of the key program metrics was derived. Signet's decision to "outsource" the credit program, and the sale at a loss of a portion of the portfolio, did not "reveal" or "admit" that any of Signet's prior disclosures of loan loss reserves or descriptions of the credit program over nearly five years were misleading in any way. There are no particularized allegations showing any material falsity in connection with Signet's many disclosures concerning the in-house credit program, much less the required "strong inference" of fraudulent intent (scienter) or loss causation. *See* Points I (A), (B), and (C), *infra*.

Second, Plaintiff attempts to litigate a "case within a case." In a purported "fraud" entirely unrelated to the credit claims, Plaintiff alleges that Signet misleadingly described and failed adequately to disclose the allegations and evidence in a highly publicized (and hotly litigated) arbitration asserting discrimination claims on behalf of purported classes of female employees with respect to "pay" and "promotion." As Judge Rakoff aptly observed, since the filing of the initial discrimination complaint in 2008, "the matter has been the subject of interminable litigation . . . before the Arbitrator, this Court, and the Second Circuit Court of Appeals." Op. and Order at 1, *Jock v. Sterling Jewelers, Inc.*, Case No. 08-cv-2875 (JSR) (S.D.N.Y. Nov. 16, 2015), ECF No. 144. Plaintiff provides no reason why this Court should be added to the list. In full compliance with the SEC Rules for disclosure of legal proceedings, Signet timely disclosed the existence of the class arbitration, the nature of the claims, and Signet's position in the arbitration. Nothing more was required.

Again, there is no punchline to Plaintiff's fraud claim. The supposed "hide the litigation" fraud is belied by the actual disclosures made by Signet. The fact that certain salacious, *unproven* allegations of sexual misconduct at annual sales meetings were set forth in declarations by potential class members and then reported in the media did not reveal any of Signet's prior

litigation disclosures to be fraudulent, nor do they establish that Signet "*must have*" known there was "pervasive sexual harassment" in its workplace. Signet has no obligation to engage in self-flagellation or confess to guilt while it is pressing a good faith defense in the arbitration. As with the credit claim, Plaintiff does not plead any misstatement, much less the required "strong inference" of scienter, or loss causation. *See* Point II, (A), (B), and (C), *infra*.

*       *       *

The complaints in this action have been amended to include each and every disclosure of "bad" news by or about the Company over an ever-extending class period, including most recently the Company's March 14, 2018 disclosure of disappointing earnings, lowered fiscal 2019 guidance, and a three-year turn-around plan. But not every setback or drop in earnings experienced by a company can be converted into a securities fraud claim. Plaintiff's ever-expanding tale of two unrelated frauds is not supported by the particularized allegations the PSLRA demands. The Complaint should be dismissed with prejudice.

**STATEMENT OF FACTS**

### A.     Parties

Lead Plaintiff, the Public Employees' Retirement System of Mississippi, allegedly purchased 150,756 shares of Signet securities between August 29, 2013, and May 24, 2017. Ex. B of Silk Decl., ECF No. 70-2 (Plaintiff's loss certification).

Defendant Signet is the world's largest retailer of diamond jewelry. FAC ¶ 32. Signet owns and operates more than 3,600 stores in the U.S., Canada, and U.K. through three operating divisions: Sterling Jewelers, Zales, and UK Jewelry. Ex. C (Signet FY 2017 Form 10-K) at 4, 7.[1]

---

[1] "Ex." or "Exhibit" refers to the exhibits attached to the accompanying Declaration of Joseph S. Allerhand (the "Allerhand Declaration"). On a motion to dismiss a securities fraud complaint, the Court may consider relevant SEC filings and investor presentations. *Hensley v. IEC Elecs. Corp.*, 2014 WL 4473373, at *1 (S.D.N.Y. Sept. 11, 2014) (Furman, J.).

3

Through its Sterling Jewelers division, Signet owns and operates 1,588 stores in the U.S., mainly under the Kay Jewelers and Jared the Galleria of Jewelry brands.[2] Through its Zales division, the Company owns and operates 1,586 locations in the U.S. and Canada.[3] In Fiscal Year 2017, Signet had $6.408 billion in sales and 29,566 employees.[4]

Defendant Michael Barnes served as Signet's Chief Executive Officer and as a member of its Board of Directors from January 2011 through October 31, 2014. FAC ¶ 33. Defendant Mark Light served in various positions with Signet for over 25 years, including, most recently, as the Company's CEO and as a member of its Board of Directors from November 1, 2014, until July 31, 2017.[5] Defendant Virginia Drosos has served as an outside director on Signet's Board of Directors since July 2012. Ex. D (Signet Schedule 14A, filed on May 4, 2017) at 8. On August 1, 2017, Ms. Drosos was appointed Signet's Chief Executive Officer, replacing Mark Light. FAC ¶¶ 34, 37. Defendant Ronald Ristau served as the Company's Chief Financial Officer from April 2010 until July 31, 2014. FAC ¶ 35. Defendant Michele Santana served as the Company's controller from October 2010 until she was appointed CFO on August 1, 2014, after Mr. Ristau left. *Id.* ¶ 36; Ex. D (Signet Schedule 14A, filed on May 4, 2016) at 23.

### B.   Signet's Credit Portfolio: Key Metrics and Disclosures

Signet directly extended credit through an in-house credit program to customers of its Sterling Jewelers brands (*i.e.*, Kay and Jared) for the past 30 years. *See* FAC ¶¶ 40, 94. As Signet disclosed, the program helped "drive the core of [Signet's] business" (*id.* ¶ 45) by "enabling

---

[2] Ex. C (Signet FY 2017 Form 10-K) at 4.

[3] Signet acquired Zales on May 29, 2014. *Id.* at 17.

[4] *Id.* at 38-39. Signet's fiscal year ends at the end of January/early February (the Saturday nearest January 31) and essentially is one year ahead of the calendar year. For example, fiscal year 2018 covers the period January 29, 2017 to February 3, 2018.

[5] Ex. D (Signet Schedule 14A, filed on May 4, 2016) at 9; FAC ¶ 34.

sales" (*id.* ¶ 52) and "bringing in a lot of new customers" (*id.* ¶ 50).

As Plaintiff concedes, the in-house credit program has always been the subject of extensive disclosures in Signet's SEC filings, earnings releases, and investor calls and presentations. Signet consistently disclosed the key metrics associated with the program and how Signet applied its fully-disclosed methodologies to calculate those numbers:[6]

- **Customer In-House Finance Receivables**: Each quarter, Signet disclosed in its balance sheet the net total amount of outstanding customer loans as "**accounts receivable, net.**"[7] This number reflected what Signet actually expected to collect on its receivables—*i.e.*, the balance of outstanding loans, less an allowance for loans that Signet deemed uncollectible. A footnote to Signet's financial statements entitled "accounts receivable, net" provided further detail.[8]

- **Allowance for Credit Losses – the Loan Loss Reserve**: In the same "accounts receivable, net" footnote discussed above, Signet also disclosed its estimate of probable loan losses on a quarterly basis in a line item called the "allowance for credit losses."[9] If this allowance (reserve) increased, it reduced earnings that quarter by a corresponding amount. As Signet disclosed, it calculated its allowance for credit losses "using a proprietary model that analyzes factors such as delinquency rates and recovery rates."[10] For accounts that were less than 90 days delinquent, an allowance was established "based on historical loss information and payment performance."[11] However, once accounts became more than 90 days delinquent, or if they were associated with a customer who filed for bankruptcy, a 100% allowance was established.[12]

---

[6] To avoid burdening the Court with long string citations to Signet's public disclosures, attached as Exhibit A to the Allerhand Declaration, in chronological order, are excerpts of the relevant credit-related disclosures (highlighted for ease of reference) from the Company's SEC filings, earnings releases, and investor calls and presentations. Each page of Exhibit A has been numbered sequentially so that citations in this brief are to Ex. A[page number].

[7] *See, e.g.*, Ex. A18, A106, A182, A301.

[8] *See, e.g.*, Ex. A19-20, A107-08, A183-84, A302-03.

[9] *See, e.g.*, Ex. A20, A107, A184, A303.

[10] *See, e.g.*, Ex. A19, A107, A183.

[11] *See, e.g.*, Ex. A19, A107, A183

[12] *See, e.g.*, Ex. A19, A107, A183.

- **Net-Charge Offs**: After a reserve had been established for a loan, the loan could be written off (or "charged off") as uncollectible if it remained delinquent for a certain amount of time. Specifically, Signet charged off accounts once they were "more than 120 days aged on a recency basis and 240 days aged on a contractual basis."[13] Signet disclosed the amount of such charge offs in its quarterly and annual filings as net "charge offs."[14] The allowance for credit losses was reduced by the amount charged off, as disclosed in the "accounts receivable, net" footnote to Signet's financial statements.[15]

- **Net Bad Debt Expense:** Signet also disclosed in the same footnote (and in investor presentations) its "net bad debt expense," which was the amount of receivables that Signet deemed uncollectible, less any recoveries (*i.e.*, payments received on accounts that had already been charged off) during a given period.[16]

Signet repeatedly disclosed that it assessed the delinquency of loans on a "recency basis." "Recency" is not an accounting concept, as Plaintiff suggests, but an aging convention. It is based on the Company's receipt of qualifying payments by customers, the amount of which varies depending on the account status. As Signet explained to investors, a customer's account starts to age five days after her payment due date. *See, e.g.*, Ex. A244, A343. For the account to remain "current," the customer must make at least 75% of the required monthly payment, and the required payment amount increases the longer the account remains delinquent. *Id.* Once an account holder is more than three payments behind, the entire past due amount is required to return to current status. *Id.* While Plaintiff takes issue with Signet's use of this methodology (FAC ¶ 60), GAAP does not prescribe one method to assess future loan delinquencies or create appropriate reserves. Rather, it is a matter of judgement.[17] And Signet fully disclosed how it

---

[13] *See, e.g.*, Ex. A75, A149, A252, A343.

[14] *See, e.g.*, Ex. A20, A107, A184, A303.

[15] *See, e.g.*, Ex. A19, A107, A183, A302.

[16] *See, e.g.*, Ex. A16, A20, A104, A107, A179, A184, A299, A303.

[17] *See* Ex. K (FASB Accounting Standards Codification 310-10-50-11B) (requiring only disclosure of the "methodology used to estimate the allowance for credit losses" and a "description of the factors that influenced management's judgment").

applied the recency aging methodology to its accounts receivable balance.[18]

Set out below is an example of Signet's disclosures for one quarter—the second quarter of Fiscal Year 2016 (pp. A167 to A186 of Ex. A to the Allerhand Decl.). In its August 27, 2015 earnings release, Signet disclosed that: "Net accounts receivable were $1,493.2 million, up 13.5% compared to $1,316.0 million as of August 2, 2014" and that "the credit participation rate [for the Sterling Jewelers division] was 61.6% in the 26 weeks ended August 1, 2015 compared to 60.0% in the 26 weeks ended August 2, 2014."[19]

In its PowerPoint presentation made available to all investors in connection with an investor call the same day as the release, Signet disclosed the following credit metrics (A179):



| Credit Metrics | | |
| --- | --- | --- |
| Year-to-Date | Fiscal 2016 | Fiscal 2015 |
| Accounts receivable, net (in millions) | $1,493.2 | $1,316.0 |
| Sterling credit participation | 61.6% | 60.0% |
| Sterling average monthly collection rate | 12.0% | 12.4% |
| Second Quarter | | |
| Net bad debt (in millions) | ($49.5) | ($41.8) |
| Other operating income (in millions) | $62.8 | $53.7 |
| Net Impact (in millions) | $13.3 | $11.9 |
| Allowance as a % of ending A/R | 7.3% | 7.0% |

---

[18] *See, e.g.*, Ex. A244, A343. Plaintiff argues this methodology, while fully disclosed, was problematic because other companies, such as banks often use a "contractual" rather than a "recency" method to age their accounts receivable. FAC ¶¶ 59-60. The contractual method typically requires a customer to pay 100% of the minimum monthly payment to be considered current. *Id.* ¶ 59. The minimum monthly payment required under Signet's financing program was typically a much higher percentage of the customer's outstanding balance (8-9%) than the payments required under bank lender programs (3-4%). *See* Ex. A229 ("The weighted average minimum monthly payment required [by Signet] is about 9% of outstanding balances, . . . nearly double what a typical credit card company would require."); *see also* Ex. E at 7 (Signet has "higher scheduled payments than traditional lenders" of "approximately 8% of balance due").

[19] Ex. A170.

The opening remarks by senior management during the investor call addressed the performance of the credit program, including in-house credit metrics, the average monthly collection rate, and net bad debt expense.[20]

In its Form 10-Q for Q2 FY2016, filed with the SEC on September 3, 2015, Signet disclosed the following information in a footnote titled "Accounts receivables, net" (A183-84):

**9 . Accounts receivable, net**

Signet's accounts receivable primarily consist of Sterling Jewelers' customer in-house financing receivables. The accounts receivable portfolio consists of a population that has similar characteristics and is evaluated collectively for impairment. The allowance is an estimate of the expected losses as of the balance sheet date, and is calculated using a proprietary model that analyzes factors such as delinquency rates and recovery rates. A 100% allowance is made for any amount that is more than 90 days aged on a recency basis and any amount associated with an account the owner of which has filed for bankruptcy, as well as an allowance for those amounts 90 days aged and under based on historical loss information and payment performance. The calculation is reviewed by management to assess whether, based on economic events, additional analyses are required to appropriately estimate losses inherent in the portfolio.

| (in millions) | August 1, 2015 | January 31, 2015 | August 2, 2014 |
|---|---|---|---|
| Accounts receivable by portfolio segment, net: | | | |
| Sterling Jewelers customer in-house finance receivables | $ 1,483.1 | $ 1,552.9 | $ 1,305.1 |
| Other accounts receivable | 10.1 | 14.7 | 10.9 |
| **Total accounts receivable, net** | **$ 1,493.2** | **$ 1,567.6** | **$ 1,316.0** |

Signet grants credit to customers based on a variety of credit quality indicators, including consumer financial information and prior payment experience. On an ongoing basis, management monitors the credit exposure based on past due status and collection experience, as it has found a meaningful correlation between the past due status of customers and the risk of loss.

Other accounts receivable is comprised primarily of gross accounts receivable relating to the insurance loss replacement business in the UK Jewelry division of $7.9 million ( January 31, 2015 and August 2, 2014 : $13.7 million and $10.0 million , respectively), with a corresponding valuation allowance of $0.5 million ( January 31, 2015 and August 2, 2014 : $0.5 million and $0.6 million , respectively). The credit function for the Zale division is outsourced and, as such, no material accounts receivable exist as of August 1, 2015 , January 31, 2015 or August 2, 2014 .

The allowance for credit losses on Sterling Jewelers' customer in-house finance receivables is shown below:

| (in millions) | 26 weeks ended | |
|---|---|---|
| | August 1, 2015 | August 2, 2014 |
| Beginning balance: | $ (113.1) | $ (97.8) |
| Charge-offs | 74.6 | 63.0 |
| Recoveries | 18.4 | 15.0 |
| Provision | (95.9) | (79.1) |
| Ending balance | $ (116.0) | $ (98.9) |
| Ending receivable balance evaluated for impairment | 1,599.1 | 1,404.0 |
| **Sterling Jewelers customer in-house finance receivables, net** | **$ 1,483.1** | **$ 1,305.1** |

Net bad debt expense is defined as the provision expense less recoveries.

---

[20] Ex. A175.

The following tables summarize the credit quality indicator and age analysis of past due Sterling Jewelers' customer in-house finance receivables:

| | August 1, 2015 | | January 31, 2015 | | August 2, 2014 | |
|---|---|---|---|---|---|---|
| (in millions) | Gross | Valuation allowance | Gross | Valuation allowance | Gross | Valuation allowance |
| Performing: | | | | | | |
| Current, aged 0 – 30 days | $ 1,252.4 | $    (38.1) | $ 1,332.2 | $    (41.1) | $ 1,110.6 | $    (34.0) |
| Past due, aged 31 – 90 days | 278.4 | (9.6) | 271.1 | (9.3) | 236.8 | (8.3) |
| Non Performing: | | | | | | |
| Past due, aged more than 90 days | 68.3 | (68.3) | 62.7 | (62.7) | 56.6 | (56.6) |
| | $ 1,599.1 | $  (116.0) | $ 1,666.0 | $  (113.1) | $ 1,404.0 | $    (98.9) |

| | August 1, 2015 | | January 31, 2015 | | August 2, 2014 | |
|---|---|---|---|---|---|---|
| (as a % of the ending receivable balance) | Gross | Valuation allowance | Gross | Valuation allowance | Gross | Valuation allowance |
| Performing | 95.7% | 3.1% | 96.2% | 3.1% | 96.0% | 3.1% |
| Non Performing | 4.3% | 100.0% | 3.8% | 100.0% | 4.0% | 100.0% |
| | 100.0% | 7.3% | 100.0% | 6.8% | 100.0% | 7.0% |

These were the key metrics reflecting the performance of the credit portfolio that Signet repeatedly disclosed throughout the putative class period. In response to frequently asked questions from investors and analysts concerning the credit program (FAC ¶¶ 97-99, 104-05, 108), Signet expanded its credit disclosure (beginning in March 2016) to include: (i) the balance-weighted FICO score for its credit portfolio for the three preceding years; (ii) the balance-weighted FICO score for new customers for each of those years; and (iii) additional details concerning its credit underwriting, credit monitoring and collection, and portfolio aging.[21]

For each year of the purported class period, Signet received unqualified audit opinions from its independent outside auditor, KPMG.[22] There has been no restatement of the allowance for credit losses (the reserve), no sudden significant increase in the reserve, and no alleged trend suggesting loan losses were incurred but not reserved for. There are no confidential witnesses familiar with Signet's financial reporting who call into question the accuracy of any of Signet's

---

[21] See Ex. A225 (Signet "expanded its disclosures . . . related to underwriting, credit monitoring, collections, and portfolio aging"); Ex. A243-44 (disclosing balanced FICO scores for FY2014-16 and describing "[u]nderwriting risk tolerance," the "quality of [the] credit loan portfolio," and how "Signet measures delinquency and . . . loss allowances" under the recency method); Ex. A342-43 (same).

[22] See, e.g., Ex. F (KPMG Audit Opinion for Fiscal Year 2014); Ex. G (2015); Ex. H (2016); Ex. C at 79 (2017).

reported numbers for the credit portfolio. Plaintiff has simply provided its own flawed calculations of an "alternative" set of loan loss reserves for the alleged class period. *See* FAC ¶¶ 303-316, and discussion *infra* at 15 to 21.

### C. Additional Credit Related Disclosures

Signet consistently and accurately disclosed the importance of the credit program in driving sales,[23] risks related to the program,[24] and how it determined whether to extend credit to customers based on "proprietary consumer credit scores," which the Company "evaluate[d] centrally against set lending criteria" and tracked on "a real-time basis" to "monitor[] the credit quality of its customer finance receivable portfolio."[25]

Plaintiff challenges statements by Defendants on earnings calls purportedly "touting" the program as "conservatively managed," "highly disciplined," and low risk (FAC ¶¶ 15, 51, 91, 112, 341-42, 464-65), claiming that at various points in time during the more-than-four-year class period, Signet secretly tightened its otherwise "lax" credit standards, resulting in decreased sales which, in turn, show that Defendants' statements about the quality of the portfolio were false. FAC ¶¶ 79, 123-24, 155, 159, 543. But as demonstrated below (pp. 22-29), Plaintiff's purported "fraud" makes no sense and Plaintiff does not plead any particularized facts—no

---

[23] *See, e.g.*, Ex. A45 (in-house credit is "powerful and it really drives our business and we have a very large percentage of our sales that use our in-house customer financing" and is a "huge competitive advantage"); Ex. A157 ("In-house credit remains an important component of our Sterling division's business and a competitive advantage."); Ex. A342 ("Our in-house consumer financing program provides Signet with a competitive advantage through the enabling of incremental profitable sales that would not occur without a consumer financing program.").

[24] *See, e.g.*, Ex. A345 ("[m]ore than half of [Sterling's] sales in the US and Canada utilize its in-house or third-party customer financing programs," "[a]ny deterioration in the consumers' financial position . . . could adversely impact sales [and] earnings[,]" and negative developments with respect to its credit portfolio could "adversely affect its collection of outstanding accounts receivable, its net bad debt charge and hence earnings"); *see also* Ex. A68 (same); Ex. A143 (same); Ex. A246 (same).

[25] *See, e.g.*, Ex. A141, A146-47; *see also* Ex. A66, A70, A75, A77, A251.

internal documents or confidential witnesses responsible for Signet's credit program or its underwriting—showing that any of the detailed metrics Signet disclosed were false or that Defendants did not believe their statements about the quality of the portfolio to be true.

Plaintiff also cites Signet's disclosure on December 1, 2017, of a Consumer Financial Protection Bureau ("CFPB") investigation relating to Signet's "in-store credit practices, promotions, and payment protection products" and a New York Attorney General ("NYAG") investigation into "similar issues under its jurisdiction." *Id.* ¶¶ 163-65. But neither investigation is alleged to concern the quality of Signet's credit portfolio or Signet's underwriting standards.

### D.    Jock Arbitration

*Jock et al. v. Sterling Jewelers, Inc.* ("*Jock* Arbitration") has been litigated over the last decade in this Court and the Second Circuit and arbitrated before the Hon. Kathleen Roberts.

A putative class action lawsuit was filed against Sterling Jewelers Inc., a subsidiary of Signet, in this Court on March 18, 2008. FAC ¶ 168. The complaint alleged that female Sterling employees were subjected to sex discrimination through improper promotion and compensation practices in violation of Title VII and the Equal Pay Act. *Id.* ¶¶ 177-78. The action on its face addresses alleged discrimination at the store level, not in the executive suite. *See* First Am. Compl. ¶ 2, *Jock v. Sterling Jewelers, Inc.*, Case No. 08-cv-2875 (S.D.N.Y. Apr. 24, 2008), ECF No. 11 (alleging that because of "Sterling's promotion and compensation policies and practices," female "store-based employees up to and including district managers" were "denied promotional opportunities" and "paid less than men").

Two days after the complaint was filed, Signet filed a Form 6-K with the SEC in which it disclosed the litigation and the nature of the claims, including that a complaint had been filed "alleging Sterling Jewelers' US store-level employment practices are discriminatory as to

compensation and promotional opportunities." Ex. B2-3.[26] Thereafter, Signet has consistently disclosed the many twists and turns in the *Jock* Arbitration in the "commitments and contingencies" footnotes to its financial statements.[27] Signet also warned in a "risk factor" in its annual reports on Form 10-K that if it was "unsuccessful" in its defense of the case, it "could be required to pay substantial damages" and that an "adverse decision" "could reduce earnings."[28]

Throughout the course of the litigation, Judge Rakoff and the Second Circuit have addressed bedeviling questions with respect to which claims can proceed as class claims in the arbitration, and whether a class must be an opt-in or opt-out class.[29] On January 16, 2018, Judge Rakoff issued a decision in what he described as the "latest chapter in a rather convoluted litigation," finding that the Arbitrator exceeded her authority by certifying a Title VII class that included more than 70,000 absent class members who never consented to class arbitration. Op. and Order at 2, 9, *Jock v. Sterling Jewelers Inc.*, Case No. 08-cv-2875 (JSR) (S.D.N.Y. Jan. 16, 2018), ECF. No. 168.

Finally, of particular relevance here, certain salacious allegations of sexual harassment were contained in declarations submitted in support of claimants' June 21, 2013 class certification motions. These declarations became public in February 2017 when the confidentiality orders were lifted, and then became the subject of various media reports, including a Washington Post article on February 27, 2017. According to the Complaint, these

---

[26] Exhibit B to the Allerhand Declaration contains all of the relevant *Jock* Arbitration disclosures in chronological order, highlighted and numbered for ease of citation (Ex. B[page number]).

[27] *See, e.g.*, Ex. B14-15, B36-37, B73, B104, B135-36.

[28] *See, e.g.*, Ex. B63, B77, B140, B164.

[29] *E.g.*, *Jock v. Sterling Jewelers Inc.*, 188 F. Supp. 3d 320, 322-24 (S.D.N.Y. 2016), *appeal dismissed*, 691 F. App'x 665 (2d Cir. 2017); *Jock v. Sterling Jewelers Inc.*, 646 F.3d 113, 117, 121, 124 (2d Cir. 2011); *Jock v. Sterling Jewelers, Inc.*, 143 F. Supp. 3d 127, 128 (S.D.N.Y. 2015), *vacated*, 703 F. App'x 15, 17-18 (2d Cir. 2017).

declarations revealed a "pervasive culture of sexual harassment [at] the Company" that Signet

should have confessed to in its earlier litigation disclosures (FAC ¶¶ 21, 276) and showed that

Signet's risk disclosures' warnings of possible harm to its reputation and loss of customer

confidence were misleading because Signet "knew" that those risks in fact had "materialized."

*Id.* ¶¶ 350-51, 374, 376. Plaintiff also complains that this same culture of harassment proves that

Signet's Code of Conduct, which is available on its website and requires a workplace free of any

form of discrimination, was also deceptive. *Id.* ¶¶ 195-97, 288, 330, 332, 334, 336. Signet

disputes that it has a "pervasive culture of sexual harassment" and there have been no findings or

conclusions in the *Jock* Arbitration with respect to any of the allegations.

## ARGUMENT

## I.  LEGAL STANDARD

To state a claim for relief under Section 10(b) of the Exchange Act, a plaintiff must

allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a

connection between the misrepresentation or omission and the purchase or sale of a security; (4)

reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). While the Court must "accept

all facts set forth in the complaint as true" in considering a motion to dismiss under Rule

12(b)(6), "Plaintiffs must allege facts showing 'more than a sheer possibility that a defendant has

acted unlawfully.'" *Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at *2 (S.D.N.Y. Jan. 18,

2018) (Furman, J.) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). A complaint may

survive dismissal under Rule 12(b)(6) only if "the factual allegations in [the] complaint . . .

plausibly suggest an entitlement to relief." *Id.* (alteration in original). Moreover, "[a] complaint

that offers only 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of

action will not do.'" *Id.* (quoting *Bell Atl. Corp. v Twombly*, 550 U.S. 544, 555 (2007)).

Section 10(b) claims must also satisfy the heightened pleading requirements of both Rule 9(b), which requires that the circumstances constituting fraud be "state[d] with particularity," Fed. R. Civ. P. 9(b), and the PSLRA, which requires that the complaint "specify each statement alleged to have been misleading" as well as the "reasons why the statement is misleading." 15 U.S.C. § 78u-4(b). Plaintiff must also allege "with particularity facts giving rise to a strong inference" that each "defendant acted with the required state of mind"—*i.e.,* scienter, or the "intention to deceive, manipulate, or defraud." *Id.*; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 313 (2007) (internal quotation marks omitted). A plaintiff may do so by alleging facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Pirnik v. Fiat Chrysler Autos., N.V. (Fiat I)*, 2016 WL 5818590, at *6 (S.D.N.Y. Oct. 5, 2016) (Furman, J.) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2017)).

Ultimately, the "strong inference" supporting the critical element of scienter must be "more than merely plausible or reasonable." *Tellabs*, 551 U.S. at 314. The necessary inquiry is "inherently comparative" and the Court "must consider plausible nonculpable explanations for the defendant's conduct" and allow a complaint to survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference." *Id.* at 323-24.

## II.     PLAINTIFF FAILS TO STATE A SECTION 10(b) CLAIM

### A.     Plaintiff Fails to State a Claim Relating to Signet's Credit Program

#### 1.     No Actionable Misstatements

Plaintiff attacks Signet's disclosures about its credit portfolio in two ways—quantitatively and qualitatively. First, using its own flawed calculations, Plaintiff claims Signet got the numbers wrong. Plaintiff alleges that for every quarter of the nearly-five-year class

period, Signet materially understated its loan loss reserves, thus overstating earnings. Second, Plaintiff claims that during investor calls, Signet painted too rosy a picture of the quality of the credit program and its administration. Neither claim survives scrutiny.

### a. *Loan Loss Reserves – the Reported Numbers*

Plaintiff purports to calculate an understatement of Signet's loan loss reserve for each quarter of the purported class period based on Signet's public disclosures. FAC ¶¶ 303-316. Specifically, Plaintiff compares (i) the "allowance for credit losses" reported by Signet in its quarterly and annual reports (the loan loss reserve) with (ii) the amount of charge offs reported by Signet for the preceding and subsequent 12-month periods for "bad debts." *Id.* ¶¶ 303, 314-16. According to Plaintiff's tautology, because the year-to-date allowance for credit losses was lower than the amount of charge offs for the preceding and subsequent twelve months, the Company "must have" understated its loan loss reserve. *Id.*[30]

But Plaintiff's argument reflects a fundamental misunderstanding of Signet's reserves. As fully disclosed, Signet reserved for *100%* of delinquent loan balances when they were 90 days past due, and, if those delinquencies ultimately were not cured (*i.e.*, when the account became both more than 120 days aged on a recency basis and 240 days aged on a contractual basis at the end of a month), the *entire loan balance* was then "charged off" against the reserve that previously had been established for the loan—thus *reducing* the reserve for that quarter.[31] Charge offs could never exceed the loan loss reserves *for those loans* because loans could only be charged off *after* they had been fully reserved.

---

[30] A chart in the Complaint sets forth Plaintiff's calculation of what Signet's reported income and earnings supposedly would have been had Signet used the reserves and bad debt expense calculated by Plaintiff. *See* FAC ¶ 315. This chart, like the charts at FAC ¶¶ 314-16, suffers from numerous defects (including comparing *quarterly* income numbers with *year-to-date* reserve and bad debt numbers).

[31] *See, e.g.*, Ex. A19, A75, A107, A149, A183, A252, A343.

The flaw in Plaintiff's reasoning is evident when considering Plaintiff's calculations. Plaintiff compares Signet's loan loss reserve reported each quarter to the amount Signet charged off for the preceding and subsequent 12 months (by adding up the charge offs reported by Signet for the prior and subsequent four quarters). FAC ¶¶ 314, 316. But each quarter, the reserve was *reduced* by the amount that was charged off during that quarter, while *new* reserves were added with respect to *other* loans. So, the reserve reported each quarter does not equate to the cumulative prior charge offs, which already had reduced the reserve reported by Signet during each prior quarter. Nor do the charge offs in four subsequent quarters (*i.e.*, *id.* ¶ 316) equate with the reserves established during a single quarter because subsequent charge offs would include loans reserved for in the later quarters. Plaintiff simply compares two different metrics that do not in any way show any understatement of reserves.

Plaintiff also points to Signet's March 14, 2018 announcement of the sale of the non-prime portion of its credit portfolio at fair market value (72% of par) below its net book value (85% of par), resulting in a $165 to $170M loss, as supporting its claim that "Signet's credit portfolio was severely overvalued, and its reserves understated." FAC ¶ 168. But the fact that the Company sold its non-prime receivables at a discount to the value on its books, and therefore will record a loss, does not show that the prior stated reserves for those receivables over the course of nearly five years were fraudulently misstated.[32] Plaintiff is once again comparing apples to oranges. Loan loss reserves reflect management's judgment as to the amounts the

---

[32] *See*, *e.g.*, *Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 498 (S.D.N.Y. 2013) ("[A]t best, plaintiffs' theory is one of underestimation in hindsight"); *NECA-IBEW Pension Tr. Fund v. Bank of Am.*, 2012 WL 3191860, at *10 (S.D.N.Y. Feb. 9, 2012) ("[T]he mere fact that [defendant's] predicted loss reserves turned out to be insufficient some time after they were made does not render those figures false at the time that they were publicly filed with the SEC.").

company will not be able to collect.[33] Loans held for sale to a third-party (*i.e.*, "accounts held for sale") must be carried at "fair market value" (*i.e.*, the market price a third party is willing to pay less costs to sell) under GAAP.[34] These two distinct accounting concepts "require wholly different accounting judgments and calculations," *Okla. Firefighters*, 951 F.Supp.2d at 497, and it is hardly surprising that a third-party buyer expects to make a profit, and thus will only acquire a portfolio of subprime debt *below* face value. Indeed, this Court rejected an *identical* attempt to plead falsity of a company's historical loan loss reserves based on a write-down resulting from the sale of the loan portfolio in *Okla. Firefighters*. *See id.* at 496-97 ("plaintiffs compare apples to oranges when they argue that the write-down taken on loans held for sale . . . should have been recorded earlier as loss provisions when those loans were still held for investment").

And if one looks at the sale of *all* of Signet's approximately $1.6 billion in accounts receivable—including both the October 2017 sale of the Company's prime receivables (for $1 billion at 100% of par value resulting in a recognized gain, *see* FAC ¶ 560) and the recently-announced sale of the remaining receivables (for $585-635 million at 72% of par, *see id.* ¶

---

[33] *See* Ex. L FAS 114 ¶ 8 (GAAP "does not specify how a creditor should determine that it is probable that it will be unable to collect all amounts due according to the contractual terms of a loan" and management "should apply its normal loan review procedures in making that judgment"); *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011) (determining loan reserves "is not a matter of objective fact" because it "reflect[s] management's opinion or judgment about what, if any, portion of amounts due on the loans ultimately might not be collectible," and thus "is inherently subjective" and "will vary depending on a variety of predictable and unpredictable circumstances"); *see also Okla. Firefighters*, 951 F. Supp. 2d at 497 (loan loss reserves are determined based on "management's opinion or judgment about what, if any, portion of amounts due on the loans ultimately might not be collectible").

[34] *See* Ex. M American Institute of Certified Public Accountants Statement of Position 01-6 at 20,956 ("Sales of Loans Not Held For Sale.") ("Once a decision has been made to sell loans …, such loans should be transferred into the held-for-sale classification and carried at the lower of cost or fair value. At the time of the transfer into the held-for-sale classification, any amount by which cost exceeds fair value should be accounted for as a valuation allowance.); *see Meyer v. Greene*, 710 F.3d 1189, 1192 (11th Cir. 2013) ("Assets 'held for sale' . . . must be booked at the lower of carrying value or fair market value less costs to sell").

564)—the Company obtained more than $1.3 billion for its portfolio, which is roughly 90% of par value overall and approximately consistent with the Company's historical loan loss reserve of 7-8% of the portfolio's value. *See* Ex. A486 (Signet's "reserve as a percentage of total AR" was, before the sale of the receivables, "7% to 8% for the consolidated prime and non-prime receivables").[35]

Other than Plaintiff's erroneous calculations and the March 14, 2018 announcement of the sale of the non-prime portion of the credit portfolio, Plaintiff's sole support for its claim that Signet's reserves were consistently understated for five years is a single confidential witness ("CW1")—an IT professional allegedly responsible for "all technological aspects of the Company's credit business, including system management, infrastructure, and data analytics." FAC ¶ 66. CW1 allegedly attended "bad debt meetings" with Defendant Light, Bob Trabucco, the chief financial officer of Sterling Jewelers, a division of Signet, and other unnamed credit department executives at which "loan loss reserves were discussed." At these meetings, "executives decided not to raise reserves to a more appropriate level because reserves were 'comped' to the prior year's level precisely to avoid a significant increase." FAC ¶¶ 75, 76.

This allegation lacks the requisite specificity as to which "meetings" were attended by which "executives" and which "reserves" were supposedly manipulated or held at artificially low levels. CW1 is not alleged to have had any involvement in loan loss reserving or the financial

---

[35] Nor do the cherry picked negative analyst opinions about the announced credit sale (*see* FAC ¶¶ 17, 181-84) show the falsity of (or correct) the alleged misstatements. *See, e.g., Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 75 (2d Cir. 2013) ("At most, the cited third-party articles and reports expressed negative *opinions* about [the company's] solvency based on information that was already publicly available. Such disclosures are not 'corrective' for the purpose of pleading loss causation.") (emphasis in original); *see also In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511-12 (2d Cir. 2010).

reporting process.[36] In fact, CW1 left Signet in *February 2014*—six months into the alleged class period—before nearly all of the allegedly understated reserves were reported (and before Defendant Light became CEO and long before Defendant Drosos assumed that post). *Id.* ¶ 66.[37]

Moreover, the notion that senior Signet executives implemented a scheme to prevent any increase in loan loss reserves over prior periods is demonstrably false. A comparison of Signet's reserves from each quarter of the purported class period to the prior year's quarter shows an average 12.2% *increase* in the reserves year over year until Q2 FY2018 after Signet sold the prime portion of its portfolio.

| Prior Year Quarter/ Fiscal Year | Reported Allowance for Credit Losses (Reserve) | Putative Class Period Quarter/ Fiscal Year | Reported Allowance for Credit Losses (Reserve) | Change Over Prior Year |
|---|---|---|---|---|
| Q2 2013 | -78.6 | Q2 2014 | -89.1 | +13.36% |
| Q3 2013 | -80.2 | Q3 2014 | -89.6 | +11.72% |
| FY 2013 | -87.7 | FY 2014 | -97.8 | +11.52% |
| Q1 2014 | -79.6 | Q1 2015 | -87.8 | +10.30% |
| Q2 2014 | -89.1 | Q2 2015 | -98.9 | +11.00% |
| Q3 2014 | -89.6 | Q3 2015 | -102.6 | +14.51% |
| FY 2014 | -97.8 | FY 2015 | -113.1 | +15.64% |
| Q1 2015 | -87.8 | Q1 2016 | -103.3 | +17.65% |
| Q2 2015 | -98.9 | Q2 2016 | -116 | +17.29% |
| Q3 2015 | -102.6 | Q3 2016 | -122.2 | +19.10% |

[36] *See, e.g.*, *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n v. MDC Partners, Inc.*, 2016 WL 5794774, at *21 (S.D.N.Y. Sept. 30, 2016) ("the Court can infer no fraud from CW 2's allegations" where "it is clear that CW 2 lacks personal knowledge"), *appeal dismissed sub nom N. Collier Fire Control v. MDC Partners Inc.*, 2017 WL 5201904 (2d Cir. Feb. 22, 2017); *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 642 (S.D.N.Y. 2015) ("Rule 9(b) 'requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud.'").

[37] *See, e.g., Schaffer*, 2018 WL 481883, at *8 (rejecting claim partly because it rested on "two confidential sources, both of whom left Horizon early in the Class Period"); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 580-81 & n.17 (S.D.N.Y. 2014) (a CW's "allegations do not render the company's statements about its quality control testing . . . false or misleading" where CW alleged the issues "occurred well before the Class Period"), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

| Prior Year Quarter/ Fiscal Year | Reported Allowance for Credit Losses (Reserve) | Putative Class Period Quarter/ Fiscal Year | Reported Allowance for Credit Losses (Reserve) | Change Over Prior Year |
|---|---|---|---|---|
| FY 2015 | -113.1 | FY 2016 | -130 | +14.94% |
| Q1 2016 | -103.3 | Q1 2017 | -116.8 | +13.07% |
| Q2 2016 | -116 | Q2 2017 | -129.4 | +11.55% |
| Q3 2016 | -122.2 | Q3 2017 | -133 | +8.84% |
| FY 2016 | -130 | FY 2017 | -138.7 | +6.69% |
| Q1 2017 | -116.8 | Q1 2018 | -126.9 | +8.65% |
| Q2 2017 | -129.4 | Q2 2018 | -114.3 | -11.67% |
| Q3 2017 | -133 | Q3 2018 | -108.8 | -18.20% |

There is no punchline to Plaintiff's reserve allegations. This is not even a case like *Fiat I*, where this Court found plaintiff failed to plead that Fiat's historical warranty and recall reserves were misleading after Fiat was forced to significantly *increase* its reserves following a drastic increase in recalls over a short period of time. *Fiat I*, 2016 WL 5818590, at *8. As this Court noted, Fiat's "publicly disclosed methodology for estimating recall costs was based on 'long-term historical averages'" and "one would expect [the] estimates to be too low if costs drastically increased over a relatively short time frame." *Id.*[38] Here, Plaintiff has not alleged any drastic increase in Signet's reserves that might suggest its prior estimates were wrong. Nor has there been any restatement of prior reported reserves. And just as in *Fiat I*, Plaintiff points to no "internal analyses, confidential witnesses, or other particularized allegations" that would demonstrate the reserves were false and misleading. *Id.* at *9.[39]

---

[38] Though the plaintiff in *Fiat* later amended his complaint and certain claims survived dismissal (*see infra* note 53), plaintiff did not re-plead any claims regarding Fiat's reserves.

[39] *See also Fait*, 655 F.3d at 107 (rejecting a challenge to the adequacy of reported loan loss reserves even where a company "doubled its loan loss provision to $1.15 billion as compared to a year earlier"); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128-30 (2d Cir. 1994) (finding no allegations that "the company's disclosures were incompatible with what the most current reserve reports showed at the time the disclosures were made"); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 361 (S.D.N.Y. 2011) ("a 'massive increase' to loan loss reserves 'is

At bottom, Plaintiff takes issue with Signet's aging and charge off policies, particularly Signet's use of the "recency" aging method. But these policies were fully disclosed in the "Critical Accounting Policies and Estimates" section of the Management's Discussion and Analysis portion of Signet's SEC filings.[40] Plaintiff's preference for one aging methodology over another does not render Signet's reserves understated or in violation of GAAP, which provides that the establishment of reserves is a matter of judgment.[41] *See supra* notes 17, 33.[42]

**b.**   ***Quality of the Credit Program***

Plaintiff also claims that Signet made false and misleading statements on earnings calls about the quality of the credit program, including that the portfolio was "strong" (FAC ¶¶ 322, 339, 369, 385, 406, 409, 417, 428, 504), "very healthy" (*id.* ¶ 339), "robust" (*id.* ¶ 408), "very stringently controlled" (*id.* ¶ 341), "conservatively managed" (*id.*), and "highly disciplined" (*id.* ¶ 464), with "qualified" "quality customers" (*id.* ¶ 400, 407), "effective[ ]" and "consistent" underwriting (*id.* ¶¶ 484, 489) and "minimize[d] risk" (*id.* ¶¶ 363, 365, 383). According to Plaintiff, these descriptions were misleading because, in truth, the program contained "high-risk

---

not, in itself, an indicator that the previous reserve levels were inadequate'"); *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 411 (S.D.N.Y. 2010) (rejecting plaintiffs' claim that reserves were knowingly inadequate even where "Fannie increased its combined loss reserves from $15.6 billion to $24.8 billion").

[40] *See, e.g.*, Ex. A70, A144, A147, A248, A251-52, A347-48.

[41] Nor does the Federal Reserve's preference with respect to aging methodologies show any actionable misstatements. The Bank Holding Company Supervision Manual referenced by Plaintiff (FAC ¶ 59) is for "banks and their consumer finance subsidiaries," which—as discussed at *supra* note 18—are different lenders than large retailers like Signet.

[42] Plaintiff's reference to a comment letter from the SEC regarding Signet's use of the recency aging method also does nothing to support its claims. *See, e.g.*, *Fait v. Regions Fin. Corp.*, 712 F. Supp. 2d 117, 123 (S.D.N.Y. 2010) (an SEC comment letter that does not question the validity of a company's financial disclosures, but simply seeks detail as to how the company calculates disclosed metrics, is insufficient to establish a misstatement or omission), *aff'd*, 655 F.3d 105 (2d Cir. 2011). Signet responded to the SEC letter (Ex. E), and while Plaintiff suggests that the SEC might be investigating Signet (FAC ¶ 152), we are unaware of any investigation.

subprime loans" and there was "lax" and "reckless" underwriting. *Id.* ¶¶ 79, 123, 125, 294, 323, 340, 363, 408, 465, 485, 517.

All of these statements are: (i) inactionable puffery—*i.e.*, statements that are "too general to cause a reasonable investor to rely upon them" (*see ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009) (a company's statement that it "had 'risk management processes [that] [we]re highly disciplined" was inactionable puffery) (first alteration in original)); or (ii) statements of opinion for which Plaintiff must plead that "the speaker did not hold the belief she professed" or "the supporting fact she supplied were untrue" or information was "omitted" that rendered the statement misleading (*see Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015); *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016)). But Plaintiff never marshals any facts, much less particularized ones, showing that Signet did not in fact hold the beliefs expressed about the credit program, nor does Plaintiff point to any omitted fact necessary for investors to assess the statements.[43]

Once again, there simply is no punchline. Plaintiff does not allege any particularized facts showing that the portfolio, in fact, was not performing "strongly," or was not a "competitive

---

[43] Alleging that a statement of belief is misleading because of an omitted fact "is no small task for an investor." *Sanofi*, 816 F.3d at 210 (citation omitted); *see Omnicare*, 135 S. Ct. at 1332 ("The investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement . . . misleading to a reasonable person reading the statement fairly and in context.") (citation omitted). The Second Circuit has emphasized that opinion statements must be evaluated in their proper context, which includes any "hedges, disclaimers, and apparently conflicting information," as well as "the customs and practices of the relevant industry." *Sanofi*, 816 F.3d at 210. Here, Signet repeatedly cautioned investors that "any deterioration in the consumers' financial position could adversely impact sales [and] earnings" and negative developments with respect to its credit portfolio could "adversely affect its collection of outstanding accounts receivable, its net bad debt charge and hence earnings." *See, e.g.*, Ex. A68, A143, A246, A345.

advantage" for Signet, or that Signet did not have "effective" underwriting. There has been no revelation (corrective disclosure) to the contrary.

The purported CWs do not support Plaintiff's generalized attack. CWs 2, 3, 4, and 5 were store-level employees who allegedly support the unremarkable proposition that part of their job was to encourage customers to sign up for credit. FAC ¶¶ 80-84.[44] CW 6 allegedly "worked as a collector in the level 3 collections department" in an undisclosed location and claims to have seen credit applications he deemed "ridiculous." *Id.* ¶ 85. But *none* are alleged to have had any involvement with approving credit applications, *none* are alleged to have any knowledge of Signet's credit guidelines, *none* are alleged to have any awareness of the quality or performance of Signet's credit portfolio, and *none* are alleged to have any involvement in Signet's disclosures—let alone any interactions with senior management responsible for the program or Signet's disclosures. *See Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (statements attributed to CWs must "provide an adequate basis for believing that the defendants' statements were false" and plaintiffs must plead facts "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged").[45]

CW 1—the IT professional who left in February 2014 before almost all of the alleged false and misleading statements—merely confirms the common sense observation that there is a "gap" between sales numbers and "real cash flow" when a portion of sales are made on credit

---

[44] *See Schaffer*, 2018 WL 481883, at *7 (rejecting confidential witness's assertion that he was instructed to focus on the "benefits of the program" as "little more than basic salesmanship" which "certainly does not support an inference that Horizon acted improperly").

[45] *See also Schaffer*, 2018 WL 481883 at *13 (rejecting allegations of rank-and-file employees with no alleged contacts with defendants); *Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010) (same), *aff'd*, 430 F. App'x 63 (2d Cir. 2011). For the same reasons, the IT professional CW 1's anecdotal description of "delinquent" applications he allegedly saw as a "joke" and nebulous assertion that there were "no strict rules" for the extension of credit (*id.* ¶ 67) also do not satisfy the particularity standard.

and that a "negative trend" in collection efforts could increase that "gap." FAC ¶¶ 69, 72. Plaintiff (and CW 1) do not allege that Signet failed to accurately disclose its sales numbers, or the percentage of those sales numbers comprised of credit sales, or that Signet misstated its cash flow. And as both Plaintiff and CW 1 acknowledge, Signet was disclosing *increasing* bad debt during the alleged class period. *Id.* ¶¶ 52, 71, 440, 451, 462, 481, 538, 551.

In the absence of any particularized allegations demonstrating falsity with respect to any of Signet's descriptions of its credit program, Plaintiff alleges that Signet periodically (and for unknown reasons) secretly "tightened" its credit standards, thus leading to lower sales. Plaintiff also speculates that the outsourcing of the credit portfolio demonstrates the falsity of Defendants' prior statements about the portfolio. Neither contention withstands scrutiny.

Alleged Tightening of Credit: Plaintiff points to disappointing sales results disclosed by Signet in August 2016 for the second quarter of its 2017 fiscal year, and concludes that these poor results were because Signet "was forced to tighten its reckless underwriting practices." FAC ¶ 123. Supposedly, this shows that the program was recklessly run in the past and full of toxic loans contrary to the positive statements challenged in the Complaint. Plaintiff's sole support for this allegation is CW 7, who is described as a credit authorizer who formerly worked at Signet's Akron headquarters and allegedly stated that "in approximately mid-2016, credit guidelines became stricter and the Company made changes to the way it scored customer accounts" for unspecified reasons. *Id*. This is far too generalized an allegation to carry the weight assigned to it, especially in the face of clear public statements by Signet about the reasons for the downturn in sales, *e.g.*, Ex. A289 ("our stores in states and provinces closely tied to the energy industry dramatically underperformed," which "accounted for approximately half of our comp decline within North America"), and confirming that its credit underwriting policies had *not* changed in

24

the preceding decade (Ex. A342).

Plaintiff pleads no facts showing why or how Signet's lending standards supposedly changed, much less how they became "stricter" than prior guidelines, or how (or by whom) such changes were made or communicated to credit authorizers like CW 7. Nor does Plaintiff plead facts showing how those alleged changes impacted the performance of the portfolio as reported by the Company or rendered any of the Company's prior statements about the strength of the portfolio false.[46] In fact, the Complaint alleges that Signet had been reporting disappointing results beginning *a year before* any supposed change in the credit guidelines. FAC ¶ 89.

Similarly, Plaintiff points to disappointing earnings results reported by the Company on May 25, 2017 (for Q1 FY2018), November 21, 2017 (for Q3 FY2018), and March 14, 2018 (for Q4 FY2018), concluding again that the poor results must have been the result of yet further undisclosed "tightening" of Signet's credit standards. FAC ¶¶ 14, 16, 155, 171, 543.[47] But Plaintiff cites no particularized facts—no internal document or confidential witness—contradicting the publicly stated reason for the disappointing results: "the later timing of Mother's Day" and challenges in the "overall retail environment" (May 2017), "weather-related incidents and systems and process disruptions associated with the outsourcing of the credit portfolio" (November 2017), and "challenges at our Kay and Jared banners, including execution

---

[46] *See Schaffer*, 2018 WL 481883, at *6 ("one unnamed rank-and-file employee['s] claim[] that he was 'instructed'—at an unknown time, in an unknown place, and by an unknown person—'not to tell patients the price of the drugs or what their insurance company was being billed'" lacks "sufficient particularity to support the probability that the witness[ ] possessed the information alleged"); *Am. Express Co.*, 724 F. Supp. 2d at 460 (refusing to credit "conclusory statements that [the defendant] had 'lowered its lending criteria'" because they came from CWs who were alleged to be "rank-and-file" employees without "access to aggregated data regarding credit risk" or to have "received a directive from the Company to lower credit standards").

[47] While Plaintiff contends Signet's reported credit penetration rate of 60.7% for Q1 FY2018 was "significantly below the Class Period high of 66.8%," "evidencing the impact of its credit tightening" (FAC ¶ 143), the credit penetration rate for Q1 FY2018 was down less than 3% from the same comparable quarter the prior year (Ex. A391).

issues related to the first phase of our credit outsourcing transaction" (March 2018). Ex. A355, A425, A474; FAC ¶¶ 155, 159, 161, 180, 542-43.[48]

Outsourcing the Credit Program: Plaintiff points to Signet's announcement on May 26, 2016, that it was "conducting a strategic evaluation of the Company's credit portfolio" and had hired Goldman Sachs to "consider a full range of options with respect to its credit operations," as somehow contradicting prior disclosures about the portfolio's credit quality and risks. FAC ¶¶ 111-12. This announcement does not logically support the conclusion that prior statements about the beneficial impact of the program or its strengths were misleading. As alleged in the Complaint (*id.* ¶¶ 8, 90-99, 104, 107-08, 113-16, 139-40, 148, 369, 472), Signet received many investor inquiries about the program over the years, and it would be a strange result indeed if the decision by Signet's board to re-evaluate the program without any admission or disclosure of serious (and previously undisclosed) problems would support a claim of securities fraud.

Nor does Signet's announcement on May 25, 2017, of the "first phase" of its outsourcing of the credit program (including the nearly $1 billion sale of its prime credit accounts to ADS and outsourcing of non-prime accounts to Genesis) or its March 14, 2018 announcement of the sale of the remaining $800 million non-prime portion (at less that net book value) reveal that any prior disclosures about the program were misleading. FAC ¶¶ 109-16, 144-45. Every credit portfolio consists of some non-performing or lower quality loans, and, as discussed at p. 17, it is not surprising that a third party buyer would pay less for the non-prime versus the prime portion

---

[48] "Analysts" cited by Plaintiff who similarly "question[ed]" the reason for the sales decline or "surmised" it could be attributable to credit tightening without any factual basis (FAC ¶¶ 159-60) do not demonstrate the falsity of the company's statements. *See In re Herbalife, Ltd. Sec. Litig.*, 2015 WL 1245191, at *5 n.7 (C.D. Cal. Mar. 16, 2015) (analyst reports "repackaging . . . already-public information" do not reveal to the market the falsity of a company's prior statements); *see also Sapssov v. Health Mgmt. Assocs., Inc.*, 608 F. App'x 855, 864 (11th Cir. 2015) (analyst reports that simply set forth "a negative summary of already public information . . . are inadequate to establish the falsity of . . . disclosures.").

of the book.

In sum, Plaintiff has seized upon any lower-than-expected sales during the nearly five-year putative class period and concluded that *each* instance must have been the result of undisclosed tightening of credit standards. Plaintiff then takes those imagined events, along with the decision to outsource the program, and concludes that *every* prior statement about the quality of the portfolio and the Company's underwriting standards was false and misleading. Putting aside the fact that even a "tightening" of credit standards and the outsourcing of the program does not render every statement about the "strength" of the program false and misleading, the FAC is devoid of any particularized facts to support Plaintiff's story.[49]

To the extent Plaintiff's real complaint is that the credit program was poorly run, even if true, the Supreme Court taught long ago that the securities laws cannot be used to attack business practices and do not serve as in insurance policy against business reversals. *See Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 479 (1977) ("[C]ongress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement.") (internal

_____

[49] Plaintiff also challenges a statement in an October 23, 2017 press release about the completion of the first phase of credit outsourcing, claiming Defendants falsely stated it had "'achieved' the 'key priority of our credit transaction . . . [to] minimize impact on our credit customers and substantially maintain our net sales'" given the later announced impact on third quarter sales on November 21, 2017. FAC ¶ 548. However, the actual statement describes achieving "[a] key priority" of the transaction, which was to maintain sales by "continu[ing] to provide the full suite of our credit offerings for our customers, and adding an incremental lease-purchase financing option with Progressive Leasing." Ex. A420. There is no particularized allegation that the Company did not in fact continue to provide the full suite of credit offerings or that any of the defendants knew of the "systems and process disruptions" that occurred "in the last week of Q3 and the first week of Q4" (October 21st to November 5th) at the time the October 23 statement was made, much less that they might impact sales. Ex. A425, A436. *See Friedman v. Endo Int'l PLC*, 2018 WL 446189, at *7 (S.D.N.Y. January 16, 2018) (Furman, J.) (finding defendant's positive statements about post-acquisition financial results were not false and misleading because of integration issues where plaintiff failed to plead that defendant "did not genuinely believe it to be true or that he proffered an untrue supporting fact"). Nor does it follow that Signet would falsely claim it had "maintained" sales during the transition only to disclose just four weeks later that disruptions in the transition had impacted sales.

citation omitted); *see also Friedman*, 2018 WL 446189, at *7 ("The securities laws . . . do not provide remedies for bad business decisions; they provide remedies only for fraud."); *Ciresi v. Citicorp*, 782 F. Supp. 819, 821 (S.D.N.Y. 1991) ("Even if well-pled," a claim that "the defendants did not plan their loan reserves properly is essentially a claim that defendants mismanaged the company" and is "not actionable under section 10(b) of the federal securities laws."), *aff'd*, 956 F.2d 1161 (2d Cir. 1992).

### 2.   No Scienter

Notably, Plaintiff does not attempt to establish scienter with respect to each Individual Defendant, which "[b]y itself, warrants dismissal of [Plaintiff's] Exchange Act claims." *Schaffer*, 2018 WL 481883, at *11. Plaintiff's allegations fail regardless. There are no allegations of insider selling or any other improper and concrete benefits realized by any of the Individual Defendants: to the contrary, four of the five Individual Defendants actually *increased* their holdings of Signet stock during the purported class period, undermining any inference of scienter.[50] Where, as here, a "[p]laintiff[ ] fail[s] to allege that Defendants received a 'concrete and personal' benefit from the alleged scheme," *Cortina v. Anavex Life Scis. Corp.*, 2016 WL 7480415, at *6 (S.D.N.Y. Dec. 29, 2016) (Furman, J.), it has conceded a lack of scienter based on "motive and opportunity." *See Rombach v. Chang*, 355 F.3d 164, 177 (2d Cir. 2004) (finding "no personal interest sufficient to establish motive" where "[p]laintiffs [did] not allege that defendants sold stock or profited in any way during the relevant period"); *Hensley*, 2014 WL 4473373, at *4 (plaintiffs "effectively concede[d]" that they failed to plead scienter under the

---

[50] *See* Ex. I (Signet Form 3 and 4s for Drosos, Light, Ristau, and Santana); *see also Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009) (acquisition of stock by three defendants, and a lack of sales by a fourth defendant, did not support a finding of scienter); *Turner v. MagicJack VocalTec, Ltd.*, 2014 WL 406917, at *11 (S.D.N.Y. Feb. 3, 2014) ("That three of the four individual Defendants, all high-ranking executives at the Company, did not sell stock during the Class Period, and that two of these Defendants instead purchased stock during the relevant period, rebuts an inference of scienter.").

motive and opportunity theory where they alleged no stock sales by Defendants during the class period).

Where motive is not apparent, "the strength of circumstantial allegations [of conscious misbehavior and recklessness] must be correspondingly greater." *Hensley*, 2014 WL 4473373, at *5 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)). Conscious misbehavior or recklessness requires Plaintiff to allege conduct by the Defendants that is, "at the least, . . . highly unreasonable" and "represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Fiat I*, 2016 WL 5818590, at *6 (quoting *Kalnit*, 264 F.3d at 142). To do so, Plaintiff must "specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements." *Id.* (quoting *Novak*, 216 F.3d at 308).

There is not a single CW who alleges, or any alleged specific internal document or report that shows, that any of the Individual Defendants knowingly or recklessly participated in the alleged fraud to understate loan loss reserves and overstate the quality of the credit program. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (dismissing claims where plaintiffs failed to "specifically identif[y] any reports or statements that would have come to light in a reasonable investigation and that would have demonstrated the falsity of the allegedly misleading statements"); *Woodward v. Raymond James Fin., Inc.*, 732 F. Supp. 2d 425, 436 (S.D.N.Y. 2010) ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."); *see also In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 407 (S.D.N.Y. 2016).

The low-level CWs cited by Plaintiff who offer anecdotal stories and their own opinions about the quality of the credit Signet offered customers (former store employees, CWs 2, 3, and

4, and "level 3 collector" CW 6) are not alleged to have been responsible for or to have had any knowledge of Signet's credit portfolio or the Company's public reporting or statements to investors—let alone any contact with the Individual Defendants. *See supra* note 45. Nor does CW 7—the alleged credit authorizer who claimed Signet's credit guidelines became "stricter" in mid-2016—allege if, how, or when any changes were communicated by or to the Individual Defendants. *See supra* pp. 24-25.

Only CW 1—the IT professional—supposedly stated that internal "gap analyses" showing the difference between sales numbers and real cash flow and "other negative trends in the credit portfolio were communicated to senior Signet executives, including Defendant Light" (FAC ¶¶ 69, 72), and that there were "regular bad debt meetings with the executives, including Light and [Trabucco], to discuss strategies to overcome expanding bad debt, low contact rates [with customers for collection efforts], and similar issues" as well as "loan loss reserves" (*id.* ¶¶ 72, 75). But again, CW 1 is alleged to have left the Company in February 2014—over *three years* before the end of the class period and before *almost all* of the supposed false and misleading statements were made—and does not identify any specific report or any particular information discussed by executives at any specific meeting that contradicted anything that Signet was saying publicly about the program, including the Company's loan loss reserves or the Individual Defendants' beliefs that the program was a "competitive advantage," "strong," and "conservatively managed."[51]

---

[51] Even if Plaintiff was right (and it is not) that the sale of the non-prime portion of its credit portfolio at a loss shows its reserves were understated at that time, that is not enough to show that Defendants *purposefully* or *recklessly* understated reserves—let alone for nearly five years. *ECA*, 553 F.3d at 200 ("[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. . . . Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient."); *Stevelman*

Plaintiff's conclusory allegations that the Individual Defendants *would have* or *must have* known of contradictory information about the Company's lending practices and the performance of the credit portfolio given the "importance" of credit (FAC ¶¶ 44, 590) fail to demonstrate scienter. *See, e.g.*, *Pirnik v. Fiat Chrysler Autos., N.V. (Fiat II)*, 2017 WL 3278928, at *3 (S.D.N.Y. Aug. 1, 2017) (Furman, J.) ("conclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge [are] insufficient"); *Am. Express Co.*, 724 F. Supp. 2d at 460 ( "general allegations that, by virtue of their senior positions . . . , the Individual Defendants necessarily had access to nonpublic information, are insufficient to show recklessness.").[52]

This Court rejected similarly vague and conclusory scienter allegations in *Fiat II* based on the "unremarkable fact" that executives were alleged to have received reports on emission tests and were aware other automobile manufacturers faced regulatory scrutiny for illegal emission "defeat devices," as well as "vague" CW statements that emission reports went to senior management. *Fiat II*, 2017 WL 3278928, at *2. The Court concluded that such allegations "provide[d] little or no support for Plaintiffs' claim that [defendants] 'must have known' that . . . cars had illegal defeat devices" and there were no particularized allegations pled that defendants had access to information that actually contradicted their public statements. *Id.* at *3.[53]

---

*v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999) (the "recklessness standard in securities fraud action 'requires more than a misapplication of accounting principles'") (citations omitted).

[52] Likewise, the CFPB and NYAG investigations—which are not alleged to even concern Signet's underwriting standards or the quality of its credit portfolio—do not demonstrate scienter. *See Schaffer*, 2018 WL 481883, at *13 ("An inconclusive investigation with an undefined scope cannot 'give rise to a compelling inference of scienter.'") (citation omitted).

[53] Subsequently, the *Fiat* plaintiff filed a fourth amended complaint which did contain particularized facts showing that the defendants had received specific warnings from the EPA that contradicted their public statements about Fiat's compliance with certain emissions regulations. *Pirnik v. Fiat Chrysler Autos., N.V.* (*Fiat III*), 2017 WL 5312182, at *2 (S.D.N.Y. Nov. 13, 2017) (Furman, J.).

Plaintiff's supposed fraud also makes no sense. According to Plaintiff, Defendants (including *three different* consecutive CEOs and *two different* CFOs) engaged in a multi-year fraud to publicly tout Signet's credit program and understate reserves in order to drive sales and mask weaknesses in the program, but—for reasons unknown and never explained—these same executives periodically (but not consistently) secretly "tightened" credit standards resulting in disappointing sales. Plaintiff's illogical theory cannot pass the familiar *Tellabs* test requiring a strong inference of fraud at least as "cogent" and "compelling" as the competing "plausible nonculpable explanation"—here, that Defendants consistently disclosed a wealth of information concerning the Company's unique in-house credit program, believed that the program was a good one, believed the reserves were adequate, but ultimately determined (with the help of an experienced investment banking firm) that more value could be realized for shareholders by outsourcing the program and then experienced some setbacks during course of the transition. *See Fiat II*, 2017 WL 3278928, at *4; *see also Dynex*, 531 F.3d at 197 (affirming dismissal of 10(b) claim because inference of scienter was not as compelling as nonculpable inference) (citing *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 314 (7th Cir. 2008)).

### 3.   No Loss Causation

In the Second Circuit, a complaint must allege that "the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (internal citation omitted). A plaintiff's burden to plead loss causation may be satisfied by pleading facts showing that the decline in stock value that the plaintiff claims as its loss was caused by either: (i) a disclosure that corrected the defendant's prior fraudulent statement; or (ii) a foreseeable materialization of a risk concealed by the fraudulent statement. *Omnicom*, 597 F.3d at 511;

*Lentell*, 396 F.3d at 173. Here, none of the stock drops alleged by Plaintiff supports a showing of loss causation.

    *First*, as described above (*supra* Point II.A.1.b), the announcement on May 26, 2016, that Signet had hired Goldman Sachs to evaluate its credit portfolio, and the eventual sale and outsourcing of the portfolio announced on October 23, 2017, and March 14, 2018, did not reveal that any prior statements about the credit portfolio were false, and thus are not "corrective" disclosures. *See Alaska Laborers Empl'rs Ret. Fund v. Scholastic Corp.*, 2011 WL 3427208, at *3 (S.D.N.Y. Aug. 3, 2011) (a statement that "d[oes] not convey any information that reveals the falsity of earlier statements made by Defendants" "cannot, as a matter of law, constitute a corrective disclosure").[54]

    *Second*, as explained above, the announcement of declines in sales in 2016, 2017, and 2018 (FAC ¶¶ 551-54) does not in any logical way amount to an admission or corrective disclosure regarding the quality of Signet's credit portfolio. Plaintiff has nothing but speculation to support its contention that these declines resulted from "credit tightening." *See Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*, 548 F. App'x 16, 18 (2d Cir. 2013) (speculative allegations are insufficient to plead loss causation); *Omnicom*, 597 F.3d at 512

---

[54] The announcement of the CFPB and NYAG investigations (FAC ¶¶ 15, 163, 165, 563) also is not corrective because those investigations are not alleged to concern Signet's underwriting standards or the quality of its credit portfolio, nor has there been any admission or finding of wrongdoing. *See Meyer*, 710 F.3d at 1201 ("The announcement of an investigation reveals just that—an investigation—and nothing more . . . . To be sure, stock prices may fall upon the announcement . . ., but that is because the investigation can be seen to portend an added risk of future corrective action. That does not mean that the investigations, in and of themselves, reveal to the market that a company's previous statements were false or fraudulent."); *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014); *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *15 (S.D.N.Y. Mar. 30, 2012).

(rejecting an observer's "conclusory suspicions" as a basis for finding loss causation).[55]

Tellingly, each successive amended complaint has changed the date when the "truth" about the credit portfolio allegedly emerged in a misguided effort to capture continuing declines in Signet's stock price. Of course, loss causation requires more. Plaintiff fails adequately to allege that these declines in Signet's stock price (in May 2017, November 2017, and March 2018) were tied to disclosures that "corrected" Signet's prior statements about the credit portfolio, as opposed to declines after the Company disclosed disappointing results and reduced guidance going forward.

### B.     Plaintiff Fails to State a Claim Relating to the *Jock* Arbitration

Plaintiff alleges that Signet misled investors about the *Jock* Arbitration, the risks to its business arising from the Arbitration, and its internal Code of Conduct. As we explain below, Signet fully complied with its litigation disclosure obligations and had no obligation to disclose salacious and disputed allegations. Plaintiff has failed to plead falsity, scienter, or loss causation with respect to its Arbitration-related claim.

### 1.     No Actionable Misstatements

Plaintiff contends that Signet's description of the *Jock* Arbitration as a class action "alleging that US store-level employment practices are discriminatory as to compensation and promotional activities" was false and misleading because it failed to disclose that declarations submitted in connection with the Arbitration had "uncovered extensive evidence showing a

---

[55] It is well-settled that analyst reports like the Grant Report, which is described in the Complaint as being "partially corrective" and as having triggered a stock price drop (FAC ¶ 556), are based on public information and do not reveal any previously unknown facts to the market, and thus cannot be corrective disclosures. *See supra* p. 18 n.35 (citing *Cent.*, 543 F. App'x at 75, and *Omnicom*, 597 F.3d at 511-12).

pervasive culture of sexual harassment reaching up to the highest levels of the Company."[56]

Signet's disclosure obligation arises out of Item 103 of SEC Regulation S-K (17 C.F.R.

§ 229.103), which requires publicly-traded companies to:

> *Describe briefly* any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant or any of its subsidiaries is a party or of which any of their property is the subject. Include the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceeding and the relief sought. . . . (emphasis added)

In *In re SeaChange International, Inc. Securities Litigation*, the Court explained that

"Item 103 marks the extent of a registrant's obligation to disclose information pertaining to

pending litigation." 2004 WL 240317, at *10 (D. Mass. Feb. 6, 2004). "The disclosure required

by Item 103 is meant to put potential investors on notice of pending litigation, not to force

companies to predict a particular outcome in the litigation." *Id.* at *10.[57]

Signet squarely met the requirements of Item 103. As explained above, just two days

after the plaintiffs filed the *Jock* complaint in 2008, Signet filed a Form 6-K with the SEC in

which it disclosed: (i) the court in which that action was pending; (ii) the date it was filed;

(iii) that the claims in the complaint were "based on the allegations of 15 former and current

employees working in a few stores"; (iv) that the plaintiffs alleged that Sterling Jewelers Inc.

"paid women less than men who performed similar work" and "favor[ed] men over women for

---

[56] FAC ¶¶ 324-25, 350-51, 371-72, 387-88, 401-02, 418-19, 430-31, 445-46, 456-57, 466-67, 492-93, 508-09, 518-19, 530-31.

[57] *See also Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 518 (7th Cir. 1989) (Item 103 does not require companies to disclose "the probability that the tribunal will deliver a particular decision"); *In re Bos. Sci. Corp. Sec. Litig.*, 490 F. Supp. 2d 142, 153-56 (D. Mass. 2007) (when an issuer satisfies the disclosure required by Item 103, it has "no duty to inform the investment community of its own internal assessments of its prospects for settling the . . . litigation"), *rev'd on other grounds sub nom. Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 78 (1st Cir. 2008).

promotions"; and (v) that the Company denied the allegations and intended to vigorously defend the claims. Ex. B2. All of this disclosure was accurate.

Not a single fact pleaded in the Complaint shows otherwise. Indeed, a review of the publicly filed *Jock* complaint, as well as subsequent public filings (including the Arbitrator's class certification decisions), confirms that the *Jock* Arbitration alleges that "US store-level employment practices [we]re discriminatory as to compensation and promotional activities," as Signet has consistently disclosed every quarter since the original disclosure of the suit.[58] And Signet has subsequently updated the disclosure, as necessary, to disclose various rulings (including those on class certification) in the long running litigation, which is now in its tenth year. There have been no findings or conclusions as to any liability. Indeed, Judge Rakoff recently issued a decision finding that the Arbitrator had no authority to certify the Title VII class that included more than 70,000 absent class members. That decision has been appealed by the claimants. Op. and Order at 2, 9, *Jock v. Sterling Jewelers, Inc.*, Case No. 08-cv-2875 (JSR) (S.D.N.Y. January 16, 2018), ECF No. 168. Signet also has cautioned investors that if it is "unsuccessful" in its defense of the case, it "could be required to pay substantial damages" and that an "adverse decision" "could reduce earnings." *E.g.*, Ex. B25, B63, B77, B140, B164. Signet has more than satisfied its Item 103 disclosure obligations.

In an attempt to conjure up a disclosure claim, Plaintiff points to and quotes from declarations submitted in connection with class certification in the Arbitration that were made public in February 2017, and then jumps to the conclusion that there is a "pervasive culture of sexual harassment reaching up to the highest levels of the Company" that renders all of Signet's

---

[58] *See, e.g.*, Ex. B2, B7, B25, B40, B52, B70, B88, B109, B125, B141; *see also* First Am. Compl. ¶ 2, *Jock v. Sterling Jewelers, Inc.*, Case No. 08-cv-2875 (JSR) (S.D.N.Y. Apr. 24, 2008), ECF No. 11; *Jock*, 143 F. Supp. 3d at 128.

litigation disclosures false and misleading. FAC ¶¶ 351, 372, 388, 402, 419, 431, 446, 457, 467, 493, 509, 519, 531. But the declarations do not change the nature of the actual claims in the Arbitration or the fact that Signet is contesting the claims, or establish that Signet will not prevail in its defense of the claims.

Plaintiff points to no ruling, opinion, order, or judgment that has ever substantiated the selected allegations in the declarations or held that the Company has a "pervasive culture of sexual harassment." More to the point, Signet is not obligated under the federal securities laws to engage in self-flagellation or to disclose every piece of disputed evidence submitted in the case or predict the probability of a particular finding by the Arbitrator. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) ("[d]isclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing") (footnote and internal quotation marks omitted); *Silsby v. Icahn*, 17 F. Supp. 3d 348, 362-63 (S.D.N.Y. 2014) (corporate defendants "ha[ve] no obligation to accuse themselves of wrongdoing"), *aff'd sub nom. Lucas v. Icahn*, 616 F. App'x 448 (2d Cir. 2015); *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 15 (S.D.N.Y. 2016) (same); *Harrison v. Rubenstein*, 2007 WL 582955, at *13 (S.D.N.Y. Feb. 26, 2007) (holding that defendant "was . . . under no duty . . . to characterize its behavior in a pejorative manner in its public disclosures") (internal quotation marks omitted).[59]

---

[59] *SeaChange* is instructive. Defendant SeaChange was litigating a patent infringement case and, just like Signet, disclosed the information required by Item 103 along with several "Risk Factors" relating to the litigation in a prospectus. 2004 WL 240317, at *6-7. A jury later awarded a $2 million verdict against SeaChange leading to a stock price decline and a reported net loss of $21 million. *Id.* at *2. The plaintiff in *SeaChange* argued that the litigation disclosure was "false and misleading because SeaChange was, at the time it made the statements, willfully infringing on [the contested] patent" and knew that it would likely receive a jury verdict that "would adversely impact SeaChange's business." *Id.* at *7. The court disagreed, explaining "[t]he information provided in the Prospectus was accurate, even considering knowledge of the patent

Plaintiff also claims that certain risk factors in Signet's public filings that "[l]oss of confidence by consumers in Signet's brand names . . . could have a detrimental impact on sales," that "Signet's success is dependent on the strength and effectiveness of its relationships with its various stakeholders whose behavior may be affected by its management of social, ethical and environmental risks," and that "[s]ocial, ethical and environmental matters influence Signet's reputation, demand for merchandise by consumers, [and the Company's] ability to recruit staff" (FAC ¶¶ 326, 328 (quoting Signet FY 2013 Form 10-K) (emphasis omitted)), were all rendered false after the declarations were submitted in 2013 because the risks were not "merely hypothetical," but were "highly material" or had already materialized. *Id.* ¶ 327. But Signet has no obligation to disclose something it does not believe to be true—*i.e.*, that it has a "pervasive culture of sexual harassment," and which certainly has not been proven in the Arbitration. *See Schaffer*, 2018 WL 481883, at *8 (risk warnings about illegal activity and misconduct were not misleading based on plaintiffs' allegation that defendant was "presently violating such laws and regulations" where plaintiff "ha[d] failed to allege any underlying violation" and "no reasonable investor would interpret such a generic risk warning as an assurance of present compliance"). Even further afield is Plaintiff's contention that Signet's disclosure on its website of its Code of Conduct adopted on February 28, 2013, misled investors because "the Company was pervaded with a culture of sexual harassment." FAC ¶ 331. As this Court has held, alleged violations of "aspirational" internal policies like codes of ethics or conduct do not give rise to securities fraud. *See Schaffer*, 2018 WL 481883, at *8 (defendant's announcement that it had adopted an internal Code of Business Ethics and Conduct is "not actionable under the securities laws.") (internal

---

infringing conduct" and SeaChange had "no duty . . . that would require SeaChange to describe the . . . litigation differently or in more detail than it did in the Prospectus." *Id.* at *9, 10.

citation omitted).[60] Likewise, statements pertaining generally to Signet's "culture, reputation, and compliance [that] were all pitched at a general and an aspirational level . . . . do not contain historical representations" that are actionable under the securities laws. *In re Braskem*, 246 F. Supp. 3d. at 756; *see also City of Pontiac*, 752 F.3d at 183 ("general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery" because "they are 'too general to cause a reasonable investor to rely upon them'"); *Barrett v. PJT Partners Inc.*, 2017 WL 3995606, at *6 (S.D.N.Y. Sept. 8, 2017) (refusing to find statements made in a code of conduct actionable because they are "aspirational statements").

### 2. No Scienter

Signet's repeated disclosure of the Arbitration and the specific risk warning relating to that proceeding undermines any contention that Defendants acted with fraudulent intent. There are no particularized allegations showing that any Individual Defendant intentionally or recklessly failed to disclose, or caused the Company to fail to disclose, facts about the Arbitration that it was obligated to disclose or to make any false or misleading statement about the risks facing the Company from that proceeding. There are no CWs cited with respect to these disclosures at all. *See Lions Gate*, 165 F. Supp. 3d at 24 (finding defendants failure to disclose a pending SEC investigation and the SEC's issuance of "Wells Notices" was "not enough to plead scienter based on conscious misbehavior or recklessness" where there was no duty to disclose the investigation or the Wells Notices). There is no inference of fraud even remotely as "cogent" or "compelling" as the competing inference that Defendants acted in good faith in disclosing the

---

[60] *See also Fries v. N. Oil & Gas Inc.*, 2018 WL 388915, at *7 (S.D.N.Y. Jan. 11, 2018) ("The mere adoption of a code of ethics is not rendered misleading by an undisclosed breach thereof.") (collecting cases); *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 755-56 (S.D.N.Y. 2017) ("Because 'a code of ethics is inherently aspirational[,] it simply cannot be that every time a violation of that code occurs, a company is liable under federal law for having chosen to adopt the code at all.'") (citation omitted).

existence of the *Jock* action and the nature of the claims.

### 3. No Loss Causation

The Complaint alleges that the February 27, 2017 Washington Post Article "for the first time[ ] provided the market with a comprehensive understanding" of the allegations of sexual harassment, and that Signet's stock dropped in response. FAC ¶ 569. Again, Signet had no duty to disclose the salacious (but unadjudicated) allegations, and their later widespread publicity did not reveal or correct any prior misstatements.[61]

## III.   PLAINTIFF FAILS TO STATE A SECTION 20(a) CLAIM

Plaintiff's control person claims under Section 20(a) of the Exchange Act fail because the Complaint does not adequately plead an underlying primary violation for all the reasons above. *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) (noting that a plaintiff must plead a plausible primary violation of Section 10(b) to state a claim for control person liability under Section 20(a)).

### CONCLUSION

For the reasons explained above, Plaintiff has failed to state a claim under Section 10(b) and 20(a) of the Exchange Act. Defendants therefore respectfully request that the Court dismiss the Complaint with prejudice.

---

[61] *See In re The Warnaco Grp., Inc. Sec. Litig. (II)*, 388 F. Supp. 2d 307, 317 (S.D.N.Y. 2005) (there can be no corrective disclosure where a defendant "was under no duty to disclose"), *aff'd sub nom. Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007). As Plaintiff acknowledges (FAC ¶ 391), information concerning the allegations of sexual harassment was already public in 2014—more than three years before the Washington Post article. On March 28, 2014, the New York Times published an article, *Women Charge Bias and Harassment in Suit Against Sterling Jewelers*, which disclosed information about the *Jock* Arbitration, including specific sexual harassment allegations that were included in the 2017 Washington Post report. *See* Ex. J (cited at FAC ¶ 569). Thus, there was no *new information* disclosed on February 27, 2017 that "caused" Plaintiff's alleged losses.

Date:   March 30, 2018
        New York, NY                              Respectfully submitted,


                                                  /s/ *Joseph S. Allerhand*
                                                  Joseph S. Allerhand
                                                  Stacy Nettleton
                                                  David P. Byeff
                                                  Nikolei M. Kaplanov
                                                  WEIL, GOTSHAL & MANGES LLP
                                                  767 Fifth Avenue
                                                  New York, NY 10153
                                                  Telephone: (212) 310-8000
                                                  Facsimile: (212) 310-8007
                                                  Joseph.Allerhand@weil.com
                                                  Stacy.Nettleton@weil.com
                                                  David.Byeff@weil.com
                                                  Nikolei.Kaplanov@weil.com


                                                  *Attorneys for Defendants Signet Jewelers*
                                                  *Limited, Michael Barnes, Virginia Drosos,*
                                                  *Mark Light, Ronald Ristau, and Michele*
                                                  *Santana*