**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re Signet Jewelers Limited Securities Litigation* | Case No.1:16-CV-06728-JMF |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THE FIFTH AMENDED CLASS ACTION COMPLAINT**

### <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS..........................................................................................................i

TABLE OF AUTHORITIES ..............................................................................................iii

PRELIMINARY STATEMENT ......................................................................................... 1

SUMMARY OF THE FACTS ............................................................................................ 3

    I.    Signet Misrepresented Its Underwriting And The Credit Quality of Its Portfolio .................................................................................................................. 3

        A.    While Achieving Unprecedented Sales Growth, Signet Assured Investors Its Lending Remained Conservative And Stringent................... 3

        B.    In Truth, Signet Engaged In Extremely Reckless Underwriting To Drive Sales Growth, Generating Huge Amounts Of High-Risk Subprime Loans ........................................................................................ 4

        C.    Defendants Issued False Assurances To Quell Concern About The Portfolio ............................................................................................... 5

        D.    The Truth Emerges .............................................................................. 6

    II.    Signet Misled Investors About Pervasive Sexual Harassment At The Company ............................................................................................................. 8

        A.    Defendants Falsely Stated That Signet Bases Its Employment Decisions Solely On Merit, And Mischaracterized The Facts Underlying *Jock* ................................................................................... 8

        B.    The Truth Emerges .............................................................................. 9

ARGUMENT ................................................................................................................... 10

    I.    The Complaint States A Claim Concerning The Credit Portfolio ....................... 10

        A.    Defendants Made Misstatements About The Loan Portfolio .................. 10

        B.    Defendants Understated Reserves............................................................ 16

        C.    The Complaint Adequately Alleges Scienter........................................... 24

    II.    The Complaint States A Claim Relating To Sexual Harassment At Signet ......... 30

        A.    Signet Misrepresented Its Business Practices ........................................... 30

        B.    Signet Misrepresented The Facts Underlying *Jock* ................................ 33

C.     Signet's Risk Disclosures Were Misleading .............................................. 36

D.     Defendants' "Truth-On-The-Market" Defense Fails ................................. 36

E.     The Complaint Pleads Scienter For The Sexual Harassment Claims ....... 37

III.     The Complaint Pleads Loss Causation .................................................................. 38

IV.     The Complaint Alleges Control Person Liability ................................................. 40

CONCLUSION ........................................................................................................................... 40

**<u>TABLE OF AUTHORITIES</u>**

PAGE(S)

CASES

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002) ..................................................................21

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
    693 F. Supp. 2d 241 (S.D.N.Y. 2010)................................12, 23, 25, 26

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011) ..................................................18

*In re Bristol Myers Squibb Co. Sec. Litig.*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008)............................................34, 38

*Caiola v. Citibank, N.A., N.Y.*,
    295 F.3d 312 (2d Cir. 2002)..................................................................35

*Carlton v. Cannon*,
    184 F. Supp. 3d 428 (S.D. Tex. 2016) ..................................................14

*In re CIT Grp. Inc. Sec. Litig.*,
    2010 WL 2365846 (S.D.N.Y. June 10, 2010) ......................................11

*City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012)............................................13, 14

*In re CommVault Sys., Inc. Sec. Litig.*,
    2016 WL 5745100 (D.N.J. Sep. 30, 2016) ...........................................28

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)...............................................................................38

*In re Dynex Capital, Inc., Sec. Litig.*,
    2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009) .................................14, 29

*Eckstein v. Balcor Film Investors*,
    8 F.3d 1121 (7th Cir. 1993) ..................................................................36

*In re Eletrobras Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017)......................................12, 31, 32

*In re eSpeed, Inc. Sec. Litig.*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006)...................................................37

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
    986 F. Supp. 2d 487 (S.D.N.Y. 2013)...................................................36

*Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017)....................................................................26

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)............................................................. *passim*

*Fries v. N. Oil & Gas, Inc.*,
    2018 WL 388915 (S.D.N.Y. Jan. 11, 2018) ........................................................33

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)..............................................................11, 31, 36, 37

*In re Gen. Elec. Co. Sec. Litig.*,
    857 F. Supp. 2d 367 (S.D.N.Y. 2012)............................................................ *passim*

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013) .................................................................35

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
    2014 WL 2815571 (S.D.N.Y. June 23, 2014) ................................................31, 32

*Lapin v. Goldman Sachs Grp., Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006)................................................12, 31, 32, 37

*In re MBIA, Inc., Sec. Litig.*,
    700 F. Supp. 2d 566 (S.D.N.Y. 2010)..................................................................37

*In re Moody's Corp. Sec. Litig.*,
    599 F. Supp. 2d 493 (S.D.N.Y. 2009)............................................................12, 31

*In re Nash Finch Co. Sec. Litig.*,
    502 F. Supp. 2d 861 (D. Minn. 2007)...................................................................20

*In re New Oriental Educ. & Tech. Grp. Sec. Litig.*,
    988 F. Supp. 2d 406 (S.D.N.Y. 2013)......................................................19, 21, 22

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)......................................................................... *passim*

*Oklahoma Firefighters Pension & Ret. Sys. v. Student Loan Corp.*,
    951 F. Supp. 2d 479 (S.D.N.Y. 2013)..................................................................23

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015)......................................................................13, 17, 18

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010).................................................................................40

iv

*In re Oxford Health Plans, Inc.*,
  187 F.R.D. 133 (S.D.N.Y. 1999) ...........................................................................28

*In re Oxford Health Plans, Inc. Sec. Litig.*,
  51 F. Supp. 2d 290 (S.D.N.Y. 1999)......................................................................21

*In re Petrobras Sec. Litig.*,
  116 F. Supp. 3d 368 (S.D.N.Y. 2015)....................................................................33

*Pirnik v. Fiat Chrysler Autos., N.V.*,
  2016 WL 5818590 (S.D.N.Y. 2016)...............................................18, 25, 26, 27

*Pirnik v. Fiat Chrysler Autos., N.V.*,
  2017 WL 3278928 (S.D.N.Y. Aug. 1, 2017).........................................................29

*In re Regeneron Pharm., Inc. Sec. Litig.*,
  2005 WL 225288 (S.D.N.Y. Feb. 1, 2005)............................................................13

*Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x 10 (2d Cir. 2011) ..............................................................................19

*Richman v. Goldman Sachs Grp., Inc.*,
  868 F. Supp. 2d 261 (S.D.N.Y. 2012)........................................................31, 32, 33

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000)......................................................................................27

*In re Salix Pharm, Ltd.*,
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)........................................................24

*Schaffer v. Horizon Pharma PLC*,
  2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ..............................................15, 20, 33

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)................................................................................27, 28

*Sharette v. Credit Suisse Int'l*,
  127 F. Supp. 3d 60 (S.D.N.Y. 2015)......................................................................10

*Shenk v. Karmazin*,
  867 F. Supp. 2d 379 (S.D.N.Y. 2011).....................................................................27

*In re Take Two*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008).....................................................................40

*Tapia-Matos v. Caesarstone Sdot-Yam, Ltd.*,
  2016 WL 3951184 (S.D.N.Y. July 20, 2016) ........................................................16

*Taubenfeld v. Career Educ. Corp.*,
    2005 WL 350339 (N.D. Ill. Feb. 11, 2005) ...................................................................20

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)...................................................................13, 14, 17

*In re Vivendi Univ., S.A. Sec. Litig.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003)...................................................................10, 39, 40

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)...................................................................38, 39, 40

*In re Winstar Commc'ns*,
    2006 WL 473885 (S.D.N.Y. Feb. 27, 2006)...................................................................21

*Woods v. Maytag Co.*,
    807 F. Supp. 2d 112 (E.D.N.Y. 2011) ...................................................................28

## OTHER AUTHORITIES

17 C.F.R. § 229.103 ...................................................................3, 34, 35

Lead Plaintiff MissPERS ("Plaintiff") respectfully submits this brief in opposition to Defendants' motion to dismiss the Fifth Amended Class Action Complaint (the "Complaint").[1]

## PRELIMINARY STATEMENT

Defendants argue that the Complaint "never delivers a punch line" for claims concerning the loan portfolio. DB 1. Defendants are whistling past the graveyard. Defendants stated that Signet's underwriting was "very conservative" and the portfolio's credit quality was "very strong." ¶¶47-64. When investors questioned whether the portfolio contained risky loans, Defendant Light denied it, stating that investors' concerns were "unwarranted, quite frankly." ¶94. Defendants made these statements knowing that nearly half the portfolio, totaling $800 million, was subprime. These facts state a violation of Section 10(b). *See In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 377-79, 386-87 (S.D.N.Y. 2012) (statements that underwriting was "conservative" and credit quality was "strong" actionable where "42% [of] consumer loans were [] non-prime").

Signet's supposedly "detailed disclosures about its credit portfolio" do not shield Defendants from liability. DB 1. These disclosures concealed Signet's massive subprime exposure, and were criticized as opaque and misleading by analysts and the financial press, who reported, *inter alia*, that Signet's "claim of [] transparency falls short of what investors really need to know," its disclosures "obfuscate some of the risk in the credit portfolio" (¶108), and "if the company were true to its word, they would have released [true delinquency] statistics [] as they have continually promised," ¶142; *see also* ¶¶138-39. Analysts described Signet's recency aging as a "universally misleading" and "archaic methodology . . . phased out by virtually all financial institutions" because it "understate[s] delinquencies by approximately 50%." ¶138-42; *see also* ¶¶98, 108, 555.

---

[1] Citations to "¶" and "DB" are to the Complaint and Defendants' motion to dismiss brief (ECF No. 113), respectively. Internal quotation marks and citations are omitted and emphasis added unless otherwise noted. "Ex. __" refers to Exhibits to the Declaration of John Rizio-Hamilton.

Analysts described Defendants' other statements as "implausible" "excuses filled with contradictions" that "obviously lead one to question the credibility of management." ¶¶14, 130, 159.

Defendants argue that the claims based on Signet's understated reserves must fail because no confidential witness "in the financial reporting chain" reported that Signet misstated the reserves. DB 1. However, Former Employee 1 ("FE1") reported that the reserves were manipulated. ¶¶66-78. FE1 attended "bad debt" meetings with Light during which Light discussed the low reserves, but decided nonetheless to "comp" reserves to the prior year's level to avoid negatively impacting Signet's "bottom line." *Id.* Defendants' argument that the Complaint must be dismissed because Signet has not issued a "restatement" or "admission of wrongdoing" is a red herring. DB 1. Such "smoking gun" facts are not required at trial, let alone the pleading stage.

Defendants also made materially misleading statements and omissions about pervasive sexual harassment at Signet. Prior to the Class Period, Signet had received nearly 250 sworn Declarations from Sterling employees, submitted in a class action arbitration ("*Jock*"), which detailed severe and pervasive sexual harassment at the Company, including by Light. ¶¶181, 203-272. The Declarations showed, *inter alia*, that Sterling executives based employment decisions on sexual quid pro quos, and victims who reported harassment were outed and retaliated against. *Id.*

Despite their knowledge of these facts, Defendants repeatedly stated that Signet made its employment decisions based solely on merit, was committed to a workplace free from sexual harassment, and had confidential procedures in place for reporting harassment. ¶¶196-97. Defendants also mischaracterized and minimized *Jock*, stating that the case concerned only "store level employment practices," which were alleged to be "discriminatory as to . . . gender" – without disclosing that it concerned pervasive sexual harassment at Signet's highest levels. ¶¶185-91.

2

Defendants argue that Signet's statements about its business practices are not actionable because they were made in Codes of Conduct and Ethics. DB 37. Not so. Courts have repeatedly held such statements actionable where, as here, they: (1) are specific as to practices the company claims to implement; (2) purport to reflect the current state of affairs of the company, as opposed to explicitly aspirational statements; or (3) the subject of the statement has been held out as central to the company's business. *See* authorities cited *infra* at 30-31.

Defendants incorrectly argue that their descriptions of *Jock* satisfied Item 103 (DB 35), which requires an accurate "description of the factual basis alleged to underlie the proceeding." 17 C.F.R. § 229.103. Defendants mischaracterized *Jock* as concerning only "store-level employment practices," that were supposedly "discriminatory as to . . . gender" – when *Jock* actually concerned pervasive sexual harassment, which included Signet's senior executives. ¶¶181-272.

For these reasons and those set forth below, Defendants' motion should be denied.

## SUMMARY OF THE FACTS

### I.   Signet Misrepresented Its Underwriting And The Credit Quality of Its Portfolio

#### A.   While Achieving Unprecedented Sales Growth, Signet Assured Investors Its Lending Remained Conservative And Stringent

Over the Class Period, Signet's sales and loan portfolio grew rapidly: sales grew up to 37% per year, and the portfolio grew 62% to $1.86 billion. ¶¶47-49. Defendants stated that they paid close attention to the portfolio and underwriting, stating that the portfolio was "a big important part of our business and one that we don't take lightly. We watch it very closely," and "[we] welcome the increasing use of our credit programs, as we . . . fully understand the credit risk and profitability of our decisions." ¶45; *see also* ¶¶87, 294, 516. Defendants assured investors that Signet's sales were not driven by reckless lending, underwriting was conservative, and the credit quality of its portfolio was strong. ¶¶49-53. Defendant Ristau said that credit was "very stringently

controlled" and "<u>very conservatively managed</u>," "<u>we don't push the credit</u>," "[w]e will never cross that line," and the portfolio was "<u>very, very strong and . . . very healthy</u>." ¶¶40-51, 341-44.

Defendants further conveyed the strength of the loan book by reporting very low loan loss reserves – between 6.5% and 7.9% of the portfolio. ¶¶58-62, 303. Signet set reserves using the "recency" method, which has been widely criticized as misleading for permitting companies (like Signet) to count as current accounts where the borrower had missed payments. ¶¶59-60, 98-99, 108, 139, 142. Due to Signet's low reserves, it met earnings estimates for 11 straight quarters, often narrowly. ¶¶61-62. Because of Defendants' statements, analysts reported that the quality of Signet's credit portfolio was strong and its underwriting was conservative. ¶¶54, 63. Signet's stock price more than doubled during the Class Period, rising from $69.83 to $150.94. ¶64.

### B.  In Truth, Signet Engaged In Extremely Reckless Underwriting To Drive Sales Growth, Generating Huge Amounts Of High-Risk Subprime Loans

In reality, Signet drove sales through reckless underwriting. Unknown to investors, 45% of its portfolio – approximately $800 million – was subprime, posing severe risk to Signet. ¶65.

Former Signet employees responsible for sales and credit reported that Signet's underwriting was highly reckless, not "conservative" and "stringent," as Defendants claimed. They reported that Signet's credit application quotas required salespeople to press credit on high-risk borrowers in order to keep their jobs. ¶¶66-85. They characterized Signet's underwriting as "ridiculous," "garbage," and a "running joke," and reported that, routinely, applicants' jobs were not verified, facially false information on applications was ignored, incomplete and unsigned applications were approved, and borrowers' extremely poor credit scores, multiple bankruptcies, and insurmountable medical bills were no obstacle because "basically anybody gets approved." *Id.* FE1, a 14-year Signet employee, was Director of Signet's Credit Information Technology and Strategy Department and reported to the Senior Vice President of Credit Operations, Mario Weiss,

during the Class Period. ¶66. FE1 was responsible for designing Signet's credit scoring system and analyzing Signet's credit metrics. *Id*. When asked about the accuracy of Defendants' statements, FE1 stated, "[t]hat's a complete lie. The extension of credit is not stringent at all." ¶67.

FE1 also reported that the poor quality of the portfolio and the inadequacy of Signet's reserves were regularly discussed at Signet's highest levels. ¶¶66-78. FE1 reported that the credit risk department began issuing internal warnings about the portfolio's high levels of bad debt in 2008, which were communicated to Light and other senior Signet executives through written reports and regular "bad debt meetings," which FE1 attended. *Id*. At the meetings, discussion frequently centered on whether Signet should "change our lending practices." *Id.* The executives discussed that, "if the Company tightened its underwriting, Sterling would lose a significant number of customers," so nothing was changed. *Id*.

These meetings also included discussions that the "reserves [were] low," in which Light, Weiss, and Robert Trabucco (former Sterling Chief Financial Officer) participated. ¶¶75-76. Light and the other executives decided not to meaningfully raise reserves because reserves were "comped" to the prior year precisely to avoid a material impact on Signet's "bottom line." ¶76.

### C.     Defendants Issued False Assurances To Quell Concern About The Portfolio

Following a rare earnings "miss" at the end of 2015, the market questioned whether Signet's underwriting and portfolio were truly as strong as Defendants had stated. ¶¶88-108. Analysts reported that Signet might be "covering up fundamental weakness," and wondered whether "the recency method . . . understates . . . past due accounts." ¶¶92, 98. The press asked if Signet held copious "subprime debt" and was "a subprime finance company." ¶¶97, 104, 108.

Defendants flatly denied that these concerns had merit. ¶¶93-95, 101, 105-06, 118. Light stated that "[i]t's very important that everybody understands this. We have been running a credit portfolio for well over 30 years[.] . . . I just want to reinforce that because there seems to be some

concerns about our credit portfolio, and – we just think it's unwarranted, quite frankly." ¶94. Defendant Santana stated that "[o]ur credit approval standards remain <u>disciplined</u>," and "our credit portfolio remains extremely profitable. . . . <u>So I really hope [our] comments . . . put this credit discussion – to minimize it where it should be</u>." ¶¶90, 95.

### D. The Truth Emerges

On May 26, 2016, Defendants announced that they were "conducting a strategic review" of the loan portfolio – including the possibility of a sale – which cast doubt on Defendants' recent assurances. ¶¶110-17. Analysts reported that, "[f]rom listening to management's script [in response to concerns], you would have never imagined that the company would need to commission a 'strategic evaluation' of the segment," and noted that "the most compelling question" was "[i]f the credit operation is performing well, why did the company commission a strategic evaluation?" ¶114. On this news, Signet's stock price fell more than 10%. ¶117.

In preparing to market the portfolio, Signet was forced to tighten its reckless underwriting, causing sales to collapse. ¶¶123-25. On August 25, 2016, Signet reported a large sales decline and earnings miss, which Defendants blamed on the energy sector and "Brexit." ¶¶125, 127, 130-31. Analysts reported that Signet's "[s]ales . . . careened off a cliff at disturbingly high speed," and Defendants' explanations were "excuses filled with contradictions" and "hard to believe." ¶130. Signet's stock price fell 13%. ¶133.

The SEC then questioned Signet's use of recency aging, asking why Signet did not disclose the value of contractually delinquent accounts that were still categorized as performing. ¶136. Signet responded that the true amount of delinquencies "is not relevant or meaningful from a disclosure perspective." ¶137. Analysts and the press were "skeptical," stating that "this information should be disclosed," recency "understate[s] delinquencies by approximately 50%," and Signet should "be interested in giving more information, not less." ¶¶138-39. They reported

that Signet was likely understating reserves by up to $130 million, and "there is a large portion of the portfolio that should have been written off but has not." ¶134-35.

On May 25, 2017, Signet announced deteriorated sales and the sale of the "prime" portion of its loan portfolio. ¶143. Signet also disclosed that the remaining 45% of the portfolio (approximately $800 million) consisted of subprime loans, which Signet had been unable to sell despite shopping it for a year. ¶¶144, 148. Defendants explained that the purpose of the sale was to "substantially derisk" and "eliminate material credit risk from the balance sheet." ¶149. Analysts reported that "the company was underwriting credits much deeper down the credit spectrum than investors believed" and Signet had "clearly . . . delayed recognizing the bad" by failing to mark down the subprime loans. ¶150. Signet's stock price fell another 8%. ¶151.

On November 21, 2017, Signet announced another sharp downturn in sales, a "precipitous decline in the credit sales penetration rate," and a 15% guidance cut, which Defendants blamed on "weather-related incidents" and "systems and process disruptions." ¶155-57. Analysts called these explanations "implausible," reporting that "one has to question whether we are simply seeing a tightening of overly generous credit standards that artificially supported sales growth in recent years," Signet needed to "demonstrat[e] that historical sales have not been inflated by aggressive credit standards over which SIG is now losing control," and these developments "obviously lead one to question the credibility of management." ¶¶159-60; *see also* ¶161. Signet's stock price fell 30% in a single day, declining from $75.84 to $52.79. ¶158.

On December 1, 2017, Signet disclosed that the Consumer Financial Protection Bureau and the New York Attorney General were investigating Signet for widespread violations of laws prohibiting deceptive lending practices. ¶¶163-65. Analysts reported that these revelations "exacerbated the loss of management credibility with the investment community." ¶166. Signet's

stock price fell another 3.5%. ¶167.

On March 14, 2018, Signet disclosed that, after a two-year search, it had finally found a buyer for its subprime book – at only 72% of par value, far below the value at which Signet carried the loans. ¶168. As a result of the steep discount, Signet was forced to recognize a loss on the loans of between $113 and $118 million, and a total loss of $170 million, including costs – which equaled nearly a third of Signet's pre-tax income for all of fiscal year 2018. ¶¶ 168-71. Analysts reported that this charge "was substantially more" than expected and "is likely the result of under-provisioning done by management over the last several years." ¶¶172-75.

## II.   Signet Misled Investors About Pervasive Sexual Harassment At The Company

### A.   Defendants Falsely Stated That Signet Bases Its Employment Decisions Solely On Merit, And Mischaracterized The Facts Underlying *Jock*

In 2008, female employees sued Sterling alleging gender discrimination and sexual harassment. ¶¶177-78. Because Sterling required its employees to sign arbitration agreements, *Jock* was arbitrated and kept confidential – along with hundreds of employee Declarations detailing severe sexual harassment by management, including Light. ¶179. Victims stated that employment decisions were based on their compliance with sexual demands, and gave numerous examples of Signet's indifference to complaints and failure to keep complaints anonymous, exposing victims to retaliation. ¶¶235-37, 241-52, 254-68. The arbitrator stated that Signet "for the most part . . . [did] not s[eek] to refute" this evidence. ¶205; *see also* ¶¶18, 206-16, 218-31, 233, 279, 287, 291-92.

Despite knowing these facts, Signet stated that it "bases . . . employment, development and promotion decisions solely on a person's ability and potential," was "committed to a workplace . . . free from sexual . . . harassment," had "[c]onfidential and anonymous mechanisms for reporting concerns," and its policies were "to encourage the communication of bona fide concerns relating

8

to the lawful and ethical conduct of business" and to "protect those who communicate bona fide concerns from any retaliation[.]" ¶¶196-97, 199, 330-34.

Signet also mischaracterized *Jock*, stating that it only concerned assertions that "store-level employment practices" were "discriminatory as to compensation and promotional opportunities" with respect to "gender," and that Signet undertook an "investigation" which "failed to substantiate the allegations." *See, e.g.*, ¶¶185, 324. Signet never revealed that *Jock* asserted widespread sexual harassment by Signet's most senior executives, including its CEO. ¶203.

### B.    The Truth Emerges

On February 26, 2017, the Declarations were made public, and became (along with interviews of some of the Declarants) the subject of a shocking *Washington Post* article that was published after market close on February 27. ¶¶21, 275-79. The article revealed that "Declarations from roughly 250 women and men who worked at Sterling . . . allege that female employees at the company . . . were routinely groped, demeaned and urged to sexually cater to their bosses to stay employed." ¶276. It also discussed Light's participation in the harassment. ¶¶278-79, 287, 291.

Contrary to Signet's representations, the Declarations showed that sexual harassment was pervasive at Signet. *See* ¶¶203-92. Declarants characterized Signet's upper management as "womanizers," "playboys," and serial sexual harassers who "made sexual conquests of female associates." ¶¶206-16. Declarants revealed that female employees were exploited at annual "Managers' Meetings," which were described as "sexcapades" where male executives and managers were "sexually preying" on female subordinates, and Declarants recounted "sexually promiscuous activity between male executives and managers and subordinate female managers" – including activity by Light. ¶¶18, 206, 209-16, 218-31, 233, 279, 287, 291-92. The Declarations also revealed that sexual harassment regularly occurred in the ordinary course of business, describing sexual harassment as "common," "prevalent," and "well-known," or recounting

instances of harassment, such as unwanted sexual touching and highly inappropriate sexual comments and advances towards female subordinates. ¶¶234-40, 242-52, 255, 257-68.

The Declarations further showed that Sterling executives and managers commonly conditioned employment decisions on whether a female subordinate acceded to sexual demands, and applied explicit and implicit pressure to exchange sexual favors for job advancement or security. Many Declarants explained that female employees who "perform[ed] sexual favors" for their superiors were given opportunities for advancement at Signet, or that those who did not risked losing their jobs. ¶¶242-52, 284, 292. Declarants also revealed that Sterling repeatedly failed to respond to complaints and left harassers to continue their behavior with impunity, and that, worse still, women who reported harassment were often outed and subjected to retaliation. ¶¶253-68.

Following these revelations, Signet's stock price dropped 13%. ¶¶22, 280-82. Within months, Light and Signet's COO, Bryan Morgan, unexpectedly departed. ¶¶289-91.

## ARGUMENT

## I.    The Complaint States A Claim Concerning The Credit Portfolio

The Court must "accept[] all factual allegations as true and draw[] all reasonable inferences in favor of the plaintiff." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 179 (S.D.N.Y. 2010). To allege falsity, a plaintiff must identify the statements, "the speaker, state where and when the statements were made, and explain why the statements were fraudulent," *In re Vivendi Univ., S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 184 (S.D.N.Y. 2003), by pleading facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission," *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 89 (S.D.N.Y. 2015). Plaintiff has done so.

### A.    Defendants Made Misstatements About The Loan Portfolio

Defendants stated that Signet's underwriting was "very stringently managed," "highly disciplined," and "conservative," and the credit quality of the portfolio was "very strong" and

10

"very healthy." ¶¶4, 9, 49-51, 90, 93, 296, 298, 341, 464. Significantly, when investors questioned Signet's purportedly conservative underwriting and the credit quality of the portfolio, Light and Santana stated that these concerns were "unwarranted, quite frankly." ¶¶94-95, 105-06.

As alleged in detail, these statements were false because Signet had engaged in highly reckless underwriting to drive sales and, as a result, nearly half of its portfolio consisted of subprime loans that posed a material risk to Signet. ¶¶10, 13, 144. When Signet finally sold these loans, it was forced to recognize an enormous loss because of their poor credit quality, confirming that the lending operation was far from "conservative" and "very stringent[]". Light and other senior executives regularly discussed Signet's reckless underwriting and the poor credit quality of the portfolio at "bad debt" meetings, but these practices were maintained in order to continue to drive sales growth. ¶¶72-76. As courts have repeatedly held, such allegations adequately plead falsity. *See, e.g.*, *Gen. Elec.*, 857 F. Supp. 2d at 377-79, 386-87 (falsity pled for statements touting "conservative" underwriting and "strong" credit quality where "42% [of] consumer loans were made to non-prime borrowers"); *Freudenberg*, 712 F. Supp. 2d at 189 (statements describing loans as "high quality" false where complaint alleged that loans were subprime); *In re CIT Grp. Inc. Sec. Litig.*, 2010 WL 2365846, at *4 (S.D.N.Y. June 10, 2010) (sustaining claims based on statements touting "conservative" and "disciplined" approach to subprime lending).

Having represented that Signet's credit operation was a key "competitve advantage" and a "big important part of our business," Defendants now contend that the Court must conclude that their statements are immaterial <u>as a matter of law</u>, and therefore "puffery." DB 20. Not so. To start, materiality is a fact-specific inquiry, and an alleged misstatement may not be dismissed as "puffery" unless it is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utilities Co.*, 228 F.3d

11

154, 162 (2d Cir. 2000). Accordingly, courts have repeatedly held that similar statements are material and actionable. *See Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (statements that inventory was "in good shape" and "under control" actionable). As these courts have explained:

> [W]here a defendant affirmatively characterizes management practices as "adequate," "conservative," "cautious," and the like, the subject is "in play." For example, if a defendant represents that its lending practices are "conservative" and that its collateralization is "adequate," the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations . . . . By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully.

*In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 271 (S.D.N.Y. 2010) (underwriting standards are "critical to investors"); *see also Gen. Elec.*, 857 F. Supp. 2d at 384 (rejecting puffery argument) (citing *Novak*, 216 F.3d at 315); *Freudenberg*, 712 F. Supp. 2d at 189 (same).

Many other facts show the materiality of Defendants' statements, including: (1) as Signet's second largest asset and a "key enabler of [] sales," the portfolio was central to Signet's business ¶¶2, 41, 297, 405 (*see In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 501, 508–09 (S.D.N.Y. 2009) (statements about independence not "puffery" because independence was critical to Moody's business)); (2) investors' chief concern was the quality of Signet's portfolio, and many of Defendants' statements were made to assuage this concern, ¶¶44, 89-90, 93-95, 105-07, 341, 464, 474, 476, 506 (*see In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463-64 (S.D.N.Y. 2017) (statements made "to reassure the investing public" material)); (3) Defendants repeatedly stated that the credit operation differentiated Signet from its competitors and was one of its "most important competitive strengths," ¶¶43, 95, 105, 176, 341, 343, 405, 470, 484 (*see Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) (statements "attempt[ing] to distinguish [defendant] from other institutions" material)); (4) analysts consistently reported on Defendants' statements, ¶¶7, 11, 14, 43-44, 54, 63, 91-93, 96-99, 103-04, 107-08, 113-16, 130-32,

134-35, 138, 142 (*see In re Regeneron Pharm., Inc. Sec. Litig*., 2005 WL 225288, at *21 (S.D.N.Y. Feb. 1, 2005) (analyst coverage shows materiality)); and (5) the market reacted severely when the truth emerged, ¶¶117, 122, 133, 150-51, 158, 167, 174 (*see City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp*., 875 F. Supp. 2d 359, 368 (S.D.N.Y. 2012) (market reaction shows materiality)). On these facts, materiality cannot be decided as a matter of law.

Defendants next argue that their statements are inactionable "opinions" (DB 20), which fails for two reasons. First, Defendants' statements were not opinions. A statement is an opinion only <u>when it is expressly stated as a belief or opinion</u>. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1333 (2015). The overwhelming majority of Defendants' statements were not so qualified. *See, e.g.*, ¶50 ("the portfolio continues to be very healthy"), ¶51 ("it is very conservatively managed"), ¶90 ("our credit approval standards remain disciplined"). These are actionable statements of present fact under *Omnicare*.

Second, even if certain statements could be considered opinions, they are actionable because the Complaint alleges omissions that rendered them materially misleading. "[O]pinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (citing *Omnicare*, 135 S. Ct. at 1326). Defendants repeatedly stated that Signet's underwriting was "conservative" and the portfolio was "strong" – and then <u>denied that there was reason to be concerned when the market questioned whether it contained material amounts of risky loans</u> – while omitting that: (1) Signet engaged in reckless underwriting, and (2) nearly half the portfolio was subprime. The omissions

"conflict with what a reasonable investor would take from the statement itself." *Id*.[2]

Defendants ask the Court to ignore the reports of Former Employees 2 through 6 because they supposedly were low-level employees who were not involved in Signet's credit operation. DB 21. Defendants ignore that each worked in sales or collections, and thus possessed first-hand knowledge of Signet's lending practices. ¶¶79-85. *See Novak*, 216 F.3d at 314 (allegations need only "support the probability" that a person in source's position "would possess the information alleged"); *In re Dynex Capital, Inc., Sec. Litig.*, 2009 WL 3380621, at *7, *13-14 (S.D.N.Y. Oct. 19, 2009) (relying on reports by "low-level" employees with first-hand knowledge of loan operation); *Carlton v. Cannon*, 184 F. Supp. 3d 428, 473-74 (S.D. Tex. 2016) (crediting "firsthand observations" from "low-level" employees). Moreover, these reports are corroborated by one another and independent facts, including that: (1) nearly half of Signet's portfolio consisted of subprime loans; (2) after the corrective disclosures, analysts reported that "the company was underwriting credits much deeper down the credit spectrum than investors believed"; (3) the number of Signet borrowers filing for bankruptcy skyrocketed during the Class Period; (4) regulators are investigating Signet for deceptive and abusive lending practices; and (5) Signet was forced to take a $113 - $118 million write-off on its subprime loans. ¶¶15, 163-65, 563. *See Lockheed*, 875 F. Supp. 2d at 371 (corroboration renders reports reliable).

As to FE1 – who tracked the performance of the loan portfolio – Defendants simply mischaracterize this report. DB 22. FE1 reported far more than the "common sense observation" that sales outpaced cash flow: FE1 reported that, during "bad debt" meetings, Light and other senior executives discussed the high levels of bad debt in the portfolio and considered tightening

_____

[2] For these reasons, the statement that "[m]anagement does not believe Signet is exposed to any significant concentrations of credit risk" is also actionable. ¶¶57, 364-65, 383-84.

Signet's underwriting, but refused to do so because it would harm sales – while making public statements that conflicted with this information. ¶¶66-78.[3]

Defendants also argue that the corrective disclosures did not reveal facts undermining Defendants' statements. DB 22-26. This is wrong: disclosing that 45% of the portfolio was subprime contradicted several of Defendants' prior statements that the portfolio was strong and underwriting strict. ¶¶143-49; *see Gen. Elec.*, 857 F. Supp. 2d at 386-87. Moreover, analysts reported that the disclosures revealed that Signet's underwriting and portfolio were <u>not</u> as represented, and Signet likely had understated reserves. *See* ¶¶114-17, 134, 150 (May 25, 2017 disclosure "suggest[s] the company was underwriting credits much deeper down the credit spectrum than investors believed"), 159-60, 173 (loss disclosed on March 14, 2018 was "likely the result of under-provisioning done by management over the last several years".

Defendants further argue that their May 26, 2016 announcement of a strategic review and possible sale of the portfolio cannot support an inference that their statements were misleading. DB 24. Yet this announcement contradicted statements Defendants had made just two months earlier to quell investor concern. ¶¶94-95, 101, 105. Analysts reported that "from listening to management's script . . . , you never would have imagined that [Signet] would need to commission a 'strategic evaluation' of the segment." ¶¶114-17.

Defendants also argue that the dramatic sales decline from November 2015 through November 2017 is irrelevant because there is no basis to infer that the decline was caused by credit tightening. DB 22. In contending that the report of Former Employee 7 ("FE7") is the "sole support for this allegation," Defendants ignore several facts demonstrating that Signet was forced to tighten

---

[3] *Schaffer v. Horizon Pharma PLC*, 2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) is distinguishable. There, plaintiffs did not identify any "way in which [] contrary information was communicated to defendants." *Id.* at *12.

its underwriting: (1) the credit participation rate declined from 66.8% to 57.9%, a strong indicator

that fewer customers qualified for credit (¶¶143, 155-57, 171); (2) analysts reported that tightening

was indeed occurring based on Signet's results (¶¶135, 157, 159-62); (3) Signet's credit partner

stated that Signet was likely attempting to reduce reliance on subprime borrowers (¶153); and (4)

Signet's sales "careened off a cliff at disturbingly high speed" even though the market was

"growing" (¶¶130-31, 159-62). Such facts, considered with FE7's report, support the inference

that credit tightening was occurring. *See Tapia-Matos v. Caesarstone Sdot-Yam, Ltd.*, 2016 WL

3951184, at *4 (S.D.N.Y. July 20, 2016) (where "inference can be drawn," it "must be drawn").[4]

Finally, Defendants urge the Court to accept the truth of their assertion that shifting energy

prices or "Brexit" caused the collapse in Signet's sales. DB 23. These explanations contradict the

Complaint, and were dismissed by analysts as "implausible" "excuses filled with contradictions."

¶¶130-31, 159. The Court cannot accept such fact-intensive assertions as true at this stage.

### B.    Defendants Understated Reserves

Signet's reserves purportedly reflected the dollar amount of accounts receivable that were

likely uncollectible. ¶303. Signet used recency aging to set reserves, which enabled Signet to count

as current accounts that were contractually delinquent. ¶¶306-309. Consequently, although 45%

of Signet's portfolio was subprime, and the number of Signet's borrowers who filed for bankruptcy

during the Class Period skyrocketed, Signet kept its reserves extremely low, often amounting to

approximately 6.4% of receivables. ¶¶61-62, 76-77, 313-16. The Complaint alleges falsity as to

---

[4] Defendants' argument that Signet's credit penetration rate declined "less than 3% from the same comparable quarter the prior year" (DB 24 nn.43-44) fails for several reasons: (1) after Signet announced the "strategic review" of the credit portfolio in May 2016, the credit penetration rate remained significantly lower than the class period high, by up to seven percentage points; (2) in the first-quarter fiscal 2018, Sterling experienced a 12.6% decline in credit sales; and (3) analysts described a "precipitous decline in the credit sales penetration rate" when the corrective disclosures were occurring. ¶¶143, 155-62.

both the reserves and Defendants' statements concerning the reserves, including that the low reserves signaled the strength of the portfolio. ¶¶409-10, 428-29, 443-44.

This Court has held that loan loss reserves are statements of opinion. Thus, "though sincerely held and otherwise true as a matter of fact, [reserves] may [] be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Tongue*, 816 F.3d at 210 (quoting *Omnicare*, 135 S. Ct. at 1332). "The core inquiry is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Id.* (quoting *Omnicare*, 135 S. Ct. at 1329).

To allege falsity, the Complaint compares Signet's reported reserves to its charge-offs (*i.e.*, actual losses) for the prior one-year period. ¶¶313-14. The prior year's charge-offs provided an objective and reliable estimate of accounts that were likely uncollectible, particularly in light of Defendants' assurances that Signet's underwriting standards and credit quality remained consistent. ¶¶105, 314-16, 488. Signet also stated that its reserves were established based on historical loss experience and payment performance information. ¶¶87, 312. Nevertheless, Signet's reserves fell short of prior-year charge-offs by $31 million to $84 million per quarter throughout the Class Period – even though the portfolio was growing. Against this benchmark, Signet's reserves were understated by 28% to 96% per reporting period. ¶¶314-16.

Further, Signet "comp[ed]" its reserves to the prior year's reserve amount. ¶¶66-78. FE1 reported that, at regular "bad debt" meetings with Light, Trabucco, and Weiss, Signet executives discussed the fact that reserves were low, but decided not to materially raise reserves because they were "comped" to the prior year's level to avoid materially impacting Signet's "bottom line." ¶¶70-76. The $113 million loss that Signet recorded when it sold its subprime loans – a highly material amount that analysts reported was "likely the result of under-provisioning done by management

17

over the last several years," ¶¶169, 172-73 – further confirms that reserves were understated.

These factual allegations, viewed in a light most favorable to plaintiff, adequately plead the falsity of Signet's loan loss reserves. While maintaining reserves that purportedly reflected the likely uncollectible loans in the portfolio, Signet omitted to disclose that: (1) its reserves did not account for losses Signet knew it would likely experience based on its loss history; and (2) its reserves were "comped" to the prior year to avoid negatively impacting results. Such facts conflict with what a "reasonable investor would take from" the loan loss reserves. *Omnicare*, 135 S. Ct. at 1329; *see In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 492 (S.D.N.Y. 2011) (valuations actionable where there was "evidence that the defendants were aware of undisclosed facts that seriously undermined the accuracy of their alleged opinions or beliefs").[5]

Even if Plaintiff were required to plead the subjective falsity of Signet's loan loss reserves, Plaintiff has done so. Defendants knew, based on recent loss history, the balance in the loan portfolio that was likely uncollectible, but nonetheless set the reserves materially lower than that amount by "comping" the reserves to the prior year. ¶¶62, 72, 75-78, 314-16.

Defendants contend that these allegations reflect a "fundamental misunderstanding" of Signet's process because "Signet reserved for *100%* of delinquent loan balances when they were 90 days past due," and thus, "[c]harge offs could never exceed the loan loss reserves *for those loans*." DB 16 (emphasis in original). This highly qualified argument is limited to loans more than 90 days past due on Signet's extremely lax recency basis, which constituted only 4% of Signet's portfolio and has no bearing on 96% of the loans at issue in this case.

Defendants next contend that Plaintiff's reasoning is "flaw[ed]" because "each quarter,

---

[5] This case is unlike *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 2016 WL 5818590, at *8 (S.D.N.Y. 2016), where there was no allegation showing objective or subjective falsity.

reserves were *reduced* by the amount that was charged off during that quarter, while *new* reserves were added with respect to *other* loans." DB 16 (emphasis in original). This argument – which describes generally how all companies reserve for and charge-off accounts receivable – misses the point. A reserve is supposed to equal the dollar amount of accounts receivable that are likely uncollectible. Signet's charge-offs over the prior year gave it an accurate benchmark of the amount of loans that were likely uncollectible as of each reporting period, especially given Defendants' claims that underwriting did not change and that reserves were based on loss history. Yet <u>at no time</u> did Signet reserve adequately for the amount of losses it knew it was likely to experience based on <u>its actual loss history</u> – which would be inexplicable but for its "comping" practice.

Defendants incorrectly argue that FE1's report lacks "specificity as to which 'meetings' were attended by which 'executives,' and which 'reserves' were supposedly manipulated." DB 17. The Complaint alleges that: (1) "bad debt" meetings occurred "regularly," (2) they were attended by Light, Trabucco, and Weiss, and (3) at the meetings, these executives discussed "comping" Signet's reserves to the prior year's level to avoid negatively impacting the "bottom line." ¶¶66-78. Such specificity suffices at the pleading stage. *See Freudenberg*, 712 F. Supp. 2d at 197; *New Orleans Emp.'s Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011).

Defendants attempt to discredit FE1's report by describing FE1 as an "IT professional" who did not have "involvement in loan loss reserving." DB 16-17. However, FE1 was responsible for conducting analyses of trends in the credit portfolio, personally attended bad debt meetings, and had personal knowledge of the discussions, thus providing a "probability that a person in the position occupied by [FE1] would possess the information alleged." *Novak*, 216 F.3d at 314.

Defendants incorrectly argue that FE1's report must be ignored because FE1 left Signet six months into the Class Period. DB 17. FE1 had a 14-year tenure with Signet, described its <u>ongoing</u>

"comping" practice, and was at Signet when many false statements about the portfolio were issued, including two sets of financials (¶¶318-55). *See In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 874-75 (D. Minn. 2007) (allegations credible where witnesses were present "during at least some portion of the class period"); *Taubenfeld v. Career Educ. Corp.*, 2005 WL 350339, at *9 (N.D. Ill. Feb. 11, 2005) (it is "not necessary for the defendants to have employed a witness for the entire Class Period in order for that witness' statement to be relevant or reliable").[6]

Moreover, numerous facts corroborate FE1's report and show that Signet's under-reserving and "comping" continued after FE1 departed, including: (1) Signet's reserves were always materially below charge-offs; (2) year-end reserves hovered between 6.9% and 7.3% of the portfolio, a very tight range; (3) the executives who executed "comping" remained at Signet until 2016 and 2017; (4) after the August 25, 2016 disclosure, analysts reported that reserves were likely understated by $130 million; (5) bankrupt creditors increased exponentially during the Class Period; (6) 45% of the portfolio was subprime; and (7) Signet was forced to sell its subprime portfolio at only 72% of par value and book a huge loss of at least $113 million, which analysts reported was likely caused by "under-provisioning" throughout the Class Period. The inference that comping and under-reserving continued through the Class Period is more plausible than Defendants' suggestion – that these long-term practices inexplicably changed once FE1 left.

Defendants' argument that there was "an average 12.2% *increase* in the reserves year over year" is misleading. DB 17. This argument ignores the portfolio's large annual growth. When this growth is properly considered, Signet's reserves remained essentially static as of each year-end,

---

[6] Defendants' reliance on *Schaffer* is misplaced. DB 22. Unlike here, the "confidential sources" had no meaningful interaction with defendants, did not "indicate[] who, when, or how" they were directed to engage in the purportedly improper practice, and the allegations failed to establish that the practices were improper in the first place. 2018 WL 481883, at *8.

hovering between 6.9% and 7.3% of the portfolio – which strongly corroborates FE1's report that the reserves were "comped" from year-to-year, even after FE1 departed Signet.

Defendants further contend that their supposed "detailed disclosures" about the credit operation absolve them. DB 7-10. This argument fails because: (1) Defendants did <u>not</u> disclose Signet's massive subprime exposure; (2) the FICO score disclosure they point to represented that the portfolio was well <u>above</u> subprime, ¶¶106, 488-89; (3) these same disclosures were widely criticized as opaque, incomplete and misleading, ¶¶59, 98, 100, 108, 150, 296; and (4) while Defendants contend there is "no alleged trend suggesting loan losses were incurred but not reserved for," this is exactly what the Complaint alleges in showing that charge-offs uniformly exceeded reserves. Defendants also suggest that because they disclosed the use of recency accounting, there was nothing false about the reserves. DB 19. This argument misses the point. Plaintiff does not allege that Defendants' use of recency accounting itself is actionable, but that Defendants used recency to suppress delinquencies and mask the portfolio's condition. ¶¶306-10.

Defendants' remaining arguments have no merit. Defendants argue that the Complaint must fail because Signet has not restated its financials, DB 21, but neither a restatement nor an admission of wrongdoing is required, and courts regularly sustain claims without them. *E.g.*, *In re Winstar Commc'ns*, 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006).[7] Nor is the fact that Signet received unqualified audit opinions from KPMG (DB 10) reason for dismissal, because management has an independent duty to verify financial statements. *See, e.g.*, *In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 426 (S.D.N.Y. 2013); *Winstar*, 2006 WL 473885, at *8. Moreover, this merely raises fact issues inappropriate for resolution now (including

---

[7] *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 294 (S.D.N.Y. 1999) (sustaining claims absent restatement); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (requiring restatement "would shift to accountants [] responsibility that belongs to [] courts").

whether management provided accurate, complete information to the auditor, and whether the auditor properly did its job). *See New Oriental*, 988 F. Supp. 2d at 426.

Defendants similarly argue that the reserve allegations fail because Signet has not reported a "drastic" increase in reserves. DB 21. However, the Complaint alleges that Signet's initial inability to sell its subprime loans delayed recognition of significant charge-offs. ¶150. Analysts and the financial press reported that "a large segment of the portfolio [worth $130 million] [] should have been written off, but has not" been, and Signet "delayed recognizing the 'bad' from a transition to an outsourced credit function." ¶¶134, 150. This was confirmed when Signet was forced to recognize a $113 - $118 million loss on the sale of its subprime loans, which financial analysts reported was the result of understating reserves for "several years." ¶173.

Despite an experienced securities analyst connecting this huge loss to Signet's understated reserves, Defendants argue that Plaintiff is conflating the distinct concepts of "loan loss reserves" and "fair market value," which they contend does not apply until the loans are sold. DB 16-17. Defendants' argument ignores that the price the buyer was willing to pay was obviously based on the credit quality of the loans – the same concern supposedly driving the reserves. Moreover, this purported distinction is irrelevant here: Signet specifically told investors <u>that it indeed carried the subprime loans at approximately fair market value because of their short-term maturity</u>. *See* Ex. C at 24 (stating that "[t]he carrying amount[] of . . . accounts receivable . . . approximate[s] fair value."); *see also* Ex. B at 19 (same). Any difference between carrying and market value should already have been accounted for in the reserves. It was not. This is precisely why analysts connected Signet's loss to its inadequate reserves. *See* ¶¶172-75. Such facts support the allegation that the reserves were understated. *See Freudenberg*, 712 F. Supp 2d at 178 (reserve allegations sufficient where loan portfolio sold at a substantial discount). In any event, Defendants' disputes

over the proper application of GAAP merely raise fact issues. *See Ambac*, 693 F. Supp. 2d at 273.

*Oklahoma Firefighters Pension & Retirement System v. Student Loan Corp.*, 951 F. Supp. 2d 479 (S.D.N.Y. 2013), is inapposite. Unlike Signet, which stated that its loans were carried at fair value, defendants there specifically disclosed that the loans were carried <u>above</u> market value by $2.78 billion – "far in excess of the eventual write-down." *Id.* at 497 n.11. The complaint there also contained "no allegations whatsoever contradicting the reasonableness of the estimated quarterly loss reserves at the time they were made," and no confidential witness accounts "from which one could reasonably conclude that defendants manipulated or did not actually perform the . . . analysis they said they did." *Id* at 496. The Complaint here pleads many contemporaneous facts supporting falsity of the reserves, including FE1's report that reserves were "comped," and that, throughout the Class Period, reserves tracked below Signet's actual losses. ¶¶75-76, 314-16.

Defendants also argue that this Court must conclude, as a matter of law, that the entire loss is due to the fact that "a third-party buyer expects to make a profit." DB 17. This is a completely unsupported fact assertion that cannot be accepted on a motion to dismiss. Again, Defendants ignore that what a buyer is willing to pay is obviously based on the credit quality of the loans. Further, Defendants never state how much profit the buyer supposedly expected to make or why the buyer's compensation would not come in the form of the interest due on the loans. Nor do they explain why or how this purported profit expectation accounts for the entire $113 - $118 million write-down. And Defendants do not explain why there was no need for a "profit" discount on the prime portfolio, which Defendants tout as having sold at 100% of par. The prime sale at par undermines Defendants' excuse.

Next, Defendants put forth a further contradictory argument: after disclaiming any connection between the adequacy of reserves and the sale price of the portfolio, they recognize

23

that the concepts <u>are</u> related by arguing that Signet's entire portfolio sold for an amount "approximately consistent with [Signet's] historical loan loss reserve." DB 18. This is irrelevant. After the prime loans were sold, Signet continued to state that the <u>subprime</u> loans were carried at fair value. *See supra* at 22-23. Obviously, this was not the case.

Defendants also argue that Plaintiff merely makes a mismanagement claim. DB 27. Not so. Plaintiff alleges that Defendants' statements were false when made, with numerous supporting facts. *Supra* at 3-8, 10-16; *Freudenberg*, 712 F. Supp. 2d at 192-93 ("it is alleged not that Defendants merely made bad business decisions . . . , but rather that Defendants misled the public about the . . . value of its loan portfolio").

### C.    The Complaint Adequately Alleges Scienter

In determining whether scienter is pled, "courts must, as with any motion to dismiss . . . , accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights*, *Ltd.*, 551 U.S. 308, 309 (2007). Scienter allegations must be viewed holistically. The issue is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23.

Scienter is pled by alleging facts that give rise to a strong inference of recklessness. *Novak*, 216 F.3d at 307. A complaint pleads scienter by alleging that defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *Id.* at 311. The inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. "When the competing inferences rest in equipoise, the tie . . . goes to the plaintiff." *In re Salix Pharm, Ltd.*, 2016 WL 1629341, at *13 (S.D.N.Y. Apr. 22, 2016). The Complaint alleges numerous facts that give rise to the requisite scienter inference.

### **Defendants Were Intimately Familiar With Signet's Portfolio And Underwriting.**

Defendants repeatedly touted their knowledge of Signet's underwriting and credit portfolio. Defendant Barnes stated that the portfolio was "a big important part of our business and one we don't take lightly. We watch it very closely." ¶45. Ristau stated that "we fully understand the credit risk." *Id*. Light and Santana repeatedly claimed to be closely familiar with the portfolio (¶¶94-95), with Santana explaining that "we remain absolutely confident in our ongoing credit portfolio performance" because of the "visibility that we have" into the portfolio. ¶105. Light was CEO of Sterling – which made the loans – from January 2006 to May 2014, when he became Signet's CEO. And, in May 2016, Light and Santana undertook a close "evaluation" of the portfolio, while continuing to extol its purported strength. ¶¶111-13. Signet also stated in SEC filings that "on an ongoing basis, management monitors the credit exposure" and "monitors the credit quality of its . . . receivable portfolio . . . on a real-time basis." ¶¶46, 294.

Defendants' statements were corroborated by FE1's report that Light and other senior executives received regular updates on portfolio credit quality and underwriting as early as 2008. ¶¶72-73. Given Defendants' intimate knowledge of Signet's credit operation, they "knew facts or had access to information suggesting that their public statements were not accurate" – including that nearly half of Signet's loans were subprime. *See, e.g.*, *Gen. Elec.*, 857 F. Supp. 2d at 395-96 ("highly improbable" that defendant who touted familiarity with the company "would not inquire into . . . expos[ure] to the subprime consumer borrower"); *Ambac Fin. Grp*, 693 F. Supp. 2d at 268 ("[e]ither Ambac conducted the surveillance it claimed, and . . . Defendants knew of these negative trends but did not disclose them, or Ambac misrepresented its surveillance . . . . In either scenario, [defendant's] public statements about Ambac's surveillance of 'very current' information . . . supports the inference that [he] acted recklessly"); *Fiat*, 2016 WL 5818590, at *7 (defendant's statements that he was "tak[ing] a harder look" at compliance issue supported scienter).

25

**Defendants Issued False Assurances To Quell Market Concern.** Beginning in late 2015, the market repeatedly questioned whether Signet had originated a large amount of risky loans, its portfolio and underwriting were as strong and conservative as represented, and its reserves were accurate. ¶¶90-107, 296. Light and Santana stated that any concerns were "<u>unwarranted</u>, quite frankly," sought to "<u>minimize</u> . . . <u>this credit discussion</u>," and emphasized that the "point . . . to take away is that we remain . . . a <u>prudent</u>, measured and profitable growth story." ¶¶94-95, 118. That Light and Santana issued these denials in the face of market concern, without disclosing that nearly half the portfolio was subprime, is evidence of severe recklessness at minimum. *See Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 553 (S.D.N.Y. 2017) ("campaign by [defendants] to placate the market in reaction to the inquires by the media, analysts, investors and the SEC provides cogent support for the inference of scienter").

**The Portfolio Was The Focus Of The Market And Defendants' Statements.** Because credit was critical to Signet, investors focused on it. ¶298. Thus, Defendants made dozens of statements reassuring investors that Signet's underwriting was conservative and its portfolio healthy. *E.g.*, ¶¶44, 47-64, 94-95, 105. Analysts routinely reported on Defendants' assurances while recommending Signet stock. ¶¶43-44, 54, 63, 91. Given how often Defendants reassured investors about the portfolio, including in response to specific investor concerns, all Defendants had "a duty to monitor" the portfolio's credit quality and Signet's underwriting – and to know highly material facts about it. Assuming they discharged this duty, they knew that nearly half the portfolio was subprime and Signet's underwriting was irresponsible. Conversely, any failure by Defendants to ensure the accuracy of their statements was severely reckless. *See Ambac Fin. Grp.*, 693 F. Supp. 2d at 266; *comScore*, 268 F. Supp. 3d at 553 (that revenue was "a subject about which investors and analysts often inquired . . . reinforces the inference of scienter"); *Fiat*, 2016 WL

5818590, at *7 (defendants' "frequent[]" public statements supported scienter).

**Signet Concealed Huge Losses On Its Subprime Portfolio.** When Signet sold its subprime portfolio at 72% of par value, it took a $170 million loss, $113 - $118 million of which represented over-valuation of the portfolio and understatement of reserves. This massive loss was equal to an entire quarter's worth of pretax income. *E.g.*, ¶512. The understatement's magnitude supports an inference of recklessness at minimum, particularly in light of Defendants' statements that they paid close attention to the portfolio. *See, e.g.*, *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (magnitude of write-off supported strong inference of recklessness); *Novak*, 216 F.3d at 312-13 ("significant write-off" supported inference of recklessness); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (same).

**Credit Was Central To Signet's Business.** Defendants repeatedly stated that Signet's credit operation was critical to its financial performance, calling it a "key enabler of sales" that "really drives our business" and a "big important part of our business." ¶¶3, 41-45, 297. The $1.8 billion portfolio was Signet's second-largest asset (comprising 30% of Signet's assets). Given this, all Defendants had a duty to know the material facts about which they spoke. Thus, there is a strong inference that they knew or recklessly disregarded undisclosed facts "suggesting that their public statements were not accurate" – *e.g.*, that nearly half the portfolio was subprime. Where (as here) a complaint identifies "facts available to Defendants that would have illuminated the falsities," the core operations doctrine supports the scienter inference. *Fiat*, 2016 WL 5818590, at *12; *see also Shenk v. Karmazin*, 867 F. Supp. 2d 379 (S.D.N.Y. 2011) (scienter pled where defendants' statements "contradicted reasonably available data and that concerned major transactions or touched upon the heart of their companies' businesses"); *Gen. Elec.*, 857 F. Supp. 2d at 395-96.

**Defendants Used Recency Aging.** Defendants used the recency method to mask the risk

27

in Signet's loan portfolio. ¶299. Analysts, reporters, and the SEC sought transparency into the credit portfolio, which Light and Santana refused to provide. ¶¶8, 12, 59, 92, 98-99, 108, 120-21, 134-39, 142. This supports scienter. *See Woods v. Maytag Co.*, 807 F. Supp. 2d 112, 126 (E.D.N.Y. 2011) (defendants' attempt to "conceal the problem" was indicative of scienter).

**Defendants' Arguments Fail.** Defendants contend that there can be no inference of scienter as to <u>any</u> Defendant <u>as a matter of law</u> because Plaintiff supposedly "does not attempt to establish scienter with respect to each Individual Defendant." DB 26. As discussed directly above, it is clear to which Defendants each scienter allegation applies. *See* ¶¶293-98.

Defendants incorrectly argue that scienter cannot exist because there are no allegations of insider selling, and four Individual Defendants supposedly increased their holdings of Signet stock. Insider selling is not required to plead scienter. *See Tellabs*, 551 U.S. at 325. Further, Barnes', Light's, and Ristau's "increased holdings" were due <u>entirely</u> to grants and options – for which they paid <u>nothing.</u> They were otherwise net <u>sellers.</u> Excluding sales for tax purposes, Barnes sold nearly 50,000 shares and purchased <u>none</u>, Ristau sold thousands of shares and purchased <u>none</u>, and Light sold <u>more than twice as much</u> stock as he purchased. *See* Ex. A. Purchases by Santana and Drosos were *de minimis* compared to their grants and options. *Id.* Cashless "acquisitions" do not rebut the scienter inference. *See In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (rejecting attempt to negate scienter using increased "options"); *In re CommVault Sys., Inc. Sec. Litig.*, 2016 WL 5745100, at *8 (D.N.J. Sep. 30, 2016) (same).

Defendants assert that no "CW" or "alleged specific internal document or report" shows Defendants committed fraud, DB 28, essentially arguing that Plaintiff needs a "smoking gun." This is neither possible (without discovery) nor required at this stage. *Tellabs*, 551 U.S. at 324; *see Scholastic*, 252 F.3d at 72 ("Even with the heightened pleading standard under Rule 9(b) and the

[PSLRA] <u>we do not require the pleading of detailed evidentiary matter in securities litigation</u>.").

Further, facts known by or available to Defendants did "<u>suggest[] that their public statements were</u>

<u>not accurate</u>" (*Novak*, 216 F.3d at 311), and FE1 <u>did</u> report that Light manipulated reserves.

Nothing more is required. *See Dynex*, 2009 WL 3380621, at *13 (available information need "not

*directly* contradict" statements for recklessness, and no requirement that "<u>contradictory facts . . .</u>

<u>be summarized in a single report [stating] the direct opposite of a misleading statement</u>").

Defendants similarly assert that FE1 "does not identify any specific report or any particular

information discussed by executives at any specific meeting that contradicted anything that Signet

was saying publicly about the program." DB 29. FE1 reported that Light and other senior

executives discussed the poor credit quality of the portfolio and Signet's reckless underwriting

(and decided not to change it), and manipulated Signet's reserves by "comping" them to the prior

year to avoid affecting the "bottom line" – all of which contradicted Defendants' public statements.

Indeed, FE1 reported that Defendants' public statements touting the "stringent" credit program

were "a complete lie." ¶67.[8] Under the law cited directly above, this is more than enough.

Defendants also assert that the Complaint "makes no sense" because it alleges that multiple

Defendants engaged in a multi-year fraud to tout the credit portfolio and understate reserves, while

also periodically tightening credit standards. DB 32. This mischaracterizes the Complaint, which

alleges that Defendants consistently misstated the strength of the portfolio and Signet's

underwriting while originating a high volume of risky loans to drive sales – a well-known

---

[8] *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 2017 WL 3278928 (S.D.N.Y. Aug. 1, 2017) is distinguishable. There, there was no allegation that defendants received any information "indicating that FCA vehicles were not in compliance," and these vehicles "constituted less than one percent of" sales. *Id*. at *2, *4. Numerous allegations demonstrate that Defendants knew or recklessly disregarded that <u>nearly half</u> of the critical $1.8 billion portfolio was subprime, and Light knew the reserves were being manipulated.

phenomenon. *See, e.g.*, *Gen. Elec.*, 857 F. Supp. 2d at 387. When Defendants were forced to sell the portfolio in light of the enormous undisclosed risk they created, they reigned in Signet's reckless underwriting while trying to market the asset – just as analysts reported. ¶¶123-24, 130, 153, 159-62. Defendants' competing inference – that they "disclosed a wealth of information" about the credit program and "believed that the program was a good one" but decided "more value could be realized for shareholders by outsourcing" it (DB at 32) is belied by: (1) the fact that they concealed that nearly half the portfolio was subprime, and (2) the huge loss shareholders suffered when Signet sold the subprime loans.

## II.   The Complaint States A Claim Relating To Sexual Harassment At Signet

### A.   Signet Misrepresented Its Business Practices

Signet stated that it "bases . . . employment, development and promotion decisions solely on a person's" merit. ¶¶196, 330. It also stated that it had in place concrete procedures to ensure compliance with this practice. Signet stated that "[c]onfidential and anonymous mechanisms for reporting concerns are available," "[t]hose who violate the standards in this Code will be subject to disciplinary action," and "[i]t is . . . the policy of the Company to protect those who communicate bona fide concerns from retaliation." ¶¶197, 334. Signet summed up its practices by saying that it was "committed to a workplace that is free from . . . sexual harassment." ¶¶195-97, 330, 332, 334.

The Declarations revealed a very different reality. Signet executives routinely conditioned employment decisions on whether female employees acceded to sexual demands. ¶¶196, 241-52, 330-31. Victims of harassment who complained were regularly outed and retaliated against by their harassers and others, and harassment was allowed to continue with impunity. ¶¶196-97, 53-56, 257 ("Sterling has no policy or procedure in place to allow employees to confidentially report sexual harassment . . . ."), 258-67, 332-33. In sum, the Declarations showed that Signet was anything but "committed to a workplace that is free from sexual . . . harassment." ¶¶206-72.

30

These allegations adequately plead falsity. *See, e.g.*, *Moody's*, 599 F. Supp. 2d at 508–09 (Code of Conduct statements about independence actionable when company "did not address or manage its conflicts of interest"); *Eletrobras*, 245 F. Supp. 3d at 463 ("repeated assertions about [] strong ethical standards" actionable where they "stand in stark contrast with" reality); *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2014 WL 2815571, at *5 (S.D.N.Y. June 23, 2014) (statements such as "[w]e have extensive procedures and controls that are designed to address conflicts of interest" actionable when company had "clear and egregious conflicts of interest"); *Richman v. Goldman Sachs Group, Inc.*, 868 F. Supp. 2d 261, 278, 280 (S.D.N.Y. 2012) ("repeated assertions that [issuer] complies with letter and spirit of the law, values its reputation, and is able to address 'potential' conflicts of interest" actionable when alleged conduct "involved both client conflicts and outright fraud"); *Lapin*, 506 F. Supp. 2d at 239-40 (statements in "business principles" about independence and integrity actionable when company was beset by conflicts).

Defendants contend that these statements are immaterial as a matter of law because they were contained in a Code of Conduct and Ethics, and thus, were "merely aspirational." DB 36-37. This argument ignores the content of the statements themselves, case law holding such statements actionable, and numerous other facts demonstrating that these misstatements were indeed material.

To start, materiality is a fact issue that generally should not be decided now. *See Ganino*, 228 F.3d at 162. Moreover, statements made in a policy or code of conduct are <u>not</u>, *ipso facto*, immaterial as a matter of law. Courts hold issuers to such statements when: (1) they are sufficiently specific as to what the company purports to do or not do, as opposed to just endorsing abstract notions of ethics; (2) they purport to reflect the current state of affairs of the company (not just its aspirations); or (3) the subject of the statement has been held out as key to the company's business. *See Moody's*, 599 F. Supp. 2d at 508–09 (code of conduct statements about independence

31

actionable because they "listed verifiable actions [the issuer] was taking to ensure its independence," were not couched in "language of optimism or hope," and company "maintained independence as a cornerstone of the business"); *Eletrobras*, 245 F. Supp. 3d at 463 n.6 (statements in code of ethics "purported to reflect the Company's current state of affairs," *e.g.*, that rules "are observed," unlike "explicitly aspirational [statements], with qualifiers such as 'aims to,' 'wants to,' and 'should.'" (emphasis in original)); *Lapin*, 506 F. Supp. 2d at 239-40 (statement about "dedication to complying with the letter and spirit of the laws" actionable where company's "success depended on such adherence"); *Goldman*, 2014 WL 2815571, at *5 (same); *Richman*, 868 F. Supp. 2d at 279-80 (same).[9]

Defendants' statements – which were incorporated into Signet's SEC filings (¶190) – meet these criteria. The misstatements were about existing facts or realities at Signet, and were not couched in aspirational terms. *See* ¶196 ("[t]he Company . . . bases our recruitment, employment, development and promotion decisions solely on a person's ability and potential" and "[t]he Company is committed to a workplace that is free from sexual . . . harassment . . . ."), ¶197 ("[i]t is . . . the policy of the Company to protect those who communicate bona fide concerns from retaliation," "[c]onfidential and anonymous mechanisms for reporting concerns are available," and "[t]hose who violate the standards in this Code will be subject to disciplinary action").

Moreover, several statements were about specific practices supposedly in place at Signet. *See id.* (stating how Signet made "recruitment, employment, development and promotion decisions," that "confidential and anonymous mechanisms for reporting concerns" were available,

---

[9] *In re Braskem S.A. Securities Litigation* is inapposite. 246 F. Supp. 3d 731 (S.D.N.Y. 2017). There, unlike here, defendants had not represented that adherence to ethical principles was central to the company's business, and the statements did not "address any concrete policy or practice with sufficient specificity." *Id.* at 756.

violators of the Codes "will be" disciplined, and Signet had a current policy to protect reporters of violations from retaliation).

Further, Defendants encouraged reliance on these statements by emphasizing Signet's ethical behavior and reputation as key to its financial success. Light stated that "trust is the most important factor why people buy jewelry where they do," "our product is about emotion and it's about trust," and "the single most important part of selling jewelry is trust." ¶¶201-02. The facts set forth in the Declarations threatened to eviscerate this trust, and repulse the recipients of most of Signet's products – including its chief product, bridal jewelry. *See id.*; ¶19.

The severe market reaction to disclosure of the Declarations underscores the materiality of these statements. When these facts were disclosed, Signet's stock price fell 13% on extraordinary volume, Signet halted trading so it could issue its own statement addressing the Declarations, and the news swept through the media for days. *See, e.g.*, *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 380 (S.D.N.Y. 2015) (market reaction showed materiality). At minimum, there is a question of fact as to materiality that cannot be resolved at the pleading stage.[10]

**B.    Signet Misrepresented The Facts Underlying *Jock***

Signet stated that *Jock* concerned only "store-level employment practices" that were allegedly "discriminatory as to . . . gender," was based on allegations of employees at a "few" stores, and that Signet had investigated the allegations and found them meritless. *See, e.g.*, ¶¶185,

---

[10] *Schaffer v. Horizon Pharma PLC* is distinguishable. 2018 WL 481883 (S.D.N.Y. Jan. 18, 2018). First, there was no "plausible allegation" in *Schaffer* that anyone engaged in "improper practices." *Id*. at *8. The Declarations provide more than a plausible allegation of misconduct here. Second, unlike here, *Schaffer*'s code of conduct was aspirational, and compliance was not allegedly central to the company's success. *Id*. Third, the alleged misstatement in *Schaffer* appears simply to have been that the company had adopted the code of conduct – a far cry from the very specific assurances Defendants made here. *Id.* Defendants' other case fares no better. *See Fries v. N. Oil & Gas, Inc*., 2018 WL 388915, at *7 (S.D.N.Y. Jan. 11, 2018) (code "notes what [company] 'promotes'").

190-91, 324, 530. Contrary to Signet's statements, *Jock* was not just about "gender" discrimination at the "store-level," or based on unsubstantiated allegations of employees at a "few" stores. Rather, hundreds of Declarations that Signet had received before the Class Period showed that *Jock* concerned pervasive sexual harassment, committed by Signet's upper management, including Light. *See, e.g.*, ¶¶18, 206, 209-16, 218-31, 233, 279, 287, 291-92. These allegations suffice to plead falsity. *See, e.g.*, *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008) (litigation disclosures omitting key facts actionable).

Defendants incorrectly argue that Signet's disclosures satisfied Item 103 of SEC Regulation S-K, 17 C.F.R. § 229.103, and thus, nothing further was required. DB 33-34. To start, Signet did not satisfy its Item 103 disclosure obligation. Item 103 required Signet to furnish an accurate "description of the factual basis alleged to underlie the proceeding." 17 C.F.R. § 229.103. Defendants characterized *Jock* as concerning only "store-level employment practices," that were "discriminatory as to . . . gender," but *Jock* also concerned pervasive sexual harassment (not only gender discrimination), amongst Signet's most senior executives (not just "store-level" practices).

Defendants attempt to avoid this conclusion by arguing that "the declarations do not change the nature of the actual claims in the Arbitration," but this misses the point. Item 103 does not strictly limit disclosure to the claims in the complaint, and Defendants cite no cases so holding. Rather, the rule requires disclosure of the "factual basis alleged to underlie the proceeding." 17 C.F.R. § 229.103. Moreover, the *Jock* complaint did allege sexual harassment. *See* First Am. Compl. ¶¶35, 79-82, *Jock v. Sterling Jewelers, Inc.*, No. 08-civ-02875 (JSR) (S.D.N.Y. Apr. 24, 2008), ECF No. 11. Thus, it was necessary to disclose the facts in the Declarations to provide

34

investors with an accurate "description of the factual basis" underlying *Jock*.[11]

Even had Signet satisfied Item 103 (it did not), liability would attach because its statements were not accurate and complete. "[U]pon choosing to speak, one must speak truthfully about material issues." *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002). A company that speaks on a subject must "be both accurate and complete" (*id.*), and "make such additional disclosures as are necessary to avoid rendering the statements made misleading," *Freudenberg*, 712 F. Supp. 2d at 179. Defendants' statements here omitted key facts required to apprise investors of the full factual basis underlying *Jock* and the attendant severe risks.

Defendants next attempt to sidestep liability by arguing that Plaintiff "points to no ruling, opinion, order, or judgment that has ever substantiated the [Declarations'] allegations or held that the Company has a 'pervasive culture of sexual harassment,'" and so disclosing the facts in the Declarations would be only "self-flagellation." DB 35. But the law – under Item 103 <u>or</u> *Caiola* – does not require a "ruling, opinion, order, or judgment" to trigger a disclosure obligation, and Defendants cite no cases saying so. *Cf. In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 363, 368-69, 380 (E.D.N.Y. 2013) (formal finding of wrongdoing not required to plead claims arising from improper business practices). Indeed, by requiring disclosure of the "factual basis alleged to underlie the proceeding," Item 103 assumes judgment has <u>not</u> been entered. 17 C.F.R. § 229.103.

Finally, while Defendants seek to contest the facts in the Declarations and minimize them as a "piece of disputed evidence," DB 35, those facts are <u>presumed true</u>. As they should be: the Declarations contain <u>nearly 250 sworn statements from nearly 200 employees</u> attesting to severe

---

[11] *In re SeaChange International, Inc. Securities Litigation* is inapposite. 2004 WL 240317 (D. Mass. Feb. 6, 2004). There, plaintiffs challenged a litigation disclosure on ground that the defendant "knew with a high degree of certainty" that it would lose the case. *Id.* at *7. The court merely held that the company was not required to disclose this purported fact. *Id.* at *8-9.

and pervasive sexual harassment. Defendants' argument rings particularly hollow because they

had the opportunity to contest the Declarations but did "not s[eek] to refute" that evidence. ¶196.

### C.    Signet's Risk Disclosures Were Misleading

Signet purported to warn – hypothetically – that a loss of confidence in its brands and

mismanagement of social and ethical risks <u>could</u> damage its reputation and financial health. *E.g.*,

¶¶326-29, 373-76. The Declarations showed that these risks were not just possible, but in fact had

already materialized, rendering the risk disclosures materially misleading. *See In re Facebook, Inc.*

*IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("[P]urported risk

disclosures are misleading where the company warns only that a risk may impact its business when

that risk has already materialized."); *cf. Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1127 (7th

Cir. 1993) (Easterbrook, J.) ("A prospectus stating a risk that such a thing could happen is a far

cry from one stating that this had happened.").

Defendants argue that Signet's risk disclosures were not materially misleading because

"Signet has no obligation to disclose something it does not believe to be true . . . , and which

certainly has not been proven." DB 36. But whether the allegations have been <u>proven</u>, or whether

Signet believes them, is beside the point: at this stage, well-pleaded allegations are presumed true,

and the question is whether they state a claim. Here, the Complaint pleads ample factual matter

from which to infer that risks presented as merely hypothetical had already materialized.

### D.    Defendants' "Truth-On-The-Market" Defense Fails

Defendants appear to suggest that their alleged misstatements were immaterial because the

arbitration was "highly publicized," DB 2, which amounts to a "truth on the market" affirmative

defense. This defense is "intensely fact-specific and is rarely an appropriate basis for dismissing a

§ 10(b) complaint for failure to plead materiality." *Ganino*, 228 F.3d at 167. Defendants must show

that any "corrective information" was "conveyed to the public with a degree of intensity and

36

credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Id.* "[D]efendants' burden [of establishing this defense is] extremely difficult, perhaps impossible, to meet." *Lapin*, 506 F. Supp. 2d at 238.

Numerous facts undermine the suggestion that the truth was "conveyed to the public" with the requisite "intensity and credibility," including that: (1) Defendants fought to keep the Declarations under seal for years and redacted them when they were belatedly made public; (2) Defendants denied and minimized sexual harassment when questioned about it; (3) the market reacted strongly when the *Washington Post* article publicized the Declarations, with Signet's stock price dropping 13% on record-breaking volume; (4) Signet halted trading and issued a public statement denying the report; and (5) there was widespread media coverage following the report. ¶¶182-83, 280-85, 391, 567-71. These facts demonstrate that the information in the Declarations was not previously known. *See, e.g.*, *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 582 (S.D.N.Y. 2010) (stock price drop and market reaction indicating surprise precluded truth-on-the-market defense); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 288 (S.D.N.Y. 2006) (defendants' statements contradicting allegations precluded truth-on-the-market defense).[12]

### E.    The Complaint Pleads Scienter For The Sexual Harassment Claims

There is no dispute that Defendants knew of the facts set forth in the Declarations before the Class Period. ¶¶203-72. The Complaint pleads that Signet's CEO for most of the Class Period, Light, was directly involved. ¶¶18, 183, 203, 209, 226-27, 279. It also pleads that Signet received the Declarations by the start of the Class Period. ¶181. Further, Signet's Chairman admitted that the Board – on which Barnes and Light served – had been briefed on *Jock* since 2008. ¶287. The

---

[12] Defendants suggest that "there was no new information disclosed" by the *Washington Post* article because an article in *The New York Times* mentioned sexual harassment allegations against Signet. DB 38 n.56. But Defendants denied the harassment allegations in that article. ¶¶391-92.

Board reviewed the sexual harassment allegations twice more in 2014 – after the Declarations had been submitted in *Jock* – when it appointed Light as COO, and when he was elevated to CEO. *Id.* Thus, Defendants made their misleading statements knowingly. *See Novak*, 216 F.3d at 308.

Defendants argue that "Signet's repeated disclosure of the Arbitration and the specific risk warning relating to the proceeding undermines any contention that Defendants acted with fraudulent intent." DB 37. However, as discussed above, Defendants' disclosures <u>were materially misleading</u>: they demonstrate Defendants' liability, rather than absolve them of it.

Defendants also argue that the Complaint fails to allege that Defendants "intentionally or recklessly failed to disclose . . . facts [they were] obligated to disclose." DB 37-38. But the Complaint pleads that Defendants made numerous false statements and omissions, and knew the undisclosed facts. Nothing more is required.

## III.    The Complaint Pleads Loss Causation

Loss causation is subject only to Rule 8(a)'s notice pleading requirements. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005). "[C]ourts in this district have made it clear that if the complaint connects the Defendants' fraud with Plaintiffs' purported loss within the short and plain statement standard of Rule 8(a), then [t]hat is all that is necessary at this stage of the litigation." *Bristol Myers*, 586 F. Supp. 2d at 163. The Complaint easily meets this standard.

It appears that Defendants are not contesting loss causation for the May 25, 2017 disclosure that, *inter alia*, 45% of the portfolio consisted of subprime loans. Nor could they, as this disclosure plainly satisfies the minimal loss causation standard set forth in *In re Vivendi, S.A. Securities Litigation*, 838 F.3d 223, 261 (2d Cir. 2016), which is explained below.

Defendants argue that loss causation is not pled for Signet's May 26, 2016 announcement that it was exploring selling the portfolio, because it did not explicitly "reveal that any prior statements about the credit portfolio were false," and thus, is not a "corrective disclosure." DB 31.

But *Vivendi* directly rejected the argument that "a specific corrective disclosure" is the only way to show loss causation, and held that loss causation may be shown by the occurrence of <u>any</u> "event" through which "the relevant truth . . . leak[s] out." 838 F.3d 223, 261 (2016). That is precisely what occurred on May 26, 2016: the announced "strategic review" and potential sale of the portfolio – made after years of statements extolling the portfolio as a "competitive advantage," and closely following repeated denials that anything was wrong – revealed that the portfolio was troubled, causing Signet's stock price to decline, ¶¶553-54, and leading the market to question the truth of Defendants' statements. *See, e.g.*, ¶¶111-16. Such allegations suffice under Rule 8. *See Vivendi*, 838 F.3d at 262-63 (loss causation demonstrated by sale of a stake in a subsidiary).

Defendants' argument that sales declines in 2016 and 2017 are not "corrective disclosures" also lacks merit. DB 33. For these disclosures (¶¶553, 557, 561), the "relevant truth" about the portfolio and its impact on Signet's financial condition – *i.e.*, poor results caused by increased bad debt and tightened underwriting – "leaked out." 838 F.3d at 260-63. Defendants are wrong that "nothing but speculation" supports the allegation that credit tightening caused these declines. DB 33. Many facts support this allegation, including specific market reaction. *See supra* at 15-16.

Defendants contend that there is no loss causation for the November 21, 2017 decline. DB 32. The announcements on November 21 – including a severe guidance cut and poor financial results – revealed the extent of Signet's reckless underwriting and the resulting impact on its financial condition caused by credit tightening. Market participants again noted these revelations in explaining why Signet's stock price dropped an astonishing 30% in a single day. ¶¶158-61. Even at trial, *Vivendi* approved of such continuing disclosures. *See Vivendi*, 838 F.3d at 262-63.

Defendants also wrongly argue that the announcement of the government investigations is not corrective because they supposedly do not "concern Signet's underwriting or the credit quality

of its loan portfolio" and have not yet resulted in "an admission or finding of wrongdoing." DB 32 n.50. But neither "admissions" nor "findings of wrongdoing" are required. *See Vivendi*, 838 F.3d at 260-63; *see also In re Take Two*, 551 F. Supp. 2d 247, 287 (S.D.N.Y. 2008) ("stock drops in response to announced SEC investigations are sufficient to plead loss causation"). Moreover, the investigations do concern Signet's underwriting and the portfolio's credit quality, as they center on deceptive lending practices – which are not "conservative," and result in uncollectible debt.[13]

Defendants incorrectly argue that the March 14, 2018 disclosure is not corrective. The steeply discounted sale price for the subprime loans and associated loss revealed that Defendants mischaracterized the portfolio's credit quality and understated reserves, and analysts reported as much. ¶173. *Vivendi* requires no more.

The Complaint also adequately alleges loss causation as to the sexual harassment claims. ¶¶273-82. Defendants' contrary argument rehashes their claim that Signet had no duty to disclose the truth, which fails as discussed above. DB 38; *see supra* at 29-36.

## IV.    The Complaint Alleges Control Person Liability

As set forth above, Plaintiff has pled primary violations of Section 10(b). Further, the Complaint alleges control as Defendants made or signed the false statements. ¶¶317-548.

## <u>CONCLUSION</u>

For the reasons set forth above, Defendants' Motion to Dismiss should be denied.

Dated: April 9, 2018                         */s/ John Rizio-Hamilton*
                                              _____

                                              John Rizio-Hamilton
                                              BERNSTEIN   LITOWITZ   BERGER   &
                                              GROSSMANN LLP

---

[13] Contrary to what Defendants argue (DB 32 n.49), the *Grant's* report is corrective because it provided new <u>factual</u> information: the increase in bankrupt borrowers. ¶86. Defendants' principal authority, *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501 (2d Cir. 2010), was decided at summary judgment, where Rule 8 did not apply and an evidentiary record had been developed.

1251 Avenue of the Americas
New York, New York 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
johnr@blbglaw.com

*Lead Counsel for Lead Plaintiff
and the Class*

41