**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re Signet Jewelers Limited Securities Litigation* | Case No. 1:16-CV-06728-JMF |

**REPLY IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE FIFTH AMENDED CLASS ACTION COMPLAINT**

WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8000
Fax: (212) 310-8007

*Attorneys for Defendants Signet Jewelers Limited,*
*Michael Barnes, Virginia Drosos, Mark Light,*
*Ronald Ristau, and Michele Santana*

April 13, 2018

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ........................................................................................................................... 2

    I.    PLAINTIFF'S CREDIT-RELATED SECTION 10(b) CLAIM FAILS ................ 2

        A.    No Falsity or Actionable Misstatement ............................................... 2

        B.    No Scienter ........................................................................................... 8

        C.    No Loss Causation ............................................................................... 11

    II.    PLAINTIFF'S *JOCK* ARBITRATION-RELATED SECTION 10(b) CLAIM FAILS ........................................................................................... 12

        A.    No Falsity or Actionable Misstatement ............................................... 12

        B.    No Scienter ........................................................................................... 15

        C.    No Loss Causation ............................................................................... 15

CONCLUSION ...................................................................................................................... 15

WEIL:\96524089\1\69177.0010

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Acceptance Ins. Cos., Sec. Litig.*,
   352 F. Supp. 2d 940 (D. Neb. 2004),
   *aff'd*, 423 F.3d 899 (8th Cir. 2005) ........................................................................8

*In re Ambac Fin. Group, Inc. Sec. Litig.*,
   693 F. Supp. 2d 241 (S.D.N.Y. 2010) ....................................................................7

*In re Banco Bradesco S.A. Sec. Litig.*,
   277 F. Supp. 3d 600 (S.D.N.Y. 2017) .....................................................................8

*In re Braskem S.A. Sec. Litig.*,
   246 F. Supp. 3d 731 (S.D.N.Y. 2017) ...................................................................14

*Carlton v. Cannon*,
   184 F. Supp. 3d 428 (S.D. Tex. 2016) .....................................................................5

*Catogas v. Cyberonics, Inc.*,
   292 F. App'x 311 (5th Cir. 2008) ..........................................................................15

*In re CIT Group Inc. Sec. Litig.*,
   2010 WL 2365846 (S.D.N.Y. June 10, 2010) .........................................................7

*In re Citigroup, Inc. Sec. Litig.*,
   330 F. Supp. 2d 367 (S.D.N.Y. 2004),
   *aff'd sub nom. Albert Fadem Tr. v. Citigroup, Inc.*,
   165 F. App'x 928 (2d Cir. 2006) ..............................................................................9

*Cortina v. Anavex Life Scis. Corp.*,
   2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016) .......................................................12

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005) ..............................................................................................11

*In re Dynex Capital, Inc. Sec. Litig.*,
   2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009) ..........................................................5

*In re Eletrobras Sec. Litig.*,
   245 F. Supp. 3d 450 (S.D.N.Y. 2017) ...................................................................14

*Freudenberg v. E*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010) .....................................................................3

ii

*In re Gen. Elec. Co. Sec. Litig.*,
   857 F. Supp. 2d 367 (S.D.N.Y. 2012).................................................................2, 8, 10

*In re Goldman Sachs Group, Inc. Sec. Litig.*,
   2014 WL 2815571 (S.D.N.Y. June 23, 2014) .......................................................14

*In re Herbalife, Ltd. Sec. Litig.*,
   2015 WL 1245191 (C.D. Cal. Mar. 16, 2015).......................................................12

*Janus Capital Group, Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011).................................................................................................9

*Lapin v. Goldman Sachs Group, Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006)....................................................................14

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005)....................................................................................11

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014),
   *aff'd*, 604 F. App'x 62 (2d Cir. 2015)...................................................................10

*Malin v. XL Capital Ltd.*,
   499 F. Supp. 2d 117 (D. Conn. 2007),
   *aff'd*, 312 F. App'x 400 (2d Cir. 2009)...................................................................4

*In re Moody's Corp. Sec. Litig.*,
   599 F. Supp. 2d 493 (S.D.N.Y. 2009)....................................................................14

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)....................................................................................10

*Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*,
   951 F. Supp. 2d 479 (S.D.N.Y. 2013)......................................................................3

*Pirnik v. Fiat Chrysler Autos., N.V. (Fiat II)*,
   2017 WL 3278928 (S.D.N.Y. Aug. 1, 2017)............................................................9

*Richman v. Goldman Sachs Group, Inc.*,
   868 F. Supp. 2d 261 (S.D.N.Y. 2012)....................................................................14

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000)......................................................................................10

*Schaffer v. Horizon Pharma PLC*,
   2018 WL 481883 (S.D.N.Y. Jan. 18, 2018),
   *appeal docketed*, No. 18-470 (2d Cir. Feb. 20, 2018) ...................................4, 9, 12

WEIL:\96524089\1\69177.0010

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)............................................................................................9

*In re Seachange Int'l, Inc.*,
  2004 WL 240317 (D. Mass. Feb. 6, 2004) ................................................................13

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008).........................................................................................9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)....................................................................................................10

*Total Equity Capital, LLC v. Flurry, Inc.*,
  2016 WL 3093993 (S.D.N.Y. June 1, 2016) ...............................................................9

*In re UBS AG Sec. Litig.*,
  2012 WL 4471265 (S.D.N.Y. 2012),
  *aff'd sub nom. City of Pontiac Policemen's & Firemen's*
  *Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) ....................................................9

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d. Cir. 2016)......................................................................................11

**OTHER AUTHORITIES**

Bill Alpert, *Digging into the Numbers at Alibaba*,
  Barron's, Feb. 22, 2016, at 30......................................................................................6

iv

# PRELIMINARY STATEMENT[1]

Plaintiff's response to our Motion confirms that the Complaint is an impermissible throw-back to the days before the PSLRA. In its opposition brief (the "Opposition" or "Opp."), Plaintiff continues to advance sweeping and conclusory allegations of fraud over a nearly five year putative class period (encompassing three CEOs and two CFOs), with no particularized facts to show falsity, no coherent—much less "cogent" and "compelling"—theory of scienter, and no alleged "corrective disclosures" with corresponding market declines sufficient to show loss causation.

Even Plaintiff's opening analogy—that Signet is "whistling past the graveyard"—falls flat. Far from exhibiting false bravado in the face of undisclosed danger, throughout the alleged class period, Signet consistently disclosed "bad news" when adverse developments occurred (lower earnings, declining same-store sales, transition challenges in out-sourcing the credit program). The only "dangers" Signet "failed" to disclose are those the Complaint has postulated but not supported with particularized factual allegations as required by the PSLRA: (i) a supposed chronic understated loan loss reserve, which Plaintiff now asserts (with no support) was consistently *manipulated* over *11 quarters* to meet or beat Wall Street earnings estimates (Opp. at 4, 29-30), along with supposedly "rosy" statements of opinion about the program's quality; and (ii) a supposed "pervasive culture of sexual harassment"—crediting as "true" the contested and unproven allegations in the *Jock* Arbitration.

We expand below on the fatal PSLRA pleading deficiencies of the Complaint.

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in Defendants' Memorandum of Law in Support of their Motion to Dismiss (ECF No. 113) (the "Motion" or "Mot."). References to "Ex." refer to the exhibits attached to the accompanying Declaration of Joseph Allerhand and the Allerhand Declaration dated March 30, 2018 (ECF No. 114).

## ARGUMENT

### I.  PLAINTIFF'S CREDIT-RELATED SECTION 10(b) CLAIM FAILS

#### A.  No Falsity or Actionable Misstatement

*Loan Loss Reserves.* Plaintiff's core claim turns on the alleged material understatement of the loan loss reserves for each quarter over the nearly five-year class period. But the fact that Plaintiff "calculates" reserves differently or argues Signet should have posted higher reserves based on Plaintiff's view of "historical losses" does not come close to pleading a misstatement—especially given the undisputed proposition that setting loan loss reserves is inherently an exercise in judgment and opinion. Opp. at 17. Plaintiff's argument that management should have considered different factors and applied a different method (*i.e.*, estimating reserves based on prior cumulative charge-offs) amounts at most to a claim of mismanagement and cannot show falsity. *See* Mot. at 18-19, 28. The Court in *In re General Electric Co. Securities Litigation*, 857 F. Supp. 2d 367 (S.D.N.Y. 2012), heavily relied on by Plaintiff, rejected a similar attack on GE's loan loss reserves and *dismissed* the unsupported claims of under-reserving. *Id.* at 390-91.

Likewise, the recent *sale* of the non-prime portion of Signet's portfolio to a *third party* at a loss does not support the allegation that Signet understated loan loss reserves with respect to a constantly changing book of receivables for almost five years. Mot. at 17-18. In the absence of any case support, Plaintiff seizes upon one sentence in a footnote to Signet's financial statements (concerning fair value measurements) in which Signet stated that the "carrying amount" of its accounts receivable (*i.e.*, the balance of outstanding loans less the loan loss reserve) "approximat[ed] fair value." Opp. at 22. But Plaintiff continues to confuse and conflate the applicable accounting concepts. There is a difference between the estimated value of a portfolio of loans held and collected in the normal course of business and what ultimately might be

2

realized through a sale to a third party under market conditions at any particular time.[2] This was

the holding in *Oklahoma Firefighters*, and the same result should apply here.[3] Plaintiff's

conclusion that the sale price reflected the buyer's assessment of the alleged poor "credit quality

of the loans" (Opp. at 22), even if true, hardly supports the separate notion that Signet did not set

its reserves in good faith. Once, however, Signet determined to sell the remaining non-prime

portfolio in a complex transaction that included Signet absorbing certain servicing costs, Signet

properly moved the assets into a different accounting model—assets held for sale—and will

recognize the loss under the accounting rules.[4]

      Other than its own flawed attempt to calculate alternative reserves and point to the sale of

the non-prime credit portfolio for a loss, Plaintiff relies completely on CW1, who supposedly

observed an unspecified discussion about "comping" reserves to prior years—whatever that

means. (Of course, any reserving exercise uses historical experiences and growth of the portfolio

as points of comparison, and Signet publicly disclosed that it considered "historical loss

information and payment performance" when determining its reserves. *See, e.g.*, Ex. A19, A107,

A183.) Plaintiff ignores, however, that CW1 is not alleged to have had involvement in or

responsibility for financial reporting, much less for setting reserves. Moreover, despite CW1's

---

[2] In the absence of observable market prices, fair value may be estimated as the discounted value of future cash flow. *See* Ex. O (Statement of Financial Accounting Standards ("SFAS") No. 107) ¶¶ 27-28; *see also* Ex. P (SFAS No. 157) ¶ 18.

[3] Plaintiff attempts to distinguish *Oklahoma Firefighters* because, prior to its sale, the defendant disclosed that the carrying value of its loan portfolio was higher than fair market value. Opp. at 23. But this disclosure had no impact on the Court's holding that the sale of the portfolio at a loss to carrying value could not show that prior reserves were understated or established in bad faith. *Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.,* 951 F. Supp. 2d 479, 496-97 (S.D.N.Y. 2013).

[4] *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171 (S.D.N.Y. 2010), did not hold, as Plaintiff claims (Opp. at 22), that the sale of a loan portfolio at a loss showed that prior loan loss reserves were fraudulently misstated. Rather, the Court held that defendants' positive statements about its loan portfolio intended to reassure investors at the height of the financial crisis were false and misleading based on undisclosed facts. *Id.* at 177, 184, 188, 191.

3

"14 year tenure with Signet" touted by Plaintiff (Opp. 19), CW1 admittedly left Signet in

February 2014—*only six months* into the 54-month alleged class period—and thus cannot speak

to what happened after he left the Company, much less support a purported fraud perpetrated by

a CFO and two CEOs for over 16 quarters after his departure. *See* Mot. at 18-19.

Plaintiff's attempt to distinguish this Court's decision in *Schaffer v. Horizon Pharma

PLC*, 2018 WL 481883 (S.D.N.Y. Jan. 18, 2018), *appeal docketed*, No. 18-470 (2d Cir. Feb. 20,

2018)—refusing to credit statements from two confidential sources who left "early in the Class

Period"—only highlights the inadequacy of CW1's allegations. *See* Opp. at 20 n.6. CW1, just

like the CWs in *Schaffer*, provides few details as to the meetings where the fraud supposedly was

hatched or discussed in terms of when they occurred, what was said, who was there, etc.[5]

There is also no basis for Plaintiff's new contention at pages 4 and 29 of its Opposition

that Signet "manipulated" its reserves in order to meet "earnings estimates for 11 straight

quarters, often narrowly." There have of course been many cases in this Court and other courts

where a plaintiff has pled the improper use of "cookie jar" reserves to inflate earnings (by

reversing previously stated reserves). But there is not a *single* particularized factual allegation or

CW in the Complaint to support such an allegation, much less the notion that—for nearly five

years—Defendants purposefully increased or decreased loan loss reserves in order to find a few

pennies at the end of each quarter to narrowly beat Wall Street estimates or guidance. And, of

course, the record shows that Signet in fact did announce disappointing results for several

quarters, including lowered guidance. *See, e.g.*, FAC ¶¶ 125, 155, 160, 165.[6]

---

[5] *See Schaffer*, 2018 WL 481883 at *12; *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 141 (D. Conn. 2007) ("Also problematic is the fact that none of the CWs are alleged to have been involved in . . . setting or estimating loss reserves."), *aff'd*, 312 F. App'x 400 (2d Cir. 2009).

[6] Finally, we do not contest the general proposition that the absence of a restatement, or an admission of wrongdoing, or a significant increase in reserves does not necessarily doom a

4

***Quality of the Credit Program.*** Contrary to Plaintiff's arguments (Opp. at 11-14), Defendants' statements on earnings calls describing the quality of the credit program as "strong," "very healthy," and "conservatively managed," among other similar descriptors, are either *quintessential* puffery statements that are not actionable under the securities laws or statements of opinion for which Plaintiff has failed to demonstrate falsity under the demanding *Omnicare* standard. Mot. at 21-23; *see also* Ex. Q (chart of cases addressing similar statements).

As the U.S. Supreme Court and Second Circuit have emphasized, opinion statements must be evaluated in their proper *context*. Mot. at 21-23 & n.43. Here, it is undisputed that Signet provided a wealth of information about its credit program each quarter at the time these challenged statements were made. *Id.* at 4-10. Viewed in this context, Plaintiff shoulders a heavy burden to demonstrate that Signet's statements about "quality" constituted anything but non-actionable "puffery" or opinions that were honestly held and did not omit some material fact. Plaintiff does not come close to meeting this standard.

*First*, the supposed contradictory "firsthand" knowledge (Opp. at 14) is sourced from low-level CWs who worked in a few out of thousands of Signet's stores or in debt collection (CWs 2-6), and is no more than anecdotes and opinions about how Signet extended credit. Not one of these CWs has any "firsthand knowledge" or awareness of the overall quality and performance of the credit portfolio, or Signet's disclosures, or had any contacts with the Individual Defendants who made those disclosures. Mot. at 23.[7] And Plaintiff never responds to Defendants' showing that CW 7's allegation—that credit standards were secretly "tightened" "in

plaintiff's claim. Opp. at 21-22. But especially when those events are absent, as here, Plaintiff must come forward with particularized facts showing falsity and not rank speculation.

[7] Plaintiff's cases are inapposite. *In re Dynex Capital, Inc. Sec. Litig.*, 2009 WL 3380621, at *7 (S.D.N.Y. Oct. 19, 2009) (allegations from low-level CWs "corroborated" allegations of senior CWs); *Carlton v. Cannon*, 184 F. Supp. 3d 428, 473-74 (S.D. Tex. 2016) (low-level CWs observed product design defect at issue in facility where they worked).

5

approximately mid-2016"—lacks the requisite specificity of who, what, where, when, and why Signet would arbitrarily do that and depress sales. Mot. at 23-24.

*Second*, without CWs to carry its burden, Plaintiff resorts to quoting *analysts* who put a decidedly negative spin on the information Signet had disclosed.[8] But these analysts' reports were based entirely on Signet's publicly-disclosed information, and obviously analyst speculation cannot show falsity. Mot. at 26 n.48. To the contrary, a proliferation of analyst reports digesting public information and reaching differing opinions proves our point.[9] Information about the credit program was out there for all to see and evaluate.[10]

*Finally*, Plaintiff places heavy reliance on supposedly "corrective" disclosures, none of which supports an allegation of fraud. Opp. at 7-8. Signet's May 2016 announcement that it had hired Goldman Sachs to perform a "strategic evaluation" of the credit portfolio hardly supports Plaintiff's illogical and unsupported leap that Defendants knew "the game was up." Plaintiff next claims the alleged fraud was revealed by the May 2017 announced sale of the $1 billion "prime" portion of Signet's credit portfolio and then yet again by the March 2018 announced sale of the remaining approximately $800 million non-prime portion. Opp. at 8. Plaintiff claims these disclosures "contradicted several of Defendants' prior statements that the portfolio was strong

---

[8] *See* Opp. at 1-2, 5-8, 12-16. For example, one analyst Plaintiff repeatedly quotes, Pacific Square, is a well-known "short" who seeks to make "bearish calls on stocks." *See, e.g.*, Bill Alpert, *Digging into the Numbers at Alibaba*, Barron's, Feb. 22, 2016, at 30 (Ex. R).

[9] *Compare* FAC ¶ 91 (following Signet's report of disappointing earnings for 3Q FY2015, Barclays and Cowen & Company noted that despite Signet's higher bad debt expense, its business remained "in good shape," "profitable," and "stable"), *with id.* ¶ 92 (Pacific Square Research expressed its opinion based on the same disclosure that "[c]redit quality clearly appears to be under pressure and, in our view, is at a critical juncture to go even lower").

[10] It is no coincidence that Plaintiff's entire theory of the credit-related fraud tracks precisely the questions raised by these analysts about the portfolio beginning in 2015. *See, e.g.*, FAC ¶¶ 92, 93, 103, 108, 114-15, 120-21, 130-32, 161. Analysts used the Company's publicly-disclosed information to advance their views on the Company, and then a plaintiff reformats the analysts' views into a complaint to support a theory of fraud? This does not suffice under the PSLRA.

WEIL:\96524089\1\69177.0010

and underwriting strict." *Id.* at 15. But this was not the disclosure of some new fact demonstrating the falsity of prior statements. Plaintiff ignores the many detailed disclosures that Signet made throughout the putative class period concerning the program, including delinquency rates, reserves, and charge-offs. Mot. at 4-11. And, beginning *in March 2016* (over a year before the sale announcements), Signet disclosed the balance-weighted FICO scores for the program (*id.* at 9)—thus alerting any investor that many loans fell below the prime category.[11] At the time, analysts understood these additional disclosures and reached their own opinions about the portfolio.[12]

Plaintiff fares no better in relying on inapposite "2008 financial crisis" cases where, unlike here, defendants allegedly hid the companies' true financial conditions in the immediate wake of the crisis, only to later reveal massive losses and other negative news. In *In re Ambac Fin. Group, Inc. Securities Litigation*, 693 F. Supp. 2d 241 (S.D.N.Y. 2010), defendants touted the company's underwriting standards as "cautious" and "conservative" and told the market that the company would experience "minimal losses" from its subprime exposure, but the company later announced a "$5.4 billion mark-to-market loss" caused by subprime exposure.[13] Similarly, in *In re CIT Group Inc. Securities Litigation*, 2010 WL 2365846, at *2 (S.D.N.Y. 2010), the defendants publicly claimed to have "tightened home lending underwriting" and "raised

---

[11] Signet disclosed the balance-weighted FICO scores for the credit portfolio for the past three years (which declined from 665 in FY 2014 to 662 in FY 2016), as well as the balance-weighted scores for new customers for each of those years (which declined from 690 to 684). Mot. at 9. Plaintiff alleges a score of 640 is considered to be subprime (FAC ¶ 106).

[12] *Compare* FAC ¶ 107 (after disclosure of recent and historical credit customer FICO scores, Buckingham Research Group was "more confident that there is no 'smoking gun' to come from [Signet]'s credit operations"), *with id.* ¶ 108 (April 2016 Capitol Forum Report claims Signet "more closely resembles a subprime retailer or installment lender than a jewelry company").

[13] The *Ambac* plaintiffs also cited an internal memo showing that Ambac had lowered its underwriting standards in several specific ways, amongst other "detailed allegations." 693 F. Supp. 2d at 284.

7

minimum FICA requirements'" when they had "effectively loosened requirements for a subprime home loan." And in *In re General Electric Co. Securities Litigation*, 857 F. Supp. 2d 367, 399 (S.D.N.Y. 2012), plaintiffs alleged defendants made a host of false and misleading statements about its ability to roll over its commercial paper portfolio and maintain its AAA rating and dividend, the quality of its loan portfolio, and asset classifications, only to later disclose the composition of its loan portfolio, slash its dividend by 96%, and suffer a ratings downgrade.[14]

There is nothing here remotely resembling the allegations in these cherry-picked financial crisis cases. There is no challenge to the many detailed metrics that Signet disclosed about its credit program over the nearly five year-class period, and there are no particularized facts casting doubt on the Company's description of the program.

## B.    No Scienter

In the absence of any alleged insider sales or other improper concrete benefit to the Individual Defendants,[15] Defendants demonstrated that the Complaint fails to make any particularized showing of conscious misbehavior or recklessness, much less an inference of fraud at least as "cogent" and "compelling" as the competing, nonculpable explanation. Mot. at 29-31. In response, Plaintiff proffers every trick from the pre-PSLRA playbook. Opp. at 24-30. All

---

[14] The plaintiffs also pled particularized facts demonstrating GE's confident statements about its commercial paper program were false and its asset classifications violated GAAP. *Gen. Elec.*, 857 F. Supp. 2d at 399.

[15] The absence of sales and the increase in Defendants' holdings during the class period negates scienter. Mot. at 28 & n.50; *see also In re Acceptance Ins. Cos., Inc., Sec. Litig.*, 352 F. Supp. 2d 940, 961 (D. Neb. 2004) (cashless exercise of stock options "increase[ed] [defendants'] holdings" and was "compelling evidence relevant to motive"), *aff'd*, 423 F.3d 899 (8th Cir. 2005). In the cases relied on by Plaintiff (Opp. at 28), the courts merely disregarded defendants' unvested shares in calculating their total *sales* of stock where plaintiff alleged the timing and amount of the *sales* were suspicious.

Defendants are improperly lumped together regardless of their title or when they joined Signet.[16]

And Plaintiff argues that the Individual Defendants acted with scienter because, as senior

executives, they had access to information concerning the credit portfolio which was a "central"

part of Signet's operations. These generalized allegations have been rejected time and time again

under the PSLRA.[17] And the "core operations" theory Plaintiff appears to rely on (Opp. at 27) is

highly questionable in the Second Circuit.[18] Even still, there are no allegations of specific

contradictory information "or that [defendants] would have any reason to know or believe that

[their] statements were contradicted by the facts at the time [they] made them." *Total Equity*

*Capital, LLC v. Flurry, Inc.*, 2016 WL 3093993, at *6 (S.D.N.Y. June 1, 2016) (Furman, J.).[19]

---

[16] Though the Second Circuit has not ruled on the group pleading doctrine, the recent weight of authority in this district holds that the doctrine is no longer viable after the Supreme Court's ruling in *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011). *See, e.g.*, *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 641 (S.D.N.Y. 2017); *In re UBS AG Securities Litigation*, 2012 WL 4471265, at *10 (S.D.N.Y. 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014). The omission of particularized scienter allegations as to each Individual Defendant is especially problematic here where the putative class period covers *five years* and includes a CEO and CFO who left in 2014 (only a year into the putative class period) and a CEO appointed in August 2017.

[17] *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 382 (S.D.N.Y. 2004) (a defendant's "position as an officer alone . . . is insufficient to support an inference of scienter"), *aff'd sub nom. Albert Fadem Tr. v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006); *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196-97 (2d Cir. 2008) (affirming dismissal because plaintiff "fail[ed] to allege the existence of information that would demonstrate that the statements made to investors were misleading"); *Pirnik v. Fiat Chrysler Autos., N.V. (Fiat II)*, 2017 WL 3278928, at *3 (S.D.N.Y. Aug. 1, 2017) ("conclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge is insufficient").

[18] *See Schaffer*, 2018 WL 481883 at *12 ("[T]here is considerable doubt whether the core operations doctrine survived enactment of the PSLRA, and many courts have held that it is no longer valid.") (citations omitted) (collecting cases).

[19] Nor does the supposed "magnitude" of the loss on the sale of the non-prime portfolio "support[] an inference of recklessness." Opp. at 27. Plaintiff's own cases show much more is needed. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76–77 (2d Cir. 2001) (complaint contained "detailed allegations" of specific contemporaneous sales and inventory reports and information directly contradicting defendants public statements about returns and sales revenue

9

The fact that Defendants ultimately enhanced Signet's disclosures about the credit portfolio in March 2016 in response to questions from analysts and investors also does not help Plaintiff. Providing additional information about the portfolio—none of which Plaintiff alleges is false—in response to investor requests was the "prudent course of action that weakens rather than strengthens an inference of scienter." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 583 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).[20]

Finally, in attempting to address *Tellabs*, Plaintiff dismisses the illogic of its purported five year fraud involving three CEOs and two CFOs, citing the GE financial crisis case as a supposedly similar example of fraud. Opp. at 29-30 (citing *Gen. Elec.*, 857 F. Supp. 2d at 387). But that case—which involved an alleged five month fraud to hide GE's true financial condition during the height of the financial crisis (September 2008 to March 2009) when every financial company was facing intense market scrutiny—illustrates the implausibility of Plaintiff's fraud theory. Here, all we have is Plaintiff's unsupported and illogical (much less cogent or compelling) theory of a nearly five year fraud in contrast to the "plausible nonculpable explanation" that Defendants made a business decision (after evaluation with an investment banker) to sell the Company's in-house credit program and experienced disappointing sales and other setbacks over the five year period in a challenging retail market. Mot. at 32 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)).

---

as well as significant alleged insider sales); *Rothman v. Gregor*, 220 F.3d 81, 91–92 (2d Cir. 2000) (defendants allegedly aware of contemporaneous specific facts showing they were reckless in not writing off 80% of previously capitalized royalty advances sooner); *Novak v. Kasaks*, 216 F.3d 300, 312-13 (2d Cir. 2000) (scienter satisfied where complaint pled contemporaneous internal inventory reports and other specific information contradicting company's public positive statements preceding significant write-off of inventory).

[20] Plaintiff's attempt to shore up its scienter story by attacking the fully-disclosed use of the "recency aging" method hardly merits a response. Opp. at 27-28. Plaintiff cannot articulate any fraud based on the use of one fully disclosed aging method versus another. *Id.* at 21. And Signet fully responded to the SEC's question on the subject. *See* Ex. E.

### C.     No Loss Causation

The Complaint does not plead a stock drop *resulting from a corrective disclosure*—as opposed to a drop tied to disappointing earnings or other "bad news" unrelated to the supposed fraud. Mot. at 32-34. This is a basic requirement under *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), and *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005), and Plaintiff has not cured this fatal "loss causation" defect in its Complaint.

*First*, Plaintiff persists in its unsupported claim that the announcement of a "strategic review" of the credit portfolio and the hiring of Goldman Sachs in May 2016 "revealed that the portfolio was troubled." Opp. at 39. But there is nothing in that disclosure (Ex. A261) that reveals or even suggests that Signet's prior disclosures—on the numbers or otherwise—were misleading. Mot. at 32-33.[21]

*Second*, Plaintiff claims Defendants "are not contesting loss causation for the May 25, 2017 disclosure that, *inter alia*, 45% of the portfolio consisted of subprime loans." Opp. at 38. But Defendants demonstrated that this disclosure as well as the March 14, 2018 announcement of the sale of the non-prime portion of the portfolio were not corrective for the same reason the announcement of the strategic review was not corrective. Mot. at 32-33. As explained *supra*, the supposed "big reveal" that the loan portfolio contained non-prime loans was not even new information: the balance-weighted FICO score for the portfolio—which, at 662, was only slightly above the 640 cutoff score for non-prime loans alleged by Plaintiff—was provided a year earlier.

---

[21] *In re Vivendi, S.A. Securities Litigation*, 838 F.3d 223, 261 (2d. Cir. 2016)—Plaintiff's sole support for this point—is inapposite. The Second Circuit affirmed a trial verdict that Vivendi concealed a liquidity crisis that later materialized when the company's rating was downgraded and it was forced to take write downs and sell crown jewel assets in a fire sale. No such facts are pled here.

WEIL:\96524089\1\69177.0010

*Third*, Plaintiff claims that various earnings announcements in which the Company reported sales declines revealed the "relevant truth"—*i.e.*, "poor results caused by increased bad debt and tightened underwriting." Opp. at 39. But these disclosures say no such thing. In fact, they attribute the losses to a variety of factors having nothing to with the imaginary "tightening" of credit. Mot. at 24-26 (quoting disclosures).

*Fourth*, while Plaintiff argues that the announcement of the CFPB and NYAG investigations is corrective because they "concern Signet's underwriting and the portfolio's credit quality, as they center on deceptive lending practices" (Opp. at 40), as disclosed and not refuted by Plaintiff, the investigations in fact concern "in-store credit practices, promotions, and payment protection products" (*see* Mot. at 11, 33 n.54)—not the quality of Signet's overall credit portfolio or its underwriting policies. Moreover, the recent weight of authority among district courts in this Circuit (and other circuit-level authority) holds that the announcement of a government investigation, without more, cannot show loss causation.[22]

## II.   **PLAINTIFF'S *JOCK* ARBITRATION-RELATED SECTION 10(b) CLAIM FAILS**

### A.   **No Falsity or Actionable Misstatement**

Plaintiff claims that at the pleading stage, the salacious, contested, and unadjudicated allegations of sexual harassment contained in certain of the declarations submitted in the *Jock* Arbitration must be "presumed true," thus rendering Signet's description of the Jock Arbitration, its Codes of Conduct and Ethics, and certain risk warnings false and misleading. Opp. at 35. According to Plaintiff, Signet should have changed its disclosures to confess guilt by admitting to violations of its Codes of Conduct and Ethics and disclosing that its brand had been tarnished

---

[22] *See* Mot. 33 n.54; *see also In re Herbalife, Ltd. Sec. Litig.*, 2015 WL 1245191, at *2 (C.D. Cal. Mar. 16, 2015). This Court has similarly held that for scienter purposes, "government investigations are just that, investigations." *Schaffer* 2018 WL 481883, at *13; *see also Cortina v. Anavex Life Scis. Corp.*, 2016 WL 7480415, at *8 (S.D.N.Y. Dec. 29, 2016) (Furman, J.).

WEIL:\96524089\1\69177.0010

by "pervasive sexual harassment." But this is not required by the securities laws. Mot. at 37

(citing cases). Indeed, Plaintiff provides no explanation why this Court should agree to an

unprecedented "*case-within-a-case*" theory of securities fraud, *i.e.*, whenever a plaintiff in an

earlier proceeding alleges discriminatory or unlawful practices (such as "bid rigging" in alleged

violation of the antitrust law, or a bribe in alleged violation of the Foreign Corrupt Practices

Act), a second "follow-on" securities fraud suit should be allowed to proceed by crediting as

"true" the contested and unproven allegations in the original suit. This makes no sense and no

case in this District endorses such an approach.

     *First*, Plaintiff argues that Signet failed to satisfy Item 103 in describing the *Jock*

Arbitration because the declarations show the Arbitration "was not just about 'gender'

discrimination at the 'store level,'" but "concerned pervasive sexual harassment, committed by

Signet's upper management, including Light." Opp. at 34. In fact, the complaint filed in *Jock* and

the numerous decisions that have been issued over the years by this Court and Second Circuit

make clear that the claims at issue in the Arbitration (and thus the "factual basis alleged to

underlie the proceeding") do concern pay and promotion discrimination at the store level. Mot. at

34-36. Plaintiff cites no support for its position that Item 103 (which only requires a *"brief"*

description of legal proceeding) obligates Signet to disclose every allegation in the Arbitration,

including disputed evidence submitted in connection with class certification. *Id.* at 35.[23]

     *Second*, Plaintiff assumes a "pervasive culture of sexual harassment," based on the

declarations' allegations, rendered Signet's Codes of Conduct and Ethics false and misleading.

---

[23] Moreover, the purpose of Item 103 is to "put potential investors on notice of pending litigation" so that they may "make further inquiry directly about the litigation should they choose to do so." *In re Seachange Int'l, Inc.,* 2004 WL 240317, at *10 (D. Mass. Feb. 6, 2004). If Plaintiff believes it can read the *Jock* complaint to allege sexual harassment (Opp. at 34), then any shareholder who read Signet's public filings could have done the same.

But again, the allegations are disputed. And the fact that the Codes of Conduct and Ethics *may* have been violated does not mean the policies and standards reflected therein are false. Mot. at 38-39. In fact, the Codes of Conduct and Ethics expressly contemplate there may be violations. *See, e.g.*, Ex. S [Signet Jewelers' 2016 Code of Conduct] at § 7 ("Violations of this Code"); Ex. T [Signet Jewelers' 2016 Code of Ethics] at 6 (speaking of "sanctions for violations"). Codes of conduct have been found actionable only where, unlike here, defendants made "historical representation[s] . . . to the effect that [their] officers had uniformly abided by the[] rules" or other false assurances of compliance. *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 756 (S.D.N.Y. 2017) ("There is an important difference between a company's announcing rules forbidding bribery and its factually representing that no officer has engaged in such forbidden conduct.").[24] But Signet never made any such representations. Mot. at 38-39.[25]

*Third*, Plaintiff claims Signet's risk factors—concerning the potential loss of customer confidence and harm to reputation—"had already materialized" when the declarations were

---

[24] Plaintiff's cases are inapposite. *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463-64 (S.D.N.Y. 2017) (company repeatedly touted its "internal controls," "commitment to transparency," and "ethical conduct" in response to news implicating the company in a "bribery and bid-rigging investigation" in an effort "to reassure investors"); *In re Goldman Sachs Group, Inc. Sec. Litig.*, 2014 WL 2815571, at *1, *5 (S.D.N.Y. June 23, 2014) (company's statements that it "had 'aligned incentives' with investors" was "directly at odds with its alleged conduct" which included selling financial products to clients "despite clear and egregious conflicts of interest"); *Richman v. Goldman Sachs Group, Inc.*, 868 F. Supp. 2d 261, 278, 280 (S.D.N.Y. 2012) (same); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 509 (S.D.N.Y. 2009) (company asserted that it "maintained independence as a cornerstone of its business" and "listed verifiable actions it was taking to ensure its independence" but later admitted such actions were not taken); *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) (Goldman "stated that . . . integrity 'was at the heart' of its business and touted its 'truly independent investment research,'" when its research analysts were making "buy" recommendations to benefit the firm's clients).

[25] To the contrary, following publication of the *Washington Post* article reporting on the declarations in *Jock*, the Company disclosed that it was "undertaking three new initiatives 'to assure ourselves, our shareholders, and our team members that our policies and practices are functioning as intended, and to identify areas where we can further improve.'" FAC ¶ 286.

confidentially submitted in the Arbitration in 2013. Opp. at 36. But the disclosed risk factors were irrefutably accurate—obviously, negative publicity could hurt the Company's brand. Mot. at 36. Plaintiff seems to suggest Signet should have *actualized* the risks by publicly disclosing the salacious allegations when there was no obligation to do so, thus potentially causing the harms that Signet warned about. Frankly, this argument makes no business or legal sense and certainly does not state a claim for securities fraud.

### B.   No Scienter

Plaintiff wrongly claims that it need only show that Defendants "knew the undisclosed facts"—*i.e.*, the allegations in certain of the declarations—to satisfy scienter. Opp. at 38. Missing from the Complaint are particularized allegations that any Defendant participated in an effort to hide the allegations in *Jock* or mislead investors as to the nature or status of that 10-year long (and still counting) proceeding. Mot. at 39-40.

### C.   No Loss Causation

Plaintiff does not dispute that, absent a duty to disclose the sexual harassment allegations, there can be no loss causation. Opp. at 40; Mot. at 40. And Defendants did not invoke the "truth on the market" defense as Plaintiff argues (Opp. at 36-37), but rather noted that many of the allegations in the declarations were made public in a New York Times article in March 2014 (Ex. J)—well before the Washington Post article in February 2017 that Plaintiff claims was a "corrective" disclosure.[26]

## CONCLUSION

For the foregoing reasons, as well as those set forth in the Motion, Defendants respectfully request that the Court dismiss the Complaint with prejudice.

---

[26] *See Catogas v. Cyberonics, Inc.*, 292 F. App'x 311, 314 (5th Cir. 2008) ("information already known to the market" is merely confirmatory and cannot be a corrective disclosure).

WEIL:\96524089\1\69177.0010

Date:   April 13, 2018                          Respectfully submitted,
        New York, NY

                                                /s/ *Joseph S. Allerhand*
                                                Joseph S. Allerhand
                                                Stacy Nettleton
                                                David P. Byeff
                                                Nikolei M. Kaplanov
                                                WEIL, GOTSHAL & MANGES LLP
                                                767 Fifth Avenue
                                                New York, NY 10153
                                                Telephone: (212) 310-8000
                                                Facsimile: (212) 310-8007
                                                Joseph.Allerhand@weil.com
                                                Stacy.Nettleton@weil.com
                                                David.Byeff@weil.com
                                                Nikolei.Kaplanov@weil.com

                                                *Attorneys for Defendants Signet Jewelers*
                                                *Limited, Michael Barnes, Virginia Drosos,*
                                                *Mark Light, Ronald Ristau, and Michele*
                                                *Santana*

16