NITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:
> DATE FILED: 11/26/18

IN RE SIGNET JEWELERS LIMITED SECURITIES LITIGATION

No. 16 Civ. 6728 (CM)

## DECISION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS THE FIFTH AMENDED CLASS ACTION COMPLAINT

McMahon, C.J.:

This is a garden variety securities fraud suit.

Lead Plaintiff the Public Employees' Retirement System of Mississippi ("MissPERS"), through its attorneys at Bernstein Litowitz Berger & Grossmann LLP, brings this putative class action on behalf of all people who bought shares of Defendant Signet Jewelers Limited ("Signet") between August 29, 2013 and March 13, 2018 (the "Class Period").

Plaintiff alleges that Signet made two categories of false or misleading statements that induced Plaintiff and others similarly situated to purchase Signet shares; when the truth became known, the value of Signet shares dropped precipitously, causing Plaintiff to suffer economic damage. *See* Securities Exchange Act of 1934 ("Exchange Act") § 10(b), 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Plaintiff further alleges that certain Signet executives (the "Executive Defendants") controlled Signet and directly participated in its allegedly fraudulent conduct by virtue of their high-ranking positions. *See* Exchange Act § 20(a), 15 U.S.C. § 78t(a).

1

Defendants move to dismiss this action for failure to state a claim upon which relief could be granted. (Dkt. No. 112.)

For the reasons discussed below, Defendants' motion to dismiss is DENIED.

## I.   Background

The following facts are alleged in Plaintiff's Fifth Amended Class Action Complaint (the "FAC") or are contained in Defendant Signet's public disclosure documents filed with the Securities and Exchange Commission ("SEC").[1]

### a.   The Parties

MissPERS is a pension fund established for the benefit of current and retired public employees of the State of Mississippi. (FAC ¶ 31, Dkt. No. 111.) It allegedly purchased 150,756 shares of Signet securities between August 29, 2013 and May 24, 2017. (Silk Decl., Ex. B, Dkt. No. 70-2.)

Signet, the world's largest retailer of diamond jewelry, is a publicly traded company that is incorporated in Bermuda and has its headquarters in Akron, Ohio. (*Id.* ¶ 32.) The company wholly owns Sterling Jewelers, Inc. ("Sterling") – through which it operates retail stores under the brand names Kay Jewelers ("Kay") and Jared the Galleria of Jewelry ("Jared") – and Zale Corporation, through which it operates retail stores under "Zales the Diamond Store" ("Zales"), among other brand names. (*Id.*)

The Executive Defendants include Michael Barnes, who served as Chief Executive Officer ("CEO") and as a Signet director from January 2011 until October 31, 2014; Mark Light, who replaced Barnes as CEO on November 1, 2014, and served in that role, as well as a Signet

---

[1] On a motion to dismiss, the Court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

director, until July 31, 2017; Virginia Drosos, who replaced Light as CEO on August 1, 2017, and has served in that role, as well as a Signet director, since July 2012; Ronald Ristau, who served as Chief Financial Officer ("CFO") from April 2010 until July 31, 2014; and Michele Santana, who replaced Ristau as CFO on August 1, 2014. (*Id.* ¶¶ 33-38; *see also* Decl. of Joseph S. Allerhand ("Allerhand Decl.) Ex. D (Signet Schedule 14A, dated May 4, 2017), Dkt. No. 114.)

#### b. Factual Background

Plaintiff alleges that Defendants committed securities fraud on the basis of the following two series of events.

##### 1. Signet's Credit Portfolio

The first series of events relates to Signet's credit portfolio.

Prior to and during the Class Period, Signet operated an in-house credit business, run through its Sterling division, whereby it extended credit to its customers for jewelry purchases. (FAC ¶ 40.) Signet's credit portfolio constituted a sizable part of its business; by 2015, credit receivables grew to be Signet's second largest asset. (*Id.*) Defendants repeatedly characterized their credit portfolio as a key "competitive advantage," because most other jewelers only offered credit-financed sales through third-party underwriters. (*Id.* ¶¶ 40-41.)

###### i. Defendants' Representations Regarding Signet's Credit Portfolio

Given the importance of Signet's lending program to driving sales, both parties concede that Signet's credit portfolio has always been the subject of extensive disclosure in SEC filings, earnings releases, and investor calls and presentations. (*Id.* ¶¶ 40-44; Defs.' Mem. of Law for Mot. to Dismiss ("Defs.' Br.) at 5, Dkt No. 113.) Signet consistently disclosed the key metrics associated with the portfolio – including accounts receivable, allowances for credit losses, net

3

charge offs, and net bad debt expense figures – and its methodologies for calculating those numbers. (*See, e.g.*, Declaration of Joseph S. Allerhand ("Allerhand Decl.") Ex. A, Dkt. No. 114.)

In addition to these disclosures, Defendants represented, both orally and in Signet's SEC filings, that they closely monitored Signet's lending operation and that its credit portfolio was healthy. (FAC ¶¶ 45–46, 50–51, 58–62.)

### Oral Representations

During the September 10, 2013 Goldman Sachs Global Retailing Conference, then-CEO Barnes said that the credit portfolio was "a big important part of our business and one that we don't take lightly. We watch it very closely and we use it really to help drive our core business." (*Id.* ¶ 45.) During New York Analyst Day, dated October 8, 2013, then-CFO Ristau stated that Signet "welcome[s] the increasing use of our credit programs, as we have very definitive approval criteria and fully understand the credit risk and profitability of our decisions. We take great care in our decision[s]." (*Id.*)

As Signet's sales grew during the Class Period, Defendants told investors that their underwriting remained conservative and that the credit quality of the portfolio remained healthy and strong, despite a growing credit portfolio. (*Id.* ¶¶ 47–48.) For example, during an August 29, 2013 earnings call, Light stated:

> [Signet's] overall credit portfolio statistics continue to remain very strong and I want to make sure that you understand that point. [] Consumers are behaving strongly. They are making more than the minimum down payments very strongly. They are using credit appropriately. Our credit approval rates remain relatively consistent to prior year [*sic*], so there is no big change in anything that we are doing here.

(*Id.* ¶ 49.) Similarly, on September 10 2013, during the Goldman Sachs Global Retailing Conference, Ristau stated that "there had been no change in the quality of the portfolio or

4

consumer behavior changes. That has all been very, very, strong and the portfolio continues to be very healthy." (*Id.* ¶ 50.) Ristau further stated that Defendants "don't push the credit, we don't change the way that we measure in terms of 'do you get credit, do you not get credit.' We will never cross that line. But because of the fact that it is so well-managed[,] we're still gaining a lot of traction, bringing in a lot of new customers." (*Id.*)

As the Class Period progressed beyond 2013, Signet's provision for bad debt steadily ticked upwards. (*Id.* ¶¶ 47–48, 52.) When asked to explain this development, Defendants stated that bad debt expenses were growing because Signet's credit portfolio was growing in size, and that the interest income derived from the growing credit portfolio "more than offset" its bad debt. (*Id.* ¶ 52–53.)

In April 2014, Signet made certain unspecified changes to its credit decision engine, which, according to Plaintiff, resulted in the company's granting more credit. (*Id.* ¶ 55.) During an August 28, 2014 earnings call, then-CFO Santana assured investors that these changes "preserve[] credit requirements, but more accurately score applicants, which yields more qualified customers," and thus would not adversely affect the credit quality of the company's portfolio. (*Id.* ¶ 56.)

### Disclosures in SEC Filings

Signet's SEC filings contained various representations regarding the health and careful management of its credit portfolio.

For instance, Signet's Form 10-Ks repeatedly disclosed that "Signet monitors the credit quality of its customer finance receivable portfolio based on payment activity that drives the aging of receivables. This credit quality indicator is assessed on a real-time basis by Signet." Signet Jewelers Ltd., Annual Report (Form 10-K), at 96 (Mar. 27, 2014); Signet Jewelers Ltd.

5

Annual Report (Form 10-K), at 82 (Mar. 26, 2015); Signet Jewelers Ltd., Annual Report (Form 10-K), at 15 (Mar. 24, 2016). A nearly identical disclosure appeared in Signet's 2017 Form 10-K. Signet Jewelers Ltd., Annual Report (Form 10-K), at 75 (Mar. 16, 2017).

Despite growing bad debt provisions, Signet's SEC filings also represented that the credit portfolio was strong. The company's 2014 Form 10-K, for instance, provided that, "[M]anagement does not believe Signet is exposed to any significant considerations of credit risk that arise form cash and cash equivalent investment, derivatives, or accounts receivable." Signet Jewelers Ltd., Annual Report (Form 10-K), at 114 (Mar. 27, 2014). This statement also appeared in Signet's 2015, 2016, and 2017 Form 10-Ks. Signet Jewelers Ltd. Annual Report (Form 10-K), at 100 (Mar. 26, 2015); Signet Jewelers Ltd., Annual Report (Form 10-K), at 108 (Mar. 24, 2016); Signet Jewelers Ltd., Annual Report (Form 10-K), at 108 (Mar. 16, 2017).

During the Class Period, Defendants also reported "reserves," *i.e.*, allowances for credit losses, at "very low levels," according to Plaintiff, ranging from 6.5% and 7.9% of the total portfolio. (*Id.* ¶¶ 58–62, 303.) Signet disclosed that it calculated its loss reserves using the "recency" method, which is a method for "aging" customers' accounts, *i.e.*, determining the delinquency of accounts receivable. (*Id.* ¶ 59.) An account is determined to be "current" under this method if a customer makes at least 75% of the required monthly payment, which itself varies by account status. (*Id.* ¶¶ 59–60.) GAAP does not prescribe one method for assessing future loan delinquencies. (Allerhand Decl. Ex. K.)

### ii. **Analyst Reports**

During the Class Period, analysts repeatedly issued favorable reports touting Signet's credit operation and the value of its stock. (*Id.* ¶ 43.) On January 29, 2014, for instance, one analyst reported that Signet's "high quality" credit portfolio was a "proven" "competitive advantage," and, thus, that the company was not likely to ever sell its portfolio. (*Id.* ¶ 43.)

6

Another analyst reported on December 19, 2014 that Signet's "proprietary credit card is probably one of its most important competitive strengths as it helps drive sales." (*Id.*) Various analysts issued "buy" recommendations for Signet stock. (*Id.* ¶ 63.) One bank issued a report stating that Signet is "[s]till shining bright;" another named Signet as its "top [stock] pick in our universe" and placed it on its Priority Stock List. (*Id.*)

As Signet's bad debt provision ticked upwards, analysts reported that they had no concerns regarding Signet's credit portfolio. (*Id.* ¶ 54.) For instance, following Signet's August 29, 2013 earnings call, one bank reported that "although bad debt as a percentage of sales rose [year over year], management said they have seen no deterioration in customers' ability to repay, and indeed profits from credit rose [year over year]." (*Id.*) Similarly, another analyst report adopted management's view of rising bad debt expenses, noting that it considered Signet's "credit portfolio as healthy despite an uptick in bad debt expense," which was "attributed to higher receivables and is being offset by higher interest income on those receivables." (*Id.*).

According to Plaintiff, as a result of Defendants' statements, Signet's stock price rose sharply upward; it started at $69.83 at the start of the Class Period, and reached a high of $150.94 on October 30, 2015. (*Id.* ¶ 64.)

### iii.    **Developments Regarding Signet's Credit Portfolio**

Following a disappointing earnings report in the third fiscal quarter of 2015, Signet's stock dropped, causing the market to scrutinize the company, and, with it, its credit portfolio. (*Id.* ¶¶ 89, 92, 98, 97, 104, 108.) Defendants dismissed market concern as "unwarranted," (*id.* ¶ 95), stating that Signet's "credit approval standards remain disciplined and unchanged" and that the "credit discussion" among analysts should be "minimize[d]." (*Id. See also* ¶¶ 93–94, 101, 105–106, 118.)

7

Starting in mid-2016, however, Signet made a number of changes concerning its credit portfolio.

On May 26, 2016, Signet reported that its management was "conducting a strategic evaluation of the Company's credit portfolio," which was to be led by Goldman Sachs, and that it would "consider a full range of options with respect to its credit operations." (*Id.* ¶ 111.) Following this disclosure, Signet's stock price declined by more than 10% in a single day. (*Id.* ¶ 117.)

Shortly thereafter, Signet purportedly adopted stricter credit guidelines, changing the way it scored customers' creditworthiness and terminating scores of customers' credit accounts. (*Id.* ¶¶ 123–125.)

On May 25, 2017, in conjunction with reporting another quarter of disappointing earnings results, Signet announced the sale of the "prime" portion of its loan portfolio to Alliance Data Services. (*Id.* ¶ 144.) This portion of the portfolio totaled $1 billion, representing approximately 55% of Signet's total book. (*Id.*) The remaining 45% of Signet's loan book consisted of approximately $700-800 million in "subprime" loans. (*Id* ¶¶ 144–48.)

Also on that day, Defendants announced that it planned to switch to the contractual method for calculating loan loss reserves, as of October 2017. (*Id.* ¶ 149.) This announcement followed a letter that the company received from the SEC, dated October 4, 2016, in which it asked Signet to share its reasoning for having adopted recency method, the less common method for aging accounts receivable, in this first place. (*Id.* ¶ 136.)

On December 1, 2017, Signet disclosed in its 10-Q that the Consumer Financial Protection Bureau ("CFPB") and the New York Attorney General ("NYAG") were investigating Signet for widespread violations of laws prohibiting deceptive lending practices. (*Id.* ¶¶ 163–

8

65.) Specifically, the CFPB investigation related to alleged violations of §§ 1031 and 1036 of the Consumer Financial Protection Act of 2010, 12 U.S.C §§ 5531, 5536, and the Truth and Lending Act, 15 U.S.C. ¶ 1601 *et seq.*, relating to in-store credit practices, promotions, and payment protections products. Signet Jewelers Ltd., Quarterly Report (Form 10-Q), at 32 (Dec. 11, 2017). The NYAG investigation related to "similar issues" under its jurisdiction. *Id.*

On March 14, 2018, as Signet announced its fiscal 2018 earnings, Signet disclosed that it planned to sell its subprime portfolio to CarVal Investors for between $401 million and $435 million. (FAC ¶ 168.) Signet stated that, as a result of the discounted transaction, Signet would record a loss "related to the difference between the net book value and fair value of the receivables," which, net of costs, totaled between $113 and $118 million. (*Id.* ¶ 168.)

### 2. Signet's Culture of "Pervasive" Sexual Harassment

The second series of events relates to allegations of widespread sexual misconduct at Signet – allegations that themselves were the subject of another lawsuit.

On March 18, 2018, a class of current and former female Signet employees filed a putative class action in this District, alleging that Sterling employees were subjected to gender discrimination through improper promotion and compensation practices, in violation of Title VII and the Equal Pay Act. *See Jock et al. v. Sterling Jewelers, Inc.*, No. 08 Civ. 2875 (Rakoff, *J.*). Pursuant to an arbitration provision in Sterling's employment agreement, the matter was referred to a confidential arbitration (hereinafter referred to as "Jock" or the "*Jock* Litigation"). (*Id.* ¶ 179.)

### iv.   **Disclosures Regarding Jock Litigation**

Signet first disclosed the *Jock* Litigation in a Form 6-K filed with the SEC on March 20, 2008, stating that the lawsuit "is based on the allegations of 15 former and current employees working in a few stores. . . . When these allegations first surfaced, they were investigated. That

9

investigation failed to substantiate the allegations." Signet Jewelers Ltd., Special Report of Foreign Issuer (Form 6-K) (Mar. 20, 2008).

After the United States Equal Employment Opportunities Commission ("EEOC") filed a lawsuit against Sterling on substantially the same basis, (*id.* ¶ 180), Signet filed another Form 6-K, supplementing its previous public disclosure to include a statement that, "The US Equal Opportunities [*sic*] Commission has filed a separate lawsuit alleging that US store-level employment practices are discriminatory as to compensation and promotional activities." Signet Jewelers Ltd., Special Report of Foreign Issuer (Form 6-K), Note 9 (Mar. 25, 2009).

After a request from the SEC to supplement its disclosures with a "brief[] descri[ption of] the factual basis alleged to underlie the class action proceedings," (*id.* ¶ 189), Signet disclosed that *Jock* was a suit "by private plaintiffs alleging that US store-level employment practices are discriminatory as to compensation and promotional activities." Signet Jewelers Ltd., Annual Report (Form 10-K), at 119 (Mar. 30, 2011). This characterization of the *Jock* Litigation appears in Signet's SEC filings up to the end of the Class Period. *See, e.g.*, Signet Jewelers Ltd., Annual Report (Form 10-K), at 122 (Mar. 16, 2017).

As part of the *Jock* Litigation, the claimants filed for class certification, in which the briefing on that issue included approximately 250 declarations from nearly 200 employees detailing their experiences at Sterling. (*Id.* ¶¶ 181, 275.) Because the arbitration proceedings were confidential, those declarations were not initially made public; instead, counsel for plaintiffs in that case posted on its website a version of its class certification brief with Signet-approved redactions. (*Id.* ¶ 182.) The redacted brief contained limited information from the declarations and, according to Plaintiff, "obscured" the nature of the allegations contained therein. (*Id.* ¶ 183.)

10

On November 26, 2013, Signet disclosed that, "In mid-October 2013, Sterling filed its opposition to Claimants' class certification motion, its disclosure of its experts and their reports, as well as three motions to exclude the reports of Claimants' experts and a motion to strike Claimants' declarations and attorney summaries." Signet Jewelers Ltd., Quarterly Report (Form 10-Q) Item 1, Note 13 (Nov. 26, 2013). It did not elaborate on the content of the allegations of contained in those moving papers – including those that were contained in the declarations from Signet's employees. *Id*

### v.  **Content of Declarations and Effect on Signet's Stock**

The declarations were publicly disclosed on February 26, 2017 – albeit still with certain "company-approved redactions." They contain various allegations that sexual harassment, rather than being confined to "store-level employees," was rampant at Signet at all levels, including among senior executives. (*Id.* ¶¶ 204–205.) Among other allegations, the declarations alleged that the ranks of Signet's executives were filled with "womanizers," "playboy[s]," and serial sexual harassers who made "sexual conquests of female associates." (*Id.* ¶¶ 206–216.) Sexual harassment allegedly occurred in the ordinary course of business and at annual "Managers' Meetings," which were described as "sexcapades" where male executives were "sexually preying" on female subordinates and were engaged in "sexually promiscuous activity" with "subordinate female managers." (*Id.* ¶¶ 216, 209–16, 218–31, 233–40, 242–52, 255, 257–68, 279, 287, 291–92). Declarants also alleged that female employees were propositioned to engage in sexual behavior in exchange for employment advancement opportunities; those who did so were rewarded by way of promotion, and those who declined or reported the activity to an "anonymous" hotline were retaliated against. (*Id.* ¶¶ 242–68, 280–82, 284, 292.) Specific allegations of sexual misconduct were leveled against Signet's then-CEO, Light. (*Id.* ¶¶ 226–27, 279.)

11

The day after the declarations were made public, the Washington Post wrote an article detailing their allegations. *See also* Drew Harwell, *Hundreds Allege Sexual Harassment, Discrimination at Kay and Jared Jewelry Company*, Wash. Post (Feb. 27, 2017), https://www.washingtonpost.com/business/economy/hundreds-allege-sex-harassment-discrimination-at-kay-and-jared-jewelry-company/2017/02/27/8dcc9574-f6b7-11e6-bf01-d47f8cf9b643_story.html?utm_term=.e17e37e424de.

The following day, Signet's stock fell 8.3% by midday, prompting Signet to halt trading pending a release of news. (FAC ¶ 281.) Signet then issued a press release in which it characterized "media reports" as presenting a "distorted and inaccurate picture of our company," and amplifying the voices of "a very small number of individuals in a workforce of more than 84,000." Signet Jewelers Ltd., *Sterling Jewelers Statement on Ongoing Arbitration* (Feb. 28, 2017), https://www.signetjewelers.com/investors/news-releases/news-release-details/2017/Sterling-Jewelers-Statement-on-Ongoing-Arbitration/default.aspx. By close of business that day, Signet's stock had fallen 13%. (FAC ¶¶ 280–82.)

On July 17, 2017, Signet issued a press release announcing that Light was retiring. (*Id.* ¶ 290.) *See also* Signet Jewelers Ltd., *Signet Jewelers Appoints Virginia "Gina" C. Drosos as CEO* (July 17, 2017) https://www.signetjewelers.com/investors/news-releases/news-release-details/2017/Signet-Jewelers-Appoints-Virginia-Gina-C-Drosos-as-CEO/default.aspx. Light's announcement stated, "Given the Company's positive direction and my need to address some health issues, the Board and I agreed that it is a good time for a transition." (*Id.*)

12

### c. Procedural Background

The procedural posture of this case is somewhat tortured. Because much of it is not relevant to the heart of the allegations in the FAC, the Court presumes familiarity with the prior proceedings and writes an abbreviated summary solely to tee up the present motion.

On August 25, 2016, a class of shareholders filed a putative securities fraud class action against Signet, Light, and Santana alleging that defendants made false or misleading statements about Signet's business prospects on the basis that the company failed to ensure the safety of customers' jewelry while in Signet's custody. (Compl. ¶ 8, Dkt. No. 1.) The case was assigned to my colleague, the Honorable Jesse M. Furman.

After the case was consolidated with a related action, Judge Furman appointed lead plaintiffs (Dkt. No. 23) and granted leave for the parties to file an Amended Complaint. (Dkt. No. 25.) The parties did just that (Dkt. No. 28) – and then did so again, after Judge Furman granted leave to amend file a Second Amended Complaint in light of revelations regarding the *Jock* Litigation and details of Signet's credit portfolio. (Dkt. Nos. 29, 30, 33.)

Two lawsuits raising questions of law and fact that were common to those asserted in the Second Amended Complaint were then transferred from the United States District Court for the Northern District of Texas. Judge Furman consolidated all three cases under the present case caption (Dkt. No. 58), appointed MissPERS as lead plaintiff, (Dkt. No. 84), and granted Plaintiff leave to file a Third Amended Complaint. (Dkt. No. 85.)

The Third Amended Complaint removed allegations regarding purportedly false statements about the safety of customers' jewelry while in Signet's custody; it focused only on representations relating to Signet's credit portfolio and the *Jock* Litigation. But just after Defendants filed a motion to dismiss (Dkt. No. 89), a former lead plaintiff in this action filed a

13

separate case in this District, which was assigned to Judge Sweet and then transferred to Judge Furman. (Dkt. No. 93). Judge Furman consolidated that case under the present caption (Dkt. No. 100), and permitted Plaintiff to file a Fourth Amended Complaint in this action. (Dkt. No. 92.)

Following Plaintiff's filing a Fourth Amended Complaint, Defendants moved to dismiss. (Dkt. No. 101). While Defendants' motion was pending, revelations emerged regarding Signet's sale of the subprime portion of its credit portfolio. Judge Furman granted Plaintiff leave to file the FAC to include those details. (Dkt. No. 110).

The case was transferred to my docket on May 23, 2018.

Which brings us to the instant motion.

The FAC, the operative complaint in this action, asserts claims for securities fraud, pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, against all Defendants (Count 1), and control person liability under Section 20(a) of the Exchange Act against the Executive Defendants (Count II). In essence, the FAC alleges that Signet made material misrepresentations or omissions relating to the health and management of its credit portfolio and, in light of the revelations that emerged in the *Jock* Litigation, to Signet's corporate culture of "pervasive" sexual harassment.

### 1. Allegations of Fraud Pertaining to Signet's Credit Portfolio

Plaintiff alleges that Defendants' representations – both orally and in SEC filings – regarding Signet's credit portfolio were false or misleading. Despite Defendants' representations that Signet's credit portfolio was carefully managed and healthy, Signet's underwriting processes were reckless, according to Plaintiff, because Defendants routinely extended credit to high-risk borrowers for the purpose of driving sales. (*Id.* ¶ 65.) In support of this contention, Plaintiff identifies six former Signet employees ("Former Employees"), who anonymously allege that the

14

company made a concerted effort to promote risky lending, ignored internal concerns about credit risk, and concealed its lending practices to the investing public. These allegations take four forms:

*First*, Signet allegedly forced its sales representatives to aggressively push credit on customers, even those who did not want it, by requiring sales representatives to meet minimum daily quotas for credit applications; the company disciplined and, at times, even fired employees when they did not meet these quotas, and promoted those who did. (*Id.* ¶¶ 79–84.)

*Second*, Signet's employees purportedly regarded the company's credit underwriting and application review processes as "ridiculous," "garbage," and a "running joke." (*Id.* ¶¶ 67, 85.) According to the Former Employees, applicants' jobs were not verified, facially false information was ignored, incomplete and unsigned applications were approved, and borrowers' poor credit scores and multiple bankruptcies were disregarded. (*Id.* ¶¶ 67, 83, 85–87.)

*Third*, senior management allegedly ignored internal warnings from members of the credit risk department, dating back to 2008, that a substantial and growing portion of Signet's credit portfolio was subprime. (*Id.* ¶¶ 71–72.) According to one former employee, management considered tightening its underwriting processes, but decided against it so as not to alienate a segment of its customer base. (*Id.* ¶ 73.)

*Fourth*, senior management, purportedly directed the company not to raise reserves, because its reserves were "'comped' to the prior year's level precisely to avoid a significant increase[,]" and raising Signet's reserves thus would hurt the company's "'bottom line.'" (*Id.* ¶ 76).

In addition to allegations regarding Signet's underwriting processes, Plaintiff alleges that Signet materially understated the reserves for its loan portfolio and its related bad debt expenses,

thereby materially overstating its income. According to Plaintiff, Defendants' use of the recency method and its related "charge-off" policy "obscured and extended the time between when a loan was made and when the related receivable was ultimately charged off -- a period of time known as the 'loss discovery period.'" (*Id.* ¶ 306.)

As noted, the recency method permits customers to make partial payments under their respective loan agreements for the account to be considered "current," *i.e.*, unlikely to default. (*Id.* ¶ 59.) Under the "more common" "contractual" method, customers must make 100% of the payments specified in their respective loan agreements to qualify as current. (*Id.* ¶ 60.) Plaintiff alleges that Defendants' use of the recency method masked Signet's "true delinquency trends" and "communicated to the market that only a very small percentage of [Signet's] debt was likely to default, and therefore that the [credit] portfolio was strong," because it marked accounts as current that were several payments contractually past due, thereby understating the number of delinquent accounts in Signet's portfolio. (*Id.* ¶¶ 58, 307.)

Plaintiff further argues that Signet's "charge-off" policy, its policy for writing off accounts receivable that it would not collect, exacerbated these trends. Signet's "charge-off" policy was to reserve for accounts that were more than 120 days aged on the recency method and more than 240 days aged on the contractual method. (*Id.* ¶ 308; *see also* Defs.' Br. at 15 (citing various disclosures in Defendants' SEC filings).) Plaintiff alleges that this policy significantly defers when [Signet] recognizes a 'loss confirming events,'" because it incorporates the recency method – which itself delayed identifying delinquent loans. (*Id.* ¶ 309.) To illustrate, if a customer failed to make any payments on an account, it would take thirty days for that account to become one day past due, and then another 240 days for it qualify as a charge off – meaning that, in the case of a customer who makes zero payments, it would take Signet nine months before it

16

wrote off the account, and potentially substantially longer if a customer makes any partial payments under the recency method. (*Id.* ¶¶ 309–10.) The combination of lenient delinquency and charge-off policies, according to Plaintiff, substantially understated reserves and bad debt expenses, which, in turn, overstated pre-tax income by material amounts throughout the Class Period. (*Id.* ¶¶ 313–316.)

### 2. Allegations of Fraud Regarding the Signet's Purported Culture of "Pervasive" Sexual Harassment

Plaintiff alleges that Signet's public disclosures about the *Jock* Litigation were false or misleading in light of the content of the declarations of hundreds of Signet employees. Specifically, Plaintiff asserts that those declarations render false Defendants' representations in Signet's SEC filings that the *Jock* Litigation was limited to "store-level employment practices" that are "discriminatory as to compensation and promotional activities" with respect to "gender," and that Signet undertook an "investigation" that "failed to substantiate any of the allegations." In reality, according to Plaintiff, the declarations make clear that *Jock* concerned "pervasive sexual harassment" that implicated Signet's senior executives. (Pl.'s Opp. to Mot. to Dismiss ("Pl.'s Opp.") at 3, Dkt. No. 115.)

Additionally, Plaintiff also argues that the declarations establish that Defendants' generalized public statements about Signet's corporate culture and policy against sexual harassment were false or misleading. This allegation takes two forms:

*First*, Plaintiff points to statements contained in Signet's Code of Conduct and Code of Ethics (collectively, the "Codes"), both of which were re-adopted each year by Signet's board of directors, published on Signet's website (*id.* ¶ 199), and incorporated by reference into Signet's SEC filings. *See, e.g.*, Signet Jewelers Ltd., Annual Report (Form 10-K), Item 10 (Mar. 27, 2014); Signet Jewelers Ltd. Annual Report (Form 10-K), Item 10 (Mar. 26, 2015).

17

The Code of Conduct explained that Signet made employment decisions "solely" on the basis of merit, and was "committed to a workplace that is free from sexual, racial, or other unlawful harassment[.] . . . Abusive, harassing, or other offensive conduct is unacceptable, whether verbal, physical, or visual." (FAC ¶ 196.)  In its Form 20-F, filed with the SEC on April 1, 2009, Signet represented that adherence to the Codes, including by senior executives, was of "vital importance:"

> In adopting both the Code of Ethics and the Code of Conduct, the Company has recognized the vital importance to the Company of conducting its business subject to high ethical standards and in full compliance with all applicable laws and, even where not required by law, with integrity and honesty.

Signet Jewelers Ltd., Annual Report for Foreign Private Issuer (Form 20-F) Item 16.B (Apr. 1, 2009).

*Second*, Plaintiff argues that Defendants' public statements about the importance of "trust" to its business were false or misleading.  (FAC ¶¶ 200–02.)  For example, at the Signet Jewelers Ltd. Institutional Investor Conference on June 24, 2015, then-CEO Light stated:

> [T]rust is the most important factor why people buy jewelry where they do . . . . [T]he beauty of our category . . . quite frankly is that because our product is about emotion and it's about trust at every age group they want to have someone to interact with and treat with them and work with them on understanding diamonds and understanding if it's the right thing to make and they want to make the right move. . . . That's the big point. Because we have the benefit of having this emotional product.

(*Id.* ¶201.)  Similarly, in Signet's Form 10-K filed with the SEC on March 24, 2016, Signet stated:

> As trust is the most important factor in why people buy jewelry where they do, customers overwhelmingly complete their purchases in our stores with our trusted knowledgeable sales associates. . . . In order to truly accomplish our core mission of helping our guests "Celebrate Life and Express Love," we must have people with high capability and passion. We will continue our efforts to attract, develop and retain the best and the brightest individuals in the jewelry and watch industry.

18

Signet Jewelers Ltd., Annual Report (Form 10-K), at 5, (Mar. 24, 2016). Later in that same document, Signet wrote that it "considers its relationship with its employees to be excellent." *Id.* at 13. Plaintiff argues that these statements, when viewed collectively and in the context of the allegations contained in the *Jock* Litigation, misstate Signet's culture and corporate priorities.

## II.    Discussion

Defendants argue that the FAC fails to state a claim upon which relief may be granted, pursuant to Fed. R. Civ. P. 12(b)(6). They are wrong.

Even under the Private Securities Litigation Reform Act ("PSLRA"), which establishes heightened pleading requirements for securities fraud claims, the usual rules for determining motions to dismiss pertain: the well-pleaded allegations of the complaint are deemed true and all reasonable inferences are drawn in favor of the pleader. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (citing *Leatherman v. Tarrant Cnty. Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993)). To survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations, citations, and alterations omitted).

The gloss imposed by the PSLRA involves what allegations can be deemed "well-pleaded." In addition to the long-standing requirements of Fed. R. Civ. P. 9(b), which requires the plaintiff to state "the circumstances constituting fraud . . . with particularity," the PSLRA requires them to "state with particularity all facts on which [information and belief that

19

defendants have violated Rule 10(b)(5)] is formed." 15 U.S.C. § 78u-4(b)(1). The Second

Circuit has ruled that the word "all" as used in the PSLRA means that plaintiffs must plead

"sufficient" facts to support a reasonable belief as to the misleading nature of defendants'

statements or omissions. *Novak v. Kasaks,* 216 F.3d 300, 313–314 (2d Cir. 2000). The PSLRA

also requires plaintiffs to "state with particularity facts giving rise to a strong inference that the

defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court may consider the full

text of documents that are quoted in or attached to the complaint, or documents that the plaintiff

either possessed or knew about and relied upon in bringing the suit. *Rothman v. Gregor*, 220

F.3d 81, 88–89 (2d Cir. 2000) (citing *Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d

Cir. 1991)); *see also supra* at 2, n.1. In a case where the complaint quotes and relies upon

statements made in press releases and investor calls, the Court may properly consider the

complete referenced press releases, the full transcripts of those calls, and any Form 10-Ks

referenced and incorporated in those calls in connection with the Rule 12(b)(6) motion, without

converting it to one for summary judgment. *See Fort Worth Employers' Ret. Fund v. Biovail

Corp.*, 615 F. Supp. 2d 218, 232 n.3 (S.D.N.Y. 2009).

### a. The Motion to Dismiss the Section 10(b) Claim is Denied

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection

with the purchase or sale of any security ... any manipulative or deceptive device or contrivance

in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. §

78j(b). SEC Rule 10b-5, which implements the statute, prohibits making "any untrue statement

of a material fact or [omitting] to state a material fact necessary in order to make the statements

made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R.

§ 240.10b-5(b). To recover for a violation of Section 10(b) and Rule 10b-5, a private securities

plaintiff must prove six elements: "(1) a material misrepresentation or omission by the

defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the

purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic

loss; and (6) loss causation." *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F.

Supp. 3d 48, 65 (S.D.N.Y. 2015) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.

Ct. 2398, 2407 (2014)).

Defendants argue that the FAC does not adequately allege a material misrepresentation or

omission, scienter, or loss causation.

### 1. Alleged Fraud Relating to Signet's Credit Portfolio

#### i.   **Plaintiff Adequately Pleaded that Defendants Made Materially False Statements about Signet's Credit Portfolio**

To allege a material misrepresentation or omission adequately, a plaintiff must plead

facts that, if true, would be sufficient to show that the defendant either made an untrue statement

of a material fact or omitted to state a material fact necessary to make whatever statements it

made not misleading.  17 C.F.R. § 240.10b-5(b).

An untrue statement of fact – as opposed to opinion or belief – "is one that was false at

the time it was made." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y.

2014), *aff'd*, 604 Fed. Appx. 62 (2d Cir. 2015)). A plaintiff "must do more than simply assert

that a statement is false – [it] must demonstrate with specificity why that is so." *Id.* (quoting

*Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004)).

In substance, the FAC alleges that Defendants misrepresented Signet's credit portfolio in

two ways – qualitatively and quantitatively. It alleges that, qualitatively, Defendants' statements

that the health and careful management of Signet's credit portfolio were false or misleading, and,

21

quantitatively, that using the recency method for aging accounts receivable materially understated Signet's loan reserves, thereby overstating earnings. Each set of misrepresentations will be considered in turn.

### 1.  *Qualitative Misstatements*

Defendants argue that their qualitative statements touting the health and management of Signet's portfolio – including that Signet's credit portfolio was "strong" or "very strong" (FAC ¶¶ 322, 339, 368, 385, 406, 409, 417, 428, 504), "very healthy" (*id.* ¶ 339), "robust" (*id.* ¶ 408), "very stringently controlled" (*id.* ¶ 341), "very stringently managed" (*id.*) "conservatively managed" (*id.*), and "highly disciplined" (*id.* ¶ 464), with "qualified customers" (*id.* ¶¶ 400, 407), "effective[]" and "consistent" underwriting (*id.* ¶¶ 484, 489) and "minimize[d] risk" (*id.* ¶¶ 363, 365, 383) – do not give rise to a cause of action, because they either constitute puffery or inactionable statements of opinion.  Neither argument is availing.

#### Puffery

The Second Circuit defines puffery as optimistic statements that are so vague, broad, and non-specific that no reasonable investor could possibly consider them significant in making investment decisions.  *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197, 206 (2d Cir. 2009).  Whether a representation constitutes mere puffery depends, in part, on the context in which it was made.  *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017).  "While certain statements, viewed in isolation, may be mere puffery, when the statements are "made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors, those statements may become material to investors."  *Id.* (internal quotation marks and citations omitted).

22

Applying these principles to the various statements outlined above, *supra* at 4–5, 22, and drawing all inferences in Plaintiff's favor, Defendants have not persuaded the Court that the purported puffery was so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance. On the contrary, many of the challenged statements regarding the strength and management of Signet's credit portfolio were made in response to direct questions about Signet's credit portfolio, and, as Plaintiff alleges, in an effort to reassure the investing public about the portfolio's health. Indeed, Defendant Ristau even stated on New York Analyst Day that "[he] couldn't do a presentation without talking about credit," suggesting how important the company's assessment of its credit portfolio was to the investing public. (FAC ¶ 44.) They were not puffery at all; they were purported descriptions of the health of the business.

This case bears a striking resemblance to *In re General Electric Co. Securities Litigation*, 857 F. Supp. 2d 367 (S.D.N.Y. 2012). In that case, the court determined that the defendants' statements about General Electric's loan portfolio – that it was "fantastic," "great," "robust," "strong," and "really high quality," and informed by the company's careful "underwriting disciplines" – were not puffery when viewed in context – specifically that the company subsequently revealed that 42% of its consumer loan portfolio was sub-prime, and $145 billion of its $230 billion commercial lending portfolio consisted of loans to non-investment grade companies. *Id.* at 385–87. In so reasoning, the court rejected General Electric's argument that it had no duty to "'break out'" details concerning its subprime exposure. *Id.* at 387. "As an abstract proposition that may be so. But once a company chooses to speak – as GE insistently did with respect to the 'high quality' of GE's capital portfolio – 'it ha[d] a duty to disclose any

23

additional fact necessary to make the statements already contained therein not misleading.'" *Id.* (quoting *In re CitiGroup Inc. Bond Litig.*, 723 F.Supp.2d 568, 590 (S.D.N.Y. 2010)).

The same principles apply here. Once Defendants conveyed to the market with dogged insistence that Signet's credit portfolio was carefully managed and of a high quality, they had a duty to speak about any developments so as to render their earlier statements not misleading. Because Plaintiff has adequately pleaded that Defendants did not satisfy that duty, the Court declines to dismiss the FAC on the basis of puffery.

### Statements of Opinion

Nor does the Court agree that Defendants' statements constitute non-actionable statements of opinion.

To plausibly allege securities fraud on the basis of statements of opinion, plaintiffs must plead that "the speaker did not hold the belief she professed" or that "the supporting fact she supplied was untrue." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015); *see also Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016). In so doing, plaintiffs must "identify particular (and material) facts going to the basis for the issuer's opinions – facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have – whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 135 S. Ct. at 1332.

While Plaintiff's pleading burden is "no small task," *id.*, it has carried that burden here. Two reasons animate the Court's decision.

One, the Court is not persuaded that Defendants' qualitative statements even qualify as statements of opinion. The Supreme Court in *Omnicare* took care to distinguish between facts and opinions, noting that, "[a] fact is a thing done or existing," whereas "[a]n opinion is a belief,

24

a view, or a sentiment which the mind forms of persons or things." *Id.* at 1325 (alterations and internal quotation marks omitted). As the Second Circuit recently instructed, "[E]xpressions of optimism and projections about the future are quintessential opinion statements." *Martin v. Quartermain*, 732 F. App'x. 37, 40 n.1 (2d Cir. 2018) (internal quotation marks, citations, and alterations omitted).

Here, Defendants' statements were neither forward-looking nor estimative. They spoke to a present state of affairs, not a belief about future events. Because "[m]eeting the [*Omnicare*] standard . . . is no small task for an investor," *Martin*, 732 F. App'x at 40 (quoting *Sanofi*, 816 F.3d at 210), it is no wonder why Defendants seek to cabin their statements of fact as opinion. But saying so does not make it so. The Court rejects Defendants' contention that their qualitative statements were expressions of opinion.

Two, even assuming *arguendo* that Defendants' qualitative remarks were statements of opinion, Plaintiff has properly alleged particularized and materials facts giving rise to an inference that Defendants misrepresented their beliefs in the things they professed and misrepresented or omitted supporting facts to support those beliefs. The FAC includes the testimony of Former Employee 1, who states that Signet's executives were aware that a substantial and growing portion of its credit portfolio contained subprime loans and chose to disregard internal warnings about that fact. (FAC ¶¶ 66–78.) Former Employees 2–6, who, as store-level employees, possessed first-hand knowledge of Signet's lending practices, alleged that Signet's corporate policy was to aggressively push credit on customers, even those who did not want it and could not afford it. (*Id.* ¶¶ 79–85.) Viewing these statements collectively and "in context," as *Omnicare* instructs, *see Omnicare*, 135 S. Ct. at 1330, Plaintiff has plausibly pleaded that Signet's credit portfolio was not as healthy and carefully managed as Defendants'

25

"opinions" suggested – especially in light of Signet's subsequent decisions to enlist Goldman Sachs to undertake a review of its credit portfolio, disclose that half of its loan portfolio was sub-prime, and sell the prime and sub-prime portions of its portfolio to separate buyers.

In sum, Plaintiff has plausibly pleaded that Defendants' qualitative statements were false or misleading.

## 2. *Quantitative Misstatements*

Defendants aver that Plaintiff has not plausibly pleaded that its reserve calculations were materially understated.

Loan loss reserves are statements of opinion, as they reflect management's belief about the number of uncollectible loans in a company's portfolio. *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 109 (2d Cir. 2011) (citation omitted). Accordingly, the familiar two-part *Omnicare* test for assessing whether a statement of opinion is actionable applies. Statements of opinion are not actionable unless subjectively false – the speaker does not believe what she says – or objectively false – the speaker misrepresents or omits existing material facts in support of her belief. Plaintiff bears the burden of pleading particularized facts going to the basis of the speaker's opinion. *Supra* at 24.

The FAC, when viewed in a light most favorable to Plaintiff, adequately pleads that Signet misstated its reserves, because it raises a plausible inference that, based upon Signet's loss history and the proportion of sub-prime loans in its portfolio, Defendants knew that its reserves did not account for losses that it was likely to incur and that its reserve figures provided a misleading picture of Signet's credit portfolio and the company's underwriting practices. Numerous facts support this inference. Most compelling are Former Employee 1's allegations that Signet personnel contemplated raising reserves at "bad debt" meetings, but senior executives

26

– who remained at the company for most of the Class Period – elected not to do so because "comp[ing]" reserves to the prior year's reserves avoided a material impact to the company's "bottom line." (FAC ¶¶ 66–78.) These allegations, when coupled with Signet's use of the recency method and charge off policy, the relative size of Signet's reserves when compared to its growing credit portfolio, and the belief among some third-party analysts that Signet substantially understated its reserves during the Class Period, all give rise to a plausible inference that Defendants did indeed understate Signet's reserves.

Defendants make hay out of the fact that the FAC contains a chart that compares Signet's yearly reserves with its prior year charge-offs – a comparison that, Defendants allege, is erroneous because yearly reserves were already reduced by the prior quarter's charge-offs. But at minimum, historical charge-offs provided an objective estimate of the number of accounts that were likely to be uncollectible in the future, particularly in light of Defendants' assurances that Signet's underwriting standards and credit quality remained consistent. (*See id.* ¶ 105.) The charts contained in the FAC illustrate that Signet's reserves fell short of prior year charge-offs by $31 million to $84 million per quarter throughout the Class Period, despite the fact that its credit portfolio was growing, not shrinking. (*See id.* ¶¶ 314–16.)

Defendants also argue that Plaintiff is wrong to regard as evidence of falsity Signet's sale of its sub-prime portfolio at 72% of par value, which resulted in a $113 million loss that third-party analysts reported was likely caused by "under-provisioning." (*Id.* ¶ 173.) Defendants are correct that loan loss reserves reflect management's judgment about the accounts receivable it will not be able to collect, that loans held for sale to a third party must be carried at fair market value under GAAP, and that making these two calculations entails "wholly different accounting judgments and calculations." Defs.' Br. at 16–17 (citing *Oklahoma Firefighters Pension & Ret.*

27

*Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 497 (S.D.N.Y. 2013). Defendants are incorrect, however, in arguing that that this case is "identical" to, and compels the same conclusion as, *Oklahoma Firefighters*.

In that case, the court dismissed a securities fraud class action complaint alleging that the defendants understated their company's loan loss reserves. The court reasoned that the allegations in the complaint were merely speculative, lacked factual information to support an inference of falsity, "identifie[d] no . . . firsthand accounts from confidential witnesses," and did not square with the fact that the defendants disclosed that the carrying value of their loans was far in excess of market value and thus exceeded the value of an eventual write-down. *Id.* at 496–497 & n.11. Here, by contrast, the FAC is supported by robust factual matter, reports of confidential former employees, and other corroborative information and third-party accounts that give rise to an inference of falsity. Defendants also ignore the obvious – that the price for which Signet sold the sub-prime portion of its book was necessarily based on the underlying credit quality of the loans contained therein. This fact is plainly relevant to assessing the sufficiency of complainant's allegations on a motion to dismiss. *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 189 (S.D.N.Y. 2010).

Defendants raise a number of additional arguments that they claim exonerate Signet's reserve calculations and compel dismissal of the FAC. They challenge the reliability and probative force of Former Employee 1's testimony, who left the company before the completion of the Class Period; point to the fact that Signet has not restated its financials or dramatically increased its reserves; and proffer that Signet received unqualified audit opinions during the Class Period. These arguments, however, are improper on a motion to dismiss, as they either raise issues of fact that go beyond the pleadings or misconstrue Plaintiff's pleading obligations

28

under the PSLRA and Rule 9(b). *See Novak,* 216 at 313–314.  In short, they do not alter the

Court's conclusion that Plaintiff has adequately pleaded falsity.

ii.     **Plaintiff Adequately Pleaded that Defendants Acted With Scienter**

In addition to alleging facts showing an actionable omission, to plead Section 10(b) and

Rule 10b-5 claims properly, a plaintiff must state with particularity facts giving rise to a strong

inference that the defendants acted with scienter.  *See* 15 U.S.C. § 78u-4(b)(2)(A); *Tellabs,* 551

U.S. at 313.  "Under this heightened pleading standard for scienter, a 'complaint will survive

. . . only if a reasonable person would deem the inference of scienter cogent and at least as

compelling as any opposing inference one could draw from the facts alleged.'" *Slayton v. Am.*

*Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (quoting *Tellabs,* 551 U.S. at 324).

A litigant may satisfy this pleading requirement by alleging facts showing either (*i*)

motive and opportunity to commit fraud, or (*ii*) strong circumstantial evidence of conscious

misbehavior or recklessness. *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan*

*Chase Co.*, 553 F.3d 187, 198–99 (2d Cir. 2009).  In this case, Plaintiff proceeds under the latter

theory.  (*See* Pl.'s Opp. at 24–30.)  Accordingly, the "strength of the circumstantial allegations

must be correspondingly greater." *JP Morgan*, 553 at 198–99 (internal citation and quotation

marks omitted).

Conscious misbehavior or recklessness is defined as conduct that is "highly

unreasonable and which represents an extreme departure from the standards of ordinary care to

the extent that the danger was either known to the defendant or so obvious that the defendant

must have been aware of it." *Kalnit v. Eichler,* 264 F.3d 131, 142 (2d Cir. 2001) (citation

omitted).  To properly allege recklessness, the plaintiff must plead facts showing "a state of mind

approximating actual intent, and not merely a heightened form of negligence." *Novak,* 216 F.3d

29

at 312 (quotation and citation omitted). Plaintiffs generally show recklessness by alleging that the defendants "knew facts or had access to information suggesting that their public statements were not accurate" or that they "failed to check information they had a duty to monitor." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,* 531 F.3d 190, 194 (2d Cir. 2008) (quoting *Novak*, 216 F.3d at 311.)

Even accounting for "plausible opposing inferences," *Tellabs*, 551 U.S. at 323, Plaintiff has pleaded a sufficiently strong inference of scienter with respect to each of the Defendants. Plaintiff alleges that Defendants were intimately familiar with Signet's portfolio and underwriting – an allegation that is itself supported by Defendants' various representations. For instance, Barnes stated that Signet's credit portfolio was a "big important part of our business and one we don't take lightly. *We watch it closely.*" (FAC ¶ 45 (emphasis added).) Ristau stated that "*we fully understand the credit risk.*" (*Id.* (emphasis added).) In reassuring the market that concerns about Signet's credit operation was unwarranted, Light stated that, "[I]t's very important that everybody understands this. We have been running a credit portfolio for well 30 years. . . . [W]e have every confidence in the way we manage our credit portfolio[.]" (*Id.* ¶ 94 (emphasis added).) And, of course, Signet represented in its SEC filings that "*on an ongoing basis, management monitors [its] credit exposure.*" Signet Jewelers Ltd., Annual Report (Form 10-K), at 106 (Mar. 27, 2014) (emphasis added); *see also* Signet Jewelers Ltd. Annual Report (Form 10-K), at 96 (Mar. 26, 2015); Signet Jewelers Ltd., Annual Report (Form 10-K), at 103 (Mar. 24, 2016). Surely each of the Executive Defendants, who either served as CEO or CFO at one point during the Class Period, qualify as management.

Having represented that they were actively monitoring Signet's credit portfolio on an ongoing basis, Defendants had a duty to discharge that function so as not to render their earlier

30

representations misleading. Either Defendants' public statements about ongoing and real-time management were false, or Defendants knew of negative trends developing but did not disclose them. Either scenario supports an inference that Defendants acted recklessly. *See In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 268 (S.D.N.Y. 2010). This is especially so when one accounts for Defendants' various public representations touting the strategic importance of credit to Signet's business. (FAC ¶¶ 3, 41–45, 297.) *See Gen Elec.*, 857 F. Supp. 2d at 395–96.

Additional facts lend further support to an inference of scienter. The allegations offered by the various Former Employees suggest that Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Novak*, 216 F.3d at 312. Former Employee 1 alleged that Defendants manipulated reserves to preserve the company's "bottom line." (FAC ¶ 76). Defendants' attempts to "placate the market in reaction to the inquiries by . . . analysts" – as, Plaintiff alleges, is precisely what took place beginning in late 2015 (FAC ¶¶ 94–95) – "provides cogent support for [an] inference of scienter." *Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 552 (S.D.N.Y. 2017). Finally, the Second Circuit has instructed that a significant write-off can also support an inference that management acted recklessly in its earlier financial reporting. *See, e g.*, *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000). Here, the size of the loss that Signet took on the sale of the subprime portion of its total book – which sold for 72% of par value, constituting a $170 million loss that was equal to an entire quarter's worth of pretax income (FAC ¶ 512) – speaks for itself.

Defendants argue that neither Plaintiff nor the Former Employees allege the existence of any "specific internal document or report that shows[] that any of the [i]ndividual [d]efendants knowingly or recklessly participated in the alleged fraud." Defs.' Br. at 29. They also revisit their argument challenging the reliability of Former Employee 1 as a credible witness to Signet's

purported fraud, given his departure from the company during the Class Period. The inference of scienter, however, "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. In other words, tie goes to the runner – in this case, the Plaintiff.

### iii. **Plaintiff Adequately Pleaded Loss Causation**

Next, Defendants argue that Plaintiff has not adequately pleaded loss causation.

A plaintiff suing for securities fraud must establish that the alleged fraud was the cause of its investment loss. 15 U.S.C. § 78u-4(b)(4); *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 338 (2005). Merely purchasing securities at an inflated price will not suffice. *Dura Pharm.*, 544 U.S. at 342. Rather one must allege "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omissions concealed something from the market that, when disclosed, negatively affected the value of the security[.]" *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005).

On a motion to dismiss, all that is required is "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharmaceuticals*, 544 U.S. at 347. That indication may be established by pleading either a corrective disclosure or a materialization of a concealed risk. *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010). Plaintiff proceeds under the latter theory. Accordingly, the FAC must adequately allege that the loss was both foreseeable and caused by the materialization of a concealed risk. *Lentell*, 396 F.3d at 173. A loss is foreseeable if it is "within the zone of risk concealed by the misrepresentations and omissions alleged by the disappointed investor." *In re Flag Telecomm. Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009) (quoting *Lentell*, 396 F.3d at 173).

The FAC alleges nine partial disclosures between November 24, 2015 and March 14, 2018, which, according to Plaintiff, slowly revealed the nature and extent of the subprime quality

32

of Signet's loan portfolio and its inadequate reserves. (FAC ¶¶ 550–66.) Some of these

disclosures were "earnings misses" accompanied by other disclosures pertaining specifically to

Signet's credit portfolio – for example, that the company's bad debt expenses were climbing, its

decision to enlist Goldman Sachs to undertake a strategic review of the portfolio, or

announcements regarding the sale of portions of its credit book. (*Id.* ¶¶ 551, 553, 557, 560, 562,

564.) Others involved disclosures from third-party analysts who questioned the company's

aggressive lending and underwriting practices. (*Id.* ¶¶ 555, 559.) Signet securities purportedly

declined in response to each disclosure. (*Id.* ¶¶ 551, 553, 555, 557, 559, 560, 562, 563, 564.)

At a later stage, Defendants may challenge the impact that these disclosures purportedly

had on the market. For now, Plaintiff's pleadings suffice under *Dura Pharmaceuticals*.

### 2. Alleged Fraud Relating to the *Jock* Litigation

#### i. **Plaintiff Adequately Pleaded that Defendants Made Materially False Statements about the *Jock* Litigation**

Defendants argue that, because "Signet fully complied with its litigation disclosure

obligations and had no obligation to disclose salacious and disputed allegations," Plaintiff has

not adequately pleaded that Signet's public disclosures about the *Jock* Litigation were false or

misleading. Defs.' Br. at 34.

While the Court agrees that Defendants were not obligated to disclose "salacious"

allegations, they *were* required to provide a brief but accurate "description of the factual basis

alleged to underlie" the claims in *Jock*. *See* 17 C.F.R. § 229.103 (public issuer's disclosure

obligation relating to legal proceedings). Plaintiff has adequately alleged that Defendants did not

do that.

As noted earlier, *supra* at 10, Defendants disclosed that the claims contained in the *Jock*

Litigation related to "store-level employment practices" that were supposedly "discriminatory as

33

to compensation and promotional opportunities" with respect to "gender." The FAC alleges, however, that the allegations in *Jock* were about pervasive sexual harassment that reached the highest offices in the company. (FAC ¶¶ 203–268). It further alleges that Defendants had an opportunity to refute declarants' allegations but chose not to do so. (*Id.* ¶ 205.) These allegations, which the Court presumes to be true at this stage, suffice to state a claim that Signet's public disclosures regarding the *Jock* Litigation were false or misleading.

The Court also finds unavailing Defendants' argument that the representations contained in Signet's Code of Conduct and Code of Ethics concerning their policy and procedures against sexual harassment do not state a claim under Section 10(b). While generalized, open-ended or aspirational statements do not give rise to securities fraud (as mere puffery), statements contained in a code of conduct are actionable where they are directly at odds with the conduct alleged in a complaint. *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 508 (S.D.N.Y.), *opinion corrected on denial of reconsideration*, 612 F. Supp. 2d 397 (S.D.N.Y. 2009).

*Moody's* is instructive. There, the defendant-organization's code of conduct touted its independence as a ratings agency, stating that the company "maintains independence in its relationship with [i]ssuers and other interested entities." *Id.* at 502. In denying Defendants' motion to dismiss, the court noted that company's code of conduct was directly contradicted by other allegations in the complaint, which included references to news articles and employee testimonials alleging that the defendant's ratings process was influenced by its clients. *Id.* at 508–09; *accord In re Eletrobras Securities Litigation*, 245 F. Supp. 3d 450, 462–63 (S.D.N.Y. 2017). Similarly, the representations contained in Signet's Codes – which state, *inter alia*, that the company "bases . . . decisions solely on a person's [merit]," (FAC ¶¶ 196, 330), has

34

"[c]onfidential and anonymous mechanisms for reporting concerns are available," (*id.* ¶ 334) and that "[t]hose who violate the standards in this Code will be subject to disciplinary action," (*id.* ¶¶ 197, 334) – are directly contravened by allegations in the FAC that the company conditioned employment decisions on whether female employees acceded to sexual demands (*id.* ¶¶ 241–52) and retaliated against women who attempted to anonymously report sexual harassment. (*Id.* ¶¶ 258–67, 332–33.)

The Court agrees with Defendants, however, that Plaintiff has not adequately pleaded that Defendants' generalized statements touting the importance of Signet's relationship with its employees and consumer trust in the Signet brand were materially false or misleading. (*See* FAC ¶¶ 202, 326–29, 373–76.) These allegations are of the sort of broad, aspirational, and vague puffery statements that no reasonable investor could possibly consider significant in making investment decisions. *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197, 206 (2d Cir. 2009).

Accordingly, excepting the statements referenced in the preceding paragraph, Plaintiff has adequately pleaded that Defendants' representations were materially false or misleading.

### ii. Plaintiff Adequately Pleaded that Defendants Acted With Scienter

Defendants argue that their repeated disclosure of the existence of the *Jock* Litigation undermines any contention that Defendants acted with scienter. Defs.' Br. at 39–40.

This is not so.

Plaintiff has sufficiently pleaded that Defendants had knowledge of the allegations contained in *Jock*. It plausibly pleaded that Signet's board of directors was briefed on the *Jock* Litigation since 2008. (FAC ¶ 287.) It also pleaded that senior management, including one of the named Defendants, was implicated in the very sexual misconduct that was alleged in *Jock* –

35

which the Court, for present purposes, presumes to be true. (*Id.* ¶¶ 226–27, 279.) Having alleged with supporting factual matter that Defendants were aware of, or had access to information pertaining to, the serious nature of the allegations contained in the declarations, *Teamsters*, 531 F.3d at 194, Plaintiff has adequately pleaded that Defendants either had present knowledge or were reckless as to the misleading nature of their disclosures regarding *Jock* and their corporate policy against sexual harassment. And indeed, this inference of scienter is at least as compelling as the one that Defendants offer – that their disclosures were in good faith.

### iii.  **Plaintiff Adequately Pleaded Loss Causation**

Defendants argue that Plaintiff failed to adequately plead loss causation, because "Signet had no duty disclose the salacious (but unadjudicated) allegations)" that were revealed in the February 27, 2017 Washington Post article that reported on the contents of the various declarations submitted in *Jock*. (Defs.' Br. at 40.)

This argument simply re-purposes Defendants' argument relating to falsity but matters not a whit to loss causation. The FAC did as it must to repel a motion to dismiss: it identified an alleged fraud (materially misleading statements relating to the nature of the allegations contained in *Jock*) and connected it with a purported loss (the precipitous decline of Signet's securities on February 28, 2017, following the fraud's revelation to the market.) That is all that is required to plead loss causation, which is subject to Fed. R. Civ. P. 8's liberal notice pleading requirements. *Dura Pharm.*, 544 U.S. at 346–47.

### b.  **The Motion to Dismiss the Section 20(a) Claim is Denied**

Plaintiff also asserts a claim against the Executive Defendants under Section 20(a) of the Exchange Act, which provides for derivative liability of persons who "control" others found to be primarily liable under the Exchange Act. Defendants do not dispute the proposition that the

36

Executive Defendants qualify as control persons under Section 20(a) – nor could they, as the Executive Defendants all are alleged to have made or signed the alleged false statements.

Because the Executive Defendants qualify as control persons, Plaintiff's control person claim cannot be dismissed, since it has adequately pleaded a primary violation of Section 10(b).

## CONCLUSION

Based on the foregoing, Defendants' motion to dismiss the FAC is DENIED. The Clerk of Court is respectfully directed to close Dkt. No. 112.

Dated: November 26, 2018

Chief Judge

TO ALL PARTIES BY ECF

37