# EXHIBIT A

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| | ) |
| *In re Signet Jewelers Limited Securities* | )   Case No. 1:16-CV-06728-CM |
| *Litigation* | ) |
| _____ | ) |

EXPERT REPORT OF ALLEN FERRELL, PH.D.

April 26, 2019

## I.    QUALIFICATIONS

1.      I am an economist and the Greenfield Professor of Securities Law at Harvard Law School.  I received a Ph.D. in economics from the Massachusetts Institute of Technology with fields in econometrics and finance and a J.D. from Harvard Law School.  My Ph.D. dissertation concerned the relationship between stock prices and financial disclosures.  After law school I clerked for Judge Silberman of the United States Court of Appeals for the D.C. Circuit and Justice Kennedy of the Supreme Court of the United States.

2.      I am also a faculty associate at the Kennedy School of Government at Harvard, a fellow at Columbia University's Program on the Law and Economics of Capital Markets, a research associate at the European Corporate Governance Institute, and a member of the editorial board of the Journal of Financial Perspectives.  I formerly was a member of the Board of Economic Advisors to the Financial Industry Regulatory Authority ("FINRA"), an academic fellow at FINRA, Chairperson of Harvard's Advisory Committee on Shareholder Responsibility (which is responsible for advising the Harvard Corporation on how to vote shares held by its endowment), the ABA Task Force on Corporate Governance, American Law Institute Project on the Application of U.S. Financial Regulations to Foreign Firms and Cross-Border Transactions, and an executive member of the American Law School section on securities regulation.

3.      I have testified before the U.S. Senate Subcommittee on Securities, Insurance, and Investment and presented to, among others, the Securities and Exchange Commission ("SEC"), the World Bank, the International Monetary Fund, the Structured Products Association, and the National Bureau of Economic Research.  I have published approximately 30 articles in leading law and finance journals.  I have also been an expert witness in a variety of securities matters. My testimony in the last four years and academic work are summarized on my curriculum vitae, which is attached hereto as **Appendix A**.

1

4.      I have been assisted by Compass Lexecon staff in this matter.  My analyses, opinions, and conclusions are based solely on the work performed by me, and those under my supervision, through the date of this report.  I am being compensated for my work on this matter at an hourly rate of $1,250.  My compensation is not contingent upon my opinions and conclusions, or the outcome of this matter.

5.      The materials I have relied upon are listed in **Appendix B**.

6.      This report is subject to change or modification should additional relevant information become available which bears on the analysis, opinions, or conclusions contained herein.

## II.   INTRODUCTION

### A.   Background and Plaintiff's Allegations

7.      Signet Jewelers Limited ("Signet" or the "Company") is the world's largest retailer of diamond jewelry.[1]  As of February 3, 2018, Signet operated 3,556 stores and kiosks in mall and off-mall locations in the U.S., Canada and the U.K.[2]  Signet has three divisions: (i) Sterling Jewelers ("Sterling," consisting primarily of Kay Jewelers and Jared); (ii) Zale (Zale Jewelry and Piercing Pagoda); and (iii) UK Jewelry.[3]  For fiscal year 2018, revenues were $3,820.5 million for the Sterling division, $1,794.7 million for the Zale division, and £471.8 million for the UK division.[4]  Signet's stock is listed on the New York Stock Exchange ("NYSE").[5]

---

1.   Signet Form 10-K for the fiscal year ended February 3, 2018 at 4.
2.   *Id.*
3.   *Id.*
4.   *Id.* at 12, 17, 20.
5.   *Id.* at cover.

8.      Plaintiff Public Employees' Retirement System of Mississippi brings this action on behalf of itself and a class of investors who purchased common shares of Signet from August 29, 2013 to March 13, 2018 ("Class Period") under Section 10(b) of the Securities Exchange Act of 1934.[6]  Plaintiff alleges that Signet's stock price was artificially inflated during the Class Period as a result of Defendants' alleged misrepresentations.[7]  Plaintiff advances two distinct claims, which I refer to as the "Harassment Claim" and the "Credit Portfolio Claim" (together, "Claims").

### (1)      Harassment Claim

9.      On March 18, 2008, a class of female retail-store employees up to and including district managers filed a class action complaint against Sterling, alleging that there existed "a pattern and practice of sex discrimination in [Sterling's] promotion and compensation."[8]  I understand that this case was moved to arbitration on June 18, 2008 (the "Jock Arbitration" and I refer to these Plaintiffs as the "Jock Claimants").[9]  Specifically, the Jock Claimants alleged that they were denied promotional opportunities for which they were qualified and were paid less than men performing the same work.[10]  I understand that the Company denies any wrongdoing and that the Jock Arbitration is still ongoing.[11]

---

6.      Fifth Amended Class Action Complaint for Violation of the Federal Securities Laws, *In re Signet Jewelers Limited Securities Litigation*, Case No.1:16-CV-06728-JMF, March 22, 2018 ("Complaint") at 1.

7.      *Id.*, ¶¶ 317, 549.  Defendants are Signet Jewelers Limited and the Executive Defendants, Michael Barnes (CEO and Director, January 2011 – October 31, 2014, Mark Light (CEO and Director, November 1, 2014 – July 31, 2017), Virginia Drosos (CEO, August 1, 2017 – present), Ronald Ristau (CFO, April 2010 – July 31, 2014), Michele Santana (CFO, August 1, 2014 – present). *Id.*, ¶¶ 32-39.

8.      Jock et al. v. Sterling Jewelers, Inc, Docket No. 1:08-cv-02875 (S.D.N.Y. Mar 18, 2008), ("Jock Complaint"), at 1 and ¶¶ 1-2.

9.      Complaint, ¶ 179.

10.     Jock Complaint, ¶ 2.

11.     Signet 6-K, March 20, 2008; and Signet Form 10-Q for the quarterly period ended

10.     I understand that Signet posted its code of conduct and ethics ("Code of Conduct") on its website and referenced it in its SEC filings starting before the Class Period.[12] Among other things, Signet's Code of Conduct stated that:

> "The Company is committed to a workplace that is free from sexual, racial, or other unlawful harassment, and from threats or acts of violence or physical intimidation. Abusive, harassing or other offensive conduct is unacceptable, whether verbal, physical or visual. Any person who believes that they have been harassed or threatened with or subjected to physical violence in or related to the workplace should report the incident to an appropriate supervisor or Human Resources, who will arrange for it to be investigated. All efforts will be made to handle the investigation confidentially."

> "Those who violate the standards in this Code will be subject to disciplinary action."

> "It is the Company's policy to encourage the communication of bona fide concerns relating to the lawful and ethical conduct of business. … It is also the policy of the Company to protect those who communicate bona fide concerns from any retaliation for such reporting. Confidential and anonymous mechanisms for reporting concerns are available and are described in this Code."[13]

11.     On February 26, 2017, Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein"), the law firm representing the Jock Claimants, publicly released declarations by former Sterling employees that had been filed in the Jock Arbitration.[14]  On February 27, 2017, after market close, *The Washington Post* reported on the declarations, stating that "[d]eclarations from roughly 250 women and men who worked at Sterling, filed as part of a private class-action

---

November 3, 2018 at 29-30.

12.   Complaint, ¶¶ 195, 199.

13.   *See* e.g., "Signet Jewelers Ltd. Code of Conduct," February 28, 2013.  Similar language was included in subsequent Code of Conduct documents.  *See also* Complaint, ¶ 199: ("[T]he Codes were substantially re-adopted each year…")

14.   "Hundreds allege sex harassment, discrimination at Kay and Jared jewelry company," *The Washington Post*, February 27, 2017 ("Most of the sworn statements were written years ago, but the employees' attorneys were only granted permission to release them publicly Sunday evening").

arbitration case, allege that female employees at the company throughout the late 1990s and

2000s were routinely groped, demeaned and urged to sexually cater to their bosses to stay

employed."[15]  The article also noted that former employees made allegations against both lower

level employees and top male managers at the company, including Mark Light, Signet's CEO at

the time of the article.[16]

      12.    Plaintiff alleges that "[t]hroughout the Class Period, Defendants made numerous

materially false and misleading statements and omissions including those concerning: … the

culture of sexual harassment at Signet, including the nature and risks of the lawsuits it was

facing; and []the conduct of its business, particularly as it related to ethical standards and sexual

harassment."[17]  Specifically, Plaintiff alleges that the Company misrepresented that the Jock

Arbitration "concerned merely 'store-level employment practices' that were alleged to be

'discriminatory as to compensation and promotional activities with respect to gender,' when in

fact the [Jock Arbitration] had uncovered extensive evidence showing a pervasive culture of

sexual harassment reaching up to the highest levels of the Company," that the Company "failed

to disclose the true degree of reputational and business risk that the Company was now facing as

a result of the facts set forth in the Declarations," and that it was "materially false and misleading

to omit disclosure of the facts asserted in the Declarations when Signet made disclosures

concerning class certification briefing in discussing the *Jock* Arbitration."[18]  Plaintiff also alleges

that the statements in Signet's Code of Conduct were misleading because the Company "was

---

15.   *Id.*
16.   *Id.*
17.   Complaint, ¶ 317.
18.   *Id.*, ¶ 325.

pervaded with a culture of sexual harassment that reached to its highest levels," and "neither encouraged the reporting of this harassment nor protected those who did."[19]

13.     Plaintiff alleges that the "[t]he artificial inflation in Signet's stock price was removed when the conditions and risks misstated and omitted by Defendants [regarding the Harassment Claim] were revealed to the market" in the *Washington Post* article published on February 27, 2017.[20]  **Exhibit 1** at 2 summarizes Plaintiff's alleged corrective disclosure regarding the Harassment Claim.

### (2)     Credit Portfolio Claim

14.     A substantial portion of Signet's sales is financed through credit.[21]  Historically, the Sterling division provided financing to its customers using an in-house credit program, while the other divisions used third parties to provide financing.[22]  Sales financed by credit were 56.1% of $3.0 billion in U.S. sales in fiscal year 2012 and 62.0% of $3.9 billion in Sterling sales in fiscal year 2017.[23]

15.     On May 26, 2016, in conjunction with its first quarter 2017 earnings release, Signet announced that it had retained Goldman Sachs to conduct a strategic review of the Company's credit portfolio.[24]  The Company said it would "consider a full range of options as we evaluate our in-house and outsourced credit programs," including "optimizing credit offerings, optimizing allocated debt and equity capitalization of the credit portfolio including

---

19.   *Id.*, ¶¶ 330-338.
20.   *Id.*, ¶¶ 568-570.
21.   Signet Form 10-K for the Fiscal Year ended January 28, 2012 at 18-19; and Signet Form 10-K for the Fiscal Year ended January 28, 2017 at 15-17.
22.   *See* e.g., Signet Form 10-K for the fiscal year ended January 31, 2015 at 5.
23.   Signet Form 10-K for the Fiscal Year ended January 28, 2012 at 19 & 46; and Signet Form 10-K for the Fiscal Year ended January 28, 2017 at 17.
24.   Signet Form 8-K, Exhibit 99.1, May 26, 2016.

potential incremental securitization; bringing all credit function in-house over the long term; in sourcing some credit functions and outsourcing others and outsourcing all credit functions."[25]

16.     On May 25, 2017, in conjunction with its first quarter 2018 earnings release, Signet announced the sale of the prime portion of its credit portfolio to Alliance Data Services ("ADS") at par value for $1 billion as part of the first phase of strategic outsourcing of its in-house credit program, and that it planned to sell the remaining 45% of its credit portfolio consisting of non-prime loans.[26]   In addition, the Company announced: 1) ADS would become the primary provider of credit funding, servicing and associated program functions to Signet's Kay, Jared and Regional brands' customers; 2) Sterling would outsource credit servicing on its non-prime accounts to Genesis Financial Solutions; and 3) that it had signed an agreement to begin a lease-purchase payment program with Progressive Leasing.[27]   Signet announced that "[a]s part of the second phase, Signet intends to fully outsource its secondary credit programs, including the sale of the remaining receivable on its balance sheet, as well as funding for new non-prime account originations."[28]

17.     On March 14, 2018, in conjunction with its fiscal year 2018 earnings release, Signet announced the sale of the non-prime portion of its credit portfolio to CarVal Investors for $401 to $435 million, which represented 72 percent of par value and 85 percent of carrying value on its balance sheet.[29]   Signet announced it would recognize a loss on the loans of between $113

---

25.   Signet Jewelers Limited Fiscal 2017 First Quarter Earnings Conference Call, ViaVid, May 26, 2016 at 3.  *See also* Signet Form 8-K, Exhibit 99.1, May 26, 2016.
26.   Signet Form 8-K, Exhibit 99.1, May 25, 2017.
27.   *Id.*
28.   *Id.*
29.   Signet Form 8-K, Exhibit 99.1, March 14, 2018.

and $118 million and a total loss (including servicing and transaction costs) of $165 to $170 million.[30]

18.     Plaintiff alleges that "[t]hroughout the Class Period, Defendants made numerous materially false and misleading statements and omissions including those concerning: [] the quality and risks of Signet's in-house credit portfolio and underwriting," and "the Company's financial performance and accounting, including its reserves and earnings…."[31]  Specifically, Plaintiff alleges that while Signet was touting the quality of the credit program, it engaged in reckless underwriting to drive sales growth, generating large amounts of non-prime debt.[32] Plaintiff also alleges that, starting in mid-2016 around the same time Goldman Sachs was conducting its strategic review, Signet was, unbeknownst to investors, forced to tighten credit standards which caused sales to contract.[33]  Plaintiff further alleges that Signet misled investors with respect to its in-house credit program at Sterling by consistently understating loan loss reserves and thereby inflating earnings, in part by using an allegedly non-conventional loan aging method called the "recency" method.[34]  Plaintiff alleges that the "conditions and risks misstated and omitted by Defendants were revealed to the market" regarding the Credit Portfolio Claim through a series of partial disclosures on November 24, 2015, May 26, 2016, June 2, 2016,

---

30.   *Id.*
31.   Complaint, ¶ 317.  Plaintiff claims that defendants made false or misleading statements in 20 earnings announcements and earnings conference calls, 15 SEC filings, and four investor conferences or conference calls. *Id.*, ¶¶ 318-548.
32.   *Id.*, ¶ 65.
33.   *Id.*, ¶¶ 123-133.
34.   *Id.*, ¶ 5.  Signet assessed the delinquency of loans on a "recency basis," which is an "aging" convention.  Signet disclosed that an account starts to age five days after the payment due date and remains current if the customer makes at least 75% of the monthly payment. Market participants were aware that the Company used the recency accounting convention —some commenting that this method minimizes delinquencies and makes the loan portfolio appear to perform better than it would under the more common contractual accounting approach. *Id.*, ¶¶ 8, 59-60, 92, 98-99, 139.

August 25, 2016, May 24, 2017, May 25, 2017, November 21, 2017, December 1, 2017, and March 14, 2008.[35] *See* **Exhibit 1**.

**B.    Hartzmark Report**

19.     Plaintiff retained Dr. Michael Hartzmark to assess (i) whether Signet's common stock traded in an efficient market, and (ii) "whether the calculation of damages on a class-wide basis is subject to a common methodology for all Class members in connection with their claims under Section 10(b) of the Exchange Act of 1934 (the 'Exchange Act') and U.S. Securities & Exchange Commission ('SEC') Rule 10b-5 adopted thereunder (collectively, "Section 10(b)")."[36]

20.     Dr. Hartzmark opines that the market for Signet's common stock is efficient.[37] Among other things, Dr. Hartzmark performs an event study to analyze whether Signet's stock price responds to new unexpected information.[38] Based on his event study, Dr. Hartzmark finds that Signet stock behaved differently, i.e., more likely to be associated with a statistically significant residual return on dates Signet announced earnings as compared to other "no-news" dates.[39] Dr. Hartzmark further concludes that the alleged corrective disclosure dates are associated with statistically significant negative residual returns.[40]

21.     Dr. Hartzmark also opines that there exists a common methodology to calculate class-wide damages.[41] Specifically, Dr. Hartzmark asserts that damages can be measured by

---

35.  *Id.*, ¶¶ 550-564.  Plaintiff also notes that Signet's stock price continued to decline on June 3, 2016 after the alleged corrective disclosure on June 2, 2016.
36.  Expert Report of Michael L. Hartzmark, Ph.D., March 15, 2019 ("Hartzmark Report"), ¶ 1.
37.  *Id.*, ¶ 10.
38.  *Id.,* ¶¶ 65-67.  Solely for the purposes of my first opinion described below, I adopt Dr. Hartzmark's event study.
39.  *Id.,* ¶¶ 77-80.
40.  *Id.,* ¶¶ 86-88.
41.  *Id.,* ¶¶ 10, 92.

"out-of-pocket" losses based on the daily level of "artificial inflation" in Signet's stock price caused by the alleged fraud, i.e., the daily difference between the stock's price and its "true value."[42] Dr. Hartzmark generally asserts that calculation of out-of-pocket losses "often begins with the same type of event study" that he used for his market efficiency analysis.[43] He further argues that "[u]sing the results of an event study along with the disclosures of firm-specific information, the level of artificial inflation in the prices of the Signet common stock caused by the Defendants' alleged misstatements and omissions can be calculated based on the price reactions to disclosures revealing these alleged misstatements and omissions" and that "daily levels of inflation can be calculated by adjusting the inflation measure for each day throughout the Class Period."[44]

## III.    ASSIGNMENT AND SUMMARY OF CONCLUSIONS

22.    I have been retained by counsel for Defendants to assess, based on Plaintiff's claims, (i) whether the alleged misrepresentations regarding the Harassment Claim [as described below] had an impact on Signet's stock price, i.e., "price impact," and (ii) whether Dr. Hartzmark, Plaintiff's expert, has provided a reliable method to calculate damages on a class-wide basis that result from Plaintiff's Credit Portfolio Claim [as described below].

23.    Based on the materials that I have reviewed and my analysis, I conclude that (i) the alleged misrepresentations regarding the Harassment Claim did not have a price impact, and (ii) Dr. Hartzmark has not provided a reliable methodology to calculate damages on a class-wide basis that result from Plaintiff's Credit Portfolio Claim.[45]

---

42.    *Id.*, ¶ 93.
43.    *Id.*, ¶¶ 93-94.
44.    *Id.*, ¶ 94.
45.    Because the alleged misrepresentations regarding the Harassment Claim did not have a price impact, Dr. Hartzmark's proposed event study methodology is therefore also not a reliable methodology to calculate damages with respect to that claim.

24.     I elaborate upon and provide the bases for my conclusion in the remainder of this report.

## IV.    THE ALLEGED MISREPRESENTATIONS REGARDING THE HARASSMENT CLAIM DID NOT HAVE A PRICE IMPACT

25.     As noted above, Plaintiff alleges that the *Washington Post* article published on February 27, 2017 corrected the Company's prior alleged misstatements regarding the Harassment Claim.[46]  Based on his event study, Dr. Hartzmark concludes, and I do not dispute, that Signet's return after accounting for market and industry effects, i.e., its residual return, is statistically significant on February 28, 2017, the first trading date after the publication of the *Washington Post* article.[47]  But this finding alone does not establish that the article revealed Signet had concealed information that, if disclosed earlier, would have impacted Signet's stock price.

26.     In an efficient market, which Plaintiff and Dr. Hartzmark allege was the case here, only *new* information is expected to impact the stock price.  Thus, whatever the cause of the stock price drop following the *Washington Post* article, it must have been new information. However, as set forth below, the substance of the allegations in the Jock declarations, and the risks that disclosure of the declarations posed to the Company, were already known to the market.  The stock drop following the *Washington Post* article cannot be attributed to previously disclosed information.

27.     The stock price drop is consistent with the bad publicity the front page article generated for Signet with the attendant impact on Signet's customers and Signet's future financial performance.  This bad publicity does not reflect the revelation of previously concealed

---

46.   *Supra* ¶ 11.
47.   Hartzmark Report, ¶¶ 86-87, Appendices C & E.

information; rather, it reflects a materialization of the *known* risk that media attention to the Jock declarations could harm Signet's brand.  Indeed, analyst Capitol Forum recognized—before the *Washington Post* article was published, and based on then-publicly-available information—that release of the Jock Arbitration documents could create "significant negative headline risk."[48] Consequently, Signet's statistically significant negative residual return following the *Washington Post* article was not the result of the removal of any inflation caused by the alleged misstatements, and does not demonstrate any price impact for those misstatements.

28.     Below, I first explain the implications of efficient markets and the impact of information – including information previously disclosed – on stock prices.  Next, I explain that the price impact inquiry is a function of Plaintiff's claims because it involves analyzing whether a company's stock price would have been impacted if the company had "revealed the truth" at the time of the alleged misrepresentations.  Finally, I explain that my analysis of the alleged misrepresentation dates and the alleged corrective disclosure date, i.e., the date of the *Washington Post* article, demonstrates that the alleged misrepresentations regarding the Harassment Claim did not have a price impact.

### A.     Stock Price Behavior and Efficient Markets

29.     In an efficient market, finance theory tells us that stock prices reflect the expected future cash flows of a company.[49]  These expectations are influenced by market, industry, and company-specific factors.  Stock prices that trade in an efficient market reflect the total mix of publicly available information regarding these expected future cash flows.[50]  Publicly available

---

48.   "Signet Jewelers: Potential Release of Class Arbitration Documents Could be PR Nightmare for Signet," The Capitol Forum, September 1, 2016.

49.   Brealey, Richard A., Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance* (New York: McGraw-Hill/ Irwin, 2003) at 60-61.

50.   Brealey, Richard A., Stewart C. Myers, and Alan J. Marcus, *Fundamentals of Corporate*

information containing such value-relevant information can encompass everything from a company's public SEC filings to newspaper articles.

30.     A central tenet of the efficient market hypothesis is that as *new* information becomes public, stock prices "quickly and fully" reflect that information.[51]  A corollary is that for a public disclosure of information to significantly alter the total mix of publicly available information and impact the stock price, it must be different from what was already known or expected by the market.  Known or expected information would have already been priced in an efficient market.[52]  Only new public information will necessitate a revision of the company's expected future cash flows and, hence, result in a changed stock price.  In short, only new information is "news" in an efficient market.

31.     The academic literature has explored how "quickly" new information is "fully" reflected in the stock price in an efficient market.  Numerous academic studies indicate that the market's reaction to new events is immediate and unbiased.[53]

---

*Finance* (New York: McGraw-Hill/Irwin, 2004) at 165.

51.   Jones, Charles P., *Investments: Analysis and Management* (Hoboken, NJ: John Wiley & Sons, 2013) at 320.  Dr. Hartzmark states that "[Event studies] are generally used to measure the reaction of market participants (and thus the stock price) to the disclosure of *new* information."  Hartzmark Report, ¶ 65 (emphasis added).

52.   Elton, Edwin J., Martin J. Gruber, Stephen J. Brown, and William N. Goetzmann, *Modern Portfolio Theory and Investment Analysis* (Hoboken, NY: John Wiley & Sons, 2003) at 402.

53.   *See, e.g.*, Kothari, S.P., "Capital Markets Research in Accounting," *Journal of Accounting and Economics* 31 (2001): 105–231, Ederington, Louis H., and Jae Ha Lee, "The Short-Run Dynamics of the Price Adjustment to New Information," *Journal of Financial and Quantitative Analysis* 30 no. 1 (1995): 117–34, Busse, Jeffrey A., and T. Clifton Green, "Market Efficiency in Real Time," *Journal of Financial Economics* 65 no. 3 (2002): 415–437,  Visaltanachoti, Nuttawat and Ting Yang, "Speed of Convergence to Market Efficiency for NYSE-listed Foreign Stocks," *Journal of Banking and Finances* 34 (2010): 594 – 605 and Černý, Alexandr, "Stock Market Integration and the Speed of Information Transition," Working Papers Series – Charles University (2004): 1–25.

32.     As recognized by Dr. Hartzmark, whether new information is incorporated into the stock price quickly can be assessed using an event study.[54]  An event study controls for market and industry effects (estimated with the use of market and industry indices) on the stock price, thereby isolating the portion of the stock price movement that is company-specific (the "residual return") for a given time period.[55]  To conclude that residual price movements (i.e., those not attributable to market and industry effects) in the stock are not simply a function of normal random price movements, the residual must be "statistically significant."[56]  The analysis of stock price behavior does not end with a finding of a statistically significant residual from an event study.  Suppose that an event study finds a statistically significant residual that is contemporaneous with a public disclosure of firm specific information.  In order to attribute the stock price movement to the public disclosure, there is still another crucial step in the analysis. As one textbook explains:

> "An event study can tell us that something happened, but it can't tell us *why*. To explain positive or negative [residuals], we must closely examine the events and institutions involved … [The event study technique] only – though this is substantial – helps delineate what needs to be explained."[57]

---

54.  *See* e.g.*,* Ferrell, Allen and Atanu Saha, "The Loss Causation Requirement for Rule 10b-5 Causes-of-Action: The Implication of *Dura Pharmaceuticals v. Broudo*," *The Business Lawyer* 63, (2007): 163–86; *see also* Hartzmark Report, ¶ 65.

55.  The residual is the difference between the actual return for a given time period and the return predicted by the regression model based upon market and industry factors.

56.  The test of statistical significance is based on measuring the random price movements of the stock over the event study's "estimation period."  From these measurements a "confidence interval" is calculated, which is simply a range that contains a specified fraction of the random stock price movement observations.  A residual is then typically considered "statistically significant" in an event study if the residual lies outside the 95% confidence interval. A "t-statistic" for the residual return exceeding +/- 1.96 indicates that the residual lies outside this 95% confidence interval and is therefore statistically significant. Using a 95% confidence interval for determining statistical significance is a standard metric for event studies.  *See* Federal Judicial Center, *Reference Manual on Scientific Evidence* (National Academies Press, 2011) at 320.

57.  Black, Bernard S. and Ronald J. Gilson, *The Law and Finance of Corporate Acquisitions* (Westbury NY: The Foundation Press, Inc., 1995) at 221 (emphasis in the original).

Only by comparing the pre-existing total mix of publicly available information to the firm-specific information released can a researcher reliably determine whether a particular disclosure is likely responsible for a stock price movement.

33.     For example, if the particular disclosure at issue was simply repeating information already known to the market, a researcher could not attribute, consistent with efficient markets, a residual return – regardless of whether it happens to be statistically significant – to such a disclosure.  Similarly, if there is reason to conclude that the particular disclosure consisted of information not considered value-relevant by the market, then a researcher could not attribute, consistent with efficient markets, the residual return to such a disclosure.  Disclosures that simply repeat information already known to the market or that pertain to matters that are irrelevant to market participants would not cause a revision in the company's expected future cash flows and, hence, not impact its stock price.

**B.     Price Impact and the Alleged Truth**

34.     The price impact inquiry is focused on stock price reactions to a particular type of disclosure: the alleged truth.  Specifically, the price impact inquiry consists of analyzing the following hypothetical: if the company had revealed to the market the alleged truth – rather than concealing it by making the alleged misrepresentations – would such a disclosure have resulted in a stock price movement?  If so, the alleged misrepresentations have price impact.  It is crucial to emphasize that the "alleged truth" that could and should have been disclosed earlier – the focal point of the price impact inquiry – is a function of the Plaintiff's theory of liability.  Once the truth that had been allegedly misrepresented and concealed has been identified by Plaintiff, a financial economist can then apply the scientific framework discussed above, including event study analysis, to test for price impact.

15

35.     To apply the scientific framework discussed above to this question, the standard approach then is to analyze the stock price behavior when the alleged misrepresentations and disclosures actually occurred.  If the alleged misrepresentations in fact caused the market to view the company more favorably than before (and presumably more favorably than if it had been told the alleged truth that was being concealed), then one would expect to observe a positive and statistically significant residual return on these dates.  In a similar vein, a researcher should analyze stock price behavior when the alleged truth was actually disclosed (the "corrective disclosures").

### C.     The Alleged Misrepresentations Regarding the Harassment Claim Did Not Have a Price Impact

36.     I will now apply the scientific framework discussed above to assess whether there was any price impact on Signet's stock price associated with the alleged misrepresentations.  I will do so in three steps.  First, I will briefly make one key observation concerning the "alleged truth" given the Plaintiff's theory of liability.  Second, I will assess whether the alleged misrepresentations caused a price impact when made by analyzing whether they caused positive and statistically significant residual returns on those dates.  Third, and finally, I will assess whether the alleged corrective disclosures that supposedly revealed the alleged truth caused a price impact.

### (1)     The Alleged Truth

37.     Before turning to the analysis of Signet's stock price behavior, there is one crucial observation concerning the alleged truth with respect to the alleged misrepresentations and corrective disclosures that should be made from the outset.  Plaintiff alleges in the Complaint that the *Washington Post* article "detailed Signet's pervasive culture of sexual harassment, reaching all the way up to the highest levels of the Company, and quoted and summarized many

of the declarations evidencing *that fact*" and also included interviews with several of the Jock Claimants.[58]  Rather than the pervasive culture of sexual harassment being a *fact*, however, these are *allegations* made by the Jock Claimants and disputed by the Company and were reported as such in the *Washington Post*.[59]  More specifically, the alleged truth revealed in the *Washington Post* article is that (i) some of the Jock Claimants *alleged* sexual harassment against certain employees, including the CEO and others in upper management, (ii) some of the Jock Claimants *alleged* that the Company did not discipline employees that violated its Code of Conduct, (iii) the Company disputes these allegations, and (iv) public disclosure of documents produced in the Jock Arbitration posed a risk to the Company.  But this allegedly corrective information was already public before the *Washington Post* article, as I document below.

### (2)     Analysis of the Alleged Misrepresentation Dates

38.     Regarding Signet's code of conduct, Plaintiff states that "[t]he version of the Code of Conduct that was published at the start of the Class Period was adopted on February 28, 2013," i.e., prior to the start of the Class Period.[60]  Plaintiff further states that the alleged false and  misleading statements in the February 28, 2013 version were repeated in the Company's subsequent codes of conduct that it adopted on February 27, 2014, February 26, 2015, and March 3, 2016, and throughout the Class Period on Signet's website and its SEC filings.[61]  Because these alleged false and misleading statements were disclosed publicly prior to the Class Period and repeated during the Class Period, they are not expected to have an impact on Signet's stock price.  Signet's Code of Conduct adopted as of February 28, 2013 is attached as **Appendix C**.

---

58.   Complaint, ¶¶ 21, 276 (emphasis added).
59.   "Hundreds allege sex harassment, discrimination at Kay and Jared jewelry company," *The Washington Post*, February 27, 2017.
60.   Complaint, ¶ 330.
61.   *Id.*, ¶ 338.

39.     Plaintiff alleges that during the Class Period Signet made false and misleading statements about the Jock Arbitration in 14 SEC filings and in a *New York Times* article that published comments from a Signet representative on March 28, 2014, prior to the alleged corrective disclosure on February 27, 2017.  *See* **Exhibit 2**.  While two of the 15 alleged misrepresentation dates (March 27, 2014 and March 26, 2015) are associated with a statistically significant positive residual return, the alleged false and misleading statements on these dates largely repeated the same statements Signet made in its 10-Q filing on August 29, 2013 (the same is true for the 12 other dates with alleged misrepresentations in SEC filings).  Thus, the stock price movements on these two dates would not have been caused by Signet's statements about the Jock Arbitration on those dates.  Indeed, Signet reported better-than-expected earnings on both days, which can explain the stock price increases on those days.[62]

40.     In sum, there is no reliable evidence that the alleged misrepresentations regarding the Harassment Claim had a positive impact on Signet's stock price when these alleged misrepresentations were made.

### (3)     Analysis of the Alleged Corrective Disclosure Date

41.     Plaintiff cites the following passages of the *Washington Post* article to support its claim that the article revealed the truth regarding the Harassment Claim:

> "Hundreds of former employees of Sterling Jewelers, the multibillion-dollar conglomerate behind Jared the Galleria of Jewelry and Kay Jewelers, claim that its chief executive and other company leaders presided over a corporate culture that fostered rampant sexual harassment and discrimination, according to arbitration documents obtained by The Washington Post.
>
> Declarations from roughly 250 women and men who worked at Sterling, filed as part of a private class-action arbitration case,

---

62.  Hartzmark Report Appendix C.  Dr. Hartzmark includes both days in his analysis of news versus no-news dates.  Hartzmark Report, ¶ 76.

> allege that female employees at the company throughout the late
> 1990s and 2000s were routinely groped, demeaned and urged to
> sexually cater to their bosses to stay employed.  Sterling disputes
> the allegations.
> …
> More than 1,300 pages of sworn statements were released Sunday
> and feature company-approved redactions that obscure the names
> of managers and executives accused of harassment or abuse."[63]

 The *Washington Post* article is attached as **Appendix D**.

42.     Before analyzing the information in the *Washington Post* article, it is worth noting

that the disclosure in the *Washington Post* is different from the disclosure that the Company

could have made.  The *Washington Post* article included interviews with some of the Jock

Claimants which the Complaint characterizes as "particularly saddening."[64]  The alleged truth,

i.e., the information that Signet allegedly concealed from the market, would not have included

any interviews.  I do not understand the Complaint to be alleging that the Company should have

undertaken interviews that it should have then disclosed.  The alleged truth would also likely not

have included salacious phrases such as a "corporate culture that fostered rampant sexual

harassment."  Price declines due to salacious statements and the harmful publicity thereby

generated do not measure the price impact of the alleged concealed truth.

43.     Importantly, the information Plaintiff alleges was misrepresented or concealed –

i.e., that the sexual harassment was not merely at the store level but reached the highest level of

the Company, that the allegations in the Jock Arbitration therefore contradicted Signet's

published Code of Conduct, and that the disclosure of declarations posed a risk to the Company

– was known publicly prior to the alleged corrective disclosure in the *Washington Post* article.

44.     On June 21, 2013, more than two months prior to the start of the Class Period and

posted on the Cohen Millstein website on December 16 or 17, 2013, the Jock Claimants filed a

---

63.   Complaint, ¶¶ 276-277.
64.   *Id.*, ¶ 278.

memorandum in support for class certification, noting similar information that was revealed in

the *Washington Post* article:

> "As the substantial record plainly reveals, this evidence of conduct
> demeaning toward women originates with the CEO, DVPs, and VPROs
> and is perpetuated by similar conduct exhibited by DMs throughout the
> Company beginning in the early 1990s and continuing to the present.  The
> conduct has occurred in settings that are public and private, ranging from
> banter in hallways and elevators to interactions within Sterling stores and
> at the mandatory annual meeting of all Company managers held in
> Orlando, Florida.  This behavior includes frequent references to
> women in sexual and vulgar ways; groping and grabbing women;
> soliciting sexual relations with women, sometimes as a *quid pro quo* for
> employment benefits; creating an environment at often-mandatory
> Company events in which women are expected to undress publicly, accede
> to sexual overtures and refrain from complaining about the abusive
> treatment to which they have been subjected. It has even included sexual
> assault and rape.  This pattern of conduct has polluted the
> Company's workplace environment, inevitably establishing de facto
> standards for assessing the value of female employees less than male
> employees at Sterling in routine compensation and promotion
> decisions."[65]

45.     After market hours on March 28, 2014, the *New York Times* published an article

that disclosed sexual harassment, not just at store level, but at the highest levels:

> "In the pending case, the plaintiffs refer to sexual affairs involving the
> chief executive, Mark Light, and subordinates…In their filings, the
> plaintiffs include a report from an expert who says that lower-level male
> employees may have modeled their behavior after that of senior
> executives.  Upper management, the expert writes, created a "climate and
> culture" that devalued the work of female employees."[66]

---

65.   Jock et al. v. Sterling Jewelers, Inc, Memorandum in Support of Motion for Class
      Certification, June 21, 2013 (citations omitted) at 33.  According to the Complaint (¶ 182),
      Cohen Millstein posted the class certification brief on its website in late 2013.  I have been
      informed by Counsel that Cohen Millstein posted the brief on December 16 or 17, 2013.
66.   "Women Charge Bias and Harassment in Suit Against Sterling Jewelers," *The New York
      Times*, March 28, 2014.

The *New York Times* also reported an example that showed that those who violated standards of
the code of conduct were not disciplined:

> "Ms. Souto-Coons said in an interview that her boss once asked her to
> write out a complaint for the company about sexual harassment of women
> in the store by a male employee, but two days later, she learned the report
> had been watered down. Two weeks later, the man was promoted, she
> said."[67]

The *New York Times* article is attached as **Appendix E**.

46.     On February 2, 2015, the arbitrator in the Jock Arbitration issued a Class
Determination Award.  In that Award, the arbitrator summarized the allegations in the
declarations that had been submitted, and noted, among other things, that there was substantial
evidence of alleged sexual harassment including from highest levels of the Company:

> "Claimants have submitted extensive evidence of alleged improper sexual
> conduct and comments reflecting gender stereotypes by numerous
> executives and senior managers (including Sterling's CEO and all three of
> the DVPs who have overseen store operations for most of the last decade)
> throughout the Company beginning in the early 1990s and continuing to
> the present.  This evidence consists primarily of declarations and
> testimony by current and former male and female Sterling employees, as
> well as testimony from Sterling executives and senior managers.  The
> conduct described in the declarations and testimony has occurred in
> settings that are public and private, ranging from banter in hallways and
> elevators to interactions within Sterling stores and at the mandatory annual
> meeting of all Sterling managers held in Orlando, Florida.  It includes
> references to women in sexual and vulgar ways, groping and grabbing
> women, soliciting sexual relations with women (sometimes as a *quid pro
> quo* for employment benefits), and creating an environment at often-
> mandatory Company events in which women are expected to undress
> publicly, accede to sexual overtures and refrain from complaining about
> the treatment to which they have been subjected. In addition, the
> testimony and declarations submitted by Claimants describe numerous
> instances in which managers at all levels of the company and throughout
> the entire period covered by this action have made comments reflecting
> negative gender stereotypes, and have relied upon such stereotypes to
> justify biased pay and promotion decisions.  For the most part Sterling has

---

67.   *Id.*

not sought to refute this evidence; rather Sterling argues that it is
inadmissible, irrelevant and insufficient to establish a corporate culture
that demeans women."[68]

The *New York Times* reported on the Class Determination Award on February 4, 2015.[69]

47.   Moreover, that information from the Jock Arbitration may pose a risk to the

Company was also known prior to the *Washington Post* article on February 27, 2017.  As an

analyst at The Capitol Forum explained in a research report issued September 1, 2016:

> "In its most recent 10-Q, Signet disclosed that Sterling Jewelers, Inc. filed
> a motion for protective order in the American Arbitration Association
> (AAA) matter.  The 10-Q further indicates that the matter was fully
> briefed and oral argument was held on July 22, 2016.  Because the
> presumption of privacy and confidentiality does not apply in class
> arbitrations, Sterling Jewelers likely filed the motion to prevent the
> potentially damaging documents and evidence submitted by the claimants
> from becoming publicly available.
>
> The release of the evidence and documents, which contain extremely
> troubling allegations of alleged improper sexual conduct and comments
> reflecting gender stereotypes by numerous executives and senior
> managers, would almost certainly have negative consequences for Signet
> for the following reasons:  first, the nature of the allegations coupled with
> the fact that senior executives are implicated carries the potential for
> significant negative headline risk at a time when the company is already
> facing accusations of swapping customers' diamonds; second, considering
> there are allegations against executives, the company could come under
> pressure to make executive level changes; third, given that a portion of
> prospective class claimants can still opt-in, it could motivate potential
> class members who are currently on the fence to join the class, which
> could result in additional liability for Signet in the event that claimants
> prevail."[70]

The Capitol Forum report is attached as **Appendix F**.

---

68.   Jock et al. v. Sterling Jewelers, Inc, Class Determination Award, AAA Case No. 11 20
      0800 0655, February 2, 2015 at 21-22.

69.   "Gender Bias Case Against Sterling Jewelers Can Proceed," *The New York Times*,
      February 4, 2015.  According to the Complaint (¶ 184), Cohen Millstein posted the Class
      Certification award on its website in 2015.

70.   "Signet Jewelers: Potential Release of Class Arbitration Documents Could be PR
      Nightmare for Signet," The Capitol Forum, September 1, 2016.

48. In short, the alleged truth had been publicly disclosed well prior to the *Washington Post* article. When the alleged truth concerning sexual harassment was disclosed to the market, there was no statistically significant stock price reaction according to Dr. Hartzmark's event study.[71] In other words, the information that Plaintiff alleges was misrepresented and concealed from the market did not impact Signet's stock price when it was publicly disclosed. Moreover, in an efficient market, which Dr. Hartzmark opines is the case here, this same information repeated in the *Washington Post* article would not have impacted Signet's stock price. Thus, the drop in Signet's stock price following the article could not have been caused by the repetition of information Plaintiff alleges was misrepresented and concealed from the market previously. The stock price drop is consistent with the bad publicity created by the article. But bad publicity in a prominent newspaper is not something that Plaintiff alleges Signet could have or should have disclosed earlier.[72] Rather, if anything, the bad publicity was a materialization of a *known* – as opposed to a concealed – risk that the market was aware of. Indeed, the Capitol Forum analyst identified this risk—which it called "headline risk"—prior to the *Washington Post* article, demonstrating that the market was aware of the risk before Plaintiff

---

71. The exact timing of the posting of the class certification brief on December 16 or 17, 2013 is unknown. Neither December 16, 17, nor 18 is associated with a statistically significant return. Because the *New York Times* article came out after market on March 28, 2014, the first trading date following the article is March 31, 2014, which is not associated with a statistically significant return. The date of the Class Determination Award is February 2, 2015 whereas the *New York Times* article reporting on the ruling came out on February 4, 2015. Neither February 2, 3, nor 4, 2015 is associated with a statistically significant return. The timing of the Capitol Forum analyst report on September 1, 2016 is unknown. Neither September 1 nor 2, 2016 is associated with a statistically significant return. *See* Hartzmark Report Appendix C.

72. I also note that, prior to market open on February 28, 2017, an analyst at Northcoast Research lowered its fiscal year 2018 forecast for Signet based on "results from [Northcoast Research's] latest jewelry survey, weakness in mall traffic, stepped up promotional activity at Kay, Jared and Zales and conversations with industry contacts." ("SIG: Valentine's Day Survey of Independents Indicates Challenging Conditions; Est Revised," Northcoast Research, February 28, 2017)

alleges it was revealed.  Accordingly, the stock drop following the *Washington Post* article does not show the removal of any inflation caused by or demonstrate any price impact for the alleged misstatements.

## V.  DR. HARTZMARK HAS NOT PROVIDED A RELIABLE METHODOLOGY TO CALCULATE DAMAGES ON A CLASS-WIDE BASIS THAT RESULT FROM PLAINTIFF'S CREDIT PORTFOLIO CLAIM

49.     As discussed above, Dr. Hartzmark claims that he can measure alleged artificial inflation, i.e., "the difference between the actual prices paid for the Signet common stock and the true or 'but-for' values of the securities absent the alleged misrepresentations and omissions (*i.e.*, had the truth been disclosed, the price *would have been* the true value)" based on two claims. First, he will measure the price reactions to the alleged corrective disclosures purportedly revealing alleged misstatements and omissions from the results of an event study.[73]  Second, Dr. Hartzmark posits that "[f]rom this, daily levels of inflation can be calculated by adjusting the inflation measure for each day throughout the Class Period."[74]  What these "adjustments" consist of or their methodological basis is left entirely unexplained.

50.     Dr. Hartzmark's proposed analysis is not a reliable methodology for measuring alleged artificial inflation throughout the Class Period consistent with Plaintiff's Claims in this matter.  Nor am I aware of a method that could reliably be applied to the multifaceted and numerous purported corrective disclosures to estimate inflation over the four-and-a-half year purported Class Period.   The confounding (i.e., nonfraud) information disclosed in the numerous purported corrective disclosures, many of which are disappointing earnings announcements, cannot be controlled for in an event study such as the one Dr. Hartzmark employs.  Specifically,

---

73.   Hartzmark Report, ¶¶ 93-94.  While Dr. Hartzmark only explains the event study, he claims that "[t]here are a variety of commonly-utilized methods to estimate the true price on each date of the Class Period" without providing any details.  *Id.* ¶ 93.

74.   *Id.*, ¶ 94.

there is no publicly traded industry proxy (including the industry index proposed by Dr. Hartzmark) for Signet's jewelry business (including its reliance on mall traffic), which could be used in an event study to control for this confounding information.  Industry developments such as declining mall traffic had a disproportionate negative effect on Signet's business model that help account for disappointing earnings announcements, a fact that would not be captured in the event study results.  Moreover, there is no reliable basis to calculate inflation over the four-and-a-half year purported class period based on the price reactions to the alleged corrective disclosures even assuming away the issue of confounding information.

51.     The need for unspecified and extensive "adjustments" to the damages model to account for these effects is readily apparent from Dr. Hartzmark's own event study.  Based on his event study model, the sum of the residual price declines on the alleged corrective disclosures related to the Credit Portfolio Claim is $84.51.[75]  In comparison, Signet's stock price on the first day of the Class Period closed at $67.00.  This implies that, based on Dr. Hartzmark's event study analysis, Signet's "true or but-for" value at the start of the Class Period would have been *negative*, i.e., -$17.51 (=$67.00 - $84.51), which is obviously a nonsensical result.  *See* **Exhibit 3** for a depiction of Signet's "true value" over the Class Period based on Dr. Hartzmark's event study.[76]

---

75.   *Id.*, Appendix C.  The residual price declines on the individual alleged corrective disclosure dates are:  November 24, 2015, $6.45; May 26, 2016, $10.44; June 2, 2016, $7.86; June 3, 2016, $3.32; August 25, 2016, $12.51; May 24, 2017, $3.66; May 25, 2017, $4.46; November 21, 2017, $22.45, December 4, 2017, $3.53; and March 14, 2018, $9.83.

76.   Including the price decline on February 28, 2017, the date which allegedly corrected the alleged misrepresentations regarding the Harassment Claim, increases inflation to $91.96 and reduces Signet's "true value" to -$24.96 (=$67.00 - $91.96) at the start of the Class Period.  *Id.*

52.     The fundamental reason Dr. Hartzmark has failed to provide a reliable method to calculate class-wide damages is the inability to control for confounding (i.e. nonfraud) information.  Dr. Hartzmark claims that to measure alleged artificial inflation, he will use "the same type of event study [he] used to evaluate the price-related factors" in his analysis of the efficiency of the market for Signet common stock.[77]  In that event study, he "specif[ied] a regression model that includes certain explanatory variables – *i.e.*, the variables that explain the outside influences on the variation in the daily returns to Signet common stock."[78]  These explanatory variables are the S&P 500 Total Return Index as a proxy for market effects and the "S&P 400 Specialty Retail Industry Total Return Index with Bloomberg identifier 'S4SPRET'" as a proxy for industry effects.[79]  However, changes in this latter index are driven by firms that are not affected by trends in the jewelry business or by declining mall traffic.  For example, Dick's Sporting Goods and Williams-Sonoma, which are neither in the jewelry industry nor primarily mall-based, accounted for over 25% of the index at the end of 2016.[80]  In fact, this index does not include a *single* jewelry store, even though on May 24, 2017 (when an alleged corrective disclosure purportedly caused Signet's stock price to decline), Dr. Hartzmark's own

---

77.  *Id.*, ¶ 94.
78.  Hartzmark Report Appendix D ¶ 1.
79.  *Id.* Appendix D ¶ 2.
80.  Bloomberg.  The industry index is comprised of the following firms: Aaron's Inc., Abercrombie & Fitch Co., Advance Auto Parts Inc., American Eagle Outfitters Inc., ANN Inc., ARO Liquidation Inc., Ascena Retail Group Inc., AutoNation Inc., Barnes & Noble Inc., Bed Bath & Beyond Inc., Cabela's Inc., Chico's FAS Inc., CST Brands LLC, Dick's Sporting Goods Inc., Foot Locker Inc., GameStop Corp., Guess? Inc., Michaels Cos Inc., Murphy USA Inc., Office Depot Inc., Rent-A-Center Inc/TX, RH, Sally Beauty Holdings Inc., Signet Jewelers Ltd., Tractor Supply Co., Urban Outfitters Inc., Williams-Sonoma Inc.  The firms listed are the superset of the members of the S&P 400 Specialty Retail Total Return Index as of year-end 2012-2017.  Dick's Sporting Goods Form 10-K for the Fiscal Year ended February 3, 2018 at 17. Williams-Sonoma Form 10-K for the Fiscal Year ended January 28, 2018 at 3.

Appendix C documents that "Signet shares fall 9% in sympathy with selloff of Tiffany shares."[81] While that would suggest that controlling for jewelry industry trends is vitally important in controlling for confounding information, Dr. Hartzmark's event study does not do so.

53.     Nor is it apparent how one would construct such an industry index.  As Signet explains: "Jewelry retailing is highly fragmented and competitive.  We compete against other specialty jewelers, as well as other retailers that sell jewelry, including department stores, mass merchandisers, discount stores, apparel and accessory fashion stores, brand retailers, online retail and auction sites, shopping clubs, home shopping television channels and direct home sellers."[82] Many of these competitors are, among other things, not publicly-traded and/or highly diversified.

54.     This failure to properly control for industry effects is crucial in this matter where the majority of the alleged corrective disclosures involve earnings announcements that discuss the adverse effects of industry-related factors on Signet's financial performance, including slow-down in mall traffic, declines in the jewelry industry, and increased competition.  Analysts reported on these negative trends throughout the Class Period:

> "SIG's status as an operator of destination stores is no longer enough to overcome the steep overall declines in mall traffic.  The pressure on malls from online shopping will only intensify."[83]
>
> "Trends weakened in April and May following the pattern we have seen across retail and in our recent survey of independent jewelers."[84]
>
> "The sales specific issues facing SIG are against the backdrop of weak industry sales, which we have noted in our recent survey of independent jewelers (published 8/9/16).  Reasons cited by independents for

---

81.   Hartzmark Report Appendix C at 292.
82.   Signet Form 10-K for the Fiscal Year Ended January 28, 2017 Form 10-K at 5.
83.   "SIG: Downgrading to Neutral from Buy," CL King, May 26, 2017.
84.   "SIG: Business Getting Tougher; Reviewing Strategic Options on Credit; What it All Means," Northcoast Research, May 26, 2016.

disappointing sales include the economy, the election cycle and preferences for medium to lower price points."[85]

"[Signet] and other mall based operators will also continue to face headwinds from ecommerce competition for holiday gifting dollars and general weakness in mall traffic."[86]

"There are numerous pressures on the industry currently, including wallet share shift, weak mall traffic trends, independent jewelers liquidating and closing and increased competition from dept stores.  Though SIG has significant scale advantages over some of the smaller players, they are in a choppy environment.  We believe sales and margins are likely to stay pressured in the near term, and it's hard to see when that might end, as industry pressures may not be a short term phenomenon."[87]

"While industry consolidation will be a L-T benefit, in the near to intermediate term, it is disruptive with struggling dept. store and independent retailers deploying 'scorched earth' pricing practices."[88]

"Underlying business trends were soft as competition from department and mall stores remained high, and new product and marketing initiatives had a limited impact in the small quarter."[89]

55.    The fact that adverse changes in economic conditions negatively affecting

Signet's performance occurred at the same time as alleged corrective disclosures can be further

seen in the fact that the Company's Zale segment – for which the in-house credit program was a

small fraction of that of Sterling's and therefore less affected, if at all, by the alleged fraud –

reported declining sales, implying that at least a portion of the declining sales at Sterling also

was unrelated to Plaintiffs' allegations.[90]  For example, on May 25, 2017, when "Signet reported

85.    "SIG: What to Expect Thursday; Remain Cautious Ahead of Release," Northcoast Research, August 23, 2016.

86.    "SIG: Poor Visibility Ahead; Cutting Forecast; Remain Cautious on Shares," Northcoast Research, August 25, 2016.

87.    "No End in Sight to the Choppy Environment," Citi, March 10, 2017.

88.    "No Visibility to where Comps & GM Head From Here; Maintain NEUTRAL," Buckingham Research, August 25, 2017.

89.    "3Q review: Credit transition creates disruption while underlying business remains choppy," Goldman Sachs, November 22, 2017.

90.    For example, the in-house credit portfolio balance was $21.6 million for Zale compared to $1654.3 million for Sterling (or 1.3%) as of Q1 2017, and $32.8 million for Zale compared

extremely poor financial results, and simultaneously announced the sale of the prime portion of its credit portfolio to Alliance Data Services,"[91] analysts emphasized the poor results; for example, Citi analysts stated that "[w]hile the credit transactions will get most of the headlines, the real takeaway is this is the weakest comp we have seen in our universe thus far."[92]  The decline in Q1 2018 same store sales relative to Q1 2017 same store sales was 12.8% for Sterling and 10.9% for Zale, implying that most if not all of the decline in Sterling sales was unrelated to Plaintiffs' allegations.[93]

56.     Moreover, not all adverse consequences of changes in industry conditions affect Signet the same way it affects its competitors.  For example, forms of increased competition such as increased promotional activities by other jewelry stores could result in a market share gain for Signet's competitors at the expense of Signet.  Such market share gains would be expected to benefit Signet's competitors while at the same time harming Signet's financial performance.

57.     Further, even if Dr. Hartzmark somehow modifies his industry index to fully account for the effects of simultaneous "outside influences" on Signet's stock price movements, his event study still would not account for the company-specific effects of industry factors.  To see why, note that on March 14, 2018, when Signet announced a disappointing outlook and

---

to $1683.8 million for Sterling (or 1.9%) as of Q1 2018.  *See* Signet Form 10-Q for the quarterly period ended April 30, 2016 at 13; Signet Form 10-Q for the quarterly period ended April 29, 2017 at 15.  Signet also noted that "[p]articipation of the Zale division in Signet's in-house consumer credit program was immaterial in Fiscal 2017."  *See* Signet Form 10-K for the fiscal year ended January 28, 2017 at 21.

91.   Complaint, ¶ 560.
92.   "Results: Weak Sales the Real Headline (More than Credit)," Citi, May 25, 2017.
93.   Signet Form 8-K, Exhibit 99.1, filed May 25, 2017.  Comparative sales changes among the various Signet divisions are not perfectly correlated (e.g., compared to Q3 2014, Q3 2015 same store sales increased for Sterling whereas they declined for Zale), hence Dr. Hartzmark cannot simply use Zale as a control for (or measure of) non-fraud effects on Sterling's financial performance.  *See* Signet Form 8-K, Exhibit 99.1, filed November 25, 2014.

which Plaintiffs allege is one of the corrective disclosure dates, Telsey Advisory Group analysts stated that "the focus of [Signet's] release is on the FY19 earnings outlook, and it is well below prior expectations."[94]  Two days later, Tiffany's likewise announced lower than expected outlook, causing Tiffany's shares to decline by over 5%.[95]  To the extent that such firm-specific declines by these two companies within several days of each other were caused by the same jewelry-industry-specific adverse changes in economic conditions, an event study that incorporates an industry proxy that appropriately includes jewelry store companies would still fail to account for industry effects on peers in the index because the effect is disproportionate on the date of the firm-specific announcement.  Consequently, the event study would conflate a Signet-specific price effect caused by adverse industry changes (which have nothing to do with Plaintiff's allegations) with a purely Signet-specific effect.  Dr. Hartzmark's methodology would incorrectly equate the resulting industry-related decline with Plaintiff's allegations.

58.     In total, there are nine corrective disclosures, as documented in **Exhibit 1**, related to the Credit Portfolio Claim – six are in conjunction with Signet's earnings release, one is included in an SEC filing, and two are made by third parties.[96]  Plaintiff alleges that the alleged corrective disclosures "corrected" prior misrepresentations regarding the health and profitability of Signet's credit portfolio and purportedly reckless underwriting standards.[97]  All these disclosures suffer from the general problem of nonfraud factors documented above.  For example, on the same date of the May 24, 2017 alleged corrective disclosure – when

---

94.   "SIG 4QF18 First Take," Telsey Advisory Group, March 14, 2018.
95.   "Doubts about Tiffany overshadow strong profits, sales in 4Q," *Associated Press Newswires*, March 16, 2018 ("A largely strong holiday season for Tiffany & Co. was overshadowed by a pessimistic outlook, sending shares down more than 5 percent at the opening bell Friday.")
96.   Complaint, ¶¶ 550-564.
97.   *Id.*

Buckingham Research Group issued a report which Plaintiff claims attributed the analysts'

downgrade of Signet stock "in substantial part to concern over potentially aggressive

underwriting and its inflationary impact on Signet's financial performance"[98] – market

participants attributed the concomitant price decline to "sympathy with selloff of Tiffany

shares."[99]  Further, the Buckingham Research Group also attributed its downgrade to factors

unrelated to Plaintiff's allegations, including its "pessimistic view around SIG's potential sales

trends over the next 12 months as well as the fallout from its heavy mall exposure," and that

Signet's "market share losses that began in 2H17 are continuing."[100]  Dr. Hartzmark's report is

silent on how to account for this substantial confounding information, and I know of no reliable

method to do so.

      59.     Similarly, the other alleged corrective disclosures also occurred simultaneously

with the disclosure of adverse economic information unrelated to Plaintiffs' allegations.  For

example, reputational impact of gem swapping allegations, not alleged here, adversely affected

Signet.  *Grant's Interest Observer* on June 2, 2016 noted that the Company had been accused of

gem swapping on social media.[101]  Market participants attributed at least part of Signet's stock

price decline following the Grant article to the gem swapping allegations.[102]  Moreover, after

Signet's August 25, 2016 earnings announcement, which Plaintiff alleges is a corrective

---

98.  *Id.*, ¶ 559.
99.  Hartzmark Report Appendix C at 292.
100.  "Moving to Sidelines on Soft Sales Trends and Limited Visibility to Inflection,"
      Buckingham Research, May 24, 2017.
101.  "Lending Clubbed," Grant's Interest Rate Observer, June 3, 2016 (released June 2, 2016).
102.  "Signet Shares Slide as Reports Question Credit, Allege Diamond Swapping; The operator
      of Kay, Jared and Zales says it strongly objects to allegations," *The Wall Street Journal
      Online*, June 3, 2016. ("Shares of Signet Jewelers Ltd. declined Friday, pushing their slide
      this week to 12%, amid reports that questioned the credit quality of its customers and
      alleged that some Signet employees had replaced premium diamonds with cheaper, man-
      made substitutes.")

disclosure, Northcoast Research analysts stated that "[w]eakness in oil patch markets contributed about half to the 2.3% drop in comp store sales in the quarter.  The social media claims of diamond swapping probably had some impact, *but it is impossible to quantify*."[103]

60.     In addition to industry-related information discussed above, other confounding information disclosed on the earnings announcement dates includes: (i) the shift of sales from Jared to Kay, which had lower quality credit customers;[104] (ii) lower-than-anticipated sales at Zale;[105] (iii) challenging economic conditions in energy dependent regions;[106] (iv) an IT glitch affecting loan collection;[107] (v) disruption of the transition of credit services;[108] (vi) website issues related to their e-commerce business;[109] and (vii) the Company's three-year

---

103. "SIG: Poor Visibility Ahead; Cutting Forecast; Remain Cautious on Shares," Northcoast Research, August 25, 2016. (emphasis added)

104. *See* e.g., "SIG 3QF16 Review: Comp Momentum into Fourth Quarter is Encouraging; Maintain Outperform Rating," Telsey Advisory Group, November 25, 2015 ("The softness on the bottom line is entirely attributed to the gross margin impact from a mix shift within the Sterling division to a greater percentage of sales at Kay vs. Jared.")

105. *See* e.g., "Weak Sales/GM Taking Center Stage; D/G to Neutral," Citi, August 26, 2016 ("The sales/merch margin equation has turned negative and weakness at Zale over the past two quarters causes us to question if that business is likely to close the sales productivity and profit gap (vs Kay) we once thought could be closed.")

106. *See* e.g., "SIG: Poor Visibility Ahead; Cutting Forecast; Remain Cautious on Shares," Northcoast Research, August 25, 2016 ("Some of the weakness is attributable to higher unemployment in oil patch markets.")

107. *See* e.g., "Valuation Pressure May Continue Unfortunately," Cowen, August 26, 2016 ("Mgmt. noted that SIG's total valuation allowance as a % of gross receivables was 7.4%, up +10bps y/y driven by an IT glitch relating to customer reminders during 2Q which resulted in slightly higher roll rates in the 90+ day aging category combined with overall receivable growth.")

108. *See* e.g., "Disappointing credit execution errors, but think any incremental progress rewarded," Bank of America, November 21, 2017 ("Phase 1 credit transition off to challenging start:  SIG has encountered significant disruptions associated with the Phase 1 outsourcing of its credit portfolio, primarily related to the conversion of IT systems and the magnitude of in-store process changes with the new ADS system.")

109. *See* e.g., "SIG: Tough 2016 In The Rearview, Now Looking Forward Navigating Choppy Waters, Credit Catalyst Gaining Clarity," Wells Fargo, March 9, 2017 ("[T]echnical issues with the Kay/Jared websites weighed on comps (management noted that their brick-and-mortar stores performed in line with the industry but they underperformed online).").

transformational plan including the closing of 200 stores.[110]  In estimating inflation, Dr. Hartzmark has to measure the impact of these and other factors on Signet's business, which his event study is incapable of doing and for which he has not provided any reliable methodology to do so.

61.     Plaintiff alleges that the disclosure of the sale of Signet's subprime portfolio on March 14, 2018 is corrective because Defendants disclosed that "CarVal Investors would buy the subprime accounts receivable for $435 million, or 72% of par value – a 15% decrease in value from Signet's purported carrying value for the loans" after "years of claiming that Signet's credit portfolio was 'healthy' and 'profitable.'"[111]  However, the risk that the non-prime portfolio may sell at a discount was known at least as of May 25, 2017, when Signet disclosed the sale of its prime portfolio and the fact that the "non-prime" portion, which it was also trying to sell, consisted of 45% of the credit portfolio.  Therefore, the price decline on March 14, 2018 measures at least in part the market's reassessment of the Company after a disclosure of a known (as opposed to undisclosed) risk.

62.     Furthermore, Dr. Hartzmark has failed to provide a reliable method to "adjust" for inflation for each day of the Class Period using the corrective disclosure price reactions.  The Class Period spans a period of four and half years, involving dozens of alleged misrepresentations – many on earnings announcements, and nine alleged corrective disclosures over a period of almost two and half years that allegedly revealed the "truth."[112]  The in-house credit portfolio changed substantially across multiple dimensions over the Class Period.  For

---

110. *See* e.g. "Downgrade to Neutral on lack of visibility around a turn," Bank of America Merrill Lynch, March 20, 2018  ("Elements of the strategy include more than 200 store closures in F2019…")

111. Complaint, ¶ 564.

112. *Id.*, ¶¶ 317-548, 550-564.

starters, the in-house credit portfolio increased from $1.19 billion at end of fiscal year 2013 to

$1.81 billion at Sterling at the end of fiscal year 2017.[113]  Over that same time frame, credit sales

as a percentage of sales increased from 56.9% to 62.0%.[114]  Sterling's credit portfolio turns every

nine to ten months, implying that few, if any, loans made in 2013 are on Signet's books towards

the end of the Class Period.[115]  Presumably, the value of the alleged fraud changes along with

these various changes, but Dr. Hartzmark fails to explain what method he could employ to

reliably account for these changes, and I am aware of none.

63.     For all the reasons discussed above, Dr. Hartzmark has not provided a reliable

method to calculate damages in this matter and, based on the challenges in this case, I am not

aware of a common methodology to do so.

_____

Allen Ferrell

April 26, 2019

---

113.  Signet Form 10-K for the Fiscal Year ended February 2, 2013, at 100; Signet Form 10-K
      for the Fiscal Year ended January 28, 2017 at 103.
114.  Signet Form 10-K for the Fiscal Year ended February 2, 2013, at 18; Signet Form 10-K for
      the Fiscal Year ended January 28, 2017 at 17.
115.  Signet Form 10-K for the Fiscal Year ended January 30, 2016 at 18 & Signet Form 10-K
      for the Fiscal Year ended January 28, 2017 at 15.

**Exhibit 1**

**Signet Jewelers Ltd.**
**Alleged Corrective Disclosures**

| Announcement Date | Stock Price Reaction Date | Description of Disclosure | Residual Return | t-Statistic |
|---|---|---|---|---|
| 11/24/15 | 11/24/15 | "Signet reported an earnings 'miss.' Defendants stated that higher net bad debt expense, which rose to $53 million compared to $41.7 million the year prior, had led to contracting margins." (Complaint ¶551; Signet SEC form 8-K, Exhibit 99.1, filed November 24, 2015 at 11:39 AM). | -4.6% | -4.62 |
| 05/26/16 | 05/26/16 | "Signet released first quarter fiscal 2017 earnings. At the same time, the Company also stated that it had hired Goldman Sachs to conduct a 'strategic review' of Signet's loan portfolio. Defendants provided no significant detail concerning this review, only sharing with investors that they were considering all options, including a sale of the portfolio." (Complaint ¶553; Signet SEC form 8-K, Exhibit 99.1, filed May 26, 2016 at 8:01 AM). | -9.6% | -6.00 |
| 06/02/16 | 06/02/16* | "Grant's Interest Rate Observer published an article titled 'Lending Clubbed' that suggested Signet was an overvalued consumer credit company and that its consumer credit portfolio may contain significant amounts of risky loans. The Grant's report also speculated that the Company was using the recency-aging method of accounting to disguise the risk associated with the portfolio." (Complaint ¶555; Bloomberg First Word, June 2, 2016 at 10:19 AM). | -8.0% | -4.92 |
| 08/25/16 | 08/25/16 | "Signet announced disappointing results for the second fiscal quarter 2017. Specifically, Signet announced that its same store sales had decreased 2.3%, and its total sales had declined 2.6%. It also reported adjusted earnings of $1.14 per share, far below consensus estimates.Signet also lowered its fiscal 2017 same-store growth guidance from 2-3.5% growth, to negative 2.5-1.0%. The Company also announced worsening credit metrics. It reported that net bad debt expense rose 12% from the prior year, total loan loss reserves increased 12% from the prior quarter, and non-performing loans as a percentage of gross receivables increased more than 22%." (Complaint ¶557; Signet SEC form 8-K, Exhibit 99.1, filed August 25, 2016 at 8:00 AM). | -13.1% | -9.15 |

1

# Exhibit 1

## Signet Jewelers Ltd.
## Alleged Corrective Disclosures

| Announcement Date | Stock Price Reaction Date | Description of Disclosure | Residual Return | t-Statistic |
|---|---|---|---|---|
| 02/27/17 | 02/28/17 | "The Washington Post published an article describing the contents of hundreds of sworn Declarations, submitted as part of class certification briefing in the Jock Arbitration and made public for the first time – after years of wrangling with Signet – the night before. The Declarations and the Washington Post Article described a culture of pervasive sexual harassment and gender discrimination at Sterling, and for the first time, provided the market with a comprehensive understanding of that culture of sexual harassment at the Company, including the fact that there was significant evidence demonstrating that it reached to Signet's highest levels." (Complaint ¶569; Bloomberg News, February 28, 2017 at 10:02 AM). | -10.2% | -6.93 |
| 05/24/17 | 05/24/17 | "Buckingham Research Group issued a report titled, 'Moving to Sidelines on Soft Sales Trends and Limited Visibility to Inflection.' In the report, Buckingham lowered its rating of Signet to Neutral, and cut its price target on Signet's stock from $86 per share to $65 per share, in advance of Signet reporting its results for the first quarter of fiscal 2018, which were due out the next day. Buckingham attributed the downgrade in substantial part to concern over potentially aggressive underwriting and its inflationary impact on Signet's financial performance, stating that, 'we think this quarter's results will likely reinforce the bear thesis that [] sales have been potentially inflated by aggressive credit standards[.]'" (Complaint ¶559; Bloomberg News, May 24, 2017 at 7:04 AM). | -6.3% | -4.66 |
| 05/25/17 | 05/25/17 | "Signet reported financial results, and simultaneously announced the sale of the prime portion of its credit portfolio to Alliance Data Services. This portion of the portfolio totaled $1 billion, approximately 55% of the credit book. The remaining 45% of the credit book consisted of $700 - $800 million of subprime loans, which the Company was unable to locate a buyer for." (Complaint ¶560; Signet SEC form 8-K, Exhibit 99.1, filed May 25, 2017 at 7:00 AM). | -8.2% | -6.07 |
| 11/21/17 | 11/21/17 | "Signet announced not only an earnings miss, but a loss per share of $0.20 and a severe decline in same store sales and credit penetration rate, and also issued reduced guidance for both fourth quarter and the full fiscal year 2018." (Complaint ¶562; Signet SEC form 8-K, Exhibit 99.1, filed November 21, 2017 at 8:00 AM). | -29.6% | -18.27 |

2

# Exhibit 1

## Signet Jewelers Ltd.
## Alleged Corrective Disclosures

| Announcement Date | Stock Price Reaction Date | Description of Disclosure | Residual Return | t-Statistic |
|---|---|---|---|---|
| 12/01/17 | 12/04/17 | "Signet disclosed in its Form 10-Q filed with the SEC that both the CFPB and the New York State Attorney General were investigating Signet for widespread violations of laws prohibiting abusive and deceptive lending practices. The December 1, 2017 Form 10-Q disclosed that Signet had been under investigation by the CFPB for a full year, and that the CFPB was 'considering taking legal action against Signet for violations of sections 1031 and 1036 of the Consumer Financial Protection Act of 2010 and the Truth in Lending Act. The violations at issue, according to Signet, related to its 'in-store: credit practices, promotions, and payment protection products.'" (Complaint ¶563; Signet SEC Form 10-Q, filed December 1, 2017 at 4:59 PM). | -6.8% | -3.80 |
| 03/14/18 | 03/14/18 | "Defendants announced they had finally found a buyer for the subprime portion of Signet's credit portfolio. Defendants announced that CarVal Investors would buy the subprime accounts receivable for $435 million, or 72% of par value – a 15% decrease in value from Signet's purported carrying value for the loans. In connection with the sale, Defendants announced that Signet would take a total loss of approximately $165 million to $175 million, including $45 to $55 million in purported 'servicing expenses' as well as $7 million in 'transaction costs.'" (Complaint ¶564; Signet SEC form 8-K, Exhibit 99.1, filed March 14, 2018 at 6:49 AM). | -20.5% | -10.79 |

3

\* Plaintiff also notes that Signet's stock price continued to decline on June 3, 2016 following the publication of the Grant's article on June 2, 2016. The residual return and t-statistic on June 3, 2016 are -3.6% and -2.23 respectively.

Notes:  Residuals returns and t-statistics are taken from Hartzmark Report Appendix C.  *See* Hartzmark Report Appendix D for a description of the calculation of the residual returns and t-statistic.  Stock price reaction date is the same as the announcement date if the disclosure was made prior to market close and the first trading date following the announcement date if the disclosure was made after market close.  The documents referenced in addition to the complaint are used to determine the time of the disclosure.

Sources: Complaint; Hartzmark Report Appendix C; Company SEC Filings; "Lending Clubbed," *Grant's Interest Rate Observer*, June 2, 2016; "Moving to Sidelines on Soft Sales Trends and Limited Visibility to Inflection," Buckingham Research, May 24, 2017.

# Exhibit 2

## Signet Jewelers Ltd.
## Alleged Misrepresentations Regarding the Sexual Harassment Claim

| Announcement Date | Stock Price Reaction Date | Description of Statement | Residual Return | t-Statistic |
|---|---|---|---|---|
| 08/29/13 | 08/29/13 | "At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the Second Quarter 2014 Form 10-Q, Signet made the following statement concerning the Actions in its 'Commitments and contingencies' disclosure concerning legal proceedings: In March 2008, a group of private plaintiffs (the 'Claimants') filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ('Sterling'), a subsidiary of Signet, in the U.S. District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. . . . On June 21, 2013, pursuant to the briefing schedule ordered by the Arbitrator, the Claimants filed their motion for class certification, disclosed their experts, and produced their expert reports. Sterling's response to Claimants' class certification motion, Sterling's disclosure of its experts and their reports, as well as any motions relating thereto are due on October 3, 2013. The Claimants' reply brief, any expert rebuttal submissions, as well as any motions relating thereto are due on December 20, 2013. Expert discovery is ongoing, and all expert depositions must be completed by January 10, 2014. The parties have proposed that a hearing on Claimants' motion for class certification be held during the week of January 20, 2014, or as soon thereafter as the Arbitrator's schedule permits. * * * On September 23, 2008, the U.S. Equal Employment Opportunity Commission ('EEOC') filed a lawsuit against Sterling in the U.S. District Court for the Western District of New York. The EEOC's lawsuit alleges that Sterling engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present. * * * Sterling denies the allegations of both parties and has been defending these cases vigorously. At this point, no outcome or amount of loss is able to be estimated." (Complaint ¶324; Signet SEC form 10-Q filed August 29, 2013 at 7:44 AM). | -4.7% | -5.24 |
| 11/26/13 | 11/26/13 | "At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the Third Quarter 2014 Form 10-Q, Signet made the following statement concerning the Actions in its 'Commitments and contingencies' disclosure concerning legal proceedings: | 1.4% | 1.49 |

1

# Exhibit 2

## Signet Jewelers Ltd.
## Alleged Misrepresentations Regarding the Sexual Harassment Claim

| Announcement Date | Stock Price Reaction Date | Description of Statement | Residual Return | t-Statistic |
|---|---|---|---|---|
| | | In March 2008, a group of private plaintiffs (the 'Claimants') filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ('Sterling'), a subsidiary of Signet, in the U.S. District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. . . . In June 2013, the Claimants filed their motion for class certification, disclosed their experts, and produced their expert reports. In mid-October 2013, Sterling filed its opposition to Claimants' class certification motion, its disclosure of its experts and their reports, as well as three motions to exclude the reports of Claimants' experts and a motion to strike Claimants' declarations and attorney summaries. The Claimants' reply brief, any expert rebuttal submissions, as well as any motions relating thereto are due in mid-January 2014. Also due at that time are Claimants' responses to Sterling's motions to exclude and strike, and Sterling's replies thereto are due in early February 2014. . . . Sterling has filed a motion requesting hearings (i.e., separate arguments) on its motions to exclude and strike. Claimants filed their opposition to Sterling's motion on November 4, 2013 and Sterling's reply thereto was filed with the Arbitrator on November 11, 2013. | | |
| | | * * * | | |
| | | On September 23, 2008, the U.S. Equal Employment Opportunity Commission ('EEOC') filed a lawsuit against Sterling in the U.S. District Court for the Western District of New York. The EEOC's lawsuit alleges that Sterling engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present. | | |
| | | * * * | | |
| | | Sterling denies the allegations of both parties and has been defending these cases vigorously. At this point, no outcome or amount of loss is able to be estimated" (Complaint ¶350; Signet SEC form 10-Q filed November 26, 2013 at 8:03 AM). | | |
| 03/27/14 | 03/27/14 | "At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the Fiscal 2014 Form 10-K, Signet made the following statement concerning the Actions in its "Commitments and contingencies" disclosure concerning legal proceedings: | 6.6% | 3.17 |

2

# Exhibit 2

## Signet Jewelers Ltd.
## Alleged Misrepresentations Regarding the Sexual Harassment Claim

| Announcement Date | Stock Price Reaction Date | Description of Statement | Residual Return | t-Statistic |
|---|---|---|---|---|
| 03/28/14 | 03/31/14 | As previously reported, in March 2008, a group of private plaintiffs (the 'Claimants') filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ('Sterling'), a subsidiary of Signet, in the U.S. District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. Discovery has been completed. The Claimants filed a motion for class certification and Sterling opposed the motion. A hearing on the class certification motion was held in late February 2014. The motion is now pending before the Arbitrator. | -0.8% | -0.40 |
| | | Also as previously reported, on September 23, 2008, the U.S. Equal Employment Opportunity Commission ('EEOC') filed a lawsuit against Sterling in the U.S. District Court for the Western District of New York. The EEOC's lawsuit alleges that Sterling engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present. | | |
| | | * * * | | |
| | | Sterling denies the allegations of both parties and has been defending these cases vigorously. At this point, no outcome or amount of loss is able to be estimated." (Complaint ¶371; Signet SEC form 10-K filed March 27, 2014 at 7:49 AM). | | |
| | | "On March 28, 2014, The New York Times published an article entitled 'Women Charge Bias and Harassment in Suit Against Sterling Jewelers,' in which it discussed, among other things, the Jock Arbitration and in the Redacted Class Certification Brief. The article quoted a Sterling spokesman as saying the following: | | |
| | | As for the allegations of sexual harassment, Mr. Bouffard said that Sterling investigated and took action when employees raised concerns. He added that Sterling had disciplined employees who violated discrimination and harassment policies. | | |
| | | * * * | | |
| | | Without referring to any specific employee, David Bouffard, a spokesman for Sterling, said that some of the allegations 'relate to personal, consensual relationships with individuals who have never raised a concern with the company, or involve situations that already have been thoroughly investigated and addressed. | | |
| | | * * * | | |

3

# Exhibit 2

## Signet Jewelers Ltd.
## Alleged Misrepresentations Regarding the Sexual Harassment Claim

| Announcement Date | Stock Price Reaction Date | Description of Statement | Residual Return | t-Statistic |
|---|---|---|---|---|
| 06/03/14 | 06/03/14 | Fairness, equal opportunity and respect for our female employees – and all employees,' [Bouffard] said, 'is central to who we are.'"(Complaint ¶391; New York Times Article, "Women Charge Bias and Harassment in Suit Against Sterling Jewelers" published online March 28, 2014 after the close and in the March 29, 2014 print edition). | | |
| | | "At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the First Quarter 2015 Form 10-Q, Signet made the following statement concerning the Actions in its 'Commitments and contingencies' disclosure concerning legal proceedings: | -2.5% | -1.20 |
| | | As previously reported, in March 2008, a group of private plaintiffs (the 'Claimants') filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ('Sterling'), a subsidiary of Signet, in the U.S. District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. Discovery has been completed. The Claimants filed a motion for class certification and Sterling opposed the motion. A hearing on the class certification motion was held in late February 2014. The motion is now pending before the Arbitrator." | | |
| | | * * * | | |
| | | Also as previously reported, on September 23, 2008, the U.S. Equal Employment Opportunity Commission ('EEOC') filed a lawsuit against Sterling in the U.S. District Court for the Western District of New York. The EEOC's lawsuit alleges that Sterling engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present." | | |
| | | * * * | | |
| | | Sterling denies the allegations of both parties and has been defending these cases vigorously. At this point, no outcome or amount of loss is able to be estimated." (Complaint ¶387; Signet SEC form 10-Q filed June 3, 2014 at 12:38 PM). | | |
| 09/10/14 | 09/11/14 | "At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the Second Quarter 2015 Form 10-Q, Signet also made the following statement concerning the Actions in its 'Commitments and contingencies' disclosure concerning legal proceedings: | 0.9% | 1.05 |

4

# Exhibit 2

## Signet Jewelers Ltd.
## Alleged Misrepresentations Regarding the Sexual Harassment Claim

| Announcement Date | Stock Price Reaction Date | Description of Statement | Residual Return | t-Statistic |
|---|---|---|---|---|
| | | As previously reported, in March 2008, a group of private plaintiffs (the 'Claimants') filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ('Sterling'), a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. Discovery has been completed. The Claimants filed a motion for class certification and Sterling opposed the motion. A hearing on the class certification motion was held in late February 2014. The motion is now pending before the Arbitrator.<br><br>Also, as previously reported, on September 23, 2008, the US Equal Employment Opportunity Commission ('EEOC') filed a lawsuit against Sterling in the US District Court for the Western District of New York. The EEOC's lawsuit alleges that Sterling engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present.<br><br>* * *<br><br>Sterling denies the allegations of both parties and has been defending these cases vigorously. At this point, no outcome or amount of loss is able to be estimated." (Complaint ¶401; Signet SEC form 10-Q filed September 10, 2014 at 5:00 PM). | | |
| 12/08/14 | 12/08/14 | "At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the Third Quarter 2015 Form 10-Q, Signet made the following statement concerning the Actions in its 'Commitments and contingencies' disclosure concerning legal proceedings: | -0.1% | -0.08 |

5

# Exhibit 2

## Signet Jewelers Ltd.
## Alleged Misrepresentations Regarding the Sexual Harassment Claim

| Announcement Date | Stock Price Reaction Date | Description of Statement | Residual Return | t-Statistic |
|---|---|---|---|---|
| | | As previously reported, in March 2008, a group of private plaintiffs (the 'Claimants') filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ('SJI'), a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. Discovery has been completed. The Claimants filed a motion for class certification and SJI opposed the motion. A hearing on the class certification motion was held in late February 2014. The motion is now pending before the Arbitrator. | | |
| | | Also, as previously reported, on September 23, 2008, the US Equal Employment Opportunity Commission ('EEOC') filed a lawsuit against SJI in the US District Court for the Western District of New York. The EEOC's lawsuit alleges that SJI engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present. | | |
| | | *  *  * | | |
| | | SJI denies the allegations of both parties and has been defending these cases vigorously. At this point, no outcome or possible loss or range of losses, if any, arising from the litigation is able to be estimated." (Complaint ¶418; Signet SEC form 10-Q filed December 8, 2014 at 8:18 AM). | | |
| 03/26/15 | 03/26/15 | "At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the Fiscal 2015 Form 10-K, Signet made the following statement concerning the Actions in its 'Commitments and contingencies' disclosure concerning legal proceedings: | 6.4% | 6.37 |
| | | As previously reported, in March 2008, a group of private plaintiffs (the 'Claimants') filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ('SJI'), a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. The Claimants filed a motion for class certification and SJI opposed the motion. | | |
| | | *  *  * | | |

6

# Exhibit 2

## Signet Jewelers Ltd.
## Alleged Misrepresentations Regarding the Sexual Harassment Claim

| Announcement Date | Stock Price Reaction Date | Description of Statement | Residual Return | t-Statistic |
|---|---|---|---|---|
| | | Also, as previously reported, on September 23, 2008, the US Equal Employment Opportunity Commission ("EEOC") filed a lawsuit against SJI in the US District Court for the Western District of New York. The EEOC's lawsuit alleges that SJI engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present. | | |
| | | * * * | | |
| | | SJI denies the allegations of both parties and has been defending these cases vigorously. At this point, no outcome or possible loss or range of losses, if any, arising from the litigation is able to be estimated." (Complaint ¶430; Signet SEC form 10-K filed March 26, 2015 at 12:49 PM). | | |
| 06/03/15 | 06/04/15 | "At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the First Quarter 2016 Form 10-Q, Signet made the following statement concerning the Actions in its 'Commitments and contingencies' disclosure concerning legal proceedings: | -0.4% | -0.48 |
| | | As previously reported, in March 2008, a group of private plaintiffs (the 'Claimants') filed a class action lawsuit for an unspecified amount against SJI, a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. The Claimants filed a motion for class certification and SJI opposed the motion. | | |
| | | * * * | | |
| | | Also, as previously reported, on September 23, 2008, the US Equal Employment Opportunity Commission ("EEOC") filed a lawsuit against SJI in the US District Court for the Western District of New York. The EEOC's lawsuit alleges that SJI engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present. | | |
| | | * * * | | |
| | | SJI denies the allegations of the Claimants and EEOC and has been defending these cases vigorously. At this point, no outcome or possible loss or range of losses, if any, arising from the litigation is able to be estimated." (Complaint ¶445; Signet SEC form 10-Q filed June 03, 2015 at 5:21 PM). | | |

7

## Exhibit 2

## Signet Jewelers Ltd.
## Alleged Misrepresentations Regarding the Sexual Harassment Claim

| Announcement Date | Stock Price Reaction Date | Description of Statement | Residual Return | t-Statistic |
|---|---|---|---|---|
| 09/03/15 | 09/04/15 | "At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the Second Quarter 2016 Form 10-Q, Signet made the following statement concerning the Actions in its 'Commitments and contingencies' disclosure concerning legal proceedings: | 0.5% | 0.63 |
| | | As previously reported, in March 2008, a group of private plaintiffs (the 'Claimants') filed a class action lawsuit for an unspecified amount against SJI, a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. The Claimants filed a motion for class certification and SJI opposed the motion. | | |
| | | * * * | | |
| | | Also, as previously reported, on September 23, 2008, the US Equal Employment Opportunity Commission ('EEOC') filed a lawsuit against SJI in the US District Court for the Western District of New York. The EEOC's lawsuit alleges that SJI engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present. | | |
| | | * * * | | |
| | | SJI denies the allegations of the Claimants and EEOC and has been defending these cases vigorously. At this point, no outcome or possible loss or range of losses, if any, arising from the litigation is able to be estimated." (Complaint ¶456; Signet SEC form 10-Q filed September 3, 2015 at 5:11 PM). | | |
| 12/04/15 | 12/07/15 | "At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the Third Quarter 2016 Form 10-Q, Signet made the following statement concerning the Actions in its 'Commitments and contingencies' disclosure concerning legal proceedings: | -1.0% | -1.00 |

8

# Exhibit 2

## Signet Jewelers Ltd.
## Alleged Misrepresentations Regarding the Sexual Harassment Claim

| Announcement Date | Stock Price Reaction Date | Description of Statement | Residual Return | t-Statistic |
|---|---|---|---|---|
| | | As previously reported, in March 2008, a group of private plaintiffs (the 'Claimants') filed a class action lawsuit for an unspecified amount against SJI, a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. The Claimants filed a motion for class certification and SJI opposed the motion. | | |
| | | * * * | | |
| | | Also, as previously reported, on September 23, 2008, the US Equal Employment Opportunity Commission ('EEOC') filed a lawsuit against SJI in the US District Court for the Western District of New York. The EEOC's lawsuit alleges that SJI engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present. | | |
| | | * * * | | |
| | | SJI denies the allegations of the Claimants and EEOC and has been defending these cases vigorously. At this point, no outcome or possible loss or range of losses, if any, arising from the litigation is able to be estimated." (Complaint ¶466; Signet SEC form 10-Q filed December 4, 2015 at 4:30 PM). | | |
| 03/24/16 | 03/24/16 | "At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In Fiscal 2016 Form 10-K, Signet made the following statement concerning the Actions in its 'Commitments and contingencies' disclosure concerning legal proceedings: | 2.8% | 1.81 |
| | | As previously reported, in March 2008, a group of private plaintiffs (the 'Claimants') filed a class action lawsuit for an unspecified amount against SJI, a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. The Claimants filed a motion for class certification and SJI opposed the motion. | | |
| | | * * * | | |

9

**Exhibit 2**

**Signet Jewelers Ltd.**
**Alleged Misrepresentations Regarding the Sexual Harassment Claim**

| Announcement Date | Stock Price Reaction Date | Description of Statement | Residual Return | t-Statistic |
|---|---|---|---|---|
| 06/03/16 | 06/06/16 | Also, as previously reported, on September 23, 2008, the US Equal Employment Opportunity Commission ("EEOC") filed a lawsuit against SJI in the US District Court for the Western District of New York. The EEOC's lawsuit alleges that SJI engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present. | -2.0% | -1.26 |
| | | *** | | |
| | | SJI denies the allegations of the Claimants and EEOC and has been defending these cases vigorously. At this point, no outcome or possible loss or range of losses, if any, arising from the litigation is able to be estimated." (Complaint ¶492; Signet SEC form 10-K filed March 24, 2016 at 1:49 PM). | | |
| | | "At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the First Quarter 2017 Form 10-Q, Signet made the following statement concerning the Actions in its 'Commitments and contingencies' disclosure concerning legal proceedings: | | |
| | | As previously reported, in March 2008, a group of private plaintiffs (the 'Claimants') filed a class action lawsuit for an unspecified amount against SJI, a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. The Claimants filed a motion for class certification and SJI opposed the motion. | | |
| | | *** | | |
| | | Also, as previously reported, on September 23, 2008, the US Equal Employment Opportunity Commission ("EEOC") filed a lawsuit against SJI in the US District Court for the Western District of New York. The EEOC's lawsuit alleges that SJI engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present. | | |
| | | *** | | |
| | | SJI denies the allegations of the Claimants and EEOC and has been defending these cases vigorously. At this point, no outcome or possible loss or range of losses, if any, arising from the litigation is able to be estimated." (Complaint ¶508; Signet SEC form 10-Q filed June 3, 2016 at 5:02 PM). | | |

10

# Exhibit 2

## Signet Jewelers Ltd.
## Alleged Misrepresentations Regarding the Sexual Harassment Claim

| Announcement Date | Stock Price Reaction Date | Description of Statement | Residual Return | t-Statistic |
|---|---|---|---|---|
| 08/31/16 | 09/01/16 | "At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the Second Quarter 2017 Form 10-Q, Signet made the following statement concerning the Actions in its 'Commitments and contingencies' disclosure concerning legal proceedings: <br><br> As previously reported, in March 2008, a group of private plaintiffs (the 'Claimants') filed a class action lawsuit for an unspecified amount against SJI, a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. The Claimants filed a motion for class certification and SJI opposed the motion. <br><br> * * * <br><br> Also, as previously reported, on September 23, 2008, the US Equal Employment Opportunity Commission (EEOC) filed a lawsuit against SJI in the US District Court for the Western District of New York. The EEOC's lawsuit alleges that SJI engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present. <br><br> * * * <br><br> SJI denies the allegations of the Claimants and EEOC and has been defending these cases vigorously. At this point, no outcome or possible loss or range of losses, if any, arising from the litigation is able to be estimated." (Complaint ¶518; Signet SEC form 10-Q filed August 31, 2016 at 4:51 PM). | -1.2% | -0.81 |
| 11/29/16 | 11/30/16 | "At the same time, Signet was also making false and misleading statements about the Actions and the pervasive culture of sexual harassment at the Company. In the Third Quarter 2017 Form 10-Q, Signet made the following statement concerning the Actions in its 'Commitments and contingencies' disclosure concerning legal proceedings: | 1.1% | 0.77 |

11

# Exhibit 2

## Signet Jewelers Ltd.
## Alleged Misrepresentations Regarding the Sexual Harassment Claim

| Announcement Date | Stock Price Reaction Date | Description of Statement | Residual Return | t-Statistic |
|---|---|---|---|---|
| | | As previously reported, in March 2008, a group of private plaintiffs (the 'Claimants') filed a class action lawsuit for an unspecified amount against SJI, a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. The Claimants filed a motion for class certification and SJI opposed the motion. | | |
| | | * * * | | |
| | | Also, as previously reported, on September 23, 2008, the US Equal Employment Opportunity Commission ('EEOC') filed a lawsuit against SJI in the US District Court for the Western District of New York. The EEOC's lawsuit alleges that SJI engaged in intentional and disparate impact gender discrimination with respect to pay and promotions of female retail store employees from January 1, 2003 to the present." (Complaint ¶530; Signet SEC form 10-Q filed November 29, 2016 at 5:18 PM). | | |

Notes:   Residuals returns and t-statistics are taken from Hartzmark Report Appendix C. *See* Hartzmark Report Appendix D for a description of the calculation of the residual returns and t-statistic. Stock price reaction date is the same as the announcement date if the disclosure was made prior to market close and the first trading date following the announcement date if the disclosure was made after market close. The documents referenced in addition to the complaint are used to determine the time of the disclosure.

Sources: Complaint; Hartzmark Report Appendix C; Company SEC Filings; "Women Charge Bias and Harassment in Suit Against Sterling Jewelers," *The New York Times*, March 28, 2014.

12



**Exhibit 3**

**Signet Jewelers Ltd**
**Stock Price and "True Value"**
**Class Period: August 29, 2013 – March 13, 2018**

Note: Signet's "True Value" is equal to Signet's stock price less inflation, where inflation is measured by the residual price declines from Dr. Hartzmark's event study. The residual price declines used to calculate the "True Value" (Credit Portfolio Claim Only) are $6.45 on November 24, 2015, $10.44 on May 26, 2015, $7.86 on June 2, 2016, $3.32 on June 3, 2016, $12.51 on August 25, 2016, $3.66 on May 24, 2017, $4.46 on May 25, 2017, $22.45 on November 21, 2017, $3.53 on December 4, 2017, and $9.83 on March 14, 2018. The "True Value" (Credit Portfolio & Harassment Claims) includes an additional residual price decline of $7.45 on February 28, 2017.

Sources: Calculated (or Derived) based on data from CRSP US Stock and Index Databases ©2019 Center for Research in Security Prices (CRSP), The University of Chicago Booth School of Business. Hartzmark Report Appendix C.

# Appendix A

April, 2019

# Allen Ferrell

Harvard Law School
Cambridge, Massachusetts  02138
Telephone: (617) 495-8961
Email: fferrell@law.harvard.edu

## CURRENT POSITIONS

*Greenfield Professor of Securities Law*, Harvard Law School

*National Bureau of Economic Research,* Research Associate

*Member of Editorial Board,* Journal of Financial Perspectives

*Fellow*, Columbia University's Program on the Law and Economics of Capital Markets

*Faculty Associate*, Kennedy School of Government

*Research Associate*, European Corporate Governance Institute

## EDUCATION

*Massachusetts Institute of Technology*, Ph.D. in Economics, 2005
Fields in econometrics and finance

*Harvard Law School,* J.D., 1995, *Magna Cum Laude*

- Recipient of the *Sears Prize* (award given to the two students with the highest grades)
- Editor, *Harvard Law Review*

*Brown University,* B.A. and M.A., 1992, *Magna Cum Laude*

## PREVIOUS POSITIONS

*Harvard University Fellow*
Harvard Law School, 1997

*Law Clerk*, Justice Anthony M. Kennedy
Supreme Court of the United States; 1996 Term

*Law Clerk*, Honorable Laurence H. Silberman
United States Court of Appeals for the District of Columbia; 1995 Term

COURSES TAUGHT

*Contracts*
*Corporate Finance*
*Law and Finance*
*Securities Litigation*
*Securities Regulation*

REFEREE FOR FOLLOWING JOURNALS

*American Law and Economics Review*
*Journal of Corporation Finance*
*Journal of Finance*
*Journal of Financial Perspectives*
*Journal of Law and Economics*
*Journal of Law, Economics and Organization*
*Journal of Legal Studies*
*Quarterly Journal of Economics*

CONSULTING AREAS

Price Impact and Securities Damages, Valuation, Mergers & Acquisitions

**Papers**

"How Accurate are Matrix Bond Prices?" with Drew Roper & Yibai Shu, Working Paper (2018)

"New Special Study of the Securities Markets: Intermediaries" with John Morley, paper for launch of Columbia University's New Special Study of the Securities Markets

"Socially Responsible Firms," with Hao Liang and Luc Renneboog, 122 *Journal of Financial Economics* 586-606 (2016) (winner of Moskowitz Prize for outstanding quantitative research)

"Price Impact, Materiality, and *Halliburton II*" with Drew Roper, 93 *Washington University Law Review* 553 (2016)

"Introducing the CFGM Corporate Governance Database: Variable Construction and Comparison to the RiskMetrics and IRRC Governance Databases" with Martijn Cremers, Paul Gompers and Andrew Metrick, Working Paper

"The Benefits and Costs of Indices in Empirical Corporate Governance Research," *in* OXFORD HANDBOOK ON CORPORATE LAW AND GOVERNANCE (2016)

"Thirty Years of Shareholder Rights and Stock Returns," with Martijn Cremers, *revise and resubmit Journal of Financial Economics*

"Thirty Years of Shareholder Rights and Firm Valuation," with Martijn Cremers, 69 *Journal of Finance* 1167 (2014)

"Rethinking *Basic*," with Lucian Bebchuk, 69 *Business Lawyer* 671 (2014)

"Calculating Damages in ERISA Litigation," with Atanu Saha, 1 *Journal of Financial Perspectives* 93 (2013)

"Forward-casting 10b-5 Damages: A Comparison to other Methods", with Atanu Saha, 37 *Journal of Corporation Law* 365 (2011)

"Event Study Analysis: Correctly Measuring the Dollar Impact of an Event" with Atanu Saha, Working Paper (2011)

"Legal and Economic Issues in Litigation arising from the 2007-2008 Credit Crisis," with Jennifer Bethel and Gang Hu, *in* PRUDENT LENDING RESTORED: SECURITIZATION AFTER THE MORTGAGE MELTDOWN (2009)

"Securities Litigation and the Housing Market Downturn," with Atanu Saha, 35 *Journal of Corporation Law* 97 (2009)

"The Supreme Court's 2005-2008 Securities Law Trio: *Dura Pharmaceuticals, Tellabs*, and *Stoneridge*," 9 *Engage* 32 (2009)

"What Matters in Corporate Governance?" with Lucian Bebchuk & Alma Cohen, 22 *Review of Financial Studies* 783 (2009)

"Do Exchanges, CCPs, and CSDs have Market Power?," *in* GOVERNANCE OF FINANCIAL MARKET INFRASTRUCTURE INSTITUTIONS (Ruben Lee) (2009)

"An Asymmetric Payoff-Based Explanation of IPO 'Underpricing'," Working Paper, with Atanu Saha (2008)

"The Law and Finance of Broker-Dealer Mark-Ups," commissioned study for NASD using proprietary database (2008)

"Majority Voting" *in* REPORT OF THE COMMITTEE ON CAPITAL MARKETS REGULATION (2008)

"The Loss Causation Requirement for Rule 10B-5 Causes of Action: The Implications of *Dura Pharmaceuticals v. Broudo*," with Atanu Saha, 63 BUSINESS LAWYER 163 (2007)

"Mandated Disclosure and Stock Returns:  Evidence from the Over-the-Counter Market," 36 *Journal of Legal Studies* 1 (June, 2007)

"Policy Issues Raised by Structured Products," with Jennifer Bethel, *in* BROOKINGS –NOMURA PAPERS IN FINANCIAL SERVICES (2007)

4

"The Case for Mandatory Disclosure in Securities Regulation around the World," 2 *Brooklyn Journal of Business Law* 81 (2007)

"U.S. Securities Regulation in a World of Global Exchanges," with Reena Aggarwal and Jonathan Katz, *in* EXCHANGES: CHALLENGES AND IMPLICATIONS (2007)

"Shareholder Rights" *in* REPORT OF THE COMMITTEE ON CAPITAL MARKETS REGULATION (2007)

"Creditor Rights: A U.S. Perspective," 22 *Angler- und Glaubigerschutz bei Handelsgesellschaften* 49 (2006)

"Measuring the Effects of Mandated Disclosure," 1 *Berkeley Business Law Journal* 369 (2004)

"If We Understand the Mechanisms, Why Don't We Understand the Output?", 37 *Journal of Corporation Law* 503 (2003)

"Why European Takeover Law Matters," *in* REFORMING COMPANY AND TAKEOVER LAW IN EUROPE (2003)

"Does the Evidence Favor State Competition in Corporate Law?", with Alma Cohen & Lucian Bebchuk, 90 *California L. Rev.* 1775 (2002)

"Corporate Charitable Giving," with Victor Brudney, 69 *Univ. Of Chicago Law Review* 1191 (2002)

"A Comment on Electronic versus Floor-Based Securities Trading," *Journal of Institutional and Theoretical Economics* (Spring 2002)

"Much Ado About Order Flow," *Regulation Magazine* (Spring 2002)

"On Takeover Law and Regulatory Competition," with Lucian Bebchuk, 57 *Business Lawyer* 1047 (2002)

"Federal Intervention to Enhance Shareholder Choice," with Lucian Bebchuk, 87 *Virginia Law Review* 993 (2001)

"A New Approach to Regulatory Competition in Takeover Law," with Lucian Bebchuk, 87 *Virginia Law Review* 111 (2001)

"A Proposal for Solving the 'Payment for Order Flow' Problem," 74 *Southern California Law Review* 1027 (2001)

"Federalism and Takeover Law: The Race to Protect Managers from Takeovers," with Lucian Bebchuk, 99 *Columbia L. Rev.* 1168 (1999)

**TESTIMONY LAST FOUR YEARS**

*Trustees of DALI et al. v. Barrick Gold Corporation,* Case No. CV-14-502316-00CP, Ontario Superior Court of Justice, Expert reports and deposition on April 16, 2019

*Ramirez v. Exxon Mobil Corporation et al.*, Case No. 3:16-cv-031110K, Expert report and deposition on March 22, 2019

*CC IMA v. IMA Pizza*, JAMS Ref No. 1425026556, Testimony on September 13, 2018

*Bradley Cooper v. Thoratec Corporation et al.,* Case No. 4:14-cv-00360-CW, Expert report and deposition on April 11, 2018

*Blattman v. C3, Inc. et al.,* Case No. 1:15-cv-00530-GMS, Expert report and deposition on December 22, 2017

*United States v. Kaleil Tuzman*, 15 Criminal Case No. 536 (US Attorney for the Southern District of New York), testimony on December 15 and 18, 2017

*United States v. Brian Block*, 16 Criminal Case No. 595 (US Attorney for the Southern District of New York), testimony on June 13, 2017

*In re Alere-Abbott Merger Litigation*, Case No. 12963-VCG, Expert report and deposition on April 7, 2017

*Beaver County Employees' Retirement Fund, et al.,* Case No. 0:14-cv-007856-ADM-TNL, Expert report and deposition on September 16, 2016

*In re Aeropostale, Inc., et al,* Case No. 16-11275, Expert report and trial testimony in U.S. Bankruptcy Court, Southern District of New York, August 17, 2016 and deposition on August 14, 2016

*Jaffe v. Household International, Inc.*, Civil Action 02-C-5893, Expert report and depositions on May 27, 2016 and February 27, 2016

*Better & YRC Investors v. YRC Worldwide*, Civil Action No. 11-CV-2072, Expert report and deposition on March 8, 2016

*David Kaplan et al v. S.A.C. Capital Advisors, L.P.*, Civil Action No. 12-CV-9350, Expert report and deposition on March 3, 2016

*In re Genworth Financial Inc. Securities Litigation*, Civil Action No. 3:14-CV-682, Expert report and deposition on February 2, 2016

*Fosbre v. Las Vegas Sands Corp.*, Case No. 2:10-cv-00765-APG-GWF, Expert report and deposition on December 11, 2015 and March 25, 2015

*Ambac Assurance v. JPMorgan Investment Management Inc. & Assured Guaranty v. JP Morgan Investment Management, Inc.*, Civil Index No. 603755/2008, Expert report and deposition on December 2, 2015

*In re Barrick Gold Securities*, Case No. 1:13-CV-03851, Expert report and deposition on November 23, 2015

*In re Puda Coal Securities Inc. Litigation et al.*, Case No. 1:11-CV-2598, Expert report and deposition on July 29, 2015

*City of Lakeland Employees Pension Plan v. Baxter International, Inc., et al.*, Case No. 1:10-cv-06016, Expert report and deposition on June 3, 2015 and October 17, 2014

*Bruce Sherman v. Bear Stearns Companies Inc., et al,* Case No. 08 MDL No. 1963, Expert report and deposition on May 28, 2015

*Louisiana Municipal Police Employees Retirement System v. Simon Property Group, Inc.*, Case No. 7764-CS, Expert report and deposition on July 7, 2014

*In re Lehman Brothers Securities and ERISA Litigation*, Case No. 09 MD 2017, Expert report and deposition on April 24, 2014

# Appendix B

# Appendix B

# Materials Relied Upon

**Court Documents**

Jock, et al. v. Sterling Jewelers, Inc, Docket No. 1:08-cv-02875 (S.D.N.Y. Mar 18, 2008)

Jock, et al v. Sterling Jewelers, Inc., Memorandum in Support of Motion for Class Certification, June 21, 2013

Jock, et al v. Sterling Jewelers, Inc., Class Determination Award, AAA Case No. 11 20 0800 0655, February 2, 2015

Fifth Amended Class Action Complaint for Violation of the Federal Securities Laws, *In re Signet Jewelers Limited Securities Litigation*, Case No.1:16-CV-06728-JMF, March 22, 2018

**Expert Reports**

Expert Report of Michael L. Hartzmark, Ph.D., March 15, 2019

**SEC Documents**

Dick's Sporting Goods Form 10-K for the Fiscal Year ended February 3, 2018, filed March 30, 2018

Signet 6-K, filed March 20, 2008

Signet Form 10-K for the fiscal year ended January 28, 2012, filed March 22, 2012

Signet Form 10-K for the fiscal year ended February 2, 2013, filed March 28, 2013

Signet Form 10-Q for the quarterly period ended August 3, 2013, filed August 29, 2013

Signet Form 10-Q for the quarterly period ended November 2, 2013, filed November 26, 2013

Signet Form 10-K for the fiscal year ended February 1, 2014, filed March 27, 2014

Signet Form 10-Q for the quarterly period ended May 3, 2014, filed June 3, 2014

Signet Form 10-Q for the quarterly period ended August 2, 2014, filed September 10, 2014

Signet Form 8-K, Exhibit 99.1, filed November 25, 2014

Signet Form 10-Q for the quarterly period ended November 1, 2014, filed December 8, 2014

Signet Form 10-K for the fiscal year ended January 31, 2015, filed March 26, 2015

Signet Form 10-Q for the quarterly period ended May 2, 2015, filed June 3, 2015

Signet Form 10-Q for the quarterly period ended August 1, 2015, filed September 3, 2015

Signet Form 8-K, Exhibit 99.1, filed November 24, 2015

Signet Form 10-Q for the quarterly period ended October 31, 2015, filed December 4, 2015

Signet Form 10-K for the fiscal year ended January 30, 2016, filed March 24, 2016

Signet Form 8-K, Exhibit 99.1, filed May 26, 2016

Signet Form 10-Q for the quarterly period ended April 30, 2016, filed June 3, 2016

Signet Form 8-K, Exhibit 99.1, filed August 25, 2016

Signet Form 10-Q for the quarterly period ended July 30, 2016, filed August 31, 2016

Signet Form 10-Q for the quarterly period ended October 29, 2016, filed November 29, 2016

Signet Form 10-K for the fiscal year ended January 28, 2017, filed March 16, 2017

Signet Form 8-K, Exhibit 99.1, filed May 25, 2017

Signet Form 10-Q for the quarterly period ended April 29, 2017, filed June 1, 2017

Signet Form 8-K, Exhibit 99.1, filed November 21, 2017

Signet Form 10-Q for the quarterly period ended October 28, 2017, filed December 1, 2017

Signet Form 10-K for the fiscal year ended February 3, 2018, filed April 2, 2018

Signet Form 8-K, Exhibit 99.1, filed March 14, 2018

Signet Form 10-Q for the quarterly period ended November 3, 2018, filed December 7, 2018

Williams-Sonoma Form 10-K for the Fiscal Year ended January 28, 2018, filed March 29, 2018


**Articles**

"Women Charge Bias and Harassment in Suit Against Sterling Jewelers," *The New York Times*, March 28, 2014

"Gender Bias Case Against Sterling Jewelers Can Proceed," *The New York Times*, February 4, 2015

"Signet Sinks 14% After Negative Mention in Grant's Newsletter," *Bloomberg First Word*, June 2, 2016

"Lending Clubbed," *Grant's Interest Rate Observer*, June 3, 2016

"Signet Shares Slide as Reports Question Credit, Allege Diamond Swapping; The operator of Kay, Jared and Zales says it strongly objects to allegations," *The Wall Street Journal Online*, June 3, 2016

"Hundreds allege sex harassment, discrimination at Kay and Jared jewelry company," *The Washington Post*, February 27, 2017

"Kay Jewelers' Owner Declines Following Sexual-Harassment Report," *Bloomberg News*, February 28, 2017

"Signet Downgraded to Neutral at Buckingham; PT Lowered to $65," *Bloomberg News*, May 24, 2017

"Doubts about Tiffany overshadow strong profits, sales in 4Q," *Associated Press Newswires*, March 16, 2018

**Academic Literature**

Black, Bernard S., and Ronald J. Gilson, *The Law and Finance of Corporate Acquisitions* (Westbury, NY: The Foundation Press, Inc., 1995)

Brealey, Richard A., Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance* (New York: McGraw-Hill/Irwin, 2003)

Brealey, Richard A., Stewart C. Myers, and Alan J. Marcus, *Fundamentals of Corporate Finance* (New York: McGraw-Hill/Irwin, 2004)

Busse, Jeffrey A., and T. Clifton Green, "Market Efficiency in Real Time," *Journal of Financial Economics* 65, no. 3 (2002): 415-437

Černý, Alexandr, "Stock Market Integration and the Speed of Information Transition," Working Papers Series – Charles University (2004): 1 – 25

Ederington, Louis H., and Jae Ha Lee, "The Short-Run Dynamics of the Price Adjustment to New Information," *Journal of Financial and Quantitative Analysis* 30, no. 1 (1995): 117-134

Elton, Edwin J., Martin J. Gruber, Gruber, Stephen J. Brown, and William N. Goetzmann, *Modern Portfolio Theory and Investment Analysis* (Hoboken, NJ: John Wiley & Sons, 2003)

Federal Judicial Center, *Reference Manual on Scientific Evidence* (National Academic Press, 2011)

Ferrell, Allen, and Atanu Saha, "The Loss Causation Requirement for Rule 10b-5 Causes-of-Action: The Implication of Dura Pharmaceuticals v. Broudo," *The Business Lawyer* 63, (2007): 163-186

Jones, Charles P., *Investments: Analysis and Management* (Hoboken, NJ: John Wiley & Sons, 2013)

Kothari, S.P., "Capital Markets Research in Accounting," *Journal of Accounting and Economics* 31, (2001): 105-231

Visaltnachoti, Nuttawat, and Ting Yang, "Speed of Convergence to Market Efficiency for NYSE-listed Foreign Stocks," *Journal of Banking and Finance* 34, (2010): 594-605

**Analyst Reports**

"SIG 3QF16 Review: Comp Momentum into Fourth Quarter is Encouraging; Maintain Outperform Rating," Telsey Advisory Group, November 25, 2015

"SIG: Business Getting Tougher; Reviewing Strategic Options on Credit; What it All Means," Northcoast Research, May 26, 2016

 "SIG: What to Expect Thursday; Remain Cautious Ahead of Release," Northcoast Research, August 23, 2016

"SIG: Poor Visibility Ahead; Cutting Forecast; Remain Cautious on Shares," Northcoast Research, August 25, 2016

"Weak Sales/GM Taking Center Stage; D/G to Neutral," Citi, August 26, 2016

"Valuation Pressure May Continue Unfortunately," Cowen, August 26, 2016

"Signet Jewelers: Potential Release of Class Arbitration Documents Could be PR Nightmare for Signet," The Capitol Forum, September 1, 2016

"SIG: Valentine's Day Survey of Independents Indicates Challenging Conditions; Est Revised," Northcoast Research, February 28, 2017

"SIG: Tough 2016 in the Rearview; Now Looking Forward Navigating Choppy Waters, Credit Catalyst Gaining Clarity," Wells Fargo, March 9, 2017

"No End in Sight to the Choppy Environment," Citi, March 10, 2017

"Moving to Sidelines on Soft Sales Trends and Limited Visibility to Inflection," Buckingham Research, May 24, 2017

"Results: Weak Sales the Real Headline (More than Credit)," Citi, May 25, 2017

"SIG: Downgrading to Neutral from Buy," CL King, May 26, 2017

"No Visibility to where Comps & GM Head From Here; Maintain NEUTRAL," Buckingham Research, August 25, 2017

"Disappointing credit execution errors, but think any incremental progress rewarded," Bank of America, November 21, 2017

"3Q review: Credit transition creates disruption while underlying business remains choppy," Goldman Sachs, November 22, 2017

"SIG 4QF18 First Take," Telsey Advisory Group, March 14, 2018

"Downgrade to Neutral on lack of visibility around a turn," Bank of America Merrill Lynch, March 20, 2018

**Other Documents**

"Signet Jewelers Ltd. Code of Conduct," February 28, 2013

Signet Jewelers Limited Fiscal 2017 First Quarter Earnings Conference Call, ViaVid, May 26, 2016

**Data Sources**

Bloomberg, L.P.

2019 Center for Research in Security Prices (CRSP), The University of Chicago Booth School of Business

# Appendix C

Current share price:  LSE: £45.59  -1.23%

Home » Responsibilities » Policies & Codes » **Code of Conduct**

## Code of Conduct

Review or download the Code of Conduct (154 Kb PDF)

This Code of Business Conduct and Ethics (the "Code") is designed to promote honest, ethical and lawful conduct by all employees, officers and directors of Signet Jewelers Limited and all subsidiaries and entities controlled by it (collectively, the "Company"). The Code is intended to help employees, officers and directors understand the Company's standards of ethical business practices and to stimulate awareness of ethical and legal issues that may be encountered in carrying out their responsibilities.

The actions of every employee, officer and director affect the reputation and integrity of the Company. Therefore, it is essential that each take the time to review this Code and develop a working knowledge of its provisions. In particular, all employees, officers and directors are expected at all times to:

- Avoid conflicts between personal and professional interests where possible;

- Pursue the ethical handling of actual or apparent conflicts of interest when conflicts or appearances of conflicts are unavoidable, including through full disclosure (to a responsible supervisor, the Signet Company Secretary & Chief Legal Officer or other appropriate internal authority) of any transaction or relationship that reasonably could be expected to give rise to a conflict;

- Provide full, fair, accurate, timely, and understandable disclosure in the periodic reports required to be filed by the Company with regulators, and in other public communications made by the Company;

- Comply with applicable governmental rules and regulations;

- Promptly report (to a responsible supervisor, the Signet Company Secretary & Chief Legal Officer or other appropriate internal authority) any violations of this Code; and

- Be accountable personally for adherence to this Code.

This Code is part of a broader set of Company policies and compliance procedures described in greater detail elsewhere and can be obtained from local human resources departments. In the instance of any conflict between this Code and such other Company policies or compliance procedures, this Code shall prevail.

The Chairman, Chief Executive Officer, Chief Financial Officer and other senior officers of the Company are also subject to the "Code of Ethics for the CEO and Senior Officers".

It is difficult to anticipate every decision or action that an employee, officer or director of the Company may face or consider. Whenever there is doubt about the right ethical or legal choice to make, fully disclose the circumstances, seek guidance about the right thing to do, and keep asking until guidance is obtained. An employee should make full disclosure to, and seek guidance from, the employee's supervisor in the first

instance. The Signet Company Secretary & Chief Legal Officer or -- in instances involving accounting practices, internal controls or audits -- the Audit Committee are also avenues to consider.

Those who violate the standards in this Code will be subject to disciplinary action. If you are in a situation that you believe may involve or lead to a violation of this Code, you have an affirmative duty to disclose such situation to, and seek guidance from a responsible supervisor, the Signet Company Secretary & Chief Legal Officer or other appropriate internal authority. The methods for reporting violations of this Code are set forth in Section 6 of this Code.

Failure to follow this Code, as well as to comply with federal, state, local and any applicable foreign laws, and the Company's corporate policies and procedures, may result in termination of employment or termination of Board service.

It is the Company's policy to encourage the communication of bona fide concerns relating to the lawful and ethical conduct of business, and audit and accounting procedures or related matters. It is also the policy of the Company to protect those who communicate bona fide concerns from any retaliation for such reporting. Confidential and anonymous mechanisms for reporting concerns are available and are described in this Code. However, anonymous reporting does not serve to satisfy a duty to disclose your potential involvement in a conflict of interest or in unethical or illegal conduct.

**Conflicts of Interest**

The Company expects all employees, officers and directors to exercise good judgment and the highest ethical standards in their activities on behalf of the Company as well as in their private activities outside the Company. Particular care should be taken to ensure that no detriment to the interests of the Company (or appearance of such detriment) may result from a conflict between those interests and any personal or business interests which an individual employee, officer or director may have. In particular, every employee, officer and director has an obligation to avoid any activity, agreement, business investment or interest or other situation that might in fact or in appearance cause the individual to place his or her own interests, or those of another, above his or her obligation to the Company. Care should be taken about the appearance of a conflict since such appearance might impair confidence in, or the reputation of, the Company even if there is no actual conflict and no wrongdoing.

While it is not possible to describe or anticipate all the circumstances and situations that might involve a conflict of interest, conflicts may arise where an employee, officer or director, or member of his or her family:

- Solicits, agrees to receive or accepts, directly or indirectly, from customers, suppliers or others dealing with the Company any kind of gift or other personal, unearned benefit as a result of his or her position with the Company other than non-monetary items in limited circumstances where it may be customary and appropriate to exchange gifts and entertainment, or to arrange or take part in programs that include meals and lodging

- Enters into personal financial transactions with customers, suppliers or others dealing with the Company that may influence the ability of the employee, officer or director to perform his or her job;

- Has a financial interest in the Company's competitors, customers, suppliers or others dealing with the Company (excluding interests that are less than 5% of the outstanding securities of a publicly-traded corporation or equivalent percentage of ownership interests in an unincorporated business);

- Has a consulting, managerial or employment relationship in any capacity with a competitor, customer, supplier or others dealing with the Company; including the provision of voluntary services; or

- Acquires, directly or indirectly, real property, leaseholds, patents or other property or rights in which the Company has, or the employee, officer or director knows or has reason to believe at the time of acquisition that the Company is likely to have, an interest.

The key in all situations is to keep an arm's length relationship and avoid any gifts or events that may give the appearance of undue influence. A personal gift from a customer, supplier or others dealing with the Company, unrelated to a legitimate business event, is not acceptable.

Employees should inform their managers when receiving gifts, gratuities or entertainment if anyone could perceive a conflict of interest, even if the employee doesn't believe the favour would violate Company guidelines. Likewise, when unsure about proper conduct, employees should describe the situation to their manager. If more direction is needed, seek input from the Signet Company Secretary & Chief Legal Officer.

Employees, officers and directors must not offer or provide gifts, gratuities or entertainment designed to induce, support or reward improper conduct including in connection with any business or anticipated future business involving the Company or where such gift, gratuity or entertainment might be seen or expected to compromise the receiver's judgement and integrity. Further guidance for the UK division on giving and receiving gifts and entertainment can be found in their Gifts and Entertainment Policy.

An employee or officer of the Company may not directly or indirectly conduct outside business that interferes with the proper performance of such employee's or officer's job at the Company, that is conducted during such employee's or officer's normal working hours, or which utilizes Company confidential information or specialized skills and knowledge gained as a Company employee or officer. Employees and officers are expected to disclose the nature of any non-Company activity for which compensation is received.

Employees and officers must obtain approval from the Signet Company Secretary & Chief Legal Officer before agreeing to serve on the board of directors or similar body of a for-profit enterprise or government agency. Executive directors must obtain the approval of the Chairman and the Board before agreeing to do so. Serving on boards of not-for-profit or community organizations does not require prior approval. However, if service with a not-for-profit or community organization creates a situation that poses a conflict of interest with the Company, the Signet Company Secretary & Chief Legal Officer should be contacted for approval to continue such service.

In addition, prior to seeking any election or appointment to public office, an employee or officer must notify his or her supervisor to clarify the Company's position in the event the candidacy is successful or the appointment is made. Written approval must be obtained in advance.

Subject to the limitations imposed by this Code, each employee and officer is free to engage in outside activities that do not interfere with the performance of his or her responsibilities or otherwise conflict with the Company's interests. Where activities may be of a controversial or sensitive nature, employees and officers are expected to seek the guidance of the Signet Company Secretary & Chief Legal Officer or other appropriate internal authority before engaging in such activities. No employee, officer or director may use his or her Company position or title or any Company equipment, supplies or facilities in connection with outside activities, nor may any employee, officer or director do anything that might infer sponsorship or support by the Company of such activity, unless such use has been approved in writing by a responsible supervisor, or other appropriate internal authority.

Employees and officers should not solicit contributions or other support from fellow employees, or distribute non-work-related material to fellow employees, during working hours or in areas where work is being performed.

Employees, officers and directors and their families are prohibited from requesting, accepting , paying  or offering any form of "under-the-table" payment, "kickback," bribe, rebate, or other improper payment or gratuity, whether directly or through a third party, in connection with any corporate expenditure or sale of goods or services.   If approached with such an offer, the Signet Company Secretary & Chief Legal Officer, a responsible supervisor, or other appropriate internal authority should be contacted immediately. Employees, officers and directors of the UK companies in the group should refer to their Anti-Bribery Policy for further guidance on this issue.

No employee, officer or director may accept loans or guarantees of obligations (except from banks or other entities that provide such services in the normal course and at arms' length) from any individual, organization or entity doing or seeking to do business with the Company. Any offer of such a loan should be reported to a responsible supervisor or other appropriate internal authority.

In all instances where the appearance of a conflict exists, the nature of the conflict must be disclosed to the Signet Company Secretary & Chief Legal Officer or other appropriate internal authority. Where there is a real or perceived conflict of interest involving a director of the Company,

the matter should be referred to the Signet Company Secretary & Chief Legal Officer for interpretation and discussion with the Chairman of the Audit Committee for resolution.

## 1. Protection and Proper Use of Company Assets

Every employee, officer and director has a personal responsibility to protect the assets of the Company from misuse or misappropriation. The assets of the Company include tangible assets, such as products, equipment and facilities, as well as intangible assets, such as corporate opportunities, intellectual property, trade secrets and business information (including any non-public information learned as an employee, officer or director of the Company). Theft/Misuse of Company AssetsThe Company's assets may only be used for business purposes and such other purposes as are approved by the Company. No employee, officer or director may take, make use of, or knowingly misappropriate the assets of the Company, for personal use, for use by another, or for an improper or illegal purpose. No employee, officer or director is permitted to remove, dispose of, or destroy anything of value belonging to the Company without the Company's consent, including both physical items and electronic information.

*Corporate Opportunities*

No employee, officer or director of the Company shall for personal or any other person's or entity's gain deprive the Company of any business opportunity for benefit which could be construed as related to any existing or reasonably anticipated future activity of the Company. Employees, officers and directors who learn of any such opportunity through their association with the Company may not disclose it to a third party or invest in the opportunity without first offering it to the Company.

No employee, officer or director of the Company may participate in an initial public offering or otherwise accept special investment opportunities from a supplier, vendor (including banks or financial advisers), or customer with whom the Company is doing business or that is seeking to sell products or services to the Company without first disclosing the opportunity to the Signet Company Secretary & Chief Legal Officer.

*Confidential Information/Privacy*

No employee, officer or director of the Company who is entrusted with information of a confidential or proprietary nature (about the Company its suppliers, customers or other constituents) shall disclose that information outside the Company, either during or after service with the Company, except with written authorization of the Company or as may be otherwise required by law. Employees, officers and directors may n use confidential information for their own personal benefit or the benefit of persons or entities outside the Company.

Confidential information includes all non-public information learned as an employee, officer or director of the Company. It includes, but is not limited to: non-public information that might be of use to competitors or be harmful to the press or harmful to the Company or its customers, disclosed; non-public information about the Company's financial condition, prospects or plans, its marketing and sales programs and research and development information; non-public information concerning possible transactions with other companies or information about the Company's customers, suppliers or joint venture partners, which the Company is under an obligation to maintain as confidential; and non-public information about discussions and deliberations, relating to business issues and decisions, between and among employees, officers and directors.

*Network Use, Integrity & Security*

The Company reserves the right to monitor or review any and all data and information contained on any employee's or officer's computer or other electronic device issued by the Company and reserves the right to monitor or review an employee's or officer's use of the Internet, Company Intranet and Company e-mail or any other electronic communications without prior notice.

Access to Company systems, will where practical, be revoked and disciplinary action will be taken in the event that such systems are used to commit illegal acts, or to violate the non-discrimination, harassment, pornography, solicitation or proprietary information terms of this Code, or any other terms of this Code.

In order to maintain systems integrity and protect the Company network, no employee or officer should divulge any passwords used to access any Company computer or database. Any suspected breach of the Company's network security systems should be reported to a responsible supervisor or appropriate internal authority immediately.

All employees and officers should refrain from using or distributing software that may damage or disrupt the Company's work environment by transmitting a virus or conflicting with Company systems.

No employee or officer should engage in the unauthorized use, copying, distribution or alteration of computer software whether obtained from outside sources or developed internally. All software, including "shareware," contains terms of use that must be adhered to.

## 2. Relationships with Customers and Vendors

### Fair Dealing

Each employee, officer and director should deal fairly with the Company's suppliers, customers, competitors and employees. No employee, officer or director should take unfair advantage through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair-dealing practice. Information about the Company's suppliers, customers, competitors and employees must be used in an ethical manner and in compliance with the law. Under no circumstance should information be obtained through theft, illegal entry, blackmail, or electronic eavesdropping, or through misrepresenting affiliation with the Company or identity. Any confidential or proprietary information should not be used if it is suspected that such information has been obtained improperly.

Similarly, each employee, officer and director must respect and protect any confidential or proprietary information shared with the Company unless disclosure is necessary to comply with statutory requirements, subpoenas, court orders or properly authorized government investigations. This information should not be released without proper authorization and should be used for legitimate business purposes only. Employees and officers should not divulge any proprietary information about their former employers, nor shall any employee, officer or director ever ask them to.

False or misleading statements to sell or market Company products or services are to be strictly avoided. Immediate efforts should be made to correct any misunderstanding that may exist with a customer or potential customer.

### Trade Practices and Antitrust Compliance

It is the Company's policy to compete solely on the basis of its superior and innovative products and services, through the efforts and contributions of its employees, officers and directors, and to avoid improper actions that unreasonably restrain trade. Every Company unit and employee, officer and director is expected to support Company efforts to compete vigorously in the marketplace in compliance with both the letter and the spirit of all applicable federal, state and foreign antitrust laws.

Whenever any doubt exists as to the legality of any communication, action, arrangement or transaction in this respect, please contact the Signet Company Secretary & Chief Legal Officer immediately. To avoid even the perception of unlawful conduct, employees should avoid: (a) discussing with a competitor prices, costs, production, products and services, bidding practices, other non-public business matters, territories, distribution channels or customers and (b) restricting the right of a customer to sell or lease a product or service at or above any price. In addition, other than in the ordinary course of business, the following practices should not be engaged in without advanced written approval by the Signet Company Secretary & Chief Legal Officer: (a) conditioning the sale or lease of a product or service on the sale or lease of another product or service ("tying"); (b) conditioning the purchase, sale or lease of a product or service on a reciprocal agreement with a customer or supplier; (c) entering into an exclusive dealing arrangement with a customer (including a lessee) or supplier; (d) limiting a customer (including a lessee) as to the territories in which, or the customers to whom, a product or service can be resold or leased and (e) discriminating in the prices or allowances offered to competing customers (including lessees).

Employees, officers and directors who are authorized to make expenditures or enter into transactions on behalf of the Company must ensure that the applicable records comply with the Company's accounting and purchasing policies and that all transactions are recorded properly.

# 3. Compliance with Other Laws, Rules & Regulations

The Company requires its employees, officers and directors to comply with all applicable laws, rules and regulations in countries where the Company does business. Violation of domestic or foreign laws and regulations may subject an individual, as well as the Company, to civil and/or criminal penalties.

To comply with the law, employees, officers and directors must learn enough about the national, state and local laws that affect the Company to spot potential issues and to obtain proper guidance on the right way to proceed. This means, for example, that employees and officers whose day-to-day work is directly affected by particular laws have a responsibility to understand them well enough to recognize potential problem areas and to know when and where to seek advice. When there is any doubt as to the lawfulness of any proposed activity, advice should be sought from the Signet Company Secretary & Chief Legal Officer or the US divisional general counsel.

Employees, officers and directors are strongly encouraged, and indeed have an obligation, to raise concerns promptly when they are uncertain as to the proper legal course of action or they suspect that some action may violate the law.

Certain legal obligations and policies that are particularly important to our business and reputation are summarised below. Further information on any of these matters may be obtained from the Signet Company Secretary & Chief Legal Officer.

*Insider Dealing and Fair Disclosure*

No employee, officer or director may deal or attempt to deal in securities while in possession of inside information ("insider dealing") or disclose inside information to another other than in the proper performance of his/her employment, profession or duties ("improper disclosure"). Inside information is any information that is not generally available, is precise in nature and would, if generally available, be likely to have a significant effect on the price of a company's securities. Insider dealing and improper disclosure are both unethical and illegal.

Accordingly, no employee, officer or director of the Company may: (a) deal in securities of the Company or any other company while in possession of inside information with respect to that Company; (b) recommend or suggest that anyone else buy, sell, or hold securities of any Company while the employee is in possession of inside information with respect to that Company (this includes formal or informal advice given to family, household members and friends); or (c) disclose inside information to anyone, other than those persons who need to know such information in order for the Company to properly and effectively carry out its business (e.g., to lawyers, advisers and other Company employees working on the matter). Where inside information is permitted to be disclosed, the recipient should be advised of its non-public nature and the limitations on its use. Any questions as to whether information is inside information should be directed to the Signet Company Secretary & Chief Legal Officer. For additional information, see also the Company's Code for Securities Transactions, available from the Signet Company Secretary & Chief Legal Officer.

Additionally, all employees, officers and directors must provide full, fair and accurate disclosure in all government filings and public communications.

*Inquiries from the Media and Public*

Employees are not authorized to answer questions from the media, analysts, investors or any other members of the public. If you should receive such an inquiry, you must record the name of the person and immediately notify the Investor Relations Director or if appropriate the authorised divisional spokesperson.

*The US Foreign Corrupt Practices Act*

The Company strictly prohibits giving anything of value, directly or indirectly, to a governmental official, agent or employee anywhere in the world in consideration for such official's, agent's or employee's assistance or influence (including the failure by such individual to perform his/her official duty), the purpose of which is to obtain favoured treatment with respect to any aspect of the Company's business. Under no circumstance is it acceptable for any employee, officer or director to offer, give, solicit or receive any form of bribe, kickback, payoff, or inducement.

As a company subject to registration in the U.S., the Company is subject to the Foreign Corrupt Practices Act, which as a general rule, makes it illegal for companies and individuals to make, or offer to make, payment, directly or indirectly, to foreign governmental officials for the purposes of obtaining, retaining or directing business. Other countries have adopted similar legislation.

*The UK Bribery Act*

The UK Bribery Act contains offences for which employees, directors and commercial organisations can be liable, namely: bribing another person; being bribed; bribing a foreign official; and a commercial organisation failing to prevent bribery. These offences can be committed directly or indirectly and, unlike the offences contained in the US Foreign Corrupt Practices Act, apply to both the public and the private sectors. Under no circumstance is it acceptable for any employee, officer or director to offer, promise, request, agree to receive, or receive a form of bribe, kickback, payoff, or inducement.

The UK Bribery Act applies to all companies that carry on a business in the UK, together with their employees, officers and directors. Further guidance on the UK Bribery Act can be found at the back of the Anti-Bribery Policy applicable to all Signet entities carrying on a business in the UK.

*Political Contributions and Activities*

In the United States, federal and many state laws prohibit corporations from making political contributions. No direct or indirect political contribution (including the use of Company property, equipment, funds or other assets) of any kind may be made in the name of the Company or by using Company funds, unless the Signet Company Secretary & Chief Legal Officer or his/her designee has certified in writing that such political contribution complies with applicable law. When such permission is given, such contributions shall be by cheque to the order of the political candidate or party involved, or by such other means as will readily enable the Company to verify, at any given time, the amount and origin of the contribution.

*Subpoenas and Government Investigations*

As a general matter, it is the Company's policy to cooperate in any government investigations and inquiries. All subpoenas, information document requests, or other inquiries should be referred immediately to Signet Company Secretary & Chief Legal Officer or if appropriate to the divisional general counsel.

*International Business Dealings*

Specific laws and regulations apply to participation in international business. Employees and officers involved in foreign business transactions must be fully familiar with, and strictly adhere to, all applicable foreign and domestic laws and regulations. Employees and officers involved in international business matters must, at a minimum, be aware of regulations, anti-boycott provisions, Treasury Department Office of Foreign Assets Control restrictions, and applicable trade embargoes in force.

*Maintaining a Safe, Healthy and Affirmative Workplace*

The Company is an equal opportunity employer and bases our recruitment, employment, development and promotion decisions solely on a person's ability and potential in relation to the needs of the job, and complies with local, state and federal employment laws. The Company, where possible, make reasonable job-related accommodations for any qualified employee or officer with a disability when notified by the employee that he/she needs an accommodation.

The Company is committed to a workplace that is free from sexual, racial, or other unlawful harassment, and from threats or acts of violence or physical intimidation. Abusive, harassing or other offensive conduct is unacceptable, whether verbal, physical or visual. Any person who believes that they have been harassed or threatened with or subjected to physical violence in or related to the workplace should report the incident to an appropriate supervisor or Human Resources, who will arrange for it to be investigated. All efforts will be made to handle the investigation confidentially.

The Company will not tolerate the possession, use or distribution of pornographic, racist, sexist or otherwise offensive materials on Company property, or the use of Company personal computers or other equipment to obtain or view such materials. All employees and officers must promptly contact an appropriate supervisor or Human Resources about the existence of offensive materials, especially child pornography, on the Company's systems or premises so that appropriate action may be taken, including notifying the proper authorities if necessary.

The Company is committed to providing a drug-free work environment. The illegal possession, distribution, or use of any controlled substances on Company premises or at Company functions is strictly prohibited. Similarly, reporting to work under the influence of any illegal drug or alcohol and the abuse of alcohol or medications in the workplace are not in the Company's best interest and violates this Code.

All accidents, injuries, or concerns about unsafe equipment, practices, conditions or other potential hazards should be immediately reported to an appropriate supervisor or Human Resources.

## 4. Accounting Practices, Books & Records and Record Retention

It is the policy of the Company to fully and fairly disclose the financial condition of the Company in compliance with applicable accounting principles, laws, rules and regulations and to make full, fair, accurate timely and understandable disclosure in our periodic reports filed with the Securities and Exchange Commission and in other communications to securities analysts, rating agencies and investors.

All employees, officers and directors -- and, in particular, the chairman, the chief executive officer, the chief financial officer, the controller and the principal accounting officer -- have a responsibility to ensure that the Company's accounting records do not contain any false or intentionally misleading entries. We do not permit intentional misclassification of transactions as to accounts, departments or accounting periods and, in particular:

1. All accounting records, as well as reports produced from those records, are to be kept and presented in accordance with the laws of each applicable jurisdiction;

2. All records are to fairly and accurately reflect the transactions or occurrences to which they relate;

3. All records are to fairly and accurately reflect in reasonable detail the Company's assets, liabilities, revenues and expenses;

4. No accounting records are to contain any intentionally false or misleading entries;

5. No transactions are to be misclassified as to accounts, departments or accounting periods;

6. All transactions are to be supported by accurate documentation in reasonable detail and recorded in the proper account and in the proper accounting period;

7. All accounting records are to comply with generally accepted accounting principles; and

8. The Company's system of internal accounting controls, including compensation controls, is required to be followed at all times.

Any effort to mislead or coerce the independent auditors or a member of internal audit staff concerning issues related to audit, accounting or financial disclosure has serious legal consequences for the perpetrator, including criminal sanctions, and for the Company and is strictly prohibited. If you become aware of any violation of this policy, you must report the matter immediately to the Signet Company Secretary & Chief Legal Officer or the Chairman of the Audit Committee.

To the Signet Company Secretary & Chief Legal Officer as follows:

The Signet Company Secretary & Chief Legal Officer Signet Jewelers Limited c/o Signet Group Services 110 Cannon Street, London EC4N 6EU

To the Chairman of the Audit Committee as follows:

The Chairman of the Audit Committee Signet Jewelers Limited Clarendon House 2 Church Street Hamilton HM11Bermuda

Compliance with the Company's Records Retention Procedures is mandatory. Destroying or altering a document with the intent to impair the document's integrity or availability for use in any potential official proceeding is a crime. Prior to the destruction of corporate records, all employees must consult an appropriate supervisor manager to ensure compliance with these policies. Documents relevant to any pending, threatened, or anticipated litigation, investigation, or audit shall not be destroyed for any reason. Any belief that Company records are being improperly altered or destroyed should be reported to a responsible supervisor, the appropriate internal authority or the Signet Company Secretary & Chief Legal Officer.

Consistent with the reporting and recordkeeping commitments discussed above and elsewhere in this Code, all employees, officers and directors should accurately and truthfully complete all records used to determine compensation or expense reimbursement. This includes, among other items, reporting of hours worked (including overtime), reimbursable expenses (including travel and meals), and sales activity.

## 5. Scope

If employees have questions regarding any of the standards discussed or policies referenced in this Code or are in doubt about the best course of action in a particular situation, the employee should refer to the reporting requirements for that goal or standard as stated in this Code, or the reporting requirements set forth in a specific Company Policy and contact the person or party designated.

This Code is not intended to supersede or materially alter Company policies and procedures already in place and communicated to Company employees. Certain policies referred to herein are contained in their entirety in the relevant policy document.

Any waivers of this Code may be made only by the Board of Directors. Any waivers for officers or directors, including the chairman, chief executive officer, chief financial officer, comptroller or chief accounting officer, must be promptly disclosed as required by applicable law and/or stock exchange regulation.

## 6. Duty to Report Violations

Each employee, officer and director is responsible for promptly reporting to the Company any circumstances that such person believes in good faith may constitute a violation of this Code, or any other Company policy, or applicable law, regulations and rules. Except as provided in the next paragraph, suspected policy violations may be reported (including confidential and anonymous reports) either on the divisional TIPs/whistleblowing telephone lines (UK: The Signet Trading TIP Line: calling in the UK: 0808 100 3323 calling to the UK: + 44 808 100 332 US: The Sterling TIPS Line: calling in the US: 800 984 8477 calling to the US: 011 800 984 8477) or by telephone 011 44 (0) 20 7283 6779, e-mail mark.jenkins@signet.co.uk, or letter to the Signet Company Secretary & Chief Legal Officer (to the attention of Mark Jenkins) at 110 Cannon Street, London, EC4N 6EU.

Any complaint regarding accounting, internal accounting controls or auditing matters (including confidential and anonymous complaints) should be reported by telephone on telephone number 011 44 (0)20 7283 6779, monitored for reporting to the Company's Audit Committee, or by letter to the Audit Committee, as follows:

Chairman of the Audit Committee Signet Jewelers Limited Clarendon House 2 Church Street Hamilton HM11 Bermuda

No retribution against any individual who reports violations of this Code in good faith will be permitted, and mechanisms for reporting in a confidential and anonymous manner are noted above. Every effort will be made to investigate confidential and anonymous reports within the confines of the limits on information or disclosure such reports entail. While self-reporting a violation will not excuse the violation itself, the extent and promptness of such reporting will be considered in determining any appropriate sanction, including dismissal. The Company will investigate any matter which is reported and will take any appropriate corrective action.

## 7. Violations of this Code

Allegations of Code violations will be reviewed and investigated by the Signet Company Secretary & Chief Legal Officer or, in appropriate circumstances, by the Company's Audit Committee. Violations of this Code may result in, among other actions, suspension of work duties, diminution of responsibilities or demotion, and termination of employment.

**Adopted by the Board on  28 February 2013**

Developed by global3digital

# Appendix D

The Washington Post

**Business**

# Hundreds allege sex harassment, discrimination at Kay and Jared jewelry company

By Drew Harwell

February 27, 2017

Hundreds of former employees of Sterling Jewelers, the multibillion-dollar conglomerate behind Jared the Galleria of Jewelry and Kay Jewelers, claim that its chief executive and other company leaders presided over a corporate culture that fostered rampant sexual harassment and discrimination, according to arbitration documents obtained by The Washington Post.

Declarations from roughly 250 women and men who worked at Sterling, filed as part of a private class-action arbitration case, allege that female employees at the company throughout the late 1990s and 2000s were routinely groped, demeaned and urged to sexually cater to their bosses to stay employed. Sterling disputes the allegations.

The arbitration was first filed in 2008 by more than a dozen women who accused the company of widespread gender discrimination. The class-action case, still unresolved, now includes 69,000 women who are current and former employees of Sterling, which operates about 1,500 stores across the country.

Most of the sworn statements were written years ago, but the employees' attorneys were only granted permission to release them publicly Sunday evening. One of the original women who brought the case, those lawyers said, died in 2014 as proceedings crawled on without resolution.

The statements allege that top male managers, some at the company's headquarters near Akron, Ohio, dispatched scouting parties to stores to find female employees they wanted to sleep with, laughed about women's bodies in the workplace, and pushed female subordinates into sex by pledging better jobs, higher pay or protection from punishment.

Though women made up a large part of Sterling's sales force, many said they felt they had little recourse with their mostly male management. Sanya Douglas, a Kay sales associate and manager in New York between 2003 and 2008, said a manager even had a saying for male leaders coaxing women into sexual favors to advance their careers, calling it "going to the big stage."

"If you didn't do what he wanted with him," she said in the 2012 sworn statement, "you wouldn't get your (preferred) store or raise."

Sterling spokesman David Bouffard told The Post in a statement Monday that company officials "have thoroughly investigated the allegations and have concluded they are not substantiated by the facts and certainly

do not reflect our culture."

The company "has created strong career opportunities for many thousands of women working at our stores nationwide" and takes allegations of pay and promotion discrimination seriously, with "multiple processes in place to receive and investigate allegations of misconduct," Bouffard said.

Allegations of sexual harassment and discrimination "involve a very small number of individuals," he said, adding that their claims were included in arbitration filings by employees' attorneys "to paint a negative and distorted picture of the company."

In arbitration, Sterling presented experts it said had reviewed some employee allegations and concluded that the company "devotes adequate resources to manage complaints of unwanted sex-related behavior," according to a 2015 filing.

Complaints that were reported to the company were thoroughly investigated, Bouffard said, and action was taken where appropriate. He added that the company encourages all employees to report any workplace concerns so officials can investigate and respond appropriately.

Not all of the 69,000 class members are alleging sexual impropriety. Many are accusing Sterling of wage violations, arguing women were systematically paid less than men and passed over for promotions given to less experienced male colleagues.

The former and current employees are seeking punitive damages and years of back pay, though no estimate of the potential damages has been given. A class hearing, during which witnesses will be called to testify before the arbitration judge for the first time, is scheduled for early next year.

Sterling, like other U.S. companies, requires all workers to waive their right to bring any employment-related disputes against their employer in public courts. Instead, complaints must be decided in arbitration — a private, quasi-legal system where cases are guaranteed little transparency.

Since 2015, The Post has requested to review the employee statements submitted as part of arbitration, all of which were designated as confidential. Employees' attorneys have also sought to make them publicly available. Attorneys for the employees and the company recently reached an agreement that the documents could be made public on the condition that they not identify any of the individuals to whom conduct was attributed.

More than 1,300 pages of sworn statements were released Sunday and feature company-approved redactions that obscure the names of managers and executives accused of harassment or abuse. But a memorandum by the employees' attorneys supporting their motion for class certification, filed in 2013, revealed that top executives including Mark Light, now chief executive of Sterling's parent company, Signet Jewelers, were among those accused of having sex with female employees and promoting women based upon how they responded to sexual demands.

Light did not respond to requests for comment, and the company did not make him available for an interview. The company declined to address detailed questions about the allegations made by former employees against Light and other managers.

Many of the most striking allegations stem from the company's annual managers meetings, which former employees described as a boozy, no-spouses-allowed "sex-fest" where attendance was mandatory and women were aggressively pursued, grabbed and harassed.

Multiple witnesses told attorneys that they saw Light "being entertained" as he watched and joined nude and partially undressed female employees in a swimming pool, according to the 2013 memorandum.

Routine sexual "preying" at company events "was done out in the open and appeared to be encouraged, or at least condoned, by the company," Melissa Corey, a manager of Sterling stores in Massachusetts and Florida between 2002 and 2008, said in her declaration.

Ellen Contaldi, a Sterling manager in Massachusetts between 1994 and 2008, said in her declaration that male executives "prowled around the (resort) like dogs that were let out of their cage and there was no one to protect the female managers from them."

"I didn't like being alone, anywhere. I used to dread going" to the meetings, Contaldi told The Post in an interview. "If you were even remotely attractive or outgoing, which most salespeople are, you were meat, being shopped."

"It was like nobody knew right from wrong, and there was nobody trying to show anybody right from wrong," Contaldi added. "There was no discipline. There was no consequence. You were on your own."

Former employees who sought help or reported abuse through an internal hotline alleged in their declarations that they were verbally attacked or terminated. Kristin Henry, a five-year Sterling employee who said she was 22 when an older district manager tried to kiss and touch her at a managers event, told The Post she was falsely accused of theft and quickly fired after reporting his advances to superiors at Sterling.

The case, *Jock et al. v. Sterling Jewelers*, was filed before the American Arbitration Association, one of the nation's largest arbitration organizations. Kathleen A. Roberts, the case's arbitrator and a retired federal magistrate, is forbidden by association rules from speaking with the media. Like other arbitrations, the case before Roberts is conducted in private and is legally binding. While arbitrator decisions are appealable, there are very limited grounds on which decisions can be overturned. The confidential nature of the case has made it difficult to determine why it has taken so long to resolve.

In a 2015 decision to grant class-action status to the women, Roberts wrote that the testimony includes references to "soliciting sexual relations with women (sometimes as a quid pro quo for employment benefits), and creating an environment at often-mandatory Company events in which women are expected to undress

publicly, accede to sexual overtures and refrain from complaining about the treatment to which they have been subjected."

"For the most part Sterling has not sought to refute this evidence," Roberts wrote. Instead, she wrote, "Sterling argues that it is inadmissible, irrelevant and insufficient to establish a corporate culture that demeans women."

The case could deeply tarnish a business that sells billions of dollars worth of jewelry a year through romance-centered marketing campaigns such as "Every Kiss Begins with Kay." Signet told shareholders in an annual report last year that it would have to "pay substantial damages" if it lost the case.

Sterling's mall outlets and storefronts account for a large chunk of America's jewelry market, as well as more than 18,000 jobs across all 50 states. Its parent company, Signet, which is domiciled in Bermuda but headquartered in Ohio, is the world's largest retailer of diamond jewelry, selling more than $6 billion of jewelry, watches and services in 2015, company filings show.

Joseph M. Sellers, a partner at the Cohen Milstein law firm and lead counsel for the case, told The Post in an interview that the former employees' statements provide "breathtaking evidence of ways in which women were mistreated in the workplace."

"It was terribly demeaning to them as women," Sellers said, "not just because they themselves were mistreated but because they saw how their co-workers were treated as sexual objects."

### 'Backed into a corner'

When Heather Ballou left her job at a small jewelry store and moved to a Kay retail outlet in Pensacola, Fla., in 2000, she believed she had made the right move to advance her young career. Sterling seemed to offer high standards, a professional atmosphere and managers willing to groom and mentor new employees, Ballou, a class member in the arbitration, said in an interview with The Post.

As she worked her way up to store manager, though, she said, she became increasingly disturbed at the frequency of sexual harassment from the company's crude "boys club." At a managers meeting in 2005, a district manager promised to help transfer her to a better store if she had sex with him, she said in her sworn statement. That night, she did, believing she was "backed into a corner" and had no other way to advance.

"Looking back, I can't believe I did some of the things I had to do," Ballou, 41, told The Post, adding that in the moment she thought: "You suck it up and do what you have to do for your family. You need this job."

Ballou attended four of Sterling's multi-day managers meetings, where attendance was mandatory for managers at company stores nationwide. The events, which were mostly held in Orlando, included daytime work seminars but were infamous for their wild parties at night, employees said. It was common practice, former employees said, for executives and high-level managers to ply subordinates with alcohol.

One night, Ballou told The Post, she saw a top executive watching as female managers in varying stages of undress splashed in a hotel pool. "He had a drink in one hand and a cigar in the other, just taking it all in, like, 'I am the king and this is my harem,' " she told The Post. She was prevented by her attorneys from naming which executive was involved, because of the condition of the arbitration documents' release. The 2013 class-action motion states Light took part in a pool-related incident similar to the one Ballou described.

Henry, who attended the 2005 meeting, said she was retrieving her shawl from a hotel room when a male district manager who was her father's age, and whom she had been told to treat like a mentor, forcibly tried to kiss and touch her. Stunned, she left immediately afterward and called her parents for advice.

"I was so embarrassed," she told The Post. "I was afraid of what would happen next, how I would be treated, if it was something he would tell other employees about."

A few days later, she called an internal hotline to report the encounter, believing her identity would be protected. But within days of her report, a regional boss visited her store for two days, interviewed her co-workers and reviewed surveillance video before accusing her of stealing a gold necklace and $100 in cash. She told The Post she showed the boss evidence that she had not stolen anything, but Sterling fired her, a few days before she was set to receive an annual commission payment worth roughly $30,000, she alleged.

Because she was fired and accused of theft, she told The Post, she was unable to find a job at another jewelry store. Now 34, she works as a nurse in Florida.

"Friends to this day ask: What ever happened to that job? And it's one of those situations: Do I tell the truth? Or do I say I just moved on, to save myself the embarrassment?" she told The Post. Seeing Kay commercials, she said, continues to unnerve her.

"They're still hiring younger women, and I worry about those women," she told The Post. "I worry about what might happen to them."

Julia Highfill, a nine-year Sterling manager in Florida, Louisiana and Mississippi, said in her sworn statement that the company "did not have an effective or serious mechanism by which female employees could complain about their mistreatment." After calling the company to report that a district manager had arrived to work late and reeking of alcohol, she alleged that he called soon after to warn her against calling again. He told her, "Anything you say, I'm going to know," she recalled in an interview.

Men who are not part of the class also filed sworn statements alleging Sterling was a hostile workplace for women. Richard Sumen, who worked for Sterling in Ohio from 1992 until 2005, said in his declaration that a group of managers and officers commonly known as the "good ole boys" was infamous for "protecting and promoting their friends, and wild escapades of sex, drugs, excessive drinking and womanizing." He recalled one former Ohio-based executive saying, "Why pay women more when they just get pregnant and have families?"

In his sworn statement, Sumen also recounted an incident at corporate headquarters in which an executive pointed to a female secretary and asked a district manager, "Are you doing her?" The secretary looked visibly uncomfortable, Sumen said, but the executive said again, louder, "I want to f---ing know if you are f---ing doing her."

Sumen told The Post that he remained troubled by what he called Sterling's discriminatory corporate climate. He wrote in his 2008 declaration, "This culture of sexism and womanizing was so prevalent that female management employees were pressured to acquiesce and participate."

**Like 'an abusive relationship'**

This culture seemingly arose in a company whose sales force was mostly women. More than 68 percent of Sterling's store managers are women, the company told The Post. Three of Signet's 10 executive officers are women. A job-recruitment video calls Sterling "your place to shine" and promises an "exciting and fulfilling career."

Light was made Sterling's chief executive in 2006 and presided over an eight-year growth streak during which the company's sales more than tripled. Light, now 54 and chief executive of Signet, earned about $7.4 million in salary, stock and bonuses in fiscal 2016, up from $2.4 million in 2014, company filings show.

Signet, the parent company of Sterling, Zales and other jewelry brands, has struggled in recent months because of disappointing holiday sales, investors' worries over how much of its jewelry is bought on credit, and a scandal during which Kay customers alleged diamonds they had brought in for cleaning were swapped for lesser-quality stones. The company denied the diamond-swapping allegations. Its share price has dropped by half since its late-2015 peak.

Since 1998, Sterling has forced all employees to agree to arbitration — a no-judge, no-jury resolution system that allows companies to keep potentially embarrassing labor disputes and case records mostly confidential.

The nonprofit American Arbitration Association, where the Sterling case is being heard, allows companies to refuse arbitrators they believe will not fairly rule on their case.

Some companies have argued that arbitration allows them a quicker path to resolving employee disputes beyond traditional courts. Workers effectively consent to the rules when they sign agreements requiring arbitration as a condition of their employment, as seen with Sterling's contracts.

The Equal Employment Opportunity Commission said in a report last year that mandatory arbitration policies "can prevent employees from learning about similar concerns shared by others in their workplace."

Ballou, who left the company in 2009, is hoping the case leads to more than back pay. Now 41, the single mother is back in school studying to become a registered nurse and working as an office manager for a real estate company, where she told The Post she "hasn't encountered an inkling" of what she saw at Sterling.

"What's sad is that I was there for so long, it was almost like when someone is in an abusive relationship: You think that's what normal is," she told The Post.

"I can't even go into a Kay anymore. It just turns my stomach," she added. "Even seeing those 'Every Kiss Begins with Kay' commercials revolts me, thinking of what's behind them. All the good things they do, all the lovely things they promise. It's a lie."

She told The Post she wanted to speak out in hopes that it could help other women, as well as her 8-year-old daughter.

"I was a victim, and I didn't have anyone to speak for me," Ballou said. "As humiliating as it was, it was worth it, because now maybe it won't happen to her."

---

💬 **751 Comments**

---

**Drew Harwell**

Drew Harwell is a national technology reporter for The Washington Post specializing in artificial intelligence. He previously covered national business and the Trump companies.  Follow 🐦

# Appendix E

Case 1:16-cv-06728-CM-SDA Document 148-1 Filed 04/26/19 Page 86 of 93

# The New York Times

# Women Charge Bias and Harassment in Suit Against Sterling Jewelers

**By Susan Antilla**

March 28, 2014

Among glittering diamonds and shining gemstones, Dawn Souto-Coons loved being in what she called "the business of romance," selling engagement rings to smiling couples at a Jared jewelry store in Florida.

But her passion for the job crumbled one day in 2005. As she filed a form, she came across paperwork for a recently hired co-worker. She found the new salesperson, a man who had no retail jewelry experience, was making $15 an hour — over $1.50 more an hour than the woman who was the store's top seller.

She checked another file, and then another, until she had reviewed the records of each of the dozen or so sales staff members. Almost all of the men, recalled Ms. Souto-Coons, then an assistant manager, were making more per hour than the women.

"I was so mad," she said. "It was just an old boys' club."

Today Ms. Souto-Coons, 55, is among 12 women in a suit against Sterling Jewelers, parent of 12 chains in the United States, including Jared the Galleria of Jewelry and Kay Jewelers. Sterling, the largest retail jewelry company in the United States by sales, is accused of gender discrimination in its pay and promotion practices since 2003.

And the accusations go further, portraying a workplace where sexual harassment and vulgar behavior left some plaintiffs feeling violated.

If the class is certified, about 44,000 current and former Sterling sales employees, from store managers to sales associates, would be offered the chance to join the plaintiffs' case, seeking back pay and punitive damages.

While the group would not be as big as the 1997 gender case against Publix Supermarkets, which included more than 100,000 women and was settled for $81.5 million, it would eclipse the 2004 gender case against Boeing, which included 29,000 women.

Even if the women are certified as a class, they must pursue their case against Sterling privately. According to company policies, employees must deal with cases through arbitration, not the courts.

For one plaintiff, Maria House, a former saleswoman at a Kay store in California, day-to-day life became grueling. After she would close a big sale, she said, an assistant manager would announce that he had a "reward" for her, opening his legs and telling her to sit on his lap.

"It used to bring me down to the point where I'd take a break to go outside in the mall and cry," said Ms. House, 56.

Sterling is fighting the case. David Bouffard, a Sterling spokesman, said in a statement that the company had investigated the claims in pay discrimination lawsuits by the plaintiffs and the Equal Employment Opportunity Commission.

"We believe that the facts show that they are without merit," he said.

As for the allegations of sexual harassment, Mr. Bouffard said that Sterling investigated and took action when employees raised concerns. He added that Sterling had disciplined employees who violated discrimination and harassment policies.

The case dates to 2005, when a saleswoman filed a pay complaint with the Equal Employment Opportunity Commission. The commission charged that Sterling had paid its female retail employees less than males and that it had denied women promotion opportunities. On March 10, a related lawsuit, first brought by the commission in 2008, was dismissed by a federal judge, who said the agency had not conducted a wide enough investigation of Sterling. The commission said it was disappointed and was considering its options.

Several months after Ms. Souto-Coons, who now operates a farm in Maryland, uncovered the pay information, she quit, taking copies of the records with her. Largely through word of mouth, plans for a lawsuit spread to upstate New York and California.

After three years at Sterling stores, Sherry Roberson, a former assistant manager, thought that she was being held back because of a problem with a manager in Chicago, going so far as to request an out-of-state transfer. But over dinner one night with a co-worker in Florida, she learned of the lawsuit.

"I couldn't believe it was happening in Florida, too," she said. "I couldn't fathom that such a large corporation would do that in this day and age and get away with it."

A Kay Jewelers in Gadsden, Ala. The women are seeking class action status for their case.
Sarah Dudik/Gadsden Times

Case 1:16-cv-06728-CM-SDA Document 148-1 Filed 04/26/19 Page 88 of 93



Sterling, based in Akron, Ohio, has 1,400 stores in 50 states and is a subsidiary of Signet Jewelers, which is based in Bermuda and has 500 stores in Britain. Signet agreed last month to purchase the rival jewelry chain Zale.

Since 1998, Sterling has required employees to agree to take disputes to private arbitration as a condition of employment. Companies are increasingly demanding that employees agree to arbitration, said Cliff Palefsky, an employment lawyer in San Francisco. More recently, firms are including clauses that prohibit bringing class-action complaints to arbitration, he said.

"In the old days, arbitration clauses said nothing about class actions," he said. "Now companies are jumping on the bandwagon."

Sterling employees can get to arbitration only after they have filed a claim with its in-house resolution program. It received 474 complaints from 1998 to 2010. In that time, according to plaintiffs' legal filings, only two moved to an arbitration decision.

In their complaint, the plaintiffs said that grievances about pay and harassment were not taken seriously. Ms. Souto-Coons said in an interview that her boss once asked her to write out a complaint for the company about sexual harassment of women in the store by a male employee, but two days later, she learned the report had been watered down. Two weeks later, the man was promoted, she said.

Beyond the Equal Employment Opportunity Commission inquiry, the civil rights division of the Department of Law and Public Safety in New Jersey found in 2009 probable cause of discrimination at Sterling after a sales associate complained that a manager had rubbed up against her. Another employee told similar stories to company officials. Sterling told investigators that it had not been able to corroborate the allegations. But the state examined company officials' notes, and concluded that they "knew or should have known" about the harassment and that the company's harassment policies were ineffective.

In the pending case, the plaintiffs refer to sexual affairs involving the chief executive, Mark Light, and subordinates, and describe a company meeting when Mr. Light jumped into a swimming pool with female managers who were "in various states of undress."

Without referring to any specific employee, David Bouffard, a spokesman for Sterling, said that some of the allegations "relate to personal, consensual relationships with individuals who have never raised a concern with the company, or involve situations that already have been thoroughly investigated and addressed." He did not respond to written questions about Mr. Light.

In their filings, the plaintiffs include a report from an expert who says that lower-level male employees may have modeled their behavior after that of senior executives. Upper management, the expert writes, created a "climate and culture" that devalued the work of female employees.

One situation noted in the complaint involves a rape case. A manager was assaulted by another manager in a Florida hotel room during an annual meeting in 2003. In the wake of that case, a third manager, the victim's hotel roommate and a witness, was fired, accused of withholding information from company management, according to a complaint she filed.

The dispute with the company is described in the roommate's 2004 lawsuit against Sterling. Months after the assault, the roommate was called to the firm's headquarters, 200 miles from where she worked, and asked personal questions about her sex life, according to her suit. Eight days later, she was fired. The woman sued for invasion of privacy and wrongful termination. Sterling won a court fight that kept her case in private arbitration. The case went to mediation and was settled.

Mr. Bouffard said that the company immediately fired the suspect. The man was convicted of rape and appealed. He later pleaded no contest to sexual battery.

Beyond the pay and harassment concerns, Mr. Bouffard said that women were well represented at Sterling, making up more than 70 percent of Sterling's sales force and assistant manager positions, and 60 percent of store manager positions.

"Fairness, equal opportunity and respect for our female employees — and all employees," he said, "is central to who we are." Last week, Sterling announced that a woman, Denise Shaffer, would take on the newly created role of Signet treasurer.

In their case, however, the plaintiffs say women are in the minority in the most powerful jobs at Sterling. Since 2002, 24 people have held the title of vice president for regional operations, meaning they oversee store operations. Only six have been women, they say.

Lisa McConnell, a plaintiff and former manager at a Kay store in Indiana, said she was hopeful that the case would make a difference for women still at Sterling.

"There's a hole in my heart — I don't know if it will ever be filled — for the way I was treated," she said. "But the purpose we are here for is to make sure this stops. We're working just as hard as the men, so give us our due."

A version of this article appears in print on March 28, 2014, on Page B1 of the New York edition with the headline: Fighting the Old Boys' Club



# Appendix F

# THE
# CAPITOL FORUM

September 1, 2016

# Signet Jewelers: Potential Release of Class Arbitration Documents Could be PR Nightmare for Signet

## Arbitration Update

In its most recent 10-Q, Signet disclosed that Sterling Jewelers, Inc. filed a motion for protective order in the American Arbitration Association (AAA) matter. The 10-Q further indicates that the matter was fully briefed and oral argument was held on July 22, 2016. Because the presumption of privacy and confidentiality does not apply in class arbitrations, Sterling Jewelers likely filed the motion to prevent the potentially damaging documents and evidence submitted by the claimants from becoming publicly available. Given that the matter has been fully briefed and was argued approximately six weeks ago, we expect a decision in the near-term and possibly as soon as September 6, 2016—the date on which the parties and arbitrator will have their next monthly status conference.

The release of the evidence and documents, which contain extremely troubling allegations of alleged improper sexual conduct and comments reflecting gender stereotypes by numerous executives and senior managers, would almost certainly have negative consequences for Signet for the following reasons: first, the nature of the allegations coupled with the fact that senior executives are implicated carries the potential for significant negative headline risk at a time when the company is already facing accusations of swapping customers' diamonds; second, considering there are allegations against executives, the company could come under pressure to make executive level changes; third, given that a portion of prospective class claimants can still opt-in, it could motivate potential class members who are currently on the fence to join the class, which could result in additional liability for Signet in the event that claimants prevail.

## A Closer Look at Arbitration

**No blanket presumption of confidentiality.** Most stakeholders have overlooked the significance of the arbitration because they assume that the documents and matters in the arbitration will remain confidential. While this is generally true, the AAA's own rules state: "The presumption of privacy and confidentiality in arbitration proceedings shall not apply in class arbitrations." Ultimately, it will be up to the arbitrator to decide whether the filings will be made public, as the AAA's rules also provide, "All class arbitration hearings and filings may be made public, subject to the authority of the arbitrator to provide otherwise in special circumstances."

**Significance of release of information.** Although stakeholders are able to gather basic information about the contents of the documents and evidence by reading the Class Award and Memorandum in Support of Motion for Class Certification, the release of the underlying documentary evidence would likely provide more insight into the culture in the Sterling Jewelers Division and the specific alleged conduct that created an unequal or unfair working environment for women. The release of the evidence would also provide information about whether the practices alleged in the Memorandum were limited in nature or pervasive.

In the discussion of the evidence of behavior demeaning to women and gender stereotypes in the Class Award, the arbitrator states that "For the most part Sterling has not sought to refute this evidence; rather Sterling argues that it is inadmissible, irrelevant and insufficient to establish a corporate culture that demeans women." Given that the evidence, which includes declarations and testimony by current former male and female Sterling employees,

1

© 2016 by The Capitol Forum. Direct or indirect reproduction or other distribution of this article without prior written permission from The Capitol Forum is a violation of Federal Copyright Law.

and testimony from Sterling executives and senior managers, Signet may be hard pressed to deny the allegations in the declarations and testimony.

As discussed above, the release of the documents would likely have a negative impact on Signet by adding to the existing negative publicity surrounding the company related to diamond-swapping allegations.  Given the fact that the declarations and testimony contain allegations of improper behavior by Signet executives, including Signet CEO Mark Light, the company could come under intense pressure to make executive level changes. Finally, a portion of prospective claimants have until October 5, 2016 to opt-in to the class arbitration.  If the release of information resonates with prospective claimants or they see patterns of behavior that also impacted them, they may be more inclined to opt-in to the class action.  Increasing the size of the class would increase the size of potential damages against Signet in the event that the claimants prevail in the arbitration.

**Details of allegations**. In the Class Award, the arbitrator alludes to the contents of the evidence.  The arbitrator notes that the evidence consists of declarations and testimony by current and former male and female Sterling employees as well as testimony from Sterling executives and senior managers. The Class Award states that the conduct described in the evidence occurred in numerous settings including hallways, elevators, Sterling stores and at the mandatory annual Sterling managers' meeting in Orlando, Florida.

The evidence, according to the Class Award, "includes references to women in sexual and vulgar ways, groping and grabbing women, soliciting sexual relations with women (sometimes as a *quid pro quo* for employment benefits), and creating an environment at often-mandatory Company events in which women are expected to undress publicly, accede to sexual overtures and refrain from complaining about the treatment to which they have been subjected." Importantly, the Class Award notes that the testimony and declarations submitted describe instances in which managers at all levels of the company made comments reflecting negative gender stereotypes, and used those stereotypes in furtherance of gender biased promotion and pay decisions.

The Memorandum in Support of Motion for Class Certification also provides information about the contents of the evidence.  In addition to the matters discussed in the Class Award, the Memorandum indicates that the inappropriate behavior "has even included sexual assault and rape." And while the section about the conduct of executives is currently redacted, it is our understanding that if the arbitrator decides to make the documents publicly available, the portions of the Memorandum that are currently redacted would also become publicly available**.**

*You are a subscriber to The Capitol Forum. Please contact 202-601-2300 for editorial or sales questions.*

*© 2016 by The Capitol Forum. Direct or indirect reproduction or other distribution of this article without prior written permission from The Capitol Forum is a violation of Federal Copyright Law.*