# EXHIBIT E

**In the Matter Of:**

*In re Signet*
*Jewelers*

*Allen Ferrell*
*May 14, 2019*



*Min-U-Script® with Word Index*

1

1

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   ----------------------------

5   IN RE:

6   SIGNET JEWELERS LIMITED        Case No.

7   SECURITIES LITIGATION     1:16-CV-06728-JMF

8   ----------------------------

9

10

11

12

13

14       VIDEOTAPED DEPOSITION OF ALLEN FERRELL

15

16                   May 14, 2019

17                    9:00 a.m.

18

19

20

21

22

23   Reported by:

24   Joan Ferrara

25   Job No. 2019-70919

2

1

2

3

4                     May 14, 2019

5                     9:00 a.m.

6                     New York, New York

7

8

9           Videotaped Deposition of ALLEN

10   FERRELL, held at the offices of Weil

11   Gotshal & Manges, LLP, 767 Fifth Avenue,

12   New York, New York, Pursuant to Notice,

13   before Joan Ferrara, a Registered Merit

14   Reporter, Certified Realtime Reporter and

15   Notary Public of the State of New York.

16

17

18

19

20

21

22

23

24

25

3

1

2  A P P E A R A N C E S:

3

4  BERNSTEIN LITOWITZ BERGER & GROSSMAN, LLP

5  Attorneys for Plaintiff Shareholders

6           1251 Avenue of the Americas

7           New York, New York 10002

8  BY:      JOHN RIZIO-HAMILTON, ESQ.

9           johnr@blbglaw.com

10          MICHAEL MATHAI, ESQ.

11

12  WEIL GOTSHAL & MANGES, LLP

13  Attorneys for Defendant Signet, Michael

14  Barnes, Ron Restau, Mark Light, Michele

15  Santana and Virginia Drosos

16           767 Fifth Avenue

17           New York, New York 10153-0119

18  BY:      JOSEPH S. ALLERHAND, ESQ.

19           joseph.allerhand@weil.com

20           JOSHUA M. GLASSER, ESQ.

21           joshua.glasser@weil.com

22           ZANDER WEISS, ESQ.

23

24  ALSO PRESENT:
             Juan Torres, Videographer
25

4

1

2

3          IT IS HEREBY STIPULATED AND

4     AGREED, by and between the attorneys

5     for the respective parties herein,

6     that filing and sealing of the

7     transcript be waived, and the same are

8     hereby waived.

9          IT IS FURTHER STIPULATED AND

10    AGREED that all objections, except as

11    to the form of the question, shall be

12    reserved to the time of the trial.

13         IT IS FURTHER STIPULATED AND

14    AGREED that the within deposition may

15    be sworn to and signed before any

16    officer authorized to administer an

17    oath, with the same force and effect

18    as if signed and sworn to before the

19    Court.

20

21

22

23

24

25

14

1              A. Ferrell

2   environment and looking at that in

3   conjunction with whether it's statistically

4   significant residuals.

5              I would also reference Part A of

6   my report, that begins on page 12, that

7   talks about the efficiency market

8   hypothesis and when would information be

9   impounded, just to sort of summarize

10  different components of my report.

11      Q.    So it's fair to say that in

12  determining that the substance of the

13  allegations in the Jock declarations and

14  the risks that disclosure of declarations

15  pose to the company were already known to

16  the market, you read disclosures that

17  occurred prior to the Washington Post

18  article and compared those disclosures to

19  the information contained in the Washington

20  Post article.

21              Is that fair to say?

22      A.    Well, I certainly read all those

23  materials, that's certainly fair to say.

24              But I would also add, besides

25  just referencing generally my report, that

15

1          A. Ferrell

2     it's very important in this type of price

3     impact analysis to keep in mind the but-for

4     disclosure as identified by the plaintiffs

5     in the Complaint.

6          Q.    Right, and we will discuss that.

7               But you would agree with me that

8     beyond reading the preexisting disclosures

9     and then comparing the substance in those

10    disclosures to the Washington Post article,

11    you didn't conduct any other analysis to

12    determine whether the information was

13    already known to the market?

14         A.    Well, I also looked at the event

15    study analysis in the context of the

16    efficient market hypothesis.  So I would

17    view those as all intricately interlinked.

18         Q.    Okay.

19         A.    But it is certainly correct, I am

20    not trying to argue the point, that I

21    certainly read disclosures that occurred.

22    That's certainly a necessary component.

23         Q.    Right.

24               And you would agree with me that

25    you don't need any training as an economist

16

1                    A. Ferrell

2    to read the materials that you relied on in

3    your report for the proposition that the

4    information in the Washington Post article

5    was previously known to the market?

6        A.    I don't -- I want to back up for

7    a second.

8            I don't agree with the framing,

9    that is the information in the Washington

10   Post article was already known -- that's

11   not how I framed it in the report.

12           The way I frame it in the report

13   is the information identified in the

14   Complaint as the but-for disclosure was

15   disclosed earlier than the Washington Post

16   article.

17           I was not -- I do not frame it as

18   all the information in the Washington Post

19   article was contained in those earlier

20   disclosures.  So I just want to make that

21   clear for the record.

22       Q.    Okay.

23           So we would agree then that the

24   Washington Post article, in fact, disclosed

25   some new information that was not

17

```
1                    A. Ferrell
2    previously known to the market, correct?
3        A.    It did provide a couple of
4    additional examples.  I don't -- don't hold
5    me to the number, but maybe three or four,
6    as well as some interviews.  So there's a
7    handful of some additional examples that
8    was contained in the Washington Post.  I
9    believe that's accurate.
10       Q.    If one wanted to determine
11   whether the information in this but-for
12   disclosure that you reference was known to
13   the market prior to the time of the
14   corrective disclosure alleged in this case,
15   would one simply go back and look at the
16   prior public disclosures that you reference
17   in your report?
18       A.    Well, one would want to look at
19   the disclosures that speak to, if there are
20   any, to the but-for disclosure that is
21   claimed to have been omitted or
22   misrepresented.
23             So you certainly -- it is
24   certainly the case, I am not arguing this
25   point, that you would want to read, you
```

1                    A. Ferrell

2    would want to know the informational

3    environment.  Otherwise, I don't see how

4    you would do a price impact analysis.

5         Q.    And to read those disclosures and

6    to understand what they say, one doesn't

7    need any specialized training as an

8    economist to do that, right?

9         A.    I agree with that.

10        Q.    Okay.

11        A.    I think the documents speak for

12   themselves.

13        Q.    In reaching the conclusion in

14   paragraph 26 that the substance of the

15   allegations in the Jock declarations and

16   the risk that disclosure of the

17   declarations pose to the company was

18   already known to the market, did you read

19   the declarations themselves?

20        A.    Even though it's not on my

21   Documents Relied Upon list, I did skim the

22   declarations just for context.  The ones

23   that I believe that were posted Sunday

24   night.  So I did very briefly skim them.

25        Q.    Okay.

Allen Ferrell - May 14, 2019

19

1                    A. Ferrell

2              But you didn't conduct any

3    detailed analysis of their contents?

4        A.    Beyond what I just said, no.

5        Q.    Is it -- why did you -- strike

6    that.

7              Why did you only briefly skim the

8    declarations?

9        A.    Well, I just wanted the context.

10   I think as I tried to emphasize, for price

11   impact analysis as an economist you have to

12   assume the theory of liability.  You have

13   to assume that whatever it is being

14   identified is the but-for disclosure, the

15   disclosure that the plaintiffs claim could

16   and should have been made earlier, and you

17   have to accept that as the disclosure that

18   should have happened earlier.

19              So that's really the linchpin,

20   not my own personal views as to what should

21   have been disclosed or whether it be based

22   on the declarations or something else.

23       Q.    Can we look briefly at paragraph

24   27, please?

25       A.    Yes.  Just give me a second to

20

1                   A. Ferrell

2    read it.

3         Q.     Sure.

4         A.     I've read it.

5         Q.     Okay.

6                You opine in paragraph 27 that

7    the stock price drop is consistent with the

8    bad publicity the front page article

9    generated for Signet with the intended

10   impact on Signet's customers and Signet's

11   future financial performance, correct?

12        A.     Yes.

13        Q.     Are you opining that 100 percent

14   of the stock price decline on February 28,

15   2017 was caused by this bad publicity

16   effect that you reference?

17        A.     No.  I'm -- just to be clear and

18   have a complete answer, I'm offering in

19   paragraph 27 some observations about the

20   stock price drop on that date, but I'm not

21   doing a full analysis of what's causing it

22   or what portion is caused by what.  So the

23   answer to your question is no.

24        Q.     Okay.

25                And so as your last answer

Allen Ferrell - May 14, 2019

21

1                       A. Ferrell

2    indicates, you have not conducted a

3    scientific analysis to determine that 100

4    percent of the stock price decline on

5    February 28, 2017 was caused by bad

6    publicity, correct?

7         A.    Yes.

8         Q.    And in paragraph 27, you mention

9    impacts on Signet's customers, Signet's

10   future financial performance and also harm

11   to Signet's brand, correct?

12        A.    I do.

13        Q.    Okay.

14              And I take it that you haven't

15   conducted any scientific analysis to

16   quantify the extent to which the bad

17   publicity impacted Signet's customers,

18   correct?

19        A.    Yes.

20        Q.    And I take it that you haven't

21   conducted a scientific analysis to quantify

22   the extent to which the bad publicity

23   impacted Signet's future financial

24   performance, correct?

25        A.    Yes.

Allen Ferrell - May 14, 2019

22

1              A. Ferrell

2        Q.     And finally, I take it that you

3    have not conducted any scientific analysis

4    to quantify the extent to which the bad

5    publicity harmed Signet's brand, correct?

6        A.     Yes.

7        Q.     Okay.

8        A.     When I say yes, I mean, I'm

9    agreeing with the proposition in your

10   question.

11       Q.     Right.

12              Okay.  Let's step back for a

13   minute.

14              When you use the term "bad

15   publicity," what do you mean?

16       A.     So what I mean in this paragraph

17   is publicity that affects customers or

18   potential customers' willingness to buy or

19   the amount that they're willing to buy

20   at -- from Signet.  So it's the impact that

21   this bad publicity has on its customer base

22   or its potential customer base, which could

23   then affect its financial performance.  And

24   that's obviously, it's also reflected in my

25   reference to Signet's brand.

Allen Ferrell - May 14, 2019

23

1               A. Ferrell

2      Q.    And again, you haven't conducted

3  a scientific analysis to quantify those

4  impacts, correct?

5      A.    I agree with that.

6      Q.    And you haven't conducted a

7  scientific analysis that quantifies how any

8  such impacts would translate into the stock

9  price decline on February 28, 2017,

10  correct?

11      A.    That's correct, beyond what I say

12  in paragraph 27, which it's consistent

13  with, but I agree with those statements.

14      Q.    Isn't it possible for there to be

15  bad publicity about newly disclosed

16  information?

17      A.    Yes, it's possible.

18      Q.    So the two concepts of bad

19  publicity and the disclosure of new

20  negative information are not mutually

21  exclusive, correct?

22      A.    I agree with that.

23      Q.    In fact --

24      A.    Sorry, I don't mean to interrupt,

25  but yes, it's a priori truth, I agree.

Allen Ferrell - May 14, 2019

33

```
 1                    A. Ferrell
 2    the facts and circumstances.  It's
 3    obviously a brief on behalf of a client.
 4         Q.    Let's look at paragraph 45.
 5    That's the March 28, 2014 New York Times
 6    article you referenced.
 7         A.    Just one quick -- I mean, I want
 8    to make sure in my earlier answer, I was
 9    not suggesting that people would believe
10    lawyers are acting unethically or lying or
11    making stuff up.  Obviously, there's
12    professional obligations.
13         Q.    There are professional
14    obligations, but lawyers are advocates,
15    correct?
16         A.    That is true.
17         Q.    And their briefs contain
18    advocacy?
19         A.    Yes.
20         Q.    So why don't you take a look at
21    paragraph 45 and let me know when you're
22    ready to discuss it.
23         A.    Okay.
24         Q.    Okay.
25               Now, you agree that when this New
```

Allen Ferrell - May 14, 2019

34

1           A. Ferrell

2    York Times article was published there was

3    no statistically significant stock price

4    reaction, correct?

5        A.     Correct.

6        Q.     So if bad publicity is enough to

7    create a statistically significant stock

8    price reaction, why was there not a

9    statistically significant stock price

10   reaction when this New York Times article

11   was published?

12       A.     I don't have an answer as to why

13   the Washington Post, that the stock price

14   action, the Washington Post article in the

15   time period that it was published created

16   bad publicity or is consistent with

17   creating bad publicity in a way that the

18   New York Times article did not.

19           So I could speculate about that,

20   but there is a price decline on the

21   Washington Post article that date.  And as

22   we discussed, that did not occur with the

23   New York Times.

24       Q.     And you have not conducted any

25   scientific analysis to explain why the

35

1              A. Ferrell

2    stock price reaction occurred following the

3    Washington Post article, but not following

4    the publication of the 2014 New York Times

5    article?

6        A.    Well, I mean, I would reference

7    our earlier discussion, which is I offer

8    some observations about the Washington Post

9    article, I offer some observations about

10   the stock price reaction on that date, but

11   I haven't done the quantification and the

12   issues that we discussed earlier.

13              (Ferrell Exhibit 2, New York

14         Times Magazine article dated April 23,

15         2019, marked for identification, as of

16         this date.)

17   BY MR. RIZIO-HAMILTON:

18       Q.    Okay.

19              Let's just take a look at this

20   article which I've marked as Ferrell

21   Exhibit 2.

22              It's a reproduction of a cover

23   story from the New York Times Magazine

24   dated April 23, 2019.

25              You could take a moment to look

1              A. Ferrell

2    at it and let me know when you're ready to

3    talk about it.

4         A.   Obviously, I haven't sat here and

5    read this document, you know, just now --

6    but yeah, I guess I'm ready.

7         Q.   My first question is, have you

8    ever seen this article before?

9         A.   Yes.

10        Q.   Okay.

11        A.   Yes.

12        Q.   And have you ever read it before

13   today?

14        A.   Yes.  I briefly read it.

15        Q.   Okay.

16        A.   I mean, I read it quickly, but

17   yes.

18        Q.   It's published actually a few

19   days before you submitted your report.

20        A.   Yes.

21        Q.   Okay.

22             And so I would have kind of the

23   same questions for this piece, as I did

24   about the 2014 New York Times piece, which

25   is to say if bad publicity is enough to

Allen Ferrell - May 14, 2019

37

```
 1                  A. Ferrell
 2   cause a statistically significant stock
 3   price reaction, why wasn't there a
 4   statistically significant market reaction
 5   when this New York Times article was
 6   published at the end of April 2019?
 7       A.   I don't know whether what you
 8   just said is accurate or inaccurate.  I
 9   haven't looked at the event study results
10   or -- I briefly read this article, but
11   nothing more.
12       Q.   Okay.
13            So for the purposes of the
14   questions about this article, assume that
15   there was no statistically significant
16   negative stock price reaction following the
17   publication of this article.  Just assume.
18            Assuming that is true, if bad
19   publicity is enough to create a
20   statistically significant stock price
21   reaction, have you undertaken any analysis
22   to determine why there was not a
23   statistically significant stock price
24   reaction in response to this article?
25       A.   So I have not analyzed this
```

Allen Ferrell - May 14, 2019

38

1              A. Ferrell

2    article besides just briefly reading it.

3    It's not really relevant to the price

4    impact inquiry which is focused on whether

5    the market knew the but-for disclosure

6    prior to the alleged corrective disclosure.

7              What I say in terms of making

8    some observations about publicity is it can

9    create a negative stock price reaction.

10   Obviously, it depends on the facts and

11   circumstances.

12       Q.    Okay.

13             But it's fair to say that you

14   haven't analyzed the stock price impact of

15   this particular article in Ferrell Exhibit

16   2?

17       A.    Correct.

18       Q.    Could you look at Footnote 72 of

19   your report?  It's set forth on page 23.

20       A.    Yes.

21       Q.    Are you opining in this into the

22   note that the February 28, 2017 Northcoast

23   Research report is confounding information

24   with respect to the stock price decline on

25   that date?

Allen Ferrell - May 14, 2019

39

1                    A. Ferrell

2       A.     No.  I'm just -- I'm not

3  analyzing -- I'm making some observations

4  about that date, but I'm not doing anything

5  more than that.

6       Q.     So you haven't conducted any

7  analysis of what portion, if any, of the

8  stock price decline on February 28, 2017 is

9  attributable to the Northcoast analyst

10  report, correct?

11      A.     Correct.

12            MR. RIZIO-HAMILTON:  Okay.  Why

13       don't we take another quick break.

14            THE VIDEOGRAPHER:  The time is

15       9:50.  We're going off the record.

16            (Recess taken from 9:50 a.m. to

17       9:58 a.m.)

18            THE VIDEOGRAPHER:  The time is

19       9:58.  We are back on the record.

20  BY MR. RIZIO-HAMILTON:

21      Q.     I just want to confirm something,

22  Dr. Ferrell.

23            You see the information cited in

24  paragraphs 44 --

25      A.     One second.  Okay.

40

1          A. Ferrell

2     Q.     The information cited in

3   paragraphs 44 through 47 of your report, do

4   you see that there?

5     A.     I do.

6     Q.     Okay.

7          Have you undertaken any analysis

8   to confirm whether all the information from

9   the declarations and the Washington Post

10   article was actually disclosed in the

11   sources you cite in paragraphs 44 to 47?

12     A.     So I want to be clear about what

13   my analysis is and what I did, which is the

14   question is not whether the Washington Post

15   such as the additional examples were

16   disclosed earlier, but rather whether the

17   but-for disclosure identified in the

18   Complaint, such as paragraph 325, whether

19   that was disclosed earlier and whether

20   there was a statistically significant price

21   reaction associated with that given that

22   we're talking about the context of an

23   efficient market.

24     Q.     But I take it that you have not

25   analyzed the issue of whether all the

41

1                   A. Ferrell

2     information in the declarations in the

3     Washington Post article was, in fact,

4     disclosed in the sources you cite in

5     paragraphs 44 to 47?

6               MR. ALLERHAND:  Objection to the

7          form.

8          A.    So all of the information in the

9     declarations -- I think it's accurate to

10    say that the declarations, as I understand

11    it, were only first made available Sunday

12    evening.  Those declarations are being

13    summarized in the allegations and, for

14    example, in the class award.  But my

15    understanding of the facts is that the

16    declarations were posted on that Sunday

17    night.

18         Q.    Okay.

19               And so fair to say, by definition

20    then, that all the information in the

21    declarations could not have been disclosed

22    in the sources that you cite in paragraphs

23    44 to 47 of your report?

24               MR. ALLERHAND:  Or the Washington

25         Post article.

1              A. Ferrell

2      A.     I agree, I agree with the -- I

3  agree that the declarations in their

4  entirety were made available Sunday

5  evening -- I forget the -- the Sunday

6  before the Washington Post article.  That's

7  my understanding, with some redactions.

8      Q.     Why don't we turn to paragraph 52

9  of your report -- I'm sorry, 51, 51.

10     A.     Okay.  So just give me a second.

11  Okay.

12     Q.     The analysis that you perform in

13  paragraphs 51 with respect to Signet's true

14  or but-for value at the start of class

15  period, that analysis assumes constant

16  dollar inflation from the beginning of the

17  class period, correct?

18     A.     Yes.

19     Q.     And if inflation in this case

20  ultimately was not constant dollar, but

21  instead was ramped, that could result in a

22  true but-for value that was positive,

23  correct?

24     A.     I think that's mathematically

25  true.  When you say "ramped," meaning -- I

Allen Ferrell - May 14, 2019

43

1                    A. Ferrell

2    take your reference to ramp meaning that

3    the sum of the residuals would be adjusted

4    downward such that it's lower than the

5    actual stock price as of the beginning of

6    the class period.

7         Q.    That's correct.

8         A.    That's my understanding.  So yes,

9    by definition, that would be true.

10        Q.    And the analysis that you set

11   forth in paragraph 51 with respect to

12   Signet's true or but for value at the start

13   of the class period also assumes that the

14   entire stock price decline on each and

15   every corrective disclosure day is

16   ultimately found to be recoverable as

17   damages in this case, is that right?

18        A.    Yes.  So I'm assuming the sum of

19   the residuals on those dates, that's

20   correct.

21        Q.    Right.

22        A.    Thereby illustrating the need for

23   adjustments to the model.

24        Q.    And if there were some

25   disaggregation that were performed in this

61

1            A. Ferrell

2    the alleged fraud, you're going to have to

3    control for those non-Signet effects.

4            And what I'm saying here in the

5    facts and circumstances of this case is I

6    know no reliable methodology to do it.

7            So that's the context in which

8    I'm discussing the event study in this

9    case.

10    Q.    So is it your view then that if

11    this matter were to proceed to the damages

12    phase, the defendants would not be able to

13    offer a reliable expert opinion that

14    calculates damages per share?

15    A.    Yes, I agree with that.  Sitting

16    here today, I know, although I'll be happy

17    to look at Hartzmark's or anybody else's

18    work, but sitting here today, I know no

19    reliable methodology to capture the

20    non-Signet effects that are occurring on

21    these multiple earnings dates so the

22    residual doesn't reflect that.

23    Q.    Okay.

24            Can we just flip back quickly to

25    paragraphs 44 through 47 in your report.

Allen Ferrell - May 14, 2019

62

```
 1                    A. Ferrell
 2       A.     Okay.
 3       Q.     I just want to be clear --
 4       A.     I'm sorry, can I just take a
 5    quick look?
 6       Q.     Yeah, go ahead.
 7       A.     Okay.
 8       Q.     Okay.
 9              So I just want to be clear that
10    you are not opining that all the
11    information set forth in the declarations
12    and the Washington Post article was
13    previously disclosed in the disclosures set
14    forth in paragraphs 44 to 47, correct?
15              MR. ALLERHAND:  Objection to the
16         form.  The Washington Post article
17         does not set forth all the detail in
18         the 200 plus declarations.  Misstates
19         the record.
20    BY MR. RIZIO-HAMILTON:
21       Q.     Mr. Allerhand apparently is now
22    serving as an expert.  That's fantastic.
23       A.     Could you reread the question?
24       Q.     Sure.
25              I just want to be clear that you
```

63

1            A. Ferrell

2    are not opining that all the information

3    set forth in the declarations and the

4    Washington Post article was previously

5    disclosed in the disclosures set forth in

6    paragraphs 44 to 47, correct?

7            MR. ALLERHAND:  Objection to the

8        form of the hypothetical.  Compound.

9        A.    I agree that the declarations,

10   the entire declarations that were posted on

11   Sunday evening, that that entire set of

12   declarations was not disclosed earlier.  So

13   I agree with that.

14            Again, I would emphasize the

15   critical point that the but-for disclosure

16   identified in the Complaint such as

17   paragraph 325 was fully disclosed in the

18   information reflected in paragraphs 44

19   through 47.

20       Q.    Is it your testimony that the

21   disclosures in paragraphs 44 to 47 of your

22   report disclosed the fact that Signet had a

23   very serious sexual harassment problem at

24   the company?

25            MR. ALLERHAND:  Objection to the

69

1                    A. Ferrell

2              THE VIDEOGRAPHER:   The time is

3      10:42.   This ends the deposition.

4              (Time noted:   10:42 a.m.)

5

6

7                    _____

8                    ALLEN FERRELL

9

10    Subscribed and sworn to before me

11    this ____ day of _____, 2019.

12

13    _____

14

15

16

17

18

19

20

21

22

23

24

25

70

1

2          C E R T I F I C A T E

3   STATE OF NEW YORK     )

4                         : ss.

5   COUNTY OF NEW YORK    )

6

7          I, Joan Ferrara, a Notary Public

8      within and for the State of New York,

9      do hereby certify:

10         That ALLEN FERRELL, the witness

11     whose deposition is hereinbefore set

12     forth, was duly sworn by me and that

13     such deposition is a true record of the

14     testimony given by the witness.

15         I further certify that I am not

16     related to any of the parties to this

17     action by blood or marriage, and that I

18     am in no way interested in the outcome

19     of this matter.

20         IN WITNESS WHEREOF, I have

21     hereunto set my hand this 14th day of

22     May, 2019.

23

24                     _____

25                     Joan Ferrara