**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/10/2019

IN RE SIGNET JEWELERS LIMITED
SECURITIES LITIGATION

No. 16 Civ. 6728 (CM) (RWL)

## DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

McMahon, C.J.:

This putative securities fraud class action is typical in all respects save one:  it is really two securities fraud class actions that have been joined in a single complaint, because two entirely separate sets of non-disclosures occurred during the same time period.  This irregularity makes the case somewhat unique but—despite suggestions to the contrary—far from extraordinary.

On March 22, 2018, Lead Plaintiff the Public Employees' Retirement System of Mississippi (hereinafter referred to as the "Plaintiff" or "Lead Plaintiff") filed the Fifth Amended Complaint (the "FAC"), the operative complaint in this action, against Defendants Signet Jewelers Limited ("Signet") and five of Signet's corporate officers, including former chief executive officer ("CEO") and director Michael Barnes; former CEO and director Mark Light; current CEO and director Virginia Drosos; former chief financial officer ("CFO") Ronald Ristau; and current CFO Michele Santana (hereinafter referred to collectively as the "Executive

Defendants," and, together with Signet, the "Defendants"). Plaintiff now seeks to certify a class

of all persons and entities who purchased or otherwise acquired Signet common stock from

August 29, 2013 to March 13, 2018 (the "Class Period")—the period during which two entirely

different types of information were allegedly not disclosed to the investing public.

For the reasons that follow, Plaintiff's motion is granted.

## I.      Relevant Factual Background

The allegations of the FAC are accepted as true for purposes of the instant motion. *See*

*Waggoner v. Barclays PLC*, 875 F.3d 79, 86 n.5 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1702,

(2018) (citing *Shelter Realty Corp. v. Allied Maintenance Corp.*, 574 F.2d 656. 661 n.15 (2d Cir.

1978)).

The Court presumes the parties' familiarity with the facts of this case, which were recited

in detail in the Court's earlier Decision and Order Denying Defendants' Motion to Dismiss the

Fifth Amended Class Action Complaint (Op. Denying Mot. to Dismiss, dated Nov. 26, 2018,

Dkt. No. 120) and Decision and Order Denying Defendants' Motion for Judgment on the

Pleadings (Op. Denying Mot. for J. on Pleadings, June 11, 2019, Dkt. No. 166). The Court

writes only to provide a summary of facts pertinent to class certification.

In brief, Plaintiff alleges that Defendants (*i*) misrepresented the health of Signet's credit

portfolio and (*ii*) concealed potential liability facing the company for its alleged "pervasive"

culture of sexual harassment. (*See generally* FAC, dated Mar. 22, 2018, Dkt. No. 111.)

### a.      Alleged Credit Program Fraud

Before and during the class period, Signet operated an in-house credit program, run

through its wholly owned subsidiary, Sterling Jewelers, Inc. ("Sterling"), whereby it extended

credit to its customers for jewelry purchases. (*Id.* ¶ 40.) Over the course of the Class Period,

Signet's credit program was the subject of extensive public disclosures, which included key

2

metrics associated with the program (*e.g.*, accounts receivable, allowances for credit losses, charge offs, and net bad debt expense figures) and Signet's methods for calculating those numbers. (*See* Op. Denying Mot. to Dismiss at 3–4 (internal citations omitted).)

Defendants also represented at various points—both orally and in Signet's SEC filings—that they closely monitored Signet's lending operation, and that its credit portfolio was healthy. Among other things, Defendants repeatedly characterized Signet's credit program as "strong" or "very strong" (FAC ¶¶ 322, 339, 368, 385, 406, 409, 417, 428, 504); described the portfolio as being "conservatively managed" (*id.* ¶ 50), "so well managed" (*id.*), and "watch[ed] . . . very closely" (*id.* ¶ 50); and stated that the company "[does not] push the credit" on its customers, and that it "w[ould] never cross that line" (*id.*). Defendants further conveyed the purported strength of Signet's loan portfolio by reporting very low loan loss reserves throughout the Class Period—ranging from 6.5% to 7.8% of Signet's receivables—which allegedly enabled Signet to meet earnings estimates for eleven straight fiscal quarters. (*Id.* ¶¶ 58–62.)

According to Plaintiff, these representations were false or misleading, because Signet's underwriting practices were, in fact, reckless, and its loan portfolio was of exceedingly poor quality.

Unknown to investors, 45% of its portfolio—approximately $800 million—was subprime. (*Id.* ¶¶ 65, 144.) Former Signet employees reported that the company employed strict quotas that forced salespeople to press credit on high-risk borrowers. (*Id.* ¶¶ 79–84.) These employees characterized Signet's underwriting as "ridiculous," "garbage," and a "running joke;" applicants' jobs were not verified, facially false information was ignored, incomplete and unsigned applications were approved, and borrowers' poor credit scores and multiple bankruptcies were disregarded. (*Id.* ¶¶ 67, 83, 85–87.) Senior management allegedly ignored

internal warnings from members of Signet's credit risk department and directed the company not to raise its loan loss reserves, fearing that doing so would hurt the company's bottom line. (*Id.* ¶¶ 71–73, 76.)

In addition to these allegations regarding Signet's underwriting processes, Plaintiff also alleges that Signet materially understated the reserves for its loan portfolio and its related bad debt expenses, thereby materially overstating its income. (*Id.* ¶¶ 303–16.) Central to their fraud, Plaintiff submits, was the company's decision to use a less common method for aging accounts receivable called the "recency" method. (*See id.*) According to Plaintiff, using the recency method enabled Defendants to disguise the risk associated with Signet's credit portfolio. (*Id.*)

### 1.   Corrective Disclosures

Plaintiff contends that Defendants' alleged fraudulent statements concerning the health and management of Signet's credit portfolio artificially inflated the company's stock price, and that this inflation was removed incrementally during the final two years of the Class Period through the following series of "corrective disclosures."[1] (*Id.* ¶¶ 550–64, 567–71.)

#### i.   *November 24, 2015: Signet Reports Disappointing Earnings*

On November 24, 2015, Signet reported an earnings "miss." (*Id.* ¶ 551.) Defendants stated that higher net bad debt expense, which rose to $54 million compared to $41.7 million the year prior, had led to contracting margins. (*Id.*) Plaintiff alleges the increase in bad debt expense was "a result of Defendants' reckless lending practices and the resulting increase in non-performing loans." (*Id.*) Signet's stock fell 4% by close of business that day. (*Id.* ¶ 89.)

---

[1]      "A 'corrective disclosure' is an announcement or series of announcements that reveals to the market the falsity of a prior statement." *Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 480 n.3 (2d Cir. 2018).

Signet's earnings report caused investors to question whether Signet's underwriting and credit portfolio were as strong as Defendants had claimed. (*Id.*; *see also id.* ¶ 104 (analyst report questioning whether Signet was "a subprime finance company.").) Defendants dismissed these concerns as unwarranted. (*Id.* ¶¶ 93–95; 101, 105–06, 118.)

According to Plaintiff, the earnings release "partially revealed the risk associated with the loan portfolio and called into question Defendants' representations about the profitability of the portfolio." (*Id.* ¶ 552.)

### ii.      May 26, 2016:  Signet Reports Disappointing Earnings and the Hiring of Goldman Sachs to Review Credit Program Options

On May 26, 2016, Signet released first quarter fiscal 2017 earnings, in which it reported a same-store sales growth "miss" and announced that the company was hiring Goldman Sachs to conduct a strategic review of its credit portfolio. (*Id.* ¶ 553.) Signet's stock declined by more than 10% by close of business that day in response to this news. (*Id.*)

Analysts expressed "surprise" following the company's announcement, stating that a review and possible sale of Signet's credit portfolio were inconsistent with the company's earlier representations that the portfolio constituted a key competitive advantage. (*Id.* ¶¶ 114–16.) In response, Defendants reiterated that the quality and performance of Signet's credit portfolio remained strong. (*Id.* ¶¶ 118–19.)

According to Plaintiff, this announcement "partially revealed the risk associated with the loan portfolio and called into question both Defendants' representations about the quality of the portfolio, and Defendants' representations that the portfolio was underwritten conservatively." (*Id.* ¶ 554.)

### iii.      June 2, 2016:  Grant's Interest Rate Observer Criticizes Signet's Credit Program

On June 2, 2016, Grant's Interest Rate Observer, a third-party publication covering the
financial markets, published an article titled "Lending Clubbed," which suggested that Signet's
credit portfolio was weaker than realized and that the company's use of the recency method
masked the "true condition" of that portfolio. (*Id.* ¶ 555.) It reported:

> At first glance, the Signet credit portfolio would seem to be shipshape. Non-performing
> loans amounted to 3.6% of gross receivables on April 30, only 10 basis points higher than
> a year earlier. Second glance tells a different story. "Recency" is the name of the
> method that Signet elects to employ in accounting for credit delinquency. A layman
> might call it forgiving.
>
> . . .
>
> Thanks to Marc Cohodes, former portfolio manager of Copper River Partners and a
> current short seller of Signet, for identifying an alternative path to the true condition of
> Signet's credit portfolio. Just count bankruptcy filings, Cohodes suggests. Thus, in the
> three months of January through March, 3,274 American personal bankruptcy
> submissions named Signet or one of its brands as a creditor. Compare the 2,663 such
> listings in the fourth quarter 2015 and the 1,903 in the first quarter 2015.

(*Id.* ¶ 120–121.)

That day, Signet's stock price fell another 6.5%. (*Id.* ¶ 122.)

According to Plaintiff, this report "partially corrected Defendants' prior materially
misleading statements and omissions concerning the stability of Signet's loan portfolio and the
consistency of Defendants' underwriting standards." (*Id.* ¶ 556.)

### iv.    *Aug. 25, 2016: Signet Reports Disappointing Results*

On August 25, 2016, Signet announced disappointing financial results for the second
fiscal quarter 2017. (*Id.* ¶ 557.) Specifically, it reported missed earnings, lower sales, reduced
guidance, increased year-over-year bad debt expense, and increased loan loss reserves from the
prior quarter. (*Id.; see also id.* ¶¶ 125–26.) Defendants provided numerous explanations for
these results, including the effects caused by "Brexit," the declining energy industry, and certain
"fundamental issues" associated with Jared the Galleria of Jewelry, a retail brand operated by

6

Sterling. (*Id.* ¶ 127.) Some analysts dismissed these explanations as unconvincing and contradictory. (*Id.* ¶ 130.)

In response to the company's August 25 announcement, Signet's stock price fell 13%. (*Id.* ¶ 133.)

According to Plaintiff, this announcement "partially corrected Defendants' prior materially misleading statements and missions concerning the credit quality of Signet's loan portfolio[,] the conservative nature of its underwriting, and the profitability of its credit business." (*Id.* ¶ 558.)

### v.   *May 24, 2017: Buckingham Lowers its Rating of Signet*

On May 24, 2017, the Buckingham Research Group lowered its rating for Signet to "neutral" and cut its price target for Signet stock. (*Id.* ¶ 559.) Buckingham attributed the downgrade in substantial part to concern over potentially aggressive underwriting and its inflationary impact on Signet's financial performance, stating, "[W]e think this quarter's results will likely reinforce the bear thesis that [] sales have been potentially inflated by aggressive credit standards[.]" (*Id.*) Signet's stock price declined 6.5% on this news. (*Id.*)

### vi.   *May 25, 2017: Signet Reports Disappointing Results and the Sale of the Prime Portion of its Credit Portfolio*

On May 25, 2017, Signet announced poor financial results for first quarter fiscal 2018 and, simultaneously, that it was selling the "prime" portion of its credit portfolio—which totaled $1 billion, representing 55% of the total book—to Alliance Data Services. (*Id.* ¶ 560.) This announcement revealed that the remaining 45% of Signet's credit portfolio was subprime. (*Id.* ¶¶ 143–44; 148.) Signet's stock price fell nearly 8% by close of business that day. (*Id.* ¶ 151.)

According to Plaintiff, "Signet's May 25, 2017 disclosure corrected Defendants' prior misleading statements and omissions concerning the strength and profitability of Signet's credit

book, the credit quality of Signet's borrower base, and the Company's underwriting." (*Id.* ¶ 561.)

### vii.  Nov. 21, 2017:  Signet Reports Disappointing Results

On November 21, 2017, Signet released third quarter 2018 financial results, which disclosed that its sales and credit participation rate declined dramatically, causing the company to reduce earnings guidance for both the following quarter and full fiscal year 2018.  (*Id.* ¶ 562.) Defendants attributed these results to, among other things, weather and "systems and process disruptions." (*Id.* ¶ 155.)  Some analysts dismissed management's explanations as implausible and reported that these results were likely caused in significant part by the company's having tightened its credit standards, which had artificially supported sales growth in the past.  (*Id.* ¶159.)

Upon Signet's release of its financial results, stock price fell 30% in a single trading day. (*Id.* ¶ 158.)

### viii.  Dec. 1, 2017:  Signet Discloses CFPB and NYAG Investigations

On December 1, 2017, Signet disclosed in its 10-Q that the Consumer Financial Protection Bureau ("CFPB") and New York Attorney General ("NYAG") were investigating Signet's "in-store credit practices, promotions, and payment protection products." (*Id.* ¶ 563.)  It further disclosed that CFPB had been investigating the company for a year up to that point, and that the agency was "considering taking legal action against Signet" for violations of sections 1031 and 1036 of the Consumer Financial Protection Act of 2010 and the Truth in Lending Act. (*Id.*)

Signet's stock declined 3.5% in response to this news.  (*Id.*)

### ix.  Mar. 14: 2018:  Signet Announces Sale of Subprime Portfolio

8

On March 14, 2018, Signet disclosed that it had sold the remaining (subprime) portion of its credit portfolio for $435 million, or 72% par value, which constituted a 15% decrease in the value Signet had carried the asset on its balance sheet. (*Id.* ¶ 564.) In connection with the sale, Defendants announced that Signet would book a total loss of approximately $165-175 million, which included $45-55 million in purported "servicing expenses" plus $7 million in "transaction costs." (*Id.*) Analysts reported that this charge-off "was substantially more" than expected and was "likely the result of under-provisioning done by management over the last several years." (*Id.* ¶¶ 172–75.)

In response to this news, Signet's stock price fell 20.2% by close of business that day. (*Id.* ¶ 564.)

      **b.**    **Alleged Fraud Arising out of *Jock* Litigation**

On March 18, 2008, a class of current and former female Signet employees filed a putative class action in this District, alleging that Sterling employees were subjected to gender discrimination through improper promotion and compensation practices, in violation of Title VII and the Equal Pay Act. *See Jock et al. v. Sterling Jewelers, Inc.*, No. 08 Civ. 2875 (S.D.N.Y.) (Rakoff, J.) (hereinafter referred to as *Jock* or the "*Jock Litigation*"). The gravamen of the lawsuit was that Sterling had a corporate culture rife with sexual misconduct, where, among other things, male supervisors propositioned female subordinates to engage in sexual activity in exchange for employment advancement opportunities; those who resisted and reported this behavior to the company using its "anonymous" complaint system faced indifference or even reprisal. (*See* FAC ¶¶ 204–91.)

Following these allegations, the United States Equal Employment Opportunities Commission also filed a lawsuit against Sterling, bringing claims under Title VII of the Civil

Rights Act of 1964 and Title I of the Civil Rights Act of 1991 (the "EEOC Litigation," and, collectively with the *Jock*, the "Actions"). (*Id.* ¶ 180.)

Because Sterling required its employees to sign arbitration agreements, *Jock* was referred to a confidential arbitration, where it proceeded outside the public light for nearly a decade (far longer than it would have taken to litigate the matter in a federal court). During that time, Signet publicly acknowledged the existence of *Jock*, but characterized it as concerning allegations "by private plaintiffs alleging that US store-level employment practices are discriminatory as to compensation and promotional activities." (*Id.* ¶¶ 185, 324.) During this period, Defendants also represented that the company makes decisions solely based on merit, disciplines misconduct within its ranks, and provides a safe and anonymous means for employees to report misconduct without a risk of retaliation. (*Id.* ¶¶ 196–97, 199, 330–34.)

As part of the *Jock* arbitration, the claimants filed for class certification, in which the briefing on that issue included approximately 250 declarations from nearly 200 employees, who documented their experiences at Sterling in rich and salacious detail. (*Id.* ¶¶ 181, 275.) Because the arbitration proceedings were confidential, those declarations were not initially made public; instead, counsel for plaintiffs in that case posted on its website a version of its class certification brief with Signet-approved redactions. (*Id.* ¶ 182.) The redacted brief contained limited information from the declarations and, according to Plaintiff, "obscured" the nature of the allegations contained therein. (*Id.* ¶ 183.)

On February 2, 2015, the arbitrator in *Jock* issued a ruling permitting the *Jock* arbitration claimants to proceed with disparate impact claims on a class-wide basis. (*Id.* ¶ 184.) In issuing her decision, the arbitrator wrote:

> The conduct described in the declarations . . . includes references to women in sexual and vulgar ways, groping and grabbing women, soliciting sexual relations with women

(sometimes as a quid pro quo for employment benefits), and creating an environment at often-mandatory Company events in which women are expected to undress publicly, accede to sexual overtures and refrain from complaining about the treatment to which they have been subjected. . . . *For the most part Sterling has not sought to refute this evidence; rather Sterling argues that it is inadmissible, irrelevant and insufficient to establish a corporate culture that demeans women.*

(*Id.* ¶ 205 (emphasis added).)

### 2.   Corrective Disclosure

On February 26, 2017, the declarations submitted in *Jock* were publicly disclosed—albeit still with certain "company-approved redactions." (*Id.* ¶ 204.) A day later, the *Washington Post* wrote an article detailing the salacious allegations described in those now-public documents. (*Id.* ¶¶ 21, 275–79.) *See* Drew Harwell, *Hundreds Allege Sexual Harassment, Discrimination at Kay and Jared Jewelry Company*, Wash. Post (Feb. 27, 2017), https://www.washingtonpost.com/business/economy/hundreds-allege-sex-harassment-discrimination-at-kay-and-jared-jewelry-company/2017/02/27/8dcc9574-f6b7-11e6-bf01-d47f8cf9b643_story.html?utm_term=.e17e37e424de.

The following day, Signet's stock fell 8.3% by midday, prompting Signet to halt trading pending a release of news. (FAC ¶ 281.) Signet's press release characterized "media reports" as presenting a "distorted and inaccurate picture of our company," and amplifying the voices of "a very small number of individuals in a workforce of more than 84,000." Signet Jewelers Ltd., *Sterling Jewelers Statement on Ongoing Arbitration* (Feb. 28, 2017), https://www.signetjewelers.com/investors/news-releases/news-release-details/2017/Sterling-Jewelers-Statement-on-Ongoing-Arbitration/default.aspx. Despite this denial, Signet stock closed down 13% by close of business that day. (FAC ¶¶ 280–82.)

Within months, Light and Signet's chief operating officer ("COO"), Bryan Morgan, left the company, and Signet's board chairman announced a raft of sweeping reforms. (*Id.* ¶¶ 286–91.)

## II.    Relevant Procedural Background

On March 22, 2018, Plaintiff filed the FAC, the operative complaint in this action, alleging that Defendants were liable for violations of Section 10(b) of the Securities Exchange Act (the "Act"), Rule 10b-5 promulgated thereunder, and Section 20(a) of the Act based upon the events described above.

On November 26, 2016, the Court denied Defendants' motion to dismiss the FAC for failure to state a claim upon which relief can be granted. (Dkt. No. 120).

On June 11, 2019, the Court denied Defendants' motion for judgment on the pleadings with respect to certain allegations of securities fraud arising from statements contained in Signet's code of conduct. (Dkt. No. 166.) Nine days later, the Court denied Defendants' motion for reconsideration of the Court's decision and order denying their motion for judgment on the pleadings. (Dkt. No. 169.)

Plaintiff now moves to certify a class of:

All persons and entities who purchased or otherwise acquired securities issued by Signet during the period from August 29, 2013 through March 13, 2018, inclusive, and who were damaged thereby. Excluded from the Class are Defendants; Signet's affiliates and subsidiaries; the officers and directors of Signet and its subsidiaries and affiliates at all relevant times; members of the immediate family of any excluded person; heirs, successors, and assigns of any excluded person or entity; and any entity in which any excluded person has or had a controlling interest.

(Dkt. No. 142; *see also* FAC ¶ 577 (proposed class).)

## III.    Discussion

Plaintiff's motion for class certification is governed by the familiar requirements of Fed. R. Civ. P. 23.

Certification under Rule 23 is appropriate only if: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Since Plaintiff seeks to certify a damages class, it must also demonstrate that "common" issues of law or fact "predominate over any questions affecting only individual members," and that a class action is "superior" to other methods of adjudication. Fed. R. Civ. P. 23(b)(3). In addition to the express requirements of Rule 23, the Second Circuit has recognized an implied requirement that the class be "ascertainable." *See, e.g., In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017). If the Court finds that the requirements of Rule 23 have been met, the Court may, in its discretion, certify the class. *See In re Initial Pub. Offerings Sec. Litig.,* 471 F.3d 24, 41 (2d Cir. 2006).

A motion for class certification should not become a mini-trial on the merits; the question before the Court is whether Plaintiff meets Rule 23's requirements, not whether Plaintiff will prevail on the merits. *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 135 (2d Cir. 2001); *see also Eisen v. Carlisle & Jacquelin* , 41 U.S. 156, 177–78 (1974). At the same time, the Court's analysis under Rule 23 must be "rigorous," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011), which may require it to "probe behind the pleadings" and consider issues that "overlap with the merits of the plaintiff's underlying claim." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33–34 (2013) (internal quotation marks and citations omitted).

Plaintiff bears the burden of showing that Rule 23's requirements are satisfied by at least a preponderance of the evidence. *See In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013). In determining the appropriateness of class certification, the Court may

consider the parties' declarations and appended supporting materials, *see, e.g.*, *Heredia v. Americare, Inc.*, No. 17 Civ. 6219 (WHP), 2018 WL 2332068, at *2 (S.D.N.Y. May 23, 2018), in addition to the FAC, *supra* at 2.

### a. The Proposed Class Satisfies the Standards for Certification Pursuant to Rule 23(a)

Defendants do not dispute that Plaintiff has satisfied Rule 23(a)'s four prerequisites, so the Court will be brief in addressing them (along with the implied requirement of ascertainability).

#### 1.     Plaintiff Has Established Numerosity

To meet the requirements of Rule 23(a)(1), "the class must be so large that joinder of all members would be impracticable." *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 423 (S.D.N.Y. 2014) (internal citation and quotation marks omitted). "Numerosity may be presumed when a class consists of forty or more [members]." *In re Bank of M. Corp. Sec., Deriv. & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 138 (S.D.N.Y. 2012). "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period. *Id.*

During the Class Period, Signet had between 60.5 million and 80.5 million shares out stock outstanding, and an average of 1.34 million shares of Signet stock were traded each day. (Decl. of John Rizio-Hamilton ("Rizzio-Hamilton Decl."), dated Mar. 15, 2019, Ex. A (Expert Report of Michael L. Hartzmark, Ph.D. (the "Hartzmark Rept.")) ¶¶ 27, 30 (internal citations omitted), Dkt. No. 144.)

The numerosity requirement is satisfied.

#### 2.     Plaintiff Has Established Commonality

Rule 23(a)(2) requires Plaintiff to demonstrate the common issues of law or fact affect all class members. Fed. R .Civ. P. 23(a)(2). Common questions must also "generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (internal citation omitted). "[A] common question is one where the same evidence will suffice for each member to make a *prima facie* showing or the issue is susceptible to generalized class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (internal quotation marks and citation omitted).

This case—as is typical of most securities fraud putative class actions, *see Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 474–75 (2013)—raises common questions of law and fact, including whether (*i*) statements disseminated to the Class by Defendants during the Class Period misrepresented or omitted material facts; (*ii*) the alleged fraud was material to the putative Class; and (*iii*) Defendants acted knowingly or recklessly.

The commonality requirement is satisfied.

**3.    Plaintiff Has Established Typicality**

Typicality requires that the claims of the class representatives be typical of those of the class. Fed. R. Civ. P. 24(a)(3). To satisfy this requirement, the party seeking certification must show that "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (internal quotation marks and citation omitted). "In a securities class action, when 'plaintiffs will necessarily seek to develop facts relating to . . . the dissemination of allegedly false or misleading statements underlying their claims,' the claims and nature of evidence 'are generally considered sufficient to satisfy the typicality requirement.'" *In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income*

*Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 139 (S.D.N.Y. 2012) (quoting *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 85 (S.D.N.Y. 2007)).

The claims asserted by Lead Plaintiff are typical of the claims of absent Class members. Lead Plaintiff alleges that Defendants violated Sections 10(b) and 20(a) of the Exchange Act by issuing materially false and misleading public statements to all Signet investors. It also alleges that it and other members of the Class purchased shares of Signet stock at artificially inflated prices as a result of the Defendants' material misrepresentations and omissions and were damaged when that artificial inflation came out of the stock price as Defendants' misrepresentations were disclosed to the market. In other words, all Class members' claims arise from the same course of events and will be resolved based on similar legal arguments.

The typicality requirement is satisfied.

### 4. Plaintiff Has Established Adequacy of Representation

Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement seeks to ensure that Plaintiff's interests are not antagonistic to those of the Class and that Plaintiff's attorneys are qualified, experienced, and able to conduct the litigation. *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997).

As described above, all members of the proposed Class allege claims arising from the same wrongful conduct. Lead Plaintiff's legal theories, if vindicated, would vindicate the interests of the Class. Defendants do not suggest that Lead Plaintiff is laboring under a conflict of interest, nor is the Court aware of any such conflict. Lead Plaintiff has diligently prosecuted this action since July 27, 2017, the date on which it was appointed to do so. (Dkt. No. 84. *See also* Rizzio-Hamilton Decl. Ex. B (Declaration of George W. Neville, legal counsel to Plaintiff)

¶¶ 4–7.)  Bernstein Litowitz Berger & Grossmann LLP, appointed lead counsel, has ably conducted this litigation and satisfied each of the considerations enumerated in Fed. R. Civ. P. 23(g).

In short, Plaintiff has satisfied the adequacy of representation requirement.

### 5.   Plaintiff Has Satisfied the Implied Requirement of Ascertainability

Ascertainability "requires only that a class be defined using objective criteria that establish membership with definite boundaries." *Petrobras*, 862 F.3d at 264.  This implied requirement is designed to prevent the certification of a class whose membership is "truly indeterminable." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 353 (S.D.N.Y. 2015) (internal quotation marks and citations omitted).

That will not be a problem here.  The proposed Class definition clearly delineates the Class's boundaries by the dates of investors' transactions in Signet stock.  Ascertaining the members of the Class will be easily administrable by reference to investor records.

### b.   The Proposed Class Satisfies the Requirements of Rule 23(b)(3)

Rule 23(b)(3) requires Plaintiff to demonstrate that common questions of law or fact predominate over individual questions and that a class action is the superior method for adjudicating this dispute. Fed. R. Civ. P. 23(b)(3).  These two requirements—the subject of Defendants' opposition briefing—require a more substantial discussion.

### 1.   Plaintiff Has Established that Common Questions Predominate

"'Predominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *Waggoner*, 875 F.3d at 83 (quoting *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015)).  This requirement is "far more demanding" than the commonality

requirement under Rule 23(a). *Amchem Prods.*, 521 U.S. at 623–24. Designed to test the proposed Class's cohesiveness, the predominance inquiry "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods*, 136 S. Ct. at 1045 (internal quotation marks and citations omitted). This is a qualitative, not quantitative, inquiry, where the Court "must account for the nature and significance of the material common and individual issues in the case." *In re Petrobras Sec.*, 862 F.3d at 271.

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809–810 (2011) ("*Halliburton I*"). Under Section 10(b), plaintiffs must prove: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[2] *Stoneridge Inv. Partners, LLC v. Sci.–Atlanta*, 552 U.S. 148, 157 (2008).

Defendants argue that common issues of law and fact do not predominate with respect to two elements of Plaintiff's Rule 10b-5 claim: (*i*) reliance and (*ii*) economic loss. Finding that common elements predominate as to the other elements of Plaintiff's claim, the Court addresses only the elements contested by Defendants.

### i.    Reliance

---

[2]    Plaintiff's claim under Section 20(a) indisputably presents common issues of law and fact, as the method for demonstrating whether Defendants exerted control over Signet varies only based on Defendants' identities, not the Plaintiff's. *See, e.g., Wilson v. LSB Indus., Inc.*, No. 15 Civ. 7614 (RAG)(WG), 2018 WL 3913115, at *8 n.8 (S.D.N.Y. Aug. 13, 2018).

To recover for a violation of Section 10(b) and Rule 10b-5, a private securities plaintiff must demonstrate, among other things, that she relied upon the alleged misrepresentation or omission or deciding to buy or sell a security. *See, e.g., Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 206 (1976). The most direct way for an investor to demonstrate reliance is by showing that she was aware of the company's allegedly false statement and bought or sold a security based on that fraud. *Halliburton I*, 563 U.S. at 810. In *Basic v. Levinson*, 485 U.S. 224, 246 (1988), however, the Supreme Court recognized that such direct proof of reliance "would place an unnecessarily unrealistic evidentiary burden on the Rule 10b-5 plaintiff who has traded on an impersonal market." *Id.* at 485. Accordingly, the Court held that reliance may be presumed—thereby obviating the need to demonstrate reliance on an individualized basis—where (*i*) the alleged misrepresentations were publicly known ("publicity"), (*ii*) the stock traded in an efficient market ("market efficiency"), and (*iii*) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed ("market timing"). *Id.* at 248 n.27; *accord Halliburton I*, 563 U.S. at 811.[3] This so-called *Basic* presumption is an indirect proxy for demonstrating "price impact," *i.e.*, that the defendant's fraudulent misstatements affected the price at which the plaintiff purchased her shares. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 281 (2014) ("*Halliburton II*").

The *Basic* presumption is rebuttable. *Basic*, 485 U.S. at 250. For decades, however, defendants argued that doing so was virtually impossible and sought to overturn *Basic*. In *Halliburton II*, the Supreme Court struck a compromise: The Court affirmed the fraud-on-the-market theory underlying *Basic*, but declared that defendants could rebut the indirect proxy that

---

[3]     While materiality is also a "predicate" of *Basic*'s fraud-on-the-market theory, it does not need to be proved at the class certification stage and therefore has no bearing here. *Amgen*, 568 U.S. at 467 & n.4.

is the *Basic* presumption at the class certification stage with evidence that the alleged misstatements had *no* impact on the price at which plaintiffs purchased or sold their shares. 573 U.S. at 280–81. If defendants establish an absence of price impact, "*Basic*'s fraud-on-the-market theory does not apply," "common reliance . . . cannot be presumed," and the action cannot "be certified and proceed as a class action (with all that entails)[.]" *Id.* at 281.

Once plaintiffs establish the applicability of *Basic*'s presumption of reliance, the burden then shifts to the defendants, who "bear the burden of persuasion [under *Halliburton II*] to rebut the *Basic* presumption by a preponderance of the evidence." *See, e.g., Ark. Teachers Ret. Sys.*, 879 F.3d at 478 (citing *Waggoner*, 875 F.3d at 99–103). To meet their burden, defendants must "do more than merely produce evidence that *might* result in a favorable outcome; they must demonstrate that the misrepresentations did not affect the [company's] stock's price by a preponderance of the evidence." *Waggoner*, 875 F.3d at 101 (emphasis in original).

### A.  Plaintiff is Entitled to *Basic*'s Presumption of Reliance

As noted, *Basic* holds that when a stock trades in an efficient market and with the defendant's alleged material misrepresentations publicly known, the Court can presume that the misrepresentation affected the stock price, and that the plaintiff bought the stock in reliance on the defendant's misrepresentation. *Halliburton II*, 573 U.S. at 279.

Defendants do not dispute that Plaintiff has satisfied *Basic*'s publicity, market timing, and market efficiency prerequisites. Therefore, in assessing whether Plaintiff has carried its initial burden, the Court will be brief in addressing *Basic*'s three prerequisites.

As to publicity, Plaintiff pleaded that Defendants made material misrepresentations and omissions in various public statements to investors that artificially inflated or maintained the market price of Signet's stock. (*See* FAC ¶¶ 317–548.)

20

As to market timing, Plaintiff alleges that it bought Signet stock during the Class Period and suffered losses when the artificial inflation was removed from the stock price as the truth was disclosed. (*Id.* ¶ 575.)

And as to market efficiency—a factor that is most often disputed, but Defendants expressly do not dispute here[4]—the Court looks to the *Cammer* and *Krogman* factors, the prevailing tests for market efficiency,[5] which are so named after the district court cases expounding them. *See Cammer v. Bloom*, 711 F. Supp. 1264, 1286–87 (D.N.J. 1989); *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001). The five *Cammer* factors are: (1) the average weekly trading volume of the stock, (2) the number of securities analysts following and reporting on it, (3) the extent to which market makers traded in the stock, (4) the issuer's eligibility to file an SEC registration Form S–3, and (5) the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the stock's price. *See Waggoner*, 875 F.3d at 94 (quoting *Bombardier*, 546 F.3d at 200) (alterations omitted). The three "*Krogman*" factors are: (1) the market capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders. *Id.* at 95 (quoting *Krogman*, 202 F.R.D. at 474).

Applying those factors here, the Court agrees with the parties that Signet stock traded in an efficient market:

---

[4]     *See* Defs.' Mem. Law Opp. Mot. Class Cert. ("Defs.' Opp."), dated Apr. 26, 2019, at 1–2, Dkt. No. 147 ("[Plaintiff's] motion is devoted to establishing a proposition we do not contest:  Signet stock traded in an efficient market.").

[5]     While the Second Circuit "'has not adopted a test for market efficiency of stocks or bonds[,]'" *In re Petrobras*, 862 F.3d at 276 (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 204 n.11 (2d Cir. 2008)), it (as well as various district courts in this Circuit) have used the *Cammer* factors to assess market efficiency. *See id.* at 276–79 (applying *Cammer* factors); *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 328 F.R.D. 86, 95 (S.D.N.Y. 2018) (noting that Second Circuit has "nodded approvingly" at *Cammer* factors and proceeding to apply them (citing *Waggoner*, 875 F.3d at 94–95)).

**Cammer** **One:**  Signet common stock experienced a high weekly average trading volume during the Class Period. *Compare In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 447 (S.D.N.Y. 2013) ("Average weekly trading volume of 2% or more of outstanding securities justifies a strong presumption of an efficient market for that security.") *with* Hartzmark Rept. ¶ 30 (Signet stock's average weekly trading volume totaled 9.2%).

**Cammer** **Two:**  Numerous financial analysts covered and reported on Signet during the Class Period.  *Compare Winstar*, 290 F.R.D. at 446 (market efficiency where three analysts followed the security) *with* Hartzmark Rept. ¶ 33 (Signet stock covered by at least 48 analysts during the Class Period, with an average of 16 major research analysts following the company, as recorded by Bloomberg).

**Cammer** **Three:**  Signet common stock (*i*) traded on the NYSE, where it was assigned a designated market maker;  (ii) was held by 1,126 institutional investors, some of whom held a substantial proportion (between 63% and 87%) of Signet's public float; and (*iii*) evinced a wide range of short interest, ranging from 1.0% to 26.7% of the public float, suggesting that investors with negative views on Signet were able to remain active in the market.  (Hartzmark Rept. ¶¶ 41–46 & nn. 63–66.)

**Cammer** **Four:**  Signet was eligible to, and did, file S-3 reports during the Class Period.  (*Id.* ¶ 49.)

**Krogman** **One:**  During the Class period, Signet's market capitalization averaged $7.3 billion, making it larger than 84% of all other companies trading on the NYSE and NASDAQ.  (*Id.* ¶ 55.)  This number is certainly large enough to support a finding of market efficiency.  *See, e.g.*, *Menaldi*, 328 F.R.D. at 95 (holding that $7.3 billion "high enough to indicate market efficiency"); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 92

(S.D.N.Y. 2015) (holding that quarterly market capitalization of ranging from $0.5 to $3.2 billion indicated market efficiency); *McIntire*, 38 F. Supp. 3d at 433 (holding that market capitalization of $292 to $585 million supported market efficiency).

*Krogman* **Two:** During the Class Period, the average bid-ask spread[6] for Signet common stock was .03%. (Hartzmark Rept. ¶ 59.)  By contrast, the average bid-ask spread for all stocks trading on the NYSE and NASDAQ was .68%—multiples larger.  Signet stock's comparatively small bid-ask spread strongly indicates that the stock traded in an efficient market.  *Krogman*, 202 F.R.D. at 478

*Krogman* **Three:** During the Class Period, Signet's public float comprised the overwhelming majority of Signet's outstanding shares, meaning that there was a large proportion of Signet shares that were available to non-insiders who could trade without restrictions and profit by trading on new information.  On average, insiders held only .4% of Signet's shares, and the public float ranged from 99.4% to 99.8 of Signet's shares. (Hartzmark Rept. ¶ 57)  These figures weigh heavily in favor of a finding of market efficiency.  *See McIntire*, 38 F. Supp. 3d at 433 (holding that a public float between 31% and 43% supported market efficiency).

The only factor that is subject to disagreement is *Cammer*'s fifth factor, *i.e.*, whether there was a "demonstration of a cause and effect relationship between Signet's unexpected, material disclosures and changes in stock price." *Waggoner*, 875 F.3d at 94 (alteration omitted) (quoting *Bombardier*, 546 F.3d at 200).  However, Defendants dispute price impact, not in the context of whether Signet traded in an efficient market, but whether Plaintiffs can establish class-wide reliance under *Halliburton II*.  Moreover, as the Second Circuit noted in *Waggoner*, where

---

[6]  A bid-ask spread is the amount by which the asking price for an asset exceeds its bid price. This percentage reflects the difference between the highest price a buyer is willing to pay for an asset and the lowest price that a seller is willing to accept. *Krogman*, 202 F.R.D. at 478. "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." *Id.*

the remaining four *Cammer* factors and the three *Krogman* factors all point toward market

efficiency, a court can dispose of *Cammer*'s fifth factor completely.  875 F.3d at 97–99.

Since Defendants elected to grapple with price impact under *Halliburton II* (which is to

say, as a means of rebutting the *Basic* presumption of reliance), the Court will follow suit.  The

Court therefore finds that Signet traded in an efficient market.  Having satisfied *Basic*'s three

prerequisites, Plaintiff is entitled to a presumption of reliance.

### B. Defendants Have Not Rebutted the *Basic* Presumption of Reliance By Establishing the Absence of Price Impact By a Preponderance of the Evidence

Seeking to rebut *Basic*'s presumption of reliance, Defendants assert that "Plaintiff hopes

to but cannot infer 'price impact' under *Halliburton II* from stock price drops that occurred on

the alleged corrective disclosure dates."  (Defs.' Opp. at 2.)  In support of this contention, they

submit the reports of two experts, Mr. Michael F. Maloney, CPA, CFF, and CFE, and Professor

Allen Ferrell, Ph.D.

Mr. Maloney, an accountant, submitted an expert report limited to "issues related to

Signet's accounting and disclosures for its accounts receivable, loan portfolio, and related loan

loss reserves[.]"  (Allerhand Decl. Ex. B ("Maloney Rept.") ¶ 5.)  He opines that the nine credit-

related corrective disclosures identified above by Plaintiff, *supra* at I(a)(1), were not actually

*corrective*, in that they did not reveal "any new information that would have informed the market

that Signet had in fact systematically overstated its financial results by failing to properly reserve

for delinquent loans in violation of GAAP."  (Maloney Rept. ¶ 10; *see also id.* ¶¶ 11–

19.)  Insofar as the alleged corrective disclosures provided information about Signet's financial

performance—for example, updated growth guidance, changes to Signet's bad debt expenses or

accounts receivable, increases to loan loss-reserves—such announcements, Mr. Maloney writes,

gave no indication that Signet had systematically understated its reserves in prior periods in order

to artificially increase earnings. (*See id.* ¶¶ 11–19.) Because "the disclosures, on their face, revealed no credit-related fraud," the "stock price drops that followed these disclosures cannot be attributed to the alleged credit-related statements, which therefore lack a price impact." (Defs.' Supp. Mem. of Law in Opp. Class Cert. ("Defs.' Suppl. Opp."), dated June 21, 2019, at 5, Dkt. No. 170.)

Mr. Maloney's opinion is deficient in a number of respects.

*First*, Mr. Maloney's expert report was not a price impact report. He offered no opinion about whether there was an absence of price impact as a result of Signet's nine credit-related corrective disclosures—a fact he confirmed in his deposition testimony. (*See* Decl. of John Rizio-Hamilton in Further Supp. ("Rizio-Hamilt on Rep. Decl."), dated May 31, 2019, Ex. B at 13:19-14:13 (deposition of Defendants' expert Mr. Michael Maloney answering "no" when asked whether he was "opining that those [nine credit-related] corrective disclosures had no price impact on each of the alleged dates")). Nor did he conduct any type of statistical analysis or event study assessing whether Signet's stock price declines were unrelated to the revelation in those disclosures. Defendants' failure to broaden the scope of Mr. Maloney's assignment or supplement his report with an event study showing the absence of price impact is, on its own, a basis for rejecting Defendants' arguments. *See, e.g.*, *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 45 (S.D.N.Y. 2018) ("Notably . . . Defendant[s] did not conduct, or submit their own event study to show the absence of price impact[.] . . . That alone would arguably support rejection of Defendants' arguments[.]"). They—not plaintiff—bear the burden of persuasion to make that showing by a preponderance of the evidence under *Halliburton II. Waggoner*, 875 F.3d at 99–103; *Ark. Teachers Ret. Sys.*, 879 F.3d at 484–85. And to meet that burden, Defendants must "do more than merely produce evidence that *might* result in a favorable

outcome; they must demonstrate that the misrepresentations did not affect the stock's price . . . ." *Waggoner*, 875 F.3d at 101. They did not do that here.

*Second*, the Court agrees with Plaintiff that Mr. Maloney took an "overly narrow view" of Plaintiff's claim. (Pl.'s Mem. of Law in Further Supp. Class Cert. ("Pl.'s Reply"), dated May 31, 2019, at 5, Dkt. No. 165.) Plaintiff's claim is not limited to whether Signet properly reserved for delinquent loans under GAAP; it also is directed at whether Defendants' repeated statements concerning the health and stringent management of Signet's credit portfolio were fraudulent. (*See, e.g.*, FAC ¶¶ 49–51, 94–95, 101, 118–19, 124, 127, 154.) Defendants counter by writing, "If, as Mr. Maloney has shown, [Signet's] financial results (*i.e.*, quantitative corrections) did not correct any alleged under-reserving or GAAP violation (*i.e.*, quantitative misstatements), they logically could not have corrected any *qualitative* misstatements about the portfolio." (Defs.' Suppl. Opp. at 4.) This "logic" is lost on the Court. In effect, it is an argument that compliance with GAAP is tantamount to no securities fraud. That proposition is not supported by the law, nor is it applicable to the particulars of this case, where Plaintiff points to a number of Defendants' specific representations that they carefully managed the portfolio by applying stringent lending standards. Those statements can be false even if Signet did not run afoul of GAAP.

*Third*, despite Defendants' objections to the contrary (*id.* at 5), Plaintiff is also correct that Mr. Maloney subjected the nine alleged corrective disclosures to an exacting standard unsupported by law. In assessing whether those disclosures revealed credit-related fraud, Mr. Maloney analyzed each statement in the exact same fashion: this disclosure only mentioned poor performance or speculation about one aspect of Signet's business; discussion of that one thing in no way indicates or reveals a problem with this other thing (Signet's reserves); ergo, no

revelation of fraud.  (Maloney Rept. ¶¶ 11(c), 12(b), 13(b), 14(b), 15(b), 16(c), 17(c), 18(a),

19(h).)  Mr. Maloney erred in assuming that a disclosure must take the form of a "flashing neon

light," with an explicit message stating that it is intended to cure an earlier fraudulent statement,

in order for it to qualify as corrective.  *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 477

(S.D.N.Y. 2013).

But, "There is no requirement that the corrective disclosure take a particular form or be of

a particular quality," such that it be a "mirror image tantamount to a confession of fraud."  *In re*

*Vale S.A. Sec. Litig.*, No. 15 Civ. 9539 (GHW), 2017 WL 1102666, at *29 (S.D.N.Y. Mar. 23,

2017) (internal citations and quotation marks omitted).  Having concluded that the alleged

corrective disclosures were not revelatory because they did not specifically address Signet's prior

reserve estimates, Mr. Maloney applied that erroneous mirror image principle.  Moreover, to the

extent Defendants suggest that the only way to correctly disclose the alleged credit-fraud was by

restating Signet's financials, that suggestion is belied by the allegations in the FAC that the

company's leadership considered and rejected a backwards restatement because doing so would

have affected the company's earnings.  (FAC ¶ 76.)

*Fourth*, in concluding that the nine credit-related disclosures did not reveal a problem

with Signet's credit portfolio, Mr. Maloney failed to consider, much less address, the various

examples cited in the FAC of the market's understanding these disclosures to mean exactly what

he opines they did not indicate—*i.e.*, that Signet *did* have a credit problem.  After Signet's

November 24, 2015 earnings release announcing an increase in bad debt expense, for example,

analysts speculated that the change signaled an underlying weakness in Signet's credit

portfolio.  (*See* FAC ¶ 92; *see also* Rizio-Hamilton Rep. Decl. Ex. A. ("Hartzmark Rebuttal

Rept.") ¶ 42 (citing and quoting third-party analyst reactions).)

27

Analysts reacted to Signet's May 26, 2016 announcement that it had enlisted Goldman Sachs to conduct a strategic review of its credit portfolio in a similar fashion, expressing "surprise . . . given the confidence in the importance of the credit book as a competitive advantage to engage with customers and maximize sales opportunities." (FAC ¶ 114.) Another analyst commented, "Credit metrics look worse, not better[.] If the credit operation is performing well why the need for a strategic evaluation[?]" (*Id.*; Hartzmark Rebuttal Rept. ¶ 45; *see also* FAC ¶ 116 ("If the volume of sales that Signet has been enjoying in the last three years is driven by loose lending, then look out below.").)

Indeed, analysts reacted to the proceeding seven corrective disclosures in a similar fashion by expressing continued doubt about the health of Signet's credit portfolio. (*See* Hartzmark Rebuttal Rept. ¶¶ 47–67.) Moreover, on each date that Mr. Maloney evaluated, Signet common stock declined by a statistically significant amount,[7] prompting analyst reactions discussing whether factors linked to the company's credit portfolio contributed to those declines. (*Id.* ¶¶ 40–67.) Mr. Maloney did not even consider whether at least some portion of those declines might be attributable to the revelations about the credit-worthiness of Signet's loan portfolio. This failure, coupled with the other evidence in the case suggesting that the market understood the nine alleged corrective disclosures to have informed investors that Signet understated its reserves in prior reporting periods, fatally undermines the persuasive force of Mr. Maloney's report.

Defendants' second expert, Professor Ferrell, fares no better.

---

[7] All but one of the nine alleged credit-related corrective disclosures are associated with stock declines that are statistically significant at the 1% level. (Hartzmark Rept. App. E.) The one disclosure that is not (the June 2, 2016 Grant's Interest Rate Observer Report) is associated with a stock decline that is statistically significant at the 5% level. (*Id.*)

Professor Ferrell testified that Defendants' alleged misstatements pertaining to the allegations raised in *Jock* had no price impact because "the substance of the allegations in the *Jock* declarations, and the risks that disclosure of the declarations posed to [Signet], were already known to the market" as a result of three prior releases of information: (*i*) a March 28, 2014 *New York Times* article (*ii*) filings in *Jock* that were publicly available, and (*iii*) a September 2016 Capital Forum Report. (Ferrell Rept. ¶¶ 26, 43–48.) According to Professor Ferrell, rather than illustrating price impact, Signet's stock drop after publication of the *Washington Post* article—a 13% decline on a high trading volume of 11.3 million shares—was simply "consistent with bad publicity [that] the front page article generated with the attendant impact on Signet's customers and Signet's future financial performance." (*Id.* ¶ 27.)

Had the three prior information releases fully revealed the content of the *Jock* declarations, this argument might be persuasive. But they did not.

Everyone agrees—Professor Ferrell included—that the *Jock* declarations were kept confidential until the night of February 26, 2017 and were quoted and disseminated for the first time in the *Washington Post* article that ran the next day. (*See* Rizio-Hamilton Rep. Decl. Ex. E at 40:24-42:7, 62:9-69:13 (deposition of Professor Ferrell acknowledging that declarations kept confidential until February 26, 2017); *see also* Drew Harwell, *Hundreds Allege Sexual Harassment, Discrimination at Kay and Jared Jewelry Company*, Wash. Post (Feb. 27, 2017) (noting that "[m]ore than 1,300 pages of sworn statements were released [yesterday]").) Professor Ferrell acknowledges in his deposition that the *Washington Post* article contained information that had not previously been disclosed in any of the prior publications on which he relied. (Rizio-Hamilton Rep. Decl. Ex. E at 16:23-17:9.) How, then, does he also take

29

the position that there was an absence of price impact arising from publication of the *Washington Post* article?

Professor Ferrell tries to square that circle by submitting that the market was fully aware of the extent to which Signet was facing credible and voluminous allegations of rampant sexual misconduct.

He is wrong. That there were generalized summaries of the evidence adduced in the *Jock* arbitration does not establish that the substance of *Jock*—the volume of the allegations, their salacious details, the overwhelming number of accusers, the identities of certain accused senior Signet executives, the scope of the liability facing the company—was fully known (or knowable) by the market.

Take, for example, the 2016 Capital Forum Report upon which Professor Ferrell relies. That report expressly stated that *if* the *Jock* declarations were ultimately published, this "underlying documentary evidence" would constitute new, then-unknown information:

> **Significance of release of information.** Although stakeholders are able to gather basic information about the contents of the documents and evidence by reading the Class Award and Memorandum in Support of Motion for Class Certification, *the release of the underlying documentary evidence would likely provide more insight into the culture in the Sterling Jewelers Division and the specific alleged conduct that created an unequal or unfair working environment for women. The release of the evidence would also provide information about whether the practices alleged in the Memorandum were limited in nature or pervasive.*

(Ferrell Rept. App. F (2016 Capital Forum Report) (emphasis added).)

The March 28, 2014 *New York Times* article, titled "Women Charge Bias and Harassment in Suit Against Sterling Jewelers," is similarly unhelpful to Defendants. Although that article did indeed report on a handful of alleged instances harassment, it did not fully convey the severity of the allegations facing Signet. (*See id.* App. E (*Times* article).) The article also featured a quote from a Signet spokesperson denying the *Jock* allegations as "without merit" (*Id.* at 2)—a denial

alleged by Plaintiff to be false (FAC ¶¶ 391–92).  Where, as here, a purported "disclosure" is

accompanied by a corporate denial, it is no "disclosure" at all, since such a denial is

counteractive, misleading, and can cause investors to doubt the contents of the purported

disclosure.  *See Bank of Am.*, 281 F.R.D. at 143 (citing cases); *see also Cooper v. Thoratec

Corp.*, No. 14 Civ. 0360 (CW), 2018 WL 2117337, at *3 (N.D. Cal. May 8, 2018); *cf.*

*DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 438 (S.D.N.Y. 2018)

(citing cases) (denials of wrongdoing not sufficient to trigger inquiry notice for statute of

limitations purposes in securities fraud action).

     Lastly, the publicly available filings in *Jock*—the third category of evidence upon which

Professor Ferrell relies—did not fully reveal the extent to which the company was facing

credible and voluminous allegations of sexual harassment.  Signet's publicly available class

certification brief was heavily redacted and condensed onto one page of lawyerly argument.

(Ferrell Rept. ¶ 44 & n.65; Allerhand Decl. Ex. S at 32–33 (class certification brief).)  The

publicly available class certification award issued by the arbitrator, while providing a summary

overview of the allegations that would eventually surface, did not state the overwhelming

number of employees who submitted declarations, and omitted the fact that Signet's most senior

executives were among those who were accused of having sexual relations with female

employees and promoting women based upon how they responded to sexual demands.  (Ferrell

Rept. ¶ 46; Allerhand Decl. Ex. T at 21–22 (class determination award).)

     In other words, Professor Ferrell's contention that the market was fully apprised of all

material facts contained in the *Washington Post* article prior to that article's publication is simply

not correct.

Equally unsupported is Professor Ferrell's contention that the 13% decline in Signet's share price was the result of "bad publicity" caused by the *Washington Post* article. Certainly, common sense suggests otherwise, as one would not expect a company whose stock traded in an efficient market to find its share price cratering (as Signet's stock did here) upon the publication of stale, already-known information.

But Defendants have made no effort to substantiate this "bad publicity" theory. By his own admission, Professor Ferrell did not perform any event study or other empirical analysis to test that proposition. (Rizio-Hamilton Rep. Decl. Ex. E at 20:6-22:7.) Nor did Defendants find anyone else to do the job. Again, it is Defendants' burden to show the *absence* of price impact— not merely to challenge Plaintiff on the persuasiveness of its own price impact claim—once *Basic*'s presumption of reliance attaches. *See Waggoner*, 875 F.3d at 104–05. "[M]erely suggesting that another factor"—here, bad publicity—"*also* contributed to an impact on a security's price does not establish that the fraudulent conduct complained of did not also impact the price of the security." *Id.* at 105 (emphasis in original).

Yet Defendants did exactly that. (*See* Rizio-Hamilton Rep. Decl. Ex. E at 20:17-23 ("Q: Are you opining that 100 percent of the stock price decline on February 28, 2017 was caused by this bad publicity effect that you reference. A: No. I'm—just to be clear and have a complete answer, I'm offering in paragraph 27 [of my report] some observations about the stock price drop on that date, but I'm not doing a full analysis of what's causing it or what portion is caused by what. So the answer to your question is no.").) While plaintiffs need not prove loss causation at the class certification stage, *Halliburton I*, 563 U.S. at 807, that does does not excuse Defendants from failing to making any showing rebutting *Basic*.

In summary, neither Mr. Maloney's nor Professor Ferrell's expert reports demonstrate an absence of price impact by a preponderance of the evidence.

In addition to those expert reports, Defendants submit a few independent arguments attacking specific corrective disclosures. Some carry weight; others do not.

One, Defendants argue that the June 2, 2016 *Grant's* report and May 24, 2017 Buckingham Research Group Report, *supra* at I(a)(1)(iii) & (v), were not corrective disclosures because they reported on already-public facts. (Defs.' Opp. at 15, 17.) "These reports were simply '[a] negative journalistic characterization of previously disclosed facts,' which 'does not constitute a corrective disclosure of anything but the journalists' opinions.'" (*Id.* at 15 (citing *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501 512 (2d Cir. 2010).)

As to the *Grant's* report, Defendants are incorrect that it simply published already-known information. *Grant's* reported on increasing bankruptcy figures for Signet borrowers. (FAC ¶ 121.) It was not, as Defendants contend, merely a journalist's negative opinion, but an analysis of how and why Signet's underlying business was weaker than most people realized. It thus qualifies as corrective.

But as to the May 24, 2017 *Buckingham* report, the Court agrees with Defendants that this report merely raised questions and speculation by analysts and, as such, cannot serve as a corrective disclosure. "[T]he raising of questions and speculation by analysts and commentators does not reveal any 'truth' about an alleged fraud[.]" *Janbay v. Canadian Solar, Inc.*, No. 10 CIV. 4430 RWS, 2012 WL 1080306, at *16 (S.D.N.Y. Mar. 30, 2012) (citing cases). Unlike the *Grant*'s report, it did not actually reveal to the market anything other than speculation. Accordingly, Plaintiff may not rely upon the May 24, 2017 *Buckingham* report.

Next, Defendants argue that Signet's December 1, 2017 announcement that the NYAG and CFPB were investigating the company's "in-store credit practices, promotions, and payment protection products" (FAC ¶ 563) was not a corrective disclosure because those investigations "had nothing to do with Signet's underwriting standards, the quality of its credit portfolio, or the adequacy of its reserves" (Defs.' Opp. at 16). This statement flies in the face of what Signet represented to my colleague, the Hon. Lorna G. Schofield, in a stipulated final judgment and order. (Rizio-Hamilton Rep. Decl. Ex. D (copy of stipulated final judgment and order in *Bureau of Consumer Financial Protection et al. v. Sterling Jewelers Inc.*, Case No. 19 Civ. 448 (LGS) (S.D.N.Y.)).) There, the company admitted that the NYAG and CFPB's investigations concerned whether Sterling personnel "submit[ed] credit applications for consumers and caus[ed] credit cards to be issued without consumers' knowledge or consent; [] misrepresent[ed] credit-financing terms and conditions; and [] enroll[ed] consumers in payment-protection insurance without their knowledge or consent." (*Id.* at 1.) Investigation into such reckless (if not illegal) conduct is plainly relevant to whether Defendants falsely touted the company's "conservative" and "stringent" lending practices, as Plaintiff alleges they did. (FAC ¶¶ 164–65.) Any suggestion otherwise is entirely unavailing.

Defendants also argue that Plaintiff cannot proceed on a "price maintenance" theory of price impact with respect to the alleged fraud arising out of *Jock*, because the Second Circuit has only applied that theory "to misstatements that either offset concrete investor concerns or confirmed market expectations about a material financial metric, product or event."[8] (Defs.'

---

[8]    Separately, the parties—at least initially—also disagree about whether (*i*) Plaintiff's theory of fraud pertaining to Signet's credit program is limited to price maintenance or also relies on a theory of price inflation and (*ii*) Defendants have sufficiently demonstrated an absence of front-end price impact as to those credit-related claims. (*Compare* Pl.'s Rep. at 2–3 *with* Defs.' Opp. at 12–13 & Defs.' Suppl. Opp. at 8–9.) In their supplemental opposition, however, Defendants clarify that the distinction between front-end and back-end price impact "matters only to [their] point that the Second Circuit has applied the price maintenance theory in limited circumstances that do not include alleged misstatements in codes of conduct or litigation descriptions." (Defs.' Suppl. Opp. at 8 (citing

Opp. at 17–18 (citing *Waggoner*, 875 F.3d at 86–87 & *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 234–35 (2d Cir. 2016).)  In support, Defendants cite to the Second Circuit's recent decision in *Singh v. Cigna Corp.*, 918 F.3d 57 (2d Cir. 2019), arguing that Signet's code of conduct statement and the description it provided of *Jock* on its website were too generalized to be actionable under Second Circuit law.  (*Id.* at 18.)

This argument tracks the tracks the same "puffery" argument advanced by Defendants' in their recent Rule 12(c) motion.  (*See* Dkt. No. 149.)  For the reasons discussed in the Court's recent Decision Denying Defendants' Motion for Judgment on the Pleadings (Dkt. No. 166), the Court finds this argument unpersuasive.

Finally, Defendants argue that, even if the Court otherwise accepts Plaintiff's position that the alleged corrective disclosures indeed revealed some fraud, any non-disclosure was fully cured by May 25, 2017, because that was the day that Signet announced that it planned to sell the prime portion of its portfolio.  This announcement, Defendants submit, fully informed the market about the "extent of the risky loans [that] Signet supposedly concealed." (Defs.' Opp. at 2.) Defendants point out that the FAC reads that "Signet's May 25, 2017 disclosure *corrected*"—not "partially corrected" (as the FAC says elsewhere about the other corrective disclosures)— "Defendants' prior misleading statements and omissions concerning the strength and profitability of Signet's credit book, the credit quality of Signet's borrower base, and the Company's underwriting." (FAC ¶ 561 (emphasis added).)  Thus, Defendants argue, the Class Period must end there, "because 'to invoke the *Basic* presumption,' [P]laintiff 'must prove that . . . [it] traded

---

Defs.' Opp. at 24–28).)  "Beyond that, the distinction between front-and back-end price impact makes no difference here." (*Id.*)  The Court agrees.  Having already concluded that Defendants have not established an absence of back-end price impact by a preponderance of the evidence, the Court is not inclined to entertain academic disagreements.

the stock between when the misrepresentations were made and when the truth was revealed.'"

(Defs.' Opp. at 19 (quoting *Halliburton II*, 573 U.S. at 277–78).)

Plaintiff offers two responses. First, it contends that Defendants' argument "merely

raises ***common*** truth on the market and loss causation issues, *i.e.*, whether the full truth was

disclosed as of a particular date, and whether the final corrective disclosure revealed new

information." (Pl.'s Rep. at 16 (emphasis in original).) Second, it argues that "the full truth was

***not*** disclosed by May 25, 2017[,]" because "Signet continued to assert that the booked value of

the loans approximated fair value through December 1, 2017, only to announce their sale at a

massive loss on March 14, 2018." (*Id.* (emphasis in original) (citing FAC ¶¶168–69).)

Defendants have the better of the argument. In a securities fraud class action, "courts are

required to cut off the class period on the date of a statement or event that cures the market."

*Pirnik*, 327 F.R.D. at 48 (internal quotation marks and citation omitted). And at class

certification, the Court must accept the allegations in the FAC as true. *See Waggoner*, 875 F.3d

at 5. The Court is, therefore, bound by Plaintiff's allegation in the FAC that the May 25, 2017

disclosure "corrected" Defendants' earlier fraud. (FAC ¶ 561.)

Moreover, Plaintiff is not correct in suggesting that determining the endpoint of the Class

Period is not an issue to be considered at the class certification stage. This issue directly

implicates reliance—an element of Plaintiff's 10b-5 claim that, indisputably, is at the core of the

class certification inquiry. Plaintiff cannot avail itself of the *Basic* presumption of reliance if, by

its own admission, the truth was fully revealed prior to the end of the class period. *See*

*Halliburton II*, 573 U.S. at 277–78 (plaintiff cannot "invoke the *Basic* presumption" unless it

"traded the stock between when the misrepresentations were made and when the truth was

revealed."). Because Plaintiff has alleged that the truth of Signet's credit-related fraud was fully

revealed by May 25, 2017, the *Basic* presumption of reliance does not attach to the subsequent

corrective disclosures at issue in this case.

Based on the foregoing, Defendants have failed to demonstrate an absence of price

impact by a preponderance of the evidence, and, therefore, have failed to rebut the *Basic*

presumption of reliance. Despite this failing, Defendants have persuasively shown that Plaintiff

is not entitled to invoke that presumption with respect to the May 24, 2017 disclosure—because

that disclosure did not reveal any "truth"—as well as all disclosures after May 25, 2017, the date

on which Signet's credit-related fraud was allegedly fully revealed to the market. As to the

remaining corrective disclosures, Plaintiff has established that common issues of law and fact

concerning "reliance" predominate.

### ii. *Economic Loss*

In *Comcast*, the Supreme Court held that, "at the class-certification stage (as at trial), any

model supporting a plaintiff's damages case must be consistent with its liability case[,]" and that

"courts must conduct a rigorous analysis to determine whether that is so." 569 U.S. at 35

(internal quotation marks and citations omitted); *accord Waggoner*, 875 F.3d at 106. The

Second Circuit has interpreted *Comcast* to require plaintiffs to "be able to show that their

damages stemmed from the defendant's actions that created the legal liability." *Sykes v. Mel S.

Harris & Assocs. LLC*, 780 F.3d 70, 82 (2d Cir. 2015) (internal quotation marks and citation

omitted); *accord Roach*, 778 F.3d at 407.

Relying on *Comcast*, Defendants argue that Plaintiff's damages model—which, using an

event study and "inflation ribbon,"[9] purports to measure how much Defendants' alleged

---

[9]   An inflation ribbon is a "[T]ime series of the difference between a stock's actual price observed in the
marketplace, and the estimated price that the stock would have traded at each day had there been full disclosure
from the outset of the Class Period." *Wilson v. LSB Indus., Inc.*, No. 15 Civ. 7614 (RA)(GWG), 2018 WL 3913115,
at *16 (S.D.N.Y. Aug. 13, 2018) (internal citation and quotation marks omitted).

misrepresentations and omissions artificially inflated Signet's stock price on each day during the Class Period (*see* Hartzmark Rept. ¶¶ 93–95)—does not reliably measure damages on a class-wide basis, given the unique features of this case (Defs.' Opp. at 20–23). Specifically, they contend that event study will not be able to distinguish between Plaintiff's two distinct theories of fraud—the credit-worthiness of the loan portfolio and the *Jock*-related representations—and isolate them from the other innocent factors that affected Signet's stock price, including the reasons for Signet's declining financial performance that were wholly unrelated to its credit operation. (*Id.* at 21; *accord* Ferrell Rept. ¶¶ 50, 52, 58, 60.) Lending support to this argument, Professor Ferrell opines that *no* model is capable of reliably measuring damages in this case, given all the confounding information disclosed in the numerous purported corrective disclosures. (Ferrell Rept. ¶¶ 50, 63.) He further criticizes Plaintiff's proposed damages model on the bases that its expert, Dr. Hartzmark, supposedly failed to account for how stock-price inflation varied during the purported class term (*id.* ¶¶ 48, 62) and isolate the impact of the materialization of known risks from the impact of allegedly concealed risks (*id.* ¶ 61).

Despite Defendants' arguments to the contrary, the Court sees no reason why an event study—the generally accepted method for measuring damages in a securities fraud class action—cannot work in this case.

As an initial matter, the Court rejects the suggestion that an event study is incapable of disaggregating the effects of confounding information. Were it otherwise, nearly every securities fraud class action would fail.

More to the point, while Plaintiff ultimately will need to disaggregate confounding factors to prove economic loss, it need not do so at this juncture to establish that common issues

relating to damages predominate. *See Waggoner*, 875 F.3d at 106 ("The *Comcast* standard is met notwithstanding that some of the decline in the price of [the securities] may have been the result of the New York Attorney General's action and potential fines."); *Menaldi*, 328 F.R.D. at 99; *Pirnik*, 327 F.R.D. at 47–48. Rather, Plaintiff's burden at this stage is simply to propose a methodology for calculating damages that corresponds to its theory of liability. It has done so here. Dr. Hartzmark's purports to "us[e] the results of an event study along with the disclosures of firm-specific information" to measure "the level of artificial inflation in the prices of the Signet common stock" based upon "price reactions to disclosures revealing [Defendants'] alleged misstatements and omissions." (Hartzmark Rept. ¶ 94.) "From this, daily levels of inflation can be calculated by adjusting the inflation measure for each day throughout the Class Period." (*Id.*) This methodology, which applies on a class-wide basis, is capable of measuring the out-of-pocket losses suffered by the Class members.

Defendants' remaining arguments are unpersuasive. For one thing, *Waggoner* explicitly rejected the notion that *Comcast* requires "that damage calculations [] be so precise" as to account for "variations in inflation over time." 875 F.3d at 106. For another, Professor Ferrell's contention that Plaintiff's methodology did not adequately isolate the impact of the materialization of known risks from the impact of allegedly concealed risks is simply a loss causation argument in disguise, because it tests the causal relationship between the alleged misstatements and the price decline. Such an argument "goes beyond the Rule 23 inquiry." *Pirnik*, 327 F.R.D. at 47 (citing, *inter alia*, *Amgen*, 568 U.S. at 475 ("[P]laintiffs are not required to establish loss causation . . . on class certification.")).

Because Plaintiff has provided a class-wide model for calculating damages arising from its theory of liability, it has met its burden under *Comcast*.

Based upon the foregoing, Plaintiff has established that common questions of law and fact will predominate in this case.

### 2.    Plaintiff Has Establish that A Class Action is Superior

Under Rule 23(b)(3), a court may not certify a class unless it finds that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Among the factors to consider is whether a particular class would be manageable. Fed. R. Civ. P. 23(b)(3)(D). "[F]ailure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule." *In re Petrobras*, 862 F.3d at 268 (internal citation omitted).

Defendants argue that manageability concerns preclude class certification, because, "This is in effect a 'case within a case'—an unpleaded Title VII class claim shoehorned into a Section 10(b) claim." (Defs.' Opp. at 24.) "This is a non-starter," Defendants argue, because [*Dukes*, 564 U.S. at 356] and its progeny make clear that 'widespread' discrimination allegations like these cannot be tried on a classwide basis for lack of commonality." (*Id.*) Based upon this "threshold" defect, Defendants assert that adjudicating Plaintiff's claim on a class-wide basis would "descend into a series of discrete and particularized mini-trials involving, in some cases, decades-old allegations of misconduct," testing whether Signet suffered from sexual misconduct in its ranks and the extent to which such misconduct was "'pervasive.'" (Defs.' Opp. at 24–25.)

Clever as it may be, this argument misses the mark. Whether allegations of widespread discrimination can be certified under *Dukes* is beside the point. As the Court reminded the Defendants in the past, (Op. Denying Mot. for J. on Pleadings at 15), the truth of whether Signet *in fact* possessed a pervasive culture of sexual harassment is not what is at issue in this securities

fraud action.[10]  Plaintiff's core allegation is that Defendants failed to disclose information about *Jock* that would have made what they *did* disclose about that lawsuit not misleading.  Despite Defendants' assertion to the contrary (Defs.' Opp. at 24–25), adjudicating that core allegation does not involve trying the particulars of the roughly 250 separate allegations of discrimination that were heard in *Jock*.  Rather, this case can be adjudicated just as any other ordinary securities class action would:  by analyzing whether the belated disclosure of the massive scope of the legal challenge facing Signet caused the company's stock to fall through the floor.

Having disposed of Defendants' red herring, the Court is left with no reason to conclude that this particular securities fraud lawsuit should be treated any differently.  Defendants do not contend that Plaintiff's claim concerning Signet's credit portfolio would be unmanageable.  Nor do they explain how the usual methods of proof and the ordinary litigation process—including summary judgment, *Daubert* motions, and motions *in limine*—would not advance Plaintiff's *Jock*-related fraud claim.  In short, this case is as manageable as any other complex securities fraud case.

The Court therefore concludes that class certification is the superior method for adjudicating this case.

---

[10]      This is why it is wrong to characterize Plaintiff's theory of fraud—as Defendants do—as the failure to undertake a "rite of confession" admitting to a "culture of sexual misconduct."  (Defs.' Suppl. Opp. at 3 (internal citation and quotation marks omitted).)

## CONCLUSION

Plaintiff's motion to certify a class is granted in accordance with this opinion. As stated earlier, the Class modified to encompass all persons and entities who purchased or otherwise acquired Signet common stock from August 29, 2013 to May 25, 2017.

The Clerk of Court is respectfully directed to close Dkt. No. 142.

It is so ordered.

Dated:  July 10, 2019

_____

Chief Judge

BY ECF TO ALL COUNSEL