UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE SIGNET JEWELERS LIMITED SECURITIES
LITIGATION

1:16-cv-06728 (CM) (SDA)

<u>OPINION AND ORDER</u>

**STEWART D. AARON, United States Magistrate Judge:**

Before the Court is Plaintiff's Letter-Motion (ECF No. 181) seeking to compel the production of documents regarding the work of two public relations ("PR") firms, including communications with members of those firms, that were withheld by Defendants in whole or in part on attorney-client privilege grounds. For the reasons set forth below, Plaintiff's motion is GRANTED IN PART and DENIED IN PART.

<u>BACKGROUND</u>

In this lawsuit, which was commenced in August 2016, Lead Plaintiff, the Public Employees' Retirement System of Mississippi ("Plaintiff"), alleges that Defendants Signet Jewelers Limited ("Signet") and certain of its senior executives (collectively, the "Defendants") committed securities fraud by misrepresenting (1) the health of Signet's credit portfolio, and (2) Signet's alleged "pervasive" culture of sexual harassment. (Fifth Amended Complaint, ECF No. 111, ¶¶ 1-25.) In late-2015/early-2016, The Capitol Forum ("CF") "published a series of articles accusing Signet of fraudulently stating its financials to conceal the quality of its in-house consumer lending program." (Defs.' 8/22/19 Ltr., ECF No. 183, at 2.) In response to this event,

Signet's outside counsel retained two PR firms, Joele Frank ("JF") and Ogilvy & Mathers ("Ogilvy"). (Pl.'s Letter-Motion, ECF No. 181, at 1; Defs.' 8/22/19 Ltr. at 2.)[1]

Signet's "PR firms and outside counsel, along with members of Signet management including in-house counsel, formed a 'strategic communications steering committee [SCSC],' which convened to discuss a communications strategy to neutralize the climate of negative and often inaccurate media coverage in light of the legal and reputational risks facing the company." (Defs.' 8/22/19 Ltr. at 2.) The SCSC "kicked off" during a communications summit in February 2016 (the "Summit"). (Pl.'s Letter-Motion at 1.)

After the filing of this lawsuit, the *Washington Post* ("WaPo"), on February 27, 2017, "published a front page story containing salacious allegations of sexual harassment at Signet drawn from declarations submitted in an employment arbitration" filed before the American Arbitration Association, *Jock et al. v. Sterling Jewelers*. (Defs.' 8/22/19 Ltr. at 2 & Ex. 2.) Signet's outside counsel retained Ogilvy in response to this event as well. (Pl.'s Letter-Motion at 2; Defs.' 8/22/19 Ltr. at 2.)

In response to Plaintiff's discovery requests, Defendants have withheld from production documents, or portions of documents, reflecting what they refer to as "privileged communications among the company, its counsel, and the counsel-retained PR firms," and have sought to claw back one such document. (Defs.' 8/22/19 Ltr. at 1; Pl.'s Letter-Motion, Ex. F, ECF No. 181-6; *see* Pl.'s Letter-Motion at 3 n.2.) Plaintiff now moves to compel the production of "all

---

[1] Although the initial letters from the parties regarding their discovery dispute only mentioned two PR firms retained by Signet, *i.e.*, JF and Ogilvy, Defendants' August 30, 2019 letter to the Court mentions two additional PR firms, *i.e.*, Burson Marsteller and Teneo, "whom counsel retained to assist them with advising Signet on a series of media crises that plagued the company from late-2015 through mid-2017." (Defs.' 8/30/19 Ltr., ECF No. 186, at 1.)

redacted or withheld documents concerning: JF and Ogilvy's work for Signet, the Summit, the SCSC, how to handle fallout from the CF Reports and the WaPo article, and investor messaging about the credit portfolio." (Pl.'s Letter-Motion at 3.)

Pursuant to Orders of the Court (8/28/19 Order, ECF No. 184; 8/30/19 Order, ECF No. 185), Defendants provided to the Court for its *in camera* review the redacted documents attached to Plaintiff's Letter-Motion as Exhibits B through E, as well as privilege log entries that reflect communications with Signet's PR firms, or on which Signet's PR firms were copied. (*See* Defs.' 8/30/19 Ltr. at 1.) In addition, Defendants stated in their letter:

> We note that the log entries [provided to the Court] represent a small amount of the total volume of documents that fall within the categories of privileged documents challenged by plaintiff. This is because the parties agreed, for efficiency purposes given the expected volume of production, that only fully withheld documents needed to be logged, and that no emails would be fully withheld (instead, they would be redacted). Accordingly, the log only includes non-email documents. However, emails and their attachments make up the vast majority of produced documents, and likewise the vast majority of documents challenged by plaintiff.
>
> Because the privilege log and the documents attached to plaintiff's motion do not reflect the full picture of documents implicated by plaintiff's motion, we are also submitting for *in camera* review ten additional unredacted documents which were produced with redactions (sent via email and labeled Tabs 1-10). These are examples of documents involving PR/crisis management firms (Joele Frank, Ogilvy, Burson Marsteller, and Teneo) whom counsel retained to assist them with advising Signet on a series of media crises that plagued the company from late-2015 through mid-2017. These crises were intertwined with legal matters or based on legal proceedings and included, among other issues, (1) the Capitol Forum and short-seller attacks on Signet's in-house credit program and related disclosures, and (2) the *Washington Post* and other media reporting in 2017 on declarations submitted in the ongoing *Jock* employment arbitration.

(*Id*. at 1.)

Oral argument by telephone was held with the parties on September 4, 2019.

**LEGAL STANDARDS**

Under federal common law,[2] "[t]he attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011) (citing *In re Cnty. of Erie*, 473 F.3d 413, 419 (2d Cir. 2007)). "The purpose of the privilege is to encourage clients to make full disclosure to their attorneys." *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999) (quotation marks and citation omitted). Courts have emphasized that "[w]hile the privilege confers important social benefits, it also exacts significant costs" because "[i]t runs counter to the ordinary judicial interest in the disclosure of all relevant evidence." *In re Application of Sarrio, S.A.*, 119 F.3d 143, 147 (2d Cir. 1997) (citation omitted); *see also In re Bairnco Corp. Secs. Litig.*, 148 F.R.D. 91, 96 (S.D.N.Y. 1993) (noting that "the attorney-client privilege both advances and impedes the administration of justice"). Thus, courts apply the attorney-client privilege "only where necessary to achieve its purpose and construe the privilege narrowly because it renders relevant information undiscoverable." *Mejia*, 655 F.3d at 132 (quotation marks and citations omitted).

"The party claiming the benefit of the attorney-client privilege has the burden of establishing all the essential elements." *United States v. Adlman*, 68 F.3d 1495, 1500 (2d Cir. 1995); *see also In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d 223, 224-25 (2d Cir. 1984) ("It is axiomatic that the burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship, . . . a burden not

---

[2] "Where, as here, subject matter jurisdiction is based on a federal question, privilege issues are governed by federal common law." *In re Copper Mkt. Antitrust Litig.*, 200 F.R.D. 213, 217 (S.D.N.Y. 2001) (citation omitted).

discharged by mere conclusory or ipse dixit assertions.") (quotation marks and citations omitted).

"The party invoking the privilege also has the burden to show that the privilege has not been

waived." *Wultz v. Bank of China Ltd.*, 304 F.R.D. 384, 391 (S.D.N.Y. 2015) (citation omitted); *see*

*also Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 428 (S.D.N.Y. 2013).

Generally, "disclosure to a third party by the party of a communication with his attorney

eliminates whatever privilege the communication may have originally possessed." *In re Horowitz*,

482 F.2d 72, 81 (2d Cir. 1973); *see also La Suisse, Societe d'Assurances Sur La Vie v. Kraus*, 62 F.

Supp. 3d 358, 363 (S.D.N.Y. 2014) ("The attorney-client privilege does not normally attach to

privileged communications that are disclosed to persons who are neither the attorney nor the

client.") (citing *Ratliff v. Davis Polk & Wardwell*, 354 F.3d 165, 170 n.5 (2d Cir. 2003)). The

rationale for the waiver doctrine is that "it is vital to a claim of privilege that the communications

between client and attorney were made in confidence and have been maintained in confidence."

*See Mejia*, 655 F.3d at 134 (citation omitted).

Notwithstanding this general rule, there are circumstances where courts have not found

a waiver even where attorney-client communications were shared with a third party. Defendants

principally rely upon *In re Grand Jury Subpoenas Dated March 24, 2003*, 265 F. Supp. 2d 321

(S.D.N.Y. 2003), to argue that, "in some circumstances, communications among client, counsel,

and PR firms are privileged." (Defs.' 8/22/19 Ltr. at 1.) *In re Grand Jury Subpoenas Dated March*

*24, 2003* recently was well described, as follows:

> That case involved a high profile target of a criminal investigation. *See id.* at 322-
> 23. The target's attorney determined that a public relations firm should be
> engaged to conduct a media campaign in an effort to paint the target in a
> favorable light so that the prosecutors might feel less pressure to indict. *Id.* at 323-
> 24. The court found that the engagement of the public relation[s] firm was
> necessary for the lawyers "to perform some of their most fundamental client

functions — such as (a) advising the client of the legal risks of speaking publicly and of the likely legal impact of possible alternative expressions, (b) seeking to avoid or narrow charges brought against the client, and (c) zealously seeking acquittal or vindication." *Id*. at 330. In other words, the public relations function being performed — characterized as a "lawyer's public advocacy on behalf of the client," *id*. at 329 — was necessary to achieve a circumscribed litigation goal: specifically, influencing the decision whether or not to indict. The court limited its holding to situations where a public relations consultant was "hired by the lawyers to assist them in dealing with the media in cases such as this," and where the communications "are made for the purpose of giving or receiving advice . . . directed at handling the client's legal problems." *Id*. at 331.

*Universal Standard Inc. v. Target Corp*., 331 F.R.D. 80, 91-92 (S.D.N.Y. 2019).[3]

## **ANALYSIS**

The Court has reviewed *in camera* the unredacted copies of the exhibits to Plaintiff's

Letter-Motion, and also has reviewed the document provided to the Court that Defendants seek

to claw back. (*See* Pl.'s Letter-Motion, Ex. B-F, ECF Nos. 181-2 to 181-6.) As set forth in further

detail below, the Court finds that none of them is privileged. Communications between Signet

and its PR firms are not covered by the attorney-client privilege. "It may be that the modern client

comes to court as prepared to massage the media as to persuade the judge; but nothing in the

---

[3] Other courts in this Circuit have construed *In re Grand Jury Subpoenas Dated March 24, 2003* in a similar, limited manner. *See Egiazaryan*, 290 F.R.D. at 432 (limiting *In re Grand Jury Subpoenas Dated March 24, 2003* to circumstances where "the public relations function being performed . . . was necessary to achieve a circumscribed litigation goal"); *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig*., 352 F. Supp. 3d 207, 212 (E.D.N.Y. 2019) ("[T]he case's precedential value is likely limited to its unique context— a high-profile criminal investigation where the lawyers are attempting to counteract 'the broad power of the government.'") (citation omitted); *Ravenell v. Avis Budget Grp., Inc*., No. 08-CV-02113 (SLT), 2012 WL 1150450, at *3 (E.D.N.Y. Apr. 5, 2012) ("The reach of [*In re Grand Jury Subpoenas Dated March 24, 2003* is] limited by its context: the Court couched its finding in the narrow scenario of public relations consultants assisting lawyers during a high profile grand jury investigation."); *In re Chevron Corp*., 749 F. Supp. 2d 170, 184 n.64 (S.D.N.Y.) (interpreting case as having a "very narrow holding" and applicable only in "cases such as . . . high profile grand jury investigation[s]"), *aff'd*, 409 F. App'x 393 (2d Cir. 2010). *See also* Ann M. Murphy, *Spin Control and the High-Profile Client—Should the Attorney-Client Privilege Extend to Communications With Public Relations Consultants?*, 55 Syracuse L. Rev. 545 (2005) (concluding that "expanding the attorney-client privilege to communications with public relations consultants is inadvisable and against the interests of justice").

client's communications for the former purpose constitutes the obtaining of legal advice or justifies a privileged status." *Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000).

Defendants advocate for the Court to apply Judge Kaplan's decision in *In re Grand Jury Subpoenas Dated March 24, 2003*, 265 F. Supp. 2d 321 (S.D.N.Y. 2003), to find that the privilege applies to communications between Signet and its PR firms. The Court finds that Judge Kaplan's decision is not applicable to the facts here. The PR firms here were not called upon to perform a specific litigation task that the attorneys needed to accomplish in order to advance their litigation goals. Rather, the PR firms were involved in public relations activities aimed at burnishing Signet's image. *See Haugh v. Schroder Inv. Mgmt. N. Am., Inc.*, No. 02-CV-07955 (DLC), 2003 WL 21998674, at *3 (S.D.N.Y. Aug. 25, 2003) ("Since [the client] has failed to show that the communications were made for the purpose of obtaining legal advice from her attorney as opposed to public relations advice from [the PR firm], the communications are not protected by the attorney-client privilege."). None of the exhibits to Plaintiff's Letter-Motion were directed at giving or obtaining legal advice.

First, Exhibit B to Plaintiff's Letter-Motion is a series of emails between Ogilvy representatives and Signet representatives (including in-house counsel) on March 1, 2017. (ECF No. 181-2.) These emails do not reflect communications that were sent for the purpose of obtaining or providing legal advice. They concern how to respond to a media inquiry from NPR.

Second, Exhibit C to Plaintiff's Letter-Motion is an email from an Ogilvy representative to a Signet in-house attorney, dated February 18, 2017. Defendants redacted from the email a set of "talking points" regarding this lawsuit, as well as statements to be made to the press. (ECF No.

181-3.) This document is not directed at giving or obtaining legal advice, but relates to "[m]essaging."

Third, Exhibit D to Plaintiff's Letter-Motion is a series of emails in December 2015, months before this lawsuit was commenced, between JF representatives, including JF in-house counsel, and Signet representatives, including Signet in-house counsel. (ECF No. 181-4.) Redacted from Exhibit D, in addition to the content of certain of the emails, was an enclosure from a Signet in-house attorney that is "a working document that outlines the capital forum allegations and creates a template through which we will document our point by point responses." Signet's in-house counsel shared this document with JF to receive JF's "thoughts" on the content. It was not shared for the purpose of giving or obtaining legal advice.

Fourth, with respect to Exhibit E to Plaintiff's Letter-Motion, redactions are made in a December 4, 2015 email from an Ogilvy representative to a Signet representative. (ECF No. 181-5.) The redactions relate to content on the CF website. The information redacted is not directed at giving or obtaining legal advice, but merely addresses CF's coverage.

Fifth, Defendants seek to claw back Exhibit F. (ECF No. 181-6; *see* Pl.'s Letter-Motion at 3 n.2.) Exhibit F is a December 15, 2015 internal exchange of emails with Signet's Vice President of Investor Relations, James Grant, that does not concern legal advice. While it is true that Signet in-house counsel were copied on the emails contained in Exhibit F, that does not make them privileged. *See JSMS Rural LP v. GMG Capital Partners III, LP*, No. 04-CV-08591 (SAS) (MHD), 2006 WL 1520087, at *5 (S.D.N.Y. June 1, 2006) ("At base, defendants appear to contend that if a document was addressed to, sent by or copied to a lawyer, it is privileged. That is plainly not the case."). Thus, there is no basis for Defendants to claw back Exhibit F.

The Court has reviewed the other documents that Defendants provided for *in camera* review and makes the following rulings:

Tab 1: SIG_03078259-60 (December 10, 2015 emails) — This document properly was redacted on traditional attorney-client privilege grounds. The redacted portions relate to legal advice given by Mike Aiello at Weil Gotshal to Signet.

Tab 2: SIG_02736069-72 (December 13-14, 2015 emails plus enclosure) — This document is part of the same chain as Exhibit D to Plaintiff's Letter-Motion, which the Court addressed above. This document should be produced in full.

Tab 3: SIG_02735454-55 (February 12, 2016 emails) — The redacted portion of this document is an email sent by a Signet in-house attorney to members of Signet's Board of Directors regarding a Bloomberg article and Signet credit-related issues. This document properly was redacted on traditional attorney-client privilege grounds, as it reflects a communication between an in-house attorney and his clients regarding legal matters.[4]

Tab 4: SIG_02550052 (JF February 25, 2016 draft meeting agenda) — This is a draft meeting agenda for a meeting that was to include representatives of PR firms. The draft contains no privileged information and should not be withheld.

Tab 5: SIG_02628501 (April 10-12, 2016 emails) — The redacted portion of this email is from a Signet in-house attorney to members of Signet's Board of Directors regarding CF, as well as an employment discrimination matter. This document properly was redacted on traditional

---

[4] While in-house counsel often wear "two hats" (*i.e.*, legal and business), such that not all of their communications are privileged, *Pearlstein v. BlackBerry Ltd.*, No. 13-CV-07060 (CM) (KHP), 2019 WL 1259382, at *4 (S.D.N.Y. Mar. 19, 2019), the in-house counsel communications at Tabs 3 and 5 concern situations where Signet faced legal risk.

attorney-client privilege grounds, as it reflects a communication between an in-house attorney and his clients regarding legal-related matters.

Tab 6: SIG_03074836-37 (February 27, 2017 email) — This is an email from Burson Marsteller. The redacted portion of this document is the text of a draft email sent to a reporter at the *New York Post*. It does not contain any privileged information. The document should be produced in full.

Tab 7: SIG_03103257-60 (February 17-28, 2017 emails) — The redacted portions of this document include communications with an attorney at Weil Gotshal, which would be privileged but for the fact that the communications included third parties from the PR firms, including Burson Marsteller and Ogilvy. The presence of these third parties on the communications acts as a waiver of the privilege. *See Ebin v. Kangadis Food Inc*., No. 13-CV-02311 (JSR), 2013 WL 6085443, at *1 (S.D.N.Y. Nov. 12, 2013) ("The[ redacted] emails were sent to, *inter alia*[,] non-attorney public relations agents, Katherine Heaviside and Mark Smith, at the public relations firm of Epoch 5, and plaintiffs asserted that defendant had waived any attorney client privilege by copying such parties on the redacted emails. . . . The Court agrees." (citation omitted)). Tab 7 does not present a situation where "the presence of a third party is needed to allow the client to communicate information to an attorney, such as where a translator is used or where an accountant supplies specialized knowledge to allow an attorney to understand the client's situation." *See Universal Standard Inc*., 331 F.R.D. at 87. Nor does it present a situation where the PR firm employees included in the communications were the "the functional equivalent" of a Signet employee. *See id*. Thus, the document should be produced in full.

Tab 8: SIG_03128722-25 (March 1, 2017 emails) & Tab 9: SIG_03074445-46 (March 1, 2017 emails) — The redacted portions of these emails contain public relations-related communications between Signet and Ogilvy representatives and do not concern legal advice. They are not privileged. Thus, the documents should be produced in full.

Tab 10: SIG_03044585-88 (March 3-5, 2017 emails plus enclosure) — The redacted portion of the March 5, 2017 email from Mike Aiello of Weil Gotshal to Signet representatives is properly withheld since it concerns legal advice. However, the redacted portions of the March 3, 2017 emails from Lynn Dennison are not properly withheld since PR firm employees were copied on the emails and therefore any privilege was waived.

Based upon Defendants' August 30, 2019 letter, the Court understands that there are many other documents withheld in whole or in part by Defendants regarding PR firms. (Defs.' 8/30/19 Ltr. at 1 ("[T]he [privilege] log entries represent a small amount of the total volume of documents that fall within the categories of privileged documents challenged by plaintiff. . . . [T]he log only includes non-email documents. However, emails and their attachments make up the vast majority of produced documents, and likewise the vast majority of documents challenged by plaintiff.").) The Court is not ordering that all these documents be produced and is not granting Plaintiff's motion in full. The relief sought by Plaintiff sweeps too broadly in seeking "production of all redacted or withheld documents concerning: JF and Ogilvy's work for Signet, the Summit, the SCSC, how to handle fallout from the CF Reports and the WaPo article, and investor messaging about the credit portfolio." (Pl.'s Letter-Motion at 3.)

There may be (and likely are) documents or portions of documents that are "concerning" the PR firms' work for Signet, but that are protected by the attorney-client privilege (*see*, *e.g.*,

discussion of Tabs 1, 3, 5 and 10, *supra*) and/or are protected by the work product doctrine.

Indeed, as the Court indicated to the parties during oral argument, the waiver rules regarding the

work product doctrine differ from those regarding the attorney-client privilege:

> [W]aiver of the work-product doctrine is significantly more difficult to establish
> than waiver of the attorney-client privilege. Unlike the attorney-client privilege,
> the work-product privilege is not necessarily waived by disclosure to any third
> party; rather, the courts generally find a waiver of the work product privilege only
> if the disclosure substantially increases the opportunity for potential adversaries
> to obtain the information. . . . Even if the attorney-client privilege has been
> waived, documents provided to third-parties may still be protected as attorney
> work-product so long as there was some good reason to show it. . . . Providing
> documents to those who have a common interest with the disclosing party, rather
> than an adversarial relationship, does not waive attorney work-product.

*JA Apparel Corp. v. Abboud*, No. 07-CV-07787 (THK), 2008 WL 111006, at *3 (S.D.N.Y. Jan. 10,

2008) (citations and quotation marks omitted).

Based upon the Court's rulings set forth above, the parties shall meet and confer in a good

faith effort to resolve any remaining disputes regarding the documents covered by Plaintiff's

Letter-Motion.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' Letter-Motion is GRANTED IN PART and DENIED IN

PART. Defendants shall produce to Plaintiff within seven (7) days of the date of this Order (1)

unredacted versions of Exhibits B to E of Plaintiffs' Letter-Motion; (2) unredacted versions of the

documents contained in Tabs 2, 4, 6, 7, 8 and 9; and (3) a partially unredacted version of Tab 10,

as set forth above. No later than September 13, 2019, the parties shall meet and confer as set

forth above. No later than September 20, 2019, the parties shall file a joint letter with the Court

advising the Court of the status of the meet and confer process.

**SO ORDERED.**

DATED:          New York, New York
                September 5, 2019

                                          _____
                                          STEWART D. AARON
                                          United States Magistrate Judge