**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE SIGNET JEWELERS LIMITED SECURITIES LITIGATION | Civil Action No. 1:16-cv-06728-CM-SDA |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED**
**MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND**
**AUTHORIZATION TO DISSEMINATE NOTICE OF SETTLEMENT**

John Rizio-Hamilton
Rebecca E. Boon
**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020

*Lead Counsel for Lead Plaintiff the Public*
*Employees' Retirement System of*
*Mississippi and the Class*

**GADOW TYLER, PLLC**
Jason M. Kirschberg
511 E. Pearl St.
Jackson, MS 39201
Telephone: (601) 355-0654
Facsimile: (601) 510-9667
Email: jason@gadowtyler.com

*Additional Counsel for Lead Plaintiff Public*
*Employees' Retirement System of*
*Mississippi*

## TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ............................................................................ 1

II.     NATURE OF THE ACTION ............................................................................... 3

III.    PROCEDURAL HISTORY .................................................................................. 5

      A.      The Filing of the Amended Complaint and Denial of Defendants'
              Motion to Dismiss ................................................................................. 5

      B.      Fact and Expert Discovery ..................................................................... 6

      C.      Class Certification .................................................................................. 6

      D.      Defendants' Motion for Judgment on the Pleadings ............................... 7

      E.      Defendants' 23(f) Petition ...................................................................... 7

      F.      The Settlement Negotiations and Terms of the Settlement ..................... 8

IV.     THE PROPOSED SETTLEMENT MERITS PRELIMINARY
       APPROVAL ...................................................................................................... 8

      A.      Standards Governing Approval of Class Action Settlements ................. 8

      B.      The Court "Will Likely Be Able to" Approve the Proposed
              Settlement Under Rule 23(e)(2) ........................................................... 10

            1.      "Procedural" Aspects of the Settlement Satisfy Rule
                   23(e)(2) ...................................................................................... 10

            2.      The Settlement's Terms Are Adequate and Equitable ............................. 12

V.      THE COURT SHOULD APPROVE THE PROPOSED FORM OF
      NOTICE AND PLAN FOR PROVIDING NOTICE TO THE CLASS ......................... 21

VI.     PROPOSED SCHEDULE OF SETTLEMENT EVENTS ............................................. 23

VII.    CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re "Agent Orange" Prod. Liab. Litig.*,
597 F. Supp. 740 (E.D.N.Y. 1984), *aff'd*, 818 F.2d. 145 (2d Cir. 1987)................................13

*Alaska Electrical Pension Fund v. Bank of America Corp.*,
No. 14-CV-7126 (JMF), 2018 WL 6250657 (S.D.N.Y. Nov. 29, 2018)................................20

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
293 F.R.D. 459 (S.D.N.Y. 2013) .............................................................................9

*Anwar v. Fairfield Greenwich Ltd.*,
1:09-cv-00118, ECF Nos. 1099, 1233, 1457, 1569 (S.D.N.Y. Mar. 28, 2013,
Nov. 22, 2013, Nov. 20, 2015 and May 6, 2016) ....................................................20

*In re Bear Stearns Cos., Inc. Sec. Derivative & ERISA Litig.*,
909 F. Supp. 2d 259 (S.D.N.Y. 2012).....................................................................12

*Christine Asia Co., Ltd., et al., v. Jack Yun Ma, et al.*,
No.: 1:15-md-02631, 2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) ....................10, 11, 12, 20

*In re Citigroup Inc. Bond Litig.*,
296 F.R.D. 147 (S.D.N.Y. 2013) .............................................................................9

*City of Providence v. Aeropostale, Inc.*,
No. 11 Civ. 7132 (CM), 2014 WL 1883494 (S.D.N.Y. May 9, 2014)....................................23

*Cohen v. J.P. Morgan Chase & Co.*,
262 F.R.D. 153 (E.D.N.Y. 2009) ...........................................................................10

*D'Amato v. Deutsche Bank*,
236 F.3d 78 (2d Cir. 2001)...................................................................................11

*In re Initial Pub. Offering Sec. Litig.*,
243 F.R.D. 79 (S.D.N.Y. 2007) ..............................................................................9

*In re Marsh & Mclennan Cos., Inc. Sec. Litig.*,
No. 04 Civ. 8144(CM), 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009)............................11, 23

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015)...........................................................................................16

*In re Oxford Health Plans, Inc. Sec. Litig.*,
2003 U.S. Dist. LEXIS 26795 (S.D.N.Y. June 12, 2003)..............................................20

*In re Pfizer Inc. Sec. Litig.*,
No. 04-cv-09866 (LTS), ECF No. 727 (S.D.N.Y. Dec. 21, 2016) ........................................20

*In re Platinum & Palladium Commodities Litig.*,
No. 10 Civ. 3617 (WHP), 2014 WL 3500655 (S.D.N.Y. Jan. 15, 2015) ................................9

*In re Polaroid ERISA Litig.*,
240 F.R.D. 65 (S.D.N.Y. 2006) ........................................................................................12

*Singh v. Cigna Corp.*,
918 F.3d 57 (2d Cir. 2019) ..............................................................................................14

*In re Veeco Instruments Inc. Sec. Litig.*,
No. 05 MDL 01695 (CM), 2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) ..............................12

*In re Vivendi Universal, S.A. Secs. Litig.*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011)...............................................................................18

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
396 F.3d 96 (2d Cir. 2005)...................................................................................9, 11, 13

STATUTES

15 U.S.C. § 78u-4(a)(7) .....................................................................................................22

15 U.S.C. § 78u-4(e) .........................................................................................................19

Class Action Fairness Act, 28 U.S.C. § 1715 (2005) ...................................................23

OTHER AUTHORITIES

Fed. R. Civ. P. 23........................................................................................................ passim

S.D.N.Y. Local Civ. R. 23.1 ............................................................................................22

Court-appointed Lead Plaintiff and Class Representative, the Public Employees' Retirement System of Mississippi ("MissPERS" or "Lead Plaintiff"), on behalf of itself and the other members of the certified Class, respectfully submits this memorandum of law in support of its unopposed motion, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for entry of the Parties' agreed-upon [Proposed] Order Preliminarily Approving Settlement and Authorizing Dissemination of Notice of Settlement ("Preliminary Approval Order"), which is filed separately herewith.[1]

## I.   PRELIMINARY STATEMENT

Lead Plaintiff has reached a proposed Settlement with Defendants that will resolve all claims in this Action in exchange for a cash payment of $240,000,000 for the benefit of the Class. Lead Plaintiff now seeks the Court's preliminary approval of the Settlement under Rule 23(e)(1) so that notice of the Settlement can be disseminated to the Class and a hearing for final approval of the Settlement (the "Settlement Fairness Hearing") can be scheduled.

The $240 million Settlement represents an outstanding result for the Class. The Settlement, if approved, would be among the top 75 securities class action settlements of all time, out of thousands of settlements nationwide. The proposed Settlement provides compensation for claims arising out of alleged misstatements and omissions concerning: (i) the quality of and reserves for an in-house credit program and (ii) alleged sexual harassment. The latter category of allegations, to Lead Counsel's knowledge, have never been successfully pursued in securities litigation prior to this case. Moreover, as detailed herein, the Settlement represents a substantial portion of the

---

[1] All capitalized terms used in this memorandum that are not otherwise defined shall have the meanings given to them in the Stipulation and Agreement of Settlement dated March 16, 2020 (the "Stipulation"), which is attached as Exhibit 1 to the Notice of Motion.

reasonably recoverable damages that Lead Counsel would have been able to credibly present to a jury, and is an excellent result for the Class.

The Settlement is the culmination of over two and a half years' worth of vigorous prosecution by Lead Plaintiff and Lead Counsel, who devoted an enormous amount of time, effort, and resources to this case.  Prior to reaching the Settlement, Lead Counsel had, among other things, conducted an extensive investigation into the claims asserted in the Action; drafted and filed three detailed amended complaints; successfully opposed Defendants' motions to dismiss and for judgment on the pleadings; and briefed and obtained class certification.  The Parties also completed fact discovery and engaged in substantial expert discovery.  Lead Counsel obtained and reviewed nearly 4 million pages of documents produced by Defendants and third parties; took and defended 31 depositions; and exchanged 20 expert reports with Defendants on a host of complex issues.  Through their extensive efforts, Lead Plaintiff and Lead Counsel had a thorough understanding of the pertinent legal and factual issues before reaching the proposed Settlement.

The proposed Settlement is also the product of an extensive, months-long mediation process conducted under the guidance of one of the most experienced and respected mediators of complex litigations in the country, former United States District Judge Layn R. Phillips ("Judge Phillips").  The Parties exchanged detailed written mediation submissions concerning liability and damages, and engaged in three formal, full-day mediation sessions with Judge Phillips. Ultimately, at the end of the final mediation session, Judge Phillips issued a mediator's recommendation that the Parties settle the case for $240,000,000, which the Parties accepted.

Finally, the risks and delay associated with continued litigation of the Action also support approval of the Settlement.  The case required Lead Plaintiff to prove two alleged unrelated frauds: one involving misrepresentations concerning Signet's loan portfolio and reserves, and the other

involving misrepresentations concerning alleged sexual harassment at the Company, which presented unique issues of first impression both on the merits and on class certification.   As explained below, Defendants had very significant arguments regarding liability and damages as to both claims, which, if successful, could have resulted in a recovery that was substantially smaller than the Settlement, or no recovery at all.

Lead Plaintiff now requests that this Court enter the proposed Preliminary Approval Order which will, among other things: (i) approve the form and manner of providing notice of the Settlement to the Class, including the form and content of the Notice, Claim Form, and Summary Notice; and (ii) schedule the final Settlement Fairness Hearing and related events.   At the Settlement Fairness Hearing, following additional briefing and addressing any potential objections to the Settlement, Lead Plaintiff and Lead Counsel will ask the Court to make a final determination as to whether, in accordance with Rule 23(e)(2), the Settlement is fair, reasonable, and adequate.

For the reasons set forth herein, Lead Plaintiff respectfully requests that the Court enter the proposed Preliminary Approval Order.

## II.   NATURE OF THE ACTION

As the Court is aware, Signet is a jewelry retailer that owns and operates thousands of jewelry stores under brands such as Kay Jewelers, Jared, and Zales.   This certified securities class action asserts claims on behalf of all persons and entities who purchased or otherwise acquired Signet common stock during the period from August 29, 2013 to May 25, 2017 (the "Class Period") and who were allegedly damaged thereby (the "Class").   ECF No. 177; Stipulation ¶1(h). Excluded from the Class by definition are Defendants and other related persons and entities, as set forth in paragraph 1(h) of the Stipulation.

The Fifth Amended Class Action Complaint for Violations of the Federal Securities Laws, dated March 22, 2018 (ECF No. 111) (the "Fifth Amended Complaint" or "Complaint"), is the

operative complaint. The Complaint asserts claims against all Defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act.

The Complaint alleges that Defendants violated the federal securities laws based on two distinct courses of false or misleading statements and omissions.  First, Lead Plaintiff alleges that Defendants publicly mischaracterized the *Jock* litigation—an employment arbitration brought by employees of Signet's U.S. division, Sterling Jewelers ("Sterling")—and the risks it posed to the Company.  Specifically, Lead Plaintiff alleges that Defendants misleadingly minimized the *Jock* litigation as involving only "store-level" employment practices concerning "compensation and promotional opportunities" at a "few stores," and falsely stated that Signet had "investigated" the allegations and found them to be unsubstantiated.  Lead Plaintiff also alleges that Defendants falsely assured the market that Signet adhered to rigorous standards of ethics set forth in the Company's Codes of Conduct and Ethics (the "Codes"), which, among other things, prohibited sexual harassment and stated that the Company made employment decisions based solely on merit. The Complaint alleges, however, that *Jock* in fact concerned allegations of sexual harassment by Signet's most senior executives, which were set forth in numerous sworn declarations by former Sterling employees (collectively, the "Declarations").  The Complaint further alleges that investors suffered losses when the truth was revealed through a February 27, 2017 *Washington Post* article reporting on the Declarations.

Second, Lead Plaintiff alleges that Defendants made false or misleading statements and omissions concerning Signet's in-house financing program, through which Signet made loans to its customers for their jewelry purchases.  Lead Plaintiff alleges that Defendants held Signet out to investors as a "prudent" lender that made high-quality loans according to "stringent" and

4

"conservative" underwriting criteria.  Lead Plaintiff alleges that, in truth, Signet engaged in reckless underwriting and built a large portfolio of high-risk subprime loans that caused the Company to incur significant losses.  Lead Plaintiff further alleges that Defendants materially understated Signet's loan loss reserves in its financial statements, thus overstating its income.  The Complaint alleges that investors suffered losses when the truth regarding Signet's financing program was revealed to the market through a series of corrective disclosures, including Signet's announcement on May 25, 2017 that 45% of Signet's credit portfolio—amounting to between $700 million and $800 million—consisted of subprime loans.

## III.   PROCEDURAL HISTORY

### A.   The Filing of the Amended Complaint and Denial of Defendants' Motion to Dismiss

This Action was commenced in August 2016 with the filing of two putative class action complaints by two individual investors.  Following a sequence of events that required republication of the PSLRA notice, on July 27, 2017, the Court appointed MissPERS as Lead Plaintiff and Bernstein Litowitz Berger & Grossmann LLP ("BLB&G") as Lead Counsel.

MissPERS then investigated the claims available to Class Members and filed a detailed amended complaint, which it later amended multiple times to incorporate new information that continued to emerge about Signet's loan portfolio.  On March 22, 2018, Lead Plaintiff filed the operative Complaint, asserting the claims summarized above.

On March 30, 2018, Defendants moved to dismiss the Fifth Amended Complaint, which motion was fully briefed on April 13, 2018.  On May 23, 2018, the Action was reassigned from the Honorable Jesse Furman to Your Honor.  On November 26, 2018, the Court entered its comprehensive Decision and Order substantially denying Defendants' motion to dismiss.

## B.      Fact and Expert Discovery

Fact discovery commenced in December 2018 and ended in September 2019.   Lead Plaintiff obtained nearly 4 million pages of documents from Defendants and 16 third parties, while producing nearly 200,000 pages of documents to Defendants in response to their requests.   Lead Counsel also took or defended 31 depositions, including deposing two of the Company's former CEOs (Defendants Michael Barnes and Mark Light); Signet's current CEO (Defendant Virginia Drosos); two former Signet CFOs (Defendants Ronald Ristau and Michele Santana); the Chairman of Signet's Board of Directors; several other senior Signet executives; multiple Declarants who submitted sworn declarations regarding alleged sexual harassment at Signet; and Signet's auditor.

Lead Plaintiff and Defendants also engaged in substantial expert discovery.   In September 2019, Lead Plaintiff submitted six opening expert reports on the following topics: (i)  the importance of Signet's disclosures concerning *Jock* and the Codes; (ii) the significance of the Declarations, the inadequacy of Signet's response to them, and the risk the Company faced in *Jock*; (iii) loss causation and damages under the securities laws; (iv) Signet's understatement of its loan loss reserves in violation of GAAP; (v) the high-risk nature of Signet's underwriting and the proliferation of subprime loans in its portfolio; and (vi) the connection between the loss Signet suffered on the sale of its loan portfolio and the poor credit quality of the loans.

In October and November 2019, Defendants submitted nine extensive expert reports in opposition to Lead Plaintiff's experts.   In November 2019, Lead Plaintiff submitted five reply expert reports.

## C.      Class Certification

While discovery was progressing, Lead Plaintiff sought and obtained class certification. On March 15, 2019, Lead Plaintiff moved for class certification, supporting its motion with the report of Michael Hartzmark, Ph.D., regarding market efficiency and class-wide damages.   On

April 26, 2019, Defendants filed their opposition, which included expert reports from Allen Ferrell, Ph. D., concerning price impact and damages issues, and Michael F. Maloney, CPA, CFF, CFE, concerning issues relating to Signet's accounting and disclosures for its loss reserves.  Following the completion of briefing, on July 10, 2019, the Court entered an order certifying the Class in substantial part, and appointing MissPERS as Class Representative and BLB&G as Class Counsel.

### D.   Defendants' Motion for Judgment on the Pleadings

As class certification was being briefed, on May 9, 2019, Defendants filed a motion for judgment on the pleadings under Rule 12(c) as to the claim based on statements in the Codes, which was fully briefed on May 30, 2019.  On June 11, 2019, the Court denied Defendants' motion. Defendants filed a motion for reconsideration of the Court's denial, which was denied on June 20.

### E.   Defendants' 23(f) Petition

On July 24, 2019, Defendants filed a petition pursuant to Rule 23(f) of the Federal Rules of Civil Procedure (the "Rule 23(f) Petition") for leave to appeal the Court's Class Certification Order to the United States Court of Appeals for the Second Circuit.  On August 5, 2019, Lead Plaintiff opposed Defendants' Rule 23(f) Petition.  On November 19, 2019, the Second Circuit granted Defendants' Rule 23(f) Petition.

After reaching their agreement-in-principle to settle the Action, described directly below, the Parties filed a joint stipulation provisionally withdrawing Defendants' pending Rule 23(f) appeal.  That joint stipulation, which was so-ordered by the Clerk of the Second Circuit Court of Appeals on January 16, 2020, permits Defendants to reinstate the appeal by filing written notice with the Clerk of the Second Circuit Court of Appeals, and serving such notice upon Lead Plaintiff, by August 28, 2020.

### F.      The Settlement Negotiations and Terms of the Settlement

In September 2019, the Parties agreed to engage in private mediation and retained Judge Phillips.  The Parties exchanged detailed mediation statements on November 1, 2019, and participated in three full-day mediations on November 18, December 9, and January 7, 2020.

Throughout the mediation sessions, counsel for the Parties engaged in extensive, hard-fought negotiations on behalf of their respective clients.  While the Parties were successful in narrowing their differences, they were unable to reach agreement by the conclusion of the final session on January 7.  Accordingly, following that mediation session, Judge Phillips issued a mediator's recommendation that the Action be settled for $240,000,000 in cash.  The Parties conditionally accepted the mediator's recommendation, subject to approvals by the Mississippi Attorney General and Signet's Board of Directors, which were subsequently obtained.

The Parties then negotiated the full settlement terms.  On March 16, 2020, the Parties executed the Stipulation setting forth those final terms and conditions.  Under those terms, Defendants will pay or cause to be paid $240,000,000 in cash (the "Settlement Amount") into an interest-bearing escrow account following preliminary approval of the Settlement.  *See* Stipulation ¶(8).  The Net Settlement Fund (*i.e.*, the Settlement Amount, plus accrued interest, minus any attorneys' fees and Litigation Expenses awarded by the Court, Taxes, Notice and Administration Costs, and any other costs or fees approved by the Court) will be distributed to Class Members who submit valid Claim Forms ("Authorized Claimants"), in accordance with a plan of allocation to be approved by the Court (discussed below).

## IV.     THE PROPOSED SETTLEMENT MERITS PRELIMINARY APPROVAL

### A.      Standards Governing Approval of Class Action Settlements

Rule 23(e) of the Federal Rules of Civil Procedure provides that the Court should approve a class action settlement if the Court finds it "fair, reasonable, and adequate."  Fed. R. Civ. P.

23(e)(2); *see In re Citigroup Inc. Bond Litig.*, 296 F.R.D. 147, 154 (S.D.N.Y. 2013); *In re Am. Int'l Grp., Inc. Sec. Litig.*, 293 F.R.D. 459, 464 (S.D.N.Y. 2013).  The settlement of class action litigation is strongly encouraged by the courts.  *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116-17 (2d Cir. 2005) ("We are mindful of the strong judicial policy in favor of settlements, particularly in the class action context.") (citations and internal quotations omitted).

As the Court is well aware, judicial approval of a class action settlement is a two-step process. First, the Court performs a preliminary review of the terms of the proposed settlement to determine whether to send notice of the proposed settlement to the class.  *See* Fed. R. Civ. P. 23(e)(1).  Second, after notice has been provided and a hearing has been held, the Court determines whether to actually approve the settlement.  *See* Fed. R. Civ. P. 23(e)(2).

A court should grant preliminary approval to authorize sending notice of a proposed settlement to the class upon a finding that it "will likely be able" to finally approve the settlement under Rule 23(e)(2).  *See* Fed. R. Civ. P. 23(e)(1)(B).  This standard for preliminary approval of class action settlements was established by amendments to Rule 23(e) that became effective on December 1, 2018.  Prior to those amendments, courts had developed a standard for preliminary approval through case law that was substantively similar to the current standard but phrased differently.  A common formulation was that the court should grant preliminary approval to a proposed settlement "[w]here the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval."  *In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. 79, 87 (S.D.N.Y. 2007) (citation omitted); *accord In re Platinum & Palladium Commodities Litig.*, No. 10 Civ. 3617

(WHP), 2014 WL 3500655, at *11 (S.D.N.Y. Jan. 15, 2015); *Cohen v. J.P. Morgan Chase & Co.*, 262 F.R.D. 153, 157 (E.D.N.Y. 2009).

In considering *final* approval of the Settlement, Federal Rule 23(e)(2) provides that the Court should consider whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorneys' fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Because each of these factors is satisfied here, preliminary approval is appropriate.

### B.    The Court "Will Likely Be Able to" Approve the Proposed Settlement Under Rule 23(e)(2)

#### 1.    "Procedural" Aspects of the Settlement Satisfy Rule 23(e)(2)

"Rule 23(e)(2)(A), which requires adequate representation, and Rule 23(e)(2)(B), which requires arm's-length negotiations, constitute the 'procedural' analysis of the fairness inquiry." *Christine Asia Co., Ltd., et al., v. Jack Yun Ma, et al.*, No.: 1:15-md-02631, 2019 WL 5257534, at *9 (S.D.N.Y. October 16, 2019) (citations and internal quotations omitted).  These two factors "look[] to the conduct of the litigation and of the negotiations leading up to the proposed settlement." Fed. R. Civ. P. 23(e)(2) advisory committee note to 2018 amendment.  Courts may consider "the nature and amount of discovery in this or other cases, or the actual outcomes of other cases, [which] may indicate whether counsel negotiating on behalf of the class had an adequate information base." *Id.*

The proposed Settlement embodies the hallmarks of a procedurally fair resolution under Rule 23(e)(2).  First, as detailed above, Lead Counsel has been litigating this Action since July 2017, during which time it completed fact discovery and a very substantial portion of expert

discovery.  Lead Counsel's settlement posture was informed by, among other things, the significant work performed in investigating and drafting multiple substantive amended complaints; responding to Defendants' motions to dismiss briefing; responding to a motion for judgment on the pleadings; briefing an extensive motion for class certification; and engaging in substantial fact and expert discovery.  This discovery included the analysis of nearly 4 million pages of documents produced by Defendants and numerous third parties; participation in 31 depositions; and the exchange of 20 expert reports on numerous issues that were central to the litigation.  Lead Counsel also engaged in full briefing on Defendants' 23(f) Petition.  Based on the extensive amount of discovery, Lead Counsel—who have extensive experience litigating securities class actions—were "in a position to realistically evaluate the strengths and weaknesses of the claims, and to evaluate the fairness of the proposed Settlement." *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, No. 04 Civ. 8144(CM), 2009 WL 5178546, at *6 (S.D.N.Y. Dec. 23, 2009); *see also Wal-Mart*, 396 F.3d at 116 ("presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery"); *Christine Asia Co.*, 2019 WL 5257534, at *10 (where the "case proceeded well into both class certification and merits discovery," a "presumption of fairness" exists).

Second, as discussed above, the Settlement was reached after extensive arm's-length negotiations between the Parties, and is the product of a mediator's recommendation.  The mediation process included the exchange of detailed mediation statements on liability and damages, followed by three separate full-day mediation sessions under the auspices of Judge Phillips, an experienced mediator of securities class actions and other complex litigation.  These facts strongly support the conclusion that the Settlement is fair.  *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (a "mediator's involvement in . . . settlement negotiations helps to

ensure that the proceedings were free of collusion and undue pressure"); *In re Bear Stearns Cos., Inc. Sec. Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 265 (S.D.N.Y. 2012) (finding a settlement fair where the parties engaged in "arm's length negotiations," including mediation before "retired federal judge Layn R. Phillips, an experienced and well-regarded mediator of complex securities cases"); *Christine Asia Co.*, 2019 WL 5257534, at *10 (settlement entitled to a presumption of fairness where it was the "product of thorough, arm's-length negotiation, facilitated by a neutral and well-respected mediator").

Finally, we note that other factors further demonstrate the procedural fairness of the proposed Settlement. Lead Plaintiff has claims that are typical of other Class Members, has no interests antagonistic to other Class members, and has an interest in obtaining the largest possible recovery from Defendants. *See In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict of interest between the class representatives and other class members.") (citation omitted). Moreover, Lead Plaintiff is a sophisticated institutional investor of the type favored by Congress when it passed the PSLRA, closely supervised all aspects of this litigation, and recommends that the Settlement be approved. *See In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007) ("[U]nder the PSLRA, a settlement reached . . . under the supervision and with the endorsement of a sophisticated institutional investor . . . is 'entitled to an even greater presumption of reasonableness….'").

In sum, all of these factors demonstrate the procedural fairness of the proposed Settlement.

### 2. The Settlement's Terms Are Adequate and Equitable

Rules 23(e)(2)(C) and 23(e)(2)(D) direct the Court to evaluate whether "the relief provided for the class is adequate" and "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(C)-(D). Here, the Settlement represents a very favorable result for the

Class.  Further, Lead Counsel, with the assistance of Lead Plaintiff's damages expert, has proposed a Plan of Allocation that ensures all Class Members will be treated equitably.

### a)   The Settlement Provides Substantial Relief, Especially in Light of the Costs, Risks, and Delay of Further Litigation

The adequacy of the amount of the settlement must be judged "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case."  *In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984), *aff'd*, 818 F.2d. 145 (2d Cir. 1987).  "[T]here is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion."  *Wal-Mart*, 396 F.3d at 119.

The Settlement provides for a cash recovery of $240 million.  This is an outstanding result for Class Members given the risks of continued litigation.  Lead Plaintiff and Lead Counsel believe that their claims have merit, but recognize the substantial risks they would face in establishing liability and damages at trial, and the expense and length of litigation through trial and appeals.

For example, Lead Plaintiff faced numerous risks in establishing Defendants' liability for the alleged misstatements concerning the *Jock* litigation and the Codes, which are the principal target of Defendants' successful Rule 23(f) Petition.  In their Rule 23(f) Petition, Defendants argued that certification of Section 10(b) claims based on underlying allegations of sexual harassment is "unprecedented" and an improper attempt to litigate an employment discrimination claim under the guise of a securities fraud claim.  Defendants further asserted that a class alleging a "culture of sexual harassment" would be unmanageable because individualized issues would overwhelm common ones—that is, the case would require a series of "mini-trials" on each alleged incident of sexual harassment to determine whether it in fact occurred.  Defendants further

contended that the Code statements are immaterial as a matter of law under the recent Second Circuit decision *Singh v. Cigna Corp.*, 918 F.3d 57 (2d Cir. 2019), which held that certain statements in a code of conduct were inactionable.

The risk that these arguments posed is highlighted by the fact that the Second Circuit granted the Rule 23(f) Petition.  While Lead Plaintiff believes it has compelling arguments in response to Defendants' positions, if the Second Circuit agreed with Defendants that certification of the *Jock* and Code-related statements is contradicted by recent law in *Singh*, unmanageable given the number of Declarations or issues involved, or otherwise inappropriate, the *Jock* and Code claims could be de-certified and effectively removed from the case.  Eliminating these claims would have substantially reduced the potential recoverable damages and weakened the case at trial.

Defendants have also continued to assert a "truth on the market" defense to these claims, arguing that the essence of the allegations in the Declarations was known years before the February 27, 2017 corrective disclosure.  Among other things, Defendants have pointed to the *Jock* class certification decision released in February 2015 to argue that the market knew that *Jock* concerned widespread sexual harassment.  That class certification decision states, in part, that the

> conduct described in the declarations and testimony has occurred in settings that are public and private, ranging from banter in hallways and elevators to interactions within Sterling stores and at the mandatory annual meeting of all Sterling managers held in Orlando, Florida. It includes references to women in sexual and vulgar ways, groping and grabbing women, soliciting sexual relations with women (sometimes as a quid pro quo for employment benefits), and creating an environment at often mandatory Company events in which women are expected to undress publicly, accede to sexual overtures and refrain from complaining about the treatment to which they have been subjected.

If the case had proceeded to trial, Lead Plaintiff would face the risk that a jury could accept Defendants' "truth on the market" defense, thereby defeating the elements of materiality and loss causation required for this branch of Lead Plaintiff's securities fraud claims.

Defendants would also continue to argue that *Jock* did not actually concern sexual harassment claims, and thus, Defendants did not mischaracterize the action or its risks.  In support of this argument, Defendants submitted a detailed expert report which argued based on a review of the entire record in *Jock* that: (i) plaintiffs in *Jock* never actually asserted a legal claim for sexual harassment; (ii) the arbitrator found that the Declarations were insufficient to show a widespread culture of sexual harassment at Signet; and (iii) the arbitrator declined to certify the claims based on underlying alleged sexual harassment.  While Lead Plaintiff had credible arguments in response, there was a real risk that a jury could be persuaded by Defendants' arguments had the case had proceeded to trial.

Lead Plaintiff also faced serious risks in establishing Defendants' liability with respect to the credit-related claims.  For example, Defendants would highlight that Signet's in-house credit program was decades-old, not illegal, very profitable, and fully disclosed in filings with the SEC over many years.  Defendants would justify the Company's willingness to take on borrowers of lower credit quality as sound business strategy by asserting that Signet used the loans to drive jewelry sales, and the Company earned a large margin on the jewelry it sold.  The large margin on the merchandise, Defendants would contend, allowed Signet to safely absorb more defaults than a traditional lender could (such as a bank), and enabled Signet to profitably lend deeper down the credit spectrum than most lenders.  Defendants would further argue that employing such profitable business strategy was not reckless, and in fact benefitted the Company's shareholders.  Indeed, Defendants would argue that if Signet were to have employed a more conservative lending strategy, it would have lost billions of dollars in sales during the Class Period, to its shareholders' detriment.  Defendants submitted extensive expert reports which defended the in-house credit program.

Furthermore, Defendants would have argued that when "bad debt" at the Company increased, they disclosed it.  Similarly, Defendants would have argued that Signet disclosed the weighted average FICO score of its borrowers, thus informing the market that there was a significant concentration of subprime borrowers.  While Lead Plaintiff believes that it has strong responsive arguments, Defendants could have nonetheless persuaded a jury that they were truthful enough with investors regarding the quality of the loan portfolio during the Class Period.

Defendants also would have made strong arguments that Signet's loan loss reserve was not materially understated during the Class Period.  Lead Plaintiff alleges that Signet used a rare and disfavored aging method called "recency" to classify loans as current even when a borrower had missed multiple payments, which allowed Signet to understate its reserves and obscure the credit risk in its portfolio.  However, Defendants would argue that they disclosed the recency method to investors, they employed that method for decades, and GAAP permits it.  Again, Defendants submitted extensive expert reports on the accounting issue.

Defendants would also point to the fact that Signet's independent auditor, KPMG, signed off on all of Signet's financial statements during the Class Period.  Defendants would argue that KPMG is a "big four" accounting firm that had no reason to be complicit in a fraud, was an expert in GAAP, thoroughly vetted the Company's financial statements during the Class Period, and repeatedly concluded that they were accurate.  Defendants would also argue that, under *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015), that their statements about loan loss reserves were "opinions" that are not actionable unless they were knowingly false or lacked a reasonable basis.  Given that KPMG vetted and signed off on the reserves, there was a risk that Defendants could have persuaded a jury that Signet's reserves were within the realm of reason.

16

Even if Lead Plaintiff defeated these arguments and established Defendants' liability with respect to both the credit claims and the sexual harassment claims, it would have faced significant hurdles in proving loss causation and damages. Had this case continued, Lead Plaintiff would have argued that maximum potential damages were $1.8 billion. It is important to note that achieving that figure would have required Lead Plaintiff to pitch three consecutive "perfect games" at trial by: (i) proving Defendants' liability for the claims related to alleged sexual harassment for the entire Class Period; (ii) proving Defendants' liability for the claims related to the loan portfolio and loss reserves for the entire Class Period; and (iii) prevailing on every contested issue concerning loss causation and damages. The proposed Settlement represents almost 14% of maximum potential damages in this scenario.

It is also important to note that obtaining a $1.8 billion judgment likely would have been a pyrrhic victory, and therefore is not an accurate benchmark against which to measure the reasonableness of the proposed Settlement in isolation. If Lead Plaintiff actually *did* obtain a $1.8 billion judgment, there is no evidence that the Company could have satisfied it, and it might have been forced into bankruptcy. This likely would have prevented Lead Plaintiff and the Class from collecting on the judgment.

In any event, even if Lead Plaintiff successfully established liability for both sets of claims for the full Class Period, Defendants would have contended that the Class's maximum potential damages were a tiny fraction of $1.8 billion. Defendants would have asserted that Lead Plaintiff's damages expert used an unprecedented method—the "constant price to earnings ratio" method— to measure damages in this case. Defendants would have argued that the accepted method of measuring inflation is the "constant dollar" method, and when this method is used, maximum recoverable damages are materially reduced. Defendants also would have contended that the law

17

requires that any gains on sales of Signet stock during the Class Period must be "netted out" from the damages figures, significantly reducing recoverable damages again.

Defendants would have further asserted that many of the corrective disclosures for the claims relating to the loan portfolio were confounded by the disclosure of information unrelated to the alleged fraud.  Defendants would have contended that when one disaggregates the impact of non-fraud related information from the relevant stock price declines, only a small portion of the declines were recoverable as damages.  Further, as to the claims related to alleged sexual harassment, Defendants would have argued that the stock price rebounded shortly after the alleged corrective disclosure, when additional mitigating information about the sexual harassment allegations became public.  Defendants would have asserted that any damages for this claim must be offset by the amount of this stock price rebound.

Defendants submitted extensive expert damages reports, which made arguments that, if accepted, would have reduced maximum recoverable damages to approximately $130 million— far less than the Settlement Amount.  Thus, in all events, the $240 million Settlement Amount represents a substantial percentage of realistically recoverable damages for the Class when one considers the risks of continued litigation.

The delay of obtaining and collecting on a judgment is also a relevant consideration.  If the litigation had continued, Lead Plaintiff would have to prevail at several additional stages—first, on Defendants' 23(f) appeal, then at summary judgment and trial, and if it prevailed at trial, on the appeals that would likely follow.  This process could take years, and it presented new risks at each stage.  *See, e.g.*, *In re Vivendi Universal, S.A. Secs. Litig.*, 765 F. Supp. 2d 512, 524, 533 (S.D.N.Y. 2011) (after a verdict for class plaintiffs, district court granted judgment for defendants following

change in law). The Settlement avoids these risks and provides a large, prompt, and certain benefit to the Class rather than the mere possibility of a recovery after additional years of litigation.

### b)      The Settlement Treats All Class Members Fairly

The Settlement does not improperly grant preferential treatment to Lead Plaintiff or any segment of the Class. All Class Members will receive a distribution from the Net Settlement Fund pursuant to an equitable plan of allocation to be approved by the Court.

At the Settlement Fairness Hearing, Lead Plaintiff will ask the Court to approve the proposed Plan of Allocation for the Net Settlement Fund (the "Plan," set forth in full in the Notice). Lead Plaintiff's damages expert, in consultation with Lead Counsel, developed the Plan, which is comparable to plans of allocation that courts have approved in numerous other securities class actions. The Plan is based on Lead Plaintiff's allegations that Defendants' materially false and misleading statements and omissions caused artificial inflation in the prices of Signet common stock during the Class Period, and that a series of public disclosures that partially corrected the alleged misrepresentations and omissions removed that inflation.

The Plan calculates a "Recognized Loss Amount" or "Recognized Gain Amount" for each purchase or acquisition of Signet common stock during the Class Period listed on the Claim Form for which the claimant provides adequate documentation. The calculation of Recognized Loss Amounts will depend on when the claimant purchased and/or sold the shares, whether the claimant held the shares through the statutory 90-day look-back period, *see* 15 U.S.C. § 78u-4(e), and the value of the shares when the claimant purchased, sold, or held them. A claimant's "Recognized Claim" will be the sum of the claimant's Recognized Loss Amounts minus the sum of the claimant's Recognized Gain Amounts. The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims.

Once the Claims Administrator has processed all submitted claims, notified claimants of deficiencies or ineligibility, processed responses, and made claim determinations, the Claims Administrator will make distributions to eligible Authorized Claimants through checks and wire transfers. If any monies remain in the Net Settlement Fund, the Claims Administrator will conduct additional re-distributions until it is no longer cost effective. At such time, any remaining balance will be contributed to non-sectarian, not-for-profit, 501(c)(3) organization(s), to be recommended by Lead Counsel and approved by the Court.

### c) The Settlement Does Not Excessively Compensate Plaintiff's Counsel

The proposed Settlement does not grant excessive compensation to Plaintiff's Counsel. The Settlement does not contemplate any specific award to Plaintiff's Counsel. Plaintiff's Counsel will be compensated solely out of the Settlement Fund in an amount to be approved by the Court.

In connection with Lead Counsel's fee and expense application, Lead Counsel will seek no more than 25% of the Settlement Fund net of Court-approved Litigation Expenses. This amount is well within the percentages that courts in the Second Circuit have approved in securities class actions with comparable recoveries. *See, e.g.*, *Christine Asia Co.*, 2019 WL 5257534, at *17 (awarding 25% of $250 million settlement); *In re Pfizer Inc. Sec. Litig.*, No. 04-cv-09866 (LTS), ECF No. 727 at 2 (S.D.N.Y. Dec. 21, 2016) (awarding 28% of $486 million settlement) (Exhibit A); *In re Oxford Health Plans, Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 26795, at *13 (S.D.N.Y. June 12, 2003) (awarding 28% of $300 million settlement); *Anwar v. Fairfield Greenwich Ltd.*, 1:09-cv-00118, ECF Nos. 1099 at *2, 1233 at *2, 1457 at *11, and 1569 at *11 (S.D.N.Y. March 28, 2013, November 22, 2013, November 20, 2015 and May 6, 2016) (awarding total fees of 28.8% on $235.25 million aggregate settlement) (Exhibit B); *Alaska Electrical Pension Fund v. Bank of America Corp.*, No. 14-CV-7126 (JMF), 2018 WL 6250657, at *1 (S.D.N.Y. Nov. 29, 2018)

(awarding 26% of $486 million settlement). Lead Counsel will also seek payment of Litigation Expenses incurred in connection with the Action in an amount not to exceed $4,000,000.

Lead Counsel's fee and expense application will be fully briefed and justified upon filing of a formal motion in accordance with the Preliminary Approval Order. By granting preliminary approval of the proposed Settlement, the Court does not in any way pass upon the reasonableness of any fee or expense application, which will be decided at the Settlement Fairness Hearing.

### d) Lead Plaintiff Has Identified All Agreements Made in Connection with the Settlement

In addition to the Stipulation, Lead Plaintiff and Signet have entered into a confidential Supplemental Agreement regarding requests for exclusion from the Class (opt-outs). *See* Stipulation ¶40. This agreement sets forth the conditions under which Signet may terminate the Settlement if the opt-outs exceed an agreed-upon threshold. As is standard in securities class actions, such agreements are not made public to avoid incentivizing the formation of a group of opt-outs for the sole purpose of leveraging the Opt-Out Threshold to exact an individual settlement. Pursuant to its terms, the Supplemental Agreement may be submitted to the Court *in camera*.

## V.   THE COURT SHOULD APPROVE THE PROPOSED FORM OF NOTICE AND PLAN FOR PROVIDING NOTICE TO THE CLASS

The Court should approve the form and content of the proposed Notice and Summary Notice. *See* Stipulation, Exs. A-1 and A-3; Proposed Preliminary Approval Order, Exs. 1 and 3. The Notice is written in plain language and sets out the relevant information and answers to most questions that Class Members will have. Consistent with Rules 23(c)(2)(B) and 23(e)(1), the Notice apprises Class Members of (among other disclosures) the nature of the Action; the claims and issues involved; the definition of the Class; the terms of the proposed Settlement; that the Court will exclude any Class Member who requests exclusion, and the procedures and deadlines for doing so; the procedures and deadlines for objecting; and the binding effect of a class judgment

on Class Members under Rule 23(c)(3)(B).

With respect to items relating to the Settlement, the Notice also satisfies the separate disclosure requirements imposed by the PSLRA. *See* 15 U.S.C. § 78u-4(a)(7). The Notice states the amount of the Settlement on an absolute and per-share basis; the issues about which the Parties disagree; the amount of attorneys' fees and litigation expenses that Lead Counsel will seek; the name, mailing address, email address, and telephone number of Lead Counsel, who will be available to answer questions from Class Members; and a brief explanation of the reasons why the Parties are proposing the Settlement. *Id.* The Notice also satisfies the requirement of S.D.N.Y. Local Rule 23.1 regarding Lead Counsel's application for attorneys' fees and expenses.

In addition, the proposed notice program set forth in the proposed Preliminary Approval Order meets the standards under the Federal Rules of Civil Procedure and due process clause of the U.S. Constitution. Rule 23(c)(2)(B) requires the court to direct to a class certified under Rule 23(b)(3) "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Similarly, Rule 23(e)(1) requires the court to "direct notice in a reasonable manner to all class members who would be bound" by a proposed settlement. Fed. R. Civ. P. 23(e)(1).

Lead Plaintiff proposes that JND Legal Administration ("JND") administer the notice and claims process. JND is an independent settlement and claims administrator that Lead Counsel selected as the proposed Claims Administrator after a competitive bidding process. If the Court preliminarily approves the Settlement, Signet will provide contact information of potential Class Members and JND will disseminate the Notice and Claim Form (the "Notice Packet") to all identified potential Class Members. JND will also utilize a proprietary list of the largest and most common U.S. banks, brokerage firms, and nominees that purchase securities on behalf of

beneficial owners to facilitate the dissemination of Notice Packets. JND will also cause the Summary Notice to be published once in the *Wall Street Journal* and be transmitted over the *PR Newswire*, and will post the Notice and other materials on a website to be developed for the Settlement. The Parties have also agreed that, no later than ten calendar days following the filing of the Stipulation with the Court, Defendants shall serve the notice required under the Class Action Fairness Act, 28 U.S.C. § 1715 (2005) *et seq.* ("CAFA"). *See* Stipulation ¶24.

Courts routinely find that comparable notice programs, combining individual notice by first class mail to all class members who can reasonably be identified, supplemented with publication notice, meet all the requirements of Rule 23 and due process. *See, e.g., Marsh & Mclennan Cos.,* 2009 WL 5178546, at *5 (approving notice program involving individual notice to potential class members via first-class mail and publication in the *Wall Street Journal* and over the newswire); *City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132 (CM) (GWG), 2014 WL 1883494, at *2 (S.D.N.Y. May 9, 2014) (authorizing notice by first-class mail and publication in *Investors' Business Daily* and over *PR Newswire*).

Accordingly, Lead Plaintiff respectfully submits that the proposed notice and related procedures are appropriate and should be approved.

## VI.   PROPOSED SCHEDULE OF SETTLEMENT EVENTS

Lead Plaintiff respectfully proposes the schedule set forth below for Settlement-related events. The timing of events is determined by the date the Preliminary Approval Order is entered and the date the Settlement Fairness Hearing is scheduled. If the Court grants preliminary approval as requested, the only date the Court need schedule is the date for the Settlement Fairness Hearing. The remaining dates set forth below will be based thereon, as set forth in the proposed Preliminary Approval Order.

If the Court agrees with the proposed schedule, Lead Plaintiff requests that the Court schedule the Settlement Fairness Hearing for a date 110 calendar days after entry of the Preliminary Approval Order, or at the Court's earliest convenience thereafter.  Thus, if the Court enters the Preliminary Approval Order by Thursday, April 2, 2020, Lead Plaintiff requests that the Settlement Fairness Hearing be scheduled for Tuesday, July 21, 2020 or as soon thereafter as possible.  The actual proposed dates stated in the schedule below are based on the Court's entry of the Preliminary Approval Order by April 2, 2020 and the Court setting the Settlement Fairness Hearing for July 21, 2020.

| **Event** | **Proposed Timing** |
|---|---|
| Deadline for mailing the Notice and Claim Form to Class Members (which date shall be the "Notice Date") (Preliminary Approval Order ¶ 5(b)) | Thursday, April 30, 2020<br><br>No later than 20 business days after entry of Preliminary Approval Order |
| Deadline for publishing the Summary Notice (Preliminary Approval Order ¶ 5(d)) | Thursday, May 14, 2020<br><br>No later than 10 business days after the Notice Date |
| Deadline for filing of papers in support of final approval of the Settlement and Plan of Allocation and Lead Counsel's application for attorneys' fees and expenses (Preliminary Approval Order ¶ 25) | Tuesday, June 16, 2020<br><br>35 calendar days before the date set for the Settlement Fairness Hearing |
| Deadline for receipt of requests for exclusion or objections (Preliminary Approval Order ¶¶ 12, 16) | Tuesday, June 30, 2020<br><br>21 calendar days before the date set for the Settlement Fairness Hearing |
| Deadline for filing reply papers (Preliminary Approval Order ¶ 25) | Tuesday, July 14, 2020<br><br>7 calendar days before the date set for the Settlement Fairness Hearing |
| Settlement Fairness Hearing (Preliminary Approval Order ¶ 3) | Tuesday, July 21, 2020<br><br>110 calendar days after entry of the Preliminary Approval Order: |

| Event | Proposed Timing |
|---|---|
| Postmark deadline for submitting Claim Forms (Preliminary Approval Order ¶ 9) | Friday, August 28, 2020<br><br>120 calendar days after the Notice Date |

## VII.    CONCLUSION

Lead Plaintiff respectfully requests that the Court enter the Parties' agreed-upon proposed Preliminary Approval Order, which will provide for: (i) preliminary approval of the Settlement; (ii) approval of the form and manner of giving notice of the Settlement to the Class; and (iii) a hearing date and time to consider final approval of the Settlement and related matters.

Dated:  March 26, 2020

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER**
 **& GROSSMANN LLP**

*/s/  John Rizio-Hamilton*
John Rizio-Hamilton
Rebecca E. Boon
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile:  (212) 554-1444

*Lead Counsel for Lead Plaintiff the Public*
*Employees' Retirement System of*
*Mississippi and the Class*

**GADOW TYLER, PLLC**
Jason M. Kirschberg
511 E. Pearl St.
Jackson, MS 39201
Telephone: (601) 355-0654
Facsimile: (601) 510-9667
Email: jason@gadowtyler.com

*Additional Counsel for Lead Plaintiff Public*
*Employees' Retirement System of Mississippi*

#1356516