**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE SIGNET JEWELERS LIMITED
SECURITIES LITIGATION

Civil Action No. 1:16-cv-06728-CM-SDA

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S**
**MOTION FOR FINAL APPROVAL OF CLASS ACTION**
**SETTLEMENT AND PLAN OF ALLOCATION**

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**
John Rizio-Hamilton
Rebecca E. Boon
1251 Avenue of the Americas, 44th Floor
New York, NY 10020

-and -

GADOW TYLER, PLLC
Jason M. Kirschberg
511 E. Pearl St.
Jackson, MS 39201

*Counsel for Lead Plaintiff and Lead*
*Counsel for the Class*

Dated:  June 16, 2020

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .............................................................................................1

ARGUMENT ....................................................................................................................3

I.    THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL .........................3

      A.    The Proposed Settlement is Procedurally Fair..........................................5

      B.    The Settlement Is Substantively Fair and Satisfies the *Grinnell* Factors.................8

      C.    All Other Factors Set Forth in Rule 23(e)(2)(C) Support Approval of the
            Settlement ...............................................................................................21

      D.    The Settlement Treats Class Members Equitably Relative to Each Other ............22

II.   THE PLAN OF ALLOCATION IS FAIR AND REASONABLE AND SHOULD
      BE APPROVED ...........................................................................................23

III.  NOTICE TO THE CLASS SATISFIED THE REQUIREMENTS OF RULE 23
      AND DUE PROCESS ...................................................................................24

CONCLUSION.................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Advanced Battery Techs., Inc. Sec. Litig.,*
298 F.R.D. 171 (S.D.N.Y. 2014) ........................................................................25

*Arkansas Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.,*
955 F.3d 254 (2d Cir. 2020).................................................................................9

*In re Barrick Gold Sec. Litig.,*
314 F.R.D. 91 (S.D.N.Y. 2016) ...........................................................................5

*In re Bear Stearns Cos., Inc. Sec. Derivative & ERISA Litig.,*
909 F. Supp. 2d 259 (S.D.N.Y. 2012)...................................................................6

*Christine Asia Co., Ltd., et al., v. Jack Yun Ma, et al.,*
No.: 1:15-md-02631, 2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) .............. passim

*In re Citigroup Inc. Sec. Litig.,*
Nos. 09 MD 2070(SHS), 09 Civ. 7359(SHS), 2014 WL 2112136 (S.D.N.Y.
May 20, 2014)......................................................................................................3

*City of Detroit v. Grinnell Corp.,*
495 F.2d 448 (2d Cir. 1974)........................................................................ passim

*Constr. Laborers Pension Tr. for S. California v. CBS Corp.,*
Case No. 18-cv-7796-VEC, 2020 WL 248729 (S.D.N.Y. Jan. 15, 2020) ..............11

*D'Amato v. Deutsche Bank,*
236 F.3d 78 (2d Cir. 2001)...................................................................................6

*Eisen v. Carlisle & Jacquelin,*
417 U.S. 156 (1974)...........................................................................................24

*Fait v. Regions Fin. Corp.,*
655 F.3d 105 (2d Cir. 2011)...............................................................................16

*Ferris v. Wynn Resorts Ltd.,*
Case No. 2:18-cv-00479-GMN-DJA, 2020 WL 2748309 (D. Nev. May 27,
2020)..................................................................................................................11

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.,*
No. 02-CV-3400 (CM)(PED), 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010)..........8, 23

*In re Giant Interactive Grp., Inc. Sec. Litig.,*
279 F.R.D. 151 (S.D.N.Y. 2011) .......................................................................23

ii

*In re Gilat Satellite Networks, Ltd.*,
  No. CV-02-1510, 2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007) ..............................................8

*Goldberger v. Integrated Res., Inc.*,
  209 F.3d 43 (2d Cir. 2000)......................................................................................................4

*Hefler v. Wells Fargo & Co.*,
  Case No. 16-cv-05479-JST, 2018 WL 6619983 (N.D. Cal. Dec. 18, 2018) ..........................22

*In re IMAX Sec. Litig.*,
  283 F.R.D. 178 (S.D.N.Y. 2012) ...........................................................................................23

*In re Initial Pub. Offering Sec. Litig.*,
  671 F. Supp. 2d 467 (S.D.N.Y. 2009)......................................................................................23

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
  233 F.R.D. 306 (E.D.N.Y. 2006) ............................................................................................8

*In re NASDAQ Mkt-Makers Antitrust Litig.*,
  187 F.R.D. 465 (S.D.N.Y. 1998) ............................................................................................7

*Newman v. Stein*,
  464 F.2d 689 (2d Cir. 1972)..................................................................................................20

*In re PaineWebber Ltd. P'ships Litig.*,
  171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997)...................................20

*In re Polaroid ERISA Litig.*,
  240 F.R.D. 65 (S.D.N.Y. 2006) ..............................................................................................5

*Shapiro v. JPMorgan Chase & Co.*,
  Nos. 11 Civ. 8331(CM)(MHD), 11 Civ. 7961(CM), 2014 WL 1224666
  (S.D.N.Y. Mar. 24, 2014) ......................................................................................................7

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019)....................................................................................................12

*In re Veeco Instruments Inc. Sec. Litig.*,
  No. 05 MDL 01695(CM), 2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) ...........................7, 10

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
  396 F.3d 96 (2d Cir. 2005).........................................................................................3, 4, 7, 24

*Weinberger v. Kendrick*,
  698 F.2d 61 (2d Cir. 1982)......................................................................................................6

**STATUTES AND RULES**

15 U.S.C. § 78u-4(a)(7) ...............................................................................................................25

Fed. R. Civ. P. 23 .................................................................................................................. passim

OTHER AUTHORITIES

Advisory Committee Notes to 2018 Amendments, 324 F.R.D. 904, 918 (Apr. 26,
    2018) ..............................................................................................................................4

In accordance with Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiff Public Employees' Retirement System of Mississippi ("Lead Plaintiff" or "MissPERS"), on behalf of itself and the Court-certified Class, respectfully submits this memorandum of law in support of its motion for final approval of: (1) the proposed settlement resolving all claims in the Action for $240 million in cash (the "Settlement"), and (2) the proposed plan of allocation for distribution of the proceeds of the Settlement (the "Plan of Allocation").[1]

## PRELIMINARY STATEMENT

Subject to Court approval, Lead Plaintiff has agreed to settle all claims in the Action in exchange for a cash payment of $240 million, which has been deposited into an escrow account. Lead Plaintiff respectfully submits that the proposed Settlement—which, if approved, would be among the top 75 securities class action settlements of all time—is an outstanding result for the Class and satisfies the standards for final approval under Federal Rule of Civil Procedure 23(e)(2). As detailed in the accompanying Rizio-Hamilton Declaration and summarized below, the Settlement: (i) is the culmination of over two and a half years of vigorous litigation by Lead Plaintiff and Lead Counsel; (ii) is the product of an extensive mediation process conducted under the guidance of a former federal judge, who is an experienced class-action mediator; and (iii) represents a substantial portion of the reasonably recoverable damages in this case.

At the time the agreement to settle was reached, Lead Plaintiff and Lead Counsel had a well-developed understanding of the strengths and weaknesses of the Action. Lead Counsel had,

---

[1] Unless otherwise noted, capitalized terms have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated March 16, 2020 (ECF No. 247-1) (the "Stipulation"), or in the Declaration of John Rizio-Hamilton in Support of (I) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses (the "Rizio-Hamilton Declaration" or "Rizio-Hamilton Decl."), filed herewith.  Citations to "¶ __" refer to paragraphs in the Rizio-Hamilton Declaration and citations to "Ex. __" refer to exhibits to that Declaration.

among other things, (i) conducted an extensive investigation into the claims asserted, including through a detailed review and analysis of the voluminous public record, interviews with numerous former Signet employees, and consultations with experts in financial economics and accounting; (ii) researched and drafted three detailed amended complaints, including the operative 192-page Fifth Amended Class Action Complaint (the "Complaint"); (iii) researched and briefed Lead Plaintiff's successful (in significant part) opposition to Defendants' motion to dismiss the Complaint; (iv) prepared Lead Plaintiff's motion for class certification, which the Court granted in substantial part; (v) completed far-reaching fact and expert discovery, including obtaining and analyzing approximately 3.6 million pages of documents from Defendants and third parties, producing nearly 200,000 pages of documents from Lead Plaintiff, participating in 31 depositions, and exchanging 20 expert reports with Defendants on a host of complex issues; and (vi) engaged in extensive arm's-length settlement negotiations, which involved the exchange of detailed mediation statements followed by three full-day mediations sessions overseen by one of the most experienced and respected mediators of complex litigations in the country, former United States District Judge Layn R. Phillips ("Judge Phillips"), which culminated in a mediator's recommendation that this Action be settled for $240 million.  ¶¶ 4, 237.

The Settlement is particularly favorable given the substantial risks of continued litigation. This case required Lead Plaintiff to prove two alleged unrelated frauds over a nearly four-year Class Period: one involving misrepresentations concerning Signet's loan portfolio and reserves, and the other involving misrepresentations concerning alleged sexual harassment at the Company, which presented unique issues both on the merits and on class certification.  As explained below, Defendants had significant arguments regarding liability and damages as to both claims, which, if

successful, would have resulted in a recovery that was substantially smaller than the Settlement, or no recovery at all.

Absent the Settlement, the Parties faced the prospect of protracted litigation through full briefing of Defendants' 23(f) appeal, summary judgment, pre-trial motion practice, a complex trial, post-trial motion practice, individual class member loss causation and damages challenges, and ensuing appeals. The Settlement avoids these risks and delays while providing a substantial, certain, and immediate benefit to the Class in the form of a $240 million cash payment.

The Settlement has the full support of the Court-appointed Lead Plaintiff and Class Representative MissPERS, which is a sophisticated institutional investor that took an active role in supervising the litigation and participated directly in the settlement negotiations. Further, although the June 30, 2020 deadline to request exclusion from the Class or object to the Settlement has not yet passed, to date, no Class Members have objected to the Settlement and only eight individuals have requested exclusion.

Given these considerations and the other factors discussed below, Lead Plaintiff respectfully submits that the Settlement is fair, reasonable, and adequate and warrants final approval by the Court. Additionally, Lead Plaintiff requests that the Court approve the Plan of Allocation for the reasons set forth below.

## ARGUMENT

## I. THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL

A class-action settlement should be approved if the Court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The Court should examine both the negotiating process leading to the settlement, and the settlement's substantive terms. *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) ("*Visa*"); *In re Citigroup Inc. Sec. Litig.*, 2014 WL 2112136, at *2-3 (S.D.N.Y. May 20, 2014).

3

Rule 23(e)(2), amended on December 1, 2018, states that the Court should consider whether:

(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Historically, the Second Circuit has held that district courts should consider the following factors set forth in *City of Detroit v. Grinnell Corp.* in evaluating a class-action settlement:

(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974) (citations omitted), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000); *see also Visa*, 396 F.3d at 117.

Accordingly, Lead Plaintiff will discuss the fairness, reasonableness, and adequacy of the Settlement in relation to the four factors set forth in Rule 23(e)(2), and will also discuss each of the *Grinnell* factors. *See Christine Asia Co., Ltd., et al., v. Jack Yun Ma, et al.*, No.: 1:15-md-02631, 2019 WL 5257534, at *8 (S.D.N.Y. Oct. 16, 2019) (McMahon, J.) ("The factors set forth in Rule 23(e)(2) have been applied in tandem with the Second Circuit's *Grinnell* factors and 'focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal.'") (quoting the Advisory Committee Notes to 2018 Amendments, 324 F.R.D. 904, 918 (Apr. 26, 2018)).

### A.    The Proposed Settlement is Procedurally Fair

"Rule 23(e)(2)(A), which requires adequate representation, and Rule 23(e)(2)(B), which requires arm's-length negotiations, constitute the 'procedural' analysis of the fairness inquiry." *Christine Asia Co.*, 2019 WL 5257534, at *9 (citations and internal quotations omitted).  Each of these factors strongly supports approval of the proposed Settlement.

### 1.    Lead Plaintiff and Lead Counsel Have Adequately Represented the Class

The "adequacy requirement entails inquiry as to whether: 1) plaintiffs' interests are antagonistic to the interest of other members of the class and 2) plaintiffs' attorneys are qualified, experienced and able to conduct the litigation."  *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 99 (S.D.N.Y. 2016) (internal quotation marks omitted).  Here, Lead Plaintiff and Lead Counsel have adequately represented the Class in their vigorous prosecution of the Action for over two and a half years and in the negotiation and achievement of the Settlement.  Lead Plaintiff has claims that are typical of and coextensive with those of other Class Members and has no interests antagonistic to those of other Class members.  Like other Class Members, Lead Plaintiff has an interest in obtaining the largest possible recovery from Defendants.  *See In re Polaroid ERISA Litig*., 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict…").  In addition, Court-appointed Lead Counsel is highly qualified and experienced in securities litigation, as set forth in its firm resume (*see* Ex. 3A-3), and successfully conducted the litigation against skilled opposing counsel.

Accordingly, as the Court previously found in certifying the Class and appointing Lead Plaintiff as Class Representative and Lead Counsel as Class Counsel, Lead Plaintiff and Lead Counsel have adequately represented the Class. *See* ECF No. 177 at 16-17.

>        2.      **The Settlement Was Reached After Arm's-Length Negotiations
>                with the Assistance of an Experienced Mediator and Following
>                Substantial Discovery**

The Court should also consider whether the settlement "was negotiated at arm's length."

Fed. R. Civ. P. 23(e)(2)(B).  Courts have traditionally considered other related circumstances in

determining the "procedural" fairness of a settlement, including: (i) counsel's understanding of the

strengths and weakness of the case based on factors such as "the stage of the proceedings and the

amount of discovery completed," *Grinnell*, 495 F.2d at 463, (ii) the "absence of any indication of

collusion" in the settlement negotiations, *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982),

and (iii) a "mediator's involvement" in the negotiations, *D'Amato v. Deutsche Bank*, 236 F.3d 78,

85 (2d Cir. 2001).  These circumstances strongly support the approval of the Settlement here.

The Settlement was reached only after months of arm's-length negotiations between

experienced counsel, which included three full-day mediation sessions under the guidance of Judge

Phillips.  ¶¶ 151-155.  Indeed, the Settlement is the product of a mediator's recommendation by

Judge Phillips.  ¶ 155.  *See In re Bear Stearns Cos., Inc. Sec. Derivative & ERISA Litig.*, 909 F.

Supp. 2d 259, 265 (S.D.N.Y. 2012) (finding a settlement fair where the parties engaged in "arm's

length negotiations," including mediation before "retired federal judge Layn R. Phillips, an

experienced and well-regarded mediator of complex securities cases").

Further, as noted above, the Parties and their counsel were extremely well informed about

the strengths and weaknesses of the case before reaching the agreement to settle.  Lead Plaintiff

and Lead Counsel had completed fact discovery, which included obtaining and analyzing

approximately 3.6 million pages of documents from Defendants and third parties, and taking,

defending, or participating in 31 depositions.  Lead Counsel deposed: (i) every named Defendant,

which included two former Signet CEOs, the current CEO, and two former CFOs; (ii) numerous

other senior Signet officials, including two former COOs and the Chair of the Board; (iii) multiple

Declarants; and (iv) other key third parties, such as Signet's auditor.  ¶¶ 83-89.  In addition, Lead Plaintiff and Lead Counsel conducted substantial expert discovery, including the exchange of 20 expert reports with Defendants on issues such as workplace sexual harassment, accounting for loan loss reserves, loss causation, damages, and retail consumer lending.  ¶¶ 137-146.  Also, in connection with the mediation process, the Parties exchanged detailed written mediation submissions concerning liability and damages which more fully informed Lead Plaintiff and its counsel of the strengths and weaknesses of its case.  ¶ 153.  Where, as here, a settlement was "reached in arms' length negotiations between experienced, capable counsel after meaningful discovery," it is entitled to a "presumption of fairness, adequacy, and reasonableness."  *See Visa*, 396 F.3d at 116.

The conclusion of Lead Plaintiff and Lead Counsel that the Settlement is in the best interests of the Class also supports approval.  Lead Plaintiff is a sophisticated institutional investor that took an active role in supervising this litigation, as envisioned by the PSLRA, and it has strongly endorsed the Settlement. *See* Declaration of Jacqueline H. Ray, Special Assistant Attorney General in the Office of the Attorney General of the State of Mississippi (the "Mississippi OAG"), submitted on behalf of MissPERS (the "Ray Decl.") (Ex. 1) at ¶¶ 5-8.  A settlement reached "under the supervision and with the endorsement of a sophisticated institutional investor . . . is 'entitled to an even greater presumption of reasonableness.'"  *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007) (McMahon, J.).

In addition, the judgment of Lead Counsel, which is experienced in securities class-action litigation, that the Settlement is in the best interests of the Class is entitled to "great weight." *Shapiro v. JPMorgan Chase & Co.*, 2014 WL 1224666, at *2 (S.D.N.Y. Mar. 24, 2014); *accord In re NASDAQ Mkt-Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998) (courts have

consistently given "'great weight' . . . to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation").

> **B.**     **The Settlement Is Substantively Fair and Satisfies the *Grinnell* Factors**

The Court must consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal."  Fed. R. Civ. P. 23(e)(2)(C)(i).  Rule 23(e)(2)(C)(i) incorporates the nine-factor test set forth in *Grinnell* for determining whether a settlement is substantively fair, reasonable, and adequate.  *Christine Asia Co.*, 2019 WL 5257534, at *10.  Accordingly, each *Grinnell* factor will be considered in turn.

> **1.**     **The Complexity, Expense and Likely Duration of the Litigation**

"[I]n evaluating the settlement of a securities class action, federal courts, including this Court, 'have long recognized that such litigation is notably difficult and notoriously uncertain.'" *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400 (CM)(PED), 2010 WL 4537550, at *15 (S.D.N.Y. Nov. 8, 2010) (citation omitted).  Courts recognize that "[s]ecurities class actions are generally complex and expensive to prosecute."  *In re Gilat Satellite Networks, Ltd.*, No. CV-02-1510, 2007 WL 1191048, at *10 (E.D.N.Y. Apr. 19, 2007).  Accordingly, "[c]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation."  *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006).

This case was no exception.  This was a highly complex case that required proving two separate frauds over a nearly four-year Class Period.  As demonstrated by Defendants' successful Rule 23(f) Petition, the sexual harassment-related claims raised seriously contested class certification issues, including whether those claims would be unmanageable, and whether the Code

statements were immaterial as a matter of law under recent Second Circuit precedent.  Defendants contended in their Rule 23(f) Petition that certification of these claims was "unprecedented."

The claims concerning Signet's credit portfolio were also highly complex, involving issues such as accounting for loan loss reserves under GAAP, the nuances of recency aging, consumer loan underwriting practices and default trends, and the valuation of a multi-billion-dollar retail consumer loan portfolio in a multi-party sale transaction after the Class Period.  The litigation of damages and loss causation was also highly complex, as the certified Class Period included six different corrective and partial corrective disclosures, many of which were confounded by the disclosure of non-fraud related information, the impact of which had to be disaggregated from the stock price declines.  The fact that the parties exchanged 20 detailed expert reports by fifteen different experts—including three experts on damages and loss causation issues, four experts opining on sexual harassment-related issues, and dueling experts on GAAP accounting, retail loan underwriting, and consumer loan portfolio valuation—demonstrates the complexity of this Action.

In addition, achieving a litigated verdict would have required substantial additional time and expense. In the absence of the Settlement, the continued litigation of the Action would have required: (i) briefing and ultimately defeating Defendants' Rule 23(f) appeal, which could have taken a year or more by itself and could have led to a remand for additional class certification proceedings, followed by another Rule 23(f) petition, as has occurred in *Arkansas Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254 (2d Cir. 2020); (ii) the conclusion of expert discovery; (iii) briefing and defeating Defendants' expected motion for summary judgment; (iv) substantial pre-trial motion practice in the form of *Daubert* motions and motions *in limine*; (v) a trial involving substantial fact and expert testimony; (vi) post-trial motions, including a contested individual claims procedure; and (vii) whatever the outcome at trial, a lengthy appeal.

In contrast, the Settlement provides an immediate recovery of $240 million for the Class.

### 2.    The Reaction of the Class to the Settlement

The reaction of the class to a proposed settlement is a significant factor. *See, e.g.*, *Veeco*, 2007 WL 4115809, at *7.  Through June 15, 2020, JND had sent a total of 199,551 copies of the Notice Packet to potential Class Members and their nominees.  *See* Ex. 2, Declaration of Luiggy Segura, submitted on behalf of JND (the "Segura Decl"), at ¶ 7.  The Notice set out the Settlement's essential terms and informed potential Class Members of, among other things, their right to opt out or object to the Settlement, as well as the procedure for submitting Claim Forms.  While the June 30, 2020 deadline for Class Members to exclude themselves or object has not yet passed, to date, no objections to the Settlement or the Plan of Allocation and eight requests for exclusion have been received.  ¶ 221; Segura Decl. ¶ 11.  Lead Plaintiff will file reply papers by July 14, 2020 addressing all requests for exclusion and any objections received.

### 3.    The Stage of the Proceedings and the Amount of Discovery

"When considering this *Grinnell* factor, the question is whether the parties . . . counsel possessed a record sufficient to permit evaluation of the merits of Plaintiffs' claims, the strengths of the defenses asserted by Defendants, and the value of Plaintiffs' causes of action for purposes of settlement." *Christine Asia Co.*, 2019 WL 5257534, at *11.  As explained above, when the Settlement was reached, Lead Plaintiff and Lead Counsel had a sufficient record to intelligently assess the strengths and weakness of their claims and the value of the case.  Lead Counsel had conducted a thorough investigation into the claims; opposed Defendants' motions to dismiss the Complaint and for judgment on the pleadings; obtained class certification; briefed Defendants' Rule 23(f) Petition; completed fact discovery; engaged in extensive expert discovery; and engaged in an extensive mediation process.

### 4.      The Risks of Establishing Liability and Damages

Courts should consider the "risks of establishing liability [and] the risks of establishing damages." *Grinnell*, 495 F.2d at 463 (citations omitted).  While Lead Plaintiff believes that its claims have merit, it recognizes that this Action presented substantial risks to establishing both liability and damages.  This was not a case with a parallel SEC action or a restatement of financial results to support Lead Plaintiff's claims and provide a roadmap for discovery.  ¶ 166.  On the contrary, Lead Plaintiff faced several significant risks at each stage of the case which created serious doubt as to whether the Class would ultimately succeed at trial.

### (a)      Risks To Proving Liability

***Claims Related to Sexual Harassment.***  Section 10(b) class claims related to sexual harassment are relatively rare, and pursuing such claims entails a level of uncertainty that does not exist in the more typical securities fraud action involving, for example, misstated revenues.  There is no "playbook" for pursuing such claims in the securities fraud class action context, and there is no established track record of success.  ¶¶ 168-170.  Highlighting the uncertainty in this context, two recent high-profile securities class actions premised on sexual harassment allegations were dismissed in whole or in extremely substantial part.  *See Ferris v. Wynn Resorts Ltd.*, Case No. 2:18-cv-00479-GMN-DJA, 2020 WL 2748309, at *13-15 (D. Nev. May 27, 2020); *Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, Case No. 18-cv-7796-VEC, 2020 WL 248729, at *8 (S.D.N.Y. Jan. 15, 2020).  Lead Counsel is not aware of any other securities fraud class action premised on allegations of sexual harassment that has achieved class certification, let alone been resolved for an amount comparable to the Settlement here.

In addition to the fundamental uncertainty involved with pursuing sexual harassment-related claims, Defendants developed several specific arguments during the litigation which presented substantial challenges to these claims.  As noted, in their successful Rule 23(f) Petition,

Defendants argued that class certification of these claims was "unprecedented," and the claims represented an improper attempt to prosecute employment discrimination claims under the guise of a securities fraud action. ¶ 171. Defendants also argued that a class alleging a "culture of sexual harassment" was unmanageable because individualized issues would overwhelm common ones—that is, "mini-trials" were required with respect to each alleged incident of sexual harassment to determine whether it in fact occurred. *Id.* Defendants further contended that the Code statements were immaterial as a matter of law under *Singh v. Cigna Corp.*, 918 F.3d 57 (2d Cir. 2019), which held that certain statements in a code of conduct were inactionable. ¶ 172. While Lead Plaintiff had meaningful responses to Defendants' arguments, the fact that the Second Circuit accepted Defendants' appeal suggested that Lead Plaintiff faced risk that these claims could be de-certified, which would have had a significant negative impact on Lead Plaintiff's trial strategy and recoverable damages. ¶¶ 173-74.

Defendants also had a "truth on the market" defense to the to the sexual harassment-related claims, arguing that the essence of the allegations in the Declarations was well-known years before the February 2017 corrective disclosure in the *Washington Post*. ¶ 175. Among other things, Defendants would have pointed to the *Jock* class certification decision released in February 2015 to argue that the market knew that *Jock* concerned allegations of widespread sexual harassment. ¶ 177. This would have been a significant argument, as that decision states that the

> conduct described in the declarations and testimony has occurred in settings that are public and private, ranging from banter in hallways and elevators to interactions within Sterling stores and at the mandatory annual meeting of all Sterling managers held in Orlando, Florida. It includes references to women in sexual and vulgar ways, groping and grabbing women, soliciting sexual relations with women (sometimes as a quid pro quo for employment benefits), and creating an environment at often mandatory Company events in which women are expected to undress publicly, accede to sexual overtures and refrain from complaining about the treatment to which they have been subjected.

While Lead Plaintiff defeated these truth on-the-market arguments at class certification, Defendants reiterated these arguments in the Rule 23(f) Petition and likely would have done so again in the Rule 23(f) appeal, at summary judgment, at trial, and on post-trial appeal. Had this argument been accepted at any stage, it would have precluded recovery for these claims. *Id.*

Defendants also would have made several arguments contending that the Declarations were not reflective of Signet's corporate culture during the Class Period. To start, Defendants strenuously denied many of the allegations in the Declarations, and were expected to do so at trial. ¶ 178. Defendants also would have argued that many of the allegations in the Declarations were decades old (with some occurring in the 1990s), and therefore irrelevant to investors during the Class Period. ¶ 179. Further, based on expert testimony, Defendants would have pointed to the tens of thousands of individuals who were employed by Sterling over the years, and compared that number to the 306 employees who submitted Declarations, to argue that the number of sexual harassment complaints was small—less than 1% of all employees. ¶ 180.

Defendants also would have argued that Signet maintained a culture of respect. Following the departure of Defendant Light, Signet appointed a female CEO, Defendant Virginia Drosos. During the Class Period, Signet had a number of other high-ranking women executives, including former CFO and Defendant Michele Santana. Signet's senior female executives were expected to testify at trial that they had not witnessed or experienced anything like what was described in the Declarations. ¶ 181.

Defendants also would have argued that in March of 2017 Signet created a new Board committee to develop "programs and policies to support the advancement and development" of women employees; appointed an independent consultant to review current and future Company policies and practices relating to sexual harassment issues; and established an "independent

ombudsman office to act as an informal third-party avenue to provide confidential advice to employees, to address concerns regarding the issues in the workplace, and to provide options and strategies to assist them in the resolution of workplace concerns." ¶ 182.  Signet also could have pointed to the fact that in April 2017, it retained Judge Barbara Jones (Ret.)—a well-known and well-respected authority on workplace compliance issues—to conduct a thorough review of "Signet's policies and practices regarding equal opportunity and workplace expectations." ¶ 183. Signet would have argued that all these facts demonstrate its commitment to equal opportunity and a respectful workplace.

Further, Defendants likely would have argued that *Jock* did not actually concern sexual harassment claims, and thus, they did not mischaracterize the action or its risks. ¶ 184.  In support of this argument, Defendants likely would have contended that the plaintiffs in *Jock* never actually asserted a legal claim for sexual harassment, while noting that the arbitrator found that the Declarations were insufficient to show a widespread culture of sexual harassment and declined to certify the claims based on underlying sexual harassment. *Id.*

Finally, Defendants likely would have argued that the Declarations were inadmissible hearsay, *i.e.*, out-of-court statements that were being offered for their truth, and therefore could not be put before the jury at trial. ¶ 185.  While Lead Plaintiff would have argued that the Declarations were being offered for other purposes—namely, to establish scienter and loss causation—a successful motion *in limine* to exclude the Declarations would have significantly undermined the sexual harassment-related claims. *Id.*

**Credit-Related Claims.**  Lead Plaintiff also faced serious risks in establishing Defendants' liability with respect to the credit-related claims.  For example, Defendants would have argued that their statements concerning the nature of Signet's underwriting were not false for several

reasons.  They likely would have argued that Signet's lending practices and underwriting conformed to industry practice for consumer lending.  ¶ 186.  Defendants also likely would have highlighted that Signet's strategy of lending to subprime borrowers was decades old, legal, very profitable, and reasonable within the context of Signet's business.  *Id.*  Defendants also likely would have argued that Signet made loans to drive jewelry sales on which it earned large margins, and such margins allowed Signet to safely absorb more defaults and profitably lend deeper down the credit spectrum than a traditional lender (such as a bank).  *Id.*  Defendants offered a lengthy expert report opining on all these and related issues. *Id.*

Defendants likely would have further argued that employing such profitable business strategy benefitted Signet's shareholders because the Company would have lost billions of dollars in sales during the Class Period under a more conservative lending strategy, to the shareholders' detriment.  ¶ 187.  In support of their position, Defendants would have highlighted that many of Signet's borrowers had poor credit only because they were young adults with no credit history who were making their first significant purchase: an engagement ring for their significant other.  ¶ 188.  Defendants also could have argued that there is nothing reckless about lending to young people seeking to get engaged, even if they are considered subprime borrowers.  These arguments, together with the prevalence and name recognition of Signet's stores—Zales, Jared, Kay, Piercing Pagoda—heightened the risk that Defendants' arguments might persuade a jury.  *Id.*

With respect to Lead Plaintiff's allegations that Signet's loan loss reserves were understated, Defendants would have argued that their accounting complied with GAAP at all times, as supported by a detailed expert report offered by Defendants on this point.  ¶ 189.  Defendants also would have argued that:  (i) their use of "recency" aging—which underpinned many of Lead Plaintiff's allegations—was disclosed; (ii) they employed the recency method for

decades; (iii) nothing in the accounting rules prohibits the use of this method; and (iv) GAAP in fact permits the use of this method for non-bank companies such as Signet. *Id.*

Defendants also would have argued that Signet's auditor, KPMG, gave unqualified audit opinions on Signet's financial statements during the Class Period. ¶ 190. Defendants likely would have contended that KPMG is a "big four" accounting firm that had no reason to be complicit in a fraud, was an expert in GAAP, thoroughly vetted the Company's financial statements numerous times during the Class Period, and repeatedly concluded that they were accurate. *Id.*

Moreover, as noted above, Defendants would have contended that the absence of a restatement and a parallel SEC action is evidence that the Company's reserves were reasonable. ¶ 191. Defendants were likely to argue further that the ultimate sale of the portfolio for what they would have characterized as a modest loss supports the conclusion that the reported reserves were reasonable, and they offered an expert report in support of this point. *Id.*

Also, under *Fait v. Regions Fin. Corp.*, 655 F.3d 105 (2d Cir. 2011), Lead Plaintiff was required to prove that the loan loss reserve statements were subjectively false. ¶ 192. No witness testified that they believed that the reserve was inadequate or understated, and many witnesses testified to the contrary, justifying Signet's use of recency aging along the lines set forth above. The fact that there was no restatement or SEC action would have bolstered these arguments.

Defendants likely would have also argued that when "bad debt" (*i.e.*, loan defaults) at the Company increased, Defendants timely disclosed it to investors. ¶ 193. While Lead Plaintiff had arguments that such disclosures were incomplete, there was a meaningful risk that a jury could have found that Defendants were truthful enough with investors regarding increases in bad debt.

Finally, an allegation in the Complaint was that Former Employee 1, Signet's former Director of the Credit Information Technology and Strategy Department, attended meetings where senior executives decided to "comp" Signet's loan loss reserve to the prior year's level, instead of raising the reserve to a more appropriate level to account for the risk in the portfolio.  ¶ 194. Former Employee 1 confirmed his statements in deposition testimony, but Defendants would have argued that there was no contemporaneous documentation of "comping."  *Id.*

### (b)    Risks To Proving Damages

Had this case continued, Lead Plaintiff would have argued that maximum damages were approximately $1.8 billion.  ¶ 195.  However, supporting this maximum damage amount would have required Lead Plaintiff to "run the table" on all liability issues for both sets of claims during the entire Class Period, plus win all contested arguments on loss causation and damages.  *Id.*  Even if Lead Plaintiff achieved complete success on liability, Defendants would have offered numerous arguments that the Class's maximum potential damages were a tiny fraction of $1.8 billion.  ¶ 196.

Defendants would have asserted that the "constant price to earnings ratio" method used by Lead Plaintiff's expert to measure damages is inappropriate, and damages should be calculated using what Defendants say was a more commonly-accepted method, such as the "constant dollar" method, which would have materially reduced damages.  ¶ 197.  Defendants also would have contended that the law requires that any gains on sales of Signet stock during the Class Period be "netted out" from the damages figures, significantly reducing recoverable damages again.  ¶ 198.

Defendants would have further asserted that many of the corrective disclosures for the claims relating to the loan portfolio were confounded by the disclosure of information unrelated to the alleged fraud, such as the declining prospects for mall retail stores and reduced sales guidance.  ¶ 199.  Defendants would have contended that when one disaggregates the impact of

17

non-fraud related information from the stock price declines, only a small portion of some of the declines were recoverable as damages.  *Id.*

Further, as to the claims related to alleged sexual harassment, Defendants would have argued that there was no loss causation because the allegations in the Declarations were known to the market years before the alleged corrective disclosure, as set forth above.  ¶ 201.  If accepted, this argument would have reduced damages substantially, by almost 30%.  *Id.*

Moreover, even if that argument failed, Defendants would have argued that Signet's stock price recovered shortly after the publication of the *Washington Post* article, when additional supposedly mitigating information about the sexual harassment allegations became public.  ¶ 202.  On March 9, 2017, Signet defended its corporate culture against the allegations in the *Washington Post* article, which was followed by a rebound in Signet's stock price.  Defendants would have asserted that any damages for this claim must be offset by the amount of this stock price rebound, which would have reduced damages for this claim by between 84% and 100%.

In support of these arguments, Defendants submitted extensive expert damages reports from two different experts, including the President and Chairman of Compass Lexecon.  While Lead Plaintiff believes its expert's opinions were well-substantiated and correct, these disputed issues regarding damages and loss causation would have presented the prototypical "battle of the experts" at trial.  There is no way to predict with any certainty which expert's opinions the jury would have accepted. Had the jury accepted Defendants' expert's views, damages would have been either eliminated or reduced to no more than $130 million, substantially less than the Settlement.

The Settlement eliminates those risks and provides a substantial and certain recovery for the Class.  *See Christine Asia Co.*, 2019 WL 5257534, at *13 ("The Parties developed and would have presented competing evidence on these issues, including competing expert evidence.  While

Plaintiffs proceeded as though they had the better arguments, the risk remained that Defendants could have defeated loss causation, or significantly diminished damages[.]").

### 5.    The Risks of Maintaining the Class Action through Trial

At the time the settlement was reached, Defendants' Rule 23(f) appeal of the Court's Class Certification Order was pending before the Second Circuit.  As noted above, the fact that the Second Circuit accepted this appeal suggests that Lead Plaintiff faced risk that the sexual harassment-related claims could be de-certified.

### 6.    The Ability of Defendants to Withstand a Greater Judgment

Lead Plaintiff also submits that the Settlement is a favorable result for the Class in light of the risk that Signet would be unable to satisfy a significant judgment after trial.  During the Class Period, Signet's stock price reached a high of nearly $151 per share and its market capitalization peaked at over $12 billion.  ¶ 208.  Following the Class Period, Signet's financial position has grown increasingly precarious, as poor business performance, a shrinking store footprint, and the uncertain retail environment devastated its financial results and stock price.  For example, during fiscal year 2019, Signet posted an operating loss of $765 million.  ¶ 210.  Signet's stock price has declined by approximately 70% in the last 18 months.  *Id.*

Concerns over Signet's financial condition have grown worse since the COVID-19 outbreak, which has hit Signet—primarily a mall-based, jewelry retailer—hard.  On March 23, 2020, Signet stock traded as low as $5.84 per share, corresponding to a market capitalization of approximately $306 million.  ¶ 211.  While Signet's share price has recovered somewhat in recent weeks, the risks to the Company's financial health remain significant.

On June 16, 2020, Signet's stock price closed at $12.12, and its market capitalization is approximately $634 million.  ¶ 208.  Accordingly, if Lead Plaintiff prevailed at trial and secured a judgment for any significant portion of the Class's potential damages, and Signet's financial

condition did not improve, there would be a serious risk that the Company would be unable to fund the judgment and, perhaps, be forced into bankruptcy.

### 7.    The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation

The last two *Grinnell* factors are the range of reasonableness of the settlement fund in light of (i) the best possible recovery and (ii) litigation risks.  In analyzing these factors, the issue is not whether the settlement represents the best possible recovery, but how the settlement relates to the strengths and weaknesses of the case.  The Court "consider[s] and weigh[s] the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable."  *Grinnell*, 495 F.2d at 462 (citations omitted).  Courts agree that the determination of a "reasonable" settlement "is not susceptible of a mathematical equation yielding a particularized sum."  *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 130 (S.D.N.Y. 1997) (citation and internal quotations omitted), *aff'd*, 117 F.3d 721 (2d Cir. 1997).  Instead, "in any case there is a range of reasonableness with respect to a settlement."  *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

The Settlement is well within the range of reasonableness in light of the best possible recovery and the risks of litigation.  As noted above, had this case continued to trial, Lead Plaintiff would have argued that maximum potential damages were $1.8 billion.  However, as noted in Lead Plaintiff's Preliminary Approval Motion, achieving that figure would have required Lead Plaintiff to pitch three consecutive "perfect games" by: (i) proving Defendants' liability for the claims related to alleged sexual harassment for the entire Class Period; (ii) proving Defendants' liability for the claims related to the loan portfolio and loss reserves for the entire Class Period; and (iii) prevailing on every contested issue concerning loss causation and damages.  Under this scenario, the proposed Settlement represents almost 14% of maximum potential damages.

However, as also noted in the Preliminary Approval Motion, obtaining a $1.8 billion judgment likely would have been a pyrrhic victory, and therefore is not an accurate benchmark against which to measure the reasonableness of the proposed Settlement in isolation. For the reasons discussed above, if Lead Plaintiff actually *did* obtain a $1.8 billion judgment, there is no assurance that the Company could have satisfied it, and it might have been forced into bankruptcy.

Moreover, as also noted above, based on the detailed reports of two experts, Defendants contended that even if Lead Plaintiff successfully established liability for all claims, damages were no more than $130 million—an amount that is substantially less than the proposed Settlement. For all these reasons, the Settlement falls within the range of reasonableness.

## C.   All Other Factors Set Forth in Rule 23(e)(2)(C) Support Approval of the Settlement

Rule 23(e)(2)(C) also instructs courts to consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" "the terms of any proposed award of attorney's fees, including timing of payment;" and "any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv). Each of these factors also supports approval of the Settlement or is neutral and does not suggest any basis for inadequacy of the Settlement.

First, the procedures for processing Class Members' Claims and distributing the proceeds of the Settlement are well-established, effective methods that have been widely used in securities class-action litigation. Here, the proceeds of the Settlement will be distributed to Class Members who submit eligible Claim Forms with required documentation to the Claims Administrator, JND. JND, an independent company with extensive experience handling the administration of securities class actions, will review and process the Claims under the supervision of Lead Counsel; provide Claimants with an opportunity to cure any deficiencies in their Claims or request review of the

denial of their Claim by the Court; and then mail or wire claimants their *pro rata* share of the Net Settlement Fund upon approval of the Court.

Second, the relief provided for the Class is also adequate when the terms of the proposed award of attorney's fees are taken into account. As discussed in the accompanying Fee Memorandum, the proposed attorneys' fees of 25% of the Settlement Fund, net of expenses, to be paid upon approval by the Court, are reasonable in light of the efforts of Plaintiff's Counsel and the risks in the litigation. Approval of attorneys' fees is entirely separate from approval of the Settlement, and neither Lead Plaintiff nor Lead Counsel may terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees. *See* Stipulation ¶ 18.

Lastly, the amended Rule 23 asks the court to consider the fairness of the proposed settlement in light of any agreements required to be identified under Rule 23(e)(3). *See* Fed. R. Civ. P. 23(e)(2)(C)(iv). Here, the only such agreement (other than the Stipulation itself) is the Parties' confidential Supplemental Agreement, which sets forth the conditions under which Defendants would be able to terminate the Settlement if the number of Class Members who request exclusion from the Class reaches a certain threshold. This type of agreement is a standard provision in securities class actions and has no negative impact on the fairness of the Settlement. *See Hefler v. Wells Fargo & Co.*, 2018 WL 6619983, at *7 (N.D. Cal. Dec. 18, 2018).

**D.     The Settlement Treats Class Members Equitably Relative to Each Other**

Rule 23(e)(2)(D) requires that the Court assess whether "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). As discussed below in Part II, pursuant to the Plan of Allocation, eligible claimants approved for payment by the Court will receive their *pro rata* share of the recovery based on their transactions in Signet common stock.

Lead Plaintiff will receive precisely the same level of *pro rata* recovery (based on its Recognized Claim as calculated under the Plan of Allocation) as all other Class Members.

## II.   THE PLAN OF ALLOCATION IS FAIR AND REASONABLE AND SHOULD BE APPROVED

A plan for allocating settlement proceeds, like the settlement itself, should be approved if it is fair, reasonable, and adequate.  *See In re IMAX Sec. Litig.*, 283 F.R.D. 178, 192 (S.D.N.Y. 2012).  A plan of allocation is fair and reasonable as long as it has a "rational basis."  *FLAG Telecom*, 2010 WL 4537550, at *21; *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 497 (S.D.N.Y. 2009).  Generally, a plan of allocation that reimburses class members based on the relative strength and value of their claims is reasonable.  *See IMAX*, 283 F.R.D. at 192.  In determining whether a plan of allocation is reasonable, courts give great weight to the opinion of experienced counsel.  *See In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 163 (S.D.N.Y. 2011).

The proposed Plan of Allocation was developed by Lead Plaintiff's damages expert in consultation with Lead Counsel, and provides a fair and reasonable method to allocate the Net Settlement Fund among Class Members.  In developing the Plan of Allocation, Lead Plaintiff's expert calculated the amount of estimated artificial inflation in the price of Signet common stock which was proximately caused by Defendants' alleged false and misleading statements. To do so, the expert considered the price changes in Signet common stock in reaction to the corrective disclosures, adjusting for price changes that were attributable to market or industry forces and other negative information unrelated to Lead Plaintiff's allegations, as well as changes in inflation throughout the Class Period, based on assumptions provided by Lead Counsel.  *See* Notice ¶ 57.

Under the Plan of Allocation, a "Recognized Loss Amount" or "Recognized Gain Amount" will be calculated for each purchase of Signet common stock during the Class Period that is listed

in the Claim Form and for which adequate documentation is provided. Notice ¶ 60.  In general, the Recognized Loss Amount will be the difference between the estimated artificial inflation on the date of purchase and the date of sale, or the difference between the actual purchase price and sales price, whichever is less.  *Id.* ¶ 59.  Claimants' Recognized Loss Amounts will be netted against their Recognized Gain Amounts, if any, to determine the Claimants' "Recognized Claims," and the Net Settlement Fund will be allocated *pro rata* to Authorized Claimants based on the relative size of their Recognized Claims.  *Id.* ¶¶ 62, 70-71.

As noted above, through June 15, 2020, more than 199,000 copies of the Notice, which contains the Plan of Allocation, and advises Class Members of their right to object to it, had been sent to potential Class Members and their nominees.  *See* Segura Decl. ¶ 7.  To date, no objections to the proposed Plan of Allocation have been received.  ¶ 230.

## III.   NOTICE TO THE CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS

The Notice to the Class satisfied the requirements of Rule 23(c)(2)(B), which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-75 (1974).  The Notice also satisfied Rule 23(e)(1), which requires that notice of a settlement be "reasonable"—*i.e.*, it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings."  *Visa*, 396 F.3d at 114.

Both the substance of the Notice and the method of its dissemination to potential members of the Class satisfied these standards.  The Court-approved Notice includes all the information required by Federal Rule of Civil Procedure 23(c)(2)(B) and the PSLRA, 15 U.S.C. § 78u-4(a)(7), including: (i) an explanation of the nature of the Action and the claims asserted; (ii) the definition

of the Class; (iii) the amount of the Settlement; (iv) a description of the Plan of Allocation; (v) an explanation of the reasons why the Parties are proposing the Settlement; (vi) a statement indicating the attorneys' fees and costs that will be sought; (vii) a description of Class Members' right to opt-out of the Class or to object to the Settlement, the Plan of Allocation or the requested attorneys' fees or expenses; and (viii) notice of the binding effect of a judgment on Class Members.

Pursuant to the Preliminary Approval Order, JND began mailing copies of the Notice Packet (consisting of the Notice and Claim Form) to potential Class Members and their nominees on April 30, 2020, and through June 15, 2020, a total of 199,551 Notice Packets were mailed. Segura Decl. ¶¶ 3-7.  JND also caused the Summary Notice to be published in the *Wall Street Journal* and over the *PR Newswire* on May 13, 2020.  *Id.* ¶ 8.  Copies of the Notice, Claim Form, Stipulation, and Complaint were made available on the Settlement website maintained by JND. *See* Segura Decl. ¶ 10.  This combination of individual mail to all Class Members who could be identified with reasonable effort, supplemented by notice in an appropriate, widely circulated publication, transmitted over the newswire, and set forth on internet websites, was "the best notice . . . practicable under the circumstances."  Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *In re Advanced Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. 171, 182-83 (S.D.N.Y. 2014).

## CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully request that the Court approve the proposed Settlement and Plan of Allocation as fair, reasonable, and adequate.

Dated:  June 16, 2020

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**

*/s/ John Rizio-Hamilton*

John Rizio-Hamilton
Rebecca E. Boon

1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
johnr@blbglaw.com
Rebecca.Boon@blbglaw.com

*Lead Counsel for Lead Plaintiff the Public
Employees' Retirement System of
Mississippi and the Class*

- and –

**GADOW TYLER, PLLC**
Jason M. Kirschberg
511 E. Pearl St.
Jackson, MS 39201
Telephone: (601) 355-0654
Facsimile: (601) 510-9667
Email: jason@gadowtyler.com

*Additional Counsel for Lead Plaintiff Public
Employee' Retirement System of Mississippi*

26