**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE SIGNET JEWELERS LIMITED SECURITIES LITIGATION | Civil Action No. 1:16-cv-06728-CM-SDA |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD COUNSEL'S MOTION**
**FOR AN AWARD OF ATTORNEYS' FEES AND LITIGATION EXPENSES**

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**
John Rizio-Hamilton
Rebecca E. Boon
1251 Avenue of the Americas, 44th Floor
New York, NY 10020

*Lead Counsel for Lead Plaintiff the Public*
*Employees' Retirement System of*
*Mississippi and the Class*

**GADOW TYLER, PLLC**
Jason M. Kirschberg
511 E. Pearl St.
Jackson, MS 39201
Telephone: (601) 355-0654
Facsimile: (601) 510-9667
Email: jason@gadowtyler.com

*Additional Counsel for Lead Plaintiff Public*
*Employees' Retirement System of*
*Mississippi*

Dated:  June 16, 2020

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT ......................................................................................................................... 4

I.      PLAINTIFF'S COUNSEL ARE ENTITLED TO AN AWARD OF
        ATTORNEYS' FEES FROM THE COMMON FUND ............................................. 4

II.     THE COURT SHOULD AWARD A REASONABLE PERCENTAGE OF THE
        COMMON FUND ..................................................................................................... 5

III.    THE REQUESTED ATTORNEYS' FEES ARE REASONABLE UNDER
        EITHER THE PERCENTAGE-OF-THE-FUND METHOD OR THE
        LODESTAR METHOD............................................................................................. 5

        A.      The Requested Attorneys' Fees Are Reasonable Under the Percentage-of-
                the-Fund Method........................................................................................... 5

        B.      The Requested Attorneys' Fees Are Reasonable Under the Lodestar
                Method .......................................................................................................... 6

IV.     THE FEE REQUEST IS ENTITLED TO A PRESUMPTION OF
        REASONABLENESS BECAUSE IT IS BASED ON A FEE AGREEMENT
        ENTERED INTO WITH LEAD PLAINTIFF AT THE OUTSET OF THE
        LITIGATION ............................................................................................................ 8

V.      OTHER FACTORS CONSIDERED BY COURTS IN THE SECOND CIRCUIT
        CONFIRM THAT THE REQUESTED FEE IS FAIR AND REASONABLE ........ 10

        A.      The Time and Labor Expended Support the Requested Fee ...................... 10

        B.      The Risks of the Litigation Support the Requested Fee ........................... 12

        C.      The Magnitude and Complexity of the Action Support the Requested Fee .......... 17

        D.      The Quality of Lead Counsel's Representation Supports the Requested
                Fee ............................................................................................................. 18

        E.      The Requested Fee in Relation to the Settlement ................................... 19

        F.      Public Policy Considerations Support the Requested Fee ...................... 19

        G.      The Reaction of the Class to Date Supports the Requested Fee .............. 19

VI.   PLAINTIFF'S COUNSEL'S EXPENSES ARE REASONABLE AND WERE
      NECESSARILY INCURRED TO ACHIEVE THE BENEFIT OBTAINED ..................20

VII.  LEAD PLAINTIFF SHOULD BE AWARDED ITS REASONABLE COSTS
      AND EXPENSES UNDER THE PSLRA .........................................................................21

CONCLUSION.....................................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
    No. 03 MDL 1529 LMM, 2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006), *aff'd*,
    272 F. App'x 9 (2d Cir. 2008) ................................................................................................18

*Alaska Electrical Pension Fund v. Bank of America Corp.*,
    No. 14-CV-7126 (JMF), 2018 WL 6250657 (S.D.N.Y. Nov. 29, 2018)...................................6

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
    127 F. Supp. 2d 418 (S.D.N.Y. 2001)....................................................................................12

*Anwar v. Fairfield Greenwich Ltd.*,
    1:09-cv-00118, ECF Nos. 1099, 1233, 1457, 1569 (S.D.N.Y. March 28, 2013,
    November 22, 2013, November 20, 2015 and May 6, 2016) ....................................................6

*Bach v. Amedisys, Inc.*,
    No. 1:10-cv-00395-BAJ-RLB, ECF Nos. 343-1, 354 (M.D. La. Dec. 19, 2017)...................22

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA)*
    *Litig.*,
    772 F.3d 125 (2d Cir. 2014)..................................................................................................23

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980)................................................................................................................4

*In re Cendant Corp. Litig.*,
    264 F.3d 201 (3d Cir. 2001)................................................................................................8, 9

*Christine Asia Co., Ltd. v. Jack Yun Ma*,
    No.: 1:15-md-02631, 2019 WL 5257534 (S.D.N.Y. October 16, 2019) ..................5, 7, 22, 23

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974)..................................................................................................12

*In re Comverse Tech., Inc. Sec. Litig.*,
    No. 06-CV-1825 (NGG) (RER), 2010 WL 2653354 (E.D.N.Y. June 24, 2010) ........... passim

*Constr. Laborers Pension Tr. for S. California v. CBS Corp.*,
    No. 18-CV-7796 (VEC), 2020 WL 248729 (S.D.N.Y. Jan. 15, 2020)...................................13

*In re Credit Default Swaps Antitrust Litig.*,
    No. 13-md-2476 (DLC), 2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016) ..................................8

*In re Deutsche Telekom AG Sec. Litig.*,
    No. 00-CV-9475 (NRB), 2005 WL 7984326 (S.D.N.Y. June 14, 2005) ................................8

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
    343 F. Supp. 3d 394 (S.D.N.Y. 2018).................................................................................5, 20

*Fait v. Regions Fin. Corp.*,
    655 F.3d 105 (2d Cir. 2011)...................................................................................................16

*Ferris v. Wynn Resorts Ltd.*,
    No.: 2:18-cv-00479-GMN-DJA, 2020 WL 2748309 (D. Nev. May 27, 2020).......................13

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
    No. 02-CV-3400 (CM), 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010)........................... passim

*In re Genworth Fin. Inc. Sec. Litig.*,
    No. 3:14-cv-00682-JRS, 2016 WL 7187290 (E.D. Va. Sept. 26, 2016) ................................6

*Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000)........................................................................................... passim

*Guevoura Fund Ltd. v. Robert F.X. Sillerman, et al.*,
    No. 1:15-cv-07192-CM, 2019 WL 6889901 (S.D.N.Y. Dec. 18, 2019) ................................23

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    No. 12-Civ-8557 (CM), 2014 WL 7323417 (S.D.N.Y. Dec. 19, 2014) ...................................7

*Hicks v. Morgan Stanley*,
    No. 01 Civ. 10071(RJH), 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005)...................................4

*La. Mun. Police Emps. Ret. Sys. v. Green Mountain Coffee Roasters, Inc.*,
    2:11-cv-00289, ECF Nos. 344-5, 349 (D. Vt. Oct. 22, 2018)...................................................22

*Maley v. Del Glob. Techs. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002)...............................................................................8, 19

*In re Marsh & McLennan Cos. Sec. Litig.*,
    No. 04 Civ. 8144(CM), 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009)...............................9, 23

*In re Marsh ERISA Litig.*,
    265 F.R.D. 128 (S.D.N.Y. 2010) .........................................................................................17

*In re Merck & Co., Inc. Vytorin/Zetia Sec. Litig.*,
    No. 08-2177 (DMC)(JAD), 2013 WL 5505744 (D.N.J. Oct. 1, 2013)....................................6

*Missouri v. Jenkins*,
    491 U.S. 274 (1989)................................................................................................................7

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
  No. 08-cv-10783, 2016 WL 3369534 (S.D.N.Y. May 2, 2016) ...............................................8

*In re Nortel Networks Corp. Sec. Litig.*,
  539 F.3d 129 (2d Cir. 2008)..........................................................................................9, 10

*In re Oxford Health Plans, Inc. Sec. Litig.*,
  2003 U.S. Dist. LEXIS 26795 (S.D.N.Y. June 12, 2003).........................................................6

*In re Pfizer Inc. Sec. Litig.*,
  No. 04-cv-09866 (LTS), ECF No. 727 (S.D.N.Y. Dec. 21, 2016) .............................................5

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett–Packard Co.*,
  845 F.3d 1268 (9th Cir. 2017) ........................................................................................13

*In re Rite Aid Corp. Sec. Litig.*,
  362 F. Supp. 2d 587 (E.D. Pa. 2005) ................................................................................8

*Savoie v. Merchs. Bank*,
  166 F.3d 456 (2d Cir. 1999).............................................................................................5

*Schuh v. HCA Holdings Inc.*,
  No. 3:11-cv-01033, ECF No. 563 (M.D. Tenn. Apr. 14, 2016) ...............................................6

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019)..............................................................................................14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)........................................................................................................4

*In re Veeco Instruments Inc. Sec. Litig.*,
  No. 05 MDL 01695(CM), 2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ...................10, 18, 23

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
  396 F.3d 96 (2d Cir. 2005)...........................................................................................5, 7

*In re Williams Sec. Litig.*,
  No. 02-cv-72-SPF, ECF No. 1638 (N.D. Okla. Feb. 12, 2007).................................................6

*In re Wilmington Trust Sec. Litig.*,
  No. 10-cv-00990-ER, ECF No. 842 (D. Del. Nov. 19, 2018) ...................................................6

*Woburn Ret. Sys. v. Salix Pharm., Ltd.*,
  No. 14-CV-8925 (KMW), 2017 WL 3579892 (S.D.N.Y. Aug. 18, 2017)...............................8

**STATUTES AND RULES**

15 U.S.C. §78u-4(a)(4) ........................................................................................................22

Fed. R. Civ. P. 23(f) ............................................................................................2, 11, 13, 14

**OTHER AUTHORITIES**

House Conference Report No. 104-369 (1995), reprinted in 1995 U.S.C.C.A.N.
    730 ..............................................................................................................................9

Court-appointed Lead Counsel, Bernstein Litowitz Berger & Grossmann LLP ("Lead Counsel"), respectfully submits this memorandum of law in support of its motion, on behalf of Plaintiff's Counsel, for an award of attorneys' fees in the amount of 25% of the Settlement Fund, net of Court-approved Litigation Expenses.[1]  Lead Counsel also seeks $3,149,815.55 for Litigation Expenses reasonably and necessarily incurred by Plaintiff's Counsel in prosecuting and resolving the Action, and $25,410.00 for costs incurred by Lead Plaintiff Public Employees' Retirement System of Mississippi ("MissPERS") directly related to its representation of the Class, as authorized by the Private Securities Litigation Reform Act of 1995 ("PSLRA").

## PRELIMINARY STATEMENT

The proposed Settlement, which provides for a cash payment of $240 million to resolve the Action, is an outstanding result for the Class.  As noted in the accompanying Settlement Memorandum, the Settlement, if approved, would be among the top 75 securities class action settlements of all time.  The significant monetary recovery was achieved through the skill, tenacity, and effective advocacy of Lead Counsel, which litigated this Action on a fully contingent fee basis against highly skilled defense counsel.  The Settlement was reached only after more than two and a half years of hard-fought litigation, including the completion of all fact and a very substantial portion of expert discovery, which required Lead Counsel to dedicate an extraordinary amount of time and resources to this case.

---

[1]  Unless otherwise noted, capitalized terms have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated March 16, 2020 (ECF No. 247-1) (the  "Stipulation"), or in the Declaration of John Rizio-Hamilton in Support of (I) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses (the "Rizio-Hamilton Declaration" or "Rizio-Hamilton Decl."), filed herewith.  In this memorandum, citations to "¶ __" refer to paragraphs in the Rizio-Hamilton Declaration and citations to "Ex. __" refer to exhibits to the Rizio-Hamilton Declaration.

As detailed in the accompanying Rizio-Hamilton Declaration,[2] Lead Counsel vigorously pursued this litigation from its outset by, among other things, conducting a comprehensive investigation into the claims asserted in the Action; preparing three detailed amended complaints, including the operative 192-page Fifth Amended Class Action Complaint for Violations of the Federal Securities Laws ("Complaint"), based on that investigation; successfully opposing, in significant part, Defendants' motion to dismiss the Complaint; briefing and obtaining certification of the Class, which involved the exchange of detailed expert reports, the depositions of the Parties' experts, and the depositions of two MissPERS representatives; successfully opposing Defendants' motion for judgment on the pleadings and engaging in full briefing on Defendants' Rule 23(f) Petition; conducting wide-ranging fact and expert discovery, which included the analysis of approximately 3.6 million pages of documents produced by Defendants and numerous third parties, participation in 31 depositions, and the exchange of 20 expert reports on numerous issues that were central to the litigation; and engaging in extensive settlement negotiations, including participation in three full-day mediation sessions under the auspices of an experienced and highly respected mediator, former U.S. District Court Judge Layn R. Phillips.

The Settlement achieved through Lead Counsel's efforts is a particularly favorable result when considered in light of the significant risks of proving the Defendants' liability and establishing loss causation and damages. These risks are set forth in detail in the Rizio-Hamilton Declaration at paragraphs 158 to 211 and are summarized in the Settlement Memorandum and below. Despite these risks, Plaintiff's Counsel collectively invested nearly 70,000 hours and

---

[2] The Rizio-Hamilton Declaration is an integral part of this submission and, for the sake of brevity in this memorandum, the Court is respectfully referred to it for a detailed description of, *inter alia*: the nature of the claims asserted in the Action (¶¶ 12-14); the history of the Action (¶¶ 15-157); the risks and uncertainties of continued litigation of the Action (¶¶ 158-211); and the services Lead Counsel provided for the benefit of the Class (¶¶ 4, 237).

incurred over $3,149,000 in Litigation Expenses, all on a contingent-fee basis with no assurance of ever being paid.

As compensation for their considerable efforts on behalf of the Class and the risk of non-payment they faced in prosecuting the Action on a contingent basis, Lead Counsel seeks attorneys' fee in the amount of 25% of the Settlement Fund, net of Court-approved Litigation Expenses. The requested fee is well within the range of fees that courts in this Circuit have awarded in securities class actions with comparable recoveries on a percentage basis. The requested fee also represents a multiplier of approximately 1.98 on Plaintiff's Counsel's lodestar, which is well within the range of multipliers typically awarded in class actions with significant contingency risks such as this one. In addition, the expenses for which Plaintiff's Counsel seek payment were reasonable and necessary for the successful prosecution of the Action.

The application for fees and expenses has the full support of the Lead Plaintiff. *See* Declaration of Jacqueline H. Ray, Special Assistant Attorney General in the Office of the Attorney General of the State of Mississippi (the "Mississippi OAG"), submitted on behalf of MissPERS (the "Ray Decl.") (Ex. 1), at ¶¶ 9-10. MissPERS is a sophisticated institutional investor that actively supervised the Action and has endorsed the requested fee as fair and reasonable in light of the result achieved in the Action, the quality of the work counsel performed, and the risks of the litigation. *Id* at ¶ 9. The fee request is also consistent with the written fee agreement entered into between Lead Counsel and Lead Plaintiff at the outset of their involvement in the Action.

In addition, while the June 30, 2020 deadline set by the Court for Class Members to object has not yet passed, to date, no objections to the request for fees and expenses have been received. ¶¶ 250, 261.

3

In light of the recovery obtained, the time and effort devoted by Plaintiff's Counsel, the work performed, the skill and expertise required, and the risks that counsel undertook, Lead Counsel submits that the requested fee award is reasonable.  In addition, the Litigation Expenses for which Lead Counsel seeks payment were reasonable and necessary for the successful prosecution of the Action.

## ARGUMENT

### I.      PLAINTIFF'S COUNSEL ARE ENTITLED TO AN AWARD OF ATTORNEYS' FEES FROM THE COMMON FUND

The Supreme Court has long recognized that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see also Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000).  Courts recognize that awards of fair attorneys' fees from a common fund "serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons," and therefore "to discourage future misconduct of a similar nature." *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, 2010 WL 4537550, at *23 (S.D.N.Y. Nov. 8, 2010)

The Supreme Court has emphasized that private securities actions such as this Action are "an essential supplement to criminal prosecutions and civil enforcement actions" by the SEC. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  Compensating plaintiffs' counsel for their risks is crucial, because "[s]uch actions could not be sustained if plaintiffs' counsel were not to receive remuneration from the settlement fund for their efforts on behalf of the class." *Hicks v. Morgan Stanley*, 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005).

## II.     THE COURT SHOULD AWARD A REASONABLE PERCENTAGE OF THE COMMON FUND

Lead Counsel respectfully submits that the Court should award a fee based on a percentage of the common fund.  The Second Circuit has approved the percentage method, recognizing that "the lodestar method proved vexing" and had resulted in "an inevitable waste of judicial resources."  *Goldberger*, 209 F.3d at 48-49 (holding that either the percentage-of-fund or lodestar method may be used to determine appropriate attorneys' fees); *Savoie v. Merchs. Bank*, 166 F.3d 456, 460 (2d Cir. 1999) (stating that the "percentage-of-the-fund method has been deemed a solution to certain problems that may arise when the lodestar method is used in common fund cases").  More recently, the Second Circuit has reiterated its approval of the percentage method, stating that it "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation," and has noted that the "trend in this Circuit is toward the percentage method."  *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) (citations omitted); *see also Christine Asia Co., Ltd. v. Jack Yun Ma*, No.: 1:15-md-02631, 2019 WL 5257534, at *17 (S.D.N.Y. October 16, 2019) (McMahon, J.); *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 343 F. Supp. 3d 394, 416 (S.D.N.Y. 2018).

## III.    THE REQUESTED ATTORNEYS' FEES ARE REASONABLE UNDER EITHER THE PERCENTAGE-OF-THE-FUND METHOD OR THE LODESTAR METHOD

### A.      The Requested Attorneys' Fees Are Reasonable Under the Percentage-of-the-Fund Method

The 25% attorney fee (net of expenses) requested by Lead Counsel is well within the range of percentage fees that have been awarded in the Second Circuit in securities class actions and other similar litigation with comparable recoveries.  *See, e.g.*, *Christine Asia Co.,* 2019 WL 5257534, at *17 (awarding 25% of $250 million settlement); *In re Pfizer Inc. Sec. Litig.*, No. 04-cv-09866 (LTS), ECF No. 727 at 2 (S.D.N.Y. Dec. 21, 2016) (awarding 28% of $486 million

settlement) (Ex. 6); *In re Oxford Health Plans, Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 26795, at

*13 (S.D.N.Y. June 12, 2003) (awarding 28% of $300 million settlement); *Anwar v. Fairfield

Greenwich Ltd.*, 1:09-cv-00118, ECF Nos. 1099 at *2, 1233 at *2, 1457 at *11, and 1569 at *11

(S.D.N.Y. March 28, 2013, November 22, 2013, November 20, 2015 and May 6, 2016) (awarding

total fees of 28.8% on $235.25 million aggregate settlement) (Ex. 7); *Alaska Electrical Pension

Fund v. Bank of America Corp.*, No. 14-CV-7126 (JMF), 2018 WL 6250657, at *1 (S.D.N.Y. Nov.

29, 2018) (awarding 26% of $486 million settlement); *In re Comverse Tech., Inc. Sec. Litig.*, No.

06-CV-1825 (NGG) (RER), 2010 WL 2653354, at *6 (E.D.N.Y. June 24, 2010) (awarding 25%

of $225 million settlement).

The requested fee is also consistent with fee awards in similarly sized securities class

actions in other circuits. *See, e.g.*, *In re Williams Sec. Litig.*, No. 02-cv-72-SPF, slip op. at 2 (N.D.

Okla. Feb. 12, 2007), ECF No. 1638 (awarding 25% of $311 million settlement) (Ex. 8); (*In re

Genworth Fin. Inc. Sec. Litig.*, No. 3:14-cv-00682-JRS, 2016 WL 7187290, at *1-*2 (E.D. Va.

Sept. 26, 2016) (awarding 28% of $219 million settlement); *Schuh v. HCA Holdings Inc.*, No.

3:11-cv-01033, slip op. at 1 (M.D. Tenn. Apr. 14, 2016), ECF No. 563 (awarding 30% of $215

million settlement) (Ex. 9); *In re Merck & Co., Inc. Vytorin/Zetia Sec. Litig.*, No. 08-2177

(DMC)(JAD), 2013 WL 5505744, at *3, *46 (D.N.J. Oct. 1, 2013) (awarding 28% of $215 million

settlement); *In re Wilmington Trust Sec. Litig.*, No. 10-cv-00990-ER, ECF No. 842 at 2 (D. Del.

Nov. 19, 2018) (awarding 28% of $210 million settlement) (Ex. 10).

In sum, the fee requested here is well within the range of fees awarded on a percentage

basis in comparable actions.

**B.**     **The Requested Attorneys' Fees Are Reasonable Under the Lodestar Method**

To ensure the reasonableness of a fee awarded under the percentage-of-the-fund method,

district courts may cross-check the proposed award against counsel's lodestar. *See Goldberger*,

209 F.3d at 50.  Through June 9, 2020, Plaintiff's Counsel have spent a total of 69,572.40 hours of attorney and other professional support time prosecuting the Action for the benefit of the Class. ¶ 240.  Plaintiff's Counsel's total lodestar, derived by multiplying the hours spent by each attorney and paraprofessional by their current hourly rates, is $29,880,618.75.[3]  *See id.*  The requested fee of 25% of the $240 million Settlement Fund (net of expenses) equates to approximately $59,206,000, plus interest earned, and thus represents a multiplier of approximately 1.98 of the total lodestar.

In complex contingent litigation such as this Action, fees representing multiples above the lodestar are regularly awarded to reflect the contingency-fee risk and other relevant factors.  *See FLAG Telecom*, 2010 WL 4537550, at *26 ("a positive multiplier is typically applied to the lodestar in recognition of the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors"); *Comverse*, 2010 WL 2653354, at *5 ("Where, as here, counsel has litigated a complex case under a contingency fee arrangement, they are entitled to a fee in excess of the lodestar").

The requested 1.98 multiplier is well within the range of multipliers commonly awarded in securities class actions and other comparable litigation.  In complex litigation, lodestar multipliers between 2 and 5 are commonly awarded, and fee awards resulting in multipliers as high as 6 have also been approved.  *See, e.g., Wal-Mart*, 396 F.3d at 123 (upholding multiplier of 3.5 as reasonable on appeal); *Christine Asia Co.*, 2019 WL 5257534, at *19 (approving $62.5 million fee

---

[3] The Supreme Court and courts in this Circuit have approved the use of current hourly rates to calculate the base lodestar figure as a means of compensating for the delay in receiving payment, inflation, and the loss of interest.  *See Missouri v. Jenkins*, 491 U.S. 274, 284 (1989); *In re Hi-Crush Partners L.P. Sec. Litig.*, 2014 WL 7323417, at *15 (S.D.N.Y. Dec. 19, 2014) ("the use of current rates to calculate the lodestar figure has been endorsed repeatedly by the Supreme Court, the Second Circuit and district courts within the Second Circuit as a means of accounting for the delay in payment inherent in class actions and for inflation").

based on lodestar multiplier of approximately 2.15, which the Court found to be "well within the range commonly awarded in securities class actions of this complexity and magnitude"); *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, No. 08-cv-10783, 2016 WL 3369534 (S.D.N.Y. May 2, 2016) (3.9 multiplier); *Woburn Ret. Sys. v. Salix Pharm., Ltd.,* 2017 WL 3579892, at *6 (S.D.N.Y. Aug. 18, 2017) (3.14 multiplier); *In re Deutsche Telekom AG Sec. Litig.*, No. 00-CV-9475 (NRB), 2005 WL 7984326, at *4 (S.D.N.Y. June 14, 2005) (3.96 multiplier); *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002) (awarding fee equal to a 4.65 multiplier, which was "well within the range awarded by courts in this Circuit and courts throughout the country"); *In re Credit Default Swaps Antitrust Litig.*, No. 13-md-2476 (DLC), 2016 WL 2731524, at *17 (S.D.N.Y. Apr. 26, 2016) (multiplier of "just over 6"); *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587, 589-90 (E.D. Pa. 2005) (6.96 multiplier).

In sum, Lead Counsel's requested fee award is well within the range of what courts in this Circuit regularly award in class actions such as this one, whether calculated as a percentage of the fund or in relation to Plaintiff's Counsel's lodestar.  Moreover, as discussed below, each of the factors established for the review of attorneys' fee awards by the Second Circuit in *Goldberger* strongly supports a finding that the requested fee is reasonable.

## IV. THE FEE REQUEST IS ENTITLED TO A PRESUMPTION OF REASONABLENESS BECAUSE IT IS BASED ON A FEE AGREEMENT ENTERED INTO WITH LEAD PLAINTIFF AT THE OUTSET OF THE LITIGATION

Because the requested fee is based on an agreement that Lead Counsel entered into with the sophisticated institutional Lead Plaintiff at the outset of the litigation, the fee should be afforded a presumption of reasonableness.  *See In re Cendant Corp. Litig.*, 264 F.3d 201, 282 (3d Cir. 2001). Even if a formal presumption of reasonableness is not afforded to the fee based on the pre-litigation agreement, the existence of the agreement and the approval of the requested fee by Lead Plaintiff,

which was actively involved in the prosecution and settlement of the Action, supports approval of the fee. *See In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 133-34 (2d Cir. 2008).

The PSLRA was intended to encourage institutional investors like MissPERS to assume control of securities class actions in order to "increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel." H.R. Conf. Rep. No. 104-369, at *32 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 731. Congress believed that these institutions would be in the best position to monitor the ongoing prosecution of the litigation and assess the reasonableness of counsel's fee request.

A number of courts have treated fee arrangements between PSLRA lead plaintiffs and their counsel established at the outset of the litigation to be presumptively reasonable in light of Congress's intent to empower lead plaintiffs under the PSLRA to select and supervise attorneys on behalf of the class. *See Cendant*, 264 F.3d at 282 (*ex ante* fee agreements in securities class actions enjoy "a presumption of reasonableness"); *In re Marsh & McLennan Cos. Sec. Litig.*, 2009 WL 5178546, at *15 (S.D.N.Y. Dec. 23, 2009) (McMahon, J.) ("Since the passage of the PSLRA, courts have found such an agreement between fully informed lead plaintiffs and their counsel to be presumptively reasonable"). The Second Circuit has indicated that the Court should, at least, give "serious consideration" to such agreements, *see Nortel*, 539 F.3d at 133-34. For example, the Second Circuit has stated that:

> We expect . . . that district courts will give serious consideration to negotiated fees because PSLRA lead plaintiffs often have a significant financial stake in the settlement, providing a powerful incentive to ensure that any fees resulting from that settlement are reasonable. In many cases, the agreed-upon fee will offer the best indication of a market rate, thus providing a good starting position for a district court's fee analysis.

*Id.*; *see also Comverse*, 2010 WL 2653354, at *4 ("an *ex ante* fee agreement is the best indication of the actual market value of counsel's services").

Here, Lead Plaintiff is a classic example of the sophisticated and financially interested investor that Congress envisioned serving as fiduciary for the class when it enacted the PSLRA. Lead Plaintiff took an active role in the litigation and closely supervised the work of Lead Counsel. *See* Ray Decl. ¶¶ 5-7. Accordingly, the fee should be considered reasonable, and should be approved. *See In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115808, at *8 (S.D.N.Y. Nov. 7, 2007) (McMahon, J.) ("[P]ublic policy considerations support the award in this case because the Lead Plaintiff . . . —a large public pension fund—conscientiously supervised the work of lead counsel and has approved the fee request[.]").

## V.   OTHER FACTORS CONSIDERED BY COURTS IN THE SECOND CIRCUIT CONFIRM THAT THE REQUESTED FEE IS FAIR AND REASONABLE

The Second Circuit has set forth the following criteria that courts should consider when reviewing a request for attorneys' fees in a common fund case:

> (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger*, 209 F.3d at 50 (internal quotes and citation omitted). Consideration of these factors further demonstrates that the fee requested by Lead Counsel is reasonable.

### A.   The Time and Labor Expended Support the Requested Fee

The substantial time and effort expended by Plaintiff's Counsel in prosecuting the Action and achieving the Settlement support the requested fee. The Rizio-Hamilton Declaration details the significant efforts that Lead Counsel dedicated to prosecuting and resolving Lead Plaintiff's claims. As set forth in greater detail in the Rizio-Hamilton Declaration, Lead Counsel, among other things:

10

- conducted an extensive investigation into the claims asserted in the Action, which included a thorough review of public information such as SEC filings, research reports, investor call transcripts, press releases, news articles, and Signet's corporate website; consultation with experts; and contacts and interviews with numerous former Signet employees (¶¶ 28-30);

- researched and drafted three extensive amended complaints based on Lead Counsel's investigation (¶¶ 27, 37, 39, 46, 49);

- briefed an opposition to, and defeated in substantial part, Defendants' motion to dismiss the Complaint (¶¶ 51, 54-56);

- engaged in massive fact discovery efforts, which included serving requests for the production of documents and interrogatories on Defendants; serving 14 subpoenas on third parties; obtaining and analyzing approximately 3.6 million pages of documents produced by Defendants and third parties; producing nearly 200,000 pages of documents to Defendants; and taking, defending or participating in 31 depositions, including deposing two of the Company's former CEOs (Defendants Michael Barnes and Mark Light), Signet's current CEO (Defendant Virginia Drosos), two former Signet CFOs (Defendants Ronald Ristau and Michele Santana), the Chairman of Signet's Board of Directors, two former Signet COOs, several other senior Signet executives, multiple Declarants who submitted sworn declarations regarding alleged sexual harassment at Signet, and Signet's auditor (¶¶ 62-89);

- consulted extensively with experts concerning a host of complex issues central to the litigation, including loss causation and damages, accounting for loan loss reserves, retail loan underwriting, the sale of Signet's loan portfolio, and sexual harassment (¶¶ 29, 137-139, 144-146);

- engaged in extensive expert discovery, including working with Lead Plaintiff's experts in preparing six opening expert reports; analyzing nine reports from Defendants' experts in opposition to Lead Plaintiff's experts; and preparing five reply expert reports (¶¶ 137-146);

- fully briefed and obtained Class certification, which involved the exchange of detailed expert reports, the depositions of the Parties' experts, and the depositions of two MissPERS representatives (¶¶ 90-100);

- fully briefed and defeated Defendants' motion for judgment on the pleadings (¶¶ 101-109);

- fully briefed Defendants' Rule 23(f) Petition (¶¶ 147-150);

- engaged in extensive settlement negotiations with Defendants' Counsel, including the exchange of detailed mediation statements on liability and damages, followed by three full-day mediation sessions under the auspices of Judge Phillips (¶¶ 151-155); and

- negotiated the final terms of the Settlement with Defendants and drafted, finalized, and filed the Stipulation and related documents with Lead Plaintiff's motion for preliminary approval of the Settlement (¶ 156).

As noted above, Plaintiff's Counsel expended nearly 70,000 hours prosecuting this Action through June 9, 2020 with a lodestar value of nearly $30 million.  The time and effort devoted to this case by Plaintiff's Counsel was critical in obtaining the outstanding result achieved by the Settlement, and confirms that the fee request here is reasonable.

### B.      The Risks of the Litigation Support the Requested Fee

The risk of the litigation is one of the most important *Goldberger* factors.  *See Goldberger*, 209 F.3d at 54; *Comverse*, 2010 WL 2653354, at *5.  The Second Circuit has recognized that the risks associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award:

> No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974) (citation omitted).  "Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation."  *Comverse*, 2010 WL 2653354, at *5 (citation omitted); *see also In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 433 (S.D.N.Y. 2001) (it is "appropriate to take this [contingent-fee] risk into account in determining the appropriate fee to award").

While Lead Counsel believes that Lead Plaintiff's claims are meritorious, Lead Counsel recognized that there were many substantial risks in the litigation from the outset and that Lead Plaintiff's ability to succeed at trial and obtain a substantial judgment was far from certain.  This case did not involve a restatement or a parallel SEC action to support Lead Plaintiff's claims or provide a roadmap for discovery.  As discussed in greater detail in the Rizio-Hamilton Declaration

and in the Settlement Memorandum, there were substantial risks here with respect to liability, loss causation, and damages.

**First**, Lead Plaintiff faced several risks in proving Defendants' liability with respect to the alleged misstatements and omissions relating to sexual harassment. Securities fraud class action claims relating to sexual harassment are relatively rare. There is no track record of success for these claims, and there is much uncertainty in pursuing them. Multiple securities class actions alleging similar claims have recently been dismissed in whole or almost entirely. *See Ferris v. Wynn Resorts Ltd.*, 2020 WL 2748309, at *13-15 (D. Nev. May 27, 2020) (dismissing securities fraud claims premised on sexual harassment allegations because, e.g., statements about corporate culture and code of conduct were puffery, and statements about compliance with legal obligations were not misleading); *Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 2020 WL 248729, at *8 (S.D.N.Y. Jan. 15, 2020) (dismissing code of conduct statements as being "far too general and aspirational to invite reasonable reliance" and amounting to "mere puffery"); *see also Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett–Packard Co.*, 845 F.3d 1268 (9th Cir. 2017). To our knowledge, this is the first time securities fraud class action claims relating to sexual harassment have been certified, and we know of no other instance in which such claims have been resolved for a sum comparable to the Settlement.

The sexual harassment claims were the principal target of Defendants' successful Rule 23(f) Petition, which underscored the risk inherent in these claims. In their Rule 23(f) Petition, Defendants argued that certification of Section 10(b) claims based on underlying allegations of sexual harassment is "unprecedented" and an improper attempt to litigate an employment discrimination claim under the guise of a securities fraud claim. ¶ 171. Defendants further argued that a class alleging a "culture of sexual harassment" would be unmanageable because it would

require a series of "mini-trials" on each alleged incident of sexual harassment.  *Id*.  Defendants

also argued that the Code statements were immaterial as a matter of law under *Singh v. Cigna*

*Corp.*, 918 F.3d 57 (2d Cir. 2019).   ¶ 172.   While Lead Plaintiff believes it has substantial

arguments in response to Defendants' positions, the Second Circuit's decision to grant the Rule

23(f) Petition suggests that there was a risk that, on appeal, the claims stemming from sexual

harassment could have been decertified, which would have substantially reduced the potential

recoverable damages and weakened the case at trial.

Moreover, even if the certification of these claims was upheld, Defendants had significant

defenses on the merits, which are detailed at length in the Rizio-Hamilton Declaration.   For

example, Defendants had a significant "truth on the market" defense to these claims, which they

supported with an expert opinion asserting that the essence of the allegations in the Declarations

was known years before the February 27, 2017 corrective disclosure.   ¶¶ 175-177.   Defendants

also would have continued to argue that *Jock* did not actually concern sexual harassment claims—

as none were formally asserted or certified in that arbitration—and thus, Defendants did not

mischaracterize *Jock* or its risks in Signet's litigation disclosures.  ¶ 184.  Defendants again based

this assertion on a detailed expert report.

Defendants also would have made a series of arguments contending that the Declarations

were not an accurate reflection of Signet's corporate culture during the Class Period.  ¶¶ 178-183.

Defendants vehemently disputed many of the allegations in the Declarations and would have done

so at trial.   Defendants also would have asserted that, in many cases, the Declarations concerned

incidents that allegedly occurred several years (and sometimes decades) before the Class Period

began, and thus, did not accurately depict Signet during the time relevant to this case.   Moreover

(and again based on expert analysis), Defendants would have contended that Declarants asserting

sexual harassment constituted only a very small percentage of total Signet employees, on the order of 1% or less, which showed that the incidents described were not representative of the Company as a whole.   Further, senior Signet female executives—including its CEO and former CFO—were expected to testify at trial that they had not witnessed anything like the harassment described in the Declarations during their many years with the Company.   Defendants also would have argued that Signet has taken several actions to promote a culture of equal opportunity and respect.

*Second*, Lead Plaintiff would have faced serious challenges in establishing Defendants' liability with respect to the credit-related claims.   For example, based on another expert opinion, Defendants would have argued that their statements concerning the quality of the Company's loan portfolio and nature of its underwriting were not misleading because Signet's in-house credit program conformed to industry lending standards, was very profitable, and was a key driver of high-margin sales that benefitted investors for many years. ¶ 186.   Defendants would have further contended that they accurately disclosed Signet's bad debt figures in its SEC filings, thus giving investors enough information to assess the health of the portfolio.

As to the statements concerning loan loss reserves, Defendants would have argued, based on another detailed expert opinion, that Signet's reserves were appropriate and complied with GAAP at all relevant times.   ¶ 189.   They would have further argued that Signet's use of the "recency" aging method was not evidence of fraud because Defendants disclosed the recency method to investors, had employed that method for decades, and GAAP permits it.  *Id*.  Moreover, Defendants would have pointed to the fact that Signet's independent auditor, KPMG, signed off on all of Signet's financial statements during the Class Period, asserting that KPMG is a "big four" accounting firm that had no reason to be complicit in a fraud, was an expert in GAAP, thoroughly vetted the Company's financial statements during the Class Period, and repeatedly concluded that

they were accurate.  ¶ 190.  Ultimately, Defendants would have contended that, under *Fait v. Regions Fin. Corp.*, 655 F.3d 105 (2d Cir. 2011), loan loss reserves are statements of opinion, which are not actionably false unless they are disbelieved, and for all the reasons noted above, Defendants had at least a good faith belief that the reserves were reasonable.  ¶ 192.

*Third*, even if Lead Plaintiff established Defendants' liability with respect to both the credit claims and the sexual harassment claims, it would have faced significant hurdles in proving loss causation and damages.  Had this case continued, Lead Plaintiff would have argued that maximum potential damages were $1.8 billion.  ¶ 195.  Defendants would have contended that the Class's true damages were zero and, at best, no more than $130 million.  ¶ 203.

In support of their position, Defendants proffered two detailed expert reports.  Based on their experts' opinions, Defendants would have argued that Lead Plaintiff's damages expert used an inappropriate method—the "constant price to earnings ratio" method—to measure artificial inflation in this case, and when the appropriate method for measuring damages—the "constant dollar" method—is used, maximum recoverable damages are materially reduced.  ¶ 197. Defendants also would have contended that the law requires that any gains on sales of Signet stock during the Class Period must be "netted out" from the damages figures, significantly reducing recoverable damages again.  ¶ 198.  Furthermore, Defendants would have argued that when the impact of non-fraud related information is disaggregated from the relevant stock price declines, only a small portion of the declines would be recoverable as damages.  ¶ 199.  Finally, as to the claims related to alleged sexual harassment, Defendants would have argued that any damages for this claim must be offset by the amount of the stock price rebound that occurred shortly after the alleged corrective disclosure, when additional supposedly mitigating information about the sexual harassment allegations became public.  ¶ 202.

While Lead Plaintiff believes that it had responses to rebut Defendants' arguments, it recognized that the outcome was far from certain, particularly given that the vast majority of issues in this case would turn on a very unpredictable "battle of the experts." In the face of the many uncertainties regarding the outcome of the case, Lead Counsel undertook and prosecuted this case on a wholly contingent basis, knowing that the litigation could last for years and would require the devotion of a substantial amount of time and a significant expenditure of litigation expenses with no guarantee of compensation.

Lead Counsel's assumption of this risk strongly supports the reasonableness of the requested fee. *See FLAG Telecom*, 2010 WL 4537550, at *27 ("Courts in the Second Circuit have recognized that the risk associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award."); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 148 (S.D.N.Y. 2010) ("There was significant risk of non-payment in this case, and Plaintiffs' Counsel should be rewarded for having borne and successfully overcome that risk.").

### C.    The Magnitude and Complexity of the Action Support the Requested Fee

The magnitude and complexity of the Action also support the requested fee. Courts have recognized that securities class action litigation is "notably difficult and notoriously uncertain." *FLAG Telecom*, 2010 WL 4537550, at *27. This case was no exception. This was a case that involved two unrelated sets of misrepresentations, which were made over a nearly four-year class period by multiple sets of CEOs and CFOs, six different total and partial corrective disclosures, and a set of claims (relating to sexual harassment) that raised novel issues.

As noted above and in the Rizio-Hamilton Declaration, the litigation raised a number of difficult and hotly contested questions concerning class certification, liability, loss causation, and damages. Proving the claims at trial would have turned on percipient and expert testimony on myriad complicated issues. To build the case, Lead Counsel had to dedicate a substantial amount

17

of time to understanding these complex matters, conducting an extensive factual investigation, obtaining significant discovery, and working extensively with experts to analyze the claims and the evidence obtained.  The fact that the parties exchanged 20 expert reports by 15 different experts speaks to the breadth and complexity of the case.  Accordingly, the magnitude and complexity of the Action support the conclusion that the requested fee is fair and reasonable.

### D.      The Quality of Lead Counsel's Representation Supports the Requested Fee

The quality of the representation by Lead Counsel is another important factor that supports the reasonableness of the requested fee.  Lead Counsel submits that the quality of its representation is best evidenced by the quality of the result achieved.  *See, e.g.*, *Veeco*, 2007 WL 4115808, at *7.  Here, as discussed above and in the Rizio-Hamilton Declaration, the Settlement provides an outstanding result for the Class considering the serious risks of continued litigation and represents a substantial portion of likely recoverable damages.  *See* ¶¶ 212-215.

Further, Lead Counsel faced talented and tenacious adversaries in this Action.  Courts have recognized that the quality of the opposition should also be taken into consideration in assessing the quality of the counsel's performance.  *See, e.g.*, *Veeco*, 2007 WL 4115808, at *7 (among factors supporting 30% award of attorneys' fees was that defendants were represented by "one of the country's largest law firms"); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006) ("The fact that the settlements were obtained from defendants represented by 'formidable opposing counsel from some of the best defense firms in the country' also evidences the high quality of lead counsels' work") (citation omitted), *aff'd*, 272 F. App'x 9 (2d Cir. 2008).  Here, Defendants were represented by able counsel from Weil, Gotshal & Manges LLP, who zealously represented their clients throughout this Action.  *See* ¶ 243.  Notwithstanding this capable opposition, Lead Counsel's litigation efforts and ability to present a strong case enabled it to achieve the Settlement for the benefit of the Class.

18

### E.   The Requested Fee in Relation to the Settlement

Courts have interpreted this factor as requiring the review of the fee request in terms of the percentage it represents of the total recovery.   "When determining whether a fee request is reasonable in relation to a settlement amount, 'the court compares the fee application to fees awarded in similar securities class-action settlements of comparable value.'"  *Comverse*, 2010 WL 2653354, at *3 (citation omitted).  As discussed in detail in Part III above, the requested fee is well within the range of fees that courts in the Second Circuit have awarded in comparable cases on both a percentage basis and lodestar multiplier basis.

### F.   Public Policy Considerations Support the Requested Fee

A strong public policy concern exists for rewarding firms for bringing successful securities litigation.  *See FLAG Telecom*, 2010 WL 4537550, at *29 (if the "important public policy [of enforcing the securities laws] is to be carried out, the courts should award fees which will adequately compensate Lead Counsel for the value of their efforts, taking into account the enormous risks they undertook"); *Maley v. Del Glob. Tech. Corp.*, 186 F. Supp. 2d 358, 373 (S.D.N.Y. 2002) ("In considering an award of attorney's fees, the public policy of vigorously enforcing the federal securities laws must be considered.").  Accordingly, public policy favors granting Lead Counsel's fee and expense application here.

### G.   The Reaction of the Class to Date Supports the Requested Fee

The reaction of the Class to date also supports the requested fee.  Through June 15, 2020, the Claims Administrator, JND, has mailed over 199,000 copies of the Notice to potential Class Members and their nominees, and the Summary Notice was published in the *Wall Street Journal* and over the *PR Newswire*.  *See* Declaration of Luiggy Segura, submitted on behalf of JND (Ex. 2), at ¶¶ 7-8.  The Notice advised Class Members that Lead Counsel intends to apply to the Court for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund, net of

19

Court-approved Litigation Expenses, and up to $4,000,000 in Litigation Expenses.  While the deadline for filing objections to the fee application is not until June 30, 2020, to date, no objections have been received.  ¶ 250.  Should any objections be received, Lead Counsel will address them in its reply papers to be filed on July 14, 2020.

## VI.   PLAINTIFF'S COUNSEL'S EXPENSES ARE REASONABLE AND WERE NECESSARILY INCURRED TO ACHIEVE THE BENEFIT OBTAINED

Lead Counsel's fee application includes a request for payment of the expenses incurred by Plaintiff's Counsel, which were reasonable in amount and necessary to the prosecution of the Action.  *See* ¶¶ 252-259.  These expenses are properly recovered by counsel.  *See Facebook IPO*, 343 F. Supp. 3d at 418 (in a class action, attorneys should be compensated "for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were incidental and necessary to the representation") (citation omitted); *FLAG Telecom*, 2010 WL 4537550, at *30 ("It is well accepted that counsel who create a common fund are entitled to the reimbursement of expenses that they advanced to a class").

As set forth in detail in the Rizio-Hamilton Declaration, Plaintiff's Counsel incurred $3,149,815.55 in expenses in connection with the prosecution and settlement of the Action.  ¶ 252. These expenses were incurred as a result of Plaintiff's Counsel's vigorous pursuit of claims for Lead Plaintiff and the Class through more two and a half years of litigation, which required a significant amount of discovery and extensive work with experts.  The expenses for which payment is sought are the types of expenses that are necessarily incurred in litigation and routinely charged to clients.  These expenses include, among others, expert fees, deposition costs, on-line legal and factual research, document management and hosting, mediation fees, travel costs, and photocopying expenses.

The largest expense, by far, is for retention of Lead Plaintiff's experts, in the amount of $2,004,360.72, or approximately 64% of Plaintiffs' Counsel total expenses. ¶ 255. As discussed in the Rizio-Hamilton Declaration, Lead Counsel consulted extensively with experts in the fields of loss causation and damages, workplace sexual harassment, financial economics, accounting, and retail consumer lending, among others. Each of the experts retained was instrumental in Lead Counsel's prosecution of the Action and in bringing about the outstanding result achieved.

Another significant expense was the cost of document management/litigation costs, including charges hosting and processing the approximately 3.6 million pages of documents received in discovery, which total $442,528.65, or approximately 14% of the total expenses. ¶ 256. Charges for online legal and factual research amount to $133,711.52, or approximately 4% of the total expenses. ¶ 257.

The Notice informed potential Class Members that Lead Counsel would apply for payment of Litigation Expenses in an amount not to exceed $4,000,000, which may include the reasonable costs and expenses of Lead Plaintiff directly related to its representation of the Class. The total amount of Litigation Expenses requested is $3,175,225.55, which includes $3,149,815.55 for expenses incurred by Lead Counsel and $25,410.00 in reimbursement of costs and expenses incurred by Lead Plaintiff, an amount well below the amount listed in the Notice. To date, there has been no objection to the request for expenses. ¶ 261.

## VII.   LEAD PLAINTIFF SHOULD BE AWARDED ITS REASONABLE COSTS AND EXPENSES UNDER THE PSLRA

In connection with its request for Litigation Expenses, Lead Counsel also seeks reimbursement of a total of $25,410.00 in costs and expenses incurred by Lead Plaintiff MissPERS directly related to its representation of the Class. The PSLRA provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the

21

class" may be made to "any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4). "Courts in this Circuit routinely award such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place." *Christine Asia Co.*, 2019 WL 5257534, at *20 (citations and internal quotations omitted).

MissPERS seeks reimbursement of $25,410.00 based on a conservative estimate of the amount of time expended in connection with the Action by attorneys of the Office of the Attorney General of the State of Mississippi (the "OAG"), which serves as legal counsel to MissPERS. Among other things, the OAG attorneys spent a substantial amount of time communicating with Lead Counsel; reviewing and commenting on pleadings and motion papers filed in the Action; gathering and producing documents in response to discovery requests; preparing for depositions and being deposed in New York City; preparing for, traveling to, and attending the mediation sessions in New York City before Judge Phillips; and evaluating and approving the proposed Settlement. *See* Ray Decl. ¶¶ 5-6. The amount requested by MissPERS is based on hourly rates for the OAG attorneys that are the same as (or similar to) the rates that have been accepted by courts throughout the country when MissPERS has requested reimbursement of its attorney time. *See, e.g., La. Mun. Police Emps. Ret. Sys. v. Green Mountain Coffee Roasters, Inc.*, 2:11-cv-00289 (WKS), slip op. at 4 (D. Vt. Oct. 22, 2018), ECF No. 349 (granting MissPERS a PSLRA award of $38,175.00 calculated using hourly rates of OAG personnel ranging from $225 per hour to $300 per hour) (Ex. 11); *see also* ECF No. 344-5; *Bach v. Amedisys, Inc.*, No. 1:10-cv-00395-BAJ-RLB, slip op. at 3 (M.D. La. Dec. 19, 2017), ECF No. 354 (granting MissPERS a PSLRA award of

$43,937.50 based on hourly rates of OAG personnel ranging from $225 per hour to $275 per hour) (Ex. 12); *see also* ECF No. 343-1.

Numerous courts have approved reasonable awards to compensate lead plaintiffs for the time their employees have spent supervising and participating in the litigation on behalf of the class.  In *Marsh & McLennan*, this Court awarded $144,657 to the New Jersey Attorney General's Office and $70,000 to certain Ohio pension funds, to compensate them "for their reasonable costs and expenses incurred in managing this litigation and representing the Class."  2009 WL 5178546, at *21.  As the Court noted, their efforts in communicating with lead counsel, reviewing submissions to the court, responding to discovery requests, providing deposition testimony and participating in settlement discussions were "precisely the types of activities that support awarding reimbursement of expenses to class representatives."  *Id.*; *see also In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 772 F.3d 125, 133 (2d Cir. 2014) (affirming award of over $450,000 to representative plaintiffs for time spent by their employees on the action); *FLAG Telecom*, 2010 WL 4537550, at *31 (approving award of $100,000 to Lead Plaintiff for time spent on the litigation); *Veeco*, 2007 WL 4115808, at *12 (awarding institutional lead plaintiff $15,900 for time spent supervising litigation); *Christine Asia Co.*, 2019 WL 5257534, at *20 (granting PSLRA awards to each of the five lead plaintiffs for their "substantial time and effort [devoted] to prosecuting [the] action, including preparing for and being deposed by Defendants, reviewing pleadings and briefs, assisting with discovery responses, collecting documents for production, and evaluating and approving the settlement"); *Guevoura Fund Ltd. v. Robert F.X. Sillerman, et al.*, No. 1:15-cv-07192-CM, 2019 WL 6889901, at *23 (S.D.N.Y. Dec. 18, 2019) (McMahon, J.) (granting PSLRA award to lead plaintiff and noting that "time spent by

23

the lead plaintiff/class representative in managing the case is properly reimbursable from the settlement amount recovered").

## CONCLUSION

For the foregoing reasons, Lead Counsel respectfully requests that the Court award attorneys' fees in the amount of 25% of the Settlement Fund, net of Litigation Expenses; award $3,149,815.55 for the reasonable expenses incurred by Plaintiff's Counsel in connection with the prosecution and settlement of the Action; and award $25,410.00 in reimbursement of Lead Plaintiff's costs and expenses, as authorized by the PSLRA.

Dated:  June 16, 2020                                  Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**

*/s/ John Rizio-Hamilton*

John Rizio-Hamilton
Rebecca E. Boon
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
johnr@blbglaw.com
Rebecca.Boon@blbglaw.com

*Lead Counsel for Lead Plaintiff the Public
Employees' Retirement System of
Mississippi and the Class*

**GADOW TYLER, PLLC**
Jason M. Kirschberg
511 E. Pearl St.
Jackson, MS 39201
Telephone: (601) 355-0654
Facsimile: (601) 510-9667
Email: jason@gadowtyler.com

24

*Additional Counsel for Lead Plaintiff Public Employees' Retirement System of Mississippi*