**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE SIGNET JEWELERS LIMITED SECURITIES LITIGATION | Civil Action No. 1:16-cv-06728-CM-SDA |

**DECLARATION OF JOHN RIZIO-HAMILTON IN SUPPORT OF (I) LEAD
PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
AND PLAN OF ALLOCATION AND (II) LEAD COUNSEL'S MOTION FOR AN
<u>AWARD OF ATTORNEYS' FEES AND LITIGATION EXPENSES</u>**

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ............................................................................................. 1

II.  PROSECUTION OF THE ACTION ................................................................. 6

    A.  Background ............................................................................................. 6

    B.  Appointment of Lead Plaintiff and Lead Counsel, Lead Counsel's
        Extensive Investigation and Filing of Three Complaints, and the
        Substantial Denial of Defendants' Motion to Dismiss ........................... 8

        1.  Appointment of MissPERS as Lead Plaintiff ........................... 8

        2.  Drafting The Third Amended Complaint ................................. 11

        3.  Defendants File A Motion To Dismiss the Third Amended
            Complaint ................................................................................. 12

        4.  Lead Plaintiff Files the Fourth Amended Complaint, the Parties
            Complete Further Motion to Dismiss Briefing, and Lead Plaintiff
            Files the Operative Complaint ................................................. 14

        5.  The Court Substantially Denies Defendants' Motions to Dismiss
            and the Parties Initiate Discovery ........................................... 18

    C.  Fact Discovery ..................................................................................... 20

        1.  The Pursuit of Extensive Document Discovery from Defendants
            and Third Parties ...................................................................... 20

        2.  Defendants' Document Requests to Lead Plaintiff................... 27

        3.  Interrogatories ......................................................................... 28

        4.  The Pursuit of Extensive Deposition Discovery ..................... 28

    D.  Class Certification................................................................................ 32

    E.  Defendants' Motion for Judgment on the Pleadings, Motion for
        Clarification, and Motion to Stay Depositions in Light of Motion for
        Judgment on the Pleadings.................................................................... 35

    F.  Motion to Compel and Subsequent Motion for Reconsideration ......... 36

G.      Lead Plaintiff's Motion to Quash Third-Party Subpoenas ................................... 39

H.      Expert Discovery ........................................................................... 42

I.      Defendants' Rule 23(f) Petition ........................................................... 45

III.    MEDIATION AND SETTLEMENT .................................................................. 46

IV.     RISKS OF CONTINUED LITIGATION .............................................................. 48

A.      The Risks of Prosecuting Securities Actions In General ..................................... 48

B.      The Substantial Risks of Proving Defendants' Liability and Damages in
        This Case ................................................................................. 51

        1.      Claims Related to Sexual Harassment ................................................ 52

        2.      Credit-Related Claims ............................................................. 58

        3.      Risks Associated With Damages ..................................................... 61

        4.      Risks After Trial ................................................................. 64

        5.      Risks Associated with Signet's Ability to Pay ..................................... 65

V.      THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE IN LIGHT
        OF THE POTENTIAL RECOVERY IN THE ACTION .................................................. 66

VI.     LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY
        APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE ............................................. 68

VII.    PROPOSED ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT ..................................... 70

VIII.   THE FEE AND EXPENSE APPLICATION ........................................................... 72

A.      The Fee Application ....................................................................... 73

        1.      Lead Plaintiff Has Authorized and Supports the Fee Application .................... 74

        2.      The Time and Labor Devoted to the Action by Plaintiff's Counsel ................... 74

        3.      The Experience and Standing of Lead Counsel ...................................... 77

        4.      The Standing and Caliber of Defendants' Counsel .................................. 77

        5.      The Need to Ensure the Availability of Competent Counsel in
                High-Risk Contingent Securities Cases ............................................ 78

ii

6.     The Reaction of the Class to the Fee Application.....................................79

B.     The Litigation-Expense Application......................................................80

IX.    CONCLUSION.......................................................................................84

JOHN RIZIO-HAMILTON declares as follows:

## I.   INTRODUCTION

1.    I, John Rizio-Hamilton, am a member of the bars of the State of New York, the U.S. District Courts for the Southern and Eastern Districts of New York, and the U.S. Courts of Appeals for the First, Second, Third, and Fourth Circuits.  I am a partner in the law firm of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G" or "Lead Counsel"), the Court-appointed Lead Counsel in the above-captioned action (the "Action").[1]  BLB&G represents the Court-appointed Lead Plaintiff, the Public Employees' Retirement System of Mississippi ("MissPERS" or "Lead Plaintiff").  I have personal knowledge of the matters stated in this declaration based on my active supervision of and participation in the prosecution and settlement of the Action.

2.    I respectfully submit this declaration in support of Lead Plaintiff's motion, under Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the proposed settlement of the Action for $240 million in cash (the "Settlement"), which the Court preliminarily approved by its Order dated April 14, 2020 (the "Preliminary Approval Order").  ECF No. 253.

3.    I also respectfully submit this declaration in support of: (i) Lead Plaintiff's motion for approval of the proposed plan for allocating the proceeds of the Net Settlement Fund to eligible Class Members (the "Plan of Allocation" or "Plan") and (ii) Lead Counsel's motion, on behalf of all Plaintiff's Counsel,[2] for an award of attorneys' fees in the amount of 25% of the

---

[1] Unless otherwise defined in this declaration, all capitalized terms have the meanings defined in the Stipulation and Agreement of Settlement dated March 16, 2020 (the "Settlement Stipulation" or "Stipulation"), and previously filed with the Court.  *See* ECF No. 247-1.

[2] Plaintiff's Counsel are: Lead Counsel BLB&G and Gadow Tyler, additional counsel for Lead Plaintiff MissPERS.

Settlement Fund, net of expenses; payment of Litigation Expenses incurred by Plaintiff's Counsel's in the amount of $3,149,815.55; and payment of $25,410.00 to MissPERS in reimbursement of its costs and expenses directly related to its representation of the Class (the "Fee and Expense Application").[3]

4.      The proposed Settlement provides for the resolution of all claims in the Action in exchange for a cash payment of $240 million for the benefit of the Court-certified Class.  This beneficial Settlement was achieved as a direct result of Lead Plaintiff's and Lead Counsel's efforts to diligently investigate, vigorously prosecute, and aggressively negotiate a settlement of this Action against highly skilled opposing counsel.  As discussed in more detail below, Lead Counsel's efforts in the Action, included, among other things:

    i.      Conducting a wide-ranging investigation concerning the allegedly fraudulent misrepresentations and omissions made by Defendants, including consulting with experts and reviewing the voluminous public record;

    ii.     Drafting and filing three detailed amended complaints, including the operative 192-page Fifth Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint"), filed with the Court on March 22, 2018 (ECF No. 111), which incorporated material from conference call transcripts, press releases, news articles, and other public statements issued by or concerning Defendants; financial analyst research reports concerning the Company and reports and other documents filed publicly by Signet with the U.S. Securities and Exchange Commission ("SEC"); Signet's corporate website; interviews with former Signet employees; and other publicly available information;

    iii.    Successfully opposing (in significant part) Defendants' motion to dismiss the Complaint (ECF Nos. 112-14) consisting of 858 pages of briefing and exhibits, by researching and drafting a substantial opposition brief

---

[3] In conjunction with this declaration, Lead Plaintiff and Lead Counsel are also submitting the Memorandum of Law in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation (the "Settlement Memorandum") and the Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses (the "Fee Memorandum").

responding to Defendants' arguments, which Lead Plaintiff filed with the Court on April 9, 2018 (ECF No. 115);

iv.    Preparing and filing Lead Plaintiff's successful (in substantial part) motion for class certification (ECF Nos. 142-44, 164), which included extensive briefing and working with an expert to prepare a report on market efficiency and the availability of class-wide damages methodologies, defending the depositions of Lead Plaintiff's representatives and expert, deposing Defendants' experts, and preparing a reply in support of the class certification motion (ECF Nos. 157, 165), which included a rebuttal expert a report;

v.    Successfully opposing Defendants' motion for judgment on the pleadings (ECF No. 149);

vi.    Engaging in full briefing on Defendants' petition, pursuant to Rule 23(f) of the Federal Rules of Civil Procedure (the "Rule 23(f) Petition"), for leave to appeal the Court's Class Certification Order to the United States Court of Appeals for the Second Circuit;

vii.    Consulting with experts regarding loss causation and damages, accounting for loan loss reserves, retail loan underwriting, the sale of Signet's loan portfolio, and sexual harassment, among other issues presented by this Action;

viii.    Engaging in significant fact and expert discovery, including producing nearly 200,000 pages of documents from Lead Plaintiff; reviewing and analyzing approximately 3.6 million pages of documents produced by Defendants and third parties; taking, defending, and participating in 31 depositions; and exchanging 20 expert reports with Defendants on a host of complex issues;

ix.    Engaging in intensive, arm's-length negotiations with Defendants, including the submission of detailed mediation statements concerning liability and damages, and participating in three full-day mediation sessions before the Hon. Layn R. Phillips (USDJ, Ret.), which ultimately culminated in the mediator's recommendation to settle the Action for $240 million in cash, which the parties accepted; and

x.    Drafting and negotiating the Settlement Stipulation and related settlement documentation.

5.    The proposed Settlement represents an outstanding result for the Class, considering the significant risks in the Action and the amount of the potential recovery. The Settlement provides a considerable benefit to the Class by conferring a substantial, certain, and

immediate recovery while avoiding the significant risks and expense of continued litigation, including the risk that the Class could recover nothing or substantially less than the Settlement Amount after years of additional litigation and delay.  As discussed in more detail below, if this case continued to be litigated, there is no guarantee that Lead Plaintiff would have been able to establish Defendants' liability with respect to the two separate frauds alleged in the Action: (i) Defendants' alleged misstatements and omissions concerning the quality of and reserves for Signet's in-house credit program, and (ii) Defendants' alleged misstatements and omissions concerning alleged sexual harassment at the Company, which presented unique issues both on the merits and on class certification.

6.      The close attention paid and oversight provided by the Lead Plaintiff, MissPERS, throughout this case is another factor in favor of the reasonableness of the Settlement.   In enacting the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Congress expressly intended to give control over securities class actions to sophisticated investors, and noted that increasing the role of institutional investors in class actions would ultimately benefit shareholders and assist courts by improving the quality of representation in this type of case. H.R. Conf. Rep. No. 104-369, at *34 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733.  Here, Lead Plaintiff's representatives were actively involved in overseeing the litigation and settlement negotiations.  *See* Declaration of Jacqueline H. Ray, Special Assistant Attorney General in the Office of the Attorney General of the State of Mississippi (the "Mississippi OAG"), submitted on behalf of MissPERS (the "Ray Decl."), attached as Exhibit 1.

7.      Lead Plaintiff and Lead Counsel believe that the Settlement is in the best interests of the Class.  Due to their substantial efforts, Lead Plaintiff and Lead Counsel are well informed

of the strengths and weaknesses of the claims and defenses in the Action, and they believe that the Settlement represents a highly favorable outcome for the Class.

8.     In addition to seeking final approval of the Settlement, Lead Plaintiff seeks approval of the proposed Plan of Allocation as fair and reasonable.  As discussed in further detail below, Lead Plaintiff's experienced expert for market efficiency, damages, and loss causation, Michael Hartzmark, Ph.D., developed the Plan of Allocation in consultation with Lead Counsel. The Plan provides for the distribution of the Net Settlement Fund on a *pro rata* basis to Class Members who submit Claim Forms that are approved for payment by the Court.   Each Claimant's share will be calculated based on his, her, or its losses attributable to the alleged fraud, similar to what likely would have been awarded at trial if the Action had not been settled and had continued to trial following a motion for summary judgment, other pretrial motions, and resulted in a verdict favorable to the proposed class.

9.     Lead Counsel worked diligently and efficiently to achieve the proposed Settlement in the face of significant risk.   Lead Counsel prosecuted this case on a fully contingent basis and incurred significant Litigation Expenses and thus bore all the risk of an unfavorable result.   For their considerable efforts in prosecuting the case and negotiating the Settlement, Lead Counsel is applying for an award of attorneys' fees for Plaintiff's Counsel of 25% of the Settlement Fund, net of Court-approved Litigation Expenses.   The 25% fee request is based on a retainer agreement entered into with Lead Plaintiff at the outset of the litigation and, as discussed in the Fee Memorandum, is well within the range of fees that courts in this Circuit and elsewhere have awarded in securities and other complex class actions with comparable recoveries on a percentage basis.   Moreover, the requested fee represents a multiplier of approximately 1.98 on Plaintiff's Counsel's total lodestar, which is on the lower end of the range

of multipliers typically awarded in class actions with significant contingency risks such as this one, and thus, the lodestar cross-check also supports the reasonableness of the fee.

10.     Lead Counsel's Fee and Expense Application also seeks payment of Litigation Expenses incurred by Plaintiff's Counsel in connection with the institution, prosecution, and settlement of the Action totaling $3,149,815.55, plus reimbursement of $25,410.00 to MissPERS for its costs and expenses directly related to its representation of the Class, as authorized by the PSLRA.

11.     For all of the reasons discussed in this declaration and in the accompanying memoranda and declarations, including the quality of the result obtained and the numerous significant litigation risks discussed fully below, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are "fair, reasonable, and adequate" in all respects, and that the Court should approve them under Federal Rule of Civil Procedure 23(e). For similar reasons, and for the additional reasons discussed below, I respectfully submit that Lead Counsel's Fee and Expense Application is also fair and reasonable and should be approved.

## II.     PROSECUTION OF THE ACTION

### A.     Background

12.     As the Court is aware, Signet is a jewelry retailer that owns and operates thousands of jewelry stores under brands such as Kay Jewelers, Jared, and Zales.  This certified securities class action asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of investors who purchased Signet common stock during the period from August 29, 2013 to May 25, 2017 (the "Class Period") and who were allegedly damaged thereby (the "Class").

13.     Lead Plaintiff alleges that Defendants violated the federal securities laws based on two distinct courses of false or misleading statements and omissions.  First, Lead Plaintiff alleges

that Defendants publicly mischaracterized the *Jock* litigation—an employment arbitration brought by employees of Signet's U.S. division, Sterling Jewelers ("Sterling")—and the risks it posed to the Company. Lead Plaintiff alleges that Defendants misleadingly minimized the *Jock* litigation as involving only "store-level" employment practices concerning "compensation and promotional opportunities" at a "few stores," and falsely stated that Signet had "investigated" the allegations and found them to be unsubstantiated. Lead Plaintiff also alleges that Defendants falsely assured the market that Signet adhered to rigorous standards of ethics set forth in the Company's Codes of Conduct and Ethics (the "Codes"), which, among other things, prohibited sexual harassment and stated that the Company made employment decisions based solely on merit. Lead Plaintiff alleges, however, that *Jock* in fact concerned allegations of severe sexual harassment, including by Signet's most senior executives, which were set forth in numerous sworn declarations by former Sterling employees (collectively, the "Declarations"). Lead Plaintiff further alleges that investors suffered losses when the truth was revealed through a February 27, 2017 *Washington Post* article reporting on the Declarations.

14. Second, Lead Plaintiff alleges that Defendants made false or misleading statements and omissions concerning Signet's in-house financing program, through which Signet made loans to its customers for their jewelry purchases. Lead Plaintiff alleges that Defendants held Signet out to investors as a "prudent" lender that made high-quality loans according to "stringent" and "conservative" underwriting criteria. Lead Plaintiff alleges that, in truth, Signet engaged in reckless underwriting and built a large portfolio of high-risk subprime loans that caused the Company to incur significant losses. Lead Plaintiff further alleges that Defendants materially understated Signet's loan loss reserves in its financial statements, thus overstating Signet's income. Lead Plaintiff alleges that investors suffered losses when the truth regarding

7

Signet's financing program was revealed to the market through a series of corrective disclosures, including Signet's announcement on May 25, 2017 that 45% of Signet's credit portfolio—amounting to between $700 million and $800 million—consisted of subprime loans.

**B.**   **Appointment of Lead Plaintiff and Lead Counsel, Lead Counsel's Extensive Investigation and Filing of Three Complaints, and the Substantial Denial of Defendants' Motion to Dismiss**

**1.**   **Appointment of MissPERS as Lead Plaintiff**

15.     As explained below, the case against Signet was previously led by a different lead plaintiff, with a different lead counsel firm.  As new facts emerged that significantly broadened the claims, MissPERS sought a leadership role so that it could secure a meaningful recovery for investors.

16.     On August 25, 2016, an initial complaint was filed against Signet, Mark Light, and Michele Santana on behalf of plaintiff Susan Dube by counsel Glancy Prongay & Murray LLP ("GP&M").  ECF No 1.  The complaint alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5, promulgated thereunder.  The action was originally assigned to the Hon. Jesse Furman.

17.     On October 24, 2016, Dube filed a motion for appointment as lead plaintiff with GP&M as lead counsel.  ECF No. 17.  The Court granted the motion on November 21, 2016. ECF No. 23.

18.     Pursuant to the Court's November 30, 2016 order, Dube filed the First Amended Complaint on January 30, 2017.  ECF No. 28.  The class period for that complaint was January 7, 2016 to June 3, 2016.  The First Amended Complaint involved allegations that defendants made false or misleading statements concerning, among other things, a practice whereby Signet employees were "swapping" customers' diamonds for less valuable ones while repairs were supposed to be made, a drop-off in customer confidence in Signet, increasing competitive

pressures that Signet was facing, and the impact of these factors on the Company's financial performance.

19.    On March 1, 2017, Dube filed a motion for leave to file a second amended complaint "to add additional factual allegations and/or claims" as a result of the February 28, 2017 news that Signet had engaged in "widespread sexual harassment and discrimination in the workplace," which would significantly expand the operative class period and the nature of alleged wrongdoing.  ECF Nos. 29, 30.

20.    On March 30, 2017, the Irving Firemen's Relief & Retirement System ("Irving") filed a letter with the Court concerning Dube's request for leave to amend and file a second amended complaint.  ECF No. 31.  Irving was the plaintiff in another securities fraud action against Signet captioned *Irving Firemen's Relief & Ret. Sys. v. Signet Jewelers Ltd.*, Case No. 17-cv-00875 (N.D. Tex.), which alleged that defendants made false and misleading statements concerning an arbitration involving widespread allegations of sexual harassment at a Signet subsidiary implicating Defendant Light and other Signet executives.  Irving sought to intervene to request the issuance of an order either: (1) requiring the *Dube* lead plaintiff to publish notice of the new claims and class period it intended to allege in its second amended complaint, and afford investors harmed by new alleged misconduct during a new time period the right to seek appointment as lead plaintiff in *Dube*, or (2) modifying the Court's March 1, 2017 order (ECF No. 30) to limit the *Dube* lead plaintiff to the factual allegations it was originally appointed to prosecute.

21.    On April 3, 2017, Dube filed the Second Amended Complaint.  ECF No. 33.  The Second Amended Complaint included claims that Signet misled investors about risks related to a culture of pervasive sexual harassment, that fraudulent "diamond swapping" occurred at certain

Signet retail locations, and, for the first time, that Signet misled investors about the quality of its credit portfolio and nature of its lending standards.

22.     On April 14, 2017, the Court issued an order providing that the only way for the *Dube* Lead Plaintiff to avoid the need for republication and the revisiting of the lead plaintiff and lead counsel selection was for Dube to revert to the claims and allegations in the original Complaint, which formed the basis for the original PSLRA notice.  ECF No. 46.  The Court held further that if, in light of the Court's ruling, Dube wished to strike the new claims and allegations in the Second Amended Complaints and revert to the claims and allegations in the original Complaint, Dube should file a letter brief to that effect.

23.     On April 21, 2017, lead plaintiff in the *Dube* action filed a letter seeking leave to file a third amended complaint, removing all allegations in the Second Amended Complaint and narrowing the class period, but retaining allegations relating to misrepresentations regarding Signet's credit portfolio during the original class period without re-publishing notice to the class. ECF No. 51.

24.     On May 4, 2017, the Court denied the *Dube* lead plaintiff's request.  ECF No. 54. On May 5, 2017, the *Dube* lead plaintiff filed a letter with the Court notifying the Court that it published notice of the claims and class period in the Second Amended Complaint on the same day, thereby re-opening the selection of lead plaintiff and lead counsel.  ECF No. 55.

25.     Accordingly, on July 5, 2017, MissPERS moved for the appointment of MissPERS as Lead Plaintiff and BLB&G as Lead Counsel.  ECF Nos. 65, 70, 74.

26.     Only July 27, 2017, Judge Furman granted MissPERS' motion, and appointed MissPERS as Lead Plaintiff, and BLB&G as Lead Counsel.  ECF No. 84.

## 2.      Drafting The Third Amended Complaint

27.     On September 29, 2017 MissPERS filed the 176-page Third Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Third Amended Complaint").  ECF No. 86.  The Third Amended Complaint alleged claims under Section 10(b) of the Exchange Act against Signet, Light and Santana, as well as Michael Barnes and Ronald Ristau, Signet's former CEO and CFO, respectively, and Section 20(a) claims against the individual defendants.  The Third Amended Complaint alleged two categories of false and misleading statements and omission pursuant to of the Exchange Act concerning: (1) the quality of the Company's underwriting and its in-house customer financing credit portfolio, and the reserves for that portfolio, and (2) sexual harassment of female employees throughout Signet, which was at issue in *Jock*.

28.     Before the Third Amended Complaint was filed, Lead Counsel conducted a comprehensive factual investigation and detailed analysis of the potential claims that could be asserted on behalf of investors in Signet securities. This investigation included, among other things, a detailed review and analysis of voluminous amounts of information relating to Signet, its in-house credit operation, and the *Jock* arbitration.  Lead Counsel reviewed, among other things:

- Signet's SEC filings;

- transcripts of Signet's investor conference calls, press releases, and publicly available presentations;

- filings from related cases, including the *Jock* arbitration; and

- an enormous volume of media, news, and analyst reports relating to Signet.

29.     In addition to undertaking an extensive review of documents, Lead Counsel engaged consulting experts to help analyze certain complicated issues in the case.  Lead Counsel

worked with a financial economist on loss causation and damages issues, which was particularly important given that there were several different partial corrective disclosures in the case.  Lead Counsel also worked with an accounting expert on the bad debt expense and loan loss reserve issues that were a critical part of Lead Plaintiff's case concerning Signet's credit portfolio. Understanding the loan loss reserve issues and being able to effectively plead them required working closely with the accounting experts to understand how companies determine the appropriate level of reserves under GAAP, the impact the reserve number has on other financial metrics, how Signet calculated its reserves using the recency aging method, and how the level of its charge-offs supported Lead Plaintiff's allegations that the reserves were understated.

30.     Lead Counsel and its in-house investigators also located and interviewed former employees of Signet and its subsidiaries, who provided substantial information to Lead Counsel. Specifically, Lead Counsel and its investigators reached out to a total of 322 individuals and interviewed 79 of those individuals.  The Amended Complaint contained information provided by seven such former employees, who provided behind-the-scenes facts concerning Signet's lending practices, underwriting, and financial condition.

### 3.     Defendants File A Motion To Dismiss the Third Amended Complaint

31.     On December 1, 2017, Defendants filed their 35-page motion to dismiss the Third Amended Complaint and accompanying declaration attaching 14 exhibits totaling nearly 650 pages.  ECF Nos. 90 and 91.  In their Motion, Defendants attacked all parts of the Third Amended Complaint as inadequate to plead securities fraud, including with respect to the complicated accounting claims at issue in this case, and the novel sexual harassment-related issues.

32.     In particular, Defendants argued that:

- Lead Plaintiff failed to state a claim relating to Signet's in-house credit portfolio particularly with respect to Signet's loan loss reserves because, among other things, GAAP does not prescribe a particular method for computing the delinquency of accounts or estimating reserves, and thus, Lead Plaintiff had failed to allege that these opinion statements were actionably false under *Fait v. Regions Fin. Corp.*, 655 F.3d 105 (2d Cir. 2011).

- Lead Plaintiff failed to state a claim with respect to statements concerning the quality of Signet's portfolio or underwriting standards because those statements were either opinion statements or inactionable puffery, and Lead Plaintiff failed to plead facts establishing that the statements were false.

- The former employees that Lead Plaintiff relied on to establish falsity and scienter, among other things, were only low-level store employees who would not have known about the performance of the credit portfolio or Defendants' knowledge or Signet's accounting.

- Lead Plaintiff failed to plead scienter because there were no allegations of insider selling or other improper benefits realized by the Defendants, there was no apparent motive, and Lead Plaintiff's allegations were conclusory.

- Lead Plaintiff failed to adequately plead loss causation because Lead Plaintiff's alleged corrective disclosure dates did not reveal that Defendants' prior statements were false, and otherwise did not reveal that Defendants failed to timely disclose that Signet's credit portfolio had deteriorated.

- Defendants also argued that Lead Plaintiff's claims related to sexual harassment should be dismissed because Signet satisfied its disclosure obligations under relevant SEC regulations, Signet's Code of Conduct and other statements were puffery, Defendants did not act with scienter in concealing information that was required to be disclosed, and Lead Plaintiff failed to plead loss causation because the Washington Post article did not correct any prior misstatements.

33.    On December 4, 2017, the Court issued an order *sua sponte* providing that, should

Lead Plaintiff wish to file any further amended complaint, it must do so by December 22, 2017.

ECF No. 92.

>    **4.    Lead Plaintiff Files the Fourth Amended Complaint, the Parties
>    Complete Further Motion to Dismiss Briefing, and Lead Plaintiff Files
>    the Operative Complaint**

34.    Lead Plaintiff's investigation continued after filing the Third Amended Complaint, including by monitoring news reports and filings in related litigation.

35.    Accordingly, in late November, Lead Plaintiff decided to file a further amended complaint based on further disclosures from Signet.  Specifically, on November 21, 2017, Signet reported an earnings miss, declining sales and credit penetration rates, and lower fiscal 2018 guidance, and attributed these results to problems with outsourcing the Company's loan portfolio.  In response to this disclosure, Signet's stock price declined by more than 30%. Thereafter, on December 1, 2017, Signet disclosed that the Consumer Financial Protection Bureau had been investigating Signet's lending practices for a year, and the New York Attorney General was also conducting an investigation into Signet's lending practices.  In light of these new disclosures, the forthcoming further amended complaint would extend the operative Class Period from May 24, 2017 to December 1, 2017.

36.    On December 15, 2017, one week before Lead Plaintiff's amended complaint was due under the Court's December 4, 2017 order, GP&M filed a new action—*Aydin v. Signet Jewelers Limited, et al.*, No. 1:17-cv-09853-RWS (S.D.N.Y.) ("*Aydin*")—alleging class claims for violations of Sections 10(b) and 20(a) of the Exchange Act based on misrepresentations and omissions concerning Signet's loan portfolio, against Signet and certain of its senior executives. *Aydin* asserted a "stub" class period from August 24, 2017 to November 21, 2017 and was based entirely on the November 21, 2017 disclosure that Lead Plaintiff was planning on incorporating into its forthcoming amended complaint.  GP&M did not indicate that *Aydin* was related to this Action, and instead published a PSLRA notice stating that the deadline to move for appointment for lead plaintiff in *Aydin* was 60 days from the date that action was filed.  The notice triggered

14

multiple law firms to issue "alerts" to the investing public seeking clients to move for lead plaintiff in the *Aydin* case.

37.     On December 21, 2017, Lead Plaintiff filed a letter with the Court (1) informing the Court that, in accordance with the Court's December 4, 2017 order, Lead Plaintiff would file a Fourth Amended Complaint on December 22, 2017 asserting claims related to the most recent disclosure; (2) requesting that *Aydin* be designated as related to this Action and reassigned to Judge Furman; and (3) requesting that the Court set an expedited briefing schedule for Lead Plaintiff's forthcoming motion to consolidate the *Aydin* action into this Action.   ECF No. 93. Lead Plaintiff explained that consolidation of *Aydin* into this Action was appropriate because *Aydin* asserted the same statutory claims, against overlapping Defendants, as those asserted in this Action, and because the sole corrective disclosure in *Aydin* was a corrective disclosure in this Action that would be encompassed by the extended class period in the forthcoming amended complaint.

38.     On December 22, 2017, the Court issued an order accepting *Aydin* as related to the Action and providing, among other things, that counsel to the *Aydin* plaintiff shall show cause in writing (1) why *Aydin* should not be consolidated with this Action, and (2) why sanctions should not be imposed for failure to designate *Aydin* as related.   ECF No. 95.

39.     Also on December 22, 2017, Lead Plaintiff filed the Fourth Amended Complaint. ECF No. 96.   The Fourth Amended Complaint incorporated Defendants' disclosures from November 21, 2017 and December 1, 2017 concerning the credit portfolio and thus extended the class period to December 1, 2017.

40.     On January 2, 2017, GP&M, counsel for the *Aydin* Lead Plaintiff, filed a Response to the Court's December 22, 2017 Order to Show Cause.   ECF No. 97.

41.     On January 5, 2017, Lead Plaintiff filed a Response to *Aydin* and GP&M's Response to Order to Show Cause.  ECF No. 99.

42.     On January 7, 2018, the Court issued an order consolidating *Aydin* with this Action and setting a briefing schedule for Defendants' forthcoming motion to dismiss the Fourth Amended Complaint.  ECF No. 100.

43.     On January 26, 2018, Defendants filed their motion to dismiss the Fourth Amended Class Action Complaint.  ECF Nos. 101, 102, 103.  Defendants' motion to dismiss was identical to the motion they filed in response to the Third Amended Complaint, but added arguments regarding the new corrective disclosures alleged in the Fourth Amended Complaint. Lead Plaintiff carefully reviewed and analyzed each of the arguments in preparation for drafting its opposition brief, and again worked closely with an accounting expert to respond to Defendants' arguments related to the loan loss reserve and GAAP issues in the case.

44.     On February 23, 2018, Lead Plaintiff filed its opposition to Defendants' motion to dismiss the Fourth Amended Class Action Complaint.  ECF Nos. 104, 105.  In summary, Lead Plaintiff's opposition argued that:

- Defendants' statements concerning the loan portfolio were false and material, and not inactionable opinions or puffery.

- Defendants' statements concerning Signet's loan loss reserves were knowingly false because Defendants knew, based on Signet's loss history, the balance in Signet's loan portfolio that was likely uncollectible, but nonetheless set the reserves materially lower than that amount.

- The Fourth Amended Complaint adequately stated claims with respect to the *Jock* action based on Defendants' failure to satisfy their disclosure obligations under Item 103 of SEC Regulation S-K, 17 C.F.R. § 229.103.

- The Fourth Amended Complaint adequately stated claims related to the Codes of Conduct and Ethics because they were not inactionable puffery as a matter of law; and

16

- The Fourth Amended Complaint adequately alleged scienter and loss causation as to both sets of claims.

45. On March 9, 2018, Defendants filed a reply in further support of their motion to dismiss the Fourth Amended Class Action Complaint. ECF Nos. 106, 107. Defendants' reply reiterated the arguments made in their motion to dismiss and responded to the arguments in Lead Plaintiff's opposition brief.

46. On March 16, 2018, Lead Plaintiff filed a letter with the Court requesting leave to file a further amended complaint to add factual allegations concerning new disclosures made by Signet on March 14, 2018, and attaching Lead Plaintiff's proposed amended Fifth Amended Class Action Complaint. ECF No. 108. Specifically, on March 14, 2018, Signet issued a press release announcing its fiscal 2018 results and revealing that it reached an agreement to sell its subprime loans for 72% of par value, a 15% discount to the carrying value Signet employed, and that the Company expected to incur a loss in connection with the transaction of $165 million to $175 million. The price of Signet stock dropped significantly when these disclosures were made, and after analyzing the information disclosed and the market's response, Lead Plaintiff determined that further amending the complaint would strengthen the Class's claims.

47. On March 19, 2018, Defendants filed a letter opposing Lead Plaintiff's request for leave to file a further amended complaint. ECF No. 109. Defendants argued that there was no good cause to permit further amendment and that Lead Plaintiff's proposed amendment would be futile.

48. On March 20, 2018, the Court issued an order granting Lead Plaintiff's Letter Motion for Leave to File the Fifth Amended Complaint and setting a new briefing schedule for the motion to dismiss. ECF No. 110.

49.     Pursuant to the schedule issued by the Court on March 20, 2018, Lead Plaintiff filed the operative Fifth Amended Complaint (the "Complaint") on March 22, 2018.  ECF No. 11.  The Complaint added discussion about Signet's March 2018 disclosure concerning the sale of the subprime portion of its credit portfolio and the impact of this disclosure on Signet's stock price.  In total, the Complaint alleged a class period of nearly five years, extending from August 29, 2013 to March 13, 2018, and ten total corrective and partial corrective disclosures.

50.     On March 30, 2018, Defendants filed their motion to dismiss the Fifth Amended Complaint.  ECF Nos. 112, 113, 114.  The motion to dismiss was identical to Defendants' previous motion, but incorporated arguments addressing the new corrective disclosure in the Complaint.

51.     On April 9, 2018, Lead Plaintiff filed its opposition to Defendants' motion to dismiss.  ECF Nos. 115, 116.

52.     On April 13, 2018, Defendants filed their reply in further support of their motion to dismiss.  ECF Nos. 117, 118.

53.     On May 23, 2018, the case was reassigned to Your Honor.

**5.     The Court Substantially Denies Defendants' Motions to Dismiss and the Parties Initiate Discovery**

54.     On November 26, 2018, the Court issued a thorough, 37-page Memorandum and Order in which it substantially denied Defendants' motions to dismiss.  ECF No. 120.

55.     In its Order, the Court sustained Lead Plaintiff's claims almost in their entirety. With respect to Lead Plaintiff's claims concerning Signet's credit portfolio, the Court held that the falsity of Defendants' statements was adequately plead because those statements were not puffery.  The Court also found that Lead Plaintiff had adequately pled the falsity of Signet's loss reserves, in light of reports from former employees.  The Court found that Lead Plaintiff had

adequately alleged scienter for the credit portfolio claims because of allegations that Defendants were intimately familiar with Signet's loan portfolio and underwriting, among other things.

56.     The Court also found that Lead Plaintiff adequately plead that Defendants made materially misleading statements about the *Jock* action, and that the statements in Signet's Codes of Conduct and Ethics were actionable.   The only statements that the Court held were not actionable were generalized statements concerning the importance of Signet's relationships with its customers and consumer trust in the Signet brand.   The Court further held that Lead Plaintiff had adequately alleged scienter based on allegations that Defendants were aware of the Declarations at the time of their statements.   Finally, the Court held that Lead Plaintiff had adequately alleged loss causation.

57.     Thereafter, Lead Counsel immediately set out to vigorously prosecute the case.

58.     On February 6, 2019, after the Court had declined to adopt the first proposed schedule the parties had submitted (ECF No. 128), the parties filed a new proposed case management plan with shorter litigation deadlines, all of which the parties agreed to with the exception of the class certification schedule.   ECF No. 131.   In a joint letter submitted to the Court on February 6, 2019, the parties explained that while Lead Plaintiff proposed to file its motion for class certification on March 15, 2019, Defendants proposed that class certification be held in abeyance *sine die* pending the Second Circuit's decision in *Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.*, No. 18-3667 (2d Cir.).   Lead Plaintiff took the position that this stay was not necessary or appropriate, and that class certification briefing should move forward without delay.

59.     On February 7, 2019, the Court adopted the parties' proposed schedule with Lead Plaintiff's proposal for class certification briefing.  ECF No. 132.  The Court wrote in its order that there would be "no more delays, no more stays."

60.     The Court also adopted a civil case management plan to govern the litigation. ECF No. 133.  The schedule provided, among other deadlines, that Lead Plaintiff's motion for class certification was due on March 15, 2019, with briefing complete by May 17, 2019; fact discovery should be concluded by September 13, 2019; and expert discovery should be concluded by December 6, 2019.   Lead Counsel had to, and did, work diligently and expeditiously to meet this schedule.

61.     While negotiating the case schedule, the parties also worked to negotiate a Protective Order and an ESI Protocol that would govern the case.  On January 29, 2019, after exchanging multiple drafts and negotiating a format acceptable to both sides, the parties filed a Stipulation and Protective Order.   ECF No. 131.   On February 11, 2019, the parties filed a Stipulated ESI Protocol and Order.  ECF No. 134.  The Court granted the Stipulated ESI Protocol and Order the next day.  ECF No. 135.

**C.      Fact Discovery**

62.     As explained in detail below, during discovery, Lead Counsel built a strong and extensive record in support of Lead Plaintiff's claims through thorough document and deposition discovery of Defendants and 14 third parties.

**1.      The Pursuit of Extensive Document Discovery from Defendants and Third Parties**

63.     On December 21, 2018, Lead Plaintiff served requests for the production of documents on Defendants. Lead Plaintiff requested that Defendants produce documents concerning, among other things, Signet's underwriting and lending practices, the performance of

its loan portfolio, the use of the recency method of aging accounts receivable, the *Jock* arbitration, the Declarations, incidents of sexual harassment at the Company, and the Company's processes and procedures for reporting sexual harassment.  After determining that it needed certain documents from prior to the Class Period to effectively litigate the case, Lead Plaintiff sought documents from a lengthy time period of nearly six years, extending from January 2013—and in some cases, earlier—through the end of 2018.

64.     On January 21, 2019, Defendants served their Objections and Responses to Lead Plaintiff's First Request for the Production of Documents on Lead Plaintiff.  In the months that followed, Lead Counsel engaged in numerous meet-and-confers and extensive negotiations with Defendants' Counsel over the scope and adequacy of Defendants' discovery responses, including relating to search terms to be used, custodians whose documents should be searched, applicable timeframes, and other parameters.  Adding to the complexity of these negotiations was the fact that Lead Plaintiff sought several categories of documents related to the *Jock* arbitration and complaints that had been filed over the years at Signet concerning sexual harassment. Defendants resisted producing many categories of these documents, taking the position that they were irrelevant particularly given that Lead Plaintiff was seeking documents from prior to the Class Period.  Ultimately, after numerous meet-and-confers and several weeks of negotiations, Lead Plaintiff succeeded in obtaining all the documents it needed to effectively litigate the Action.

65.     In total, Lead Counsel obtained and reviewed more than 3.1 million pages of documents from Defendants.

66.     As Lead Counsel continued to receive and review documents from Defendants, Lead Counsel identified several third parties who it determined likely had relevant information.

Thus, in addition to seeking discovery from Defendants, Lead Plaintiff served subpoenas on 14 third parties.  Lead Counsel held dozens of meet and confers with these third parties—some of which were difficult and contentious—before receiving document productions.  During these meet and confers, Lead Counsel negotiated with each third party the scope of the third party's document production, including the applicable date range, search terms, and custodians.  In some cases, Lead Plaintiff also negotiated with counsel for the various third parties addendums to the Protective Order in case in this case so that Lead Plaintiff could effectively use the third party documents as exhibits during depositions.

67.     As a result of Lead Plaintiff's efforts in third party discovery, Lead Plaintiff obtained more than 413,000 pages of documents from third parties, many of which proved important to Lead Plaintiff's prosecution of the action, particularly with respect to expert discovery.  For example, the documents provided by third-party CarVal—which purchased Signet's loan portfolio after the Class Period—were the foundation of Lead Plaintiff's expert report concerning Signet's sale of the subprime portion of its credit portfolio at a price below par, and its implications for Signet's Class Period statements touting the portfolio's quality.

68.     The chart below identifies the recipients of the third party subpoenas issued by Lead Plaintiff, the dates of the subpoenas, and a general description of the role of the subpoenaed entity:

| **Subpoenaed Entity** | **Date** | **Role in Case** |
|---|---|---|
| Genesis Financial Solutions, Inc. | January 11, 2019 | Serviced subprime loans in Signet's loan portfolio |
| Goldman Sachs & Co. LLC | January 11, 2019 | Conducted strategic evaluation of Signet's credit portfolio |

| **Subpoenaed Entity** | **Date** | **Role in Case** |
|---|---|---|
| KPMG LLP | January 11, 2019 | Signet's Class Period outside auditor |
| Progressive Leasing, LLC | January 11, 2019 | Serviced subprime loans in Signet's loan portfolio |
| Alliance Data Systems Corporation | January 11, 2019 | Purchased prime portion of Signet's credit portfolio |
| CarVal Investors, LLC | January 11, 2019 | Purchased subprime portion of Signet's credit portfolio |
| Castlelake, L.P. | January 11, 2019 | Purchased subprime portion of Signet's credit portfolio |
| Ernst & Young Y LLP | February 11, 2019 | Signet consultant |
| Navex Global, Inc. | April 25, 2019 | Signet vendor |
| PricewaterhouseCoopers LLC | February 22, 2019 | Signet consultant |
| Simpson Thatcher & Bartlett LLP | February 11, 2019 | Signet advisor |
| Aaron's Inc. | February 21, 2019 | Serviced subprime loans in Signet's loan portfolio |
| Deloitte & Touche LLP | February 22, 2019 | Signet consultant |
| Dent-A-Med, Inc. | March 4, 2019 | Serviced subprime loans in Signet's loan portfolio |

69.    In total, Defendants and third parties together produced nearly 750,000 documents, totaling nearly 3.6 million pages, to Lead Plaintiff.

70.    As Lead Counsel received documents, it reviewed and analyzed those documents through regular team meetings, running targeted searches aimed at locating the most relevant documents, analyzing the document trail on several key issues and creating timelines of events

germane to the case. The magnitude and complexity of the documents was substantial—totaling 3.6 million pages spanning nearly 6 years and including, among other things, emails, loan documentation, internal finance memoranda, financial statements, , audit-related documents, internal analyses of bad debt expense and loan loss reserves, analyses of credit portfolio performance, litigation documents related to the *Jock* action, the *Jock* declarations, sexual harassment complaints, and board materials.

71.     As part of its discovery efforts, Lead Counsel assembled a team of staff attorneys that, at various points in the litigation and depending on what Lead Counsel needed to accomplish, ranged in size from 11 to 32 attorneys.  This team consisted of many lawyers who have been with the firm for years and have worked on other significant class actions.  Their biographies, along with those of all lawyers who worked on this case, are attached hereto in Exhibit 3A-3.  As explained below, this team was integral in helping Lead Counsel review and analyze the documentary record, prepare to take and defend depositions, assist expert witnesses, and compile the strongest evidentiary support for Lead Plaintiff's claims.

72.     Throughout this process, Lead Counsel ensured that the review and analysis of documents was conducted efficiently.  At the outset of Lead Counsel's document review efforts, Lead Counsel solicited proposals from vendors to provide document-management services. After receiving bids from three well-regarded firms, Lead Counsel ultimately selected the e-discovery vendor Epiq. At a price that matched the lowest bid received, Epiq provided document-review support, including algorithm-based "technology-assisted review" ("TAR") (also known as "predictive coding"). The TAR software enabled Lead Counsel to efficiently streamline the review by "learning" the coding of documents as they were reviewed. While Lead Counsel could not rely on this machine algorithm to identify all of the necessary documents to prosecute this

Action, it did use the algorithm to assist Lead Counsel in efficiently prioritizing the review of documents most likely to be relevant.

73.     Using the TAR predictive coding to prioritize those documents most likely to provide meaningful information, attorneys from Lead Counsel reviewed, analyzed, and categorized the documents in Precision's electronic database.  Before beginning, Lead Counsel developed a search protocol, issue "tags," and guidelines for identifying "hot" documents, as well as a manual and guidelines for the review and "coding" of documents.  Using these tools, Lead Counsel tasked its attorneys with reviewing documents, with the documents most likely to be "hot" put into prioritized batches for review.  Lead Counsel's review and analysis of those documents included substantive analytical determinations as to the importance and relevance of each document—including whether each document was "hot," "highly relevant," "relevant," or "irrelevant."  For documents identified as "hot," attorneys often documented their substantive analysis of the documents' importance by making notations on the document review system, explaining what portions of the documents were hot, how they related to the issues in the case, and why the attorney believed that information to be significant.  Attorneys also "tagged" the specific issues that documents related to, such as Signet's underwriting, lending practices, bad debt expense, loan loss reserves, and sexual harassment complaints, and also "tagged" what witnesses the documents related to, which enabled Lead Counsel to effectively and efficiently collect documents in preparation for depositions. Given the dynamic, evolving nature of discovery, Lead Counsel frequently revised and refined its tools, techniques, and "tags" as it developed its understanding of the issues.

74.     Throughout its review, Lead Counsel also analyzed the adequacy and scope of the document productions by Defendants and third parties.  For example, attorneys reviewed all

privilege redactions and entries in Defendants' privilege logs to assess whether Defendants redacted or withheld potentially non-privileged information. Lead Counsel also reviewed the productions to determine whether they substantively tracked what had been agreed to be produced in response to document requests. Where Lead Counsel identified deficiencies— including documents improperly redacted or withheld for privilege—in a document production, Lead Counsel challenged Defendants or the producing party to set forth the basis for privilege or otherwise address and correct the deficiency.

75.     In addition to regular communications that occurred throughout the review process, attorneys who primarily focused on the document review participated in weekly meetings with the full litigation team. In advance of these meetings, "hot" documents and documents that raised questions for discussion that had recently been reviewed and analyzed were compiled and circulated. At the meetings, Lead Counsel discussed those documents, including the reasons they identified them as "hot," and attorneys asked questions and discussed similar documents that had been reviewed. These efforts ensured that the entire litigation team learned of and understood the documentary evidence being developed, provided an opportunity for Lead Counsel to further refine its legal and factual theories, focused the document-review team on developing other supporting evidence, and enabled Lead Counsel to ensure that documents were reviewed consistently. Lead Counsel also often conducted follow-up research and drafted memoranda concerning topics of interest that arose at these meetings.

76.     In addition, Lead Counsel prepared chronologies of events, and maintained a central repository of key documents organized by issue, which it continually updated and refined as the team's knowledge of issues expanded. This step enabled attorneys to quickly and

efficiently access critical documents necessary for the preparation for depositions and drafting of evidentiary submissions to the Court.

77.     As noted above, the attorney team also prepared and utilized several "issue memoranda" focused on key aspects of the case that Lead Counsel needed to understand to effectively conduct depositions.  This included memoranda addressing the evolution of Signet's underwriting policies and risk tolerance before and throughout the Class Period; Signet's analysis of its use of the recency accounting method; Signet's loan loss reserves and bad debt expense; the impact on charge-offs and delinquencies that would occur if Signet were to switch to from recency to contractual accounting; and summaries of the work that third parties such as Ernst & Young and PricewaterhouseCoopers performed for Signet.

### 2.     Defendants' Document Requests to Lead Plaintiff

78.     Defendants served their First Set of Document Requests to Lead Plaintiff, comprising 36 document requests, on December 21, 2018. Lead Plaintiff responded and objected to those Requests on January 5, 2019, and thereafter engaged in extensive meet-and-confers with Defendants to discuss the scope of Lead Plaintiff's responsive document production.

79.     In response to Defendants' document requests, Plaintiff's Counsel worked with Lead Plaintiff to gather potentially relevant and responsive materials.  This included Plaintiff's Counsel visiting Lead Plaintiff's offices in Jackson, Mississippi to oversee the document collection process.  Lead Counsel then reviewed those documents carefully, and subsequently produced the relevant, responsive, nonprivileged documents in Lead Plaintiff's possession.

80.     Lead Plaintiff made its first production of documents to Defendants on February 3, 2019, its second production on March 13, 2019, its third production on March 18, 2019, and its fourth production on March 21, 2019.  In total, Lead Plaintiff produced over 209,000 pages of documents to Defendants.

27

### 3.     Interrogatories

81.     On January 29, 2019, Lead Plaintiff served its First Set of Interrogatories to Defendants.  Lead Plaintiff's interrogatories focused on the sexual harassment-related aspect of the case and sought to discover the number and type of claims of gender and sexual misconduct made against Signet executives before and during the Class Period, and how those claims were handled.

82.     On February 28, 2019, Defendants served their Responses and Objections to Lead Plaintiff's First Set of Interrogatories. Lead Plaintiff carefully reviewed Defendants' interrogatory responses to tailor its discovery efforts.

### 4.     The Pursuit of Extensive Deposition Discovery

83.     Lead Counsel took, defended and participated in a total of 31 depositions, which further developed the evidentiary record and informed Lead Counsel's analysis of the claims and defenses in the Action. Those depositions were held at locations across the country, including Boston, New York, Ohio, Texas, Florida, and Washington, D.C.  For Lead Counsel, these depositions required significant attorney preparation.

84.     To build an efficient and effective deposition plan, Lead Counsel constructed "key players" lists compiled from: (i) its investigation in connection with the Complaint; (ii) document searches, including analyses of hot documents; and (iii) corporate-organization charts produced by Defendants. This process involved considerable effort given the volume of Defendants' productions and the expansive nature and time period of the alleged fraud.

85.     Once deponents were identified, effectively preparing for, conducting, defending and participating in depositions required that Lead Counsel devote substantial time, effort, and resources.

86.     One of Lead Counsel's most significant projects in preparation for the depositions—both in terms of time and effort as well as substantive importance—was the preparation of detailed "deposition kits." These kits typically consisted of hundreds of documents with an index summary.  The kits also included a detailed memorandum analyzing those documents and the witnesses background and role in the case.  In addition, as noted above, the attorney team prepared memoranda concerning several key issues in the case, which were used to prepare for the depositions of each witness who was involved with that issue.

87.     Lead Counsel prepared a deposition kit for each witness.  Preparing deposition kits required a comprehensive, deep dive into the witnesses materials, including their: (i) custodial documents, i.e., documents the deponent drafted, received, or maintained in their files; (ii) role in the events at issue, including with respect to information in relevant documents they may not have personally reviewed; (iii) prior relevant testimony or interviews; and (iv) information gleaned from public searches.  The preparation of each kit required the analysis of myriad documents in the particular context of each witness, as well as the exercise of professional judgment in narrowing down which documents to present to that deponent.  As the kits were prepared and refined, the attorneys taking the depositions worked closely with the attorneys tasked with creating the relevant kits.

88.     In addition to Lead Plaintiff's depositions, Defendants took the depositions of six of the seven former employees cited in the Complaint.  Lead Plaintiff attended each of these depositions and asked questions of each witness.

89.     Between March 19, 2019 and September 13, 2019, Lead Plaintiff took, defended or participated in 31 total depositions, including the depositions of two former CEOs of Signet, the current CEO of Signet, two former CFOs of Signet, two former COOs of Signet, the Chair of

the Board, several current and former senior finance or human resources executives at Signet, and multiple Declarants.   The chart below lists the depositions in date order (the names of the Declarants and the former employees cited in the Complaint who were deposed are not listed in order to protect their privacy).

| Deponent | Role | Purpose | Date |
|---|---|---|---|
| Matthew Kamm | Artisan Partners Representative | Class certification | March 19, 2019 |
| Lorrie Tingle | MissPERS 30(b)(6) Representative | Class certification | March 27, 2019 |
| FE 3 | Signet sales associate | Fact witness | March 27, 2019 |
| FE 5 | Signet assistant store manager | Fact witness | April 2, 2019 |
| George Neville | MissPERS 30(b)(6) Representative | Class certification | April 5, 2019 |
| FE 6 | Collector, Signet | Fact witness | April 14, 2019 |
| FE 1 | Director of Credit Information Technology and Strategy Department, signet | Fact witness | April 15, 2019 |
| FE 7 | Credit Authorizer, Signet | Fact witness | April 16, 2019 |
| Jed Fogdall | Dimensional Fund Advisors representative | Class certification | April 16, 2019 |
| FE 4 | District Manager in Training, Signet | Fact witness | April 30, 2019 |
| Allen Ferrell | Signet expert | Class certification | May 14, 2019 |
| Michael Maloney | Signet expert | Class certification | May 15, 2019 |
| Declarant | Declarant | Fact witness | May 29, 2019 |

| **Deponent** | **Role** | **Purpose** | **Date** |
|---|---|---|---|
| Michael Hartzmark | Lead Plaintiff expert | Class certification | June 7, 2019 |
| Declarant | Declarant | Fact witness | June 12, 2019 |
| Declarant | Declarant | Fact witness | July 10, 2019 |
| Harsh Suri | Partner, Ernst & Young | Fact witness | July 24, 2019 |
| Declarant | Declarant | Fact witness | July 31, 2019 |
| Suzanne Shane | Senior Vice President In-House Credit Operation and Customer Care, Signet | Fact witness | July 31, 2019 |
| MaryEllen Mennett | Director of Field Human Resources, Signet | Fact witness | August 7, 2019 |
| Robert Trabucco | Former CFO, Sterling | Fact witness | August 8, 2019 |
| Mario Weiss | Senior Vice President of Credit Operations, Signet | Fact witness | August 14, 2019 |
| Edward Hraback | Former COO and President of Sterling, former COO of Signet | Fact witness | August 15, 2019 |
| Mark Light | Former CEO, Signet | Fact witness | August 20, 2019 |
| Ronald Ristau | Former CFO, Signet | Fact witness | August 20, 2019 |
| Michael Barnes | Former CEO, Signet | Fact witness | August 23, 2019 |
| Gina Drosos | Current CEO, Signet | Fact witness | August 29, 2019 |
| Todd Stitzer | Chairman of the Board, Signet | Fact witness | September 4, 2019 |
| Mamta Soni | Partner, KPMG | Fact witness | September 6, 2019 |

| **Deponent** | **Role** | **Purpose** | **Date** |
|---|---|---|---|
| Michelle Santana | Former CFO, Signet | Fact witness | September 10, 2019 |
| Bryan Morgan | Former COO, Signet | Fact witness | September 13, 2019 |

### D. Class Certification

90.     On March 15, 2019, Lead Plaintiff filed its Motion for Class Certification and Appointment of Class Representatives and Class Counsel ("Class Certification Motion") (ECF Nos. 142, 143, 144), requesting that the Court certify a class comprising all persons and entities who purchased or otherwise acquired shares of Signet common stock between August 29, 2013 and March 13, 2018, inclusive, and were damaged thereby.

91.     Lead Plaintiff's motion attached and was supported by the expert report of Dr. Michael Hartzmark, Ph. D., who opined that the market for Signet common stock was efficient throughout the Class Period, and that damages for investors in Signet common stock could be calculated through a common methodology.

92.     In connection with class certification, in addition to serving subpoenas for Lead Plaintiff's documents and for depositions of Lead Plaintiff's representatives, Defendants served subpoenas for the production of documents and for depositions on Lead Plaintiff's third-party investment advisors: Northern Trust Investments, Dimensional Fund Advisors, Artisan Partners, and State Street Global Advisors. In response to those subpoenas, Lead Plaintiff's investment advisors produced nearly 23,425 pages of documents to Defendants.  Lead Counsel reviewed those advisors' documents closely in preparation for Lead Plaintiff's depositions

93.     Defendants deposed representatives from both Artisan Partners and Dimensional Fund Advisors on March 19, 2019 in Milwaukee, and April 16, 2019 in Austin, respectively.

Lead Counsel prepared for and attended each of these depositions on behalf of Lead Plaintiff, and defended them and asked questions where appropriate. Defendants obtained declarations from Northern Trust Investments and State Street Global Advisors in lieu of deposing those entities.

94.     On April 26, 2019, Defendants opposed Lead Plaintiff's motion for class certification (the "Class Certification Opposition").   ECF Nos. 147, 148.   Among other things, Defendants argued that there was no price impact for the "Code Statements" because (i) they were puffery and (ii) information concerning sexual-harassment allegations in *Jock* had been publicly released as early as 2013.   Defendants also argued that there was no price impact for the corrective disclosures related to Signet's credit portfolio because none actually revealed any truth about Defendants' fraud. Defendants also argued that damages could not be measured on a class-wide basis, and that the claims related to the Code Statements were unmanageable because establishing liability for those claims would require Plaintiff to conduct "a series…of mini-trials" in order to prove the equivalent of a Title VII case.   Finally, Defendants argued that if the Court certified a class, it should end on May 25, 2017.

95.     In connection with class certification, Defendants also sought to review materials Dr. Hartzmark considered in connection with his reports in support of the Class Certification Motion, and also to depose him.   After Lead Plaintiff produced extensive materials Dr. Hartzmark relied on in developing his analyses, on June 7, 2019, Defendants deposed Dr. Hartzmark in connection with Lead Plaintiff's Class Certification Motion, which deposition Lead Counsel defended.

96.     On June 21, 2019, Defendants filed a supplemental memorandum in support of their opposition to Lead Plaintiff's motion for class certification (the "Supplemental

Opposition"). ECF Nos. 170, 171. Defendants' Supplemental Opposition reiterated Defendants' arguments that: (i) neither the *Jock* and Code claims nor the credit-related claims had price impact; (ii) Plaintiffs had not offered a reliable damages methodology; (iii) the *Jock* and Code claims were not manageable; and (iv) that, if the Court certified a class, it should end on May 25, 2017.

97. On June 28, 2019, Lead Plaintiff filed a motion for leave to file a supplemental brief. ECF Nos. 172, 173, 174. On July 1, 2019, the Court denied Lead Plaintiff's motion for leave. ECF No. 176.

98. On July 10, 2019, the Court issued a decision and order granting Lead Plaintiff's motion for class certification (the "Class Certification Order") in substantial part. ECF No. 177. The Court reviewed the requirements for class certification under Rule 23(a) and 23(b), finding that Lead Plaintiff had established that all were met. Specifically, the Court rejected Defendants' arguments that there was no price impact for either set of claims, that Lead Plaintiff had not established that it could reliably measure damages, and that the *Jock* and Code claims were unmanageable. However, the Court accepted Defendants' argument that the Class Period should end on May 25, 2017, when Signet announced the sale of its prime portfolio and revealed the size of its subprime portfolio.

99. On July 11, 2019, Defendants filed a letter with the Court seeking clarification of the Class Certification Order. ECF No. 178. In the letter, Defendants asked whether the Class Certification Order had declined to certify claims based on Signet's Code of Conduct. That same day, Lead Plaintiff filed a response to Defendants' letter, arguing that the Class Certification Order certified the Code of Conduct claims, along with claims based on Defendants' statements about *Jock* and Signet's credit program. ECF No. 179.

100.    Later the same day, the Court endorsed Defendants' letter, stating that it agreed with Plaintiff's counsel and there was nothing to clarify.  ECF No. 180.

**E.    Defendants' Motion for Judgment on the Pleadings, Motion for Clarification, and Motion to Stay Depositions in Light of Motion for Judgment on the Pleadings**

101.    While class certification briefing was ongoing, on May 9, 2019, Defendants moved for judgment on the pleadings with respect to the Code Statements on the ground that they were per se non-actionable under *Singh v. Cigna Corp.*, 918 F.3d 57 (2d Cir. 2019), which had been issued in March.  ECF No.149.

102.    After filing their motion for judgment on the pleadings, on May 13, 2019, Defendants filed a letter with the Court proposing that upcoming depositions of certain *Jock* Declarants be postponed until later in the deposition schedule in light of the pending motion for judgment on the pleadings.  ECF No. 152.  Defendants principally argued that if the motion were granted, those depositions would become moot because the sexual harassment part of the case would be largely eliminated and what remained could be litigated based solely on the record in *Jock*.

103.    On May 13, 2019, Lead Plaintiff responded to Defendants' letter, arguing that Defendants' request should be denied because it was based on a meritless motion for judgment on the pleadings, which was filed principally to interfere with Lead Plaintiff's right to depose key third parties and prejudiced Lead Plaintiff's ability to complete discovery by the Court-ordered deadline.  ECF No. 154.

104.    On May 14, 2019, the Court rejected Defendants' request for a stay and held that Lead Plaintiff's depositions would move forward as scheduled, adding that "[t]here will be no stay pending adjudication of the recently filed Rule 12(c) motion or for any other reason. An

order of reference to the Magistrate will issue in case efforts are made to impede the lead plaintiff EBTs while they are taking place."  ECF No. 156.

105.   On May 23, 2019, Lead Plaintiff filed a memorandum in opposition to Defendants' motion for judgment on the pleadings.  ECF No. 159.  Lead Plaintiff contended that Defendants' arguments based on *Singh* were wrong because *Singh* neither overruled longstanding precedent on puffery, nor did it create a new rule that code of conduct statements are *per se* inactionable.  Lead Plaintiff further argued that, in any case, *Singh* was factually inapposite because the statements there were far more general than the statements at issue in this case, and Lead Plaintiff had established facts demonstrating that Defendants' statements were false when made.

106.   On May 30, 2019, Defendants filed a reply in further support for their motion for judgment on the pleadings.  ECF Nos. 161, 163.

107.   On June 11, 2019, the Court denied Defendants' motion for judgment on the pleadings.  ECF No. 166.  The Court held that *Singh* did not stand for the proposition that code of conduct statements were immaterial as a matter of law, and that under the facts of this case, the Code Statements were actionable.

108.   Thereafter, on June 18, 2019, Defendants moved for reconsideration of the Court's order denying Defendants' motion for judgment on the pleadings.  ECF No. 167.

109.   Two days later, on June 20, 2019, the Court denied Defendants' motion.  ECF No. 169.

### F.     Motion to Compel and Subsequent Motion for Reconsideration

110.   As noted above, discovery in the Action was contested. Lead Counsel and Defendants' Counsel exchanged numerous letters and participated in numerous meet-and-confer sessions regarding document production and disputes over the scope of documents produced.

36

While most disputes were resolved through negotiation between the parties and without the intervention of the Court, some required presentation of the issues to the Court through letters or motion papers.

111.    During the course of discovery, while reviewing the documents produced to Lead Plaintiff by Defendants and third parties, Lead Plaintiff realized that Defendants were withholding documents relevant to Lead Plaintiff's case concerning Signet's statements to investors about the *Jock* action and issues with the Company's credit portfolio.  These documents involved Signet's communications with multiple third-party public relations firms, and Defendants withheld them from production on the grounds of attorney-client privilege.  The parties exchanged multiple letters and held several meet and confers on this issue and were unable to reach a resolution regarding the production of these documents.

112.    Ultimately, on August 19, 2019, Lead Plaintiff filed a letter motion to compel with Magistrate Judge Lehrburger in accordance with the Court's rules concerning discovery disputes.  ECF No. 181.  The matter was then transferred to Magistrate Judge Aaron.  The letter motion argued that Defendants were improperly withholding a number of documents based on a claim of privilege.  Lead Plaintiff argued that the documents being withheld were not privileged to begin with because they dealt with business rather than legal issues, and that based on Second Circuit law addressing the inclusion of third-parties in otherwise privileged correspondence, any privilege had been waived.

113.    On August 22, 2019, Defendants responded to Lead Plaintiff's motion.  ECF No. 183.  Defendants took the position that the documents being withheld dealt with purely legal issues protected by the privilege, and no waiver had occurred.

114.    On August 28, 2019, Magistrate Judge Aaron scheduled a telephone conference for September 4, 2019 to address Lead Plaintiff's letter motion and Defendants' response.  ECF No. 184.

115.    On September 4, 2019, the parties participated in a conference with Magistrate Judge Aaron.  Lead Counsel and Defendants' Counsel each presented argument on the issues raised in Lead Plaintiff's letter-motion.

116.    On September 5, 2019, Magistrate Judge Aaron issued a 13-page opinion and order granting Lead Plaintiff's letter motion to compel.  ECF No. 187.  The order required the parties to meet and confer concerning the scope of documents to be produced, and required Defendants to promptly review and produce those documents.

117.    On September 10, 2019, Defendants filed a letter-motion seeking a stay of Judge Aaron's September 5, 2019 order to "allow the parties to proceed most efficiently with the meet-and-confer process and avoid piecemeal objections and appeals," and to allow Defendants time to object to Judge Aaron's order.  ECF No. 188.  In response to Defendants' letter, Judge Aaron scheduled a second status conference with the parties for September 11, 2019.  ECF No. 189.

118.    Following the September 11 status conference, Judge Aaron granted an extension of time for Defendants to produce the withheld documents so long as Defendants timely filed objections to his September 5, 2019 opinion.  ECF No. 190.  He ruled further that the extension would expire five days after this Court ruled on Defendants' objections to his September 5 order.

119.    On September 12, 2019, Defendants filed a letter-motion seeking an extension of time to file objections to Judge Aaron's September 5, 2019 order requiring the production of certain documents.  ECF No. 191.  Lead Plaintiff filed a letter-motion in opposition to Defendants' motion the same day.  ECF No. 192.

38

120.    On September 12, 2019, this Court denied Defendants' motion.  ECF No. 193.

121.    On September 19, 2019, Defendants filed objections to Judge Aaron's September 5 opinion.  ECF Nos. 196, 197.

122.    Throughout this time period, Lead Plaintiff participated in ongoing meet and confers with Defendants regarding the production of documents that Defendants did not object to producing, and in an attempt to narrow the scope of the remaining dispute.

123.    On September 20, 2019, the parties jointly filed a letter with Magistrate Judge Aaron providing an update as to the meet and confer process regarding the withheld documents. ECF No. 198.  The parties disagreed as to approach to certain categories of the withheld documents.  Magistrate Judge Aaron then issued an order requiring that Defendants submit for in camera review examples of the documents the parties disagreed over.  ECF No. 199.

124.    On September 30, 2019, Lead Plaintiff filed responses to Defendants' objections to Judge Aaron's September 5 order.  ECF No. 211.  Lead Plaintiff principally argued that Judge Aaron correctly applied precedent on privilege from the Second Circuit.

125.    On October 7, 2019, this Court affirmed Magistrate Judge Aaron's September 5 order, holding that Judge Aaron correctly held that the documents Defendants were withholding either were not created for the purpose of obtaining legal advice (and thus were not privileged to begin with) or the privilege was waived.  ECF No. 217.

126.    Ultimately, Lead Plaintiff's victory on its motion to compel resulted in the production of thousands of relevant documents that Lead Plaintiff used in its remaining depositions, expert reports, and mediation papers.

### G.    Lead Plaintiff's Motion to Quash Third-Party Subpoenas

127.    At the same time the parties were litigating Lead Plaintiff's letter motion to compel, Defendants served four subpoenas on third parties the day before the close of fact

discovery.  One of these subpoenas was served on attorneys at the law firm of Cohen Milstein who represented the Declarants in the *Jock* action, which sought, among other things, all of Cohen Milstein's communications with the media about the *Jock* action and Declarations.

128.    It was Lead Plaintiff's opinion that certain of the subpoenas were an attempt by Defendants to discredit one of the *Jock* Declarants that provided deposition testimony in the Signet action, and that, in any case, given that the subpoenas were served just before the close of fact discovery, they were all untimely because they required the production of documents after the close of fact discovery.  Accordingly, Lead Plaintiff filed a letter motion to quash the subpoenas with the Court on September 18, 2019, arguing that the subpoenas violated the Court's discovery deadline and that allowing them to remain in effect would prejudice Lead Plaintiff because Lead Plaintiff would not be afforded the opportunity to develop a discovery record in response to any information uncovered by the subpoenas.  ECF No. 194.

129.    Defendants filed their response to Lead Plaintiff's letter-motion to quash on September 23, 2019.  ECF No. 201.  In their opposition, Defendants argued that the subpoenas were timely, that Lead Plaintiff was not prejudiced by the subpoenas, and that Lead Plaintiff lacked standing to challenge the subpoenas.

130.    On September 24, 2019, Lead Plaintiff filed a letter reply in response to Defendants' opposition.  ECF No. 203.  Lead Plaintiff reiterated the arguments it made in its opening letter motion, and responded to Defendants' arguments concerning timeliness and standing.

131.    On September 25, 2019, Magistrate Judge Aaron issued an order denying without prejudice Lead Plaintiff's letter-motion to quash.  ECF No. 204.  Specifically, the Court required

Defendants to meet and confer with the third party recipients of the subpoenas before motions to quash were filed.

132.    Thereafter, Defendants continued to confer with Cohen Milstein in an attempt to narrow the scope of documents requested by the subpoena.  Those efforts were ultimately unsuccessful.  Cohen Milstein submitted its responses and objections to the subpoena on October 4, 2019 and refused to produce documents.  As a result, Defendants filed a letter motion with Magistrate Judge Aaron on October 11, 2019 for a discovery conference in order to compel Cohen Milstein to comply with the subpoena.  ECF No. 220.  In the letter, Defendants argued that Cohen Milstein's objections to the subpoena were unfounded and that they should be required to produce responsive documents.

133.    On October 18, 2019, Lead Plaintiff filed a letter in response to Defendants' October 11 letter motion to compel.  ECF No. 223.  Lead Plaintiff argued that Defendants were seeking documents for the first time the day before the close of fact discovery that they had never before tried to obtain during discovery, and that the subpoena was in violation of the Court's Case Management Order because it required the production of documents after the close of fact discovery.  Lead Plaintiff also again argued that it would be prejudiced if the Court were to allow Defendants to pursue new discovery when Lead Plaintiff no longer had the opportunity to rebut that discovery with its own discovery or incorporate any information learned into expert reports.  Lead Plaintiff argued that the subpoena should be quashed.

134.    Also on October 18, 2019, Cohen Milstein filed a letter in response to Defendants' October 11 letter.  ECF No. 224.

135.    On October 22, 2019, Defendants filed a letter in response to Lead Plaintiff's letter.  ECF No. 226.  Defendants responded to Lead Plaintiff's arguments and argued further that the subpoena was valid and would not prejudice Lead Plaintiff.

136.    On October 24, 2019, Magistrate Judge Aaron denied Defendants' motion to compel.  ECF No. 232.  Judge Aaron found that the subpoena was not timely because it was served the day before the close of fact discovery and sought discovery for the first time.  Judge Aaron also found that the subpoena would result in additional burdens and delays, including Lead Plaintiff needing to supplement or amend its expert reports.

## H.    Expert Discovery

137.    In addition to conducting extensive fact discovery, Lead Plaintiff undertook equally extensive expert discovery.  Lead Counsel worked with its experts closely throughout each step of expert discovery to analyze the strengths and weaknesses of the case.  This process involved careful analysis of the depositions and documents produced by Defendants and third parties, as well as critical and strategic thinking about how best to use the evidence gathered throughout discovery to survive summary judgment and prove Lead Plaintiff's claims at trial.

138.    Lead Plaintiff submitted six opening expert reports by the following experts on September 20, 2019:

> (1)    Harvey L. Pitt, the former Chairman of the SEC, who opined on the importance of Signet's disclosures concerning the *Jock* litigation and the Codes, as well as the inadequacy of its response to an SEC comment letter concerning its accounting;
>
> (2)    Michael L. Hartzmark, Ph.D., who opined on loss causation and damages under the securities laws;
>
> (3)    Andrew M. Mintzer, CPA, who opined that Signet's loss reserves were materially understated in violation of GAAP;
>
> (4)    Steven J. Sherman of the financial services firm Loop Capital, who opined that a loss Signet suffered on the sale of its credit portfolio after the Class

Period was driven by the poor credit quality of the loans;

(5)   Professor Joanna L. Grossman, who opined on the significance of the sexual harassment-related evidence, the inadequacy of Signet's response to such evidence, and the risk the Company faced from it; and

(6)   Mark C. Riley, a former bank CEO, who opined that Signet's underwriting was reckless, and its portfolio was comprised of several hundred million dollars of high-risk, subprime loans.

139.   In total, Lead Plaintiff's expert reports encompassed 702 pages and cited thousands of documents and dozens of deposition transcripts.

140.   On September 30, 2019, Defendants filed a letter with Magistrate Judge Aaron seeking an extension beyond the October 25, 2019 deadline to submit their rebuttal to Professor Joanna Grossman's report.   ECF No. 212.   Defendants argued that the "sheer breadth" of Professor Grossman's report required more response time.

141.   After the matter was considered by this Court, on October 2, 2019, this Court granted Defendants an extra three weeks to submit their rebuttal to Professor Grossman's expert report, making that report due on November 15, 2019, and Lead Plaintiff's reply report due on December 9, 2019.   ECF No. 215.   Expert discovery was scheduled to close on December 13, 2019.

142.   In response to Lead Plaintiff's opening expert reports, Defendants submitted reports of the following eight experts on October 25, 2019:

(1)   Robert F. Curry, who responded to the opening report of Mr. Sherman, and opined on Signet's sale of its credit portfolio;

(2)   Karen J. Garnett, who responded to the opening report of Mr. Pitt, and opined on the adequacy of Signet's *Jock* disclosures in its SEC filings, as well as the lack of materiality of the Company's Codes of Conduct and Ethics;

(3)   Myron S. Glucksman, who responded to the opening report of Mr. Riley, and opined that Signet's in-house credit operation was conservatively managed and well-run;

(4)  Sandra K. Johnigan, CPA/CFF, CFE, who responded to the opening report of Mr. Mintzer, and opined that the methodology Signet used to set its loan loss reserves for the credit portfolio was compliant with GAAP;

(5)  Bettina B. Plevan, who responded to the opening report of Professor Grossman, and opined on the nature of the *Jock* action and the risk it posed to the Company;

(6)  Denise Neumann Martin, Ph.D., who also responded to the opening report of Professor Grossman, and opined on the nature of the declarations submitted in the *Jock* action;

(7)  Daniel R. Fischel, Chairman and President of Compass Lexecon, who responded to the opening report of Dr. Hartzmark, and opined on loss causation and damages under the securities laws; and

(8)  Ralph M. Scholten, Ph.D., who also responded to the opening report of Dr. Hartzmark, and also opined on loss causation and damages under the securities laws.

143.   On November 15, 2019, Defendants submitted the expert report of Jone M. Papinchock, Ph.D., who responded to the opening report of Professor Grossman, and opined on the Company's sexual harassment policies and procedures.

144.   In response to these rebuttal reports, BLB&G again worked closely with its experts to prepare reply expert reports responding to each of the arguments the Defendants' experts made.

145.   Between November 6 and 13, 2019, Lead Plaintiff submitted five reply reports, from Mr. Pitt, Dr. Hartzmark, Mr. Mintzer, Mr. Sherman, and Mr. Riley—at the same time as the parties were preparing for and participating in their first mediation session, as discussed below.

146.   The reply report of Professor Grossman was in the process of being written and was due to be served in December 2019, when the Court stayed the case in connection with Defendants' Rule 23(f) petition, described below.

I.      **Defendants' Rule 23(f) Petition**

147.    Following the Court's Class Certification Order on July 10, 2019 and memo endorsement denying clarification of that order on July 11, 2019, on July 24, 2019, Defendants filed a petition with the Second Circuit Court of Appeals seeking permission to appeal the Court's Class Certification Order (the "23(f) Petition"). *See In re: Signet Jewelers Limited*, No. 19-2268 (2d Cir.), ECF No. 1.  The 23(f) Petition substantively reiterated Defendants' arguments from the Opposition and Supplemental Opposition, contending that the Court had erred in granting class certification on several grounds, including that: (i) the Code of Conduct statements were immaterial under *Singh*, and so could not have had price impact; (ii) the Code claims were unmanageable, as trying them would involve "scores of mini-trials" involving the Declarants; (iii) the Court ignored evidence showing that the allegedly-concealed truth about *Jock* and Signet's adherence to its Code of Conduct had been previously revealed in a 2014 New York Times article and class certification materials from the *Jock* arbitration that were publicly available during the Class Period; and (iv) damages were not subject to a common methodology as required by *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).

148.    On August 5, 2019, Lead Plaintiff filed an opposition to Defendants' 23(f) Petition. In the opposition, Lead Plaintiff strongly argued that the Court's Class Certification Order was correct.  Specifically, Lead Plaintiff argued, among other things, that: (i) Defendants' argument that the Code statements lacked price impact because they were "puffery" was an improper materiality argument made at the class certification stage, and in any event was premised on a misreading of  *Singh*; (ii) the action was manageable, and Defendants' arguments amounted to a misreading of Lead Plaintiff's burden in proving securities-fraud claims; (iii) Defendants' truth-on-the-market argument concerning the *Jock*-related claims was factually incorrect, and was belied by the extensive record developed in the case; (iv) there was ample

evidence of price impact from the corrective disclosure alleged in connection with the *Jock* and Code of Conduct claims, and Defendants had failed to identify any confounding evidence suggesting an alternative reason for the stock price decline on that day; and (v) Lead Plaintiff's proposed damages methodology easily met the minimal requirements of *Comcast*.

149.    On August 12, 2019, Defendants sought leave from the Second Circuit to file a reply in further support of their 23(f) Petition, and attached their proposed reply. Lead Plaintiff opposed the motion on August 22, 2019, and Defendants filed a reply in support of their motion seeking leave on August 28, 2019. On September 25, 2019, Defendants sought leave to supplement the 23(f) Petition appendix with the expert report of Professor Joanna L. Grossman, one of Plaintiff's experts, which Defendants characterized as supporting their contention that Lead Plaintiff sought to "transform this Section 10(b) action into a case on sexual harassment." Lead Plaintiff opposed Defendants' motion to supplement on October 7, 2019. Defendants filed a reply to Lead Plaintiff's opposition on October 10, 2019.

150.    On November 19, 2019, the Second Circuit granted Defendants' 23(f) Petition. On November 20, 2019, the parties submitted a joint letter to the Court seeking to stay the case during the pendency of Defendants' Rule 23(f) appeal. ECF No. 243. The Court granted that request on November 21, 2019. ECF No. 244.

## III.    MEDIATION AND SETTLEMENT

151.    In August 2019—with fact discovery scheduled to close in September 2019—that the parties agreed to mediate once fact discovery was completed.

152.    After retaining Judge Phillips, the parties scheduled two full-day mediation sessions in New York.  Ultimately, a third in-person mediation session was also scheduled, as noted below.  The first mediation session was scheduled for November 18, 2019—one month after the close of fact discovery and three days after Defendants served all but one of their

rebuttal expert reports.  The second mediation session was scheduled for December 9, 2019—the same day that Defendants' final rebuttal expert report was due.

153.    In advance of the mediation sessions, the parties exchanged detailed mediation submissions concerning both the liability and damages issues in the case.  Through this briefing, and during the first mediation session, which Jacqueline H. Ray, Mississippi Special Assistant Attorney General, attended, it was clear that the disagreements between the parties were many and complex.  Nevertheless, Lead Counsel was able to begin a dialogue with Defendants about potentially resolving the case, although the parties remained extremely far apart.

154.    The parties held the second mediation session on December 9, 2019.  The session lasted for a full day and Mary Jo Woods, Mississippi Special Assistant Attorney General, attended.  The parties continued to make progress but remained far apart.  At the conclusion of the second mediation session, it became clear that a third session with all parties would be necessary to address these complex issues.  Accordingly, the parties scheduled a subsequent mediation session for January 7, 2020.

155.    On January 7, 2020, the parties held an 11-hour full-day mediation session in New York, again attended by Special Assistant Attorney General Jacqueline H. Ray.  At the conclusion of that session, Judge Phillips issued a mediator's recommendation to resolve the case for $240 million in cash.  Per Judge Phillips' deadline, on January 10, 2020, the parties accepted the recommendation.  This agreement-in-principle to settle was subject to approvals from the Attorney General of Mississippi and Signet's Board of Directors, which were subsequently obtained.

156.    Following the agreement in principle, the Parties negotiated the final terms of the Settlement and drafted the Stipulation and Agreement of Settlement and related settlement

papers.  On March 16, 2020, the Parties executed the Stipulation, which embodies the final and binding agreement to settle the Action.  On March 26, 2020, Lead Plaintiff submitted the Parties' Stipulation to the Court as part of Lead Plaintiff's motion for preliminary approval of the Settlement (the "Preliminary Approval Motion").  ECF Nos. 247-50.

157.    On April 14, 2020, the Court entered the Preliminary Approval Order, which preliminarily approved the Settlement, approved the proposed procedure to provide notice of the Settlement to potential Class Members, and set July 21, 2020 as the date for the final Settlement Fairness Hearing.  ECF No. 253.  The $240 million Settlement Amount was deposited into an escrow account and has been earning interest for the benefit of the Class.

## IV.    RISKS OF CONTINUED LITIGATION

158.    The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a $240 million cash payment.  The Settlement represents (if approved) one of the top 75 largest securities class action settlements of all time.  The recovery also represents a significant portion of the recoverable damages in the Action as determined by Lead Plaintiff's damages expert, particularly after considering Defendants' substantial arguments with respect to liability, loss causation and damages. These arguments created a significant risk that, after years of protracted litigation, Lead Plaintiff and the Settlement Class would have achieved no recovery at all, or a smaller recovery than the Settlement Amount.

### A.    The Risks of Prosecuting Securities Actions In General

159.    In recent years, securities class actions have become riskier and more difficult to prove, given changes in the law, including numerous United States Supreme Court decisions. For example, data from Cornerstone Research show that, in each year between 2010 and 2017, approximately half of all securities class actions filed were dismissed, and the percentage of dismissals was as high as 57% in 2013.  *See* Cornerstone Research, *Securities Class Action*

*Filings 2019 Year In Review* (2020), attached hereto as Exhibit 4, at 16.  In fact, well-known economic consulting firm NERA found that "[a] record 205 cases were dismissed in 2017, which marked the second consecutive year (and second year since the PSLRA became law) in which more cases were dismissed than settled." *See* NERA, Stefan Boettrich and Svetlana Starykh, Recent Trends in Securities Class Action Litigation: 2017 Full-Year Review (2018), attached hereto as Exhibit 5, at 22.

160.    Even when they have survived motions to dismiss, securities class actions can be defeated either at the class certification stage, in connection with *Daubert* motions or at summary judgment. For example, class certification has been denied in some recent securities class actions. *See, e.g.*, *Gordon v. Sonar Cap. Mgmt. LLC*, 2015 WL 1283636 (S.D.N.Y. Mar. 19, 2015); *Sicav v. James Jun Wang*, 2015 WL 268855 (S.D.N.Y. Jan. 21, 2015); *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013); *George v. China Auto. Sys., Inc.*, 2013 WL 3357170 (S.D.N.Y. July 3, 2013); *see also Colman v. Theranos, Inc.*, 325 F.R.D. 629, 651 (N.D. Cal. 2018); *In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244 (N.D. Cal. Dec. 5, 2017), *reconsideration denied*, 2018 WL 3472334 (N.D. Cal. Jan. 18, 2018), *and leave to appeal denied*, *Oklahoma Firefighters Pension & Ret. Sys. v. Finisar Corp.*, 2018 WL 3472714 (9th Cir. July 13, 2018); *Smyth v. China Agritech, Inc.*, 2013 WL 12136605 (C.D. Cal. Sept. 26, 2013); *In re STEC Inc. Sec. Litig.*, 2012 WL 6965372 (C.D. Cal. Mar. 7, 2012).

161.    Multiple securities class actions also recently have been dismissed at the summary judgment stage. *See, e.g.*, *In re Barclays Bank PLC Sec. Litig.*, No. 09-01989, (S.D.N.Y.) (summary judgment granted on September 13, 2017 after eight years of litigation); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2008), *aff'd* 597 F.3d 501 (2d Cir. 2010) (summary judgment granted after six years of litigation and millions of dollars

spent by plaintiffs' counsel); *see also In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 496 (D. Conn. 2013), *aff'd* 766 F.3d 172 (2d Cir. 2014); *Fosbre v. Las Vegas Sands Corp.*, 2017 WL 55878 (D. Nev. Jan. 3, 2017), *aff'd sub nom.*, *Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, 732 F. App'x 543 (9th Cir. 2018); *Perrin v. Sw. Water Co.*, 2014 WL 10979865 (C.D. Cal. July 2, 2014); *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1015 (S.D. Cal. 2011); *In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050 (N.D. Cal. June 19, 2009), *aff'd*, 627 F.3d 376 (9th Cir. 2010); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1211 (S.D. Cal. 2010). And even cases that have survived summary judgment have been dismissed prior to trial in connection with *Daubert* motions. *See, e.g.*, *Bricklayers and Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd*, 752 F.3d 82 (1st Cir. 2014) (granting summary judgment *sua sponte* in favor of defendants after finding that plaintiffs' expert was unreliable).

162.    Even when securities class action plaintiffs are successful in certifying a class, prevailing at summary judgment, and overcoming *Daubert* motions, and have gone to trial, there are still very real risks that there will be no recovery or substantially less recovery for class members.  For example, in *In re BankAtlantic Bancorp, Inc. Securities Litigation*, a jury rendered a verdict in plaintiffs' favor on liability in 2010. 2011 WL 1585605, at *6 (S.D. Fla. Apr. 25, 2011). In 2011, the district court granted defendants' motion for judgment as a matter of law and entered judgment in favor of the defendants on all claims. *Id*. at *38. In 2012, the Eleventh Circuit affirmed the district court's ruling, finding that there was insufficient evidence to support a finding of loss causation. *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 725 (11th Cir. 2012).

163.     There is also the increasing risk that an intervening change in the law can result in the dismissal of a case after significant effort has been expended.  The Supreme Court has heard several securities cases in recent years, often announcing holdings that dramatically changed the law in the midst of long-running cases.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318 (2015); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014); *Comcast Corp. v Behrend*, 569 U.S. 27 (2013); *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011); *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010). As a result, many cases have been lost after thousands of hours have been invested in briefing and discovery. For *example*, in *In re Vivendi Universal, S.A. Securities Litigation*, after a verdict for class plaintiffs finding Vivendi acted recklessly with respect to 57 statements, the district court granted judgment for defendants following a change in the law announced in *Morrison*. 765 F. Supp. 2d 512, 524, 533 (S.D.N.Y. 2011).

164.     In sum, securities class actions face serious risks of dismissal and non-recovery at all stages of the litigation.

**B.     The Substantial Risks of Proving Defendants' Liability and Damages in This Case**

165.     While Lead Plaintiff believes that its claims have merit, it faced substantial risks that Defendants would succeed in eliminating all or part of the case in connection with the Rule 23(f) appeal of class certification, summary judgment, pre-trial motions, at trial, or on post-trial appeal.

166.     From a "big picture" perspective, such risks were heightened here because this case lacked obvious badges of fraud that can provide significant tailwinds for the plaintiff's discovery efforts and overall case.  For example, there was no parallel SEC action against Signet that Lead Plaintiff could use to support its case or guide its discovery efforts.  Further, Signet has

not issued any restatement of financial results.  This was significant because the financial misstatements alleged in the case were Signet's loan loss reserves, which, under *Fait*, must be "subjectively false" to be actionable.  Pleading and proving the subjective falsity of Signet's loan loss reserves under *Fait* without a restatement, while not impossible, is a meaningful challenge.  Moreover, there was no significant insider stock selling.

167.    As set forth in more detail below, some of the litigation risks Lead Plaintiff faced were particularly acute with respect to the sexual harassment claims.  That said, Lead Plaintiff also faced substantial challenges to proving liability for the credit-related claims, and to proving significant damages.  Even if Lead Plaintiff and the Class were to have ultimately prevailed and obtained a judgment at trial, Signet's financial situation could have rendered moot any such victory, as the Company may have been unable to fully satisfy any such judgment.

### 1.    Claims Related to Sexual Harassment

168.    Securities fraud class action claims related to sexual harassment are relatively rare, and pursuing such claims entails a level of uncertainty that does not exist in the more typical context involving, for example, misstated revenues.   Underscoring the uncertainty inherent in these kinds of cases, two recent, high-profile securities class actions premised on sexual harassment allegations were dismissed in whole or in extremely substantial part.  A principal basis for these dismissals was that, even assuming the harassment occurred, the statements at issue—including statements made in a code of conduct—were too general to be actionable for the purposes of a securities fraud claim. *See Ferris v. Wynn Resorts Ltd.*, 2020 WL 2748309, at \*13-15 (D. Nev. May 27, 2020) (dismissing securities-fraud claims premised on sexual harassment allegations because, e.g., statements about corporate culture and code of conduct were puffery, and statements about compliance with legal obligations were not misleading); *Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 2020 WL 248729, at

*8 (S.D.N.Y. Jan. 15, 2020) (dismissing, e.g., code of conduct statements as being "far too general and aspirational to invite reasonable reliance" and amounting to "mere puffery").

169.    While Lead Plaintiff overcame this risk at the pleading stage, such arguments are not limited to the pleading stage, as noted further below.  Defendants were poised to argue in the Rule 23(f) appeal that their statements in the Code of Conduct were too general to have price impact, and were of course free to press this "puffery" argument in various forms at summary judgment, trial and on post-trial appeal.  These recent decisions demonstrate that such arguments do carry risk in this context.

170.    In addition, there was no track record of success or "playbook" for successfully prosecuting securities fraud class claims in this context.  In the face of this uncertainty, Lead Plaintiff and Lead Counsel committed extremely significant resources to this case and achieved success.  Lead Counsel is not aware of any other securities fraud class action premised on underlying allegations of sexual harassment that has achieved class certification, or been resolved for an amount comparable to the settlement in this case.

171.    In addition to this overall risk, Defendants developed multiple arguments as to these claims throughout the litigation process, each of which posed a substantial hurdle.  First, although Lead Plaintiff achieved class certification, Defendants had numerous significant class certification defenses that they were poised to raise on appeal.  As noted above, the Second Circuit granted Defendants' Rule 23(f) Petition in November 2019.  This appeal was principally targeted at the certification of the sexual harassment-related claims.  The 23(f) Petition asserted that the certification of the Section 10(b) claims based on underlying allegations of sexual harassment was "unprecedented," and that the claims represented an improper attempt to litigate employment discrimination claims under the guise of a securities fraud action.  Defendants

53

further asserted that a class alleging a "culture of sexual harassment" would have been unmanageable because individualized issues would overwhelm common ones—that is, Defendants asserted that the case would require a series of "mini-trials" on each alleged incident of sexual harassment to determine whether they in fact occurred.

172.    Defendants further contended that: (i) the market was well aware of the essence of the Declarations prior to the corrective disclosure, and (ii) the Code statements were immaterial as a matter of law under the recent Second Circuit decision in *Singh v. Cigna Corp*., 918 F.3d 57 (2d Cir. 2019), which, as noted above, held that certain statements in a code of conduct were inactionable.

173.    While Lead Plaintiff had meaningful responsive arguments to those set forth above, there was a risk that the Second Circuit could have vacated the District Court's grant of class certification as to the sexual harassment-related claims and remanded the case for further consideration, or even reversed class certification as to these claims.

174.    Had the Second Circuit agreed with Defendants that certification of the sexual harassment-related claims was undermined by recent law in *Singh*, unmanageable, or that the essence of the Declarations was known before the corrective disclosure, these claims effectively would have been removed from the case.  Such a development would have had a significant negative effect on Lead Plaintiff's ability to prevail at trial as to any of its claims.  Lead Plaintiff and Lead Counsel believe that the sexual harassment-related claims had strong jury appeal, and likely would have anchored Lead Plaintiff's trial strategy.  In any event, removing the sexual harassment-related claims from the case would have reduced damages by nearly 30% on its own, as set forth further below.

175.    Second, Defendants had a significant "truth on the market" defense, in which they asserted that the allegations in the Declarations were well-known years before the February 2017 corrective disclosure in the *Washington Post*.  As noted above, this argument formed part of Defendants' Rule 23(f) appeal, but even if Lead Plaintiff defeated it at the class certification stage, Defendants would have pressed it throughout the remainder of the litigation—at summary judgment, trial, and on any post-trial appeal.  Had it been accepted by the Second Circuit or the ultimate factfinder, it would have defeated the elements of materiality and loss causation required for these claims, and precluded recovery.

176.    For example, Defendants pointed to a March 28, 2014 *New York Times* article entitled "Women Charge Bias and Harassment in Suit Against Sterling Jewelers" as revealing the truth to the market prior to the February 27, 2017 corrective disclosure in the *Washington Post*.  The 2014 *New York Times* article discussed the *Jock* case and a redacted class certification brief filed in *Jock* that described certain of the Declarations. Among other things, the 2014 *New York Times* article described allegations of misconduct by Signet's CEO, Defendant Light, as well as other high-level executives, and discussed how the *Jock* plaintiffs had filed an expert report stating that "[u]pper management . . . created a 'climate and culture' that devalued the work of female employees."

177.    Defendants also relied on the arbitrator's class certification decision, which was released publicly on February 3, 2015, to argue that the market knew, years before the corrective disclosure, that *Jock* concerned allegations of widespread sexual harassment, and that such allegations, if true, likely contradicted Signet's Code of Conduct.  This would have been a significant argument, because the class certification decision states:

Claimants have submitted extensive evidence of alleged improper sexual conduct and comments reflecting gender stereotypes by numerous executives and senior

managers (including Sterling's CEO and all three of the DVPs who have overseen store operations for most of the last decade) throughout the Company beginning in the early 1990s and continuing to the present. This evidence consists primarily of declarations and testimony by current and former male and female Sterling employees, as well as testimony from Sterling executives and senior managers. The conduct described in the declarations and testimony has occurred in settings that are public and private, ranging from banter in hallways and elevators to interactions within Sterling stores and at the mandatory annual meeting of all Sterling managers held in Orlando, Florida. It includes references to women in sexual and vulgar ways, groping and grabbing women, soliciting sexual relations with women (sometimes as a quid pro quo for employment benefits), and creating an environment at often mandatory Company events in which women are expected to undress publicly, accede to sexual overtures and refrain from complaining about the treatment to which they have been subjected.

178.    Third, Defendants also would have made several arguments contending that the Declarations were not reflective of Signet's corporate culture during the Class Period.  As an initial matter, Defendants strenuously denied many of the allegations in the Declarations and were expected to do so at trial.

179.    Defendants also contended that many of the allegations in the Declarations, including ones concerning alleged sexual harassment by former CEO and named Defendant Light, were literally decades old, with several occurring in the 1990s and others occurring years before the Class Period began.  Defendants would have contended that decades-old sexual harassment allegations did not accurately portray Signet's culture at any relevant time, and would have been irrelevant to investors during the Class Period.

180.    Defendants also likely would have pointed to the tens of thousands of employees who worked at Sterling over the years, and compared that number to the 306 individuals who submitted Declarations, in order to argue that the number of complaints was relatively small— less than 1% of all employees—such that the allegations in the Declarations were immaterial and/or not reflective of the Company culture as a whole. Defendants submitted an expert report offering precisely such an analysis.

181.    Defendants also would have argued that Signet maintained a culture of respect. After the departure of Defendant Light, Signet appointed a female CEO, Defendant Virginia Drosos.  During the Class Period, Signet had a number of other high-ranking women executives, including former CFO and Defendant Michele Santana. Signet's senior female executives were expected to testify at trial that they had not witnessed or experienced anything like what was described in the Declarations.

182.    Moreover, Defendants would have pointed to developments following the corrective disclosure to bolster this argument.  For example, as noted above, following the February 2017 *Washington Post* article, Defendant Light was replaced by a female CEO. Further, the Company announced on March 9, 2017 that: (1) Signet had formed a new committee of Signet's Board of Directors focused on respect in the workplace, charged with developing and implementing "programs and policies to support the advancement and development" of women employees; (2) the new committee would appoint an independent consultant to review all current and future Company policies and practices, including those covering sexual harassment training, reporting, and investigation, and non-retaliation; and (3) the Board committee would establish an "independent ombudsman office to act as an informal third-party avenue to provide confidential advice to employees, to address concerns regarding the issues in the workplace, and to provide options and strategies to assist them in the resolution of workplace concerns."

183.    On April 19, 2017, Signet announced that it retained former Southern District of New York Judge Barbara Jones to conduct a thorough review of "Signet's policies and practices regarding equal opportunity and workplace expectations."  Judge Jones is a well-known and well-respected authority on workplace compliance issues.  Signet would have asserted that these actions arguably demonstrate its commitment to equal opportunity and a respectful workplace.

184.    Fourth, Defendants would have argued that *Jock* did not actually concern sexual harassment claims, and thus, they did not mischaracterize the action or its risks in Signet's litigation disclosures in its SEC filings.  In support of this argument, Defendants would have contended that the plaintiffs in *Jock* never asserted a legal claim for sexual harassment.  They would have further pointed to the fact that the arbitrator found that the Declarations were insufficient to show a widespread culture of sexual harassment for the purposes of employment discrimination claims, and that the arbitrator declined to certify the claims based on underlying sexual harassment.

185.    Finally, Defendants would have argued that the Declarations were inadmissible hearsay, *i.e.*, out-of-court statements that were being offered for their truth, and therefore could not be put before the jury at trial.  While Lead Plaintiff would have contended in response that the Declarations were not being offered for their truth, but rather for other purposes—namely, for showing scienter, because Defendants were in possession of the Declarations when they made their misstatements, and loss causation, as the information in the Declarations caused the stock price to decline—a successful motion *in limine* to exclude the Declarations could have significantly undermined the claims.

### 2.    Credit-Related Claims

186.    Lead Plaintiff also believes that its claims related to Signet's credit portfolio have merit.  Nevertheless, Lead Plaintiff acknowledges that it faced meaningful challenges with respect to the credit-related claims.  First, Defendants likely would have argued that Signet's lending practices and underwriting conformed to industry practice for consumer lending, and thus, the statements concerning the nature of its underwriting were not false.  Defendants likely would have highlighted that Signet's strategy of lending to subprime borrowers was decades old, perfectly legal, very profitable, and reasonable within the context of Signet's business.

Defendants likely would have justified Signet's willingness to take on risky borrowers as a sound business strategy by asserting that Signet used the loans to drive jewelry sales, and earned a very large margin on those sales. Defendants likely would have contended that such margins allowed the Company to safely absorb more defaults and profitably lend deeper down the credit spectrum than a traditional lender (such as a bank). Defendants in fact offered a lengthy expert report opining on these and related issues.

187.     Defendants likely would have further argued that employing such a rational, time-tested and profitable business strategy is not reckless, and in fact benefitted Signet's shareholders. Defendants were likely to contend that, if Signet were to have employed a more conservative lending strategy, it would have lost billions of dollars in sales during the Class Period, to its shareholders' detriment.

188.     Part of Signet's narrative in making this argument would likely have been that many of Signet's borrowers did not have good credit only because they were young adults who had no credit history and were making their first significant purchase: an engagement ring for their significant other. Signet could have argued that there is nothing reckless about lending to young people seeking to get engaged, and that it is profitable and worth lending to such borrowers, even if they are classified as subprime. Such arguments, as well as the prevalence and name recognition of Signet's stores—Zales, Jared, Kay, Piercing Pagoda—exacerbated the risk that Defendants' argument may persuade a jury.

189.     Second, with respect to Lead Plaintiff's allegations that Signet's loan loss reserves was understated, Defendants would have argued that their accounting complied with GAAP at all times. Defendants offered a detailed expert report in support of precisely such an argument. Defendants also would have pointed to the fact that their use of "recency" aging—which

underpinned many of Lead Plaintiff's allegations—was disclosed.  They also likely would have argued that they employed the recency method for decades, that nothing in the accounting rules prohibits the use of the recency method, and that GAAP in fact permits the use of this method for non-bank companies such as Signet.

190.    Third, Defendants would have argued that Signet's independent auditor, KPMG, signed off on all of Signet's financial statements that Lead Plaintiff asserts were misstated during the Class Period, and gave unqualified audit opinions.  Defendants likely would have contended that KPMG is a "big four" accounting firm that had no reason to be complicit in a fraud, was an expert in GAAP, thoroughly vetted the Company's financial statements numerous times during the Class Period, and repeatedly concluded that they were accurate.

191.    Fourth, as noted above, Defendants would have contended that there was no restatement of financial results, and no parallel SEC action, further lending support to their argument that their reserves were reasonable. They were likely to argue further that the ultimate sale of the portfolio for what they would have characterized as a modest loss supports the conclusion that the reported reserves were reasonable, and they offered an expert report in support of this point.

192.    Fifth, Lead Plaintiff was required to prove that the loan loss reserve statements were subjectively false under *Fait v. Regions Fin. Corp*., 655 F.3d 105 (2d Cir. 2011).  No witness testified that they believed that the reserve was inadequate or understated, and many witnesses testified to the contrary, mounting justifications for Signet's use of the recency method of aging, along the lines set forth above.  The fact that there was no restatement or SEC action would have bolstered these arguments.

193.    Sixth, Defendants likely would have argued that when "bad debt" (*i.e.*, loan defaults) at the Company increased, Defendants timely disclosed it to investors.  While Lead Plaintiff believes that it would have had strong arguments that such disclosures were incomplete, including because the Company did not disclose that bad debt was increasing due to the large number of subprime loans in its credit portfolio, there was a meaningful risk that a jury could have found that Defendants were truthful enough with investors regarding increases in bad debt during the Class Period.

194.    Finally, an allegation in the Complaint was that Former Employee 1, Signet's former Director of the Credit Information Technology and Strategy Department, attended meetings where senior executives decided to "comp" Signet's loan loss reserve to the prior year's level, instead of raising the reserve to a more appropriate level to account for the risk in the portfolio.  Former Employee 1 confirmed his statements in deposition testimony, but Defendants would have argued that there was no contemporaneous documentation of "comping" the reserve.

### 3.    Risks Associated With Damages

195.    Had this case continued, Lead Plaintiff would have argued that maximum damages were approximately $1.8 billion.  Supporting this figure would have required Lead Plaintiff to "run the table" on all liability issues for both sets of claims during the entire Class Period, plus win all contested arguments on loss causation and damages.

196.    Even if Lead Plaintiff successfully established liability for both sets of claims for the full Class Period, Defendants would have contended that the Class's maximum potential damages were a tiny fraction of that amount.  In support of this contention, Defendants would have offered numerous arguments, in support of which they offered two detailed expert reports, summarized below.

197.    Defendants would have asserted that Lead Plaintiff's damages expert used an inappropriate method—the "constant price to earnings ratio" method—to measure damages in this case.  Defendants would have argued that damages should be calculated using what they would describe as a more commonly-accepted method, such as the "constant dollar" method, which would have materially reduced the maximum recoverable damages in this case.

198.    Defendants also would have contended that the law requires that any gains on sales of Signet stock during the Class Period must be "netted out" from the damages figures, which would have also significantly reduced recoverable damages.

199.    Defendants would have further asserted that many of the corrective disclosures for the claims relating to the loan portfolio were confounded by the disclosure of information unrelated to the alleged fraud, such as the declining prospects for mall retail stores and reduced sales guidance.  As just one example, with respect to the May 26, 2016 alleged corrective disclosure, Signet announced a strategic review of its credit portfolio—but also announced a sales miss, lower-than-expected sales guidance, and declining mall traffic, all of which analysts discussed as meaningful factors affecting the Company's valuation.  Defendants would have contended that these other factors were due to macroeconomic factors unrelated to the fraud, and that when one disaggregates the impact of non-fraud related information from the stock price declines, only a small portion of some of the declines were recoverable as damages.

200.    In addition, Defendants would have argued (and offered expert testimony to the effect) that damages associated with the credit-related claims could not reasonably be much larger than the alleged reserve understatements in the case, which were less than $200 million at all times. While Lead Plaintiff had strong arguments in response, there was a risk that a jury could find this argument persuasive from an economic perspective.

201.    Further, as to the claims related to alleged sexual harassment, Defendants would have argued that there was no loss causation because the allegations in the Declarations were known to the market years before the alleged corrective disclosure, as set forth above.   If accepted, this argument would have reduced damages very substantially, by almost 30%.

202.    Moreover, even if that argument failed, Defendants would have contended that Signet's stock price rebounded shortly after the alleged corrective disclosure in the *Washington Post* article, when additional mitigating information about the sexual harassment allegations became public.  Specifically, on March 9, 2017, Signet mounted a full-throated defense of its corporate culture against the allegations detailed in the *Washington Post* article, which was followed by a rebound in Signet's stock price.  Defendants would have asserted that any damages for this claim must be offset by the amount of this stock price rebound, which would have reduced damages associated with this claim by 84-100%.

203.    In support of each of these arguments, Defendants submitted extensive expert damages reports from two different experts, Daniel Fischel and Dr. Ralph Scholten.  Defendants experts are highly experienced; in particular, Mr. Fischel is the President and Chairman of Compass Lexecon. While Lead Plaintiff believes its expert's opinions were well-substantiated and correct, these disputed issues regarding damages and loss causation would have presented the prototypical "battle of the experts" at trial.  There simply is no way to predict with any degree of certainty which expert's opinions the jury would have accepted.  Had the jury accepted some or all of Defendants' expert's views, damages would have been either eliminated or significantly reduced to no more than $130 million.

204.    The Settlement eliminates those risks and provides a substantial and certain recovery for the Class.  *See Christine Asia Co., Ltd. v. Yun Ma*, 2019 WL 5257534, at *13

(S.D.N.Y. Oct. 16, 2019) ("The Parties developed and would have presented competing evidence on these issues, including competing expert evidence. While Plaintiffs proceeded as though they had the better arguments, the risk remained that Defendants could have defeated loss causation, or significantly diminished damages[.]"); *see also, e.g.*, *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 2015 WL 6971424, at *5 (S.D.N.Y. Nov. 9, 2015), *aff'd sub nom. In re Facebook, Inc.*, 674 F. App'x 37 (2d Cir. 2016) ("[D]amages would be subject to a battle of the experts, with the possibility that a jury could be swayed by experts for Defendants, who could minimize or eliminate the amount Plaintiffs' losses. Under such circumstances, a settlement is generally favored over continued litigation."); *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at *9 (S.D.N.Y. Nov. 7, 2007) (McMahon, J.) ("[A] very lengthy and complex battle of the parties' experts likely would have ensued at trial, with unpredictable results. These risks as to liability strongly militate in favor of the Settlement.").

### 4.    Risks After Trial

205.    Even if Lead Plaintiff and the Class overcame all the above risks and prevailed at trial, Defendants would have appealed any judgment in Lead Plaintiff and the Class's favor. Such an appeal could have taken years, and could have been successful. For example, in *Glickenhaus & Co. v. Household Int'l Inc.*, 787 F.3d 408 (7th Cir. 2015), a securities fraud class action alleging a massive predatory lending scheme, the plaintiffs won a trial verdict. Defendants appealed, challenging loss causation, as well as a jury instruction about who legally "made" a statement for liability purposes. Defendants prevailed, and the Seventh Circuit put aside the judgment that plaintiffs had won.

206.    Moreover, even if a judgment in Lead Plaintiff's favor was affirmed on appeal, Defendants could then have challenged the reliance and damages of each class member, including Lead Plaintiff, in an extended series of individual proceedings. That process could

have taken multiple additional years, and could have severely reduced any recovery to the Class as Defendants "picked off" class members.   For example, in *In re Vivendi Universal SA Securities Litigation*, 765 F. Supp. 2d 520 (S.D.N.Y. 2011), the district court acknowledged that in any post-trial proceedings, "Vivendi is entitled to rebut the presumption of reliance on an individual basis," and that "any attempt to rebut the presumption of reliance on such grounds would call for separate inquiries into the individual circumstances of particular class members." 765 F. Supp. 2d at 583-584.   Over the course of several years, Vivendi indeed successfully challenged several class members' damages in individual proceedings.

207.   Thus, even if Lead Plaintiff and the Class were to have prevailed at trial, the subsequent processes of an appeal and challenges to individual class members could have severely limited, or even eliminated, any recovery—and, at minimum, could have added several years of further delay.

### 5.   Risks Associated with Signet's Ability to Pay

208.   During the Class Period, Signet's stock price reached a high of $150.94 and its market capitalization peaked at over $12 billion.   On June 16, 2020, Signet's stock price closed at $12.12, and its market capitalization has declined to approximately $634 million. Accordingly, the proposed settlement represents approximately 38% of the Company's entire value—another indicator of the proposed settlement's strength.

209.   Notably, Lead Plaintiff and the Class's potential trial damages, even if substantially reduced by the factors discussed above, would have constituted all or nearly all of the Company's market capitalization.   This means that, if Lead Plaintiff were to have prevailed at trial and obtained a judgment for a significant portion of the potential damages at issue in this case, and Signet's financial condition failed to improve, there would have been a serious risk that

the Company would be unable to pay any judgment and may even have been forced to file for bankruptcy.

210.    Indeed, Signet's financial position has grown increasingly precarious in recent years. Signet's stock price has dropped almost 75% since the end of the Class Period (and approximately 70% in the last 18 months), and it has repeatedly reported disappointing results driven by a host of factors, including declining mall retail sales, weakness in sales of its legacy inventory, and increased competition and need for promotional activity (i.e., discounting).  For example, in fiscal year 2019, Signet posted an operating loss of $765 million.  The Company's North American store base has also shrank well over 10% since early 2017.  Signet's poor business performance, shrinking footprint, and the uncertain retail environment exacerbated the ability-to-pay risk Lead Plaintiff faced after trial.

211.    These concerns have intensified in the wake of the COVID-19 outbreak, which has hit Signet, a mall-based jewelry retailer, especially hard. Signet stock traded as low as $5.84 per share—corresponding to a market capitalization of approximately $306 million—on March 23, 2020.  While Signet's share price has rebounded somewhat in the following months, the risks to the Company's financial health remain significant.  In particular, on June 9, 2020, Signet announced disappointing first quarter results and nearly 400 further permanent store closures (representing a more than 10% further store count reduction).  Signet stock dropped by approximately 34% over the next three trading sessions.

## V.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE IN LIGHT OF THE POTENTIAL RECOVERY IN THE ACTION

212.    The $240 million Settlement represents an excellent recovery for the Class.  It is also a very favorable result when it is considered in relation to the range of potential recoveries that might be recovered if Lead Plaintiff prevailed at trial, which was far from certain for the

reasons noted above.  As noted above, had this case continued to trial, Lead Plaintiff would have argued that maximum potential damages were $1.8 billion.  However, as stated in Lead Plaintiff's Preliminary Approval Motion, achieving that figure would have required Lead Plaintiff to pitch three consecutive "perfect games" at trial by: (i) proving Defendants' liability for the claims related to alleged sexual harassment for the entire Class Period; (ii) proving Defendants' liability for the claims related to the loan portfolio and loss reserves for the entire Class Period; and (iii) prevailing on every contested issue concerning loss causation and damages.  Under this scenario, the proposed Settlement represents almost 14% of maximum potential damages.

213.   However, as also noted in the Preliminary Approval Motion, obtaining a $1.8 billion judgment likely would have been a pyrrhic victory, and therefore is not an accurate benchmark against which to measure the reasonableness of the proposed Settlement in isolation.  If Lead Plaintiff actually *did* obtain a $1.8 billion judgment, there is no assurance that the Company could have satisfied it, and it might have been forced into bankruptcy.  This likely would have prevented Lead Plaintiff and the Class from collecting on the judgment.

214.   Moreover, as explained above, based on the detailed reports of two experts, Defendants contended that even if Lead Plaintiff successfully established liability, damages could be no more than $130 million—an amount that is substantially less than the proposed Settlement.

215.   For all these reasons, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement is fair, reasonable, and adequate, and that it is in the best interests of the Class to accept the immediate and substantial benefit conferred by the Settlement, instead of incurring the

significant risk that the Class might recover a lesser amount, or nothing at all, after additional protracted and arduous litigation.

## VI.    LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

216.    The Court's Preliminary Approval Order directed that the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Litigation Expenses (the "Notice") and the Proof of Claim and Release Form ("Claim Form") be disseminated to the Class.  The Preliminary Approval Order also set a June 30, 2020 deadline for Class Members to submit objections to the Settlement, the Plan of Allocation, or the Fee and Expense Application or to request exclusion from the Class and set a final approval hearing date of July 21, 2020.

217.    In accordance with the Preliminary Approval Order, Lead Counsel instructed JND Legal Administration ("JND"), the Court-approved Claims Administrator, to disseminate copies of the Notice and Claim Form by mail and to publish the Summary Notice.  The Notice contains, among other things, a description of the Action, the Settlement, the proposed Plan of Allocation, and Class Members' rights to participate in the Settlement, to object to the Settlement, the Plan of Allocation, or the Fee and Expense Application, or to exclude themselves from the Class.  The Notice also informs Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund, net of expenses, and for payment of Litigation Expenses in an amount not to exceed $4,000,000, including reimbursement of the reasonable costs and expenses incurred by Lead Plaintiff directly related to its representation of the Class.  To disseminate the Notice, JND obtained information from Signet and from banks, brokers, and other nominees regarding the names and addresses of potential Class Members.  *See* Declaration of Luiggy Segura Regarding: (A) Mailing of the Notice and Claim Form;

(B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date (the "Segura Decl."), attached as Exhibit 2, at ¶¶ 3-7.

218.    On April 30, 2020, JND mailed 9,677 copies of the Notice and Claim Form (together, the "Notice Packet") to potential Class Members and nominees by first-class mail.  *See* Segura Decl. ¶¶ 3-4.  Through June 15, 2020, JND disseminated 199,551 Notice Packets.  *Id.* ¶ 7.

219.    On May 13, 2020, in accordance with the Preliminary Approval Order, JND caused the Summary Notice to be published in the *Wall Street Journal* and to be transmitted over the *PR Newswire*.  *See id*. ¶ 8.

220.    Lead Counsel also caused JND to establish a dedicated settlement website, www.SignetSecuritiesLitigation.com, to provide potential Class Members with information concerning the Settlement and access to downloadable copies of the Notice and Claim Form, as well as copies of the Stipulation, Preliminary Approval Order, and Complaint.  *See id*. ¶ 10. Copies of the Notice and Claim Form are also available on Lead Counsel's website, www.blbglaw.com.

221.    As noted above, the deadline for Class Members to file objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or to request exclusion from the Class, is June 30, 2020.  To date, eight requests for exclusion have been received (*see* Segura Decl. ¶ 11) from individual investors and there are currently no objections to the Settlement, the Plan of Allocation, or the Fee and Expense Application.  Lead Plaintiff will file reply papers in support of final approval of the Settlement on July 14, 2020, after the deadline for submitting requests for exclusion and objections has passed, and will address all requests for exclusion and any objections received.

## VII.    PROPOSED ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

222.    In accordance with the Preliminary Approval Order, and as provided in the Notice, all Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the Settlement Fund less (i) any Taxes, (ii) any Notice and Administration Costs, (iii) any Litigation Expenses awarded by the Court, (iv) any attorneys' fees awarded by the Court, and (v) any other costs or fees approved by the Court) must submit valid Claim Forms with all required information postmarked no later than August 28, 2020.  As provided in the Notice, the Net Settlement Fund will be distributed among Class Members according to the plan of allocation approved by the Court.

223.    Lead Plaintiff's damages expert developed the proposed Plan of Allocation in consultation with Lead Counsel.  Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Class Members who suffered losses as a result of the conduct alleged in the Complaint.

224.    The Plan of Allocation is included in the mailed Notice.  *See* Notice, attached as Exhibit A to the Segura Decl., at pp. 11-15.  As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Class Members might have been able to recover after trial or estimates of the amounts that will be paid to Authorized Claimants under the Settlement.  Instead, the calculations under the Plan are only a method to weigh the claims of Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund.

225.    In developing the Plan of Allocation in conjunction with Lead Counsel, Lead Plaintiff's damages expert calculated the estimated amount of alleged artificial inflation in the per share closing prices of Signet common stock that was allegedly proximately caused by Defendants' alleged materially false and misleading statements and omissions.  In calculating the

estimated artificial inflation allegedly caused by Defendants' alleged misrepresentations and omissions, Lead Plaintiff's damages expert considered price changes in Signet common stock in reaction to certain public announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and omissions, adjusting for price changes that were attributable to market or industry forces and other negative information unrelated to Lead Plaintiff's allegations, as well as changes in inflation throughout the Class Period, based on assumptions related to the case provided by Lead Counsel.  *See* Notice ¶ 57.

226.    Under the Plan of Allocation, a "Recognized Loss Amount" or "Recognized Gain Amount" will be calculated for each purchase or acquisition of Signet common stock during the period from August 29, 2013 through and including May 24, 2017 that is listed in the Claim Form and for which adequate documentation is provided.  *Id.* ¶ 60.  The calculation of Recognized Loss Amounts will depend upon several factors, including: (a) when the shares of Signet common stock were purchased or otherwise acquired, and at what price; and (b) whether the Signet common stock shares were sold or held through the end of the Class Period or the 90-day look-back period under the PSLRA, and if the shares were sold, when and for what amounts. *Id.* ¶¶ 59-61.   In general, the Recognized Loss Amount will be the difference between the estimated artificial inflation on the date of purchase and the estimated artificial inflation on the date of sale, or the difference between the actual purchase price and sales price, whichever is less. *Id.* ¶ 59.

227.    Claimants who purchased and sold all their shares of Signet common stock before the first corrective disclosure, or who purchased and sold all their shares between two consecutive dates on which artificial inflation was allegedly removed from the price of Signet common stock (that is, they did not hold the shares over a date where artificial inflation was

allegedly removed from the stock price), will have no Recognized Loss Amount under the Plan of Allocation with respect to those transactions because any loss they suffered would not have been caused by the disclosure of the alleged fraud.  *Id.* ¶ 59.

228.    Under the Plan of Allocation, Claimants' Recognized Loss Amounts will be netted against their Recognized Gain Amounts, if any, to determine the Claimants' "Recognized Claims," and the Net Settlement Fund will be allocated *pro rata* to Authorized Claimants based on the relative size of their Recognized Claims.  Notice *Id.* ¶¶ 62, 70-71.  Once the Claims Administrator has processed all submitted claims it will make the *pro rata* distributions to eligible Class Members, until additional re-distributions are no longer cost effective.  *Id.* ¶ 73.  At such time, any remaining balance will be contributed to non-sectarian, not-for-profit, 501(c)(3) organization(s) approved by the Court.  *Id.*

229.    In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Class Members based on the losses they suffered on transactions in Signet common stock that were attributable to the conduct alleged in the Complaint.  Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

230.    As noted above, through June 15, 2020, 199,551 copies of the Notice, which contains the Plan of Allocation and advises Class Members of their right to object to the proposed Plan of Allocation, have been sent to potential Class Members.  S*ee* Segura Decl. ¶ 7.  To date, no objections to the proposed Plan of Allocation have been received.

## VIII.   THE FEE AND EXPENSE APPLICATION

231.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying to the Court, on behalf of Plaintiff's Counsel, for an award of attorneys' fees in the amount of 25% of the Settlement Fund, net of Court-approved Litigation

Expenses (the "Fee Application").  Lead Counsel also requests payment for expenses that Plaintiff's Counsel incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $3,149,815.55 and reimbursement to Lead Plaintiff MissPERS in the amount of $25,410.00 for costs and expenses that it incurred directly related to its representation of the Class, in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(4) (collectively, the "Expense Application").

232.    The legal authorities supporting the requested fee and expenses are discussed in Lead Counsel's Fee Memorandum.  The primary factual bases for the requested fee and expenses are summarized below.

### A.    The Fee Application

233.    For the efforts of Plaintiff's Counsel on behalf of the Class, Lead Counsel is applying for a fee award to be paid from the Settlement Fund on a percentage basis.  As discussed in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the Class's interest in achieving the maximum recovery in the shortest amount of time required under the circumstances and has been recognized as appropriate by the U.S. Supreme Court and the Second Circuit Court of Appeals for cases of this nature.

234.    Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is reasonable and should be approved.  As discussed in the Fee Memorandum, a 25% fee award is well within the range of percentages awarded in securities class actions in this Circuit and elsewhere in comparable settlements.

### 1.     Lead Plaintiff Has Authorized and Supports the Fee Application

235.    Lead Plaintiff MissPERS is a sophisticated institutional investor that closely supervised, monitored, and actively participated in the prosecution and settlement of the Action. *See* Ray Decl. ¶¶ 2-7.  Lead Plaintiff has evaluated the Fee Application and fully supports the fee requested, which is consistent with the fee agreement entered into by MissPERS and Lead Counsel at the outset of the litigation.  *Id.* at ¶¶ 9-10.  After the agreement to settle the Action was reached, Lead Plaintiff reviewed the proposed fee and believes it is fair and reasonable in light of the outstanding result obtained for the Class, the quality of the work performed by Plaintiff's Counsel, and the risks undertaken by counsel.  *Id.* at ¶ 9.  Lead Plaintiff's endorsement of Lead Counsel's fee request further demonstrates its reasonableness and should be given weight in the Court's consideration of the fee award.

### 2.     The Time and Labor Devoted to the Action by Plaintiff's Counsel

236.    As defined above, Plaintiff's Counsel are the Court-appointed Lead Counsel BLB&G and Gadow Tyler, PLLC ("Gadow Tyler"), additional counsel for Lead Plaintiff MissPERS.

237.    As described above in greater detail, the work that Plaintiff's Counsel performed in this Action included, among other things: (i) conducting an extensive investigation into the alleged fraud, which included a detailed review of publicly-available information from SEC filings, analyst reports, conference call transcripts, press releases, news articles, Signet's corporate website, and other publicly available sources of information concerning Signet, as well as interviews with former Signet employees and consultations with experts in financial economics and accounting; (ii) drafting and filing three detailed amended complaints asserting violations of the Exchange Act against Defendants; (iii) successfully defeating Defendants' motion to dismiss the Complaint, in large part, through extensive briefing; (iv) obtaining

certification of the Class, which involved the submission of an expert report on market efficiency and the availability of class-wide damages methodologies, defending the depositions of Lead Plaintiff's representatives and expert, deposing Defendants' experts, and the submission of a rebuttal expert report; (v) defeating Defendants' motion for judgment on the pleadings; (vi) undertaking substantial fact and expert discovery efforts, including producing nearly 200,000 pages of Lead Plaintiff's documents to Defendants in response to their requests, drafting and serving extensive discovery requests on Defendants and document subpoenas upon numerous third parties, serving interrogatories and litigating discovery disputes, reviewing and analyzing approximately 3.6 million pages of documents produced by Defendants and third parties, taking, defending and participating in 31 depositions, and exchanging 20 expert reports with Defendants on a host of complex issues; (vii) consulting extensively throughout the litigation with experts regarding loss causation, damages, accounting, consumer loan underwriting, corporate disclosure, and sexual harassment issues that were central to this Action; (viii) engaging in extensive, arm's-length settlement negotiations to achieve the Settlement, including three all-day, in person mediation sessions; and (ix) drafting and negotiating the Settlement Stipulation and related settlement documentation.

238. Throughout the litigation, I maintained control of and monitored the work performed by other lawyers at BLB&G on this case. Specifically, most of the major tasks in the case—drafting sections of each pleading, motion, or discovery request or response, negotiating particular discovery issues with Defendants or third parties—were handled primarily by me with the assistance of one of the other lawyers on the team. I personally handled client communications, strategy meetings, and was involved in all aspects of the settlement process. More junior attorneys and paralegals worked on matters appropriate to their skill and experience

level.  Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of the Action.

239.     Attached hereto as Exhibits 3A and 3B, respectively, are my declaration on behalf of BLB&G and the declaration of Jason M. Kirschberg on behalf of Gadow Tyler, in support of Lead Counsel's motion for an award of attorneys' fees and litigation expenses (the "Fee and Expense Declarations").  Each of the Fee and Expense Declarations includes a schedule summarizing the lodestar of the firm and the litigation expenses it incurred, delineated by category.  The Fee and Expense Declarations indicate the amount of time spent on the Action by the attorneys and professional support staff of each firm and the lodestar calculations based on their current hourly rates.   The Fee and Expense Declarations were prepared from contemporaneous daily time records regularly maintained and prepared by the respective firms, which are available at the request of the Court.  The first page of Exhibit 3 is a chart that summarizes the information set forth in the Fee and Expense Declarations, listing the total hours expended, lodestar amounts, and litigation expenses for each Plaintiff's Counsel's firm, and gives totals for the numbers provided.

240.     As set forth in Exhibit 3, Plaintiff's Counsel expended a total of 69,572.40 hours in the investigation, prosecution, and resolution of this Action through June 9, 2020.  The resulting lodestar is $29,880,618.75.  The vast majority of the total lodestar—approximately 99%—was incurred by Lead Counsel.  Lead Counsel has and will continue to invest substantial time and effort in this case after the June 9, 2020 cut-off imposed for their lodestar submissions on this application, including by overseeing the distribution of funds to eligible claimants.

241.     If the Court awards the total requested Litigation Expenses, the requested fee of 25% of the Settlement Fund, net of expenses, represents $59,206,193.61 (plus interest accrued at

the same rate as the Settlement Fund), and therefore represents a multiplier of approximately 1.98 on Plaintiff's Counsel's lodestar.  As discussed in further detail in the Fee Memorandum, the requested multiplier is well within the range of fee multipliers typically awarded in comparable securities class actions and in other class actions involving significant contingency-fee risk, in this Circuit and elsewhere.

### 3.  The Experience and Standing of Lead Counsel

242.  As demonstrated by the firm résumé attached as Exhibit 3A-3 hereto, BLB&G is among the most experienced and skilled law firms in the securities-litigation field, with a long and successful track record representing investors in cases of this kind, and is consistently ranked among the top plaintiffs' firms in the country.  Further, BLB&G has taken complex cases like this to trial, and is among the few firms with experience doing so on behalf of plaintiffs in securities class actions.  I believe that this willingness and ability to take cases to trial added valuable leverage during the settlement negotiations.

### 4.  The Standing and Caliber of Defendants' Counsel

243.  The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition.  Here, Defendants were represented by Weil, Gotshal & Manges LLP, one of the country's most prestigious and experienced defense firms, which vigorously represented its clients.  In the face of this experienced, formidable, and well-financed opposition from one of the nation's top defense firms, Lead Counsel was nonetheless able to persuade Defendants to settle the case on terms that are highly favorable to the Class.

### 5. The Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases

244.    The prosecution of these claims was undertaken entirely on a contingent-fee basis, and the considerable risks assumed by Lead Counsel in bringing this Action to a successful conclusion are described above.  Those risks are relevant to the Court's evaluation of an award of attorneys' fees.  Here, the risks assumed by Lead Counsel, and the time and expenses incurred by Lead Counsel without any payment, were extensive.

245.    From the outset of its retention, Lead Counsel understood that it was embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action and that funds were available to compensate staff and to cover the considerable litigation costs that a case like this requires.  With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Lead Counsel received no compensation during the course of the Action and have incurred over $3,149,000 in expenses in prosecuting the Action for the benefit of the Class.

246.    Lead Counsel also bore the risk that no recovery would be achieved.  As discussed above, from the outset, this case presented multiple risks and uncertainties that could have prevented any recovery whatsoever.  Despite the most vigorous and competent efforts, success in contingent-fee litigation like this is never assured.

247.    Lead Counsel knows from experience that the commencement and prosecution of a class action do not guarantee a settlement.  To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and legal arguments that are needed to sustain a complaint or

win at class certification, summary judgment, and trial, or on appeal, or to cause sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

248. Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors, particularly institutional investors, take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

249. Lead Counsel's extensive and persistent efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Class. In these circumstances and in consideration of the hard work and the excellent result achieved, I believe that the requested fee is reasonable and should be approved.

### 6. The Reaction of the Class to the Fee Application

250. As stated above, through June 15, 2020, more than 199,000 Notice Packets had been mailed to potential Class Members advising them that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund, net of Court-approved Litigation Expenses. *See* Segura Decl. ¶ 7. In addition, the Court-approved Summary Notice was published in the *Wall Street Journal* and transmitted over the *PR Newswire*. *Id.* ¶ 8. To date, no objections to the request for attorneys' fees have been received. Should any objections be submitted, they will be addressed in Lead Counsel's reply papers to be filed on July 14, 2020, after the deadline for submitting objections has passed.

251.    In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the outstanding result obtained, the quality of the work performed, the risks of the Action, and the fully contingent nature of the representation, Lead Counsel respectfully submits that a fee award of 25% of the Settlement Fund, net of expenses, resulting in a lodestar multiplier of approximately 1.98 is fair and reasonable, and is supported by the fee awards that courts have granted in other comparable cases.

### B.    The Litigation-Expense Application

252.    Lead Counsel also seeks payment from the Settlement Fund of $3,149,815.55 in litigation expenses that were reasonably incurred by Plaintiff's Counsel in commencing, litigating, and settling the claims asserted in the Action.

253.    From the outset of the Action, Plaintiff's Counsel have been cognizant of the fact that they might not recover any of their expenses, and, further, if there were to be reimbursement of expenses, it would not occur until the Action was successfully resolved, often a period lasting several years.   Plaintiff's Counsel also understood that, even assuming that the case was ultimately successful, reimbursement of expenses would not necessarily compensate them for the lost use of funds advanced by them to prosecute the Action, and any attorneys' fee percentage awarded to Plaintiff's Counsel would be net of any awarded expenses.  Consequently, counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case

254.    As shown in Exhibit 3 hereto, Plaintiff's Counsel have incurred a total of $3,149,815.55 in Litigation Expenses in prosecuting the Action.   These expense items are incurred separately by Plaintiff's Counsel, and these charges are not duplicated in counsel's hourly rates.

255.     Of the total amount of Plaintiffs' Counsel's expenses, $2,004,360.72, or approximately 64%, was incurred for the retention of experts.  As noted above, Lead Counsel consulted with experts in the fields of loss causation and accounting during its investigation and the preparation of the amended complaints, and consulted further with its damages expert during the settlement negotiations with Defendants and the development of the proposed Plan of Allocation.  Lead Counsel also retained and consulted extensively with experts regarding the accounting, consumer loan underwriting, corporate disclosure, and sexual harassment issues that were central to this litigation, among others.

256.     Another large component of the Litigation Expenses for which payment is sought document management/litigation support costs, which amount to $442,528.65, or approximately 14% of the total expenses.

257.     Another significant expenditure in this Action was for online legal and factual research, which was necessary to prepare the amended complaints, research the law pertaining to the claims asserted in the Action, oppose Defendants' motions to dismiss and for judgment on the pleadings, brief and obtain class certification, as well as to litigate discovery disputes, including briefing a motion to compel.  The charges for online research amounted to $133,711.52, or approximately 4% of the total amount of expenses.

258.     The other expenses for which Lead Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely passed on to clients billed by the hour.  These expenses include, among others, mediation costs, costs of out-of-town travel, service of process expenses, court reporting, copying costs, and postage and delivery expenses.

259.    All of the Litigation Expenses incurred by Plaintiff's Counsel were reasonable and necessary to the successful litigation of the Action and have been approved by Lead Plaintiff. *See* Ray Decl. ¶ 10.

260.    Additionally, Lead Plaintiff MissPERS seeks reimbursement of the reasonable costs and expenses that it incurred directly in connection with its representation of the Class. Such payments are expressly authorized and anticipated by the PSLRA, as more fully discussed in the Fee Memorandum.   Lead Plaintiff seeks reimbursement of $25,410.00 for the time expended in connection with the Action by the following attorneys of the Office of the Attorney General of the State of Mississippi, which serves as legal counsel to MissPERS:  Jacqueline H. Ray, Special Assistant Attorney General and Mary Jo Woods, Special Assistant Attorney General. Among other things, these attorneys spent a substantial amount of time communicating with Lead Counsel concerning strategy; reviewing and commenting on pleadings and motion papers filed in the Action; gathering and producing documents in response to discovery requests; preparing for, traveling to, and attending the mediation sessions in New York City before Judge Phillips; and evaluating and approving the proposed Settlement.  *See* Ray Decl. ¶¶ 5-7.

261.    The Notice informed potential Class Members that Lead Counsel would be seeking payment of Litigation Expenses in an amount not to exceed $4,000,000, which might include an application for the reasonable costs and expenses incurred by Lead Plaintiff directly related to its representation of the Class.   Notice ¶¶ 5, 76.   The total amount requested, $3,175,225.55, which includes $3,149,815.55 for expenses incurred by Plaintiff's Counsel and $25,410.00 for costs and expenses incurred by Lead Plaintiff, is significantly below the $4,000,000 that Class Members were advised could be sought.  To date, no objection has been raised as to the maximum amount of expenses set forth in the Notice.

262.   The expenses incurred by Plaintiff's Counsel and Lead Plaintiff were reasonable and necessary to represent the Class and achieve the Settlement.   Accordingly, Lead Counsel respectfully submits that the Litigation Expenses should be paid in full from the Settlement Fund.

263.   Attached to this declaration are true and correct copies of the following documents previously cited in this declaration:

| | |
|---|---|
| Exhibit 1: | Declaration of Jacqueline H. Ray, Special Assistant Attorney General, Legal Counsel to the Public Employees' Retirement System of Mississippi, in Support of: (I) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses |
| Exhibit 2: | Declaration of Luiggy Segura Regarding:  (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date |
| Exhibit 3: | Summary of Plaintiff's Counsel's Lodestar and Expenses |
| Exhibit 3A: | Declaration of John Rizio-Hamilton in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses, Filed on Behalf of Bernstein Litowitz Berger & Grossmann LLP |
| Exhibit 3B: | Declaration of Jason M. Kirschberg in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses, Filed on Behalf of Gadow Tyler, PLLC |
| Exhibit 4: | Cornerstone Research, Securities Class Action Filings 2019 Year In Review (2020) |
| Exhibit 5: | NERA, Stefan Boettrich and Svetlana Starykh, Recent Trends in Securities Class Action Litigation: 2017 Full-Year Review (2018) |
| Exhibit 6: | *In re Pfizer Inc. Sec. Litig.*, No. 04-cv-09866 (LTS), ECF No. 727 (S.D.N.Y. Dec. 21, 2016) |
| Exhibit 7: | *Anwar v. Fairfield Greenwich Ltd.*, 1:09-cv-00118, ECF Nos. 1099, 1233, 1457, and 1569 (S.D.N.Y. March 28, 2013, November 22, 2013, November 20, 2015 and May 6, 2016) |
| Exhibit 8: | *In re Williams Sec. Litig.*, No. 02-cv-72-SPF, ECF No. 1638 (N.D. Okla. Feb. 12, 2007) |

Exhibit 9:     *Schuh v. HCA Holdings Inc.*, No. 3:11-cv-01033, ECF No. 563 (M.D. Tenn. Apr. 14, 2016)

Exhibit 10:    *In re Wilmington Trust Sec. Litig.*, No. 10-cv-00990-ER, ECF No. 842 (D. Del. Nov. 19, 2018)

Exhibit 11:    *La. Mun. Police Emps. Ret. Sys. v. Green Mountain Coffee Roasters, Inc.*, 2:11-cv-00289 (WKS), ECF No. 349 (D. Vt. Oct. 22, 2018)

Exhibit 12:    *Bach v. Amedisys, Inc.*, No. 1:10-cv-00395-BAJ-RLB, ECF No. 354 (M.D. La. Dec. 19, 2017)

## IX.   CONCLUSION

264.   For all the reasons discussed above, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate.   Lead Counsel further submits that the requested fee in the amount of 25% of the Settlement Fund, net of expenses, should be approved as fair and reasonable, and the requests for payment of Plaintiff's Counsel's expenses in the amount of $3,149,815.55 and reimbursement of Lead Plaintiff's costs and expenses in the amount of $25,410.00 should also be approved.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, this 16th day of June, 2020.

*/s/ John Rizio-Hamilton*
John Rizio-Hamilton

84