**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE SIGNET JEWELERS LIMITED
SECURITIES LITIGATION

Civil Action No. 1:16-cv-06728-CM-SDA



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/21/2020

**DECISION AND ORDER APPROVING SETTLEMENT, PLAN OF ALLOCATION**
**AND THE FEE AWARD**

McMahon, C.J.:

In accordance with Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiff

Public Employees' Retirement System of Mississippi ("Lead Plaintiff" or "MissPERS"), on behalf

of itself and the Court-certified Class, moves for approval of a settlement resolving all claims in

this Action for $240 million in cash (the "Settlement"). Lead Plaintiff has agreed to settle all claims

in the Action in exchange for a cash payment of $240 million, which has been deposited into an

escrow account. The Settlement: (i) is the culmination of over two and a half years of vigorous

litigation by Lead Plaintiff and Lead Counsel; (ii) is the product of an extensive mediation process

conducted under the guidance of a former federal judge, who is an experienced class-action

mediator; and (iii) represents a substantial portion of the reasonably recoverable damages in this

case. For those reasons, the Settlement is APPROVED.

Lead Plaintiff also seeks approval of a plan of allocation for distribution of the proceeds of

the Settlement (the "Plan of Allocation"). The Plan of Allocation is APPROVED.

Finally, court-appointed Lead Counsel, Bernstein Litowitz Berger & Grossmann LLP ("Lead Counsel"), on behalf of Plaintiff's Counsel, moves for an award of attorneys' fees in the amount of 25% of the Settlement Fund, net of Court-approved Litigation Expenses. Lead Counsel also seeks $3,149,815.55 for Litigation Expenses reasonably and necessarily incurred by Plaintiff's Counsel in prosecuting and resolving the Action, and $25,410.00 for costs incurred by Lead Plaintiff directly related to its representation of the Class, as authorized by the Private Securities Litigation Reform Act of 1995 ("PSLRA").[1] Those amounts are APPROVED.

## I.   GENERAL RULES ON APPROVING SETTLEMENT OF CLASS ACTIONS

A class-action settlement approval requires the Court to find it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The Court examines both the negotiating process leading to the settlement, and the settlement's substantive terms. *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) [hereinafter "*Visa*"]; *In re Citigroup Inc. Sec. Litig.*, 2014 WL 2112136, at *2-3 (S.D.N.Y. May 20, 2014).

Under Rule 23(e)(2), amended on December 1, 2018, this Court considers:

(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Historically, courts in the Second Circuit consider the following factors set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) in evaluating a class-action settlement:

---

[1]  Unless otherwise noted, capitalized terms have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated March 16, 2020 (ECF No. 247-1) (the "Stipulation"), or in the Declaration of John Rizio-Hamilton in Support of (I) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses (ECF No. 258) (the "Rizio-Hamilton Declaration" or "Rizio-Hamilton Decl.").. Citations to "¶ __" refer to paragraphs in the Rizio-Hamilton Declaration and citations to "Ex. __" refer to exhibits to that Declaration.

(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Id.* at 463 (citations omitted), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000); *see also Visa*, 396 F.3d at 117.

As demonstrated herein, the Settlement satisfies the factors set forth in Rule 23(e)(2) and *Grinnell* and, accordingly, is approved.

### A.   The Proposed Settlement is Procedurally Fair

"Rule 23(e)(2)(A), which requires adequate representation, and Rule 23(e)(2)(B), which requires arm's-length negotiations, constitute the 'procedural' analysis of the fairness inquiry." *Christine Asia Co., Ltd., et al., v. Jack Yun Ma, et al.*, No. 15-md-02631, 2019 WL 5257534, at *9 (S.D.N.Y. Oct. 16, 2019) (citations and internal quotations omitted). Each of these factors supports approval of the proposed Settlement.

### 1.   Lead Plaintiff and Lead Counsel Have Adequately Represented the Class

The "adequacy requirement entails inquiry as to whether: 1) plaintiffs' interests are antagonistic to the interest of other members of the class and 2) plaintiffs' attorneys are qualified, experienced and able to conduct the litigation." *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 99 (S.D.N.Y. 2016) (internal quotation marks omitted). Here, Lead Plaintiff and Lead Counsel have adequately represented the Class in their prosecution of the Action for over two and a half years and in the negotiation and achievement of the Settlement. Lead Plaintiff has claims that are typical of and coextensive with those of other Class Members and has no interests antagonistic to those of other Class Members. Like other Class Members, Lead Plaintiff has an interest in obtaining the

3

largest possible recovery from Defendants. *See In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict . . . .").

Court-appointed Lead Counsel is qualified and experienced in securities litigation, as set forth in its firm resume (*see* Ex. 3A-3). From conducting an extensive investigation into the claims asserted prior to filing suit to engaging in lengthy arm's length settlement negotiations and three full day mediation sessions overseen by retired United States District Judge Layn R. Phillips ("Judge Phillips") – which resulted in Judge Phillips' recommendation that the case settle for $240 million -- Lead Counsel have successfully litigated this lawsuit against able defense counsel. During the course of this lawsuit, Lead Counsel drafted multiple complaints; fended off a motion to dismiss in substantial part; obtained certification of a class; and completed fact and expert discovery, including obtaining and analyzing approximately 3.6 million pages of documents from Defendants and third parties, producing nearly 200,000 pages of documents from Lead Plaintiff, participating in 31 depositions, and exchanging 20 expert reports with Defendants on a host of complex issues. Counsel successfully conducted the litigation against skilled opposing counsel.

Accordingly, Lead Plaintiff and Lead Counsel have adequately represented the Class.

### 2. The Settlement Was Reached After Arm's-Length Negotiations with the Assistance of an Experienced Mediator and Following Substantial Discovery

Courts also consider whether the settlement "was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B). Courts have traditionally considered other related circumstances in determining the "procedural" fairness of a settlement, including: (i) counsel's understanding of the strengths and weakness of the case based on factors such as "the stage of the proceedings and the amount of discovery completed," *Grinnell*, 495 F.2d at 463, (ii) the "absence of any indication of collusion" in the settlement negotiations, *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982), and (iii) a

4

"mediator's involvement" in the negotiations, *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001). These circumstances support the approval of the Settlement.

The Settlement was reached only after months of arm's-length negotiations between experienced counsel, which included three full-day mediation sessions under the guidance of Judge Phillips. ¶¶ 151-155. In fact, the Settlement is the product of a mediator's recommendation by Judge Phillips. ¶ 155. *See In re Bear Stearns Cos., Inc. Sec. Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 265 (S.D.N.Y. 2012) (finding a settlement fair where the parties engaged in "arm's length negotiations," including mediation before "retired federal judge Layn R. Phillips, an experienced and well-regarded mediator of complex securities cases").

Further, as noted above, the Parties and their counsel were well informed about the strengths and weaknesses of the case before reaching the agreement to settle. Lead Plaintiff and Lead Counsel had completed fact discovery, which included obtaining and analyzing approximately 3.6 million pages of documents from Defendants and third parties, and taking, defending, or participating in 31 depositions. Lead Counsel deposed: (i) every named Defendant, which included two former Signet CEOs, the current CEO, and two former CFOs; (ii) numerous other senior Signet officials, including two former COOs and the Chair of the Board; (iii) multiple Declarants; and (iv) other key third parties, such as Signet's auditor. ¶¶ 83-89. In addition, Lead Plaintiff and Lead Counsel conducted substantial expert discovery, including the exchange of 20 expert reports with Defendants on issues such as workplace sexual harassment, accounting for loan loss reserves, loss causation, damages, and retail consumer lending. ¶¶ 137-146. Also, in connection with the mediation process, the Parties exchanged detailed written mediation submissions concerning liability and damages which more fully informed Lead Plaintiff and its counsel of the strengths and weaknesses of its case. ¶ 153. Where, as here, a settlement was

"reached in arms' length negotiations between experienced, capable counsel after meaningful discovery," it enjoys a "presumption of fairness, adequacy, and reasonableness." *See Visa*, 396 F.3d at 116.

Lead Plaintiff and Lead Counsel's conclusion that the Settlement is in the best interests of the Class also supports approval. Lead Plaintiff is a sophisticated institutional investor that took an active role in supervising this litigation, as envisioned by the PSLRA, and it has strongly endorsed the Settlement. *See* Ray Decl. (Ex. 1) at ¶¶ 5-8. A settlement reached "under the supervision and with the endorsement of a sophisticated institutional investor . . . is 'entitled to an even greater presumption of reasonableness.'" *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at \*5 (S.D.N.Y. Nov. 7, 2007). The judgment of Lead Counsel, which is experienced in securities class-action litigation, that the Settlement is in the best interests of the Class is entitled to "great weight." *Shapiro v. JPMorgan Chase & Co.*, 2014 WL 1224666, at \*2 (S.D.N.Y. Mar. 24, 2014); *accord In re NASDAQ Mkt-Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998) (courts have consistently given "'great weight' . . . to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation").

## B.    The Settlement Is Substantively Fair and Satisfies the *Grinnell* Factors

Courts must consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal." Fed. R. Civ. P. 23(e)(2)(C)(i). Rule 23(e)(2)(C)(i) incorporates the nine-factor test set forth in *Grinnell* for determining whether a settlement is substantively fair, reasonable, and adequate. *Christine Asia Co.*, 2019 WL 5257534, at \*10. I consider each *Grinnell* factor in turn.

1.       **The Complexity, Expense and Likely Duration of the Litigation**

"[I]n evaluating the settlement of a securities class action, federal courts, including this Court, 'have long recognized that such litigation is notably difficult and notoriously uncertain.'" *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400, 2010 WL 4537550, at *15 (S.D.N.Y. Nov. 8, 2010) (citation omitted).  Courts recognize that "[s]ecurities class actions are generally complex and expensive to prosecute." *In re Gilat Satellite Networks, Ltd.*, No. CV-02-1510, 2007 WL 1191048, at *10 (E.D.N.Y. Apr. 19, 2007).  Accordingly, "[c]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006).

This case is no exception.  This was a complex case that required proving two separate frauds over a nearly four-year Class Period.  As demonstrated by Defendants' successful Rule 23(f) Petition, the sexual harassment-related claims raised seriously contested class certification issues, including whether those claims would be unmanageable, and whether the Code statements were immaterial as a matter of law under recent Second Circuit precedent.  Defendants contended in their Rule 23(f) Petition that certification of these claims was "unprecedented."

The claims concerning Signet's credit portfolio were also complex, involving issues such as accounting for loan loss reserves under GAAP, the nuances of recency aging, consumer loan underwriting practices and default trends, and the valuation of a multi-billion-dollar retail consumer loan portfolio in a multi-party sale transaction after the Class Period.  Similarly complex was the litigation of damages and loss causation, as the certified Class Period included six different corrective and partial corrective disclosures, many of which were confounded by the disclosure of non-fraud related information, the impact of which had to be disaggregated from the stock price

declines.  The fact that the Parties exchanged 20 detailed expert reports prepared by 15 different experts—including three experts on damages and loss causation issues, four experts on sexual harassment-related issues, and dueling experts on GAAP accounting, retail loan underwriting, and consumer loan portfolio valuation—demonstrates the complexity of this Action.

Achieving a litigated verdict would have required substantial additional time and expense. In the absence of the Settlement, the continued litigation of the Action likely would have required the Parties to: (i) brief Defendants' Rule 23(f) appeal, which could have taken a year or more by itself and could have led to a remand for additional class certification proceedings, followed by another Rule 23(f) petition, as has occurred in cases such as *Arkansas Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254 (2d Cir. 2020); (ii) finish expert discovery; (iii) brief Defendants' expected motion for summary judgment; (iv) engage in pre-trial motion practice in the form of *Daubert* motions and motions *in limine*; (v) try this Action, which would have involved substantial fact and expert testimony; (vi) submit post-trial motions, including a contested individual claims procedure; and (vii) whatever the outcome at trial, litigate an appeal.

By contrast, the Settlement provides an immediate recovery of $240 million for the Class.

### 2.     The Reaction of the Class to the Settlement

The reaction of the class to a proposed settlement is another relevant factor. *See, e.g.*, *Veeco*, 2007 WL 4115809, at *7.  Here, the Class's reaction supports approval of the Settlement and the Plan of Allocation.

### (a)     The Notice Program

In accordance with the Court's Preliminary Approval Order (ECF No. 253), through July 14, 2020, JND has sent a total of 207,520 copies of the Notice Packet to potential Class Members and their nominees. *See* Ex. 2, Declaration of Luiggy Segura, submitted on behalf of JND (the "Segura Decl"), at ¶ 7; Supplemental Declaration of Luiggy Segura, submitted on behalf of JND

(the "Suppl. Segura Decl"), at ¶ 2 (ECF No. 263). The Notice informed Class Members of the terms of the proposed Settlement and Plan of Allocation, and that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund, net of expenses, and payment of Litigation Expenses in an amount not to exceed $4,000,000. The Notice also apprised Class Members of their right to object to the proposed Settlement, the Plan of Allocation, and/or the request for attorneys' fees and expenses; their right to exclude themselves from the Class; the procedure for submitting Claim Forms; and the June 30, 2020 deadline for filing objections and for receipt of requests for exclusion.[2]

On June 16, 2020, 14 days before the objection and exclusion deadline, Lead Plaintiff and Lead Counsel filed their opening papers in support of the Settlement, Plan of Allocation, and fee and expense request. These papers are available on the public docket (ECF Nos. 254-58), on the Settlement website (www.SignetSecuritiesLitigation.com), *see* Suppl. Segura Decl. ¶ 3, and on Lead Counsel's website (www.blbglaw.com/cases/signet-jewelers-limited).

On July 8, 2020, this Court entered an order advising that the final Settlement Fairness Hearing scheduled for July 21, 2020 would be conducted remotely and the Court would be providing the dial-in instructions for the hearing. ECF No. 260. The Claims Administrator updated the Settlement website and Lead Counsel updated its website to inform Class Members that the Settlement Fairness Hearing would be conducted remotely and that the dial-in instructions for the hearing would be posted on both websites when they become available.

---

[2] The Summary Notice, which informed readers of the proposed Settlement, how to obtain copies of the Notice and Claim Form, and the deadlines for the submission of Claim Forms, objections, and requests for exclusion, was published in the Wall Street Journal and released over the PR Newswire on May 13, 2020. *See* Declaration of Luiggy Segura Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date (ECF No. 258-2) at ¶ 8.

The June 30, 2020 deadline for Class Members to exclude themselves or object has now passed. Following the notice program, there has been no objection to the Settlement, the Plan of Allocation, or Lead Counsel's application for attorneys' fees and Litigation Expenses. In addition, only eleven requests for exclusion from the Class have been received—all from individuals and none from institutional investors. *See* Suppl. Segura Decl. ¶ 4 & Ex. 1. Five of the eleven individuals requesting exclusion indicate in their requests that they did not purchase any shares of Signet common stock during the Class Period, so these individuals are not members of the Class. Another five of the requests do not provide any information on the requestors' transactions in Signet common stock, so it is not possible to determine if those individuals are members of the Class. The one other individual requesting exclusion states that he purchased 100 shares of Signet common stock during the Class Period. Thus, the eleven requests for exclusion received represent approximately 0.00008% of the estimated number of damaged shares of Signet common stock purchased during the Class Period and approximately 0.005% of the total number of Notices mailed to potential Class Members. In the letters submitted requesting exclusion, none of these individuals criticizes or takes any issue with any aspect of the proposed Settlement, the Plan of Allocation, or the requested fees and expenses.

While not all of the requests include all of the information about trading in Signet common stock as required by the Notice (¶ 77), Lead Plaintiff and Lead Counsel, with the consent of Defendants, has asked that the Court nonetheless grant all of the requests for exclusion from the Class. This Court hereby grants all of the requests for exclusion from the Class.

### (b) The Class's Reaction Supports Approval of the Settlement and the Plan of Allocation

The absence of any objections and the small number of requests for exclusion support a finding that the Settlement is fair, reasonable, and adequate. "[T]he favorable reaction of the

overwhelming majority of class members to the Settlement is perhaps the most significant factor in [the] *Grinnell* inquiry" into the fairness and adequacy of the Settlement. *Visa*, 396 F.3d at 119; *see also id.* at 118 ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement."); *see also In re Virtus Inv. Partners, Inc. Sec. Litig.*, 2018 WL 6333657, at *2 (S.D.N.Y. Dec. 4, 2018) ("the absence of objections by the class is extraordinarily positive and weighs in favor of settlement"); *In re Advanced Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. 171, 176 (S.D.N.Y. 2014) ("The absence of . . . objections and minimal investors electing to opt out of the Settlement provides evidence of Class members' approval of the terms of the Settlement.").

It is significant that no institutional investors—which held over 93% of the shares of Signet common stock outstanding during the Class Period—have objected to the Settlement. Institutional investors are often sophisticated and possess the incentive and ability to object. Accordingly, the absence of objections by these sophisticated class members is further evidence of the fairness of the Settlement. *See In re Citigroup Inc. Bond Litig.*, 296 F.R.D. 147, 156 (S.D.N.Y. 2013) (the reaction of the class supported the settlement where "not one of the objections or requests for exclusion was submitted by an institutional investor"); *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 2006 WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006) (the lack of objections from institutional investors supported approval of settlement); *In re AT&T Corp. Sec. Litig.*, 2005 WL 6716404, at *4 (D.N.J. Apr. 25, 2005) (the reaction of the class "weigh[ed] heavily in favor of approval" where "no objections were filed by any institutional investors who had great financial incentive to object").

The reaction of the Class also supports approval of the Plan of Allocation. *See, e.g., In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 240

11

(E.D.N.Y. 2013) (the conclusion that the proposed plan of allocation was fair and reasonable was "buttressed by the . . . absence of objections from class members"); *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at *14 (S.D.N.Y. Nov. 7, 2007) ("[N]ot one class member has objected to the Plan of Allocation which was fully explained in the Notice of Settlement sent to all Class Members. This favorable reaction of the Class supports approval of the Plan of Allocation.").

### 3. The Stage of the Proceedings and the Amount of Discovery

"When considering this *Grinnell* factor, the question is whether the parties . . . counsel possessed a record sufficient to permit evaluation of the merits of Plaintiffs' claims, the strengths of the defenses asserted by Defendants, and the value of Plaintiffs' causes of action for purposes of settlement." *Christine Asia Co.*, 2019 WL 5257534, at *11. As explained above, when the Settlement was reached, Lead Plaintiff and Lead Counsel had a sufficient record to intelligently assess the strengths and weakness of their claims and the value of the case.

### 4. The Risks of Establishing Liability and Damages

Courts also consider the "risks of establishing liability [and] the risks of establishing damages." *Grinnell*, 495 F.2d at 463 (citations omitted). While Lead Plaintiff believes that its claims have merit, it has acknowledged that this Action presented substantial risks to establishing both liability and damages. This was not a case with a parallel SEC action or a restatement of financial results to support Lead Plaintiff's claims and provide a roadmap for discovery. ¶ 166. On the contrary, absent a settlement, Lead Plaintiff would have faced several significant risks at each stage of the case. These risks created serious doubt as to whether the Class would ultimately succeed at trial.

#### (a) Risks To Proving Liability

*Claims Related to Sexual Harassment.* Section 10(b) class claims related to sexual harassment are relatively rare, and pursuing such claims entails a level of uncertainty that does not

exist in the more typical securities fraud action involving, for example, misstated revenues. There is no "playbook" for pursuing such claims in the securities fraud class action context, and there is no established track record of success. ¶¶ 168-170. For example, two recent high-profile securities class actions premised on sexual harassment allegations were dismissed in whole or in extremely substantial part. *See Ferris v. Wynn Resorts Ltd.*, Case No. 2:18-cv-00479, 2020 WL 2748309, at *13-15 (D. Nev. May 27, 2020) (dismissing securities fraud claims premised on sexual harassment allegations because, e.g., statements about corporate culture and code of conduct were puffery, and statements about compliance with legal obligations were not misleading); *Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, Case No. 18-cv-7796, 2020 WL 248729, at *8 (S.D.N.Y. Jan. 15, 2020) (dismissing code of conduct statements as being "far too general and aspirational to invite reasonable reliance" and amounting to "mere puffery"); *see also Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett–Packard Co.*, 845 F.3d 1268 (9th Cir. 2017). Lead Counsel has represented that it is not aware of any other securities fraud class action premised on allegations of sexual harassment that has achieved class certification, let alone been resolved for an amount comparable to the Settlement here.

In addition to the fundamental uncertainty involved with pursuing sexual harassment-related claims, Defendants have developed several specific arguments during the litigation which presented substantial challenges to these claims. As noted, in their successful Rule 23(f) Petition, Defendants argued that class certification of these claims was "unprecedented," and the claims represented an improper attempt to prosecute employment discrimination claims under the guise of a securities fraud action. ¶ 171. Defendants also argued that a class alleging a "culture of sexual harassment" was unmanageable because individualized issues would overwhelm common ones—that is, "mini-trials" were required with respect to each alleged incident of sexual

harassment to determine whether it in fact occurred. *Id.* Defendants further contended that the Code statements were immaterial as a matter of law under *Singh v. Cigna Corp.*, 918 F.3d 57 (2d Cir. 2019), which held that certain statements in a code of conduct were inactionable. ¶ 172. While Lead Plaintiff may have had meaningful responses to Defendants' arguments, the fact that the Second Circuit accepted Defendants' appeal suggests that Lead Plaintiff faced the risk that these claims could be de-certified, which would have had a significant negative impact on Lead Plaintiff's trial strategy and recoverable damages. ¶¶ 173-74.

Defendants also had a "truth on the market" defense to the to the sexual harassment-related claims, arguing that the essence of the allegations in the Declarations was well-known years before the February 2017 corrective disclosure in the *Washington Post*. ¶ 175. Among other things, Defendants would have pointed to the *Jock* class certification decision released in February 2015 to argue that the market knew that *Jock* concerned allegations of widespread sexual harassment. ¶ 177. This would have been a significant argument, as that decision states:

> The conduct described in the declarations and testimony has occurred in settings that are public and private, ranging from banter in hallways and elevators to interactions within Sterling stores and at the mandatory annual meeting of all Sterling managers held in Orlando, Florida. It includes references to women in sexual and vulgar ways, groping and grabbing women, soliciting sexual relations with women (sometimes as a *quid pro quo* for employment benefits), and creating an environment at often-mandatory Company events in which women are expected to undress publicly, accede to sexual overtures and refrain from complaining about the treatment to which they have been subjected.

Class Determination Award, *Jock, et al. v. Sterling Jewelers Inc.*, AAA Case No. 11 20 0800 0655 (Feb. 2, 2015). While Lead Plaintiff defeated these truth on-the-market arguments at class certification, Defendants reiterated these arguments in the Rule 23(f) Petition and likely would have done so again in the Rule 23(f) appeal, at summary judgment, at trial, and on post-trial appeal. Had this argument been accepted at any stage, it would have precluded recovery for these claims. ¶ 177.

Defendants also would have made several arguments that the Declarations were not reflective of Signet's corporate culture during the Class Period.  To start, Defendants strenuously denied many of the allegations in the Declarations, and were expected to do so at trial.  ¶ 178. Defendants also would have argued that many of the allegations in the Declarations were decades old (with some occurring in the 1990s), and therefore irrelevant to investors during the Class Period.  ¶ 179.  Further, based on expert testimony, Defendants would have pointed to the tens of thousands of individuals who were employed by Sterling over the years, and compared that number to the 306 employees who submitted Declarations, to argue that the number of sexual harassment complaints was small—less than 1% of all employees.  ¶ 180.

Defendants also would have argued that Signet maintained a culture of respect.  Following the departure of Defendant Light, Signet appointed a female CEO, Defendant Virginia Drosos. During the Class Period, Signet had a number of other high-ranking women executives, including former CFO and Defendant Michele Santana.  Signet's senior female executives were expected to testify at trial that they had not witnessed or experienced anything like what was described in the Declarations.  ¶ 181.

Defendants also would have argued that in March of 2017 Signet created a new Board committee to develop "programs and policies to support the advancement and development" of women employees; appointed an independent consultant to review current and future Company policies and practices relating to sexual harassment issues; and established an "independent ombudsman office to act as an informal third-party avenue to provide confidential advice to employees, to address concerns regarding the issues in the workplace, and to provide options and strategies to assist them in the resolution of workplace concerns."  ¶ 182.  Signet also would have pointed to the fact that in April 2017, it retained Judge Barbara Jones (Ret.)—a well-known and

well-respected authority on workplace compliance issues—to conduct a thorough review of "Signet's policies and practices regarding equal opportunity and workplace expectations." ¶ 183. Signet would have argued that all these facts demonstrate its commitment to equal opportunity and a respectful workplace.

Further, Defendants likely would have argued that *Jock* did not actually concern sexual harassment claims, and thus, they did not mischaracterize the action or its risks. ¶ 184. In support of this argument, Defendants likely would have contended that the plaintiffs in *Jock* never actually asserted a legal claim for sexual harassment, while noting that the arbitrator found that the Declarations were insufficient to show a widespread culture of sexual harassment and declined to certify the claims based on underlying sexual harassment. *Id.*

Finally, Defendants likely would have argued that the Declarations were inadmissible hearsay, *i.e.*, out-of-court statements that were being offered for their truth, and therefore could not be put before the jury at trial. ¶ 185. While Lead Plaintiff asserts that it would have argued that the Declarations were being offered for other purposes—namely, to establish scienter and loss causation—a successful motion *in limine* to exclude the Declarations would have significantly undermined the sexual harassment-related claims. *Id.*

***Credit-Related Claims.*** Lead Plaintiff also faced serious risks in establishing Defendants' liability with respect to the credit-related claims. For example, Defendants could have argued that their statements concerning the nature of Signet's underwriting were not false for several reasons. They likely would have argued that Signet's lending practices and underwriting conformed to industry practice for consumer lending. ¶ 186. Defendants also likely would have highlighted that Signet's strategy of lending to subprime borrowers was decades old, legal, very profitable, and reasonable within the context of Signet's business. *Id.* Defendants also likely

16

would have argued that Signet made loans to drive jewelry sales on which it earned large margins, and such margins allowed Signet to safely absorb more defaults and profitably lend deeper down the credit spectrum than a traditional lender (such as a bank). *Id.* Defendants offered a lengthy expert report opining on all these and related issues. *Id.*

Defendants likely would have further argued that employing such profitable business strategy benefitted Signet's shareholders because the Company would have lost billions of dollars in sales during the Class Period under a more conservative lending strategy, to the shareholders' detriment. ¶ 187. In support of their position, Defendants would have highlighted that many of Signet's borrowers had poor credit only because they were young adults with no credit history who were making their first significant purchase: an engagement ring. ¶ 188. Defendants also would have argued that there is nothing reckless about lending to young people seeking to get engaged, even if they are considered subprime borrowers. These arguments, together with the prevalence and name recognition of Signet's stores—Zales, Jared, Kay, Piercing Pagoda—heightened the risk that Defendants' arguments might persuade a jury. *Id.*

With respect to Lead Plaintiff's allegations that Signet's loan loss reserves were understated, Defendants would have argued that their accounting complied with GAAP at all times, as supported by a detailed expert report offered by Defendants on this point. ¶ 189. Defendants also would have argued that: (i) their use of "recency" aging—which underpinned many of Lead Plaintiff's allegations—was disclosed; (ii) they have employed the recency method for decades; (iii) nothing in the accounting rules prohibits the use of this method; and (iv) GAAP in fact permits the use of this method for non-bank companies such as Signet. *Id.*

Defendants also would have argued that Signet's auditor, KPMG, gave unqualified audit opinions on Signet's financial statements during the Class Period. ¶ 190. Defendants likely

would have contended that KPMG is a "big four" accounting firm that had no reason to be complicit in a fraud, was an expert in GAAP, thoroughly vetted the Company's financial statements numerous times during the Class Period, and repeatedly concluded that they were accurate. *Id.*

Moreover, as noted above, Defendants could have contended that the absence of a restatement and a parallel SEC action is evidence that the Company's reserves were reasonable. ¶ 191. Defendants likely would have argued further that the ultimate sale of the portfolio for what they would have characterized as a modest loss supports the conclusion that the reported reserves were reasonable, and they offered an expert report in support of this point. *Id.*

Also, under *Fait v. Regions Fin. Corp.*, 655 F.3d 105 (2d Cir. 2011), Lead Plaintiff was required to prove that the loan loss reserve statements were subjectively false. ¶ 192. No witness testified that they believed that the reserve was inadequate or understated, and many witnesses testified to the contrary, justifying Signet's use of recency aging along the lines set forth above. The fact that there was no restatement or SEC action would have bolstered these arguments.

Defendants likely would have also argued that when "bad debt" (*i.e.*, loan defaults) at the Company increased, Defendants timely disclosed it to investors. ¶ 193. While Lead Plaintiff asserts it would have argued that such disclosures were incomplete, there was a meaningful risk that a jury could have found that Defendants were truthful enough with investors regarding increases in bad debt.

Finally, the Complaint alleged that Former Employee 1, Signet's former Director of the Credit Information Technology and Strategy Department, attended meetings where senior executives decided to "comp" Signet's loan loss reserve to the prior year's level, instead of raising the reserve to a more appropriate level to account for the risk in the portfolio. ¶ 194. Former

Employee 1 confirmed his statements in deposition testimony, but Defendants likely would have argued that there was no contemporaneous documentation of "comping." *Id.*

### (b)    Risks To Proving Damages

Had this case continued, Lead Plaintiff would have argued that maximum damages were approximately $1.8 billion. ¶ 195.  However, supporting this maximum damage amount would have required Lead Plaintiff to "run the table" on all liability issues for both sets of claims during the entire Class Period, plus win all contested arguments on loss causation and damages. *Id.*  Even if Lead Plaintiff had achieved complete success on liability, Defendants likely would have offered numerous arguments that the Class's maximum potential damages were a tiny fraction of $1.8 billion. ¶ 196.

Defendants would have asserted that the "constant price to earnings ratio" method used by Lead Plaintiff's expert to measure damages is inappropriate, and damages should be calculated using what Defendants have said was a more commonly-accepted method, such as the "constant dollar" method, which would have materially reduced damages. ¶ 197.  Defendants also would have contended that the law requires that any gains on sales of Signet stock during the Class Period be "netted out" from the damages figures, significantly reducing recoverable damages again. ¶ 198.

Defendants likely would have further asserted that many of the corrective disclosures for the claims relating to the loan portfolio were confounded by the disclosure of information unrelated to the alleged fraud, such as the declining prospects for mall retail stores and reduced sales guidance. ¶ 199. Defendants would have contended that when one disaggregates the impact of non-fraud related information from the stock price declines, only a small portion of some of the declines were recoverable as damages. *Id.*

Further, as to the claims related to alleged sexual harassment, Defendants would have argued that there was no loss causation because the allegations in the Declarations were known to the market years before the alleged corrective disclosure, as set forth above. ¶ 201. If accepted, this argument could have reduced damages substantially, by almost 30%. *Id.*

Moreover, even if that argument failed, Defendants likely would have argued that Signet's stock price recovered shortly after the publication of the *Washington Post* article, when additional supposedly mitigating information about the sexual harassment allegations became public. ¶ 202. On March 9, 2017, Signet defended its corporate culture against the allegations in the *Washington Post* article, which was followed by a rebound in Signet's stock price. Defendants would have asserted that any damages for this claim must be offset by the amount of this stock price rebound, which would have reduced damages for this claim by between 84% and 100%.

In support of these arguments, Defendants submitted extensive expert damages reports from two different experts, including the President and Chairman of Compass Lexecon. While Lead Plaintiff maintains that its expert's opinions were well-substantiated and correct, it notes that these disputed issues regarding damages and loss causation would have presented the prototypical "battle of the experts" at trial. There is no way to predict with any certainty which expert's opinions the jury would have accepted. Had the jury accepted Defendants' expert's views, damages could have been either eliminated or reduced to no more than $130 million, substantially less than the Settlement.

The Settlement eliminates those risks and provides a substantial and certain recovery for the Class. *See Christine Asia Co.*, 2019 WL 5257534, at *13 ("The Parties developed and would have presented competing evidence on these issues, including competing expert evidence. While

Plaintiffs proceeded as though they had the better arguments, the risk remained that Defendants could have defeated loss causation, or significantly diminished damages[.]").

### 5.    The Risks of Maintaining the Class Action through Trial

At the time the settlement was reached, Defendants' Rule 23(f) appeal of the Court's Class Certification Order was pending before the Second Circuit.  As noted above, the fact that the Second Circuit accepted this appeal suggests that Lead Plaintiff faced risk that the sexual harassment-related claims could be de-certified.

### 6.    The Ability of Defendants to Withstand a Greater Judgment

The Settlement represents a favorable result for the Class in light of the risk that Signet would be unable to satisfy a significant judgment after trial.  During the Class Period, Signet's stock price reached a high of nearly $151 per share and its market capitalization peaked at over $12 billion. ¶ 208. Following the Class Period, Signet's financial position has grown increasingly precarious, as poor business performance, a shrinking store footprint, and the uncertain retail environment devastated its financial results and stock price.  For example, during fiscal year 2019, Signet posted an operating loss of $765 million.  ¶ 210.  Signet's stock price declined by approximately 70% in the 18 months prior to June 2020.  *Id.*

Concerns over Signet's financial condition have grown worse since the COVID-19 outbreak, which has hit Signet—primarily a mall-based, jewelry retailer—hard.  On March 23, 2020, Signet stock traded as low as $5.84 per share, corresponding to a market capitalization of approximately $306 million. ¶ 211.  While Signet's share price has recovered somewhat in recent weeks, the risks to the Company's financial health remain significant.

On June 16, 2020, Signet's stock price closed at $12.12, and its market capitalization is approximately $634 million. ¶ 208.  Accordingly, if Lead Plaintiff had prevailed at trial and secured a judgment for any significant portion of the Class's potential damages, and Signet's

financial condition did not improve, there would have been a serious risk that the Company would be unable to fund the judgment and, perhaps, be forced into bankruptcy.

### 7.   The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation

The last two *Grinnell* factors are the range of reasonableness of the settlement fund in light of (i) the best possible recovery and (ii) litigation risks.  In analyzing these factors, the issue is not whether the settlement represents the best possible recovery, but how the settlement relates to the strengths and weaknesses of the case.  This Court must "consider and weigh the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable." *Grinnell*, 495 F.2d at 462 (citations omitted).  The determination of a "reasonable" settlement "is not susceptible of a mathematical equation yielding a particularized sum." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 130 (S.D.N.Y. 1997) (citation and internal quotations omitted), *aff'd*, 117 F.3d 721 (2d Cir. 1997). Instead, "in any case there is a range of reasonableness with respect to a settlement." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

The Settlement is within the range of reasonableness.

As noted above, had this case continued to trial, Lead Plaintiff would have argued that maximum potential damages were $1.8 billion.  The proposed Settlement represents almost 14% of maximum potential damages. However, as noted in Lead Plaintiff's Preliminary Approval Motion, achieving that figure would have required Lead Plaintiff to prevail on (i) the claims related to alleged sexual harassment for the entire Class Period; (ii) the claims related to the loan portfolio and loss reserves for the entire Class Period; and every contested issue concerning loss causation and damages.  Moreover, a $1.8 billion judgment likely would have been a pyrrhic victory, which makes maximum damages not an accurate benchmark against which to measure the reasonableness

of the proposed Settlement -- if Lead Plaintiff *had* actually obtained a $1.8 billion judgment, there is no assurance that the Company could have satisfied it, and it might have been forced into bankruptcy.

Moreover, Defendants' experts contend that, even if Lead Plaintiff successfully established liability on all claims, damages would be no more than $130 million—an amount that is substantially less than the proposed Settlement.  For all these reasons, the Settlement falls within the range of reasonableness.

## C.   All Other Factors Set Forth in Rule 23(e)(2)(C) Support Approval of the Settlement

Rule 23(e)(2)(C) also instructs this Court to consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" "the terms of any proposed award of attorney's fees, including timing of payment;" and "any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv).  Each of these factors either supports approval of the Settlement or is neutral and does not suggest any reason why the Settlement should be deemed inadequate.

The procedures for processing Class Members' Claims and distributing the proceeds of the Settlement are well-established, effective methods that have been widely used in securities class-action litigation.  Here, the proceeds of the Settlement will be distributed to Class Members who submit eligible Claim Forms with required documentation to the Claims Administrator, JND. JND, an independent company with extensive experience handling the administration of securities class actions, will review and process the Claims under the supervision of Lead Counsel; provide Claimants with an opportunity to cure any deficiencies in their Claims or request review of the denial of their Claim by the Court; and then mail or wire claimants their *pro rata* share of the Net

Settlement Fund upon approval of the Court.

The relief provided for the Class is also adequate in light of the terms of the proposed award of attorney's fees. As discussed in detail in Parts IV-IX below, the proposed attorneys' fees of 25% of the Settlement Fund, net of expenses, are reasonable in light of the efforts of Plaintiff's Counsel and the risks in the litigation. Approval of attorneys' fees is entirely separate from approval of the Settlement, and neither Lead Plaintiff nor Lead Counsel may terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees. *See* Stipulation ¶ 18.

Finally, Amended Rule 23 asks this Court to consider the fairness of the proposed settlement in light of any agreements required to be identified under Rule 23(e)(3). *See* Fed. R. Civ. P. 23(e)(2)(C)(iv). Here, the only such agreement (other than the Stipulation itself) is the Parties' confidential Supplemental Agreement, which sets forth the conditions under which Defendants would be able to terminate the Settlement if the number of Class Members who request exclusion from the Class reaches a certain threshold. This type of agreement is a standard provision in securities class actions and has no negative impact on the fairness of the Settlement. *See Hefler v. Wells Fargo & Co.*, 2018 WL 6619983, at \*7 (N.D. Cal. Dec. 18, 2018). Furthermore, the small number of opt-outs known to the court renders the Supplemental Agreement a non-factor at this point.

## D. The Settlement Treats Class Members Equitably Relative to Each Other

Rule 23(e)(2)(D) requires this Court to assess whether "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). As discussed below in Part II, pursuant to the Plan of Allocation, eligible claimants approved for payment by the Court will receive their *pro rata* share of the recovery based on their transactions in Signet common stock.

24

Lead Plaintiff will receive precisely the same level of *pro rata* recovery (based on its Recognized Claim as calculated under the Plan of Allocation) as all other Class Members.

## II.   THE PLAN OF ALLOCATION IS FAIR AND REASONABLE AND IS APPROVED

A plan for allocating settlement proceeds, like the settlement itself, should be approved if it is fair, reasonable, and adequate. *See In re IMAX Sec. Litig.*, 283 F.R.D. 178, 192 (S.D.N.Y. 2012).

A plan of allocation is fair and reasonable as long as it has a "rational basis." *FLAG Telecom*, 2010 WL 4537550, at *21; *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 497 (S.D.N.Y. 2009). Generally, a plan of allocation that reimburses class members based on the relative strength and value of their claims is reasonable. *See IMAX*, 283 F.R.D. at 192. In determining whether a plan of allocation is reasonable, courts give great weight to the opinion of experienced counsel. *See In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 163 (S.D.N.Y. 2011).

Lead Plaintiff's proposed Plan of Allocation is fair, reasonable, and adequate.

The proposed Plan of Allocation was developed by Lead Plaintiff's damages expert in consultation with Lead Counsel, and provides a fair and reasonable method to allocate the Net Settlement Fund among Class Members. In developing the Plan of Allocation, Lead Plaintiff's expert calculated the amount of estimated artificial inflation in the price of Signet common stock which was proximately caused by Defendants' alleged false and misleading statements. To do so, the expert considered the price changes in Signet common stock in reaction to the corrective disclosures, adjusting for price changes that were attributable to market or industry forces and other negative information unrelated to Lead Plaintiff's allegations, as well as changes in inflation throughout the Class Period, based on assumptions provided by Lead Counsel. *See* Notice ¶ 57.

Under the Plan of Allocation, a "Recognized Loss Amount" or "Recognized Gain Amount" will be calculated for each purchase of Signet common stock during the Class Period that is listed in the Claim Form and for which adequate documentation is provided. Notice ¶ 60. In general, the Recognized Loss Amount will be the difference between the estimated artificial inflation on the date of purchase and the date of sale, or the difference between the actual purchase price and sales price, whichever is less. *Id.* ¶ 59. Claimants' Recognized Loss Amounts will be netted against their Recognized Gain Amounts, if any, to determine the Claimants' "Recognized Claims," and the Net Settlement Fund will be allocated *pro rata* to Authorized Claimants based on the relative size of their Recognized Claims. *Id.* ¶¶ 62, 70-71.

As noted above, through July 14, 2020, more than 207,500 copies of the Notice, which contains the Plan of Allocation and advises Class Members of their right to object to it, have been sent to potential Class Members and their nominees. *See* Suppl. Segura Decl. ¶ 2. Through July 14, 2020, no objections to the proposed Plan of Allocation have been received. *See* ECF 262 at 3.

## III.   NOTICE TO THE CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS

The Notice to the Class satisfies the requirements of Rule 23(c)(2)(B), which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-75 (1974). The Notice also satisfies Rule 23(e)(1), which requires that notice of a settlement be "reasonable"—*i.e.*, it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Visa*, 396 F.3d at 114.

Both the substance of the Notice and the method of its dissemination to potential members of the Class satisfy these standards. The Court-approved Notice includes all the information

26

required by Federal Rule of Civil Procedure 23(c)(2)(B) and the PSLRA, 15 U.S.C. § 78u-4(a)(7),

including: (i) an explanation of the nature of the Action and the claims asserted; (ii) the definition

of the Class; (iii) the amount of the Settlement; (iv) a description of the Plan of Allocation; (v) an

explanation of the reasons why the Parties are proposing the Settlement; (vi) a statement indicating

the attorneys' fees and costs that will be sought; (vii) a description of Class Members' right to opt-

out of the Class or to object to the Settlement, the Plan of Allocation or the requested attorneys'

fees or expenses; and (viii) notice of the binding effect of a judgment on Class Members.

Pursuant to the Preliminary Approval Order, JND began mailing copies of the Notice

Packet (consisting of the Notice and Claim Form) to potential Class Members and their nominees

on April 30, 2020. As of July 14, 2020, a total of 207,520 Notice Packets had been mailed. Suppl.

Segura Decl. ¶ 2.  JND also caused the Summary Notice to be published in the *Wall Street Journal*

and over the *PR Newswire* on May 13, 2020.  Segura Decl. ¶ 8.  Copies of the Notice, Claim Form,

Stipulation, and Complaint were made available on the Settlement website maintained by JND.

*See* Segura Decl. ¶ 10.  This combination of individual mail to all Class Members who could be

identified with reasonable effort, supplemented by notice in an appropriate, widely circulated

publication, transmitted over the newswire, and set forth on internet websites, was "the best notice

. . . practicable under the circumstances."  Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *In re Advanced

Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. 171, 182-83 (S.D.N.Y. 2014).

## IV.   PLAINTIFF'S COUNSEL ARE ENTITLED TO AN AWARD OF ATTORNEYS' FEES FROM THE COMMON FUND

The Supreme Court has long recognized that "a litigant or a lawyer who recovers a common

fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's

fee from the fund as a whole."  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see also

Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000). Courts recognize that awards

of fair attorneys' fees from a common fund "serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons," and therefore "to discourage future misconduct of a similar nature." *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, 2010 WL 4537550, at \*23 (S.D.N.Y. Nov. 8, 2010)

The Supreme Court has emphasized that private securities actions such as this Action are "an essential supplement to criminal prosecutions and civil enforcement actions" by the SEC. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). Compensating plaintiffs' counsel for their risks is crucial, because "[s]uch actions could not be sustained if plaintiffs' counsel were not to receive remuneration from the settlement fund for their efforts on behalf of the class." *Hicks v. Morgan Stanley*, 2005 WL 2757792, at \*9 (S.D.N.Y. Oct. 24, 2005).

## V.   THE COURT MAY AWARD A REASONABLE PERCENTAGE OF THE COMMON FUND

This Court may award a fee based on a percentage of the common fund. The Second Circuit has approved the percentage method, recognizing that "the lodestar method proved vexing" and had resulted in "an inevitable waste of judicial resources." *Goldberger*, 209 F.3d at 48-49 (holding that either the percentage-of-fund or lodestar method may be used to determine appropriate attorneys' fees); *Savoie v. Merchs. Bank*, 166 F.3d 456, 460 (2d Cir. 1999) (stating that the "percentage-of-the-fund method has been deemed a solution to certain problems that may arise when the lodestar method is used in common fund cases"). More recently, the Second Circuit has reiterated its approval of the percentage method, stating that it "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation," and has noted that the "trend in this Circuit is toward the percentage method." *Visa*, 396 F.3d at 121 (citations omitted); *see also Christine Asia Co.*, 2019 WL 5257534, at \*17; *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 343 F. Supp. 3d

394, 416 (S.D.N.Y. 2018).

Here, a percentage fee is warranted.

## VI.   THE REQUESTED ATTORNEYS' FEES ARE REASONABLE UNDER EITHER THE PERCENTAGE-OF-THE-FUND METHOD OR THE LODESTAR METHOD

### A.   The Requested Attorneys' Fees Are Reasonable Under the Percentage-of-the-Fund Method

The 25% attorney fee (net of expenses) requested by Lead Counsel is within the range of percentage fees that have been awarded in the Second Circuit in securities class actions and other similar litigation with comparable recoveries. *See, e.g.*, *Christine Asia Co.*, 2019 WL 5257534, at *17 (awarding 25% of $250 million settlement); *In re Pfizer Inc. Sec. Litig.*, No. 04- cv-09866 (LTS), ECF No. 727 at 2 (S.D.N.Y. Dec. 21, 2016) (awarding 28% of $486 million settlement) (Ex. 6); *In re Oxford Health Plans, Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 26795, at *13 (S.D.N.Y. June 12, 2003) (awarding 28% of $300 million settlement); *Anwar v. Fairfield Greenwich Ltd.*, 1:09-cv-00118, ECF Nos. 1099 at *2, 1233 at *2, 1457 at *11, and 1569 at *11 (S.D.N.Y. Mar. 28, 2013, Nov. 22, 2013, Nov. 20, 2015 and May 6, 2016) (awarding total fees of 28.8% on $235.25 million aggregate settlement) (Ex. 7); *Alaska Electrical Pension Fund v. Bank of America Corp.*, No. 14-CV-7126 (JMF), 2018 WL 6250657, at *1 (S.D.N.Y. Nov. 29, 2018) (awarding 26% of $486 million settlement); *In re Comverse Tech., Inc. Sec. Litig.*, No. 06-CV-1825 (NGG) (RER), 2010 WL 2653354, at *6 (E.D.N.Y. June 24, 2010) (awarding 25% of $225 million settlement).

The requested fee is also consistent with fee awards in similarly sized securities class actions in other circuits. *See, e.g.*, *In re Williams Sec. Litig.*, No. 02-cv-72-SPF, slip op. at 2 (N.D. Okla. Feb. 12, 2007), ECF No. 1638 (awarding 25% of $311 million settlement) (Ex. 8); *In re Genworth Fin. Inc. Sec. Litig.*, No. 3:14-cv-00682-JRS, 2016 WL 7187290, at *1-*2 (E.D. Va.

Sept. 26, 2016) (awarding 28% of $219 million settlement); *Schuh v. HCA Holdings Inc.*, No. 3:11-cv-01033, slip op. at 1 (M.D. Tenn. Apr. 14, 2016), ECF No. 563 (awarding 30% of $215 million settlement) (Ex. 9); *In re Merck & Co., Inc. Vytorin/Zetia Sec. Litig.*, No. 08-2177 (DMC)(JAD), 2013 WL 5505744, at *3, *46 (D.N.J. Oct. 1, 2013) (awarding 28% of $215 million settlement); *In re Wilmington Trust Sec. Litig.*, No. 10-cv-00990-ER, ECF No. 842 at 2 (D. Del. Nov. 19, 2018) (awarding 28% of $210 million settlement) (Ex. 10).

In sum, the fee requested here is well within the range of fees awarded on a percentage basis in comparable actions.

## B.   The Requested Attorneys' Fees Are Reasonable Under the Lodestar Method

To ensure the reasonableness of a fee awarded under the percentage-of-the-fund method, district courts may cross-check the proposed award against counsel's lodestar. *See Goldberger*, 209 F.3d at 50. Through June 9, 2020, Plaintiff's Counsel spent a total of 69,572.40 hours of attorney and other professional support time prosecuting the Action for the benefit of the Class. ¶ 240. Plaintiff's Counsel's total lodestar, derived by multiplying the hours spent by each attorney and paraprofessional (through June 9) by their current hourly rates, is $29,880,618.75.[3] *See id.* The requested fee of 25% of the $240 million Settlement Fund (net of expenses) equates to approximately $59,206,000, plus interest earned, and thus represents a multiplier of approximately 1.98 of the total lodestar.

In complex contingent litigation such as this Action, fees representing multiples above the lodestar are regularly awarded to reflect the contingency-fee risk and other relevant factors. *See*

---

[3] The Supreme Court and courts in this Circuit have approved the use of current hourly rates to calculate the base lodestar figure as a means of compensating for the delay in receiving payment, inflation, and the loss of interest. *See Missouri v. Jenkins*, 491 U.S. 274, 284 (1989); *In re Hi-Crush Partners L.P. Sec. Litig.*, 2014 WL 7323417, at *15 (S.D.N.Y. Dec. 19, 2014) ("the use of current rates to calculate the lodestar figure has been endorsed repeatedly by the Supreme Court, the Second Circuit and district courts within the Second Circuit as a means of accounting for the delay in payment inherent in class actions and for inflation").

*FLAG Telecom*, 2010 WL 4537550, at *26 ("a positive multiplier is typically applied to the lodestar in recognition of the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors"); *Comverse*, 2010 WL 2653354, at *5 ("Where, as here, counsel has litigated a complex case under a contingency fee arrangement, they are entitled to a fee in excess of the lodestar").

Lead Counsel asks for a 1.98 multiplier, which is within the range of multipliers commonly awarded in securities class actions and other comparable litigation. In complex litigation, lodestar multipliers between 2 and 5 are commonly awarded, and fee awards resulting in multipliers as high as 6 have also been approved. *See, e.g., Wal-Mart*, 396 F.3d at 123 (upholding multiplier of 3.5 as reasonable on appeal); *Christine Asia Co.*, 2019 WL 5257534, at *19 (approving $62.5 million fee based on lodestar multiplier of approximately 2.15, which the Court found to be "well within the range commonly awarded in securities class actions of this complexity and magnitude"); *NECAIBEW Health & Welfare Fund v. Goldman Sachs & Co.*, No. 08-cv-10783, 2016 WL 3369534 (S.D.N.Y. May 2, 2016) (3.9 multiplier); *Woburn Ret. Sys. v. Salix Pharm., Ltd.,* 2017 WL 3579892, at *6 (S.D.N.Y. Aug. 18, 2017) (3.14 multiplier); *In re Deutsche Telekom AG Sec. Litig.*, No. 00-CV-9475 (NRB), 2005 WL 7984326, at *4 (S.D.N.Y. June 14, 2005) (3.96 multiplier); *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002) (awarding fee equal to a 4.65 multiplier, which was "well within the range awarded by courts in this Circuit and courts throughout the country"); *In re Credit Default Swaps Antitrust Litig.*, No. 13-md-2476 (DLC), 2016 WL 2731524, at *17 (S.D.N.Y. Apr. 26, 2016) (multiplier of "just over 6"); *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587, 589-90 (E.D. Pa. 2005) (6.96 multiplier).

In sum, Lead Counsel's requested fee award is well within the range of what courts in this Circuit regularly award in class actions such as this one, whether calculated as a percentage of the

fund or in relation to Plaintiff's Counsel's lodestar. Moreover, as discussed below, each of the factors established for the review of attorneys' fee awards by the Second Circuit in *Goldberger* supports this Court's finding that the requested fee is reasonable.

## VII.  THE FEE REQUEST IS ENTITLED TO A PRESUMPTION OF REASONABLENESS BECAUSE IT IS BASED ON A FEE AGREEMENT ENTERED INTO WITH LEAD PLAINTIFF AT THE OUTSET OF THE LITIGATION

Because the requested fee is based on an agreement that Lead Counsel entered into with the sophisticated institutional Lead Plaintiff at the outset of the litigation, the fee is presumptively reasonable. *See In re Cendant Corp. Litig.*, 264 F.3d 201, 282 (3d Cir. 2001). The existence of the agreement and the approval of the requested fee by Lead Plaintiff, which was actively involved in the prosecution and settlement of the Action, supports approval of the fee. *See In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 133-34 (2d Cir. 2008).

The PSLRA was intended to encourage institutional investors like MissPERS to assume control of securities class actions in order to "increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel." H.R. Conf. Rep. No. 104-369, at *32 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 731. Congress believed that these institutions would be in the best position to monitor the ongoing prosecution of the litigation and assess the reasonableness of counsel's fee request.

A number of courts have treated fee arrangements between PSLRA lead plaintiffs and their counsel established at the outset of the litigation to be presumptively reasonable in light of Congress's intent to empower lead plaintiffs under the PSLRA to select and supervise attorneys on behalf of the class. *See Cendant*, 264 F.3d at 282 (*ex ante* fee agreements in securities class actions enjoy "a presumption of reasonableness"); *In re Marsh & McLennan Cos. Sec. Litig.*, 2009

WL 5178546, at *15 (S.D.N.Y. Dec. 23, 2009) ("Since the passage of the PSLRA, courts have found such an agreement between fully informed lead plaintiffs and their counsel to be presumptively reasonable"). The Second Circuit has indicated that the Court should, at least, give "serious consideration" to such agreements, *see Nortel*, 539 F.3d at 133-34. For example, the Second Circuit has stated that:

> We expect . . . that district courts will give serious consideration to negotiated fees because PSLRA lead plaintiffs often have a significant financial stake in the settlement, providing a powerful incentive to ensure that any fees resulting from that settlement are reasonable. In many cases, the agreed-upon fee will offer the best indication of a market rate, thus providing a good starting position for a district court's fee analysis.

*Id.*; *see also Comverse*, 2010 WL 2653354, at *4 ("an *ex ante* fee agreement is the best indication of the actual market value of counsel's services").

Here, Lead Plaintiff is a typical sophisticated and financially interested investor that Congress envisioned serving as fiduciary for the class when it enacted the PSLRA. Lead Plaintiff took an active role in the litigation and closely supervised the work of Lead Counsel. *See* Ray Decl. ¶¶ 5-7. Accordingly, this Court finds that the requested fee is reasonable. *See In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115808, at *8 (S.D.N.Y. Nov. 7, 2007) ("[P]ublic policy considerations support the award in this case because the Lead Plaintiff . . . —a large public pension fund—conscientiously supervised the work of lead counsel and has approved the fee request[.]").

## VIII.   OTHER FACTORS CONSIDERED BY COURTS IN THE SECOND CIRCUIT CONFIRM THAT THE REQUESTED FEE IS FAIR AND REASONABLE

The Second Circuit has set forth the following criteria that courts should consider when reviewing a request for attorneys' fees in a common fund case:

(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger*, 209 F.3d at 50 (internal quotes and citation omitted). These factors further demonstrate that the fee requested by Lead Counsel is reasonable.

### A.    The Time and Labor Expended Support the Requested Fee

The substantial time and effort expended by Plaintiff's Counsel in prosecuting the Action and achieving the Settlement support the requested fee. Lead Counsel dedicated significant efforts to prosecute and resolve Lead Plaintiff's claims. Among other things, Lead Counsel:

- conducted an extensive investigation into the claims asserted in the Action, which included a thorough review of public information such as SEC filings, research reports, investor call transcripts, press releases, news articles, and Signet's corporate website; consultation with experts; and contacts and interviews with numerous former Signet employees (¶¶ 28-30);

- researched and drafted three extensive amended complaints based on Lead Counsel's investigation (¶¶ 27, 37, 39, 46, 49);

- briefed a largely successful opposition to Defendants' motion to dismiss the Complaint (¶¶ 51, 54-56);

- engaged in extensive fact discovery efforts, which included serving requests for the production of documents and interrogatories on Defendants; serving 14 subpoenas on third parties; obtaining and analyzing approximately 3.6 million pages of documents produced by Defendants and third parties; producing nearly 200,000 pages of documents to Defendants; and taking, defending or participating in 31 depositions, including deposing two of the Company's former CEOs (Defendants Michael Barnes and Mark Light), Signet's current CEO (Defendant Virginia Drosos), two former Signet CFOs (Defendants Ronald Ristau and Michele Santana), the Chairman of Signet's Board of Directors, two former Signet COOs, several other senior Signet executives, multiple Declarants who submitted sworn declarations regarding alleged sexual harassment at Signet, and Signet's auditor (¶¶ 62-89);

- consulted extensively with experts concerning a host of complex issues central to the litigation, including loss causation and damages, accounting for loan loss reserves, retail loan underwriting, the sale of Signet's loan portfolio, and sexual harassment (¶¶ 29, 137-139, 144-146);

- engaged in extensive expert discovery, including working with Lead Plaintiff's experts in preparing six opening expert reports; analyzing nine reports from Defendants' experts in opposition to Lead Plaintiff's experts; and preparing five reply expert reports (¶¶ 137-146);

- fully briefed and obtained Class certification, which involved the exchange of detailed expert reports, the depositions of the Parties' experts, and the depositions of two MissPERS representatives (¶¶ 90-100);

- fully briefed and defeated Defendants' motion for judgment on the pleadings (¶¶ 101-109);

- fully briefed Defendants' Rule 23(f) Petition (¶¶ 147-150);

- engaged in extensive settlement negotiations with Defendants' Counsel, including the exchange of detailed mediation statements on liability and damages, followed by three full-day mediation sessions under the auspices of Judge Phillips (¶¶ 151- 155); and

- negotiated the final terms of the Settlement with Defendants and drafted, finalized, and filed the Stipulation and related documents with Lead Plaintiff's motion for preliminary approval of the Settlement (¶ 156).

As noted above, Plaintiff's Counsel expended nearly 70,000 hours prosecuting this Action through June 9, 2020, with a lodestar value of nearly $30 million. The time and effort devoted to this case by Plaintiff's Counsel was critical in obtaining the result achieved by the Settlement, and confirms that the fee request here is reasonable.

## B.     The Risks of Litigation Support the Requested Fee

The risk of the litigation is one of the most important *Goldberger* factors. *See Goldberger*, 209 F.3d at 54; *Comverse*, 2010 WL 2653354, at *5. The Second Circuit has recognized that the risks associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award:

> No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.

*Grinnell*, 495 F.2d at 470. "Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation." *Comverse*, 2010 WL 2653354, at *5 (citation omitted); *see also In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 433 (S.D.N.Y. 2001) (it is "appropriate to take this [contingent-fee] risk into account in determining the appropriate fee to award"). Here, this factor supports the requested fee.

As discussed at great length above in Part I(B)(4)-(6), Lead Plaintiff faced several substantial litigation risks including risks in proving liability and damages, as well as Defendants' potential inability to withstand a greater judgment. In the face of these many uncertainties regarding the outcome of the case, Lead Counsel undertook and prosecuted this case on a wholly contingent basis, knowing that the litigation could last for years and would require the devotion of a substantial amount of time and a significant expenditure of litigation expenses with no guarantee of compensation.

Lead Counsel's assumption of this risk strongly supports the reasonableness of the requested fee. *See FLAG Telecom*, 2010 WL 4537550, at *27 ("Courts in the Second Circuit have recognized that the risk associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award."); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 148 (S.D.N.Y. 2010) ("There was significant risk of non-payment in this case, and Plaintiffs' Counsel should be rewarded for having borne and successfully overcome that risk.").

### C.     The Magnitude and Complexity of the Action Support the Requested Fee

The magnitude and complexity of this Action also support the requested fee. Courts have recognized that securities class action litigation is "notably difficult and notoriously uncertain." *FLAG Telecom*, 2010 WL 4537550, at \*27. This case was no exception. This case involved two unrelated sets of alleged misrepresentations, which were made over a nearly four-year class period by multiple sets of CEOs and CFOs, six different total and partial corrective disclosures, and a set of claims (relating to sexual harassment) that raised novel issues.

As noted above, the litigation raised a number of difficult and hotly contested questions concerning class certification, liability, loss causation, and damages. Proving the claims at trial would have turned on percipient and expert testimony on myriad complicated issues. To build the case, Lead Counsel had to dedicate a substantial amount of time to understanding these complex matters, conducting an extensive factual investigation, obtaining significant discovery, and working extensively with experts to analyze the claims and the evidence obtained. The fact that the parties exchanged 20 expert reports by 15 different experts speaks to the breadth and complexity of the case. Accordingly, the magnitude and complexity of the Action support the conclusion that the requested fee is fair and reasonable.

### D.     The Quality of Lead Counsel's Representation Supports the Requested Fee

The quality of the representation by Lead Counsel is another important factor that supports the reasonableness of the requested fee in this case. The quality of its representation is evidenced by the quality of the result achieved. *See, e.g.*, *Veeco*, 2007 WL 4115808, at \*7. Here, as discussed above and in the Rizio-Hamilton Declaration, the Settlement provides a very favorable result for the Class considering the serious risks of continued litigation and represents a substantial portion of likely recoverable damages. *See* ¶¶ 212-215.

Further, Lead Counsel faced talented adversaries in this Action. Courts have recognized that the quality of the opposition should also be taken into consideration in assessing the quality of the counsel's performance. *See, e.g.*, *Veeco*, 2007 WL 4115808, at *7 (among factors supporting 30% award of attorneys' fees was that defendants were represented by "one of the country's largest law firms"); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006) ("The fact that the settlements were obtained from defendants represented by 'formidable opposing counsel from some of the best defense firms in the country' also evidences the high quality of lead counsels' work") (citation omitted), *aff'd*, 272 F. App'x 9 (2d Cir. 2008). Here, Defendants were represented by able counsel from Weil, Gotshal & Manges LLP, who zealously represented their clients throughout this Action. *See* ¶ 243. Notwithstanding this capable opposition, Lead Counsel's litigation efforts and ability to present a strong case enabled it to achieve the Settlement for the benefit of the Class.

**E.    The Quality of Lead Counsel's Representation Supports the Requested Fee**

Courts have interpreted this factor as requiring the review of the fee request in terms of the percentage it represents of the total recovery. "When determining whether a fee request is reasonable in relation to a settlement amount, 'the court compares the fee application to fees awarded in similar securities class-action settlements of comparable value.'" *Comverse*, 2010 WL 2653354, at *3 (citation omitted). As discussed in detail in Part VI above, the requested fee is well within the range of fees that courts in the Second Circuit have awarded in comparable cases on both a percentage basis and lodestar multiplier basis.

**F.    Public Policy Considerations Support the Requested Fee**

A strong public policy concern exists for rewarding firms for bringing successful securities litigation. *See FLAG Telecom*, 2010 WL 4537550, at *29 (if the "important public policy [of

enforcing the securities laws] is to be carried out, the courts should award fees which will adequately compensate Lead Counsel for the value of their efforts, taking into account the enormous risks they undertook"); *Maley v. Del Glob. Tech. Corp.*, 186 F. Supp. 2d 358, 373 (S.D.N.Y. 2002) ("In considering an award of attorney's fees, the public policy of vigorously enforcing the federal securities laws must be considered."). Accordingly, public policy favors granting Lead Counsel's fee and expense application here.

### G.    The Reaction of the Class Supports the Requested Fee

The reaction of the Class also supports the requested fee. As explained in detail in Part I(B)(2)(a) above, JND has mailed 207,520 copies of the Notice Packet were mailed to potential Class Members and their nominees and the Summary Notice was published in the Wall Street Journal and released over the PR Newswire on May 13, 2020. *See* Declaration of Luiggy Segura Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date (ECF No. 258-2) at ¶ 8. The Notice advised Class Members that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund, net of expenses, and payment of Litigation Expenses in an amount not to exceed $4,000,000. *See* Notice ¶¶ 5, 76. The Notice also apprised Class Members of their right to object to the request for attorneys' fees and expenses; their right to exclude themselves from the Class; and the June 30, 2020 deadline for filing objections and for receipt of requests for exclusion. *See* Notice at p. 3 and ¶¶ 77, 83. As noted above, the June 30, 2020 deadline has passed and there have been no objections to Lead Counsel's application for attorneys' fees and Litigation Expenses.

The absence of any objections to the requested attorneys' fees and Litigation Expenses supports a finding that the request is fair and reasonable. *See, e.g.*, *Vaccaro v. New Source Energy*

*Partners L.P.*, 2017 WL 6398636, at *8 (S.D.N.Y. Dec. 14, 2017) ("The fact that no class members have explicitly objected to these attorneys' fees supports their award."); *Asare v. Change Grp. of New York, Inc.*, 2013 WL 6144764, at *16 (S.D.N.Y. Nov. 18, 2013) ("not one potential class member has made an objection, a factor held by courts as supporting approval of an attorneys' fees award"); *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115808, at *10 (S.D.N.Y. Nov. 7, 2007) (the reaction of class members to a fee and expense request "is entitled to great weight by the Court" and the absence of any objection "suggests that the fee request is fair and reasonable").

As with approval of the Settlement, the lack of objections by institutional investors is notable, and lends further support to approval of the fee request. *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005) (fact that "a significant number of investors in the class were 'sophisticated' institutional investors that had considerable financial incentive to object had they believed the requested fees were excessive" and did not do so, supported approval of the fee request); *In re Bisys Sec. Litig.*, 2007 WL 2049726, at *1 (S.D.N.Y. July 16, 2007) (noting that only one individual raised any objection, "even though the class included numerous institutional investors who presumably had the means, the motive, and the sophistication to raise objections if they thought the [requested] fee was excessive"). Accordingly, the favorable reaction of the Class supports this Court's approval of the fee request.

## IX.   PLAINTIFF'S COUNSEL'S EXPENSES ARE REASONABLE AND WERE NECESSARILY INCURRED TO ACHIEVE THE BENEFIT OBTAINED

Lead Counsel's fee application includes a request for payment of the expenses incurred by Plaintiff's Counsel. *See* ¶¶ 252-259. The request is reasonable in amount and was necessary to the prosecution of the Action. These expenses are properly recovered by counsel. *See Facebook IPO*, 343 F. Supp. 3d at 418 (in a class action, attorneys should be compensated "for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were incidental

and necessary to the representation") (citation omitted); *FLAG Telecom*, 2010 WL 4537550, at
*30 ("It is well accepted that counsel who create a common fund are entitled to the reimbursement
of expenses that they advanced to a class").

Plaintiff's Counsel incurred $3,149,815.55 in expenses in connection with the prosecution
and settlement of the Action. ¶ 252. These expenses were incurred as a result of Plaintiff's
Counsel's vigorous pursuit of claims for Lead Plaintiff and the Class through more two and a half
years of litigation, which required a significant amount of discovery and extensive work with
experts. The expenses for which payment is sought are the types of expenses that are necessarily
incurred in litigation and routinely charged to clients. These expenses include, among others,
expert fees, deposition costs, on-line legal and factual research, document management and
hosting, mediation fees, travel costs, and photocopying expenses.

The largest expense, by far, is for retention of Lead Plaintiff's experts, in the amount of
$2,004,360.72, or approximately 64% of Plaintiffs' Counsel total expenses. ¶ 255. As discussed
in the Rizio-Hamilton Declaration, Lead Counsel consulted extensively with experts in the fields
of loss causation and damages, workplace sexual harassment, financial economics, accounting,
and retail consumer lending, among others. Each of the experts retained was instrumental in Lead
Counsel's prosecution of the Action and in bringing about the outstanding result achieved.

Another significant expense was document management/litigation costs – including
charges for hosting and processing the approximately 3.6 million pages of documents received in
discovery – which total $442,528.65, or approximately 14% of the total expenses. ¶ 256. Charges
for online legal and factual research amount to $133,711.52, or approximately 4% of the total
expenses. ¶ 257.

The Notice informed potential Class Members that Lead Counsel would apply for payment

of Litigation Expenses in an amount not to exceed $4,000,000, which might include the reasonable

costs and expenses of Lead Plaintiff directly related to its representation of the Class. The total

amount of Litigation Expenses requested is $3,175,225.55, which includes $3,149,815.55 for

expenses incurred by Lead Counsel and $25,410.00 in reimbursement of costs and expenses

incurred by Lead Plaintiff. This amount is well below the amount listed in the Notice, and no one

has lodged an objection to this request. This favorable reaction of the Class supports approval of

the expense request.

## X.   LEAD PLAINTIFF SHOULD BE AWARDED ITS REASONABLE COSTS AND EXPENSES UNDER THE PSLRA

In connection with its request for Litigation Expenses, Lead Counsel also seeks

reimbursement of a total of $25,410.00 in costs and expenses incurred by Lead Plaintiff MissPERS

directly related to its representation of the Class.

The PSLRA provides that an "award of reasonable costs and expenses (including lost

wages) directly relating to the representation of the class" may be made to "any representative

party serving on behalf of a class." 15 U.S.C. § 78u4(a)(4). "Courts in this Circuit routinely award

such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their

involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs

to remain involved in the litigation and to incur such expenses in the first place." *Christine Asia

Co.*, 2019 WL 5257534, at *20 (citations and internal quotations omitted).

MissPERS seeks reimbursement of $25,410.00 based on a conservative estimate of the

amount of time expended in connection with the Action by attorneys of the Office of the Attorney

General of the State of Mississippi (the "OAG"), which serves as legal counsel to MissPERS.

Among other things, the OAG attorneys spent a substantial amount of time:

42

- communicating with Lead Counsel;

- reviewing and commenting on pleadings and motion papers filed in the Action;

- gathering and producing documents in response to discovery requests;

- preparing for depositions and being deposed in New York City;

- preparing for, traveling to, and attending the mediation sessions in New York City before Judge Phillips; and

- evaluating and approving the proposed Settlement.

*See* Ray Decl. ¶¶ 5-6.

The amount requested by MissPERS is based on hourly rates for the OAG attorneys that are the same as (or similar to) the rates that have been accepted by courts throughout the country when MissPERS requested reimbursement of its attorney time. *See, e.g.*, *La. Mun. Police Emps. Ret. Sys. v. Green Mountain Coffee Roasters, Inc.*, 2:11-cv-00289 (WKS), slip op. at 4 (D. Vt. Oct. 22, 2018), ECF No. 349 (granting MissPERS a PSLRA award of $38,175.00 calculated using hourly rates of OAG personnel ranging from $225 per hour to $300 per hour) (Ex. 11); *see also* ECF No. 344-5; *Bach v. Amedisys, Inc.*, No. 1:10-cv-00395-BAJ-RLB, slip op. at 3 (M.D. La. Dec. 19, 2017), ECF No. 354 (granting MissPERS a PSLRA award of $43,937.50 based on hourly rates of OAG personnel ranging from $225 per hour to $275 per hour) (Ex. 12); *see also* ECF No. 343-1.

Numerous courts have approved reasonable awards to compensate lead plaintiffs for the time their employees have spent supervising and participating in the litigation on behalf of the class. For example, in *Marsh & McLennan*, this Court awarded $144,657 to the New Jersey Attorney General's Office and $70,000 to certain Ohio pension funds, to compensate them "for their reasonable costs and expenses incurred in managing this litigation and representing the

Class." 2009 WL 5178546, at *21. Their efforts in communicating with lead counsel, reviewing submissions to the court, responding to discovery requests, providing deposition testimony and participating in settlement discussions were "precisely the types of activities that support awarding reimbursement of expenses to class representatives." *Id.*; *see also In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 772 F.3d 125, 133 (2d Cir. 2014) (affirming award of over $450,000 to representative plaintiffs for time spent by their employees on the action); *FLAG Telecom*, 2010 WL 4537550, at *31 (approving award of $100,000 to Lead Plaintiff for time spent on the litigation); *Veeco*, 2007 WL 4115808, at *12 (awarding institutional lead plaintiff $15,900 for time spent supervising litigation); *Christine Asia Co.*, 2019 WL 5257534, at *20 (granting PSLRA awards to each of the five lead plaintiffs for their "substantial time and effort [devoted] to prosecuting [the] action, including preparing for and being deposed by Defendants, reviewing pleadings and briefs, assisting with discovery responses, collecting documents for production, and evaluating and approving the settlement"); *Guevoura Fund Ltd. v. Robert F.X. Sillerman, et al.*, No. 1:15-cv-07192-CM, 2019 WL 6889901, at *23 (S.D.N.Y. Dec. 18, 2019) (granting PSLRA award to lead plaintiff and noting that "time spent by the lead plaintiff/class representative in managing the case is properly reimbursable from the settlement amount recovered").

This Court approves MissPERS's reimbursement of costs and expenses.

## CONCLUSION

For the foregoing reasons, the proposed Settlement and Plan of Allocation are APPROVED as fair, reasonable, and adequate.

Additionally, this Court awards: attorneys' fees in the amount of 25% of the Settlement Fund, net of Litigation Expenses; award $3,149,815.55 for the reasonable expenses incurred by Plaintiff's Counsel in connection with the prosecution and settlement of the Action; and award $25,410.00 in reimbursement of Lead Plaintiff's costs and expenses, as authorized by the PSLRA.

Lastly, as noted above, all elevens requests for exclusion from the Class are GRANTED.

Dated:  July 21, 2020

_____

Chief Judge

BY ECF TO ALL PARTIES